1  SPECTOR ROSEMAN KODROFF & WILLS, PC
   Jeffrey L. Kodroff, Esq.
2  1818 Market St., Ste. 2500
   Philadelphia, PA  19103
3  Tel. 215-496-0300
   Fax. 215-496-6611
4
   COHEN MILSTEIN SELLERS & TOLL PLLC
5  Daniel A. Small, Esq.
   1100 New York Avenue, NW, Suite 500W
6  Washington, DC 20005
   Tel. 202-408-4600
7  Fax. 202-408-4699
8  *Plaintiff Co-Lead Counsel*
9  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   Elizabeth J. Cabraser, Esq. (SBN: 083151)
10 275 Battery Street, 29th Floor
   San Francisco, CA 94111-3339
11 Tel. 415-956-1000
   Fax. 415-956-1008
12
   *Plaintiffs' Liaison Counsel*
13

14                 UNITED STATES DISTRICT COURT

15               NORTHERN DISTRICT OF CALIFORNIA

16                     SAN JOSE DIVISION

17

18 IN RE: GOOGLE, INC. STREET VIEW          Case No. 5:10-md-02184 JW (HRL)
   ELECTRONIC COMMUNICATIONS
19 LITIGATION                               **PLAINTIFFS' SUPPLEMENTAL
                                            BRIEFING**
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................ 1

I.   Under the Wiretap Act, "Radio Communications" Are Radio Broadcasts............. 1

    A.   Congress's Purpose in Enacting the Wiretap Act, and the Act's
Plain Language, Confirm that Congress Used "Radio
Communication" To Refer to Radio Broadcasts........................................ 2

    B.   The Text of the Wiretap Act Shows that Congress Used "Radio
Communication" To Refer to Radio Broadcasts........................................ 5

    C.   Legislative History of the Wiretap Act Confirms that Congress
Used "Radio Communication" To Refer to Radio Broadcasts. ................. 7

        1.   These Communications Have Always Been Protected. ................. 7

        2.   The 1994 Amendments Further Demonstrate That The Class
Members" Communications Are Protected. ................................. 8

    D.   Google's Interpretation Would Lead to Unexpected, Unpredictable,
and Arbitrary Results. ............................................................................ 13

II.   Under the Wiretap Act, Wireless Home Internet Networks Are Not "Radio
Communications" But Instead Are Electronic Communications Made, In
Part, By Radio. .................................................................................................. 15

III.   Under The Wiretap Act, Cellular Telephone Calls Are Protected As "Wire
Communications." .............................................................................................. 19

Conclusion ................................................................................................................ 20

1

## TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4

*Del Campo v. Am. Corrective Counseling Serv., Inc.*,
5
    718 F. Supp. 2d 1116 (N.D. Cal. 2010) ................................................................................. 1

6
*DIRECTV, Inc. v. Barczewski*,
    604 F.3d 1004 (7th Cir. 2010) ........................................................................................... 5

7
*Enockson v. State of Iowa Third Judicial District Juvenile Court Servs.*,
8
    No. 97-civ-4095-MWB, 1999 WL 33656965 (N.D. Ia. Aug. 17, 1999) ..................................... 5

9
*Ex Parte Angel Janevski*,
    APL 2009-0671, 2009 WL 416502 (Bd. Pat. App. & Interf. Feb. 18, 2009) ........................... 13

10
*Facebook v. Power Ventures, Inc*.,
11
    2010 WL 3291750 (N.D. Cal. July 20, 2010) ................................................................... 2, 7

12
*FDIC v. Meyer*,
    510 U.S. 471 (1994) ...................................................................................................... 2, 16

13
*Gonzales v. Google*,
14
    234 F.R.D. 674 (N.D. Cal. 2006) ................................................................................... 16, 17

15
*In re Pharmatrak, Inc.*,
    329 F.3d 9 (1st Cir. 2003) ................................................................................................... 3

16
*In re U.S. for an Order Authorizing Roving Interception of Oral Communications*,
17
    349 F.3d 1132 (9th Cir. 2003) ........................................................................................... 19

18
*K-Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988) ........................................................................................................... 2

19
*Konop v. Hawaiian Airlines, Inc.*,
20
    302 F.3d 868 (9th Cir. 2002) ............................................................................................. 15

21
*Multiven, Inc. v. Cisco Systems, Inc.*,
    725 F.Supp.2d 887 (N.D. Cal. July 20, 2010) ..................................................................... 2

22
*Price v. Turner*,
23
    260 F.3d 1144 (9th Cir. 2001) ....................................................................................... 10, 13

24
*S.D. Warren Co. v. Me. Bd. Of Envtl. Prot.*,
    547 U.S. 370 (2006) ...................................................................................................... 2, 16

25
*SEC v. McCarthy*,
26
    322 F.3d 650 (9th Cir. 2003) ............................................................................................... 7

27
*U.S. v. Daas*,
    198 F.3d 1167 (9th Cir. 1999) ............................................................................................. 2

28

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. First City Nat'l Bank of Houston,*
   386 U.S. 361 (1967) ........................................................................................... 1

*United States v. Lande,*
   968 F.2d 907 (9th Cir. Mont. 1992) .................................................................. 17

*United States v. Warshak,*
   631 F.3d 266 (6th Cir. 2010) ...................................................................... 16, 17

**STATUTES**

18 U.S.C. § 2501(18) ...................................................................................... 19

18 U.S.C. § 2510(1) ........................................................................................ 19

18 U.S.C. § 2510(12) ............................................................................... 3, 6, 15

18 U.S.C. § 2510(16) ................................................................................ passim

18 U.S.C. § 2510(16)(A) ................................................................................. 11

18 U.S.C. § 2510, *et seq.* ................................................................................. 9

18 U.S.C. § 2511(1)(b)(ii) ................................................................................. 6

18 U.S.C. § 2511(2)(b) ...................................................................................... 6

18 U.S.C. § 2511(2)(g)(i) .......................................................................... 1, 2, 16

18 U.S.C. § 2511(2)(g)(ii) .............................................................................. 5, 6

18 U.S.C. § 2511(2)(g)(v) .............................................................................. 5, 6

18 U.S.C. § 2511(5)(B) ................................................................................. 5, 6

18 U.S.C. § 2520(c)(1) ...................................................................................... 5

47 U.S.C. § 153 ................................................................................................ 2

Cal. Penal Code § 629.50 *et seq* ....................................................................... 8

Mo. Code § 542.401, *et seq.* ............................................................................ 8

Tex. Civ. Prac. & Rem. § 123.001, *et seq.* ...................................................... 8

**TREATISES**

Burr, J. Beckwith, *The Electronic Communications Privacy Act of 1986: Principles for Reform,*
   http://www.digitaldueprocess.org/files/DDP_Burr_Memo.pdf. ................................. 14

Daniel Kamitaki, *Beyond E-Mail: Threats to Network Security and Privileged Information for the modern Law Firm,*
   15 S. Cal. Interdisc. L.J. 307 (2006) .............................................................. 11

1

## TABLE OF AUTHORITIES
### (continued)

2
Page

3   James Ridge, Comment, *What Happens When Everything Becomes Connected: The Impact on Privacy When Technology Becomes Pervasive,*
4   49 S. Tex. L. Rev. 725 (2008)............................................................................... 11

