DAVID H. KRAMER, State Bar No. 168452
MICHAEL H. RUBIN, State Bar No. 214636
BART E. VOLKMER, State Bar No. 223732
CAROLINE E. WILSON, State Bar No. 241031
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: mrubin@wsgr.com

*Attorneys for Defendant Google Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE INC. STREET VIEW ELECTRONIC COMMUNICATIONS LITIGATION | CASE NO.: 5:10-md-02184 JW (HRL) |
| | **DEFENDANT GOOGLE INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................2

    A.    The Term "Radio Communication" Should Be Defined According To Its Plain, Ordinary Meaning When Used In The Wiretap Act ...................................2

        1.    "Radio communication" Means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted over the radio spectrum" ........................................2

        2.    Narrower Definitions Of "Radio Communications" Should Be Rejected ................................................................................5

    B.    Home Wi-Fi Networks Transmit "Radio Communications" Within The Purview Of The Wiretap Act's Usage Of That Term ...............................7

    C.    Cellular Telephone Calls Constitute Radio Communications And Were Intended By Congress To Come Within Section 2510(16)'s Enumerated Exceptions To Ready Accessibility .............................................9

CONCLUSION ...................................................................................................................11

1

## TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4   *Cooper v. F.A.A.*, 622 F.3d 1016 (9th Cir. 2010) ....................................................... 5

5   *Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780,
    2010 WL 3291750 (N.D. Cal. July 20, 2010) .................... 6

6

7   *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) ...................... 5

    *United States v. Ahrndt*, No. 08-468,
8       2010 WL 373994 (D. Or. Jan. 28, 2010) .................... 7

9   *United States v. Santos*, 553 U.S. 507 (2008) ........... 2, 6

10

### STATUTES

11   18 U.S.C. § 2510, *et seq.* ...............................................*passim*

12   47 U.S.C. § 153(7) ....................................................... 6

13   47 U.S.C. § 153(40) ..................................................... 5

14   47 U.S.C. § 338(i)(4)(B)(iv) .......................................... 4

15   47 U.S.C. § 605(a) ....................................................... 4

16

### MISCELLANEOUS

17   S. Rep. No. 99-541 (1986) .................................... 1, 4, 9, 10

18   H.R. Rep. No. 99-647 (1986) ...................................... 7, 10

19   H.R. Rep. No. 103-827(I) (1994) ..................................... 9

20   Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132 § 731(2) (1996) .......... 9

21   Communications Assistance For Law Enforcement Act, Pub. L. 103-414 § 203 (1994) ............... 9

22   Digital Telephony and Law Enforcement Access to Advanced Telecommunications
        Techs. and Servs.: Joint Hearing on H.R. 4922 and S. 2375 Before the
23      Subcomm. On Technology and the Law, 103d Cong. 1022 (1994) ................ 8, 9

24   *In The Matter Of Authorization Of Spread Spectrum And Other Wideband
        Emissions Not Presently Provided For In The FCC Rules And Regulations,*
25      FCC Docket No. 81-413, First Report and Order (May 9, 1985) .................. 8

26   *In The Matter Of Inquiry Concerning The Deployment Of Advanced
        Telecommunications Capability To All Americans In A Reasonable And
27      Timely Fashion, And Possible Steps To Accelerate Such Deployment
        Pursuant To Section 706 Of The Telecommunications Act of 1996,* Fifth
28      Report, 23 FCC Rcd. 9615 (2008) .................. 7, 8

1

Merriam-Webster Dictionary Online ........................................................................ 3

2

Rudolf F. Graf, Modern Dictionary of Electronics
    (Butterworth-Heinemann, 6th ed. 1997) ....................................... 3

3

4

Harry Newton, Newton's Telecom Dictionary (Telecom Books, 16th ed. 2000).......................... 5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2       In connection with Google's motion to dismiss plaintiffs' Consolidated Class Action

3   Complaint ("CCAC"), the Court has instructed the parties to provide supplemental briefing

4   concerning three questions:

5       1.   What "radio communication" means within the purview of the Wiretap Act.

