| | |
|---|---|
| **SPECTOR ROSEMAN KODROFF & WILLS, PC**<br>Jeffrey L. Kodroff<br>jkodroff@srkw-law.com<br>John A. Macoretta<br>jmacoretta@srkw-law.com<br>Mary Ann Geppert<br>mgeppert@srkw-law.com<br>1818 Market St., Ste. 2500<br>Philadelphia, PA  19103<br>Tel. 215-496-0300<br>Fax. 215-496-6611<br><br>**COHEN MILSTEIN SELLERS & TOLL PLLC**<br>Daniel A. Small<br>dsmall@cohenmilstein.com<br>David A. Young<br>dyoung@cohenmilstein.com<br>1100 New York Avenue, NW, Suite 500<br>Washington, DC  20005<br>Tel. 202-408-4600<br>Fax. 202-408-4699<br><br>*Plaintiffs' Co-Lead Counsel*<br><br>**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**<br>Elizabeth J. Cabraser (SBN: 083151)<br>ecabraser@lchb.com<br>Michael W. Sobol (SBN: 194857)<br>msobol@lchb.com<br>Nicole D. Sugnet (SBN: 246255)<br>nsugnet@lchb.com<br>275 Battery Street, 29th Floor<br>San Francisco, CA  94111-3339<br>Tel. 415-956-1000<br>Fax. 415-956-1008<br><br>*Plaintiffs' Liaison Counsel* | **WILSON SONSINI GOODRICH & ROSATI**<br>Professional Corporation<br>Michael H. Rubin (SBN: 214636)<br>mrubin@wsgr.com<br>One Market Plaza, Spear Tower<br>Suite 3300<br>San Francisco, CA 94105<br>Tel. 415-947-2000<br>Fax. 415-947-2099<br><br>David H. Kramer (SBN: 168452)<br>dkramer@wsgr.com<br>Dylan J. Liddiard (SBN: 203055)<br>dliddiard@wsgr.com<br>650 Page Mill Road<br>Palo Alto, CA 94304-1050<br>Tel. 650-493-9300<br>Fax. 650-565-5100<br><br>*Attorneys for Defendant Google Inc.* |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: GOOGLE INC. STREET VIEW ELECTRONIC COMMUNICATIONS LITIGATION | Case No.  3:10-md-02184-CRB<br><br>**COVER PAGE FOR JOINT LETTER TO MAGISTRATE JUDGE MARIA-ELENA JAMES RE DISCOVERY DISPUTE** |

Pursuant to the Court's Standing Order, Plaintiffs and Defendant Google Inc. submit this joint letter regarding a discovery dispute they were unable to resolve, despite meeting and conferring in person in a good faith attempt to resolve this dispute.

Dated: August 8, 2014              Respectfully submitted,

    / s /  Nicole D. Sugnet
*Counsel for Plaintiffs and the Class*

    / s /  Michael H. Rubin
*Counsel for Google Inc.*

The District Court has authorized "limited discovery on the issue of standing." Dkt. No. 108. Plaintiffs argue that Google should be required to produce "All Street View Data" to Plaintiffs, so that Plaintiffs can analyze such data for information relevant to their standing. Google argues that Plaintiffs' demand violates the limited discovery order, and that Plaintiffs should instead be directed to provide information so that Google can have a third party search the data or, alternatively, that the Court appoint a special master to conduct the searches.

## I. PLAINTIFFS' POSITION

Plaintiffs bring this class action on behalf of all persons in the United States whose Wi-Fi communications were surreptitiously intercepted, recorded, and stored by Google in violation of the Wiretap Act. Google programmed its fleet of "Street View" vehicles to automatically connect to every wireless network in range as they traveled streets throughout the United States and the rest of the world. For over three years, Google recorded communications transmitted over unencrypted networks, and then transferred them to its own computers.

