Jeffrey L. Kodroff
John A. Macoretta
Mary Ann Geppert
SPECTOR ROSEMAN & KODROFF PC
2001 Market Street
Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile:  (215) 496-6611

Daniel A. Small
COHEN MILSTEIN SELLERS & TOLL
1100 New York Avenue NW
Suite 500 West
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

*Interim Class and Co-Lead Counsel*

Elizabeth J. Cabraser
Michael W. Sobol
Melissa Gardner
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 9411
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Interim Class and Liaison Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE LLC STREET VIEW ELECTRONIC COMMUNICATIONS LITIGATION** | Case No.  3:10-md-02184-CRB **CLASS ACTION** **PLAINTIFFS' NOTICE OF MOTION; MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; AND MEMORANDUM OF POINTS AND AUTHORITIES** |

Date:            September 6, 2019
Time:            10:00 a.m.
Courtroom:    6
Judge:           The Hon. Charles R. Breyer

1

## NOTICE OF MOTION

2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3

**PLEASE TAKE NOTICE** that Plaintiffs, Dean Bastilla, Rich Benitti, Matthew Berlage,

4 David Binkley, James Blackwell, Stephanie and Russell Carter, Jeffrey Colman, Bertha Davis,

5 James Fairbanks, Wesley Hartline, Benjamin Joffe, Patrick Keyes, Aaron Linsky, Lilla Marigza,

6 Eric Myhre, John Redstone, Danielle Reyas, Karl Schulz, Jason Taylor, and Vicki Van Valin

7 (collectively, "Plaintiffs"),[1] will move the Court for an order, pursuant to Federal Rule of Civil

8 Procedure ("Rule") 23(e), granting preliminary approval of the proposed class action Settlement

9 Agreement[2] entered into by Plaintiffs and Google LLC ("Google") (collectively, "Parties"), on

10 Friday September 6, 2019 at 10:00 a.m., or at such other time as may be set by the Court, at 450

11 Golden Gate Avenue, Courtroom 6, San Francisco, CA 94102, before The Honorable Charles R.

12 Breyer, United States District Judge for the Northern District of California, consistent with the

13 following:

14
15   (a)   Granting preliminary approval of the proposed Settlement Agreement entered into between the Parties;

16   (b)   Determining that the Court, at the final approval stage, will likely certify the Settlement Class as defined in the Settlement Agreement;

17   (c)   Appointing Plaintiffs as Class Representatives of the proposed Class;

18
19   (d)   Appointing the law firms Spector Roseman & Kodroff, P.C. ("SRK"), Cohen Milstein Sellers & Toll, PLLC ("CMST"), and Lieff Cabraser Heimann & Bernstein LLP ("LCHB") as Class Counsel for the proposed Class;

20
21   (e)   Approving the Parties' proposed Notice Program outlined herein, including the proposed "Notice of Class Action Settlement" Long Form ("Long Form"), and directing that notice be disseminated pursuant to the Notice Program;[3]

22
23   (f)   Appointing A.B. Data as Notice Administrator, and directing A.B. Data to carry out the duties and responsibilities of the Class Administrator specified in the Settlement Agreement;

24 _____

[1] Named Plaintiff Jennifer Locsin does not move to serve as Class Representative as Class
25 Counsel, after several attempts, has been unable to contact her or her attorney.

[2] *See* Settlement Agreement of June 11, 2018, attached as Exhibit A to the Declaration of Jeffrey
26 L. Kodroff ("Kodroff Decl.") filed herewith.

[3] *See* Declaration of Linda V. Young, Vice President, Media with A.B. Data, Ltd. ("A.B. Data"),
27 attached as Exhibit J to the Kodroff Decl.; Notice Program attached as Kodroff Decl., Exhibit J-1 and Long Form attached as Kodroff Decl., Exhibit J-5.

28

PTFFS' NOTICE OF MTN, MTN FOR PRELIM
APPROVAL OF SETTLEMENT; MPA ISO MTN
CASE NO.  3:10-MD-02184-CRB

1

     (g)     Staying all non-Settlement related proceedings in the above-captioned case pending final approval of the Settlement Agreement; and

2

3

     (h)     Setting a Fairness Hearing and certain other dates in connection with the final approval of the Settlement Agreement.

4

     This Motion is based on this Notice of Motion and Motion, the accompanying

5

Memorandum of Points and Authorities, the Settlement Agreement, the Declaration of Jeffrey L.

6

Kodroff with supporting exhibits, the Declaration of Linda V. Young of A.B. Data attached

7

thereto with supporting exhibits, the argument of counsel, all papers and records on file in this

8

matter, and such other matters as the Court may consider.

9

Dated: July 19, 2019               Respectfully submitted,

10

                    By:          */s/ Jeffrey L. Kodroff*

11

                          Jeffrey L. Kodroff

12

                    SPECTOR ROSEMAN & KODROFF PC
                    Jeffrey L. Kodroff

13

                    John A. Macoretta
                    Mary Ann Geppert

14

                    2001 Market Street
                    Suite 3420

15

                    Philadelphia, PA 19103
                    Telephone:  (215) 496-0300

16

                    Facsimile:  (215) 496-6611
                    Email:  jkodroff@srkwlaw.com

17

                    COHEN MILSTEIN SELLERS & TOLL

18

                    Daniel A. Small
                    1100 New York Avenue NW

19

                    Suite 500 West
                    Washington, DC 20005

20

                    Telephone:  (202) 408-4600
                    Facsimile:  (202) 408-4699

21

                    Email:  dsmall@cohenmilstein.com

22

                    *Interim Class and Co-Lead Counsel*

23

24

25

26

27

28

1
2
3
4
5
6

Elizabeth J. Cabraser (State Bar No. 083151)
ecabraser@lchb.com
Michael W. Sobol (State Bar No. 194857)
msobol@lchb.com
Melissa Gardner (State Bar No. 289096)
mgardner@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

7

*Interim Class and Liaison Counsel*

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PTFFS' NOTICE OF MTN, MTN FOR PRELIM
APPROVAL OF SETTLEMENT; MPA ISO MTN
CASE NO.  3:10-MD-02184-CRB

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................. 1

II.  LITIGATION HISTORY .................................................................................. 3

    A.   Procedural History .................................................................................. 3

    B.   Discovery ................................................................................................. 3

    C.   Settlement ................................................................................................ 4

III. SUMMARY OF SETTLEMENT TERMS ....................................................... 4

    A.   Class Definition ...................................................................................... 4

    B.   Settlement Fund Payments ...................................................................... 4

    C.   Injunctive Relief ..................................................................................... 5

    D.   Cy Pres .................................................................................................... 5

    E.   Release .................................................................................................... 9

    F.   Proposed Schedule of Events ................................................................ 10

IV.  ARGUMENT ................................................................................................. 10

    A.   Plaintiffs Have Alleged an Injury in Fact and Satisfy All Article III
        Requirements .......................................................................................... 11

    B.   The Court Will Be Able to Certify the Proposed Settlement Class. ..... 14

        1.   The Requirements of Rule 23(a) Are Satisfied. ....................... 14

            a.   Numerosity Is Satisfied. ................................................ 14

            b.   Commonality Is Satisfied. ............................................. 15

            c.   Typicality Is Satisfied .................................................... 16

            d.   Adequacy of Representation Is Satisfied. ..................... 16

        2.   Class Certification Is Appropriate Under Rule 23(b)(3). .......... 17

            a.   Common Questions of Law or Fact Predominate Over
                Individual Issues. .......................................................... 18

            b.   Class Treatment Is a Superior Method of Adjudication ... 19

    C.   The Proposed Settlement Is Fundamentally Fair, Adequate and Reasonable ....... 19

        1.   The Class Representatives and Class Counsel Have Adequately
            Represented the Class. ................................................................ 20

        2.   The Settlement Agreement Was Negotiated at Arm's Length ... 20

        3.   The Meaningful, Well-Tailored Relief Provided for the Class Is
            Adequate and Appropriate for This Case. ................................. 22

            a.   The Cy Pres Awards Relate to the Nature of Plaintiffs'
                Lawsuit, the Objectives of the Wiretap Act, and the Interests
                of the Absent Class Members. ...................................... 23

            b.   The Costs, Risks, and Delay from Trial and Appeal Show
                that the Recovery Contained in the Cy Pres Settlement Is
                Adequate. ...................................................................... 24

**TABLE OF CONTENTS**
(continued)

Page

c. The Proposed Method of Distributing Relief on Behalf of the Class Is Effective.................................................................. 26

d. Information About Past Distributions in Comparable Class Settlements Supports a Finding of Fairness, Reasonableness, and Adequacy.............................................................................. 28

e. Any Award of Attorneys' Fees Will Not Prevent the Court from Finding that the Relief Provided to the Class Is Adequate. ............................................................................... 30

f. There Are No Other Agreements Required to Be Identified Under Rule 23(e)(3). ....................................................... 30

 4. The Settlement Agreement Treats Class Members Equitably Relative to Each Other. ............................................................. 30

D. The Court Should Approve the Proposed Program for Class Notice. .................. 31

 1. The Proposed Method of Providing Notice Is the Best Notice Practicable Under the Circumstances.......................................... 31

 2. The Contents of the Notice Are Clear and Appropriate and Should Be Approved. ......................................................................... 33

V. CONCLUSION.................................................................................................. 34

# TABLE OF AUTHORITIES

Page

## CASES

*Allen v. Bedolla*,
  787 F. 3d 1218 (9th Cir. 2015) ........................................................................... 10

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) ............................................................................................ 14

*Campbell v. Facebook Inc.*,
  315 F.R.D. 250 (N.D. Cal. 2016) .......................................................... 25, 28, 29

*Churchill Vill., L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) .............................................................................. 33

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ............................................................................ 10

*Clemens v. Hair Club for Men, LLC*,
  No. 15-01431, 2016 WL 1461944 (N.D. Cal. Apr. 14, 2016) ............................ 17

*Coneff v. AT & T Corp.*,
  673 F.3d 1155 (9th Cir. 2012) ............................................................................ 27

*Custom LED, LLC v. eBay, Inc.*,
  No. 12-350, 2013 WL 6114379 (N.D. Cal. Nov. 20, 2013) ................................ 10

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................................................ 11

*Dennis v. Kellogg Co.*,
  697 F.3d 858 (9th Cir. 2012) .............................................................................. 26

*DirecTV, Inc. v. Huynh*,
  No. 04-3496, 2005 WL 5864467 (N.D. Cal. May 31, 2005) .......................... 25, 26

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ............................................................................................ 31

*Frank v. Gaos*,
  139 S. Ct. 1041 (2019) ........................................................................................ 11

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................................ 15, 17, 18

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .............................................................................. 16

*Hendricks v. StarKist*,
  No. 13-00729, 2015 WL 4498083 (N.D. Cal. July 23, 2015) ............................ 31

*Hesse v. Sprint Corp.*,
  598 F.3d 581 (9th Cir. 2010) .............................................................................. 10

*Hughes v. Kore of Indiana Enter., Inc.*,
  731 F.3d 672 (7th Cir. 2013) .............................................................................. 27

*In re Abbot Labs. Norvir Anti-trust Litig.*,
  No. 04-1511, 2007 WL 1689899 (N.D. Cal. June 11, 2007) .............................. 14

*In re Anthem, Inc. Data Breach Litig.*,
  327 F.R.D. 299 (N.D. Cal. 2018) ........................................................................ 10

*In re Bluetooth Headset Prod. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) .............................................................................. 21

*In re Google Buzz Privacy Litig.*,
  No. 10-672 (N.D. Cal. Sept. 3, 2010) ................................................................... 2