5   Kimberly S. Cuccia, Note, *Have You Seen My Inbox? Government Oversteps the Fourth Amendment Again: Goodbye Telephones, Hello E-Mail,*
6   43 Val. U.L. Rev. 671 (2009) ............................................................................... 18

7   Trenton C. Haas, *Carnivore and the Fourth Amendment,*
    34 Conn. L. Rev. 261 (2001) ............................................................................... 17

8
## REGULATIONS

9
47 C.F.R. §§ 74.401 *et seq.* ............................................................................... 5

10
## CONSTITUTIONAL PROVISIONS

11  132 Cong. Rec. H4039-01,
    1986 WL 776505 ............................................................................... 17
12
    132 Cong. Rec. S14451
13  (daily ed. Oct. 1, 1986) ............................................................................... 17

14  CALEA, Pub. L. No. 103-414,
    108 Stat. 4279 (1994)............................................................................... 9
15
    Electronic Communications Privacy Act of 1986,
16  S. Rep. No. 541, 99th Cong. 2nd Sess. (1986)............................................................................... 8, 10

17  H.R. Conf. Rep. 104-518 (1996)............................................................................... 12

18  H.R. Rep. No. 103-827 (1994)............................................................................... 9, 10

19  Omnibus Crime Control and Safe Streets Act of 1968,
    S. Rep. No. 1097, 90th Cong. 2nd Sess. (1968) ............................................................................... 7
20
    Pub. L. No. 14-132
21  § 731(2) (1996) ............................................................................... 12

22  S. Rep. No. 103-402 (1994) ............................................................................... 9, 10

23

24

25

26

27

28

1

**Introduction**

2     This brief is respectfully submitted by Plaintiffs in response to this Court's Order

3   Requesting Supplemental Briefing to address:

4     **I.  What does "radio communication" mean within the purview of the Wiretap Act?**

5     **Answer:**  As used in the Wiretap Act, "radio communications" are radio *broadcasts* as
       commonly understood, such as AM/FM radios, CB's etc.; Congress did not use that term
6      to mean private communications transmitted, however briefly via radio waves.

7     **II.  Are wireless home Internet networks "radio communications" within the
       purview of the Wiretap Act's usage of that term?**

8
       **Answer:**  Wireless home Internet networks are not radio broadcasts and, therefore, are not
9      "radio communications" for purposes of the Wiretap Act; instead, they are electronic
       communications made, in (small) part, via radio waves, which the Wiretap Act treats
10     differently from "radio communications."

11    **III.  Are cellular telephone calls "radio communications" as intended by Congress
       when drafting the Wiretap Act and, if so, does such technology properly fit within
12     any of the five enumerated exceptions to the definition of "readily accessible to the
       general public" as outlined in Section 2510(16)?**

13
       **Answer**: Cellular telephone calls are not "radio communications"; they are protected
14     "wire communications" under the Wiretap Act even though they transmit in part on radio
       waves. Thus the exceptions enumerated in § 2510(16) do not apply.

15

16   **I.     Under the Wiretap Act, "Radio Communications" Are Radio Broadcasts.**

17          The Wiretap Act does not authorize the intentional interception of the class members'

18   private electronic communications, nor can it be read to have such a result.  Google contends that

19   private electronic communications, including personal e-mails, are "radio communications" that

20   are "readily accessible to the general public," pursuant to 18 U.S.C. § 2511(2)(g)(i) and

21   § 2510(16), and thus excepted from the Wiretap Act's protection. Google, however, cannot carry

22   this burden.  *See United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967)

23   ("the general rule where one claims the benefits of an exception to the prohibition of a statute" is

24   that party bears the burden of proof); *Del Campo v. Am. Corrective Counseling Serv., Inc.*, 718 F.

25   Supp. 2d 1116, 1133 (N.D. Cal. 2010) ("The burden of proving a statutory exception falls on the

26   party seeking to reap the benefit of the exception." (Citation omitted)).  The Wiretap Act's

27   purpose, plain language, legislative history, and amendments reveal that all Internet

28   communications, even those that are transmitted in a small way by Wi-Fi systems, are not "radio

communications" as that term is used in the Wiretap Act, but are rather electronic

communications.  Thus, because the definition of "readily accessible to the general public"

contained in §2510(16) only applies to radio communications, §2510(16) cannot apply in

determining whether these electronic communications are exempted from the Act. Rather,

"readily accessible to the general public" under §2511(2)(g)(i) must be read by the ordinary

meaning of that phrase.  *See S.D. Warren Co. v. Me. Bd. Of Envtl. Prot.*, 547 U.S. 370, -- (2006);

*FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

### A.   Congress's Purpose in Enacting the Wiretap Act, and the Act's Plain Language, Confirm that Congress Used "Radio Communication" To Refer to Radio Broadcasts.

The term at the heart of Google's defense, "radio communications," is not defined in the

Wiretap Act.[1]  Thus, the first step in ascertaining congressional intent is to, "… look to the plain

language of the statute.  To determine the plain meaning of a particular statutory provision, and

thus congressional intent, the court looks to the entire statutory scheme.  If the statute uses a term

which it does not define, the court gives that term its ordinary meaning."  *U.S. v. Daas*, 198 F.3d

1167, 1174 (9th Cir. 1999).  As this Court has explained, "unless otherwise defined, statutory

words will be interpreted as taking their ordinary, contemporary, common meaning."  *Multiven,*

*Inc. v. Cisco Systems, Inc.*, 725 F.Supp.2d 887, 892 (N.D. Cal. July 20, 2010).  Additionally, "the

structure and purpose of a statute can provide guidance in determining the plain meaning of its

provisions."  *Facebook v. Power Ventures, Inc.*, 2010 WL 3291750, at * 6 (N.D. Cal. July 20,

2010) (*citing K-Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)).

Looking to the plain language of the statute,  there can be no question that the Wiretap Act

was intended to protect private electronic communications such as e-mails - not to authorize the

intentional interception and use of private communications sent from or received in one's own

home.  The Act's very title - the Electronic Communication Privacy Act - establishes this intent.

It is well settled that, "[t]he paramount purpose of the Wiretap Act is to protect effectively the

---

[1] There is a definition of "radio communication" employed in the statute creating the Federal Communication Commission ("FCC"), but that definition is not helpful here because the purposes of the two statutes are different, the FCC does not regulate the transmissions at issue in this case, and, in fact, another key term "wire communication" is defined materially differently in the two Acts.  47 U.S.C. § 153.

- 2 -

1    privacy of communications." *In re Pharmatrak, Inc.,* 329 F.3d 9, 18 (1st Cir. 2003).