6       2.   Whether wireless home internet networks are "radio communications" within the

7   purview of the Wiretap Act's usage of that term.

8       3.   Whether cellular telephone calls constitute "radio communications" as intended by

9   Congress when drafting the Wiretap Act and, if so, whether such technology properly fits within

10  any of the five enumerated exceptions to the definition of "readily accessible to the general

11  public" as outlined in Section 2510(16).

12      Google responds as follows:

13      **Answer to Question 1:**  The Wiretap Act does not define "radio communication."  The

14  term therefore takes its ordinary, plain meaning:  any transfer of signs, signals, writing, images,

15  sounds, data, or intelligence of any nature transmitted over the radio spectrum.

16      **Answer to Question 2:**  Transmissions sent over wireless home internet networks are

17  "radio communications" within the purview of the Wiretap Act's usage of that term.  That is

18  because Wi-Fi networks (whether located in a home or elsewhere) unquestionably transmit

19  information over the radio spectrum, specifically on the 2.4 GHz and 5.0 GHz radio bands.

20      **Answer to Question 3:**  When drafting ECPA's amendments to the Wiretap Act,

21  Congress intended that the radio portion of cellular telephone calls would constitute "radio

22  communications."[1]  The Senate Report refers to "the radio portion of a cellular telephone" call as

23  a "radio communication."  S. Rep. No. 99-541, at 21 (1986).  ECPA's legislative history is

24  unmistakable that the common-carrier exception found in Section 2510(16)(D) was intended to

25  render cellular communications not "readily accessible to the general public."

26  _____

27      [1]   The Wiretap Act did not include the terms "radio communication" or "electronic
    communication" when enacted in 1968.  They were added when the Wiretap Act was amended
28  in 1986 by the Electronic Communications Privacy Act ("ECPA").

1

**ARGUMENT**

2       Google moved to dismiss the CCAC on December 17, 2010.  In relevant part, Google

3   argued that to state a claim under the federal Wiretap Act (18 U.S.C. § 2510, *et seq.*), plaintiffs

4   were required to plead facts showing that the Wi-Fi transmissions at issue in this case were not

5   "readily accessible to the general public" pursuant to Section 2511(2)(g)(i).  Docket No. 60 at 6-

6   8.  Specifically, Google argued that plaintiffs failed to state a claim because they did not plead

7   that their Wi-Fi transmissions, as radio communications, came within one of the statutory

8   exceptions to ready accessibility set forth in Section 2510(16).  *Id*.  At the March 21, 2011

9   hearing on Google's motion to dismiss, plaintiffs acknowledged that the CCAC does not attempt

10  to plead facts that would bring their Wi-Fi transmissions within Section 2510(16) ("We did not

11  plead it in the consolidated amended class action complaint . . . [because] [w]e do not believe

12  that the subsection of the statute . . . applies to these electronic communications").  Docket No.

13  75 at 34-35.

14      The Court asked in its Order requesting supplemental briefing whether Wi-Fi

15  transmissions constitute "radio communications" within the meaning of the Wiretap Act.  Docket

16  No. 73.  Google respectfully submits that they do, and, thus, for the reasons set forth in Google's

17  motion to dismiss, the CCAC fails to state a claim upon which relief can be granted under the

18  federal Wiretap Act.

19  **A.    The Term "Radio Communication" Should Be Defined According To Its
        Plain, Ordinary Meaning When Used In The Wiretap Act.**

20

21      **1.    "Radio communication" Means "any transfer of signs, signals,
             writing, images, sounds, data, or intelligence of any nature
             transmitted over the radio spectrum."**

22

23      The Wiretap Act does not define the term "radio communication."  *See* 18 U.S.C. § 2510.

24  The Court should therefore use the term's ordinary, plain meaning.  *See United States v. Santos*,

25  553 U.S. 507, 511 (2008) ("When a term is undefined, we give it its ordinary meaning.").