After the Ninth Circuit affirmed the denial of Google's Motion to Dismiss, the District Court authorized "limited discovery on the issue of standing." Dkt. No. 108. To determine whether Plaintiffs' Wi-Fi communications are among those that Google intercepted, Plaintiffs have agreed, after conferring with Google, to accept a very limited amount of information: (1) the Street View Data, and (2) two documents, which Google has agreed to produce, to help Plaintiffs understand the data and any changes to it.[1] Plaintiffs and Google agree that the Street View Data is the dataset that must be searched for the named Plaintiffs' communications. Google's sole dispute is *who* conducts the searches—a task likely to be anything but ministerial. Consistent with standard discovery practices and the importance of this issue, Plaintiffs seek to use their own retained expert to independently understand and then analyze the data. Google objects and seeks to require its input on the search parameters through a jointly-retained third party expert. Plaintiffs respectfully request that the Court order Google to produce the Street View Data to Plaintiffs for their own review and searching.[2]

The Court should order Google to produce the Street View Data to Plaintiffs for several reasons. First, Plaintiffs are entitled to discover any non-privileged matter that is relevant to their standing, *see* Fed. R. Civ. P. 26(b)(1), and Google agrees that the Street View Data are the proper material to search.

Second, as Google implicitly acknowledges in its own proposal, the Street View Data are

---

[1] Plaintiffs' requests for production and a Rule 30(b)(6) deposition are attached hereto as Exhibit 1. Based on extended meet and confer discussions with Google, Plaintiffs agreed to defer Requests 2, 3, 4, and 6 and the noticed deposition, and to narrow the scope of Requests 5 and 7 to the two documents referenced above. They have also narrowed the definition of "Street View Data" to include only (i) network traffic from unencrypted wireless networks and (ii) associated GPS information, that were recorded by Google Street View vehicles operating in the United States from January 1, 2007 through May 15, 2010. The intercepted network traffic includes both the content of Internet communications ("payload data")—the subject of this litigation—and basic network information.

[2] This limited data, purportedly contained on "dozens" of disks, creates no meaningful burden of production on Google, particularly where Google already deposited much of the data with the Court.

not susceptible to a simple "keyword" search that can be agreed to by the parties in advance. Searching for their communications will likely require Plaintiffs to study the data, review search results, and develop new strategies based on what they find or what they learn about the data. For example, Google likely captured only fragments of some messages, and Plaintiffs cannot predict the best way to search those fragments without knowing more about what was captured. Similarly, examining the data intercepted in the immediate vicinity of the Plaintiffs' residences may provide contextual clues for determining whether any fragments belong to them. Plaintiffs cannot know in advance what clues—like names of acquaintances or references to events they attended—will exist. Given the importance of this potentially case dispositive issue, Plaintiffs should be unconstrained in using their own ingenuity and efforts to find, as Google puts it, "the needle in the haystack" of the 200 gigabytes of data Google intercepted in the United States.

Third, the Street View Data contains *class members'* communications that Google intercepted, not Google's communications. Google has *no* privacy or proprietary or other interest in that information, and should not even possess it. Google argues that Plaintiffs have no more right to search the Street View Data than to inspect Google's filing cabinets. The correct analogy, however, is that Plaintiffs seek to inspect the putative class's filing cabinets, which are in Google's offices because Google took them. Google's reliance on cases involving production of a party's own data is misplaced.[3]

Fourth, putative class members are depending on Plaintiffs to find Plaintiffs' communications in the Street View Data, so that Plaintiffs can continue to represent class members' interests. Class members are also relying on Interim Class Counsel—appointed by this Court under Rule 23(g)(1) to represent the interests of the putative class—to use their resources, persistence, and ingenuity to find Plaintiffs' communications in the Street View Data. Plaintiffs and Interim Class Counsel have the obligation to use their best efforts to find Plaintiffs' communications. Google has the opposite incentive. At best, the iterative search process described above would be prolonged by requiring, as Google proposes, coordination with the third-party expert and input and agreement from Google; more likely, Plaintiffs' ability to fully and effectively search the Street View Data would be materially compromised.