*In re Google Referrer Header Privacy Litig.*,
  869 F.3d 737 (9th Cir. 2017) .............................................................................. 23

*In re Netflix Privacy Litig.*,
  11-379 (N.D. Cal. Mar. 18, 2013) ........................................................................ 2

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  MDL No. 2672, 2017 WL 672727 (N.D. Cal. Feb. 16, 2017) ..................... passim

# TABLE OF AUTHORITIES
## (continued)

Page

*In re Yahoo Mail Litig.*,
  308 F.R.D. 577 (N.D. Cal. 2015)............................................................. 15, 30

*Jordan v. County of Los Angeles*,
  669 F.2d 1311 (9th Cir. 1982).................................................................. 14

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012)................................................. 2, 6, 23, 26

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)....................................................................... 11

*Matera v. Google, Inc.*,
  No. 15-04062, 2016 WL 5339806 (N.D. Cal. Sept. 23, 2016) .......... 13, 28, 29

*Nachshin v. AOL, LLC*,
  663 F.3d 1034 (9th Cir. 2011)................................................. 6, 22, 23, 26

*O'Connor v. Uber Techs., Inc.*,
  No. 13-03826, 2019 WL 1437101 (N.D. Cal. Mar. 29, 2019).......... 19, 20, 30

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014)........................................................... 16

*Philips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)................................................................... 31

*Rackemann v. LISNR, Inc.*,
  No. 17-00624, 2017 WL 4340349 (S.D. Ind. Sept. 29, 2017)............... 13

*Radcliffe v. Experian Info. Sols. Inc.*,
  715 F.3d 1157 (9th Cir. 2013)....................................................... 16

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009)..................................................... 24, 25

*Sciortino v. PepsiCo, Inc.*,
  No. 14-00478, 2016 WL 3519179 (N.D. Cal. June 28, 2016)................. 20

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990)................................................... 26, 27

*Spokeo v. Robins*,
  136 S. Ct. 1540 (2016)....................................................... 11, 12, 13

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016)............................................................... 18

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996).......................................................... 19

*Van Patten v. Vertical Fitness Grp., LLC*,
  847 F.3d 1037 (9th Cir. 2017).......................................................... 13

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)............................................................... 14, 30

*Warth v. Seldin*,
  422 U.S. 490 (1975)................................................................. 12

*Wolin v. Jaguar Land Rover N. Am., LLC*,
  617 F.3d 1168 (9th Cir. 2010)................................................... 16, 19

## STATUTES

18 U.S.C. § 2511(1)(a) ............................................................... 12
18 U.S.C. § 2511(2)(d)............................................................... 25
18 U.S.C. § 2511(c)................................................................. 27
18 U.S.C. § 2511, *et. seq.*........................................................ 16
18 U.S.C. § 2520 ............................................................ 12, 18, 26
18 U.S.C. §§ 2510, *et seq.*......................................................... 1
28 U.S.C. § 1715................................................................... 33
Cal. Bus. & Prof. Code §§17200, *et seq.* ........................................... 3

**TABLE OF AUTHORITIES**
**(continued)**

Page

### RULES

Fed. R. Civ. P. 23(a) ................................................................................ 11, 14, 15, 16

Fed. R. Civ. P. 23(b) ......................................................................................... passim

Fed. R. Civ. P. 23(c) ........................................................................................... 31, 33

Fed. R. Civ. P. 23(e) .......................................................................................... passim

Fed. R. Civ. P. 23(g) ................................................................................................. 17

### TREATISES

ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS §3.3 (4TH ED.
2002) ............................................................................................................................ 14

American Law Institute, *Principles of the Law of Aggregate Litigation* (2010)
§ 3.07, cmt. b. ..................................................................................................... 26, 27

Restatement (Second) of Torts § 625B ..................................................................... 13

### OTHER AUTHORITIES

Bartholomew, *Saving Charitable Settlements*, 83 FORDHAM L. REV. 3241 (2015) ...................... 27

H.R. Rep. No. 99-647 (1986) ..................................................................................... 12

S. Rep. 99-541, *reprinted in* 1986 U.S.C.C.A.N. 3555 (1986) ................................... 12

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.**     <u>**INTRODUCTION**</u>

3         This proposed nationwide class action settlement resolves a claim against Google for

4    damages and declaratory and injunctive relief under Title III of the Omnibus Crime Control and

5    Safe Streets Act of 1968 (the "Wiretap Act"), as amended by the Electronic Communications

6    Privacy Act of 1986 ("ECPA"), 18 U.S.C. §§ 2510, *et seq.* Plaintiffs allege[4] that their privacy

7    was violated, as well as that of the proposed Class Members, when Google engineers created

8    software specifically designed to intercept, decode, and analyze all types of payload[5] data

9    contained in electronic communications traveling over unencrypted wireless internet connections

10   ("Wi-Fi connections"), embedded the software onto Google Street View vehicles, and then used

11   the software to intentionally intercept Plaintiffs' and proposed Class Members' electronic

12   communications from January 1, 2007 through May 15, 2010. *See* CCAC, D. 54, ¶¶ 1-4; Kodroff

13   Decl., Exhibit A, ¶ 2. Google then compiled the private payload data[6] from the Street View

14   vehicles and stored it on its servers.

15        The Settlement Agreement was achieved after nearly a decade of litigation, including a

16   contested motion to dismiss, its appeal to the Ninth Circuit, which affirmed Plaintiffs' properly

17   pled claim under the Wiretap Act, substantial jurisdictional discovery on the issue of standing,

18   over five months of arm's-length negotiations, and mediation. It seeks to restore and strengthen

19   the privacy of Plaintiffs and the proposed Class Members' electronic communications through *cy*

20   *pres* awards and injunctive relief.

21        First, the Settlement Agreement calls for the establishment of a $13 million settlement

22   fund to be distributed, after the deduction of settlement administration expenses, litigation

23   expenses, service awards, and attorneys' fees, to court-approved *cy pres* recipients who are

24   ---

[4] For purposes of the this Motion for Preliminary Approval, references and discussion regarding Google's conduct of intercepting Plaintiffs' and Class Members' electronic communications in violation of the Wiretap Act are all based on the allegations contained in the Consolidated Class Action Complaint ("CCAC.").

[5] Payload data includes "personal emails, passwords, videos, audio, documents and Voice Over Internet Protocol ("VOIP") information." *See* CCAC, ECF Docket No. ("D.") 54, ¶ 4.

[6] Plaintiffs allege that Google admitted to collecting 600 gigabytes of data in more than 30 countries. *See* CCAC, D. 54, ¶¶ 73, 75.

independent organizations with a track record of addressing consumer privacy concerns on the Internet and/or in connection with the transmission of information via wireless networks; as a condition of receiving the settlement funds, the *cy pres* recipients are required to use the funds to promote the protection of Internet privacy.  The amount of the *cy pres* settlement is about 50 percent larger than the range of similar class action settlements, including:  *In re Google Buzz Privacy Litig.*, No. 10-672 (N.D. Cal. Sept. 3, 2010), D. 41 ($8.5 million *cy pres* fund); *In re Netflix Privacy Litig.*, 11-379 (N.D. Cal. Mar. 18, 2013), D. 256 ($9 million *cy pres* fund); and *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) ($9.5 million *cy pres* fund).

Second, the Settlement Agreement also provides for significant injunctive relief that extends for five years after Final Approval.  Google would be required to  1) destroy all of the acquired payload data;  2) agree to not use Street View vehicles to collect and store payload data for use in any product or service, except with notice and consent;  3) comply with all aspects of the Privacy Program described in the relevant portions of the Assurance of Voluntary Compliance;[7] and  4) agree to host and maintain educational webpages that instruct users on the configuration of wireless security modes and the value of encrypting a wireless network, including a how-to video demonstrating how users can encrypt their networks and instructions on how to remove a wireless network from inclusion in Google's location services.

In light of the risks of continuing litigation—which may not yield any recovery for Plaintiffs and the proposed Class Members—the Settlement Agreement is deserving of preliminary approval because it provides the immediate benefits of substantial *cy pres* donations tailored to serve and promote the interests of Class Members, and injunctive relief.  This is an excellent recovery for the proposed Class Members and is, therefore, fair, adequate and reasonable as described further herein.

Furthermore, Plaintiffs have devised a robust and far-reaching Notice Program to advise Class Members of this litigation and the Settlement Agreement.  The proposed Internet and website media notice campaign will disclose to proposed Class Members their legal rights and

---

[7] The Assurance of Voluntary Compliance refers to the agreement entered into by Google and the Attorneys General of various states in March 2013 regarding Google's collection of Wi-Fi information with its Street View vehicles.  *See* Kodroff Decl., Exhibit A, ¶ 4.

options, including their objection and exclusion rights. Plaintiffs propose that A.B. Data serve as the Notice Administrator. A.B. Data is experienced in this line of work.[8] *See* Curriculum Vitae of Linda V. Young and Profile of A.B. Data's Background and Capabilities, attached as Kodroff Decl., Exhibits J-2 and J-3, respectively.

## II.   LITIGATION HISTORY

### A.   Procedural History

Following consolidation of all related actions by the JPML in the Northern District of California, on November 8, 2010, Plaintiffs filed the CCAC against Google for damages and declaratory and injunctive relief under the Wiretap Act, various state wiretap statutes, and the California Business and Professions Code §§17200, *et seq. See* CCAC, D. 54.

On June 29, 2011, the Court denied Google's motion to dismiss Plaintiffs' federal Wiretap Act claims (while dismissing Plaintiffs' state wiretap statute and California Business and Professions Code §17200 claims), *see* D. 82, a decision that was subsequently affirmed by the Ninth Circuit on December 27, 2013 (as amended). *See* D. 101 and *Joffe v. Google, Inc.*, 746 F.3d 920 (9th Cir. 2013), *cert. denied* 573 U.S. 947 (2014).

### B.   Discovery

On February 7, 2014, the Court authorized "limited discovery on the issue of standing" to determine whether any Plaintiff's communications were acquired by Google. D. 108. On September 19, 2014, the Court decided to appoint a Special Master to take custody of the Google Street View data and to oversee searches of the data. *See* D. 121. The Court subsequently appointed Douglas Brush as the Special Master. After the conclusion of jurisdictional discovery, the Special Master completed his report, which was filed with the Court on December 14, 2017. *See* D. 139.

---

[8] Plaintiffs selected A.B. Data following a competitive bidding process, through which five competing proposals were obtained. A.B. Data was ultimately selected based upon quality and cost considerations. A.B. Data has quoted Class Counsel a flat fee of $158,000 for providing notice to the Class. *See* Kodroff Decl., ¶¶ 19-20. Over the past two years, SRK engaged A.B. Data in *Vista Healthplan, Inc. v. Cephalon, Inc., et al.*, 2:06-cv-1833 – MSG (E.D. Pa.); CMST engaged A.B. Data in *In re Harman International Industries, Inc. Securities Litigation*, 1:07-cv-01757-RC (D.D.C.) and in *In re BP p.l.c. Securities Litig.*, 4:10-MD-02185 (S.D. Tex.); and LCHB engaged A.B. Data in *Cipro Cases I and II (California)*, Nos. 4154 and 4220 (Cal. App. 4 Dist.). *See id.* at ¶ 21.