2           At the time the Wiretap Act was originally passed in 1968, the types of radio

3    communications "readily accessible to the general public" included radio broadcasts such as

4    AM/FM radio, citizen's band (CB), general mobile radio service, family radio service, multi-use

5    radio service, amateur (ham) radio and police and fire bands.[2]  These radio communications could

6    all be easily intercepted by handheld scanners, like those sold at Radio Shack, by simply tuning to

7    the right frequency.  Unlike these traditional radios, there is no small handheld scanner or other

8    device sold at consumer electronics, computer, or telecommunications outlets, such as Radio

9    Shack, the Apple store, or Metro PCS, that can be purchased to intercept and read wireless

10   network electronic communications, including personal emails, that are not specifically addressed

11   to the purchaser as recipient.  But interception is only the first complication.  Unlike traditional

12   radio communications, once the data contained in electronic communications is intercepted, it

13   must also then be decoded and deciphered by using very complex technology.  Thus, electronic

14   communications sent over wireless routers in a private home are not what the drafters of the

15   Wiretap Act intended to be radio communications readily accessible to the public.

16          Furthermore, the mere fact that, for instance, a personal e-mail was sent over a Wi-Fi

17   network extending only a few feet in the class members' homes **does not** transform it into a

18   "radio communication" broadcast and thus one that may be freely intercepted and used.  There is

19   no support in the plain language of the Wiretap Act for this construction.  To the contrary, the

20   very definition of "electronic communication," makes clear that communications should be

21   looked at as a whole - and not divided into separate segments with differing levels of protection.

22   Specifically, electronic communications are defined to include "any transfer of signs, signals,

23   writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a

24   wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or

25   foreign commerce."  18 U.S.C. § 2510(12).

26   _____

27   [2] The 802.11a standard, the first WiFi standard, was not even published by IEEE (the governing
     body for this standard) until 1999.  In fact, its formal name is 802.11a-1999.  *See* Interpretations
28   for IEEE std 802.11a -1999, published November, 2008 by the Institute of Electrical and
     Electronic Engineers Inc.

1       Thus, the class members' communications -- which, for instance, may have started on a

2 computer, been transmitted over a wire to the router of the recipient and then briefly sent across

3 the living room from the recipient's router to her laptop -- are "electronic communications."

4 These communications were predominantly sent by wire and in part sent on radio waves, and thus

5 fall squarely under the "electronic communications" definition.  The fact that either the first or

6 final few feet of the electronic communication may have gone via wireless transmission ("Wi-

7 Fi") does not transform the communication into a "radio communication" broadcast similar to an

8 AM/FM radio or a CB.[3]  Nor is there anything in the statute to define "radio communications" as

9 synonymous with anything sent on a radio wave, however briefly and without regard to the

10 entirety of the communication system at use.

11       Likewise, while dictionaries do not define the term "radio communication," the term

12 "communication" is defined in ways supporting a holistic assessment of the communication.  As

13 commonly and ordinarily understood, "communications" include the entire process from sending

14 through transmittal and receipt - not parsed out tiny segments along the way as Google would

15 argue.  For example, Black's Law Dictionary defines communication as, "The expression or

16 exchange of information…; **the process of bringing an idea to another's**

17 **perception**."(Emphasis added).  Google's own online dictionary defines "communication" as

18 "[t]he imparting or exchanging of information or news" and "[t]he successful conveying or

19 sharing of ideas and feelings."[4]  Likewise, the Miriam-Webster Dictionary definition of

20 communication includes, "a process by which information is exchanged between individuals

21 through a common system of symbols, signs or behavior."

22       Thus, determining whether a communication was a "radio communication" requires

23 considering the entirety of the communication process and the systems through which it was

24 transmitted.  To qualify as a "radio communication," a communication would require much more

25 than simply having been briefly sent on a radio wave in an individual's home.

26 

27 [3] It would be an absurd interpretation of a privacy law to hold that a personal e-mail containing
highly private information, such as medical information is not protected from being stolen simply

28 because, unknown to anyone else, one person on an e-mail string happens to use a wireless router.
[4] http://www.google.com/dictionary?langpair=en%7Cen&q=communication&hl=en&aq=f.

**B.**   **The Text of the Wiretap Act Shows that Congress Used "Radio Communication" To Refer to Radio Broadcasts.**

The term "radio communication" is not frequently used in the Wiretap Act.  In addition to § 2510(16), which contains the definition of "readily accessible to the general public" as that phrase applies to a "radio communication" (and on which Google's motion to dismiss depends), the term appears only four other times.  It appears in § 2511(2)(g)(ii), which is an express exception for the interception of certain "radio communication[s]," including those "readily accessible to the general public."  *Id.* § 2511(2)(g)(ii)(II).  It appears in § 2511(2)(g)(v), which creates an exception that allows authorized users of a shared system to intercept a "radio communication" made over that system that is "not scrambled or encrypted."[5]  And it appears in §§ 2511(5)(B) and 2520(c)(1), which both create special rules for certain interceptions of "radio communication[s]" by remote news crews that are "not scrambled or encrypted."[6, 7]

In these exceptions to the prohibition on interception, each substantive use of the term "radio communication" refers to radio broadcasts and not communications that are intended to be private as is the case with e-mails exchanged not scrambled or encrypted between a sender and a receiver.  For example, § 2511(2)(g)(ii) includes radio communications transmitted by stations "for the use of the general public," by the government (including "police and fire" and "public safety communications systems"), "citizens band" and other "amateur" or ham radio broadcasts, and "marine and aeronautical communications systems" used to broadcast information to and from ships and planes.[8]  Similarly, § 2511(2)(g)(v) applies to systems that use radio frequencies that are "monitored by" the other users and the providers of the system.  Likewise, §§ 2511(5)(B) and 2520(c)(1) address the transmission of news broadcasts from field reporters back to their

---

[5] *See also Enockson v. State of Iowa Third Judicial District Juvenile Court Servs.*, No. 97-civ-4095-MWB, 1999 WL 33656965, at *9 (N.D. Ia. Aug. 17, 1999).

[6] These provisions apply to "a radio communication that is transmitted on frequencies allocated under subpart D of part 74" of the FCC's rules.  18 U.S.C. § 2511(5)(B).  That subpart applies to "remote pickup broadcast stations," 47 C.F.R. §§ 74.401 *et seq.*, which are used by broadcasting stations to receive news reports from the field.

[7] By contrast, nothing in the Wiretap Act provides or suggests that communications intended to be private must be "scrambled or encrypted" to maintain such privacy.

[8] *See, e.g., DIRECTV, Inc. v. Barczewski*, 604 F.3d 1004, 1006 (7th Cir. 2010).

1    radio or television stations, which are then, in turn, broadcast to the public.

2           Moreover, Congress informed broadcasters using these radio communication systems how

3    to protect their broadcasts if they want to limit reception of their communications to a particular

4    group – *e.g.* subscribers or others. Thus, § 2511(2)(g)(v) only makes it lawful to intercept a radio

5    communication made over a shared system if such a radio communication is "not scrambled or

6    encrypted." Similarly, the special rules for remote news reports apply only if the radio

7    communication is "not scrambled or encrypted." *E.g.*, *id.* § 2511(5)(B). More generally,

8    Congress provided that a "radio communication" is not readily accessible to the general public if

9    the sender takes actions to limit access to that communication, such as by "scrambl[ing] or

10   encrypt[ing]" the communication or sending it using methods "withheld from the public" in order

11   to "preserv[e] the privacy" of the communication. *Id.* § 2510(16). Thus, the statute provides a

12   roadmap for the government and other radio broadcasters to transmit their radio communications

13   — which can be listened to without liability if they are "readily accessible to the general public,"

14   *id.* § 2511(2)(g)(ii)(II) — securely and under protection of the Wiretap Act.