26  •   "Radio" refers to the radio frequency ("RF") portion of the electromagnetic spectrum,

27      which is "generally defined as that part of the spectrum where electromagnetic waves

28      have frequencies in the range of about 3 kilohertz [3000 hertz] to 300 gigahertz."  *See*

FCC Office of Engineering & Technology, Bulletin No. 56 at 2-3 (1999) (available at http://www.fcc.gov/Bureaus/Engineering_ Technology/Documents/bulletins/oet56/ oet56e4.pdf); Merriam-Webster Dictionary Online (radio means "of or relating to electric currents or phenomena (as electromagnetic radiation) of frequencies between about 3000 hertz and 300 gigahertz") (available at http://www.merriamwebster.com/ dictionary/radio).

- The dictionary definition of "communication" is "information transmitted or conveyed." *See* Merriam-Webster Dictionary Online (available at http://www. merriam-webster.com/dictionary/communication); *see also* Rudolf F. Graf, Modern Dictionary of Electronics 181 (Butterworth-Heinemann, 6th ed. 1997) (communication is "[t]he transmission of information from one point, person, or equipment to another."). That aligns with the "communication" portion of the definition of "electronic communications" from the Wiretap Act: "*any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature* transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system." 18 U.S.C. § 2510(12) (emphasis added).

Accordingly, "radio communication" means: **any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted over the radio spectrum.**

The Wiretap Act's text confirms that the plain meaning controls. The term "radio communication" first appears in the Wiretap Act when the statute defines ready accessibility "with respect to a *radio communication*." 18 U.S.C. § 2510(16) (emphasis added). In that subsection, Congress broadly authorized the acquisition of radio communications and created carefully defined exceptions to that general rule. 18 U.S.C. § 2510(16), § 2511(2)(g)(i). Congress was specific and clear: only those radio transmissions which come within one of Section 2510(16)'s exceptions will be deemed inaccessible to the public. That structure would be upended if some communications sent over the radio spectrum did not constitute "radio communications." A person receiving a radio transmission would be left without any statutory guideposts for determining whether the communication may be acquired as a matter of right.

1    Moreover, the specific examples of "radio communications" found in the statute and its

2  legislative history show the breadth of the phrase, including:

3  - the "data and background music services carried on FM subcarriers" (S. Rep. No. 99-541,
     at 15);
4
5  - the "data carried on the Vertical Blanking Interval (VBI) of a television signal" (*id.*);

6  - "satellite communications, auxiliary broadcast services and private microwave services"
     (*id.*);

7  - "tone-only pager" transmissions (18 U.S.C. § 2510(16)(D));

8  - radio transmissions sent "by any station for the use of the general public, or that relate[]
     to ships, aircraft, vehicles, or persons in distress" (18 U.S.C. § 2511(2)(g)(ii)(I));
9
10 - radio transmissions from "governmental, law enforcement, civil defense, private land
     mobile, or public safety" systems (18 U.S.C. § 2511(2)(g)(ii)(II));

11 - radio transmissions from "amateur, citizens band, or general mobile radio services" (18
     U.S.C. § 2511(2)(g)(ii)(III)); and
12
13 - radio transmissions from "any marine or aeronautical communications system" (18
     U.S.C. § 2511(2)(g)(ii)(IV)).

14 These examples of communications transmitted over the radio spectrum which—given their

15 placement in the statute or its legislative history—must constitute "radio communications" show

16 how broad the proper definition of the term is.  Indeed, even communications sent from

17 government tracking devices that "emit a signal on a specific radio frequency [and] can be

18 received by special tracking equipment" qualify as "radio communications" under the Wiretap

19 Act.  S. Rep. No. 99-541, at 10.  Given this diverse range of Congressionally identified "radio

20 communications," there can be no doubt that the transfer of any sign, signal, writing, images,

21 sound, data, or intelligence of any nature transmitted over the radio spectrum constitutes a "radio

22 communication."  Indeed, there is nothing in the text or legislative history of the Wiretap Act

23 that would exclude any transmission sent over the radio spectrum from the definition of "radio

24 communication."