Fifth, Google's proposal is highly inefficient. The parties have already negotiated for months over Plaintiffs' discovery requests, suggesting it could take (at least) several more to negotiate the selection of the third party and the search protocols and present any disagreements to the Court. And we already know such disagreements will exist. For example, Plaintiffs are entitled to search all of the intercepted data, not just that captured from Plaintiffs' own networks, to ascertain whether Google intercepted Plaintiffs' communication, because any Plaintiff whose communications were intercepted while being transmitted over someone else's unencrypted Wi-Fi network has standing and is within the proposed class. *See* 18 U.S.C. § 2520(a); Consol. Class Action Compl. ¶ 119 (Dkt. No. 54). For example, using her e-mail address, a Plaintiff may locate an e-mail she sent her sister that was intercepted while transmitted over her sister's unencrypted

---

[3] Additionally, the inapposite cases cited by Google involve either straightforward searches for specific documents, review of privileged information, or requests to forensically examine deleted material, not the iterative analysis of the admittedly relevant database Plaintiffs seek here. Moreover, any confidentiality concerns can be addressed with a confidentiality order. Plaintiffs sent Google a draft protective order on April 4, based heavily on the model protective order for this District.

Wi-Fi network. Plaintiffs are entitled to use this and other techniques to search for their intercepted communications, no matter the network from which Google intercepted those communications.[4] However, Google has made it clear that it will object to searches for communications intercepted from networks other than those of the named Plaintiffs. Google should have no say in how Plaintiffs search the data, but under its approach, it will litigate this issue and likely many others, all before the searches are even run.

This inefficiency is especially wasteful given that some disputed searches would not find any of Plaintiffs' communications, and the Court will end up deciding academic issues. The far more reasonable and efficient approach is for Plaintiffs to search the recorded data, and if they locate a communication they believe belongs to a named Plaintiff, Google can then examine the communication and make any arguments it would like at that time.[5]

Plaintiffs respectfully request that the Court reject Google's unorthodox, inadequate, and inefficient proposal, and order Google to produce the Street View Data to Plaintiffs.

## II. GOOGLE'S POSITION

Demanding an entire haystack to look for a few needles is inconsistent with this Court's limited jurisdictional discovery order (and the Federal Rules), but that's the relief Plaintiffs are seeking. Outright denial of Plaintiffs' overly-broad request (although warranted) is not the outcome Google favors. Instead, Google has proposed two alternative paths, either of which would resolve the standing issue consistent with the Court's order: the Court should either *(1)* direct Plaintiffs to provide search terms and other information to Google so that the parties can determine whether any of Plaintiffs' communications are in the payload data—that's how electronic discovery ordinarily proceeds; *or (2)* appoint a special master to conduct an orderly search of the data.

Only a tiny fraction of the Street View Data (at most) could possibly relate to Plaintiffs, and some background helps to underscore why either of Google's two approaches make sense as a means to locate it. Between 2008 and May 2010, Google Street View vehicles drove along public roads, passively collecting network identifying information openly broadcast by Wi-Fi networks. Google sought this information because knowing the location of Wi-Fi networks helps it provide "location aware" services, such as directions. In May 2010, Google discovered that the vehicles had also acquired so-called "payload data" from Wi-Fi networks that were configured to be open—*i.e.*, networks that were not password protected. But the acquisition of that data was subject to significant technological limitations: an in-range unencrypted Wi-Fi network must

---

[4] Again, the key point is that Plaintiffs cannot fairly be required to specify all possible searches without seeing the data and without engaging in an iterative process of developing more refined and/or alternative searches based on their review of the data and free of Google's interference.

[5] Google's contention that Plaintiffs will "fish" the Street View Data for better Plaintiffs is a red herring. As we explain, Plaintiffs need all of the intercepted data to effectively search for their communications, and Google's argument is premature before Plaintiffs have determined whether their own communications are in the Street View Data. In any event, Plaintiffs do not object to the Court restricting their use of the data solely to searching for Plaintiffs' communications, and requiring leave of the Court if counsel later determines that their obligations to the proposed class call for any other uses of the data.