1   **C.   Settlement**

2   After the issuance of the Report of the Special Master, the Parties engaged in extensive

3   arm's length settlement negotiations, which spanned over 5 months and included a mediation

4   session on February 1, 2018 before the respected and skilled mediator Greg Lindstrom of Phillips

5   ADR Enterprises P.C.  *See* Kodroff Decl., ¶ 14.   The mediation resulted in the proposed

6   Settlement Agreement, which was executed by the Parties on June 11, 2018.  *Id.*

7   **III.   SUMMARY OF SETTLEMENT TERMS**

8   **A.   Class Definition**

9   The Settlement Agreement provides for a single Settlement Class, defined as follows:

10   "Class" means all persons who used a wireless network device from
     which Acquired Payload Data was obtained.

11

12   "Acquired Payload Data" means the Payload Data acquired from
     unencrypted wireless networks by Google's Street View vehicles
     operating in the United States from January 1, 2007 through May

13   15, 2010.

14   Kodroff Decl., Exhibit A, ¶¶ 2, 5.[9]

15   **B.   Settlement Fund Payments**

16   Google has agreed to pay $13 million into a Settlement Fund—none of which will revert

17   to Google absent termination or rescission—to be used for the payment of approved *cy pres*

18   distributions, any approved attorneys' fees, expense reimbursement, Plaintiff service awards,[10]

19   dissemination of class notice, and the administrative costs of the Settlement.  *See* Kodroff Decl.,

20   Exhibit A, ¶¶ 16, 21, 24, 53.

21

22

23   [9] The CCAC defined the proposed litigation class as follows: "All persons in the United States
     whose electronic communications sent or received on wireless internet connections were

24   intercepted by Defendant's Google Street View vehicles from May 25, 2007 through the present."
     The differences between the proposed litigation Class and Settlement Class reflect information

25   learned through discovery in this action, including that the specific conduct challenged in the
     CCAC took place as early as January 1, 2007 and terminated no later than May 15, 2010, and that

26   the "electronic communications" contemplated by the litigation Class definition contain Payload
     Data collected by the Street View Vehicles. *See* Kodroff Decl., ¶ 12.

27   [10] Plaintiffs propose that those Plaintiffs named in the CCAC, who participated in jurisdictional
     discovery, receive a service award of $5,000 each.  And those Plaintiffs named in the CCAC, who

28   did not participate in jurisdictional discovery, receive a service award of $500 each.

### C.    Injunctive Relief

Google has agreed to injunctive relief to safeguard the privacy of Class Members with respect to both their previously-intercepted electronic communications, as well as their future electronic communications sent over Wi-Fi connections.  Google has agreed (1) to "destroy all Acquired Payload Data, including disks containing such data, within forty-five (45) days of Final Approval, subject to any preservation obligations Google may have with respect to any Excluded Class Member" (*see* Kodroff Decl., Exhibit A, ¶ 33); (2) to "not collect and store for use in any product or service Payload Data via Street View vehicles, except with notice and consent." (*see* Kodroff Decl., Exhibit A, ¶ 34); and (3) to "comply with all aspects of the Privacy Program described in paragraph 16 of Section I of the Assurance of Voluntary Compliance and with the prohibitive and affirmative conduct described in paragraphs 1-5 of the Assurance of Voluntary Compliance." *See* Kodroff Decl., Exhibit A, ¶ 35.

Furthermore, Google has agreed, for five years after Final Approval, to "host and maintain educational webpages that instruct users on the configuration of wireless security modes and the value of encrypting a wireless network, including a how-to video demonstrating how users can encrypt their networks and instruction on how to remove a wireless network from inclusion in Google's location services.  Google agrees to use its best efforts to have the webpages operational by the time the class notice is first disseminated."  *See* Kodroff Decl., Exhibit A, ¶¶ 36-37.

### D.    Cy Pres

After payment of settlement administration expenses, Court-approved attorneys' fees, litigation expenses, Plaintiff service awards, and class notice, the net settlement fund will be distributed to the *cy pres* recipients recommended by the Plaintiffs and approved by the Court. *See* Kodroff Decl., Exhibit A, ¶¶ 11, 16, 29.

The Settlement Agreement requires that the "Proposed Cy Pres Recipient(s)…be independent organizations with a track record of addressing consumer privacy concerns on the Internet and/or in connection with the transmission of information via wireless networks, directly or through grants…[and] shall commit to use the funds to promote the protection of Internet privacy."  *See* Kodroff Decl., Exhibit A, ¶¶ 29-30.

Plaintiffs recommend the following entities as *cy pres* recipients: The Center on Privacy & Technology at Georgetown Law, Center for Digital Democracy, Massachusetts Institute of Technology - Internet Policy Research Initiative, World Privacy Forum, Public Knowledge, Rose Foundation for Communities and the Environment, American Civil Liberties Union Foundation, Inc., and Consumer Reports, Inc.  Detailed proposals from each of these organizations are attached as Kodroff Decl. Exhibits B through I, respectively.[11]  The proposed *cy pres* awards account for the nature of Plaintiffs' lawsuit, the objectives of the Wiretap Act, and the interests of the silent Class Members.  *See Lane*, 969 F.3d at 819-820, quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011).[12]

**The Center on Privacy & Technology at Georgetown Law** ("the Center") has a long track record of researching and educating the public on the issues raised in this litigation, from consumer privacy, to commercial tracking, to the technology of packet sniffing, to the Wiretap Act.  The Center proposes to use a *cy pres* award to hire a full-time Associate and a full-time technologist, who would have responsibility for research, drafting, and distributing public education materials focused on protecting consumer Internet and digital privacy.  The Center also proposes to fund an annual conference focused on elevating new research on consumer privacy issues and educating policymakers and members of the public alike.  *See* Kodroff Decl., Exhibit B.

**The Center for Digital Democracy** ("CDD") conducts research and outreach to serve as an "early warning system" for threats from commercial surveillance on a spectrum of new and

---

[11] While some of the *cy pres* proposals request an award of a specific dollar amount, Plaintiffs do not at this time propose an allocation of the total *cy pres* money among the proposed recipients. Plaintiffs intend to propose such an allocation in their final approval brief.  *See* Kodroff Decl., Exhibit A, ¶ 32.

[12] Pursuant to this District's Guidance, Co-Lead Class Counsel identify the following relationships with the ACLU: Lieff Cabraser filed a lawsuit with the ACLU and ACLU of Michigan in 2012 against Morgan Stanley for violating federal civil rights laws by providing strong incentives to a subprime lender to originate mortgages that were likely to be foreclosed on. Cohen Milstein has co-counseled several cases with the ACLU or ACLU state-based affiliates. For example, the firm recently filed a lawsuit with the ACLU of Maryland to stop the Prince George's County Board of Education from charging fees for summer school, and with the ACLU Women's Rights Project against AT&T for violating the Pregnancy Discrimination Act.  Other than this disclosure, Class Counsel are aware of no other relationship between the proposed *cy pres* recipients and the Plaintiffs or their counsel.

1   developing technologies.  Notably, CDD was one of the first groups to raise public concerns

2   about Street View Vehicles when the vehicles were initially launched.  CDD proposes to use *cy*

3   *pres* funds for a two-year research, outreach, and education project focused on emerging

4   developments in the Big Data digital marketplace, to better understand next-generation

5   technologies and services, and to raise awareness among consumers of their implications for

6   privacy and security.  *See* Kodroff Decl., Exhibit C.

7        **The Massachusetts Institute of Technology - Internet Policy Research Initiative**

8   ("IPRI") was founded in 2015 as a response to the critical need for technology-informed policy

9   making in the areas of privacy, security, networks and the Internet economy.  Its mission is to

10  lead the development of policy-aware, technically grounded research that enables policymakers

11  and engineers to increase the trustworthiness of interconnected digital systems like the Internet

12  and related technologies.  IPRI proposes to use *cy pres* funds to launch a new MIT Privacy

13  Education and Design Lab (PEDaL), which would develop new approaches to privacy education

14  and research for computer scientists, software developers, product managers, engineers, and

15  others (the software at issue in this litigation was developed by a Google engineer), to ensure that

16  they are aware of potential privacy risks in their work.  Through open source curriculum materials

17  and online courseware, IPRI would make the materials available to faculty at universities around

18  the world.  By educating the next generation of scholars, technologists, and policymakers, IPRI

19  would help alert them to potential privacy risks and ways to avoid them.  *See* Kodroff Decl.,

20  Exhibit D.

21       **The World Privacy Forum** ("WPF"), for more than eighteen years, has been a leading

22  voice on behalf of consumers affected by the unconsented collection and sharing of consumer

23  data, online and offline fraud, and invasions of health privacy, digital privacy, and privacy related

24  to mobile devices and communications.  WPF proposes to use *cy pres* funds to support long-

25  running projects regarding the collection of digital information without consumers' consent,

26  including to fund WPF's consumer data privacy education campaign, which provides consumers

27  with objective, plain English advice on how to reduce their risk of privacy-related problems.

28  WPF also proposes to fund direct counseling and support to victims.  Further, WPF would fund

its ongoing research and best practices work addressing the collection and sale of personally

identifiable information, including by providing guidance directly to industry participants through

multi-stakeholder dialogues organized by standard-setting bodies and federal agencies.  *See*

Kodroff Decl., Exhibit E.

**Public Knowledge** ("PK") was founded in 2001 to advocate for the public interest and

consumer rights in universal access to nondiscriminatory broadband networks and access to

knowledge online, and has since expanded its mission to encompass consumer protection, privacy,

and competition issues related to online platforms and services.  PK proposes to use *cy pres* funds

to organize a stakeholder summit targeting development of comprehensive privacy legislation; to

publish White Papers that generate pro-privacy incentives for companies and to educate the

public; to conduct public information campaigns and mobilize consumers to direct their voices to

policy makers;  to create a  privacy advocacy website that would contain direct action information

and educational materials; and to fund a 1-2 year Privacy Fellow, who could focus full time on

executing this privacy work and then move on to another position in the field as a privacy

advocate.  *See* Kodroff Decl., Exhibit F.

**The Rose Foundation for Communities and the Environment** is a non-profit

organization that specializes in distributing *cy pres* funds for a wide range of charitable work that

has a direct nexus with the class action settlement.  The Rose Foundation utilizes its grant-making

experience and deep knowledge of privacy issues and consumer education to conduct a public,

competitive, and transparent national grant-making process designed to identify appropriate

recipients whose work has a direct nexus to the interests of the class members and goals of the

underlying litigation.  The foundation's Consumer Privacy Fund has previously administered

more than $6 million in privacy grants to more than 100 consumer privacy non-profits throughout

the United States, funded by *cy pres* settlements in other privacy litigation.  Advised by an expert

funding board with extensive knowledge of privacy issues and organizations, the Rose

Foundation proposes to use *cy pres* funds from this action to support further grant-making

specifically tailored to the interests of the Class and the goals of this litigation.  In addition to

soliciting, reviewing, selecting, and administering funding of project proposals, the Rose

1 Foundation would contract with each grantee to allow for oversight and require detailed follow-

2 up reporting to ensure that promises made in the grant application are fulfilled to the best ability

3 of each grantee.  *See* Kodroff Decl., Exhibit G.

4       **The American Civil Liberties Union Foundation, Inc.** ("ACLU") consistently has been

5 at the forefront of precedent-setting privacy litigation (*see*, *e.g., U.S. v. Carpenter*) and also

6 engages in records requests, public education, advocacy before companies and internet standards-

7 setting bodies, and separately funded state and federal lobbying, to protect data privacy and

8 security throughout the United States.  The ACLU proposes to use *cy pres* funding to hire and

9 fund specialized public interest attorneys who will focus on securing civil and privacy rights

10 related to data surveillance and artificial intelligence used by corporations and the government

11 with data collected from members of the public.  *See* Kodroff Decl., Exhibit H.