15          While Congress thus used the term "radio communication" to refer specifically to radio

16   broadcasts, it used a different phrase, "communication by radio" — or variants of that phrase —

17   when it wanted to address non-broadcast transmissions. For example, Congress defined

18   "electronic communication," which is expressly protected under the act, to include any

19   communication "transmitted in whole or in part by . . . radio." *Id.* § 2510(12). Furthermore,

20   Congress made it unlawful to use a "device to intercept any oral communication," which is also

21   expressly protected under the Act, if the "device transmits communications by radio" — that is, if

22   it relays the intercepted communication to the eavesdropper by radio. *Id.* § 2511(1)(b)(ii). And

23   Congress authorized employees of the FCC, in carrying out their official duties, "to intercept . . .

24   [an] oral communication transmitted by radio." *Id.* § 2511(2)(b). Each of these uses of

25   "communication by radio" or the like applies to communications that include non-broadcast

26   transmissions, which were intended to be private.

27          In sum, Congress's different usages of "radio communication" and "communication by

28   radio" in the Wiretap Act demonstrate that Congress meant to use the former term to refer only to

918178.1                              - 6 -                    PLAINTIFFS' SUPPLEMENTAL BRIEFING
                                                              CASE NO. 5:10-MD-02184 JW (HRL)

radio *broadcasts*, while the latter term includes *non-broadcasts* using a radio device. Nowhere in the Act did Congress use "radio communication" to mean all communications by radio. Google's argument at the hearing on this matter that, "I can say that radio communications includes any signal carried on a radio wave" is unsupported. (Hearing transcript, 3/21/11, at 13). Consequently, there is no reason to read the term that way in § 2510(16), thereby gifting Google with unfettered access to the WiFi portion of private communications to and from the Internet.

### C.   Legislative History of the Wiretap Act Confirms that Congress Used "Radio Communication" To Refer to Radio Broadcasts.

Because "radio communications" is undefined under the Wiretap Act, this Court may also look to the legislative history of the Act to determine whether the class members' electronic communications sent in part over Wi-Fi are "radio communications." *See Facebook*, 2010 WL 3291750, at *6 (citing *SEC v. McCarthy*, 322 F.3d 650, 655 (9th Cir. 2003)). The legislative history clearly indicates that the class members' electronic communications are protected and are not "radio communications."

### 1.   These Communications Have Always Been Protected.

In 1968, Congress passed the Omnibus Crime Control and Safe Streets Act. *See* Senate Committee on the Judiciary, Omnibus Crime Control and Safe Streets Act of 1968, S. Rep. No. 1097, 90th Cong. 2nd Sess. (1968). Title III of the Act, entitled "Wiretapping and Electronic Surveillance" addressed advances in technology that posed a threat to privacy. For example, according to Title III of the Act,

> The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance… **No longer is it possible, in short, for each man to retreat into his home and be left alone**.

*Id.* at *38. (Emphasis added). Thus, the Act had the "dual purpose" of "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which interception of wire and oral communications may be authorized." *Id.* Specifically, the 1968 Act defined "wire communications," which were

1    protected from interception, as "any communication made in whole or in part through the use of

2    facilities for the transmission of communications by the aid of wire, cable, or other like

3    connection."  The class members' communications fit under this definition and thus would be

4    protected from interception and use.  In fact, the wiretap acts of many states, including two

5    alleged in the Complaint, employ language similar to the 1968 Act and do not, therefore, allow

6    the interception of "readily accessible" "radio communications."  *See, e.g.* Mo. Code § 542.401,

7    *et seq.,* and Tex. Civ. Prac. & Rem. § 123.001, *et seq.*[9]

8            In 1986, Congress amended the Act by replacing it with the Electronic Communications

9    Privacy Act ("ECPA"), "in light of dramatic changes in new computer and telecommunications

10   technologies" and the "development of new methods of communication and devices for

11   surveillance."  *See* Senate Committee on the Judiciary, Electronic Communications Privacy Act

12   of 1986, S. Rep. No. 541, 99th Cong. 2nd Sess. at *1 (1986).  The ECPA took the 1968 Act a step

13   further and protected "against the unauthorized interception of electronic communications," in

14   addition to wired and oral communications.  *Id.*  Specifically, the ECPA changed the definition of

15   "wire communications" to include only aural transfers, and created a new category of "electronic

16   communications" that were protected from interception.  *See* 1986 Amendments, Par. (1) Pub.L,

17   99-508, § 101(a)(1), and Par. (12) Pub.L. 99-508, § 101(a)(6).  In enacting the ECPA and making

18   these changes, Congress certainly did not intend, as Google argues, to provide less protection for

19   private communications.  To the contrary, the drafters of the ECPA stated that:

20           the law must advance with the technology to ensure **the continued vitality of the
             fourth amendment**. Privacy cannot be left to depend solely on physical
21           protection, or it will gradually erode as technology advances.  Congress must act to
             protect the privacy of our citizens.  If we do not, we will promote the gradual
22           erosion of this precious right.

23   *Id.* at *5. (Emphasis added).

24                   **2.       The 1994 Amendments Further Demonstrate That The Class
                               Members" Communications Are Protected.**
25

26           In 1994, Congress amended the ECPA by passing the Communications Assistance For

27   Law Enforcement Act ("CALEA"), to keep pace with technology.  *See* CALEA, Pub. L. No. 103-

28
     _____
     [9] See also Cal. Penal Code § 629.50 *et seq.*

414, 108 Stat. 4279 (codified as amended at 18 U.S.C. § 2510, *et seq.*) (1994).  The 1994

amendments made two changes clearly establishing that personal e-mails transmitted by wireless

routers are not the type of public radio communications that are exempted from the statute.

First, both the Senate and House issued reports ("Reports") regarding CALEA, which

demonstrated that Wi-Fi and other wireless data were intended to be protected in the new

amendments.  The Reports stated that the CALEA "expands privacy and security protection for

telephone and computer communications. The protections of the Electronic Communications

Privacy Act of 1986 are extended to cordless phones and **certain data communications**

**transmitted by radio**."  H.R. Rep. No. 103-827, pt. 1, at 12 (1994); S. Rep. No. 103-402, at 10

(1994) (Emphasis added).  In order to shed light on what is considered "certain data

communications transmitted by radio," the Reports stated that:

> In 1990, Senator Patrick Leahy, chairman of the Senate Judiciary Subcommittee on Technology and the Law, assembled a Privacy and Technology Task Force with experts from business, consumer advocacy, the law, and civil liberties, to examine current developments in communications technology and the extent to which the law in general, and ECPA, specifically, protected, or failed adequately to protect, personal and corporate privacy.
>
> After examining a wide array of communication media, including cellular phones, personal communications networks*,* the newer generation of cordless phones, wireless modems, wireless local area networks (LANs) and electronic mail and messaging, **the task force issued a final report on May 28, 1991 recommending, inter alia, that the legal protections of ECPA be extended to cover new wireless data communications, such as those occurring over cellular laptop computers and wireless local area networks (LANs), and cordless phones**.
>
> *          *          *
>
> **Consistent with the task force's conclusions** and in view of the increasing impediments to authorized law enforcement electronic surveillance, **the Committee has concluded that continued change in the telecommunications industry deserves legislative attention to preserve the balance sought in 1968 and 1986**.