25    Finally, the plain meaning of "radio communication" is confirmed by looking to the

26 Communications Act, which cross-references and is cross-referenced by the Wiretap Act, and

27 does define the term.  *See, e.g.*, 18 U.S.C. § 2510(10), § 2511(2)(e), § 2511(2)(g)(iii); 47 U.S.C.

28 § 338(i)(4)(B)(iv), § 605(a).  The Communications Act states that "'radio communication' or

1   'communication by radio' means the transmission by radio of writing, signs, signals, pictures,

2   and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among

3   other things, the receipt, forwarding, and delivery of communications) incidental to such

4   transmission." 47 U.S.C. § 153(40). That definition is nearly identical to the one that Google

5   proposes here and corroborates that the plain meaning of the term governs. *See Cooper v.*

6   *F.A.A.*, 622 F.3d 1016, 1032 (9th Cir. 2010) (construction of identical language in a "closely

7   analogous" statute "is a reliable extrinsic source"); *see also Nat'l Treasury Emps. Union v.*

8   *Chertoff*, 452 F.3d 839, 857-58 (D.C. Cir. 2006); *cf.* Harry Newton, Newton's Telecom

9   Dictionary 698 (Telecom Books, 16th ed. 2000) (radio communication means "[a]ny

10  telecommunication by means of radio waves").

### 2.   Narrower definitions of "Radio Communications" Should Be Rejected.

13      Plaintiffs did not challenge the proposition that Wi-Fi transmissions constitute "radio

14  communications" in their brief responding to Google's motion to dismiss. Docket No. 64 at 3-

15  10. Instead, they offered a statutory interpretation argument that side-stepped the question,

16  claiming that Section 2510(16) does not apply to Section 2511(2)(g)(i), even for the "subset of

17  electronic communications that are transmitted by radio." *Id.* at 4. Plaintiffs presumably settled

18  on that strategy because Wi-Fi devices transmit using the radio spectrum, and it would strain

19  credibility to declare that these transmissions are not "radio communications." In response to the

20  Court's request for supplemental briefing, however, plaintiffs may posit a definition of "radio

21  communication" that attempts to limit the term's plain language. That would, however, be

22  nothing more than an attempt to redefine ready accessibility and circumvent the dictates of

23  Section 2510(16). Any such efforts are properly rejected.

24      Plaintiffs may argue that the Wiretap Act's use of the term "radio communication"

25  incorporates some notion of the transmitter's subjective intentions about how or by whom the

26  radio signal will be acquired. *See* Docket No. 75 at 32. That is, they might argue that a

27  communication sent over the radio spectrum is not properly deemed a "radio communication"

28

unless the person intends to broadcast the information to everyone.[2]  That kind of definition finds

no support in the Wiretap Act or the legislative history, and conflicts with the statute's text and

structure.  Congress declared that radio communications may be acquired freely unless one of

five specific and objective indicators listed in the statute is present.  *See* Docket No. 60 at 6-8.

Importing notions of subjective intent of the communicator into the definition of "radio

communication" would undermine the presumption of ready accessibility and leave the recipient

of a radio transmission to guess whether radio signals may be acquired lawfully.  That is the

opposite of what Congress had in mind, and the opposite of what due process requires.  *See, e.g.*,

*Santos*, 553 U.S. at 515.  What constitutes a "radio communication" is an objective

determination, not something that can change depending on the state of mind of the person

sending a communication over the radio spectrum.  *Cf. Facebook, Inc. v. Power Ventures, Inc.*,

No. C 08-05780, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010); *compare* 47 U.S.C. §

153(40) *with* 47 U.S.C. § 153(7) ("The term 'broadcasting' means the dissemination of radio

communications intended to be received by the public, directly or by the intermediary of relay

stations.").