3

have been transmitting data at the very moment that a Street View vehicle happened to pass by. And, even then, since Google's software was designed to identify networks for location purposes, it cycled through available Wi-Fi channels at the rate five times *per second*. That means that data from a given network could have been acquired only if it was transmitted to the street during the one-fifth of a second that the vehicle's software could see that specific network.

These constraints illustrate how unlikely it is that any one individual's Wi-Fi communications were acquired by a Street View car driving down the road. Unsurprisingly, Plaintiffs offer no *facts* to support their allegations of standing, which are made merely "on information and belief." Compl. ¶¶ 18-38. Recognizing that this case could not proceed if Plaintiffs could not substantiate these allegations, the Court rejected Plaintiffs' requests for unfettered discovery and allowed only limited discovery into standing. *See* Dkt. No. 108. Although Plaintiffs have now abandoned much of the overly-broad discovery they initially sought even after that ruling, they still demand *all* of the Street View Data so that they may rummage through it.[6] But *all* of the Street View Data is not relevant to assessing whether the named Plaintiffs have standing—only the *named Plaintiffs' data* is relevant to that question. Plaintiffs' request that *all* of it be produced is thus overbroad and ignores the Court's order, and it should be constrained.

Significantly, the Rules do not permit Plaintiffs to obtain all of the Street View Data just so that they can search it. "'Rule 34(a) does not give the requesting party the right to conduct the actual search.'" *Powers v. Cooley Law Sch.*, 2006 U.S. Dist. LEXIS 67706, at *12 (W.D. Mich. Sept. 21, 2006) (citation omitted). Instead, "[t]he discovery process . . . relies upon the *responding party* to search his records." *Id.* at 14 (emphasis added). Plaintiffs cannot justify subverting this bedrock principle, particularly when (i) at most only an infinitesimal amount of the data at issue could relate to Plaintiffs, (ii) serious doubts exist about Plaintiffs' standing, and (iii) Plaintiffs' claimed need for *all* of the data is entirely speculative—based solely on a "likely" need to study the data. *Supra* p. 2. Plaintiffs do not have an "an unfettered right to conduct [their] own examination" of all the payload data. *Advante Int'l Corp. v. Mintel Learning Tech.*, 2006 U.S. Dist. LEXIS 45859, at *2, 4 (N.D. Cal. June 29, 2006).[7] Instead, Google proposes two options.

***The Court Can Direct Plaintiffs to Provide Information to Google***. As in any other case, discovery can proceed by Plaintiffs providing information, including search terms, which would allow for a determination of whether their individual Wi-Fi communications are in the payload data. Google would then engage a third party to conduct the actual search. *See, e.g.*, *Lee v. Stonebridge Life Ins. Co.*, 2013 U.S. Dist. LEXIS 106654, at *6 (N.D. Cal. July 30, 2013) (providing search terms to the responding party "is how discovery of electronically stored information is routinely performed"). Any need to iteratively search the data is no reason to discard the normal practice—courts routinely direct parties to come up with appropriate searches togeth-

---

[6] *See* Request No. 1, Pls.' Notice Pursuant to Fed. R. Civ. P. 30(B)(2) & 30(B)(6) & First Set of Reqs. For Produc. of Docs. Pursuant to Rule 34 (Ex. 1) ("Requests").

[7] Plaintiffs' analogy that they are "seek[ing] to inspect the putative class's filing cabinets, which are in Google's offices" demonstrates just how overbroad their request is. Discovery here is expressly limited to determining the standing of the *named* Plaintiffs; Plaintiffs should be denied access to data that they *admit* cannot relate to parties before the court. *See, e.g.*, *Calyon v. Mizuho Sec. USA Inc.*, 2007 U.S. Dist. LEXIS 36961, at *6 & n.4, 10 (S.D.N.Y. May 18, 2007) (denying plaintiff access to defendants' hard drives due to *inter alia* concerns about access to third-parties' data)*.* And no protective order could justify Plaintiffs' fishing expedition.

er. *See id.* at *6-8 (rejecting defendant's claim that its expert needed the "'*flexibility*'" to "'follow . . . leads'" and ordering the parties to "meet and confer to discuss a list of search terms").