12       **Consumer Reports, Inc**. ("CR") has a ninety-year history of testing products to provide

13 consumers with unbiased information about the risks they face in the marketplace.  In recent

14 years, CR has expanded its efforts to the digital marketplace, evaluating the privacy implications

15 of digital technologies to provide consumers with information about security and privacy risks

16 and further corporate accountability.  CR proposes to use *cy pres* funds to support CR's Digital

17 Lab, an initiative addressing data privacy and security issues faced by consumers in a marketplace

18 fueled by personal data, which support would enable CR to design and implement tests to rate

19 technology products, services, and platforms on their collection, use, and protection of consumer

20 data, and to educate and empower consumers and to galvanize the industry to bring better and

21 safer products and services to market.  *See* Kodroff Decl., Exhibit I.

22       **E.**    **Release**

23       In exchange for the relief described herein, and upon entry of a final order approving this

24 Settlement Agreement, Plaintiffs and Class Members will release all claims "arising out of or

25 related to the allegations in the [CCAC], including but not limited to the claims arising out of or

26 related to the allegations in the [CCAC] that have been asserted or could have been asserted' by

27 Plaintiffs and the other Class Members.  *See* Kodroff Decl., Exhibit A, ¶¶ 17, 46.[13]

28 _____

[13] Pursuant to this District's Procedural Guidance for Class Action Settlements, Plaintiffs advise

*Footnote continued on next page*

### F.    Proposed Schedule of Events

Consistent with the provisions of the Settlement Agreement, Plaintiffs respectfully propose the following schedule for the various Settlement events:

| Event | Date |
|---|---|
| Notice of Settlement to be Disseminated | 30 days after entry of the Court's Preliminary Approval Order |
| Deadline for Class Counsel's motions for final approval and for attorneys' fees, costs, and service awards. | 45 days after the entry of the Court's Preliminary Approval Order. |
| Objection and Opt Out Deadline | 60 days after Dissemination of Notice |
| Deadline for Parties to file a written response to any comment or objection filed by a class member | 90 days after Dissemination of Notice |
| Notice Administrator affidavit of compliance with notice requirements | 14 days before Final Approval Hearing |
| Final Approval Hearing | Not less than 130 days after entry of the Preliminary Approval Order, or as soon thereafter as is convenient for the Court |

## IV.    ARGUMENT

In the Ninth Circuit, "'[t]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'"  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig. ("Volkswagen"),* MDL No. 2672, 2017 WL 672727, at * 11 (N.D. Cal. Feb. 16, 2017) (Breyer J.) *quoting Allen v. Bedolla*, 787 F. 3d 1218, 1223 (9th Cir. 2015) (Internal citation omitted).  The Court's role in determining whether to approve a proposed class action settlement includes evaluating a number of factors.

_____

*Footnote continued from previous page*
that the released claims differ from the claims asserted in the CCAC insofar as the Release applies to claims arising out of or relating to the allegations in the CCAC that could have been, but were not, asserted therein.  The scope of the Release is consistent with governing standards in this Circuit.  *See e.g., In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018) (approving class settlement release of claims "related to or arising from any of the facts alleged in any of the Actions"); *Custom LED, LLC v. eBay, Inc.*, No. 12-350, 2013 WL 6114379 (N.D. Cal. Nov. 20, 2013) (approving release of claims "arising out of or relating in any way to any of the legal, factual, or other allegations made in the Action, or any legal theories that could have been raised on the allegations of the Action.").  *See also Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (claims appropriately included in scope of release can include any claim "based on the identical factual predicate as that underlying the claims in the settled class action."); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992) (same, noting that released claims need not have been asserted or necessarily presentable in the underlying class action).

1      First, the United States Supreme Court recently noted in *Frank v. Gaos* that courts "'have

2   an obligation to assure [themselves] of litigants' standing under Article III'" in the context of

3   court approval of proposed class action settlements.  139 S. Ct. 1041, 1046 (2019) (quoting

4   *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006)).  Article III standing requires that the

5   Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

6   conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

7   *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S.

8   555, 560-61 (1992)).

9      Next, in determining whether to grant preliminary approval of a class action settlement, a

10   court must determine whether it "will likely be able to … certify the class for purposes of

11   judgment on the [settlement] proposal." Fed. R. Civ. P. 23(e)(1)(B)(ii).  The court is also

12   required to determine whether it "will likely be able to … approve the [settlement] proposal under

13   Rule 23(e)(2)" at the final approval stage as "fair, reasonable, and adequate." Fed. R. Civ. P.

14   23(e)(1)(B)(i); *see* Fed. R. Civ. P. 23(e)(2).

15      Plaintiffs satisfy the Article III standing requirements.  Further, as outlined below, it will

16   be proper to certify the settlement class at the final approval stage pursuant to Rule 23(a) and

17   Rule 23(b)(3).  The proposed Settlement Agreement between the Parties—calling for a *cy pres*

18   distribution of the settlement fund and injunctive relief—is fundamentally fair, adequate and

19   reasonable pursuant to Rule 23(e)(2).  Thus, this Court should grant preliminary approval of the

20   class action settlement described herein and direct notice to the Class.

21      **A.**     **<u>Plaintiffs Have Alleged an Injury in Fact and Satisfy All Article III</u>**
             **<u>Requirements.</u>**

22

23      Standing under *Spokeo* and *Gaos* is readily shown here.  "[T]o establish injury in fact, a

24   plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is

25   'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*,

26   136 S. Ct. at 1548 quoting *Lujan*, 504 U.S. at 560.  Specifically, "[f]or an injury to be

27   'particularized,' it must affect the plaintiff in a personal and individual way." *Id.* at 1548.  For an

28   injury to be "concrete," it "must be '*de facto*;' that is, it must actually exist." *Id.* at 1548.

1    "Intangible" injuries, such as privacy invasions, can satisfy Article III; the Supreme Court has

2    confirmed "that intangible injuries can nevertheless be concrete." *Id.* Furthermore, "[i]n

3    determining whether an intangible harm constitutes injury in fact, both history and the judgment

4    of Congress play important roles. . . . [I]t is instructive to consider whether an alleged intangible

5    harm has a close relationship to a harm that has traditionally been regarded as providing a basis

6    for a lawsuit in English or American courts. . . . In addition, because Congress is well positioned

7    to identify intangible harms that meet minimum Article III requirements, its judgment is also

8    instructive and important." *Id.* at 1549.

9          Here, Plaintiffs suffered an injury in fact when Google invaded their legally protected

10   privacy interest under the Wiretap Act.[14]  A violation of the Wiretap Act exists when "any

11   person…intentionally intercepts, endeavors to intercept, or procures any other person to intercept

12   or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

13   The prohibition outlined in the statute, and its accompanying private cause of action in 18 U.S.C.

14   § 2520, reflect the considered judgment of Congress that intentional, nonconsensual interception

15   of private communications is an invasion of the right to privacy.  The statute defines the scope of

16   the right to privacy consumers may expect, and provides a remedy.

17         Plaintiffs' injuries in this case are precisely the harms Congress sought to remedy and

18   prevent.  For example, the Senate Judiciary Committee explained in its report recommending

19   passage of the ECPA, which amended the Wiretap Act to apply to electronic communications,

20   "the law must advance with the technology…. Privacy cannot be left to depend solely on physical

21   protection, or it will gradually erode as technology advances."  S. Rep. 99-541, *reprinted in* 1986

22   U.S.C.C.A.N. 3555, at 3559 (1986); *see also* H.R. Rep. No. 99-647, at 16-19 (1986) (stating that

23   one of Congress' goals in passing ECPA was to keep the privacy protection of electronic

24   communications consistent with expectations arising from the Fourth Amendment).  The Wiretap

25   Act's purpose is to protect private communications like those over Wi-Fi connections, using the

26   Fourth Amendment's privacy protections as a touchstone.  Thus, Google is alleged to have done

27   _____

28   [14] At the pleading stage, standing is analyzed taking the allegations of the complaint as true.  *See Spokeo*, 136 S. Ct. at 1547; *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975).

1    precisely what the statute prohibits: it intentionally designed highly-sophisticated software that

2    allowed it to reach into Plaintiffs' homes and intercept their electronic communications being sent

3    or received, at that moment, over Wi-Fi connections, then collected, decoded, and stored these

4    private communications on their servers.  *See* CCAC, D. 54, ¶¶ 18-38.  Plaintiffs and the

5    proposed Class Members were injured because their privacy right was breached.

6         Furthermore, as with many privacy torts, a Wiretap violation lies in the *invasion* of a

7    plaintiff's privacy, rather than in tangible, material harm flowing therefrom.  *See* Restatement

8    (Second) of Torts § 625B ("The intrusion itself makes the defendant subject to liability, even

9    though there is no publication or other use of any kind of the photograph or information

10   outlined.").  Thus, Plaintiffs allege *substantive*, rather than *procedural*, violations of the Wiretap

11   Act.  Courts widely recognize that alleged ECPA violations give rise to Article III standing.  *See*

12   *Matera v. Google, Inc.*, No. 15-04062, 2016 WL 5339806, at *13, 14 (N.D. Cal. Sept. 23, 2016)

13   ("[T]he Wiretap Act . . . create[s] substantive rights to privacy in one's

14   communications"…."[T]he Court concludes that the judgment of Congress and the California

15   Legislature indicate that the alleged violations of Plaintiff's statutory rights under the Wiretap Act

16   and CIPA constitute concrete injury in fact.  This conclusion is supported by the historical

17   practice of courts recognizing that the unauthorized interception of communication constitutes

18   cognizable injury."); *Rackemann v. LISNR, Inc.*, No. 17-00624, 2017 WL 4340349, at *3-5 (S.D.

19   Ind. Sept. 29, 2017) (Finding that the plaintiff "sufficiently identified as an injury the violation of

20   his substantive interest in the privacy of his communications….[Thus, plaintiff had] standing to

21   raise a challenge regarding violations of the Wiretap Act.").

22        Thus, Google's alleged Wiretap violations are concrete and particularized harms,

23   historically rooted in the privacy torts traditionally protected in English and American Courts, and

24   validated by the considered judgment of Congress.  *See Spokeo*, 136 S. Ct. at 1549; *Van Patten v.*

25   *Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1042-43 (9th Cir. 2017).  Plaintiffs clearly sustained

26   an injury in fact when their electronic communications were allegedly intercepted by Google in

27   violation of the Wiretap Act.

28        The other requirements of Article III causation and redressability are also met.  Google is

1  alleged to have caused the harms at issue by intentionally designing and implementing the Google

2  Street View program to include interception of communications over Wi-Fi connections.  *See*

3  CCAC, D. 54 ¶¶ 1-8.  The injury is redressable by statute through monetary damages and

4  injunctive relief, as sought in the CCAC and obtained in the proposed Settlement Agreement.

5  Plaintiffs thus have fulfilled all requirements for Article III standing.

6            **B.**     **The Court Will Be Able to Certify the Proposed Settlement Class.**

7            According to this Court,

8            Class certification is a two-step process. . . . The Settlement Class
             Representatives must first satisfy Rule 23(a)'s four elements:
9            (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of
             representation. *See* Fed. R. Civ. P. 23(a). "[C]ertification is proper
10           only if the trial court is satisfied, after a rigorous analysis, that the
             prerequisites of Rule 23(a) have been satisfied[.]" . . . . The
11           Settlement Class Representatives must then establish that a class
             action may be maintained under any of Rule 23(b)(1), (2), or (3).
12

13  *Volkswagen*, 2017 WL 672727, at *12, quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591,

14  613 (1997); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (internal quotations

15  omitted).