H.R. Rep. No. 103-827, pt. 1, at 14-15 (1994); S. Rep. No. 103-402, at * 11 (1994) (Emphasis

added).  Thus, the Task Force assembled by Senator Leahy recommended to Congress that the

ECPA be amended to protect "**new wireless data communications, such as those occurring**

**over cellular laptop computers and wireless local area networks (LANs), and cordless**

**phones**," and Congress so amended the ECPA **"[c]onsistent with the task force's conclusions**."

- 9 -

1   *Id.* (Emphasis added).

2          Second, the 1994 amendments regarding cordless telephone communications further

3   demonstrate that the class members' electronic communications, including their personal e-mails,

4   are protected under the Act.  Originally, the 1986 Act expressly excepted the "radio portion of a

5   cordless telephone communication transmitted between the cordless handset and the base unit"

6   from protection.  S. Rep. No. 541, 99th Cong. 2nd Sess. at *12, 14 (1986).  This exemption was

7   included because at the time such communications could, "be intercepted easily with readily

8   available technologies, such as an AM radio," and thus, "it would be inappropriate to make the

9   interception of such a communication a criminal offense."  *Id.*

10          By 1994, however, cordless phones were becoming digital.  Thus, conversations over

11  cordless phone transmissions could no longer be easily listened to on any AM/FM radio.

12  Moreover, the Reports found that by 1994, "[t]he cordless phone, far from being a novelty item

13  used only at 'poolside' has become ubiquitous…More and more communications are being

14  carried out by people [using cordless phones] in private, in their homes and offices, with an

15  expectation that such calls are just like any other phone call."  H.R. Rep. No. 103-827, pt. 1, at 19

16  (1994); S. Rep. No. 103-402, at 14-15 (1994).

17          Thus, in 1994, due to the sophisticated technology now needed to intercept cordless

18  telephone conversations, as well as the reasonable expectation of privacy by individuals using

19  cordless telephones, Congress decided to protect cordless telephone conversations, and removed

20  the exemption, which had allowed their interception, from the Act.  As the Ninth Circuit

21  explained in *Price v. Turner*,

22          when technological advances made it more difficult to intercept cordless radio
            transmissions, Congress again amended the Act [in 1994] to include protection for
23          cordless phone transmissions that could no longer be analogized to AM/FM radio
            transmissions.  *See* H.R. Rep. No. 827, 103d Cong., 2d Sess. 10, 17-18, 30 (1994),
24          (reprinted in 1994 U.S.C.C.A.N. 3489, 3490, 3497-98, 3510.)

25  260 F.3d 1144, 1148 (9th Cir. 2001).

26          Electronic communications, including personal e-mails, that are wireless in a private home

27  are the cordless phones of today.[10]  The level of protection of cordless phone transmissions is

28  _____

[10] For cordless telephones, the phone company provides wires to the subscriber's home and the

1   analogous to the class members' electronic transmissions in this case - those between a laptop and

2   router.  First, just as with current cordless radio transmissions, very sophisticated technology,

3   such as that developed by Google, is needed to intercept Wi-Fi transmissions.  *See* Daniel

4   Kamitaki, *Beyond E-Mail: Threats to Network Security and Privileged Information for the*

5   *modern Law Firm*, 15 S. Cal. Interdisc. L.J. 307, 340 (2006) ("An attorney would probably not

6   breach her ethical duty of confidentiality by using a WLAN **because the wireless signal offers**

7   **comparable or greater security than most cordless or cellular phones**") (Emphasis added).

8   Complex equipment – not something readily available from Radio Shack – is necessary because

9   each Wi-Fi transmission is broken down into "packets" of payload data, which vary in size based

10  upon factors such as the strength of the wireless signal, interference with the signal and nature of

11  the data itself, which are sent in random order.[11]  Moreover, just as with cordless phones, home

12  wireless Internet networks have become ubiquitous, with a tantamount expectation of privacy.

13  *See* James Ridge, Comment, *What Happens When Everything Becomes Connected: The Impact*

14  *on Privacy When Technology Becomes Pervasive*, 49 S. Tex. L. Rev. 725, 735-736 (2008)

15  ("Because of the similarity of wireless networks to other forms of wireless communication, it is

16  predicated that courts would find that users could reasonably expect the same privacy.  This

17  expectation of privacy is anticipated because of Congress's 1994 amendment to the [ECPA].

18  **This amendment included radio signals in the definition of electronic communications**")

19  (Emphasis added); Daniel Kamitaki, *Beyond E-Mail: Threats to Network Security and Privileged*

20  *Information for the modern Law Firm*, 15 S. Cal. Interdisc. L.J. 307, 340, 344 (2006) ("Data

21  transmitted over the air in a WLAN network is analogous to the radio signals in cellular and

22  cordless phones, which is probably sufficient to create a reasonable expectation of privacy under

23  the attorney-client privilege.  Under a Fourth Amendment analysis, cordless and cellular

---

24  subscriber connects a cordless phone to the phone jack in the wall (the termination point).  This is

25  no different than what occurs today with a wireless computer connection, only the amount of
    information that can be intercepted is far greater than just recording a phone conversation.

26  [11] In fact, because of these features of the Wi-Fi communications at issue, even if this Court found
    that the electronic communications were also "radio communications," the Court should still find

27  that they are protected because they are "scrambled or encrypted" pursuant to 18 U.S.C.
    § 2510(16)(A).  Thus, the "padlock" showing whether additional encryption software has been

28  installed on a wireless network is not "the key" to determining whether communications sent via
    the network are scrambled or encrypted.  (*See* Hearing Transcript, 3/21/11, at 7).

communications are afforded a reasonable expectation of privacy as Congress amended the ECPA in 1994 to protect radio signals as electronic communications"…"Both wired and wireless LANs have a reasonable expectation of privacy, even without additional security measures, because they are not so inherently insecure as to be accessible to the general public.").

Finally, the 1996 amendments to the Wiretap Act further show that Congress intended to protect electronic communications.  In 1996, Congress removing "electronic communications" from the definition in § 2510(16) of "readily accessible to the general public" as applied to "radio communications."  Congress did so because some were interpreting that language, contrary to Congress' intent, to protect radio broadcasts by amateur radio operators.  *See* Pub. L. No. 14-132 § 731(2); H.R. Conf. Rep. 104-518 at 124.  Importantly, in amending §2510(16) to remove reference to "electronic communications," Congress made clear its view that doing so would *not* diminish the statute's protection of "electronic communications":

> Subsection (b) eliminates "electronic communication" from the definition of "radio communications that are readily accessible to the general public." This inclusion of "electronic communication" negated the need to exempt from the wiretap coverage radio transmissions, *i.e.*, scanners, CBs, and Ham radio signals. It is not intended to preclude the need for a title III wiretap order for telephone conversations occurring over cordless telephones, which operate through radio signals not readily available to the general public. "Electronic communications" are already specifically and separately covered by the wiretap statutes.

*See* H.R. Conf. Rep. 104-518 at 124.  Therefore, the effect of the 1996 amendments is to confirm that the statute treats "electronic communications" as distinct from "radio communications" even when the electronic communication is sent in part by radio waves, just as the statute treats "electronic communications" as distinct from "wire communications" even when the electronic communication is sent by wire.  This determination is wholly consistent with the statutory language and Congress' intent set forth in the legislative history to protect private personal communications, especially those like e-mail that start and finish in the privacy of our own homes.