In fact, the Wiretap Act forecloses the possibility that the definition of "radio

communication" could depend on subjective considerations by declaring that some radio

communications may be acquired in all cases, *whether or not they are readily accessible to the

public.  Compare* 18 U.S.C. § 2511(2)(g)(ii)(I), (III) and (IV) (describing classes of radio

communications which may be intercepted even if they are not readily accessible to the public)

---

[2]    Plaintiffs' claim that "people don't use [Wi-Fi] to broadcast" is mistaken.  Docket No. 75 at 32.  Companies and individuals often use Wi-Fi technology to broadcast with the express purpose of transmitting information to anyone who happens to be in range.  *See, e.g.*, Wi-Fi Splash Pages, http://www.boonedigital.com/services/wi-fi-splash-pages/ ("A Wi-Fi Splash page is a special web page that greets a visitor when they connect to a Wi-Fi Hotspot, such as in an Internet cafe or library.  Rather than just send the visitor directly to the Internet, the Splash Page appears first, allowing the Wi-Fi Hotspot provider the opportunity to message to the user.").  And "broadcasting" is how plaintiffs themselves have characterized Wi-Fi transmissions.  *See, e.g.*, Myhre Amended Compl. ¶ 46 (Docket No. 61 at Ex. 15); Van Valin Compl. ¶ 9 (Docket No. 61 at Ex. 6); Keyes Compl. ¶ 45 (Docket No. 61 at Ex. 8); Marigza Compl. ¶ 13 (Docket No. 61 at Ex. 13).

1   *with* § 2511(2)(g)(ii)(II) (describing a radio communication which may intercepted if "readily

2   accessible to the general public").  It would make no sense for the statute to define a "radio

3   communication" as only those communications one sends over radio intending them to be

4   publicly accessible, and then include a list of transmissions defined as "radio communications"

5   that can be intercepted in all circumstances.[3]  In short, plaintiffs should not be heard to claim that

6   the definition of "radio communication" incorporates some aspect of subjective intent of the

7   transmitter.

8           Alternatively, plaintiffs may argue that "electronic communications" cannot be "radio

9   communications."  *See* Docket No. 75 at 39.  That view defies the text of the Wiretap Act:

10  "electronic communication" is defined to include information "transmitted in whole or in part by

11  a . . . radio."  18 U.S.C. § 2510(12).  It also clashes with the Wiretap Act's legislative history,

12  which states that:

13          Inclusion of the term "radio" in the definition of "electronic communication" in
            Section 2510(12) reflects the fact that radio communications come within the
14          scope of chapter 119.  A number of other provisions, however, affect the legality
            of the interception of radio communications . . . .
15

16  H.R. Rep. No. 99-647, at 36 (1986).  And it contradicts plaintiffs' own position that "all radio

17  communications are electronic communications."  Docket No. 64 at 4.  Under the Wiretap Act,

18  an "electronic communication" may simultaneously be classified as a "radio communication."

19          The Court should reject these and any other efforts by plaintiffs to limit artificially the

20  plain meaning of the term "radio communication."

21      **B.    Home Wi-Fi Networks Transmit "Radio Communications" Within The
                Purview Of The Wiretap Act's Usage Of That Term.**
22

23          Wi-Fi networks (placed in a home or otherwise) "transmit data over radio waves," *United*

24  *States v. Ahrndt*, No. 08-468, 2010 WL 373994, at *4 (D. Or. Jan. 28, 2010), and those

25  transmissions therefore constitute "radio communications" under the Wiretap Act.  Specifically,

26

27          [3]    Citizens band ("CB") broadcasts provide a stark example; those radio communications
        may be acquired lawfully in all cases, regardless of the expectations of the transmitter or notions
28      of ready accessibility.  18 U.S.C. § 2511(2)(g)(ii)(III).