**The Court Can Appoint a Special Master**. In appropriate cases, courts appoint special masters or "neutrals" to conduct searches of electronic records. *See Commercial Law Corp. v. FDIC*, 2012 U.S. Dist. LEXIS 5743, at *5-10 (E.D. Mich. Jan. 18, 2012). Google proposed just such an approach here—as a compromise. The parties would agree to a special master's protocol to determine whether any named Plaintiffs' communications are in the payload data.[8] This approach has many advantages, including ensuring that discovery remains limited to standing.

*First*, this approach is consistent with the Federal Rules. *See* Fed. R. Civ. P. 53(a)(1)(C). Courts routinely appoint special masters or "neutrals" to review databases because it requires technical expertise, cannot be effectively and timely addressed by a judge, and can serve to protect other interests. *See, e.g.*, *Commercial Law*, 2012 U.S. Dist. LEXIS 5743, at *5-10; *Simon Prop. Group L.P. v. MySimon, Inc.,* 194 F.R.D. 639, 641-42 (S.D. Ind. 2000); *Playboy Enters. v. Welles,* 60 F. Supp. 2d 1050, 1054-55 (S.D. Cal. 1999). Indeed, this Court ordered the appointment of a special master to review hard drives if the parties could not resolve the dispute themselves. *SEIU v. Rosselli*, 2009 U.S. Dist. LEXIS 80881, at *14 (N.D. Cal. Aug. 20, 2009).

*Second*, this approach is more efficient and would expedite jurisdictional discovery. The parties would simply provide the information necessary to see if any of Plaintiffs' communications are present in the Street View Data. And because the search protocol would be known by both parties, there would be no need for further discovery into each side's experts' methodology if any of Plaintiffs' communications happen to be located. And a special master's report would be less susceptible to collateral attacks and claims of bias than the conclusions of either party.

*Third*, a special master would protect any interests that parties not before the Court might have, and prevents Plaintiffs' counsel from using the data to "fish" for new class representatives. *See Bradbury v. T-Mobile*, 2009 U.S. Dist. LEXIS 100550, at *2-3, 4 (N.D. Cal. Oct. 20, 2009). Plaintiffs allege that the payload data contains private information, yet they seek the right to rummage through all of it. A special master obviates the need for access by *either* party.

*Fourth*, this approach would reduce Google's burden. If Google were ordered to produce the data to Plaintiffs, many dozens of existing disks would need to be copied. That would take a significant amount of time. But if Google's proposal is endorsed by the Court, Google could simply turn over the original disks directly to a special master.

Plaintiffs nevertheless rejected Google's compromise proposal as soon as it was made, insisting instead that Google must turn over all of the data. But their objections are unavailing. Contrary to their claim, Google would not "interfere" with (or seek to approve) the neutral's searches, nor would Google's approval be needed for the neutral's selection. *See* Ex. 2.A ¶ 1(b)(i). And Google's proposal expressly includes a process for iteratively searching the data (*see id.* ¶ 2(e)(i)). Thus, Google respectfully requests that the Court reject Plaintiffs' request for all payload data and instead adopt one of the two approaches to jurisdictional discovery proposed by Google.

---

[8] This proposal was first provided to Plaintiffs in February 2014 and is an exhibit to Google's Amended Objections and Responses to Plaintiffs' Discovery Requests. Google's Amended Objections are attached as Exhibit 2. For convenience, the proposal is referred to as Exhibit 2.A.

## **ATTESTATION**

I, Nicole D. Sugnet, am the ECF User whose identification and password are being used to file this **JOINT LETTER TO MAGISTRATE JUDGE MARIA-ELENA JAMES RE DISCOVERY DISPUTE**.  In compliance with Civil L.R. 5-1, I hereby attest that Michael H. Rubin has concurred in this filing.

Dated:  August 8, 2014                                          By: /s/  Nicole D. Sugnet
                                                                                    Nicole D. Sugnet