16           Plaintiffs contend, and Google does not dispute, for settlement purposes only, that the

17  proposed class meets the requirements for class certification under Rule 23(a) and Rule 23(b)(3).

18           **1.**     **The Requirements of Rule 23(a) Are Satisfied.**

19           **a.**     **Numerosity Is Satisfied.**

20           The numerosity requirement is satisfied when the class is "'so numerous that joinder of all

21  parties is impracticable.'" *Id.* quoting Rule 23(a)(1).  While there is no fixed rule, numerosity is

22  generally presumed when the potential number of class members reaches forty.  *See Jordan v.*

23  *County of Los Angeles*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S.

24  810 (1982).  "Where 'the exact size of the class is unknown, but general knowledge and common

25  sense indicate that it is large, the numerosity requirement is satisfied.'"  *In re Abbot Labs. Norvir*

26  *Anti-trust Litig.*, No. 04-1511, 2007 WL 1689899 at *6 (N.D. Cal. June 11, 2007) quoting ALBA

27  CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS §3.3 (4ᵀᴴ ED. 2002).

28           Here, numerosity is readily established because Google's conduct involved numerous cars

1    driving house to house through densely populated cities and other areas for three years.

2    Discovery has revealed that the Street View data includes up to 297,758,782 payload data frames.

3    *See* Kodroff Decl., ¶13.  Even assuming multiple data frames may have been acquired from the

4    same wireless network device, Class Members likely number in the tens of millions and easily

5    satisfy the numerosity requirement.[15]

6                          **b.    Commonality Is Satisfied.**

7            Rule 23(a)(2) requires that there be one or more questions common to the class.  *See*

8    *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1018 (9th Cir. 1998).  Plaintiffs "need only show the

9    existence of a common question of law or fact that is significant and capable of classwide

10   resolution."  *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 592 (N.D. Cal. 2015) (citations omitted).

11   Furthermore, "'[t]he existence of shared legal issues with divergent factual predicates is

12   sufficient, as is a common core of salient facts coupled with disparate legal remedies within the

13   class.'"  *Volkswagen*, 2017 WL 672727, at *12 *quoting Hanlon*, 150 F.3d at 1019.

14           Here, Plaintiffs readily meet this standard, as several significant common questions of law

15   and fact exist, including the following:

16           (a)     Whether Google "intercepted" the "contents" of "electronic

17                   communications" within the meaning of the Wiretap Act;

18           (b)     Whether any interception was "intentional" within the meaning of the

19                   Wiretap Act; and

20           (c)     Whether payload data transmitted over unencrypted wireless networks is

21                   "readily accessible to the general public" within its ordinary meaning.

22           All Class Members' claims will be resolved by answering these same legal questions.

23   Indeed, Class Members' claims arise from a common course of alleged conduct: that Google

24   intentionally intercepted their electronic communications sent or received on Wi-Fi connections.

25   *See Volkswagen*, 2017 WL 672727, at *12 (Finding commonality satisfied where the class

26   [15] The Canadian government issued a report stating that "Google estimates that it collected over 6
     million BSSIDs [network names] over the period its Street View cars drove throughout Canada."
27   This indicates that about 6 million persons/entities in Canada had their data captured by Google.
     The U.S. population is nearly ten times Canada's, providing further evidence that the Class
28   includes millions of members.

1   representative claims "arise from Volkswagen's common course of conduct.").  Thus,

2   commonality is satisfied.

3               **c.      Typicality Is Satisfied**

4           The typicality requirement is satisfied when the "representative parties' claims [are]

5   'typical of the claims or defenses of the class.'" *Volkswagen*, 2017 WL 672727, at *13 quoting

6   Rule 23 (a)(3).  "Typicality 'assure[s] that the interest of the named representative aligns with the

7   interests of the class.'" *Id.* quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168,

8   1175 (9th Cir. 2010) (citation and quotations omitted).  Specifically, "'representative claims are

9   'typical' if they are reasonably coextensive with those of absent class members; they need not be

10  substantially identical.'" *Id.* quoting *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation

11  and quotations omitted).  "The test of typicality 'is whether other members have the same or

12  similar injury, whether the action is based on conduct which is not unique to the named plaintiffs,

13  and whether other class members have been injured by the same course of conduct.'" *Id. quoting*

14  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).

15          Here, Plaintiffs' claims stem from the same course of conduct as the claims of the Class

16  Members.  As alleged, Plaintiffs and the Class Members all had their electronic communications,

17  sent or received over unencrypted Wi-Fi connections, intentionally intercepted by Google in

18  violation of 18 U.S.C. § 2511, *et. seq.*  Plaintiffs' claims are based on the same pattern of

19  wrongdoing as those brought on behalf of Class Members.  Thus, they all are alleged to have

20  suffered the same injury.  *See Volkswagen*, 2017 WL 672727, at *13.

21              **d.      Adequacy of Representation Is Satisfied.**

22          The adequate representation requirement is satisfied when "the representative party [is]

23  able to 'fairly and adequately protect the interests of the class.'" *See Volkswagen*, 2017 WL

24  672727, at *13 quoting Rule 23(a)(4).  "This requirement is rooted in due-process concerns—

25  'absent class members must be afforded adequate representation before entry of a judgment

26  which binds them.'" *Id.* quoting *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1165 (9th

27  Cir. 2013) (Internal citation omitted).  Furthermore, "[c]ourts engage in a dual inquiry to

28  determine adequate representation and ask: '(1) do the named plaintiffs and their counsel have

- 16 -

1   any conflicts of interest with other class members and (2) will the named plaintiffs and their

2   counsel prosecute the action vigorously on behalf of the class?'" *Id.* quoting *Hanlon*, 150 F.3d at

3   1020. (Internal citation omitted).

4       First, Class Counsel have extensive experience litigating and settling class actions,

5   including consumer cases throughout the country. *See* Firm Resumes of SRK and CMST

6   attached as Kodroff Decl., Exhibits K and L, respectively. The Firm Resume for LCHB can be

7   accessed at https://www.lieffcabraser.com/pdf/Lieff_Cabraser_Firm_Resume.pdf. At the outset

8   of the MDL, as part of a competitive application process, the Court chose Lead Counsel and

9   Liaison Counsel due to their qualifications, experience, and commitment to the successful

10  prosecution of this case. The criteria that the Court considered in appointing Lead and Liaison

11  Counsel were substantially similar to the considerations set forth in Rule 23(g). *See, e.g.*,

12  *Clemens v. Hair Club for Men, LLC*, No. 15-01431, 2016 WL 1461944, at *2 (N.D. Cal. Apr. 14,

13  2016); Order of October 8, 2010, D. 47. Indeed, Class Counsel have vigorously litigated this

14  action and had sufficient information at their disposal before entering into settlement negotiations,

15  which allowed Class Counsel to adequately assess the strengths and weaknesses of Plaintiffs'

16  case and balance the benefits of settlement against the risks of further litigation. *See* Kodroff

17  Decl., ¶ 30. Thus, Class Counsel have fairly and adequately protected the interests of all

18  Settlement Class Members, and will continue to do so.

19      Second, the named Plaintiffs' interests are aligned with, and are not antagonistic to, the

20  interests of the other Class Members. Specifically, the Plaintiffs and the Settlement Class

21  Members are equally interested in obtaining relief for Google's violations of the Wiretap Act, and

22  for ensuring that Google refrains from any future intentional interceptions of their private Wi-Fi

23  communications in violation of the ECPA. *See Hanlon*, 150 F.3d at 1021 (adequacy satisfied

24  where "each…plaintiff has the same problem.").

25      Accordingly, Plaintiffs and Class Counsel have fairly and adequately protected the

26  interests of all Settlement Class Members, and will continue to do so.

27          **2.      Class Certification Is Appropriate Under Rule 23(b)(3).**

28  Class certification pursuant to Rule 23(b)(3) requires that "the court finds [1] that the

1   questions of law or fact common to class members predominate over any questions affecting only

2   individual members, and [2] that a class action is superior to other available methods for fairly

3   and efficiently adjudicating the controversy[.]"  *See Volkswagen*, 2017 WL 672727, at *13

4   quoting Rule 23(b)(3).

5               **a.       Common Questions of Law or Fact Predominate Over**
                           **Individual Issues.**

6

7        "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to

8   warrant adjudication by representation'" and requires "courts to give careful scrutiny to the

9   relation between common and individual questions in a case."  *Tyson Foods, Inc. v. Bouaphakeo*,

10  136 S. Ct. 1036, 1045 (2016) (citation omitted).  Predominance is found "[w]hen common

11  questions present a significant aspect of the case and they can be resolved for all members of the

12  class in a single adjudication[.]"  *Hanlon*, 150 F.3d at 1022 (internal quotations omitted);

13  *Volkswagen*, 2017 WL 672727, at *14.

14        Here, common questions predominate because there are few, if any, individualized factual

15  issues, and because the core facts involve Google's uniform conduct that allegedly harmed all

16  Class Members.  Specifically, Plaintiffs allege that Google intentionally intercepted their and the

17  other Class Members' electronic communications during transmission over Wi- Fi connections,

18  and this conduct is a violation of the Wiretap that uniformly injured Plaintiffs' and the other Class

19  Members' legally protected privacy interests.  Thus, Google engaged in the same alleged illegal

20  conduct in violation of the Wiretap Act "in the same manner against all Class Members." *Id.*

21  Class Members' injury would also be established through common proof.  Had Plaintiffs

22  prevailed on summary judgment or at trial, the Court would have been authorized to assess

23  damages for each Class Member of $10,000.  *See* 18 U.S.C. § 2520(a).  Common questions

24  would predominate with respect to each Class Member's entitlement to the statutory damages

25  award because the fundamental questions turn on Google's conduct, not the individual's.

26  Because Google's alleged conduct applies "to all Class Members' claims" and Plaintiffs allege "a

27  common and unifying injury" as a result of Google's alleged illegal conduct, the predominance

28  requirement is met.  *Volkswagen*, 2017 WL 672727, at *14.

1

           **b.**        **Class Treatment Is a Superior Method of Adjudication.**

2

     Whether a class action is the superior method for the adjudication of claims "'requires the

3

court to determine whether maintenance of [the] litigation as a class action is efficient and

4

whether it is fair.'" *Volkswagen*, 2017 WL 672727, at *14 quoting *Wolin*, 617 F.3d at 1175-76.

5

Specifically, "[a] class action is the superior method for managing litigation if no realistic

6

alternative exists." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996).

7

Furthermore, a class action is superior where, as here, classwide litigation of common issues

8

"reduce[s] litigation costs and promote[s] greater efficiency." *Id.* at 1234.

9

     Here, certification of the instant claims as a class action is the superior method of

10

adjudication.  First, there is no realistic alternative to a class action due to the size of the Class.

11

Second, most members would find the cost of litigating individual claims to be prohibitive,

12

especially considering the risk factors of the case.  *See* Section IV.C.3.b., *infra*.  Third, if

13

individual lawsuits were asserted against Google, each Class Member "would be required to

14

prove the same wrongful conduct to establish liability and thus would offer the same evidence."

15

This would also leave open "the possibility of inconsistent rulings and results." *Volkswagen*,

16

2017 WL 672727, at *14.

17

     Consequently, this Court will likely certify the proposed Settlement Class at final approval

18

pursuant to Rule 23(b)(3).