Indeed, all of the legislative history discussed above demonstrates that Congress intended to protect the private communications that Google intentionally intercepted.  "Radio communications" as understood by Congress at the time would include freely accessible

1  communications like Citizen's Band (CB) radios, General Mobile Radio Service (GMRS), Family

2  Radio Service (FRS), Multi-Use Radio Service (MURS), amateur radio and police and fire

3  Bands. These "radio communications" are broadcast on systems designed and configured to

4  broadcast messages to multiple and unidentified recipients - i.e. anyone who can pick up the

5  signal by dialing into the frequency. In sharp contrast, the class members' communications were

6  sent on systems designed to communicate privately and only with specific, identified recipients

7  through technology such that the general public could not intercept or understand their

8  communications. There is no support in the legislative history for Google's defense that it (and

9  the Federal Government) was free to seize millions of class members' personal electronic e-mail

10 communications because the system through which they were transmitted briefly employed radio

11 waves. To the contrary, Congress had clearly indicated an intent to protect private

12 communications that are not readily accessible to the general public through means such as, for

13 example, "a radio scanner purchased at Radio Shack," *Price,* 260 F.3d at 1146.

14      **D.      Google's Interpretation Would Lead to Unexpected, Unpredictable, and**
        **Arbitrary Results.**
15

16      If this Court were to find that the class members' electronic e-mail communications were

17 "radio communications," most of the class members' communications would still be protected

18 from interception and use under at least two of the exceptions listed in § 2510(16).

19      First, § 2510(16)(C) protects "radio communications" that are carried on a subcarrier. Wi-

20 Fi transmissions are sent on the following protocols: 802.11a, 802.11b, 802.11g and 802.11n.

21 Transmissions on 802.11a, 802.11g, and 802.11n are divided into several parallel data streams or

22 channels, and transmitted by subcarriers through a technique known as Orthogonal Frequency-

23 Division Multiplexing (OFDM).[12] Because Wi-Fi networks using three of the four available

24 protocols - 802.11a, 802.11g, and 802.11n - transmit data using subcarriers, those

25 communications would be protected, even if they are deemed to be "radio communications."

26 ───────────────

27 [12] Orthogonal frequency division multiplexing (OFDM) is a form of multicarrier modulation
   where the carrier spacing is selected, so that each subcarrier within the channel is orthogonal to
   the other subcarriers, which mathematically ensures that during the sampling time for one carrier,
28 all other carriers are at a zero point. *Ex Parte Angel Janevski*, APL 2009-0671, 2009 WL 416502
   (Bd. Pat. App. & Interf. Feb. 18, 2009).

1  These protocols are typically selected by the devices based, in part, upon availability and level of

2  traffic.  The user would not typically select or even know which protocol was in use at the time of

3  any given transmission.  Yet, under Google's interpretation of the statute, the protocol would be

4  the key to determining whether communications were protected or whether, instead, the Act

5  expressly authorized others to intercept and use them.[13]

6      Furthermore, § 2510(16)(E) protects "radio communications" that are "transmitted on

7  frequencies allocated under part 25, subpart D, E, or F of part 74, or part 94 of the Rules of the

8  Federal Communications Commission, unless, in the case of a communication transmitted on a

9  frequency allocated under part 74 that is not exclusively allocated to broadcast auxiliary services,

10  the communication is a two-way voice communication by radio."  Wi-Fi protocol 802.11b,

11  802.11g and 802.11n are divided into 13 channels, some of which are included in this protection

12  and some of which are not.  For instance, transmissions on 802.11b channels 9, 10 and 11 would

13  be protected, whereas transmission on other channels would not be.  Again, the channel on which

14  a Wi-Fi transmission is made is not in the control of the user.

15      In sum, using Google's interpretation of the term "radio communications," the

16  determination of which communications are protected and which can be freely seized and used

17  would rest on which channel someone happened to be on or which protocol of 802.11.  Neither

18  the sender, nor the receiver would have a hand in making these selections, nor would they likely

19  even be aware of it.  These different standards would be,

20      the unanticipated byproduct of technology changes, and not a careful balancing of
       the needs of law enforcement and the privacy rights of individuals.  Nor [would]
21      they reflect a substantive difference in the nature of the information; rather they
       reflect the fact that the ECPA was enacted in 1986 - six years before Congress
22      authorized commercial activity on the Internet...

23  Burr, J. Beckwith, *The Electronic Communications Privacy Act of 1986: Principles for Reform*,

24  at 8, http://www.digitaldueprocess.org/files/DDP_Burr_Memo.pdf.  As noted in *Konop v.*

25

---

26  [13] In its Memorandum in Support of its Motion to Dismiss, Google shrugged this off, saying,
    "Subcarrier and subsidiary radio transmissions relate to collateral information that accompanies
27  commercial radio and television broadcasts; they have nothing to do with Wi- Fi."  (D. 60 at 11).
    That is precisely the point - Congress was not considering Wi-Fi when it drafted the "readily
28  accessible" "radio communications" provisions in the Act, and did not intend to authorize the
    interception of Wi-Fi transmissions.  Wi-Fi transmissions did not exist at the time.

1    *Hawaiian Airlines, Inc.*, "until Congress brings the laws in line with modern technology,

2    protection of the Internet and websites … will remain a confusing and uncertain area of the law."

3    302 F.3d 868, 874 (9th Cir. 2002).[14]  Google's interpretation aggravates, rather than relieves, such

4    confusion and uncertainty.

5    **II.      Under the Wiretap Act, Wireless Home Internet Networks Are Not "Radio
          Communications" But Instead Are Electronic Communications Made, In Part, By**

6    **      Radio.**

7             Plaintiffs' e-mail communications fit squarely into the statutory definition of "electronic

8    communications" under the Wiretap Act.  The Act defines "electronic communication" as "any

9    transfer of . . . data" that is "transmitted in whole or in part by a wire[] [or] radio..." § 2510(12).

10   Plaintiffs used their home wireless Internet ("WiFi") networks to send data wirelessly from a

11   computer or wireless phone (such as an iPhone) to a WiFi router; that WiFi router is attached to

12   plaintiffs' broadband service (in virtually all cases by wire) and, from there, by wires to the

13   Internet.  Google's claim is that it can intercept these transmissions with impunity, simply

14   because the home user took advantage of the convenience of a private WiFi system to avoid her

15   computer being tethered by cords to her router or modem.

16            As shown above, Congress used the particular term "radio communication" to refer to

17   only radio broadcasts.  Google does not claim — nor could it — that users of home WiFi

18   networks are broadcasting their private e-mails and Internet transactions for public consumption.

19   _____

20   [14] Google's own efforts to amend the ECPA have acknowledged that its application to current
     technology is not as clear as it argues in this case.  Rick Salgado, Google's senior counsel for

21   Law Enforcement and Information Security, testified before the House Judiciary Subcommittee
     that, "a large gap has grown between the technological assumptions made in the ECPA and the

22   reality of how the Internet works today, leaving us in some circumstances with complex and
     baffling rules that are both difficult to explain to users and difficult to apply."

23   www.google.com/googleblogs/pdfs/google_testimony_rick_salgado.pdf.  Yet Google now urges
     this Court to apply the statue in the most baffling of ways.