1   "Wi-Fi networks operate on an unlicensed basis under Part 15 of the [Federal Communication]

2   Commission's rules, in the 2.4 and 5 GHz frequency bands." *See In The Matter Of Inquiry*

3   *Concerning The Deployment Of Advanced Telecommunications Capability To All Americans In*

4   *A Reasonable And Timely Fashion, And Possible Steps To Accelerate Such Deployment*

5   *Pursuant To Section 706 Of The Telecommunications Act of 1996*, Fifth Report, 23 FCC Rcd.

6   9615, at n.35 (2008); *AirPort Extreme Setup Guide*, at 31 (specifications for wireless router

7   manufactured by Apple stating that the device transmits over the 2.4 GHz and 5 GHz frequency

8   bands) (available at http://manuals.info.apple.com/en_US/AirPortExtreme_802.11n

9   _UserGuide.pdf).

10          Wi-Fi's use of the radio spectrum is evident from the technology's history.  Prior to 1985,

11  people were unable to engage in robust, unlicensed broadcasting over the 2.4 GHz and 5 GHz

12  bands of the radio spectrum.  *In The Matter Of Authorization Of Spread Spectrum And Other*

13  *Wideband Emissions Not Presently Provided For In The FCC Rules And Regulations*, FCC

14  Docket No. 81-413 at 1, First Report and Order (May 9, 1985) (Docket No. 61 at Ex. 16).  Wi-Fi

15  networks would not exist if that were the rule today.  But the FCC elected to open up those bands

16  for unlicensed civilian wireless technologies to allow all manner of radio-based consumer

17  devices to flourish.  *Id*. at B-2.

18          The technology that would develop into Wi-Fi was in its infancy in 1986 when Congress

19  passed ECPA, but subsequent amendments to the statute and the legislative history concerning

20  them make clear that transmissions sent over home Wi-Fi networks constitute "radio

21  communications" under the Wiretap Act.  In 1990, Senator Patrick Leahy—then Chairman of the

22  Senate Subcommittee on Technology and the Law—appointed a Privacy and Technology Task

23  Force that was "charged with examining new technologies and determining the adequacy and

24  effectiveness of the protections found in current federal law (most notably in the Electronic

25  Communications/Privacy Act)."  Digital Telephony and Law Enforcement Access to Advanced

26  Telecommunications Techs. and Servs.: Joint Hearing on H.R. 4922 and S. 2375 Before the

27  Subcomm. On Technology and the Law, 103d Cong. 1022 ("S. Hrg. 103-1022") at 179 (1994).

28  The task force examined a "host of new communications offerings" to determine whether they

1   were covered by ECPA, and if not, whether the statute should be amended to provide new

2   protections.  *Id.* at 182.

3         *Senator Leahy's task force specifically analyzed "'wireless' modems which can transmit*

4   *data between computers without the computers being wired together" and concluded—based on*

5   *Section 2510(16) —that "there is a likelihood that such communications will not be protected*

6   [*under the Wiretap Act*]  *unless the user goes to the expense of full data encryption." Id.* at 183.

7   Accordingly, it recommended "that the legal protections of ECPA be extended to cover new

8   wireless data communications, such as those occurring over . . . wireless local area networks

9   (LANs)."  H.R. Rep. No. 103-827(I), at 14 (1994).  In 1994, responding directly to this

10  recommendation, Congress amended Section 2510(16) so that all "electronic communications"

11  that constituted "radio communications" were deemed not "readily accessible to the general

12  public."  *See* Communications Assistance For Law Enforcement Act, Pub. L. 103-414 § 203

13  (1994) (adding Section 2510(16)(F), which stated that "an electronic communication" was a

14  radio communication not readily accessible to the general public); H.R. Rep. No. 103-827(I), at

15  10.  The amendment's purpose was to "provide protection for all forms of electronic

16  communications, including data, even when they may be transmitted by radio."  *Id.* at 32.  The

17  1994 amendment extended, for the first time, threshold ECPA coverage to Wi-Fi transmissions.