19

     **C.**        **The Proposed Settlement Is Fundamentally Fair, Adequate and Reasonable.**

20

     Recent amendments to Rule 23, which took effect on December 1, 2018, "provide new

21

guidance on the 'fair, adequate, and reasonable' standard at the preliminary approval stage."

22

*O'Connor v. Uber Techs., Inc.*, No. 13-03826, 2019 WL 1437101, at *4 (N.D. Cal. Mar. 29,

23

2019).  Specifically, the amendments clarify that "preliminary approval should only be granted

24

where the parties have 'show[n] that the court will likely be able to ... approve the proposal under

25

[the final approval factors in] Rule 23(e)(2)...'" *Id.* quoting Rule 23(e)(1)(B) (emphasis in

26

original).  These factors take into account whether:

27

          (A) the class representatives and class counsel have adequately
          represented the class;

28

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

    (i) the costs, risks, and delay of trial and appeal;

    (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

*Id.*, quoting Rule 23(e)(2).  Here, the proposed Settlement, negotiated by competent counsel who vigorously represented the interests of the Class, meets the standards for preliminary approval.

### 1.  The Class Representatives and Class Counsel Have Adequately Represented the Class.

As discussed in detail in Section IV.B.1.d., *supra*, the Plaintiffs' interests are aligned with, and are not antagonistic to, the interests of the Class Members.  Each of the Plaintiffs has remained committed to representing the proposed Class in this litigation since 2010, remaining available to and in touch with Class Counsel, and submitting information, declarations, and other evidence, including electronic devices for forensic imaging, as required to meet the needs of the Special Master and the jurisdictional discovery conducted in this action.  *See* Kodroff Decl., ¶ 29. And Class Counsel, who have extensive experience litigating and settling consumer class actions throughout the country, have committed all necessary time, expertise, and resources to vigorously litigating this action for more than nine years.  *See* Kodroff Decl., ¶ 28 and Exhibits K and L thereto.

### 2.  The Settlement Agreement Was Negotiated at Arm's Length.

This factor "examines…the means by which the parties arrived at settlement." *Volkswagen*, 2017 WL 672727, at *16 quoting *Sciortino v. PepsiCo, Inc.*, No. 14-00478, 2016 WL 3519179, at *4 (N.D. Cal. June 28, 2016) (internal quotations omitted).  Specifically,

1   "[p]reliminary approval is appropriate if the proposed settlement is the product of serious,

2   informed, non-collusive negotiations."  *Id.*

3        Here, Plaintiffs have conducted a meaningful investigation and analyzed and evaluated the

4   merits of the claims made against Google, including having the benefit of the Court's ruling on

5   Google's motion to dismiss, the Ninth Circuit opinion affirming that ruling, the Report of the

6   Special Master, and the results of Jurisdictional Discovery.  Furthermore, the Parties engaged in

7   extensive arm's length settlement negotiations, which spanned over 5 months and included a

8   mediation session on February 1, 2018 before a respected and skilled mediator, which ultimately

9   resulted in the proposed Settlement Agreement.  *See* Kodroff Decl., ¶ 14.  Thus, Plaintiffs had the

10  necessary information to properly assess the value of the Class's claims and the value of this

11  Settlement Agreement to the Class.  Based upon that analysis, and recognizing the substantial

12  risks of continued litigation, Plaintiffs concluded that this settlement with Google is in the best

13  interest of the Class Members.

14       Furthermore, there are no signs of collusion in the Settlement Agreement.[16]  First, the key

15  terms of the Settlement were negotiated with the assistance of a respected mediator, who

16  witnessed and oversaw the vigorous and arm's length nature of the negotiations.  *See* Kodroff

17  Decl., ¶ 14.

18       Second, given the risks in continuing litigation that threaten the Class with little or no

19  relief, *see* Section IV.C.3.b., *infra*, the $13 million *cy pres* settlement addresses these concerns by

20  providing "the next best compensation use, *e.g.*, for the aggregate, indirect, prospective benefit of

21  _____

22  [16] Signs of collusion include:
            (1) when counsel receive a disproportionate distribution of the
23          settlement, or when the class receives no monetary distribution
            but class counsel are amply rewarded, (2) when the parties negotiate
24           a "clear sailing" arrangement providing for the payment of attorneys'
            fees separate and apart from class funds, which carries "the
25          potential of enabling a defendant to pay class counsel excessive fees
            and costs in exchange for counsel accepting an unfair settlement on
26          behalf of the class"; and (3) when the parties arrange for fees not
            awarded to revert to defendants rather than be added to the class fund[.]

27  *Volkswagen*, 2017 WL 672727, at *15; *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935,
    947 (9th Cir. 2011).

28

1  the Class." *Nachshin*, 663 F.3d at 1038.  (Internal citations and quotations omitted).

2         Third, Class Counsel will not receive a disproportionate distribution of the Settlement

3  funds.[17]  The Settlement leaves the amount of Class Counsel's fee entirely in the discretion of the

4  Court and under Plaintiffs' proposed schedule, their fee petition will be filed well before the

5  deadline for objections, thus providing the Class with a full opportunity to object.  And there is no

6  suggestion of collusion given that the named Plaintiffs also will not receive a disproportionate

7  share of the recovery.  The settlement leaves the amount of any plaintiff service awards to the

8  discretion of this Court.[18]  Plaintiffs' request for service awards will be made together with the

9  request for attorneys' fees, affording Class Members ample time to object.

10         Fourth, the Settlement Agreement does not create a "clear sailing" arrangement, as

11  reasonable attorneys' fees will be paid only upon Court approval of Plaintiffs' petition, and

12  Google has reserved all rights to contest the amount of Plaintiffs' fee request.  *See generally*

13  Exhibit A.

14         Fifth, no portion of the $13 Settlement Amount will revert back to Google.  According to

15  the Settlement Agreement, "[o]ther than via termination or rescission as described in this Section,

16  in no event shall any portion of the Settlement Fund revert to Google."  *See* Kodroff Decl.,

17  Exhibit A, ¶ 53.

18             **3.    The Meaningful, Well-Tailored Relief Provided for the Class Is
                        Adequate and Appropriate for This Case.**
19

20         The Settlement represents a strong result for the Class.   The injunctive relief and

21

---

22  [17] Pursuant to this District's Procedural Guidance for Class Action Settlements, Class Counsel
    anticipate a request for attorneys' fees of no more than 25% of the $13 million Settlement

23  Amount, plus a request for reimbursement expenses.  A fee petition will be filed with the Court
    well in advance of the objection deadline and the Long Form Notice will inform the Class

24  Members of the prospective attorney fee and expense request, thus providing the Class with a full
    opportunity to object.  Thus far in this Action, SRK has expended 3,505.35 hours, and has a

25  lodestar of $1,815,054.50 and costs of $250,988.19.  CMST has expended 2,820.40 hours, and
    has a lodestar of $2,006,816.35 and costs of $323,698.37.   LCHB has expended 1,724.70 hours,

26  and has a lodestar of $1,114,113.50 and costs of $141,272.20.  *See* Kodroff Decl., ¶¶ 25-27.
    Thus, the ultimate award of attorneys' fees in this action will result in a negative multiplier.

27  [18] Plaintiffs anticipate requesting service awards of up to $5,000 for each of the eighteen Plaintiffs
    named in the CCAC who participated in jurisdictional discovery, and up to $500 for each of the

28  three Plaintiffs named in the CCAC who did not participate.

1    corrected practices components of the Settlement Agreement are meaningful provisions that

2    provide direct benefits to Class members, as well as the public, by protecting their privacy rights

3    and interests.  *See* Section III.B, *supra*.  The Court will have ongoing jurisdiction to enforce

4    compliance with these provisions.  *See* Kodroff Decl., Exhibit A, ¶ 44.  Moreover, the Court

5    should grant preliminary approval because the proposed *cy pres* awards account for the nature of

6    Plaintiffs' lawsuit, the objectives of the Wiretap Act, and the interests of the silent Class Members,

7    and because analysis of the Rule 23(e)(2)(C)(i)-(iv) shows that the relief provided for the Class is

8    fair, reasonable and adequate, supporting the conclusion that the Court will likely grant final

9    approval.

10          **a.**       **The *Cy Pres* Awards Relate to the Nature of Plaintiffs' Lawsuit,**
     **the Objectives of the Wiretap Act, and the Interests of the**
11                        **Absent Class Members.**

12   With respect to class action settlements that provide for a *cy pres* remedy, "[t]he district

13   court's review…is not substantively different from that of any other class-action settlement," with

14   one exception.  *Lane*, 696 F.3d at 819-820.  In the Ninth Circuit "*cy pres* awards [must] meet a

15   'nexus' requirement by being tethered to the objectives of the underlying statute and the interests

16   of the silent class members."  *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 743

17   (9th Cir. 2017) (*vacated and remanded on other grounds by Gaos*, 139 S. Ct. 1041)*, citing*

18   *Nachshin*, 663 F.3d at 1039.  This requirement is satisfied by ensuring that the *cy pres* remedy

19   'account[s] for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and

20   the interests of the silent class members....'" *Lane*, 696 F.3d at 819-820 quoting *Nachshin*, 663

21   F.3d at 1036.

22   Here, the proposal that funds be distributed to each potential *cy pres* recipient complies

23   with the directives from the Ninth Circuit, because the funds will be used to promote the

24   protection of Internet privacy.  This will be achieved in three ways.

25   First, because the basis of Plaintiffs' claim under the Wiretap Act is that Google

26   intentionally intercepted Plaintiffs' and the other Class Members' private electronic

27   communications, each approved *cy pres* recipient will commit to instituting a program that aims

28   to educate Internet users on how to protect their privacy on the Internet, such as through network

1    encryption.

2         Second, some approved *cy pres* recipients will also pursue programs designed to ensure an

3    internet policy environment that is more protective of consumers' privacy.  Thus, Plaintiffs and

4    Class Members will benefit from these programs, which seek to better protect them from having

5    their private electronic communications intercepted again.

6         Third, some approved *cy pres* recipients will institute programs to educate the next

7    generation of computer programmers and software engineers on the importance of Internet

8    privacy and make them more sensitive to these issues.  These programs are aimed at preventing

9    future conduct tied to the allegations in this case—the development and use of software to

10   intercept private communications from unsuspecting Internet users.

11              **b.    <u>The Costs, Risks, and Delay from Trial and Appeal Show that</u>**
                        **<u>the Recovery Contained in the *Cy Pres* Settlement Is Adequate.</u>**
12

13        Although Plaintiffs are confident in the strength of their claims under the Wiretap Act, and

14   their ability to ultimately prevail at trial, they nevertheless recognize that this novel and

15   precedent-setting litigation is inherently risky.  Given the substantial recovery obtained for the

16   Class, and the uncertainties that would accompany continued litigation, there is little question that

17   the proposed *cy pres* settlement provides an adequate remedy on behalf of the Class Members.

18        First, there is a risk that Google might prevail in motion practice, at trial, or on appeal,

19   resulting in substantial delay or no relief for Class Members.  For instance, if the litigation were

20   to proceed, Google likely would raise multiple defenses to seek to avoid liability under the

21   Wiretap Act, including the filing of a motion for summary judgment on the ground that the

22   intercepted electronic communications were "readily accessible to the general public," within its

23   ordinary meaning, and thus lawfully intercepted.  While Plaintiffs believe they would prevail on

24   any such motion, success is not guaranteed.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966

25   (9th Cir. 2009) (noting that the elimination of "[r]isk, expense, complexity, and likely duration of

26   further litigation" weighed in favor of approving settlement).