24            Google belongs to the non profit digitaldueprocess.org (now lobbying for changes to the
     Act), which declares this guiding principle:

25            A particular kind of information (for example, the content of private
              communications) should receive the same level of protection regardless of the

26            technology, platform or business model used to create, communicate or store it.
     www.digitaldueprocess.org/index.cfm?objectid=37940370-2551-11DF-8E02000C296BA163.

27   We agree, and the Act supports such a principles interpretation.  Yet Google argues the contrary:
     It would be odd, indeed, if an individuals right to privacy in her personal communications turned

28   on what particular frequency or what particular subcarrier modality the communications
     happened to be on from split second to split second.

1   On the contrary, those electronic communications are intended for specific recipients — whether

2   addressees on an e-mail or designated websites — and not for the general public. *See United*

3   *States v. Warshak*, 631 F.3d 266, 284 (6th Cir. 2010) ("Given the often sensitive and sometimes

4   damning substance of his e-mails, we think it highly unlikely that Warshak expected them to be

5   made public, for people seldom unfurl their dirty laundry in plain view."); *Gonzales v. Google*,

6   234 F.R.D. 674, 687 (N.D. Cal. 2006) (noting the potentially sensitive nature of queries to search

7   engines).  Internet users do not choose wireless rather than wired connections between their

8   computers and their broadband Internet service to distinguish between broadcasts and private

9   communications; instead, the choice is purely one of convenience.

10      It is contrary to the language and intent of the Wiretap Act to hold Plaintiffs' e-mail

11   communications were transformed into "radio communications" – and thereby lack any privacy

12   protection – because of the fraction of a second the electronic communication touched radio

13   waves.  As shown above, there is no support for this argument in the plain language of the Act, its

14   structure, or in the legislative history.

15      Thus, wireless home Internet networks are not "radio communications," even though a

16   small portion of the communication is transmitted by radio waves.  Rather, they are "electronic

17   communications."  Whether electronic communications are readily accessible to the general

18   public is not determined by the language of § 2510(16), but rather by § 2511(2)(g)(i), which

19   states that it is not unlawful to intercept electronic communications "made through an electronic

20   communication system that is configured so that such electronic communication is readily

21   accessible to the general public," where "readily accessible to the general public" is defined by

22   the ordinary meaning of that phrase.  *See S.D. Warren Co. v. Me. Bd. Of Envtl. Prot.*, 547 U.S.

23   370, -- (2006); *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

24      Here, the wireless home Internet networks are electronic communications that are not

25   readily accessible to the general public.  Google's interception is far different than inadvertently

26   picking up another persons radio transmission using a scanner or Ham radio.  Instead, the

27   communications transmitted between the class members' computers and their Wi-Fi routers are

28   not visible or apparent, and can only be intercepted and viewed with sophisticated technology that

1  the "general public" does not have.  *See* D. 54, ¶ 5.  In fact, these Wi-Fi communications only

2  have a range of approximately 120 feet to 600 feet (under optimal circumstances).  Such a

3  communication system is not readily accessible to the general public.  *See* Trenton C. Haas,

4  *Carnivore and the Fourth Amendment*, 34 Conn. L. Rev. 261, 270 (2001) (interpreting 18 USC

5  § 2511 (2)(g) as protecting "only private communications" and excluding only "those

6  communications that are readily accessible to the general public--such as chat room activity and

7  bulletin boards."); *United States v. Lande*, 968 F.2d 907, 911 (9th Cir. Mont. 1992) quoting

8  132 Cong. Rec. S14451 (daily ed. Oct. 1, 1986) (statement of Sen. Mathias) (The ECPA "extends

9  privacy protection to new forms of electronic communications, but is **careful to exempt media in**

10 **which privacy is not expected**, such as tone only paging devices; amateur radio services; police,

11 fire, and other public safety radio communications systems; and many satellite transmissions,

12 including network feeds destined for rebroadcast, and satellite cable programming as defined in

13 47 U.S.C. § 605."). (Emphasis added).

14       Furthermore, the fact that individuals have a reasonable expectation of privacy with

15 respect to their wireless e-mail and Internet communications, especially when such

16 communications are transmitted in their homes, also evidences the fact that such electronic

17 communications should be protected under the Fourth Amendment, and deemed not to be readily

18 accessible to the general public.  For example, individuals use their home Wi-Fi systems for e-

19 mail, online banking, and other activities of a confidential nature.  They are willing to conduct

20 these sensitive activities because they understand the communications to be private.  *See*

21 *Warshak*, 631 F.3d at 284; *Gonzales*, 234 F.R.D. at 687.  Such actions evidence a clear

22 expectation that individuals do not expect their online activities to be made public.  Thus, the

23 protection of home Wi-Fi communication systems from interception is consistent with the

24 concerns driving Congress' desire to protect electronic communications under the ECPA and

25 under the Fourth Amendment.  *See* 132 Cong. Rec. H4039-01, 1986 WL 776505 (Cong.Rec.)

26 (Congressman Kastenmeier) ("The second principle which should be followed in this area is a

27 recognition that what is being protected is the sanctity and privacy of the communication. **We**

28 **should not attempt to discriminate for or against certain methods of communication, unless**

1   **there is a compelling cast that all parties to the communication want the message accessible**

2   **to the public.").** (Emphasis added).[15]

3       Moreover, Google's desire to parse out infinitesimally brief moments from the entirety of

4   an electronic communication and thus transform the communication into a "radio

5   communication" is not supported by the legislative history.  Specifically, the 1994 amendment to

6   the ECPA protects cordless telephone communications as electronic communications even though

7   a portion of the communication is carried out by radio. In other words, the presence of the small

8   portion of radio waves connecting the cordless telephone handset to the base unit does not take

9   the cordless telephone communication outside of the realm of an "electronic communication"

10  protected under the ECPA, and identify it as a "radio communication."  Rather, the ECPA treats it

11  as one continuous communication, and does not single out the radio portion for separate treatment

12  from the electronic portion. Likewise, the radio waves connecting a wireless laptop to its router

13  does not make the communication a radio communication.  It is an electronic communication

14  protected in its entirety under the ECPA.[16]

15

16  [15] *See also* Kimberly S. Cuccia, Note, *Have You Seen My Inbox? Government Oversteps the*
17  *Fourth Amendment Again: Goodbye Telephones, Hello E-Mail*, 43 Val. U.L. Rev. 671, 694-695
    (2009):

18          Applying this historical jurisprudence today, most courts, as in the cases discussed
            above, have held that most private-party e-mail correspondence is private, and thus
19          constitutionally protected, because the user expects the content to be private.
            Furthermore, e-mail is one of the most popular mediums for communication,
20          similar to telephones and letters in the past. ISPs house today's virtual mailboxes.
            Even if an ISP contracts for a right to access a user's e-mail "in the ordinary
21          course of business," this access does not waive a user's expectation of privacy.
            Therefore, in light of Fourth Amendment jurisprudence, courts will likely continue
22          to hold that individuals have an expectation of privacy regarding their e-mail.