18        In 1996, however, *Congress repealed the 1994 amendment.  See* Antiterrorism and

19  Effective Death Penalty Act of 1996, Pub. L. 104-132 § 731(2) (deleting Section 2510(16)(F)).

20  That return to the status quo rendered wireless radio communications once again "readily

21  accessible to the general public" unless one of Section 2510(16)'s existing exceptions applies.

22  This history demonstrates that Section 2510(16) is the proper vehicle for determining whether a

23  communication sent over the radio spectrum is "readily accessible to the general public" and

24  shows beyond any doubt that Wi-Fi transmissions are "radio communications."

25    **C.    Cellular Telephone Calls Constitute Radio Communications And Were**
         **Intended By Congress To Come Within Section 2510(16)'s Enumerated**
26        **Exceptions To Ready Accessibility.**

27        The wireless portions of cellular telephone calls are "radio communications" under the

28  plain meaning of that term because they are transmitted over the radio spectrum.  *See* S. Rep. No.

1  99-541, at 8 ("cellular calls are radio-based communications"), 9 (cellular "technology uses both

2  radio transmission and wire to make 'portable' telephone service available").  Indeed, the

3  legislative history of ECPA's amendments to the Wiretap Act refers to "the radio portion of a

4  cellular telephone" call as a "radio communication."  *Id*. at 21.

5        Because cellular telephone calls constitute "radio communications" when they travel over

6  the radio spectrum, a court would turn to Section 2510(16) to determine whether they are

7  "readily accessible to the general public" within the meaning of the Wiretap Act.  The House

8  Report is clear that the common-carrier exception found in Section 2510(16)(D) was intended to

9  cover cellular telephone calls:

> Because cellular communication is transmitted over a communication system
> currently regarded by the FCC as a common carrier, the Committee also intends
> that such communication not be considered "readily accessible to the general
> public" at any time subsequent to the date of enactment, regardless of how a
> provider of cellular service is denominated by any state or how the FCC may
> classify any such provider in the future.

14  H.R. Rep. No. 99-647, at 32.[4]

15        In summary, the radio portions of cellular telephone calls constitute "radio

16  communications," and Congress intended that the common-carrier exception would render those

17  radio communications not "readily accessible to the general public" under Section 2510(16).

---

[4]     In addition, Congress also sought to protect cellular telephone calls from interception by deeming at least some of them "wire communications."  *See* S. Rep. No. 99-541, at 11 ("cellular communications . . . are included in the definition of 'wire communications' and are covered by the statute.").  To the extent that a cellular phone transmission is a "wire communication," then the generic exception of Section 2511(2)(g)(i) would not apply because "wire communications" are by statutory definition distinct from "electronic communications."  18 U.S.C. § 2510(12) (an "electronic communication" does not include "any wire . . . communication"); § 2511(2)(g)(i) (generic exception for acquiring "readily accessible" communications applies to "electronic communications").  Therefore, in certain cases, the question of ready accessibility does not guide the analysis of whether the interception of cellular telephone calls is lawful under the Wiretap Act.  That is, however, not true for Wi-Fi transmissions, which plaintiffs have correctly characterized as "electronic communications" under the Wiretap Act.  *See* CCAC ¶¶ 1, 2, 4, 119, 122, 129, 130; Docket No. 75 at 30:9-10 ("We allege that they are electronic communications.").

1

**<u>CONCLUSION</u>**

2

For the reasons stated in Google's papers and at the hearing on Google's motion to

3

dismiss, Google respectfully requests that the Court dismiss with prejudice the CCAC and enter

4

judgment in its favor.

5

Dated:  April 11, 2011                              Attorneys for Defendant Google Inc.

6

7

By:   /s/  David H. Kramer
             David H. Kramer

8

             Michael H. Rubin
             Bart E. Volkmer

9

             Caroline E. Wilson
             Wilson Sonsini Goodrich & Rosati

10

             650 Page Mill Road
             Palo Alto, CA 94304-1050

11

             Telephone:  (650) 493-9300
             Facsimile:   (650) 565-5100

12

             Email:  mrubin@wsgr.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28