27        Second, this Court has interpreted the Wiretap Act to limit the Court's discretion to a

28   choice between awarding damages in the full statutory amount of $10,000 (per Class Member) or

1   awarding nothing at all.  *See Campbell v. Facebook Inc.*, 315 F.R.D. 250, 268 (N.D. Cal. 2016),

2   quoting *DirecTV, Inc. v. Huynh*, No. 04-3496, 2005 WL 5864467, at *6 (N.D. Cal. May 31, 2005)

3   (Breyer J.), *aff'd* 503 F.3d 847 (9th Cir. 2007) ("the ECPA 'makes the decision of whether or not

4   to award damages subject to the court's discretion.'"…."Such discretion is clear from the statute,

5   which was amended in 1986 to state that the court 'may' award damages, rather than stating that

6   it 'shall' award damages.  However, the court's discretion is limited to deciding whether to 'either

7   award the statutory sum or nothing at all,' it 'may not award any amount between those two

8   figures.'").  Although Plaintiffs believe that Google's conduct merits the award of full statutory

9   damages, there is a risk that the Court may disagree and award no damages.

10      Third, the passage of time has created another risk that supports the adequacy of this

11  settlement.  The Class Period encompasses Google's interception of Class Members' electronic

12  communications between January 1, 2007 and May 15, 2010.  By the time of trial, memories of

13  key witnesses may have faded.  And the information in the data intercepted by Google that could

14  identify Class Members, such as individual Wi-Fi router information, will no longer be current as

15  to some Class Members.  This presents potential challenges to distributing a recovery to these

16  Class Members.  *See Rodriguez*, 563 F.3d at 966 (noting that an "anticipated motion for summary

17  judgment, and . . . [i]nevitable appeals would likely prolong the litigation, and any recovery by

18  class members, for years," which facts militated in favor of approval of settlement.).

19      Fourth, Google may argue that the Wiretap Act does not apply where it was a party to, or

20  the intended recipient of, the intercepted communications pursuant to §2511(2)(d).  Google's

21  position may be that its servers were the intended recipient of some of the communications that

22  were collected, including Gmail messages, Google search queries, and communications made in

23  connection with the use of other Google services, such as YouTube, Google Docs, Google Maps,

24  and Google Blogger.  This argument creates another risk that could reduce the number of Class

25  Members who could recover.

26      The above risks, and others, which could result in the Class getting no relief or

27  significantly less relief, when balanced against the proposed $13 million *cy pres* recovery and the

28

1    proposed injunctive relief, shows that the Settlement is more than adequate.[19]

2                    **c.      The Proposed Method of Distributing Relief on Behalf of the**
                             **Class Is Effective.**

3

4          The proposed *cy pres* awards are, by far, the most effective means of providing a benefit

5    to the Class.  These distributions, guided by the objectives of the Wiretap Act, will meaningfully

6    benefit Class members by funding activities that are in their interest and that serve the goals of

7    this litigation.  They meet the standards for preliminary approval.  *See Dennis v. Kellogg Co.*, 697

8    F.3d 858 (9th Cir. 2012); *Nachshin*, 663 F.3d 1034.

9          In cases like this one, where individual class members cannot readily be identified and/or

10   individual distributions would not be economically viable, *cy pres* awards are widely viewed as

11   the best and most effective means of benefiting class members.  *See Six (6) Mexican Workers v.*

12   *Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990) ("[F]ederal courts have frequently

13   approved [*cy pres*] in the settlement of class actions where the proof of individual claims would

14   be burdensome or distribution of damages costly"); American Law Institute, *Principles of the*

15   *Law of Aggregate Litigation* (2010) ("ALI") § 3.07, cmt. b.  Identifying the individual Class

16   Members associated with up to 297,758,782 frames of collected payload data would diminish, if

17   not exhaust, the settlement fund, leaving little to no money for direct payments once the costly

18   exercise was complete.  *See Lane*, 696 F.3d at 821 (*cy pres* supported where "direct monetary

19   payments . . . would be infeasible given that each class member's direct recovery would be *de*

20   *minimis*.").  Moreover, analysis of the intercepted data for just 18 named plaintiffs took more than

21   three years and involved the expenditure of considerable resources by both Parties and the Special

22   [19] The Ninth Circuit has stated that a district court is not required "to find a specific monetary
     value corresponding to each of the plaintiff class's statutory claims and compare the value of
23   those claims to the proffered settlement award.  While a district court must of course assess the
     plaintiffs' claims in determining the strength of their case relative to the risks of continued
24   litigation…it need not include in its approval order a specific finding of fact as to the potential
     recovery for each of the plaintiffs' causes of action.  Not only would such a requirement be
25   onerous, it would often be impossible—statutory or liquidated damages aside, the amount of
     damages a given plaintiff (or class of plaintiffs) has suffered is a question of fact that must be
26   proved at trial." *Lane*, 696 F.3d at 823.  Nonetheless, pursuant to this District's Procedural
     Guidance for Class Action Settlements, Plaintiffs advise that the potential class recovery, if the
27   litigation Class had achieved certification and Plaintiffs had prevailed on their Wiretap Act claims
     was likely either $0 or $10,000 in statutory damages per Class Member, at the discretion of this
28   Court.  *See* 18 U.S.C. § 2520(a); *DirecTV*, 2005 WL 5864467, at *6.

Master.  *See* D. 123; 138-3.  Putting aside cost considerations, identifying tens of millions of Class Members could take many more months, if it could ever be accomplished.  In these unique circumstances, *cy pres* is the best way to ensure that Class Members benefit from the Settlement and that the goals of the litigation are met.

Indeed, the *cy pres* doctrine is intended to ensure that the kinds of administrative hurdles to identifying and compensating Class Members present here do not hinder a settlement from achieving the purposes of the litigation or Rule 23.  In addition to compensatory objectives, those include access to justice, disgorgement by the defendant, and deterring future similar conduct. *See* ECPA, 18 U.S.C. § 2511(c) (providing for disgorgement remedy); ALI, § 3.07, cmt. b (noting that without *cy pres*, defendants could retain the funds otherwise distributed to charities, and such an outcome "would undermine the deterrence function of class actions and the underlying substantive-law basis of the recovery"); *Six (6) Mexican Workers*, 904 F.2d at 1306 ("where the statutory objectives include enforcement, deterrence or disgorgement, the class action may be the "superior" and only viable method to achieve those objectives, even despite the prospect of unclaimed funds"); *Coneff v. AT & T Corp.*, 673 F.3d 1155, 1159 (9th Cir. 2012) (discussing deterrence as a "primary policy rationale for class actions"); Bartholomew, *Saving Charitable Settlements*, 83 FORDHAM L. REV. 3241, 3264 (2015) (explaining that "[*cy pres*] settlements provide greater process to justice than otherwise possible").  By enabling Google's disgorgement of the Settlement Amount, the proposed *cy pres* awards further Rule 23's and ECPA's deterrence goals, and achieve a measure of justice for all Class Members.

Compensatory objectives are also furthered by the *cy pres* distributions.  The privacy protections that will be achieved by funding the *cy pres* recipients' work likely will provide greater and longer-lasting benefits to Class Members than would a minuscule sum of money (if any) distributed directly to them.  *See Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013) ("A foundation that receives $10,000 can use the money to do something to minimize violations of the [relevant statute]; as a practical matter, class members each given $3.57 cannot.").  Particularly in the context of modern privacy violations, where entities engaged in commerce at a nationwide scale can affect hundreds of millions of people through nationwide

data collection practices, where tangible damages can be difficult to prove, and class members

can be difficult to identify, the work of privacy organizations on behalf of millions of diffuse

victims is critical to the continued vindication of the privacy rights that Congress sought to

protect through the ECPA.

> **d.** **Information About Past Distributions in Comparable Class Settlements Supports a Finding of Fairness, Reasonableness, and Adequacy.**

The Procedural Guidance requests information about Class Counsel's prior settlements

involving the same or similar clients, claims, and/or issues.  Three recent settlements involving

privacy litigation, two of which settled claims under the Wiretap Act, further demonstrate that the

Settlement here is fair, adequate and reasonable.

In *Matera et al. v. Google LLC*, Lieff Cabraser was Co-Lead Counsel for a putative class

of non-Gmail users who alleged that Google violated the Wiretap Act, among other laws, by

intercepting the contents of messages between class members and Gmail account holders.  The

settlement provided for a three-year injunction that bars Google from processing email content

from non-Gmail users for advertising purposes.  No. 15-4062, at D. 103.  Notice to the estimated

10 million class members was effectuated by publishing online banner ads on popular websites

and establishing a dedicated settlement website, which resulted in more than 109 million

impressions to internet users, and 602,693 clicks through to the settlement website.  *Id.* at D. 96;

D. 98-1.  The settlement was granted final approval by Judge Lucy Koh of the Northern District

of California on February 9, 2018.  *Id.* at D. 103.   The attorneys were awarded $2.2 million in

fees and $51,421.93 for reimbursement of expenses. *Id.* Administrative costs were approximately

$123,500.  *Id.* at D. 96-2.  In exchange for the settlement relief, class members released claims for

injunctive and declaratory relief consistent with certification of the settlement class under Federal

Rule 23(b)(2).  *Id.* at D. 102.

In *Campbell et al. v. Facebook, Inc.*, Lieff Cabraser was Co-Lead Counsel for a certified

litigation class of Facebook users who alleged that Facebook violated the Wiretap Act, among

other laws, by intercepting the contents of messages that were sent over a Facebook messaging

service.  The settlement provided for confirmation of changes to Facebook's business practices

1    and implementation of changes to Facebook's disclosures and Help Center materials regarding its

2    scanning practices.  No. 13-5996, at D. 227.  Notice to the estimated 190 million class members

3    was effectuated by publishing information about the settlement and fee request on Class

4    Counsel's public websites.  *Id.* at D. 235.  The settlement was granted final approval by Judge

5    Phyllis Hamilton of the Northern District of California on August 18, 2017.  *Id.*, at D. 252, and is

6    currently pending resolution of an objector's appeal to the Ninth Circuit.  The attorneys were

7    awarded $3,236,304.69 in fees and $653,695.31 for reimbursement of expenses.  There were no

8    separate administrative costs.  *Id.* at D. 253.  In exchange for the settlement relief, class members

9    released claims for injunctive and declaratory relief only consistent with certification of the

10    litigation and settlement class under Federal Rule 23(b)(2).

11          In *Perkins et al. v. LinkedIn Corp.*, Lieff Cabraser was Co-Lead Counsel for a settlement

12    class of LinkedIn users who alleged that LinkedIn violated California's right of publicity statute

13    (Cal. Civil Code § 3344), among other privacy laws, by inviting class members' "contacts" to

14    join LinkedIn's social network via e-mails that appeared to be, but were not, sent by class

15    members themselves.  The settlement established a $13 million settlement fund and provided for

16    non-monetary relief, which included substantial changes to LinkedIn's business practices to

17    improve user control over invitation e-mails, and changes to LinkedIn's disclosures. No. 13-4303,

18    at D. 95.  The settlement was granted final approval by Judge Lucy Koh of the Northern District

19    of California on February 16, 2016.  *Id.* at D. 134.  Notice to the estimated 20.8 million class

20    members was effectuated through an e-mail notice program and a dedicated settlement website,

21    which resulted in submission of 441,161 valid claims for *pro rata* compensation, resulting in

22    $20.43 payments to each claiming class member, and the distribution of $1,041,996.26 in funds

23    from uncashed checks, in equal parts, to the *cy pres* recipients Access Now, Electronic Privacy

24    Information Center, and Network for Teaching Entrepreneurship.  *Id.* at D. 130; 134.  The

25    attorneys were awarded $3.25 million in fees, inclusive of expenses. *Id.* at D. 134.