    [16] To find that the radio portion of an electronic communication is not an electronic
23  communication, but rather a radio communication that is readily accessible to the general public
    would lead to an absurd result.  For example, if an attorney sends attorney/client privileged
24  information to his client via e-mail from his "protected" land-based personal computer, and his
    client receives the privileged e-mail from his wireless network, the e-mail would no longer be
25  able to be deemed confidential, as the radio portion of the wireless network would not be
    protected under the ECPA.  In effect, such a circumstance would thwart attorneys, doctors and
26  other professionals from sending confidential information via e-mail. Considering that the
    Omnibus Crime Control and Safe Streets Act of 1968, the ECPA of 1986, and the 1994 CALEA
27  were all passed by Congress in order to keep pace with advancing technology and preserve
    confidential communications among individuals, it would make no sense to separate the radio
28  portion of an electronic communication from the rest of the communication and deem it to be
    unprotected under the ECPA.

**III.** **Under The Wiretap Act, Cellular Telephone Calls Are Protected As "Wire Communications."**

Cellular telephone calls are "wire communications," as defined by the Wiretap Act, because they contain the human voice and are transmitted through facilities that transmit the communications, in part, by wire.

The Wiretap Act defines a "wire communication" as:

> any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce

18 U.S.C. § 2510(1). An "aural transfer" is "a transfer containing the human voice at any point between and including the point of origin and the point of reception." *Id.* § 2501(18). Cellular telephone calls contain the human voice. Although the cellular telephone uses a radio to transmit the voice to and from the cellular network, those voice calls are transmitted through wire, cable, or a like connection in switching stations and through the cellular company's network. They are therefore wire communications, as the Ninth Circuit has already confirmed. *See In re U.S. for an Order Authorizing Roving Interception of Oral Communications*, 349 F.3d 1132, 1139 (9th Cir. 2003) ("cellular telephone service, despite its apparent wireless nature, is within § 2510(1)'s definition of "wire communication" because cellular service uses wire and cable connections to connect calls") (Footnote omitted).

This is confirmed by the legislative history of the ECPA. Congress did not think that cellular communications were adequately protected under existing law, and so the ECPA was designed to "remedy this inadequacy and provide explicit privacy protection to all communications utilizing cellular radio." H.R. Rep. 99-647, at 31. Congress accomplished this by amending the prior definition of "wire communication" "to include communications utilizing wire, cables or other like connections within a switching office," with the intention "that 'wire communication' be construed to include communications made over cellular systems." *Id.*

Accordingly, the Wiretap Act protects cellular telephone calls from interception without

1  regard to the definition of "readily accessible to the general public" in § 2510(16), which applies

2  only to "radio communications."  The fact that cellular telephone calls are protected under the

3  Wiretap Act as wire communications provides further confirmation that not all communications

4  sent by radio waves are "radio communications," as that term is used in the Act.  Cellular

5  telephone calls are transmitted in part by radio waves, yet the Act is clear that they are wire

6  communications, not radio communications.  Accordingly, the fact that a communication may be

7  in part transmitted by radio waves is not dispositive of whether that communication is a "radio

8  communication" as that term is used in the Act.

9                                          **<u>Conclusion</u>**

10             Under the Wiretap Act, "radio communications" are radio broadcasts, and do not include

11  private communications that are, in part, sent via wireless home Internet networks.  Rather,

12  private communications that are sent briefly via wireless home Internet networks, such as those of

13  the class members', are electronic communications that are not readily accessible to the general

14  public under the normal meaning of those terms, and thus, are protected under the Act.  Cellular

15  telephone calls are also protected under the Act, but because they fit within the definition of "wire

16  communications;" therefore, the definition of "readily accessible to the general public" as applied

17  to "radio communications" in § 2510(16) is irrelevant to determining whether an interception of

18  cellular calls is lawful.  Consequently, Plaintiffs respectfully request that Google's Motion to

19  Dismiss be denied.

20  Dated:  April 11, 2011                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

21                                           By:    /s/ Elizabeth J. Cabraser
                                                   Elizabeth J. Cabraser (SBN: 083151)

22

23                                           275 Battery Street, 29th Floor
                                             San Francisco, CA 94111-3339
24                                           Tel. 415-956-1000
                                             Fax. 415-956-1008

25                                           *Plaintiffs' Liaison Counsel*

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SPECTOR ROSEMAN KODROFF & WILLS, PC
Jeffrey L. Kodroff, Esq.
1818 Market St., Ste. 2500
Philadelphia, PA  19103
Tel. 215-496-0300
Fax. 215-496-6611

COHEN MILSTEIN SELLERS & TOLL PLLC
Daniel A. Small, Esq.
1100 New York Avenue, NW, Suite 500W
Washington, DC 20005
Tel. 202-408-4600
Fax. 202-408-4699

*Plaintiff Co-Lead Counsel*

- 21 -

1

## CERTIFICATE OF SERVICE

2      I, Kenneth S. Byrd, am readily familiar with Lieff, Cabraser, Heimann & Bernstein, LLP's

3  practice for collection and processing of documents *for service via the United States District*

4  *Court's Electronic Court Filing system*.

5      I am readily familiar with Lieff, Cabraser, Heimann & Bernstein, LLP's practice for

6  collection and processing of documents *for service for U.S. Mail*, and that practice is that the

7  documents are deposited with the United States Postal Service with postage fully prepaid the

8  same day as the day of collection in the ordinary course of business.

9      On April 11, 2011, I served true and correct copies of the Plaintiffs' Supplemental Brief,

10  via the Court's electronic ECF system to the following recipients:

11              David H. Kramer
               Michael H. Rubin
12              Bart E. Volkmer
               Caroline E. Wilson
13              WILSON SONSINI GOODRICH & ROSATI
               Professional Corporation
14              650 Page Mill Road
               Palo Alto, CA 94304-1050
15              Telephone: (650) 493-9300
               Facsimile: (650) 565-5100
16              Email: dkramer@wsgr.com
                      mrubin@wsgr.com
17                    bvolkmer@wsgr.com
                      cwilson@wsgr.com
18              *Attorneys for Defendant Google, Inc.*
19
   and by *U.S. Mail* to the following recipients, not registered for email service via ECF:
20
              Brooks F. Cooper
21              520 SW Sixth Avenue, Suite 914
               Portland, OR 97204
22              brooks@bcooper-law.com
23
24              Robert H. Carp
               Carp Law Offices LLC
25              100 Needham Street, 2nd Floor
               Newton, MA 02464
26              rcarp@carplawoffices.com
27
28

918178.1                          - 22 -                    PLAINTIFFS' SUPPLEMENTAL BRIEFING
                                                             CASE NO. 5:10-MD-02184 JW (HRL)

1

Sharron Williams Gelobter
Yurumein Law Firm

2

1736 Franklin Street, 10th Floor
Oakland, CA 94612

3

sgelobter@yurumeinlaw.com

4

Stephen A. Swedlow

5

Korein Tillery
205 North Michigan Avenue, Suite 1940

6

Chicago, IL 60601

7

sswedlow@koreintillery.com

8

Noah I. Axler
Donovan Searles & Axler

9

1845 Walnut St.
Suite 1100

10

Philadelphia, PA  19103

11

12

     I declare under penalty of perjury under the laws of the United States of America that the

13

above is true and correct.

14

                    /s/ Kenneth S. Byrd

15

                    Kenneth S. Byrd

16

17

18

19

20

21

22

23

24

25

26

27

28

918178.1

- 23 -

PLAINTIFFS' SUPPLEMENTAL BRIEFING
CASE NO. 5:10-MD-02184 JW (HRL)