26    Administrative costs were approximately $716,750.  *Id.* at D. 127-4.

27          This case will utilize a publication notice program similar to that employed in *Matera*, but

28    significantly more robust in light of the heightened notice requirements for a Rule 23(b)(3)

1    settlement and release as compared to the Rule 23(b)(2) settlement in that case.  *See Dukes*, 564

2    U.S. at 363 ("(b)(2) does not require that class members be given notice and opt-out rights"); *In*

3    *re Yahoo Mail Litig.*, No. 13-4980, 2016 WL 4474612, at *5 (N.D. Cal. Aug. 25, 2016) (same).

4    Consideration of recent similar settlements under the Wiretap Act on behalf of multi-million-

5    person classes, each of which also represents a strong result for consumers, further supports the

6    Settlement's fairness, adequacy and reasonableness.

7               **e.      Any Award of Attorneys' Fees Will Not Prevent the Court from**
                          **Finding that the Relief Provided to the Class Is Adequate.**

8

9               As stated above, Class Counsel anticipates a request for attorneys' fees for no more than

10   25% of the $13 million Settlement Amount, plus a request for reimbursement of expenses.  *See*

11   footnote 17, *supra*.  Because the relief obtained for the Class is adequate—considering the risks

12   of continuing litigation and the effectiveness of a *cy pres* settlement in this particular instance—a

13   request for attorney's fees in this amount is justified.  *See O'Connor*, 2019 WL 1437101, at *14

14   ("In determining whether an attorneys' fee award is justified, the Court must evaluate the results

15   obtained on behalf of the class.").  Under the schedule Plaintiffs have proposed, a fee petition will

16   be filed with the Court well in advance of the objection deadline, thus providing the Class with a

17   full and fair opportunity to object.

18              **f.      There Are No Other Agreements Required to Be Identified**
                          **Under Rule 23(e)(3).**

19

20              Pursuant to Rule 23(e)(3), Plaintiffs state that there are no other agreements that would

21   modify any term of the Settlement Agreement.[20]

22              **4.      The Settlement Agreement Treats Class Members Equitably Relative**
                          **to Each Other.**

23

24              The proposed injunctive relief and *cy pres* awards are designed, as detailed in Section

25   IV.C.3.a., *supra*, to benefit each Class Member alike by ensuring the destruction of the Street

26   View data, by protecting against future interceptions of their wireless communications, by

27   _____

     [20] Plaintiffs have an agreement, subject to Court approval, to retain A.B. Data to serve as the
     Notice Administrator.  Plaintiffs do not understand this type of agreement to be the subject of
28   Rule 23(e)(3)'s disclosure requirement.

PTFFS' NOTICE OF MTN, MTN FOR PRELIM
                                                   APPROVAL OF SETTLEMENT; MPA ISO MTN
                                                   CASE NO.  3:10-MD-02184-CRB

1   educating Class Members and the general public on how to protect their privacy on the Internet,

2   and by educating future software engineers, computer programmers, and other individuals who

3   choose careers in information technology to become sensitive to Internet privacy.  The *cy pres*

4   awards are aimed at influencing these individuals to become safeguards of Internet privacy rather

5   than exploiters of personal information communicated over the Internet.  Moreover, all Class

6   Members benefit from the deterrence achieved by the Settlement.

7         **D.**     **The Court Should Approve the Proposed Program for Class Notice.**

8        If the Class is certified, "'the court must direct to class members the best notice that is

9   practicable under the circumstances, including individual notice to all members who can be

10   identified through reasonable effort.'" *Volkswagen*, 2017 WL 672727, at *18 quoting Rule

11   23(c)(2)(B).  Indeed, "'the express language and intent of Rule 23(c)(2) leave no doubt that

12   individual notice must be provided to those class members who are identifiable through

13   reasonable effort.'" *Id.*, quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974).  Notice

14   must also comport with the Due Process Clause of the U.S. Constitution.  *See Hendricks v.*

15   *StarKist*, No. 13-00729, 2015 WL 4498083, at *8 (N.D. Cal. July 23, 2015) quoting *Philips*

16   *Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985) (internal citations omitted).

17        Here, Plaintiffs' proposed method of providing the notice of the Settlement to the Class

18   Members satisfies these requirements.

19         **1.**     **The Proposed Method of Providing Notice Is the Best Notice**
20                 **Practicable Under the Circumstances.**

21        Because the proposed Class Members necessarily are Internet users and are electronically

22   savvy enough to send and receive electronic communications, the method of providing the best

23   practical notice to each potential Class Member is through the Internet.  This is also the best

24   method of providing notice given the potential size of the Class.  And because the proposed

25   Notice Program uses the Internet as its medium, the Program's implementation can be measured

26   in real-time and, if needed, adjustments to the placements can be made to meet the Program's

27   goals.  Thus, the proposed Notice Program is appropriate for this specific Class, and would be

28

1   executed as follows, subject to Court approval:[21]

2       **Settlement Website:**  The Notice Administrator will create and maintain a Settlement

3   Website that will go live within 30 days of the entry of an order granting preliminary approval.

4   The Settlement Website will remain active until at least 30 days after the effective date of the

5   Settlement Agreement.  It will post the Consolidated Class Action Complaint, Settlement

6   Agreement, Long Form Notice, Opt-Out Form, and *cy pres* proposals.  It will notify Class

7   Members of their rights to object or opt-out, inform Class Members that they should monitor the

8   Settlement Website for developments, and notify Class Members that no further notice will be

9   provided to them once the Court enters the Final Order and Judgment, other than updates on the

10  Settlement Website.  Furthermore, the Notice Administrator will establish an email account and

11  P.O. Box to which Class Members may submit questions regarding the Settlement.  The Notice

12  Administrator will monitor the email account and P.O. Box and respond promptly to

13  administrative inquiries from Class Members and may direct substantive inquiries to Class

14  Counsel.    *See* Kodroff Decl., Exhibit J, ¶¶ 14-15.

15      **Publication Notice:**  Notice to Class Members will also include a comprehensive

16  publication program that conforms to all applicable rules and guidelines. The proposed Notice

17  Program includes a combination of digital advertisements on websites, social media, search

18  engines, and a press release in English and Spanish.  *See* Kodroff Decl., Exhibit J, ¶ 10.  Notice

19  will be provided via strategically designed banner ads appearing on mobile devices and social

20  media newsfeeds.  *See id.* at ¶ 11, and Kodroff Decl., Exhibit J-4.   These digital ads will feature a

21  graphic image, brief copy describing the litigation and links and directions to access the case-

22  specific website.  *See* Kodroff Decl., Exhibit J, ¶ 11.   The more detailed Long Form will be

23  available on the case-specific website.  *See id.* and Kodroff Decl., Exhibit J-5.  The Notice

24  Administrator has determined that the digital banner ads will be executed through the Google

25  Display Network, Instagram, Facebook (which includes a settlement-specific Facebook page),

26  and Google AdWords/Search platforms.  A minimum of 382.1 million impressions will be

---

27  [21] All costs associated with implementing the Notice Program, including the fees and the costs of
28  the Notice Administrator, up to $500,000, will be paid out of the Settlement Fund.  *See* Kodroff
    Decl., Exhibit A, ¶ 41.

1    delivered. Utilizing the known demographics of the Class, the digital banner ads will be

2    specifically targeted to likely Class Members.  *See* Kodroff Decl., Exhibit J, ¶ 12.  The Notice

3    Administrator will also disseminate a news release via *PR Newswire* in English and Spanish.

4    This news release will be distributed to more than 10,000 newsrooms, including print, broadcast,

5    and digital media, across the United States. After the press release is disseminated, both A.B.

6    Data and *PR Newswire* will post a link to the press release on their respective Twitter pages.  *See*

7    *id*. at ¶ 13.  This Notice Program will deliver an estimated reach of 70% to the target audience.

8    *Id.* at ¶ 17.[22]

9
                        **2.**     **The Contents of the Notice Are Clear and Appropriate and Should Be**
                                   **Approved.**
10

11           The contents of the Proposed Long Form Notice satisfy the requirements of Rule 23

12   (c)(2)(B) because the notice "clearly and concisely" states:

13                  (i) the nature of the action; (ii) the definition of the class certified;
                    (iii) the class claims, issues, or defenses; (iv) that a class member
14                  may enter an appearance through an attorney if the member so
                    desires; (v) that the court will exclude from the class any member
15                  who requests exclusion; (vi) the time and manner for requesting
                    exclusion; and (vii) the binding effect of a class judgment on
16                  members under Rule 23(c)(3).

17   *Volkswagen*, 2017 WL 672727, at *20 quoting Fed. R. Civ. P. 23(c)(2)(B).  *See generally*

18   Kodroff Decl., Exhibit J-5.  Furthermore, the Notice Long Form "provides a summary of the

19   Settlement and clearly explain[s] how Class Members may object to or opt out of the Settlement,

20   as well as how Class Members may address the Court at the final approval hearing."

21   *Volkswagen*, 2017 WL 672727, at *20; *see id.* quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361

22   F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the

23   settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

24   forward and be heard."); *See generally* Kodroff Decl., Exhibit J-5.

25           In sum, the Settlement Website and publication plan represent a cross section of media

26   specifically chosen by the Notice Administrator to target likely Class Members and attain a wide

27   [22] Google has agreed to cause notice of the Settlement Agreement to be served upon appropriate
     State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715, at its
28   own expense.  *See* Kodroff Decl., Exhibit A, ¶ 40.

1    and cost-effective reach.  The format and language of the Long Form Notice has been drafted so

2    that it is in plain language, is easy to read, and will be readily understood by the Proposed Class

3    Members, thus satisfying the requirements of Rule 23 and Due Process.

4         Under the circumstances of this case, the proposed Notice Program constitutes the best

5    notice practicable.  Plaintiffs thus request that the Court direct that the Notice Program described

6    herein be effectuated.

7    **V.**      <u>**CONCLUSION**</u>

8         For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs'

9    Motion for Preliminary Approval of Class Action Settlement and enter an Order consistent with

10    the proposed form attached.

11    Dated: July 19, 2019         Respectfully submitted,

12

13            By:          */s/ Jeffrey L. Kodroff*
                            Jeffrey L. Kodroff

14            SPECTOR ROSEMAN & KODROFF PC

15            Jeffrey L. Kodroff
           John A. Macoretta

16            Mary Ann Geppert
           2001 Market Street

17            Suite 3420
           Philadelphia, PA 19103

18            Telephone:  (215) 496-0300
           Facsimile:  (215) 496-6611

19            Email:  jkodroff@srkwlaw.com

20            COHEN MILSTEIN SELLERS & TOLL
           Daniel A. Small

21            1100 New York Avenue NW
           Suite 500 West

22            Washington, DC 20005
           Telephone:  (202) 408-4600

23            Facsimile:  (202) 408-4699
           Email:  dsmall@cohenmilstein.com

24            *Interim Class and Co-Lead Counsel*

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Elizabeth J. Cabraser (State Bar No. 083151)
Michael W. Sobol (State Bar No. 194857)
Melissa Gardner (State Bar No. 289096)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008
ecabraser@lchb.com
msobol@lchb.com
mgardner@lchb.com

*Interim Class and Liaison Counsel*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

Dated: July 19, 2019                    Respectfully submitted,

By: _____ /s/ *Michael Sobol* _____
                    Michael Sobol

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

*Interim Class and Liaison Counsel*