1  Jeffrey L. Kodroff
   John A. Macoretta
2  Mary Ann Geppert
   SPECTOR ROSEMAN & KODROFF PC
3  2001 Market Street
   Suite 3420
4  Philadelphia, PA 19103
   Telephone: (215) 496-0300
5  Facsimile:  (215) 496-6611

6  Daniel A. Small
   COHEN MILSTEIN SELLERS & TOLL
7  1100 New York Avenue NW
   Suite 500 West
8  Washington, DC 20005
   Telephone:  (202) 408-4600
9  Facsimile:  (202) 408-4699

10  *Interim Class and Co-Lead Counsel*

11  Elizabeth J. Cabraser
    Michael W. Sobol
12  LIEFF CABRASER HEIMANN & BERNSTEIN LLP
    275 Battery Street, 29th Floor
13  San Francisco, CA 9411
    Telephone: (415) 956-1100
14
    *Interim Class and Liaison Counsel*
15

16                **UNITED STATES DISTRICT COURT**

17              **NORTHERN DISTRICT OF CALIFORNIA**

18                 **SAN FRANCISCO DIVISION**

19  IN RE GOOGLE LLC STREET VIEW      Case No.  3:10-md-02184-CRB
    ELECTRONIC COMMUNICATIONS
20  LITIGATION                        **CLASS ACTION**

21                                    **DECLARATION OF JEFFREY L. KODROFF
                                      IN SUPPORT OF PLAINTIFFS' MOTION**
22                                    **FOR PRELIMINARY APPROVAL OF CLASS
                                      ACTION SETTLEMENT**
23
                                      Date:      September 6, 2019
24                                    Time:      10:00 am
                                      Courtroom: 6
25                                    Judge:     The Hon. Charles R. Breyer

26

27         Jeffrey L. Kodroff, under the penalty of perjury, submits this Declaration in support of

28  Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, and declares as follows:

I.     **INTRODUCTION**

1.     I, Jeffrey L. Kodroff, am a partner at Spector, Roseman & Kodroff, P.C. ("SRK").

2.     I, along with Dan Small of Cohen Milstein Sellers and Toll ("CMST"), am Interim Class and Co-Lead Counsel in the above-captioned case (the "Action").  Elizabeth J. Cabraser of Lieff Cabraser Heimann & Bernstein, LLP ("LCHB") is Interim Class and Liaison Counsel. (Collectively, "Class Counsel").  *See* Docket No. ("D.") 47.

3.     I submit this Declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (the "Motion"), and have personal knowledge of the matters set forth below based upon my active participation in all aspects of the prosecution and settlement of the Action.

4.     Pursuant to the terms of the Settlement Agreement, Google LLC ("Google") has agreed to establish a $13 million settlement fund to be paid—after the deduction of settlement administration expenses, litigation expenses, service awards and attorneys' fees, as awarded by the Court—to court-approved *cy pres* recipients that are independent organizations with a track record of addressing consumer privacy concerns on the Internet and/or in connection with the transmission of information via wireless networks.  As a condition of receiving the settlement funds, the *cy pres* recipients are required to use the funds to promote the protection of Internet privacy.

5.     The Settlement Agreement also requires Google to 1) destroy all of the Acquired Payload Data; 2) agree to not collect and store for use in any product or service payload data via Street View vehicles, except with notice and consent; 3) comply with all aspects of the Privacy Program described in the relevant portions of the Assurance of Voluntary Compliance; and 4) host and maintain educational webpages that instruct users on the configuration of wireless security modes and the value of encrypting a wireless network, including a how-to video demonstrating how users can encrypt their networks and instructions on how to remove a wireless network from inclusion in Google's location services.

## II.     OVERVIEW OF THE LITIGATION

### A.     Procedural History

6.     Plaintiffs brought this putative class action alleging that their privacy was violated, pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the "Wiretap Act") as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. §§ 2510, *et seq*., when Google intentionally intercepted their electronic communications travelling over unencrypted wireless internet connections via software embedded on Google Street View vehicles.

7.     On November 8, 2010, Plaintiffs filed a Consolidated Class Action Complaint ("CCAC") against Google in the Northern District of California for damages and declaratory and injunctive relief under the Wiretap Act, various state wiretap statutes, and the California Business and Professions Code §§ 17200, *et seq.  See* D. 54.

8.     On June 29, 2011, the Court denied Google's motion to dismiss Plaintiffs' federal Wiretap Act claims (while dismissing Plaintiffs' state wiretap statute and California Business and Professions Code § 17200 claims), *see* D. 82, a decision that was affirmed by the Ninth Circuit on December 27, 2013 (as amended).  *See* D. 101 and *Joffe v. Goggle, Inc.*, 746 F.3d 920 (9th Cir. 2013), *cert. denied* 134 S. Ct. 2877 (2014).

### B.     Discovery

9.     On February 7, 2014, the Court authorized "limited discovery on the issue of standing" to determine whether any Plaintiffs' communications were acquired by Google. D. 108.

10.     On September 19, 2014, the Court entered an Order Regarding Jurisdictional Discovery that provided for the Court to appoint a Special Master to possess and search the data intercepted by Google Street View vehicles.  *See* D. 121.  The Court subsequently appointed Douglas Brush as the Special Master.

11.     On December 14, 2017 the Parties filed the Report of the Special Master called for by Section 4 of the Order Regarding Jurisdictional Discovery.  *See* D. 139.

12.     Through the course of discovery, Plaintiffs learned that the specific conduct challenged in the CCAC took place as early as January 1, 2007 and terminated no later than May 15, 2010, and that "electronic communications" contemplated by the Class definition in the CCAC contain Payload Data collected by the Street View Vehicles.

13.     Discovery has also revealed that the alleged intercepted electronic communications include 297,758,782 payload data frames.

**C.      Settlement**

14.     After the issuance of the Report of the Special Master, Plaintiffs and Google (the "Parties") engaged in extensive arm's length settlement negotiations, which spanned over 5 months and included a mediation session on February 1, 2018 before the respected and skilled mediator Greg Lindstrom of Phillips ADR Enterprises P.C.  The mediation resulted in the proposed Settlement Agreement, which was executed by the Parties on June 11, 2018.  *See* the Settlement Agreement of June 11, 2018, attached hereto as Exhibit A.

**III.     THE SETTLEMENT TERMS**

15.     The Settlement Agreement requires that Google pay $13 million into a Settlement Fund—none of which will revert to Google absent termination or rescission—to be used, as approved by the Court, for the payment of attorneys' fees, reimbursement of expenses, Plaintiff service awards, class notice, Settlement Administrator charges, Escrow Account charges, and Escrow Account tax liabilities. *See* Exhibit A, ¶¶ 16, 23, 53.  The "Net Settlement Fund" will then be distributed to one or more Court "Approved Cy Pres Recipients," who will use the funds to promote the protection of Internet privacy.  *See* Exhibit A, ¶¶ 24, 30.  Plaintiffs propose the following entities to be "Approved Cy Pres Recipients:" The Center on Privacy & Technology at Georgetown Law, Center for Digital Democracy, Massachusetts Institute of Technology—Internet Policy Research Initiative, World Privacy Forum, Public Knowledge, Rose Foundation for Communities and the Environment, American Civil Liberties Union Foundation, Inc., and Consumer Reports, Inc.  Detailed proposals from each of these organizations are attached hereto as Exhibits B through I, respectively.  The proposals will be placed on the settlement website for review by the Class Members.

16.     The Settlement Agreement also provides for the following injunctive relief:

a.     Google shall "destroy all Acquired Payload Data, including disks containing such data, within forty-five (45) days of Final Approval, subject to any preservation obligations Google may have with respect to any Excluded Class Member." *See* Exhibit A, ¶ 33.

b.     Google shall "not collect and store for use in any product or service Payload Data via Street View vehicles, except with notice and consent." *See* Exhibit A ¶ 34.

c.     Google shall "comply with all aspects of the Privacy Program described in paragraph 16 of Section I of the Assurance of Voluntary Compliance and with the prohibitive and affirmative conduct described in paragraphs 1-5 of the Assurance of Voluntary Compliance." *See* Exhibit A ¶ 35.

d.     "Google agrees to host and maintain educational webpages that instruct users on the configuration of wireless security modes and the value of encrypting a wireless network, including a how-to video demonstrating how users can encrypt their networks and instruction on how to remove a wireless network from inclusion in Google's location services. Google agrees to use its best efforts to have the webpages operational by the time the class notice is first disseminated." *See* Exhibit A ¶ 36.

17.     In exchange for the relief described in the Settlement Agreement, and upon entry of a final order approving the Settlement Agreement, Google will be "fully, finally and forever released and discharged" by the Class Members from "all claims, complaints, demands, damages, debts, liabilities, actions, proceedings, remedies, causes of actions or suits, known or unknown, of whatever kind or nature, including but not limited to whether in law or in equity, under contract, tort or any other subject area, or under any other statute, rule, regulation, order, or law, asserted or not asserted, arising out of or related to the allegations in the Consolidated Amended Complaint, including but not limited to the claims arising out of or related to the allegations in the Consolidated Amended Complaint that have been asserted or could have been asserted by [Plaintiffs and the other Class Members] in the Consolidated Amended Complaint." *See* Exhibit A, ¶¶17, 46.

18.     The Settlement Agreement provides for a single Settlement Class, defined as follows:

> "Class" means all persons who used a wireless network device from which Acquired Payload Data was obtained.
>
> "Acquired Payload Data" means the Payload Data acquired from unencrypted wireless networks by Google's Street View vehicles operating in the United States from January 1, 2007 through May 15, 2010.

Exhibit A, ¶¶ 2, 5.

## IV.     NOTICE TO THE CLASS

19.     Class Counsel sought request for proposals from five potential notice administrators, which were followed by detailed questions from Class Counsel. Class Counsel then received revised proposals from each entity.

20.     Based upon quality and cost considerations from this competitive process, Class Counsel ultimately selected A.B. Data, Ltd ("A.B. Data") to propose as Notice Administrator. A.B. data has quoted Class Counsel a flat fee of $158,000 for providing notice to the Class.

21.     Over the past two years, SRK engaged A.B. Data in *Vista Healthplan, Inc. v. Cephalon, Inc., et al.*, 2:06-cv-1833—MSG (E.D. Pa.); CMST engaged A.B. Data in *In re Harman International Industries, Inc. Securities Litigation,* 1:07-cv-01757-RC (D.D.C.) and in *In re BP p.l.c. Securities Litigation*, 4:10-MD-02185 (S.D. Tex.); and LCHB engaged A.B. Data in *Cipro Cases I and II (California)*, Nos. 4154 and 4220 (Cal. App. 4 Dist.).

22.     Linda V. Young, Vice President, Media with A.B. Data, has provided a Declaration outlining the details and providing examples of the Notice Program.  *See* Declaration of Linda V. Young ("Young Declaration"), attached hereto as Exhibit J, ¶¶ 7-17.  *See* Notice Program, attached hereto as Exhibit J-1.

23.     The primary goal of the Notice Program "is to deliver notice to the Proposed Class leveraging the latest digital media technologies, while also meeting the requirements of due process and delivering a reach of at least 70%."  *See* Exhibit J-1, Pg. 2.

24.     The Young Declaration also provides details as to the qualifications of A.B. Data. *See* Exhibit J, ¶¶ 4-6, as well as the Curriculum Vitae of Linda V. Young and the Profile of A.B.

Data's Background and Capabilities, attached as J-2 and J-3, respectively.  The Young Declaration further provides an example banner ad, as well as the proposed "Notice of Class Action Settlement" Long Form Notice ("Long Form Notice").  *See* Exhibit J-4 and J-5, respectively.

## V.  PROSPECTIVE REQUEST FOR ATTORNEYS' FEES

25.     Class Counsel anticipates making a request for attorneys' fees for no more than 25% of the $13 million settlement fund and for reimbursement of litigation expenses.

26.     A fee petition will be submitted to the Court for its review and approval and the Long Form Notice will inform the Class Members of the attorney fee amount, thus providing the Class with an opportunity to object to same.

27.     Thus far in this Action, SRK has expended 3,505.35 hours, and has a lodestar of $1,815,054.50 and costs of $250,988.19.  CMST has expended 2,820.40 hours, and has a lodestar of $2,006,816.35 and costs of $323,698.37.  LCHB has expended 1,724.70 hours, and has a totaled lodestar of $1,114,113.50 and costs of $ $141,272.20.  Thus, the ultimate award of attorneys' fees in this Action will result in a negative multiplier.

## VI.  QUALIFICATIONS OF CLASS COUNSEL AND PLAINTIFFS AS CLASS REPRESENTATIVES

28.     As exemplified in each firm's resume, Class Counsel have extensive experience litigating and settling consumer class actions and other complex matters.  Each firm has held significant leadership roles in prominent class actions throughout the United States.  Collectively, Class Counsel have assisted putative class members in recovering billions of dollars.  A true and correct copy of the Firm Resume of SRK is attached hereto as Exhibit K**.**  A true and correct copy of the Firm Resume of CMST is attached hereto as Exhibit L.  The Firm Resume of LCHB can be accessed at:  https://www.lieffcabraser.com/pdf/Lieff_Cabraser_Firm_Resume.pdf.  Class Counsel have committed all necessary time, expertise, and resources to vigorously litigating this Action for more than nine years.

29.     Furthermore, each of the proposed Class Representatives has remained committed to representing the proposed Class in this litigation since 2010, remaining available to and in

1    touch with Class Counsel, and for those who participated in jurisdictional discovery, by

2    submitting information, declarations, and other evidence, including electronic devices for forensic

3    imaging, as required to meet the needs of the Special Master and the jurisdictional discovery

4    conducted in this Action.  Named Plaintiff Jennifer Locsin does not move to serve as Class

5    Representative because, after several attempts over several years, Class Counsel have been unable

6    to contact her or her individually-retained attorney.

7    **VII.    RECOMMENDATION OF CLASS COUNSEL**

8          30.    Class Counsel had sufficient information at their disposal before entering into

9    settlement negotiations, which allowed Class Counsel to adequately assess the strengths and

10   weaknesses of Plaintiffs' case and balance the benefits of settlement against the risks of further

11   litigation.  After weighing the benefits of the Settlement against the inherent risks and expense of

12   continued litigation, Class Counsel believe that the proposed Settlement is fair, reasonable and

13   adequate, and in the best interest of the Class.

14         31.    The Settlement Agreement was achieved after a contested motion to dismiss, a

15   Ninth Circuit opinion affirming that Plaintiffs properly pled a claim under the Wiretap Act,

16   substantial jurisdictional discovery, over five months of arm's-length negotiations, and mediation.

17         32.    Google has vigorously denied Plaintiffs' allegations of wrongdoing, and absent

18   settlement, Plaintiffs anticipate Google would defend this Action aggressively at multiple,

19   procedural steps prior to trial, including opposing class certification and moving for summary

20   judgment.

21         33.    This case is almost 10 years old.  The outcome of continued litigation, including

22   trial and likely appeals, is far from certain, would add still more years to this litigation, and would

23   entail significant expense.  In contrast, the Settlement provides significant immediate benefits to

24   the Settlement Class.

25         34.    Although Plaintiffs and Class Counsel are confident in the strength of their claims

26   under the Wiretap Act, and their ability to ultimately prevail at trial, they nevertheless recognize

27   that this litigation is inherently risky.  Given the substantial relief obtained for the Class, and the

28

KODROFF DECL. ISO PLTFS' MTN. FOR PRELIM.
APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO.  3:10-MD-02184-CRB

1   uncertainties that would accompany continued litigation, there is little question that the proposed

2   *cy pres* settlement provides adequate relief to the Class Members.

3       35.     Accordingly, Class Counsel believe the Settlement to be fair, adequate and

4   reasonable.

5   **VIII.**   **CONCLUSION**

6       36.     In sum, the settlement negotiations in this Action were conducted at arm's length

7   by informed and experienced counsel for all parties, spanned five months, and included a

8   mediation session before a reputable mediator who had an integral part in the settlement

9   negotiations.  Further, the Settlement provides a significant benefit to the Class now, without the

10  inherent risk, expense, delay, and uncertainty of continued litigation, and treats Class Members

11  equitably relative to each other.

12      37.     Consequently, Class Counsel believe the proposed Settlement is fair, reasonable,

13  and adequate, and should be preliminarily approved by the Court.

14          Executed this 19th day of July, 2019, at Philadelphia, Pennsylvania.

15                                          /s/ Jeffrey L. Kodroff

16                                          Jeffrey L. Kodroff, Esq.
                                            SPECTOR, ROSEMAN & KODROFF, P.C.

17

18

19

20

21

22

23

24

25

26

27

28

KODROFF DECL. ISO PLTFS' MTN. FOR PRELIM.
APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO.  3:10-MD-02184-CRB

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

IN RE: GOOGLE LLC STREET VIEW
ELECTRONIC COMMUNICATIONS
LITIGATION

Case No: 3:10-md-02184-CRB

SETTLEMENT AGREEMENT

This agreement ("Settlement Agreement" or "Agreement") is made and entered into this

11th day of June, 2018 (the "Execution Date"), by and between Google LLC ("Google" or

"Defendant") and Plaintiffs Dean Bastilla, Ric Benitti, Matthew Berlage, David Binkley, James

Blackwell, Stephanie & Russell Carter, Jeffrey Colman, Bertha Davis, James Fairbanks, Wesley

Hartline, Benjamin Joffe, Pat Keyes, Aaron Linsky, Lilla Marigza, Eric Myhre, John Redstone,

Danielle Reyas, Karl Schulz, Jason Taylor, and Vicki Van Valin (collectively, "Plaintiffs," and

with Google, the "Parties"), individually and on behalf of the Class, as defined below.

WHEREAS, Plaintiffs brought suit on behalf of themselves and all others similarly

situated for damages and declaratory and injunctive relief under Title III of the Omnibus Crime

Control and Safe Streets Act of 1968 ("the Wiretap Act"), as amended by the Electronic

Communications Privacy Act of 1986, 18 U.S.C. §§ 2510, et seq., various state wiretap statutes,

and the California Business and Professions Code §§ 17200, et seq. against Google, pending in the

Northern District of California and captioned *In re: Google LLC Street View Electronic

Communications Litigation*, Case No. 10-md-2184 (the "Action"); and

WHEREAS, on June 29, 2011, the Court denied Google's motion to dismiss Plaintiffs'

federal Wiretap Act claims (while dismissing Plaintiffs' state wiretap statute and California

Business and Professions Code § 17200 claims), a decision that was subsequently affirmed by the Ninth Circuit on December 27, 2013 (as amended); and

WHEREAS, on September 19, 2014, the Court entered an Order Regarding Jurisdictional Discovery, setting forth a process for the review of data acquired by Google's Street View vehicles by a Special Master appointed by the Court; and

WHEREAS, the Court subsequently appointed Douglas Brush as the Special Master, and on December 14, 2017 the Parties filed the Report of the Special Master called for by Section 4 of the Order Regarding Jurisdictional Discovery; and

WHEREAS, arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel and counsel for Google, including a mediation with Greg Lindstrom of Phillips ADR Enterprises P.C., and this Settlement Agreement has been reached as a result of those negotiations; and

WHEREAS, Plaintiffs have conducted a meaningful investigation and analyzed and evaluated the merits of the claims made in the Action against Google, including with the benefit of the Court's ruling on Google's motion to dismiss, evaluation of the Report of the Special Master and the results of Jurisdictional Discovery, and the impact of this Settlement Agreement on the Class, and based upon that analysis, and recognizing the substantial risks of continued litigation, have concluded that a settlement with Google on the terms set forth below is fair, reasonable, and adequate and in the best interest of the members of the Class; and

WHEREAS, Google believes that it is not liable for the claims asserted and has good defenses to Plaintiffs' claims, but nevertheless has decided to enter into this Settlement Agreement in order to avoid further expense, inconvenience, and the distraction of burdensome and protracted

litigation and to obtain the releases, orders and judgment contemplated by this Settlement

Agreement, and to put to rest with finality all Released Claims, as defined below; and

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and

other good and valuable consideration, and intending to be legally bound, it is agreed by and

between Google and the Plaintiffs that the Action be settled, compromised, and dismissed with

prejudice, without costs to Plaintiffs, the Class Members, or Google except as provided for herein,

subject to the approval of the Court, on the following terms and conditions:

A.     **Definitions**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.     "802.11 Wireless Standard" means the family of specifications developed by the

Institute of Electrical and Electronics Engineers (IEEE) for wireless LAN (WLAN) technology

and assigned the 802.11 number.

2.     "Acquired Payload Data" means the Payload Data acquired from unencrypted

wireless networks by Google's Street View vehicles operating in the United States from January 1,

2007 through May 15, 2010.

3.     "Affiliates," with respect to a party, shall mean (i) all entities now or in the future

controlling, controlled by or under common control with that party; (ii) all entities in the past

controlling, controlled by or under common control with that party, for the period of time that such

control exists or existed; and (iii) predecessors, successors, or successors in interest thereof,

including all entities formed or acquired by that party in the future that come to be controlled by

that party. For purposes of this definition, "control" means possession directly or indirectly of the

power to direct or cause the direction of management or policies of a company or entity through

the ownership of voting securities, contract, or otherwise, and "entities" includes all persons,

companies, partnerships, corporations, associations, organizations, and other entities.

4.      "Assurance of Voluntary Compliance" means the Assurance of Voluntary Compliance entered into by Google and the Attorneys General of the States of Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, and Washington in March 2013 regarding Google's collection of Wi-Fi information with its Street View vehicles.

5.      "Class" means all persons who used a wireless network device from which Acquired Payload Data was obtained.

6.      "Class Administrator" means a third-party class action settlement administrator to be selected by Plaintiffs with the approval of the Court. Under the supervision of Co-Lead Counsel (as defined below), the Class Administrator shall oversee and implement the Notice Plan, receive any requests for exclusion from the Class, establish, maintain and post materials on a Settlement website, and complete and file any required tax forms and pay any tax liabilities in connection with Escrow Account (as defined below).

7.      "Class Member" means any person within the definition of the Class, excluding (a) any Releasee; (b) any judicial officer presiding over the Action, or any member of his or her immediate family or of his or her judicial staff; and (c) any Excluded Class Member.

8.      "Excluded Class Member" means any person meeting the Class definition who has timely exercised his or her right to be excluded from the Class.

9.      "Co-Lead Counsel" means the following law firms:

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., N.W., Suite 500
Washington, DC  20005

Spector Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103

10.    "Court" means the United States District Court for the Northern District of California.

11.    "Approved Cy Pres Recipient" means an organization approved by the Court to receive cy pres funds from this Settlement, as described in Section B.b.

12.    "Proposed Cy Pres Recipient" means an organization proposed by Co-Lead Counsel to the Court to receive cy pres funds from this Settlement, as described in Section B.b.

13.    "Data Frames" means data frames under the 802.11 Wireless Standard, consisting of (1) a header, containing network identifying information (such as a MAC Address or SSID) ("Data Frame Headers"); and (2) a body that may contain the content of communications being transmitted over the network ("Payload Data").

14.    "Final Approval" means that (a) the Court has entered (i) a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and (ii) a final judgment dismissing the Action with prejudice and without costs (except as specified in this Agreement); and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review. Neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be taken into account in determining the above-stated times.

15.    "Google Affiliates" shall mean all Affiliates of Google. For purposes of this Agreement, Google Affiliates shall not include Google Capital or any entities that otherwise would be deemed an Affiliate of Google as a result of an investment in Google Capital or GV (formerly Google Ventures), even where such investment may afford Google Capital or GV some level of control over the entity.

16.    "Net Settlement Fund" means the Settlement Fund less all amounts approved by the Court for distribution to any person or entity other than the Approved Cy Pres Recipients, including amounts approved by the Court for attorneys' fees, reimbursement of expenses, Plaintiff service awards, class notice, Class Administrator charges, Escrow Account charges, and Escrow Account tax liabilities.

17.    "Released Claims" means any and all claims, complaints, demands, damages, debts, liabilities, actions, proceedings, remedies, causes of actions or suits, known or unknown, of whatever kind or nature, including but not limited to whether in law or in equity, under contract, tort or any other subject area, or under any statute, rule, regulation, order, or law, asserted or not asserted, arising out of or related to the allegations in the Consolidated Amended Complaint, including but not limited to the claims arising out of or related to the allegations in the Consolidated Amended Complaint that have been asserted or could have been asserted by Releasors in the Consolidated Amended Complaint. Released Claims do not include any claims arising out of the enforcement of this Settlement Agreement.

18.    "Releasees" means Google; Google Affiliates, and their respective officers, directors, employees, members, agents, attorneys, administrators, representatives, insurers, beneficiaries, trustees, shareholders, investors, contractors, joint venturers, predecessors,

successors, assigns, transferees, and all other individuals and entities acting on Google's behalf in connection with the Released Claims.

19.    "Releasors" means Plaintiffs and the other Class Members; their current and former parents; their predecessors, affiliates, successors, and subsidiaries; and their officers, directors, attorneys, representatives, and employees; and assignees of any Released Claims.

20.    "Settlement" means the settlement of the Action contemplated by this Agreement.

21.    "Settlement Amount" means $13,000,000.00 in United States currency.

22.    "Settlement Fund" has the meaning provided in paragraph 23, below.

**B.    Relief**

**a.    Settlement Fund**

23.    Within twenty (20) business days of the later of (1) an entry of an order preliminarily approving the Settlement or (2) the date upon which Co-Lead Counsel causes the necessary W9 statement and payment information to be made available to Google, Google shall pay or cause to be paid the Settlement Amount into an escrow account designated by Co-Lead Counsel (the "Escrow Account"). This amount, along with any interest earned thereon, shall be held in escrow and constitutes the Settlement Fund. The Escrow Account and Settlement Fund shall be administered in accordance with the provisions of this Settlement Agreement. The Escrow Account shall be established as a "qualified settlement fund" as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations.

24.    The Net Settlement Fund shall be distributed to one or more Approved Cy Pres Recipients.

25.    Google represents that the Settlement Amount is in addition to Google's charitable donations and that but for this Settlement, Google would not have expended these funds for charitable purposes.

7

26.     Google shall not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration, except as expressly otherwise provided in this Settlement Agreement.

27.     In no event shall Google's liability with respect to the Settlement exceed $13,000,000.

28.     No disbursements shall be made from the Settlement Fund except as authorized by the Court.

**b.     Cy Pres**

29.     Plaintiffs shall identify one or more Proposed Cy Pres Recipient(s) to recommend to the Court for approval. The Proposed Cy Pres Recipient(s) shall be independent organizations with a track record of addressing consumer privacy concerns on the Internet and/or in connection with the transmission of information via wireless networks, directly or through grants, and such organization(s), as a condition of receiving settlement funds, shall commit to use the funds to promote the protection of Internet privacy. Before submitting their Proposed Cy Pres Recipient(s) to the Court, Plaintiffs agree to disclose them to Google and consult with Google in good faith regarding any concerns Google may have.

30.     Each Proposed Cy Pres Recipient shall agree that, if approved by the Court, it shall commit to use the funds to promote the protection of Internet privacy, and that until such time as the funds allocated to it are exhausted, it shall provide a report to the Court and the parties every six months informing them of how it has used the cy pres funds since the previous report and how it intends to use any remaining funds. Plaintiffs shall be responsible for ensuring that such reports are posted on an Internet website dedicated to the Settlement.

31.     Google shall not exercise any control or influence over any Approved Cy Pres Recipient's expenditure of the cy pres funds.

32.     In the event Plaintiffs identify more than one Proposed Cy Pres Recipient, Plaintiffs shall propose to the Court the amount or percentage of the Net Settlement Fund for each Proposed Cy Pres Recipient to receive.

**c.     Injunctive Relief**

33.     Google shall destroy all Acquired Payload Data, including the disks containing such data, within forty-five (45) days of Final Approval, subject to any preservation obligations Google may have with respect to any Excluded Class Member. Google shall report via counsel to Co-Lead Counsel upon the expiration of the forty-five (45) days whether it has destroyed the Acquired Payload Data. If Google does not destroy the Acquired Payload Data within the forty-five (45) days because of ongoing preservation obligations, it will report accordingly to Co-Lead Counsel. When the Acquired Payload Data is destroyed, Google will report via counsel the fact of that destruction to Co-Lead Counsel.

34.     Google shall not collect and store for use in any product or service Payload Data via Street View vehicles, except with notice and consent.

35.     Google shall comply with all aspects of the Privacy Program described in paragraph 16 of Section I of the Assurance of Voluntary Compliance and with the prohibitive and affirmative conduct described in paragraphs 1-5 of the Assurance of Voluntary Compliance. Through counsel, Google shall confirm to Plaintiffs in writing on an annual basis that it remains in compliance.

36.     Google agrees to host and maintain educational webpages that instruct users on the configuration of wireless security modes and the value of encrypting a wireless network, including a how-to video demonstrating how users can encrypt their networks and instructions on how to

remove a wireless network from inclusion in Google's location services. Google agrees to use its best efforts to have the webpages operational by the time the class notice is first disseminated.

37.    Google's obligations in this "Injunctive Relief" subsection shall terminate five years after Final Approval.

## C.    Preliminary Approval of the Settlement

38.    The Parties agree to use their best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e), and scheduling a final fairness hearing) to obtain Final Approval of the Settlement and the final dismissal with prejudice of the Action.

39.    Plaintiffs shall submit to the Court a motion requesting that the Court preliminarily approve the Settlement and authorize notice to the Class (the "Preliminary Approval Motion"). The Preliminary Approval Motion shall include: (a) a proposed form of order preliminarily approving the Settlement; (b) a proposed form of, and method for, dissemination of notice to the Class; and (c) a proposed form of a final order approving the Settlement and dismissing the Action with prejudice, all of which shall be furnished to Google for review and prior approval, which is not to be unreasonably withheld. The Preliminary Approval Motion shall also identify the Proposed Cy Pres Recipient(s).

40.    Within ten calendar days after the filing with the Court of this Settlement Agreement and the Preliminary Approval Motion, Google shall (at its own expense) cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

**D.**     **Notice to the Class, Objections, and Requests for Exclusion**

41.     After preliminary approval of the Settlement, Co-Lead Counsel may utilize up to $500,000 from the Settlement Fund to implement the notice plan approved by the Court. The amount spent or incurred for notice and notice administration is not refundable to Google in the event the Settlement Agreement is disapproved, rescinded, or otherwise fails to become effective.

42.     The Class Administrator shall oversee and implement the notice plan approved by the Court. All costs associated with the notice plan shall be paid from the Settlement Fund.

43.     The notice shall contain instructions and a deadline for persons within the Class definition to request exclusion from the Class or object to the Settlement.

**E.**     **Final Approval of the Settlement and Dismissal of the Action**

44.     If the Settlement is preliminarily approved by the Court, Plaintiffs shall, pursuant to the schedule set by the preliminary approval order, seek final approval of the Settlement and entry of a final order and judgment:

> (a)     granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Rule 23(e) of the Federal Rules of Civil Procedure and directing the consummation of the Settlement according to its terms;

> (b)     specifying one or more Approved Cy Pres Recipients for receipt of the Net Settlement Fund;

> (c)     directing that the Action be dismissed with prejudice and, except as provided for by the Settlement Agreement, without costs;

> (d)     reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including the administration and consummation of this Settlement, to the United States District Court for the Northern District of California; and

> (e)     determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment.

45.     This Settlement Agreement shall become effective only upon Final Approval of the Settlement.

**F.** **Releases, Discharge, and Covenant Not to Sue**

46.     Upon Final Approval and in consideration of payment of the Settlement Amount, Releasees shall be fully, finally and forever released and discharged by the Releasors from the Released Claims. Releasors shall not, after Final Approval, seek to recover from any Releasee based, in whole or in part, upon any of the Released Claims.

47.     In addition, Releasors hereby expressly waive and release, upon Final Approval of this Settlement Agreement, any and all provisions, rights, and benefits conferred by Section 1542 of the California Civil Code, and all other similar provisions of law, to the extent such provision may be applicable to this release. California Civil Code § 1542 states:

> CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

The Releasors shall, by operation of the final judgment and Final Approval, be deemed to assume the risk that facts additional, different, or contrary to the facts which each believes or understands to exist, may now exist, or may be discovered after the release set forth in this Agreement becomes effective, and the Releasors shall be deemed to have agreed that any such additional, different, or contrary facts shall not limit, waive, or reduce the foregoing releases.

48.     Upon Final Approval, Google shall be deemed to have fully released Releasors from any claims relating to the institution or prosecution of the Action.

**G.** **Rescission or Termination**

49.     If the Court does not approve this Settlement Agreement or any material part hereof, or if it is set aside on appeal, then this Settlement Agreement will be deemed terminated. A modification or reversal on appeal of any award from the Settlement Fund granted by the Court to pay service awards or attorneys' fees, or to pay or reimburse expenses, shall not be deemed to

12

disapprove or modify all or a part of the terms of this Settlement Agreement and shall not be grounds for termination.

50.     If the number of persons within the Class definition who request exclusion from the Class exceeds 5,000, then Google shall have the option to rescind this Settlement Agreement in its entirety (except as hereafter provided in this Section) by written notice to the District Court and to counsel for the Plaintiffs filed and served within ten business days of the date that the Class Administrator informs Google the total number of requests for exclusion that have been received.

51.     If the Settlement Agreement is terminated or rescinded as provided for in this Section, then the balance of the Settlement Fund shall be returned to Google, but only after payment from the Settlement Fund of all expenses incurred with Court approval. No Court-approved expenses paid from the Settlement Fund shall be returned to Google.

52.     If the Settlement Agreement is terminated or rescinded as provided for in this Section, then the Parties shall be restored to their respective positions in the Action as of the Execution Date. In that event, the Action shall proceed as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Action or otherwise for any purpose. Google and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become effective or if it is terminated or rescinded pursuant to this Section.

53.     Other than via termination or rescission as described in this Section, in no event shall any portion of the Settlement Fund revert to Google.

**H.     Taxes**

54.     Co-Lead Counsel, through the Class Administrator, shall be solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and

when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund. All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund. Google shall have no responsibility to make any tax filings relating to the Settlement Fund and shall have no responsibility to pay tax on any income earned by the Settlement Fund unless the Settlement Fund (or a portion thereof) is returned to Google pursuant to the terms of the Settlement Agreement. In the event any funds in the Settlement Fund, including interest or other income, are returned to Google, Google shall be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income.

**I.    Miscellaneous**

55.    Google represents that it has complied with paragraph 16 of Section I of the Assurance of Voluntary Compliance (as defined above) and with the prohibitive and affirmative conduct described in paragraphs 1-5 of Section II of the Assurance of Voluntary Compliance. An asserted violation of this provision may be reported to any of the Attorneys General identified in paragraph 4 above, but an asserted violation of this provision shall not be a basis for recission of this Agreement.

56.    This Settlement Agreement constitutes the entire agreement among Plaintiffs and Google pertaining to the Settlement of the Action against Google. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and Google.

57.    Neither this Settlement Agreement nor any negotiations or proceedings connected with it shall be deemed or construed to be an admission by any party or any Releasee of any wrongdoing or liability or evidence of any violation by Google of any federal or state statute or law either in the Action or in any related action or proceedings, and evidence thereof shall not be discoverable or used, directly or indirectly, in any way, except in a proceeding to interpret or

14

enforce this Settlement Agreement. This Settlement Agreement represents the settlement of disputed claims and does not constitute, nor shall it be construed as, an admission or disparagement of the correctness of any position asserted by any party, or an admission of liability or lack of liability or of any wrongdoing or lack of any wrongdoing by any party, or as an admission of any strengths or weaknesses of the Plaintiffs' claims or Google's defenses. Google specifically denies any wrongdoing or liability by any of the Releasees.

58.     This Settlement Agreement may be executed in counterparts by Plaintiffs and Google, and a facsimile or scanned signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

59.     Neither Plaintiffs nor Google shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

60.     The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

61.     The Court shall retain jurisdiction over the implementation and enforcement of this Settlement.

62.     Any disputes between Plaintiffs and Google concerning this Settlement Agreement shall, if they cannot be resolved by the parties, be submitted to the United States District Court for Northern District of California.

63.     This Settlement Agreement shall be governed and interpreted according to the laws of the State of California, without regard to its choice of law or conflict of law principles.

64.     Until such time as all Parties execute this Agreement and Plaintiffs present it to the Court with a motion seeking preliminary approval of the Settlement, the Parties agree that all terms of this Agreement shall be confidential and neither Party will disclose the terms of this Agreement or any communications, documents or negotiations that led to it, except:

(a)     As reasonably necessitated by any law, statute, rule, regulation, order, discovery request, subpoena or other governmental requirement (including public reporting requirements), provided that, to the extent permitted by applicable law, the disclosing Party must first notify the other Party and give the other Party a reasonable opportunity to seek a protective order or other appropriate remedy prior to such disclosure, except that Google is not required to provide notice in the case of disclosure to a government regulator or government entity or pursuant to any other governmental requirement (including public reporting requirements);

(b)     To such Party's Affiliates, accountants, auditors, attorneys, financial advisors, insurers, indemnitors, and other professionals engaged by such Party, as reasonably required for their performance of services for such Party, provided such persons or entities (i) have a need to know such information to exercise their professional duties to the Party, (ii) are informed of the confidentiality of such information, and (iii) agree to maintain the confidentiality of such information;

(c)     As reasonably required for due diligence in connection with any transaction involving Google or a Google Affiliate;

(d)     A Party may disclose any information that becomes part of the public domain without a breach of this Section by the disclosing Party;

(e)     With the prior written consent of the other Party;

(f)     Plaintiffs may disclose the terms of this Agreement to the extent necessary to

identify Proposed Cy Pres Recipients, to retain a Settlement Administrator, to

obtain advice on the Notice Plan, to obtain advice on the forms of class notice, to

open the Escrow Account, and to take any other measures needed to prepare the

Preliminary Approval Motion, provided that any such parties agree to maintain the

confidentiality of such information;

(g)     Both Parties may disclose that "the dispute between the parties has been resolved";

and

(h)     Both Parties may disclose in the course of any legal proceeding to support any

claim or defense, provided that, to the extent permitted by applicable law, the

disclosing Party must first notify the other Party and give the other Party a

reasonable opportunity to seek a protective order or other appropriate remedy prior

to such disclosure.

This Paragraph 64 is not a bar to a claim, complaint, action, proceeding, or remedy for breach of

this Agreement, but the Parties must take appropriate steps to preserve the confidentiality required

by this Paragraph 64.

65.     Each party acknowledges that it has been and is being fully advised by competent

legal counsel of such party's own choice and fully understands the terms and conditions of this

Settlement Agreement, and the meaning and import thereof, and that such party's execution of this

Settlement Agreement is with the advice of such party's counsel and of such party's own free will.

Each party represents and warrants that it has sufficient information regarding the transaction and

the other parties to reach an informed decision and has, independently and without relying upon

the other parties, and based on such information as it has deemed appropriate, made its own

17

decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

66.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

Date: 6/11/18

Daniel A. Small
David A. Young
COHEN MILSTEIN
SELLERS & TOLL PLLC
1100 New York Ave., NW, Suite 500
Washington, DC  20005
Tel: (202) 408-4600
Email:   dsmall@cohenmilstein.com
         dyoung@cohenmilstein.com

*Interim Co-Lead Class Counsel*

Date:_____

Jeffrey L. Kodroff
SPECTOR ROSEMAN
& KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Tel: (215) 496-0300
Email:   jkodroff@srk-law.com

*Interim Co-Lead Class Counsel*

18

decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

66.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.


Date:_____       _____
                                   Daniel A. Small
                                   David A. Young
                                   COHEN MILSTEIN
                                   SELLERS & TOLL PLLC
                                   1100 New York Ave., NW, Suite 500
                                   Washington, DC  20005
                                   Tel: (202) 408-4600
                                   Email:   dsmall@cohenmilstein.com
                                            dyoung@cohenmilstein.com

                                   *Interim Co-Lead Class Counsel*


Date: 6/12/18                      _____
                                   Jeffrey L. Kodroff
                                   SPECTOR ROSEMAN
                                   & KODROFF, P.C.
                                   1818 Market Street, Suite 2500
                                   Philadelphia, PA  19103
                                   Tel: (215) 496-0300
                                   Email:   jkodroff@srk-law.com

                                   *Interim Co-Lead Class Counsel*

18

Date: 6.11.18

Michael W. Sobol
LEIFF CABRASER
HEIMANN & BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA  94111
Tel: (415) 956-1000 215)
Email:   msobol@lchb.com

*Interim Liaison Class Counsel*

Date: 6/11/18

David H. Kramer
WILSON SONSINI GOODRICH ROSATI
650 Page Mill Road
Palo Alto, CA 94304
Tel: (650) 493-9300
Email:   dkramer@wsgr.com

*Counsel for Google LLC*

19

Date:_____

Michael W. Sobol
LEIFF CABRASER
HEIMANN & BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA  94111
Tel: (415) 956-1000 215)
Email:   msobol@lchb.com

*Interim Liaison Class Counsel*

Date:___6/11/18_____

David H. Kramer
WILSON SONSINI GOODRICH ROSATI
650 Page Mill Road
Palo Alto, CA 94304
Tel: (650) 493-9300
Email:   dkramer@wsgr.com

*Counsel for Google LLC*

19

# EXHIBIT B



# Cy Pres Award Proposal – *In re Google Inc. Street View Electronic Communications Litigation*

The Center on Privacy & Technology at Georgetown Law is pleased to submit this proposal in support of a request for a cy pres award made available in the resolution of *In re Google Inc. Street View Electronic Communications Litigation*. This proposal provides a brief background on our organization and our achievements and outlines our plans and goals for work that would be funded by a grant of cy pres funds. We think we are well-positioned to promote the interests of the class that the lawsuit seeks to protect.

## OUR ORGANIZATION

The Center on Privacy & Technology at Georgetown Law is a think tank that aims to bridge the gap between the policy and academic worlds on privacy and surveillance, and train law students to be the next generation of leaders in the field. The Center is part of Georgetown University, a 501(c)(3) institution of higher education.

The Center has five full-time faculty directors (Professors David Vladeck, Angela Campbell, Julie Cohen, Laura Donohue, and Paul Ohm), and eight staff: a founding director (Alvaro Bedoya), an executive director (Laura Moy), an operations director (Katie Evans), three full-time staff attorneys (Clare Garvie, Gabrielle Rejouis, and Harrison Rudolph), and one technology fellow (Julia Chrusciel). Our goals are to:

1. **Provide an intellectual and technical foundation for broad reforms in our nation's commercial privacy laws.** A thorough and sound intellectual foundation is absolutely crucial to successful public interest policy advocacy. This is especially the case in technology policy, where legally complex problems are layered on top of technical complexity and constant change. The Center conducts, shares, and publishes research to provide that foundation, especially as it relates to commercial privacy. The Center also organizes and hosts public-facing events to ensure that our research and the research of other privacy thought-leaders are elevated to the national stage. We are uniquely well positioned to lead in this area, drawing from the institutional advantages of Georgetown Law, as well as from the work and counsel of our five faculty advisors, all intellectual leaders in their respective specialties. Our faculty advisors and staff have compiled a long track record on the issues raised in this litigation, from consumer privacy, to commercial tracking, to the technology of packet sniffing, to the Wiretap Act. We are consistently a leader in providing informed commentary on consumer tracking and proposals to control it.

2. **Train the next generation of privacy-positive lawyers and technologists.** Public interest technology policy is only as strong as the advocates who lead it. The

Center aims to incubate those advocates and equip them with a hybrid skillset that includes both legal and technical competencies. In courses tied to the Center and its faculty, budding legal advocates have opportunities to partner with MIT engineering students, to write hybrid legal-technical white papers analyzing privacy issues and proposing novel policy solutions, to draft legislation that solves privacy and security problems, to learn the nuts and bolts of Internet privacy and security (e.g. "How does Wireshark work? What is war-driving?") and to code in Python. The Center also hosts events that introduce law students to the people—and concepts—at the center of technology policy.

3. **Expose—and diminish—the negative impact of invasive commercial data practices and government surveillance on vulnerable communities.** Public interest policy advocacy in Washington, D.C. and national media coverage of privacy and surveillance have not historically put communities of color at the center, even though communities of color are frequently the most impacted by privacy-invasive commercial and government practices. The Center seeks to change that by raising awareness around and evaluating the implications of commercial and government surveillance on racial and ethnic minorities, LGBT Americans, women, the poor, and other marginalized populations.

To achieve its goals, the Center:

- Presses industry leaders to adopt more privacy protective data practices;

- Drafts model privacy legislation, and advises and supports state and federal legislators who seek to pass and/or improve privacy legislation;

- Files comments with federal executive branch departments and other federal agencies;

- Convenes academics, advocates, government officials, and industry representatives on urgent privacy issues;

- Establishes and expands course offerings that provide technical literacy to Georgetown Law students—and legal and policy literacy to technologists; and

- Provides informed commentary on the debate over privacy legislation and regulation.

## REQUEST FOR CY PRES AWARD

At a time when the nation is grappling with privacy threats of unprecedented scale, the Center on Privacy & Technology at Georgetown Law seeks additional funding to maintain and expand its research, public education, and advocacy across all areas of work. In addition, the Center seeks ongoing core support for the above-detailed work that the Center does, which at present costs approximately $1.1 million per year.

Examples of discrete purposes to which we might apply a cy pres award, depending on the size of the grant, include:

1. **Support for an Annual Conference on Consumer Privacy.** The Center already hosts a successful high-profile annual conference highlighting cutting edge research on government surveillance and its disproportionate impact on historically disadvantaged communities.[1] Center staff and faculty directors also frequently organize and present at events highlighting issues related to consumer privacy. For example, the Center's executive director recently delivered a talk at a major national tech conference regarding location privacy.[2] She and one of the Center's faculty directors presented at a Federal Trade Commission hearing regarding consumer privacy.[3] The Center also co-hosted an event designed to highlight the ways in which threats to privacy harm marginalized communities.[4] At present, however, the Center lacks the resources to support a recurring series of conferences focused on elevating new research on consumer privacy issues and educating policymakers and members of the public alike. We anticipate the annual budget for such a conference to range from $25,000 - $50,000 per year, for travel and lodging for participants, rental fees, conference materials, and other logistics. Ideally, we would hire a full-time associate to focus on consumer privacy issues and dedicate a significant percentage of time to coordinating the conference series.

2. **Support for a Full-Time Associate.** As the Center grows and works to pilot new course offerings, to produce a new consumer privacy event, and to generate more public education materials, the needs associated with conducting this work are growing as well. The Center needs funding to support a full-time associate who focuses on consumer privacy issues. A full-time associate would cost the Center approximately $100,000 per year.

3. **Support for a Full-Time Technologist.** The work of the Center would be greatly enhanced with the hiring of a permanent full-time technologist. A technologist would assist Center staff in assessing the practices of technology companies that collect and use consumer information in ways that may violate consumers' expectations of privacy. The technologist would also assist staff in translating complex information into public education materials for broad distribution. The technologist would help build out a technological infrastructure at Georgetown, including a digital forensic lab, to help our

---

[1] https://www.law.georgetown.edu/privacy-technology-center/events/color-of-surveillance-2018/.

[2] http://schedule.sxsw.com/2019/events/PP87304.

[3] https://www.ftc.gov/news-events/events-calendar/ftc-hearing-competition-consumer-protection-21st-century-february-2019.

[4] https://www.eventbrite.com/e/hill-briefing-protecting-digital-civil-rights-registration-59840592824#.

researchers probe the online tracking of individuals.  Finally, the technologist would assist in the development of new courses designed to train the next generation of privacy lawyers emerging from Georgetown Law. A full-time technologist likely would cost the Center approximately $100,000 per year.

# EXHIBIT C

**Proposal for *Cy Pres* Funding Support**
**Center for Digital Democracy**
**June 19, 2019**

**Background on Center for Digital Democracy.** The Center for Digital Democracy (CDD) is a non-partisan, nonprofit 501(c)(3) organization founded in 2001. Our core mission was, and remains, to ensure that the privacy of individuals and their communities is protected, and that technology platforms, content providers, data companies, advertisers, and other commercial players are held accountable for their behaviors in the digital marketplace. As the successor group to the Center for Media Education, which we established in 1991, CDD is considered one of the pioneers of the digital rights movement. For more than two decades, we have been at the forefront of research, public education, and advocacy to protect consumer privacy and to promote civic engagement in the digital era.

- In the early 90s, at the birth of the modern Internet era, we brought together the first coalition of consumer, civil liberty, education, and library organizations to call for "Public Interest Principles for the Information Highway," which helped create a framework for later policies, including online privacy protection, network neutrality, and low-cost online access for schools and libraries.

- Our research, organizing and advocacy led to passage of the 1998 Children's Online Privacy Protection Act (COPPA), which remains the only federal law protecting online privacy. We subsequently urged the Federal Trade Commission (FTC) to revise its COPPA rules so the law would stay abreast of contemporary developments; this effort resulted in an updated set of regulations in 2012, covering geolocation tracking and other contemporary techniques.

- Over the past ten years, we played a key role in encouraging the FTC to develop policy initiatives on "online behavioral targeting," location tracking, mobile apps, and other threats to consumer privacy.

- Our steady stream of research documents, formal comments, and petitions, documenting a variety of questionable data practices at major tech companies, were highly influential in the FTC's 2011 Consent Decree agreements with both Google and Facebook.

Today, we play a critical leadership role on a range of vital issues, by promoting digital rights for privacy and fair treatment; protecting the welfare of vulnerable Americans from discriminatory and unfair practices; developing policies to protect children and youth from marketplace manipulation and other harmful practices; and advocating for safeguards to ensure responsible commercial data and digital marketing practices in political campaigns and elections.

CDD is widely recognized for its ability to track and analyze commercial digital marketplace developments—to identify and then address the evolving and newly emerging Big Data practices that not only shape our daily lives, but also profoundly influence our democratic institutions.

Our work serves as an "early warning system," alerting the public about ongoing threats from commercial surveillance taking place on a spectrum of new and developing technologies, including mobile apps, social media, gaming platforms, streaming television, and connected devices. Indeed, CDD was one of the first groups to raise public concerns about Google's Street View when it was initially launched. We conduct ongoing, extensive research on the commercial marketplace, including the activities of leading companies such as Google, Facebook, Amazon, broadband Internet service providers (ISPs) and large data brokers. Our analyses and reports on digital marketing and data practices help demystify complex and often covert online marketplace activities. We engage in broad outreach to leading consumer, privacy, civil rights, child advocacy, public health and other groups, keeping them apprised of the continuing erosion of privacy in the Big Data era and collaborating with them to develop solutions. We also regularly share information about the latest technological and policy developments with our allies in the international privacy, consumer, and digital rights movement. Our overall work helps build greater understanding of all these complex issues among journalists, academics, regulators, and the public-at-large.

**Populations served:** We serve all consumers in the U.S., including children, communities of color, and other vulnerable or at-risk individuals and communities. We believe our efforts have led to a better-informed public, more responsible corporate behavior, and increased interest from state and federal policymakers in addressing how best to protect consumer privacy.

**Proposed Project:** CDD respectfully requests $500,000 for a 2-year research, outreach, and education project focused on emerging developments in the Big Data digital marketplace and their potential impacts on consumer privacy.

**Rationale:** Since the time that Google's Street View was launched, the digital marketplace has expanded exponentially. Though the practices outlined in the lawsuit may have been curtailed, today's data-driven apparatus has become even more pervasive and complex. Nearly every digital device and application has been refined to enhance its data-tracking capabilities. A complex system of interconnected services tracks, analyzes and then attempts to influence individuals through data-management platforms, offline and online "data onboarding" services, "data marketing clouds," "cross-device identification" applications and other new Big Data operations. Companies are now able to reap an abundance of geo-location data on individuals, often in real-time, as well as to have access to a nearly unlimited array of highly personal data, including an individual's political and news interests, financial and health status, race/ethnicity, shopping transactions and more. Mobile devices, apps, social media, gaming platforms, PCs, and connected TVs provide a continuous, interactive stream of information about individuals, families, friends, and acquaintances. Increasingly, many leading commercial data companies, including Facebook and Google, are now developing and using artificial intelligence, machine

learning, and algorithmic decision-making to take advantage of the abundance of personal data they regularly collect.

While many people rely on mobile devices, social media, and other technical tools in their daily lives, most have little knowledge or understanding of these underlying data systems and business models, the nature and extent of personal data extracted through their interactions with these technologies, or the consequences to their own privacy, safety, and security. Opinion polls indicate that the vast majority of Americans are concerned about their loss of privacy, but are resigned to having few, if any, means of dealing effectively with this problem.

In the wake of the scandal over Cambridge Analytica's use of social media during the 2016 election, we have seen more attention being paid to many of these issues in the press, as well as in the halls of Congress. However, the entire system is moving forward so quickly, that policy makers, the news media, and the general public have difficulty staying abreast of the most recent developments. Because of our ongoing tracking of the digital marketplace and the expertise we have developed in this area, we are playing a vital role both in keeping consumers and other key stakeholders informed, and in helping develop policy and corporate accountability solutions to address threats to privacy. Though other individuals and groups have recently taken up the cause for data privacy, CDD remains one of the only organizations with deep background and expertise in today's complex, elaborate and dynamic commercial data systems, as well as a laser-like focus on where the system is headed, what it means, and what we can do about it.

**Goals, Activities, and Deliverables:** We seek funding to embark on new areas of inquiry and to support our ongoing efforts for several projects currently underway. The funding would also help us increase our organizational capacity, enabling us to conduct our research more efficiently, distribute additional educational materials online through videos, multimedia, infographics, and other means; and organize convenings of stakeholder groups in several key issue areas. We believe this project will greatly benefit the class of individuals harmed by Google's Street View's intrusion into their privacy—and, equally important, possibly spare others from having to endure such incursions in the future.

Major project goals:

- to research next-generation technologies and services that are still in development for the commercial marketplace, or are in the process of being introduced, and to analyze them in terms of their implications for privacy and security;

- to provide accessible information to key stakeholders that explains these developments in the context of how today's Big Data-driven commercial surveillance system operates; what its impacts are on our lives; and which potential options might be developed to address privacy and security issues;

- to increase awareness among consumers, promote more responsible corporate behavior, and help inform policy makers of contemporary developments.

Project activities and deliverables: Our research will focus on several key technological developments that we believe are particularly urgent. These include streaming video (also known as "over-the-top" or OTT); e-sports gaming platforms; intelligent billboards and other Digital Out-of-Home (DOOH) technologies; advanced geotargeting systems; smart speakers; augmented reality; artificial intelligence/machine learning; and virtual reality. We will use this research to develop and publish online issue briefs and reports, videos and other multimedia materials. We will also conduct press briefings, convene meetings with stakeholder organizations, and present our work at scholarly conferences. The new developments we are researching will have significant consequences for health, democratic participation, family relationships, and other aspects of people's lives. We will use the funding to engage in outreach efforts across several of these cross-cutting thematic areas where we already have done foundational research, published educational materials, developed networks of allied organizations, and worked with key media outlets. These issue areas are described below, along with summaries of our previous and current work, and a set of proposed activities:

*Retail, grocery and ecommerce privacy.* Grocery and retail shopping are in the midst of a major transformation, as offline (in-store) and online purchasing are increasingly being merged into one integrated market. Retailers are making major investments in Big Data systems to gather more detailed information on their customers, and to be able to reach them whether they are at the store or on the Internet. So-called "smart" discount coupons, delivered digitally to mobile phones, enable more precise tracking of consumer purchase activities. An extensive set of location-aware services has been constructed throughout the U.S. to identify the "places" where people spend their time, enabling companies to create "geofences" that identify and target individuals when they are near a school, shopping center, grocery store, or fast food restaurant. E-commerce companies, led by Amazon, are also making significant strides in their consumer data profiling capabilities. Few consumers understand the extensive ways data are captured and used in this growing retail and e-commerce system. Our article, "Big Data and the Transformation of Food and Beverage Marketing," published in *Critical Public Health,* alerted public health professionals to current and emerging practices in the retail marketplace and the privacy risks they raise for all consumers.

- Proposed activities and deliverables: an e-guide on contemporary shopping practices—what consumers need to know to protect their privacy and receive fair treatment; a series of op-eds; issue briefs for policymakers, stakeholder organizations, and leading industry representatives; infographics for social and other media; online video primer; panels at leading consumer affairs and privacy conferences.

*Wearable consumer devices and connected health.* CDD has documented how "wearable" and other connected devices can be used in ways that potentially affect

4

our health—such as signaling to pharmaceutical companies that we are concerned about some specific medical condition, which can lead to being personally targeted for various branded medications or treatments. Our 2016 report, *Health Wearable Devices in the Big Data Era: Ensuring Privacy, Security, and Consumer Protection,* provided an overview and analysis of the major features, key players, and trends that are shaping this new consumer-wearable and connected-health marketplace, raising concerns that the weak and fragmented health-privacy regulatory system fails to provide adequate federal laws to safeguard personal health information collected by wearables. As more consumers rely on the Internet to obtain health information, and as the medical profession expands its own use of the Internet to engage in diagnosis and treatment, the privacy and security of our health data will be at even greater risk.

- Proposed activities and deliverables: an update of our 2016 report, to include the new marketplace technologies outlined above; an e-guide to the consumer online health landscape—covering the key developments, implications, and issues that need attention; a policy review of recent and current initiatives to address the consumer wearables market; an article for a leading health journal laying out the issues for the medical profession; op-eds in selected publications; and participation at meetings in the health field.

*Digital privacy safeguards for political/electoral campaigns.* Candidates and campaigns across the political spectrum increasingly use a full array of data-driven and digital marketing techniques pioneered by the commercial sector. These include data profiling, real-time targeting, geo-tracking, emotional analytics, and other potentially manipulative and discriminatory practices. CDD began closely analyzing these developments long before the 2016 presidential campaign brought them to the public's attention. In 2018, through a series of reports, as well as outreach to policymakers, journalists, and campaign reform advocates, we worked to broaden the debate over the role of data and digital marketing beyond the important issue of Russian interference, illuminating how the basic operations of the digital marketing industry (especially the large platforms) can be used by a wide spectrum of political players in ways that threaten to undermine both individual privacy and the integrity of the democratic process. Our project is designed to inform Americans about the impact on their privacy of the political use of their commercially sourced data. They need to understand what kinds of information political interests are now able to collect and how these data are used to influence their voting decisions. Beyond explaining how the process works, we will also assess current and proposed safeguards—at both the state and federal levels—that might serve as models for developing new regulations or responsible data-industry practices. We want to explore whether anything can be done to give individuals greater control over how their commercial data can be used by political campaigns. This might mean urging the adoption of such practices as data minimization, privacy by design, and other mechanisms that have traditionally played a role in strengthening privacy in the commercial marketplace.

- <u>Proposed activities and deliverables</u>: develop additional materials for online distribution to the public; work with scholars and NGOs globally to identify needed policy safeguards; educate the news media and policymakers through reports and briefings; convene a panel in Washington, DC, with experts, privacy groups; produce a digital guide for voters; write and place a series of op-eds in major news outlets; convene and participate in public forums involving diverse stakeholders.

*Digital safeguards for children and youth.* CDD remains at the forefront of work to ensure that the privacy of both children and adolescents is protected. We constantly monitor industry trends and practices, engage in legal analysis (with our partner, the Institute for Public Representation, Georgetown University Law Center), and undertake efforts to alert and educate the public. We have examined some of the most powerful commercial services targeting children, including video programming on YouTube and Google's Play store for apps. Through a series of complaints filed at the FTC, as well as extensive outreach to the news media, we have kept both children and teen privacy— and the need for modernizing advertising safeguards for these vulnerable groups— front and center before policymakers and the press. We believe it is time to develop and promote a set of "Fair Data and Marketing Practices for Youth" in the digital era that should be adopted by leading digital media companies. Ensuring privacy and fair practices for teens 13-16 is also on our agenda, since they currently have no data collection and digital advertising protections. We will continue our work fostering collaboration globally among privacy advocates, scholars and consumer groups working in the EU, Canada and elsewhere.

- <u>Proposed activities and deliverables</u>: examine the growth of an expanded commercial sector targeting youth, including via streaming video, mobile devices, and gaming platforms; document new industry practices, such as data collection and microtargeted ads via connected TVs, and their privacy implications for young people; convene child-development scholars, advocates, and industry representatives to develop a fair data and marketing framework; produce e-guides for parents.

<u>Note</u>: While all of the project areas described above are part of CDD's priorities for the next few years, the only areas currently supported are portions of our retail and youth efforts, which are funded, in part, through a grant by Robert Wood Johnson Foundation to address the impact of the digital marketing of unhealthy food and beverages to young people.

**Evaluation:**

We will rely on a number of measures to assess our effectiveness. These will include the position papers, briefs, and consumer materials written and distributed; metrics for downloads of online e-guides and other documents; press coverage generated; number of briefings to outside groups, as well the nature and variety of the participants we attract; evidence of the

impact of our work on individual companies and industry self-regulatory bodies; public policies developed that reflect our work; and testimonials from leading NGOs and others about the impact of our project on their own activities. We will provide this evidence to the court on an annual basis for two years.

**Principal Project Directors:**

<u>Jeff Chester, MSW, Executive Director</u>: A former investigative reporter, filmmaker and Jungian-oriented psychotherapist, Jeff Chester received his M.S.W. in Community Mental Health from U.C. Berkeley. He is the author of *Digital Destiny: New Media and the Future of Democracy* (The New Press, 2007), as well as articles in both the scholarly and popular press. During the 1980s, Jeff co-directed the campaign that led to the establishment by Congress of the Independent Television Service (ITVS) for public TV. He also co-founded the National Campaign for Freedom of Expression, the artist advocacy group that supported federal funding for artists. In 1996, *Newsweek* magazine named Jeff Chester one of the Internet's fifty most influential people. He was named a Stern Foundation "Public Interest Pioneer" in 2001, and a "Domestic Privacy Champion" by the Electronic Privacy Information Center in 2011. CDD is a member of the Transatlantic Consumer Dialogue (TACD). Until January 2019, Jeff was served as the U.S. co-chair of TACD's Information Society (Infosoc) group, helping direct the organization's transatlantic work on data protection, privacy and digital rights.

<u>Kathryn C. Montgomery, Ph.D., Research Director and Senior Strategist</u>. In the early 90s, Kathryn Montgomery and Jeff Chester co-founded the Center for Media Education (CME). Dr. Montgomery served as President from 1991 to 2003. From 2003 until 2018, Dr. Montgomery was Professor of Communication at American University in Washington, D.C., where she founded and directed the 3-year interdisciplinary PhD program in Communication. In 2018, she was awarded Professor Emerita status at the university. Throughout her career, Dr. Montgomery has written and published extensively about the role of media in society, addressing a variety of topics, including the politics of entertainment television; youth engagement with digital media; and contemporary advertising and marketing practices. Montgomery's research, writing, and testimony have helped frame the national public policy debate on a range of critical media issues. In addition to numerous journal articles, chapters, and reports, she is author of two books: *Target: Prime Time – Advocacy Groups and the Struggle over Entertainment Television* (Oxford University Press, 1989); and *Generation Digital: Politics, Commerce, and Childhood in the Age of the Internet* (MIT Press, 2007). Montgomery's current research focuses on the major technology, economic, and policy trends shaping the future of digital media in the Big Data era. She earned her doctorate in Film and Television from the University of California, Los Angeles.

**Additional information:**

CDD has no relationship with the law firms or lawyers at Spector, Roseman, Kodroff & Wills, PC; Cohen, Milstein, Sellers & Tolls PLLC; and Lieff, Cabraser, Heimann & Bernstein, LLP.

We have received two *cy pres* awards in the past. In 2012, CDD received an award as a result of a Netflix privacy litigation. We also received a separate *cy pres* grant to educate consumers about telecommunications issues.

We neither solicit nor accept funding from corporations, including Google and its parent, Alphabet, Inc.

# EXHIBIT D



**Proposal: Privacy Education and Design Lab (PEDaL)**
June 10, 2019

**Organization Information**

1. **Name of Organization**

    The MIT *Internet Policy Research Initiative* (IPRI)

2. **Discuss the founding and development of the organization. Explain the original issue and/or opportunity the organization was founded to address and how that may have changed over time.**

    Daniel Weitzner, a Principal Research Scientist at the MIT Computer Science and Artificial Intelligence Lab (CSAIL), founded IPRI in 2015 as a response to the critical need for technology-informed policy making in the areas of privacy, security, networks and the Internet economy. The group plays an important bilingual role of informing policy making with technical expertise, and helping engineers build secure and privacy protecting products that are informed by policy.

    Over time, the mission of IPRI has expanded to include more research areas, as well as involve researchers and students from a wide variety of disciplines, including computer science, economics, and political science. IPRI has increased its efforts in artificial intelligence (AI) technology and policy as well as expanded its role as an Internet policy expert in the global policy community.

    IPRI is in a unique position to advance individual privacy rights through computer science research that will create new privacy-preserving technologies, and public policy research to explore technically-grounded advances in privacy policy and law.

    IPRI's senior leadership has strong consumer and Internet civil liberty advocacy backgrounds. Daniel Weitzner was the first staff member in Washington DC for the Electronic Frontier Foundation and founder of the Center for Democracy and Technology. He was also a senior policymaker (White House Deputy CTO for Internet Policy).  While at the White House, Weitzner was responsible for developing the Consumer Privacy Bill of RIghts in 2012. Taylor Reynolds was the senior economist at the OECD responsible for the Internet economy, and his

Internet Policy
Research
Initiative

research on broadband pricing led to multimillion dollar fines against incumbent telecommunication firms engaged in deceptive advertising. R. David Edelman was Special Assistant in the White House on issues of the digital economy that included Internet civil liberties.

Of particular relevance, Daniel Weitzner has a long history of successful Internet civil liberties advocacy. His work led directly to amendments to the Electronic Communications Privacy Act in 1994 that offered groundbreaking protections for web browsing logs, email records, and other transactional data. (18 USC 2703(d)) Under Weitzner's leadership, the interests of the Class in better privacy protection will be materially advanced.

**3. Describe the organization's current goals.**

The Internet Policy Research Initiative's (IPRI's) mission is to lead the development of policy-aware, technically grounded research that enables policymakers and engineers to increase the trustworthiness of interconnected digital systems like the Internet and related technologies.

To achieve this mission, IPRI produces fundamental, cross-disciplinary technology and policy research (publishing 30 research papers in 2018); engages with global policymakers, industrial partners, and civil society organization; and is building a network of students educated in the field of Internet policy.

**4. Provide a brief description of the organization's current programs.  Include population and numbers served, as well as expected results**

MIT is one of the top universities in the world across a number of disciplines, including engineering, computer science, and economics. MIT has 11,376 students and 13,000 employees. Recently the Institute announced the creation of the Schwarzman College of Computing which represents a new paradigm for computer science research and education that recognizes the importance of addressing the social, ethical and policy impact of computing on society.

Currently, IPRI has six main research goals:

1. ***Privacy,*** covering topics such as designing new databases and systems embedded with privacy protection and user control, evaluating the international privacy policy landscape and studying privacy incentives, data protection policy, web surveillance, human-computer interaction in the context of privacy, the implications of silently listening, and overarching insight into the global privacy research area.

2. ***Cybersecurity***, covering topics like encryption policy, accountability, cryptography, data sharing, securing core economic and social infrastructure, and measuring cyber risk.

3. ***AI Policy***, covering topics like the role of AI in financial decision-making, increasing access to new training data sets with policy, working with stakeholders on AI principles, and shaping global Internet policymaking via policymaker engagement and informing the public debate.

4. ***Networks***, covering topics like Internet architecture, Internet security, Internet economics, Internet policy, and network management.

5. ***Decentralized Web***, covering topics decentralized privacy preserving platforms for clinical research, the trustworthiness of autonomous systems, the relationship between privacy and machine learning, complex machine and model explanations, securely aggregating distributed data, and developing smart contracts for data sharing.

6. ***App Inventor***, involving the creation of a tool to enable anyone, especially youth, to develop mobile apps that better their communities.

IPRI is a cross-campus initiative made up of 75 researchers from across disciplines but is housed at MIT's Computer Science and Artificial Intelligence (CSAIL) Lab - the largest lab at MIT. CSAIL is one of the leading AI, computer science and robotics research labs in the world. Being housed in the lab provides us daily interactions with leading computer scientists and engineers.

The expanded set of work we could do with additional funding would have broad, global impact. Our work is already used by governments, scholars, and stakeholders, and we are seen as a trusted source of both engineering tools, education and policy guidance. Below is a list of recent projects with broad impact across the globe:

- We developed "Privacy Bridges" with European partner universities to help create a framework for data protection and usage between the US and the EU. Our report was presented at the International Conference of Privacy and Data Protection Commissioners.

- Our team contributed technical and policy guidance to the OECD as they developed the OECD's AI Policy Principles that were adopted by 36 countries. IPRI sent three experts to participate in the OECD's Expert Group on AI. IPRI also hosted the OECD's AI Expert Group Meeting in January 2019.

- Daniel Weitzner was selected to be a member of the OECD's Expert Group to revise the OECD's long-standing privacy guidelines.

- Our researchers and leadership frequently prepare submissions to governments related to encryption policy. Our researchers have testified

3



in front of the US Congress and meet with Australian
Parliament on these issues.

5.  **Has your organization been reviewed or rated by Charity Navigator or similar entity?**

    a.  **If yes, what are your ratings?**

        *No: As a university, MIT is not rated*

        *https://www.charitynavigator.org/index.cfm?bay=search.profile&ein=04210359
        4*



**Grant Proposal - MIT Privacy Education and Design Lab - PEDaL**

6. **Identify Principal Investigator/Project Director**
   Daniel Weitzner is the MIT IPRI Founding Director and a Principal Research Scientist at MIT CSAIL.

7. **Explain how much money you are requesting**

   We have developed a significant new research proposal with the interests of the Class in mind. We are requesting a total of $1.4 million dollars which will be allocated to new research and educational initiatives which will lead to new privacy-ware software development practices and greater awareness of privacy policy considerations by MIT-trained computer scientists and those beyond MIT who use our educational tools.

   - Education ($758,505)
     - Creation of new open course content on engineering privacy for use by other educators
     - Development of new online open courses
     - Creation of new labs where students build and analyze technical systems to protect user privacy
   - New research streams ($641,205)
     - Privacy aware databases
     - User behavioral analysis: The impact of surveillance on personal behavior

8. **Provide a summary of the plan for the program or project request. Include the issue and/or opportunity addressed, goals and objectives, activities, and timeline.**

   The MIT Internet Policy Research Initiative proposes to launch a new MIT Privacy Education and Design Lab (PEDaL). PEDAL will materially advance the interests of the Class in Joffe v. Google, helping to assure than members of the class, and those similarly situated in the future are far less likely to be victims of privacy harm arising from poorly-educated software developers and careless product managers. We will develop new approaches to privacy education and research to assure that the software developers educated at MIT will learn to be aware of privacy risks as a core part of their computer science education. Through open source curriculum materials and online courseware (MIT's edX), we will also make the core education experience of these courses available to faculty for their own use at universities around the world, to independent students through the edX Massively Open Online Courseware (MooC) platform, as well as to professional software developers already in the field.

**Privacy-aware educational materials - training the next generation of computer scientists to design with privacy in mind.**

Internet Policy
Research
Initiative

PEDaL will building on the novel, multi-disciplinary education approach of MIT's Internet Policy Research Initiative by extending two courses currently offered by IPRI faculty: 6.805: Foundations of Internet Policy, and 6.S978: Privacy Legislation Law and Technology (offered jointly between MIT Electrical Engineering and Computer Science Department and Georgetown Law School (see New York TImes: Natasha Singer, Top Universities Join to Push 'Public Interest Technology', March 11, 2019; MIT Spectrum, Legal/Code-MIT engineering students team up with Georgetown lawyers-in-training on internet privacy legislation, Winter 2018). These courses teach 30+ computer science and engineering student each semester to develop the intellectual skills necessary to understand the complex public policy questions, including privacy, raised by computing in our society today. PEDaL will add a hands-on laboratory component to each course giving students in-depth experience of actually building and analyzing technical systems that address privacy harms.

By expanding these well-established courses, we will give our students added engineering experience needed to design and develop applications using personal data in a manner that does a better job of adhering to privacy law and best practice, thereby avoiding privacy harms suffered by the class of plaintiffs in Joffe.  Engineering students learn good software development style through practice. We already have a well-developed curriculum for teaching our students how to understand broader issues of law and policy. By adding lab components to the courses, we will give students concrete software development challenges that test their policy knowledge and give them the experience to make good design decisions in their careers. To help students understand and master the challenges of privacy-aware system design, we will build software platforms that simulate large-scale databases of personal information, as environments within which students can experiment with different privacy designs. Developing lab teaching materials is a resource-intensive task, so support from this fund will be critical. IPRI will hire additional teaching assistants and a postdoctoral fellow to supervise the development of the new lab materials. Once these are developed, however, we will make them available freely to the rest of the academic community and professional software developers around the world.

**Privacy and Data Governance Research Projects**

PEDaL will lead technical research on privacy-enhancing data systems and analytic techniques to develop new software architectures are reduce the risk of privacy harm such as was suffered by the plaintiff class. We propose to lead research projects in the following areas:

MIT
**Internet Policy
Research
Initiative**

- Database Systems: Explore new data management architectures to provide enterprises with purpose management, provable delete and automated accountability tools for managing personal data according to legal rules and institutional commitments. Database systems that do a better job of tracking legal purposes, and detecting unlawful purposes, are possible and could go a long way to alert against harms experiences in the Streetview case.
- Human Computer Interaction: Apply rigorous HCI research methodologies to understand the impact of various privacy policy environments on user behavior and learn when the user experience is producing chilling effects. This research will inform both services design and policymaking.

Resources required for these research efforts include funds to cover some of PI Weitzner's time in order to lead these efforts, and then funding for student Teaching Assistants, Research Assistants, and Post-doctoral Fellows. Funds expended for students in these categories not help us to complete the curriculum development and research activities, but also serve as a critical educational experience for the students we will hire. These students, having immersed themselves in research and course development on privacy topics, will bring that experience into the industrial or academic positions they occupy as professionals.

**Timeline**

MIT IPRI is ready to launch PEDaL as soon as funds become available and complete all work within 3 years.

9. **Explain why the organization is approaching the issue and/or opportunity in this way.**

Today there are a variety of underlying causes of privacy harm, many of which occur simultaneously. Some companies have business models premised on extracting profits from personal data. Many systems lack basic security protection measures, leaving personal data open to theft and abuse. And finally, as was clearly the case, developers can be careless with the personal data their systems collect and use. In a culture of "move fast and break things", privacy and security concerns are often afterthoughts, but that needs to change.

IPRI is approaching this problem from an educational perspective as this utilizes its proven strength in building a network of students with a disciplinary strength in both engineering and social studies. Such students are thus enabled to better engage with the Internet policy field. We will use the technical and political expertise available at IPRI to both educate and involve students in relevant policy research.

10. **Will the money be used to continue an existing project or create a new project**

7


Internet Policy
Research
Initiative

    **a.  If a continuing project please provide all other funding sources**

        PEDaL will be a new activity that is part of the MIT Internet Policy Research Initiative (IPRI). IPRI is funded by the William and Flora Hewlett Foundation Cyber Program with a leadership grant of $15 Million.

**11. Specifically explain how this money will be used to enhance internet privacy and/or internet security for consumers and businesses.**

By educating the next generation of scholars, technologists, and policymakers, IPRI will help install a knowledge of potential privacy risks to look out for and how to avoid them. IPRI students are often ideally situated to use this knowledge, as they join a variety of relevant organizations after graduating, including Apple, the White House, Amazon, IBM, the OECD, the Aspen Institute, and many more. By sharing this learned expertise with their future organizations, IPRI students can help develop better-informed Internet policies and technologies that provide enhanced Internet privacy and security.

**12. What are the major goals and objectives of this project?**

See Section 8 above.

**13. Explain exactly how the money will be utilized to accomplish the goal and/or objective identified.**

The $1.4 million dollars will be spent as follows over three years:

- Two new research streams ($641,205 ) will be supported by investments in:
  - **Developing privacy aware Databases:** $213,735 for PIs, postdocs, research assistants, and materials'
  - **User behavioral analysis:** $427,470 for PIs, postdocs, research assistants, and materials.
- PEDaL - Our new education project ($758,505) will be supported by investments in:
  - **Internet policy course:** $266,500 for online course production.
  - **Privacy legislation course for engineers:** $492,055 for PIs, postdocs, teaching assistants and edX (online course) production.

**14. What target population will your project benefit**

Internet Policy
Research
Initiative

PEDaL will benefit the general public by better ensuring their data privacy in the future, the current plaintiff class. In addition, it will benefit students to learn and grow from this example.

**15. When will the project be completed?**

The project will be completed three years from the start date.

**16. If the project will be continued beyond a year after receiving the grant please describe when the project will be completed**
Work will begin immediately upon receiving funds but some of the research and refinements for the courses under development will require three full years of work, as is common with computer computer science research. We will launch revisions to the two existing privacy courses within six months of receiving funds but will revise curriculum and lab material over a three year cycle in order to incorporate student feedback and teaching experience.

**17. Is this project going to be funded by any other sources in addition to the proposed grant?**
    **a. If yes, by whom and how much?**
      *As this project overlaps with IPRI's current goals and motivations, some of IPRI's existing funding from the Hewlett Foundation may go to this project.*

## Utilization of Data
**18. Describe how you will evaluate the success of the grant on improving internet privacy and/or internet security for consumers and businesses**

***We measure success on the following metrics:***
    (a) curriculum development: number of students, undergraduates and graduate students who take the courses. Our success metric is 50 students per year for each of three years.
    (b) open courseware and MooC development: We expect at least 250 students annually to complete the online version of the course.
    *(c)* privacy research: metrics of success include papers published in respected academic journals and, most importantly, software useful by developers of systems that hold actual personal data.

**19. Describe how often and what the form of evaluation you will provide during the course of the project and upon completion**

9



Internet Policy
Research
Initiative

We will provide reports to the court as requested and publish a public report on progress annually.

20. **Do you intend to use the results of the project in any publications, conference papers, and presentations**
    a. **If so, please identify.**

    Course materials will be made available publicly for use by any academic institution and software professionals. Research results will be published in peer-reviewed journals or conferences.

**Miscellaneous**

21. **Do you have any relationship to the law firms Spector Roseman & Kodroff, PC; Cohen Milstein; or Lieff Cabrasser or any lawyers at those firms?**

    *No*

22. **Have you ever received cy pres money previously?**
    a. **If yes, please explain.**

    *No*

23. **Within the last 3 years have you received any money from Google or its parent company Alphabet, Inc.**
    a. **If yes, please identify the amounts and the purposes of the money**

    MIT IPRI has not received any funds from Google or Alphabet. Other research units at MIT may have received Google funds, but none goes to support IPRI work.

    \*       \*       \*       \*       \*

# EXHIBIT E



Robert W. Cobbs
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., NW
Fifth Floor
Washington, DC 20005

June 19, 2019

Thank you for your invitation to apply for *cy pres* restitution funds *In re Google, Inc. Street View Electronic Communications Litigation*. I am writing to you as the Founder and Executive Director of the World Privacy Forum, a 501(c)(3) nonprofit whose mission is to protect and promote privacy for consumers and workers in the United States and abroad. I specifically want to tell you how WPF's work in the field of data protection and consumer education qualifies it for a *cy pres* award in the class-action settlement with Google, Inc. and request that WPF be considered for an award. I understand that the work for this award would be conducted in the US with a US focus.

After you read this letter, I would be happy to talk with you to explain more about WPF's work for consumers and their privacy. WPF has had a dynamic and positive effect on consumers' privacy knowledge and rights since its founding in 2002. Today, WPF is the only organization linking independent, highly factual research and consumer privacy education, training, and support. WPF works tirelessly to document and provide education and free training around meaningful, emerging privacy issues, to protect consumers from online fraudsters and identity thieves, and to ensure that consumers have access to factually correct tips and tools to help inform their privacy choices. When digital privacy risks emerge, we work to document those risks and assist consumers in tackling them. We directly support consumers with staff support for digital consumer privacy questions.

*Cy pres* grants are an important part of the fundraising strategy that makes WPF's work possible. The organization is a particularly suitable recipient for *cy pres* grants related to consumer data privacy cases, including the Google Street View case. For more than 18 years, WPF has been a leading voice on behalf of consumers affected by the unconsented collection and sharing of consumer data, online and offline fraud, health privacy, and advanced digital privacy topics  privacy related to Internet of Things (connected home devices), impacts from AI, data brokers, biometrics, and large tech platforms for social and search, as well as privacy issues related to mobile devices and communications.

The World Privacy Forum's mission and purpose is focused on consumer education and research around privacy, particularly as it intersects with technology. The World Privacy Forum works nationally, and we assist consumers from all economic strata. In addition to supporting a broad cross-section of consumers nationally, we have a long record of assisting consumers who are economically disadvantaged, as well as working directly with vulnerable groups of consumers such as the elderly and victims of domestic violence and crime with online and offline privacy questions and needs. We regularly train other non-profits working with vulnerable consumers and provide expertise and information regarding how to assist vulnerable consumes to understand privacy options and risks.

The World Privacy Forum is regarded as a leading consumer privacy organization, and the most significant repository of data broker and privacy expertise nationally and globally, and is a globally recognized leader in consumer privacy research and education. WPF is regularly asked to speak and testify regarding consumer privacy issues at high-level events nationally and globally. WPF has been invited to testify before Congress multiple times regarding consumer privacy, including before the US Senate in early June of this year regarding databrokers and privacy. The video and written testimony for the hearing is available here: https://www.banking.senate.gov/hearings/data-brokers-and-the-impact-on-financial-data-privacy-credit-insurance-employment-and-housing.

In the past year, WPF has served as an expert advisor on privacy and AI to the OECD, where we wrote and completed the OECD Guidelines on AI (now soft law in OECD countries, including the US.) We gave a plenary presentation on data privacy and ethics at the global data protection commissioners conference in Hong Kong (2017) and Brussels (2018), and taught a seminar on EU and US data protection in Brussels with Europe's Data Protection Supervisor. We have trained in the last year several hundreds of US workers in domestic violence shelters on privacy, data brokers, and technology. Other activities include: testifying at the FTC Data Harms hearing (Dec. 2017) which included the release of a new identity theft report, presenting a key paper on consumer trust and identity in the digital ecosystem at Harvard's Kennedy School, and testifying at the FTC AI hearings (2019). WPF is also a member of the American Law Institute's Data Privacy Project, and a member of the Transatlantic Consumer Dialogue. I will be pleased to provide a more detailed account of our activity, as it spans a lot of ground regarding consumer privacy. We work to communicate across multiple audiences. Over time, this has allowed us to create a network for disseminating privacy information to a wide range of consumers across the US.

All of this activity has generated significant media coverage, including quotes over now many years for WPF in the highest profile media outlets in the world, including *New York Times, The Washington Post*, *Consumer Reports*, *The Economist*, *CBS News*, *ABC News*, *NPR*, *The Guardian*, *The Wall Street Journal*, and many others. I have attached a link to our World Privacy Forum in the News page at the end of this letter. WPF is aware that any funds remaining after disbursement of the Google, Inc. settlement to class members

will be donated to organizations agreed upon by the parties. I hope you consider WPF as an organization that meets the court's definition of a worthy *cy pres* recipient.

A *cy pres* grant from this case would support WPF's ongoing efforts to help consumers who are victims of digital privacy challenges through our consumer education and advocacy work. WPF efforts will benefit the national class, including vulnerable class members. WPF has two significant and long-running projects that directly address the issues forming the basis of the Google Street View lawsuit regarding the company having collected consumers' digital information without consent or knowledge. WPF is committed to use the funds to address issues identities—to third parties, without consumers' knowledge or consent. WPF is committed to use the funds to address issues related to the basis of the lawsuit.

Specifically, a grant would support:

- •WPF's consumer data privacy education campaign, which provides consumers with objective, plain English advice on how to reduce their risk of privacy-related problems stemming from everything from daily activities to data breaches and digital data leaks to third parties. This includes the costs of providing direct counseling and support to victims of privacy breaches and problems. We also assist many consumers who need assistance with some aspect of digital privacy that has gone wrong.
- •WPF's longstanding work in providing direct consumer support and well-researched tips specifically for online and offline privacy challenges, including challenges with "Internet of Things" and connected devices (such as home voice assistants, connected televisions, IoT videocameras, and more.)
- •WPF's ongoing and groundbreaking research and best practices work on consumer privacy issues addressing the collection of personally identifiable information and subsequent unconsented sale and sharing of that consumer data with third parties. WPF has written extensive and groundbreaking research in this area of privacy, and we have testified before Congress on these issues multiple times. WPF would also be able to provide additional guidance directly to industry by participating in multi-stakeholder dialogues through bodies that set standards and federal agencies like the National Institute of Standards and Technology. Depending on the size of the grant, WPF could potentially:
- •Expand our consumer education activities by, for example, increasing the reach of our consumer education materials through more promoting online, launching a privacy-related podcast, conducting additional research and education on third party data sharing, tips, and issues, and expanding our technology and privacy training curriculum with related content.
- •Strengthen our consumer privacy education efforts around data shared with third parties by doing more earned media, adding interns or staff focused on this topic, holding press events and strengthening our presence at the state level.

•Strengthen and expand our existing training to vulnerable consumers regarding data sharing with third parties, in particular, WPF consistently works with victims of domestic violence, for whom third party data sharing can be a safety issue, to assist them directly in securing their data and in reading policies.

The World Privacy Forum is independent of all parties to the litigation and their counsel for the time frame of the suit. However, we have accepted *de minimus* general support funding from Google after 2013. We have no current funding from Google. For previous funding, Google agreed to abide by our funding terms, which provides for complete independence.

Attached at the bottom of this letter, please find a list of cy pres awards WPF has been granted by the courts during the past five years, please also find a list of links to our work mentioned in this letter.

Please advise me if you need any more information or if you would like to speak with me or any of WPF's staff directly involved with providing service to consumers. I do believe that WPF uniquely fits the ideal profile of a *cy pres* grant awardee from this case. Thank you for your consideration.

Regards,


Pam Dixon


**WPF has been approved by the courts as a cy pres recipient in the following cases from 2014-2018:**


*Kristin Mantia v. Bactes Imaging Solutions, Inc.* Cy Pres distribution 2015
This class action was regarding fees for copies of medical records. The defendant, Bactes Imaging Solutions, Inc., fulfills medical records requests under HIPAA Business Associate contracts with hospitals and other medical providers. The plaintiffs, having requested records and paid the fees set forth in Bactes's invoices, claim that the fees Bactes charged exceed those permitted under G.L. c. 111, § 70. World Privacy Forum was named as a recipient based on our extensive health privacy work.

*Chavez v. Netflix, Inc.* Pres distribution 2014
The Netflix class action suit alleged Netflix violated the VPPA by disclosing subscribers' personal information and keeping former customers' personal information and video

rental history past the statutorily allowed time period of one year.  Specifically, the plaintiffs alleged that Netflix kept their viewing histories, credit card numbers, and billing and contact information. World Privacy Forum was named as a cy pres recipient based on our extensive and ongoing work on identity theft, data brokers, and consumer privacy online.


*Gaos et al v. Google, In re Google Referrer Header Privacy Litigation*, pending
The Google settlement was based on data spills from the Google Safari browser, via referrer headers that were configured in a way that did not match the Google privacy policy at the time. WPF was added as a cy pres recipient based on our extensive work in online consumer privacy research and direct support. We had also written a detailed letter to the FTC explaining why the referrer case was problematic for consumer privacy. The Google cy pres settlement had been finalized, but final settlement has been challenged by a third party and is pending review.


**World Privacy Forum Brief Background**

A brief selection of our present and past activities includes:

- WPF is a leading researcher about privacy and data analytics, including big data, predictive analytics, consumer scoring, and the data broker industry. We have published major reports about the issue, and have testified before Congress about privacy and data brokers now four times. Our major reports on include *The Scoring of America (2014)*, and *Data Brokers and the Federal Government (2013)*. The reports have been frequently cited, including in the White House Big Data report. WPF is representing civil society at the OECD as a member of the AI Expert Group, where we serve to represent the consumers' interests.

- WPF is a leading researcher about health privacy, including electronic health records, digital health data flows, sensor-driven biometric data, medical privacy regulation, the Common Rule and human subject research, and other emerging health data flows, issues, and practices. The Executive Director of WPF currently serves as an expert advisor to the OECD on a health privacy advisory group. Previously, WPF has served as an appointee or board member on US national and state-level health privacy boards, including doing digital standards work on HL7.

- WPF conducted extensive biometric field research in India regarding it's Aadhaar digital ID, which is the world's largest biometric ID ecosystem. WPF's India work formed the basis of a peer-reviewed scholarly article on India's Aadhaar which was published in 2017. Specifically, *A Failure to Do No Harm* was published in a special issue of Springer-Nature and co-

published in the Harvard-based Journal of Technology Science. This work was cited twice in the landmark Aadhaar decision by the Supreme Court of India, an historic decision which overturned the damaging aspects of the Aadhaar system. Our concept of privacy by obscurity and that biometric systems should do no harm, and must create a public good, were key concepts the court used to change a system impacting more than 1 billion people in a positive direction.

- The World Privacy Forum researched and published the first major report on medical identity theft and brought this crime to the attention of the public for the first time. The World Privacy Forum coined the term "medical identity theft" in its report on the topic. The Forum also has published the only detailed consumer education and victim materials on this crime. California passed a new law that went into effect in 2008 based on the recommendations in the WPF medical identity theft report, which later became part of HIPAA. The World Privacy Forum's continuing activities in this area have made a substantial impact in the awareness and understanding of this crime for both victims and health care providers. Our work led to the California medical data breach law, the enactment of federal medical data breach notification as an update to HIPAA, and the eventual removal of SSNs from Medicare and Medicaid cards.

- Consensus and multistakeholder work:

  - WPF was appointed by the Secretary of OECD as a civil society delegate to the AI Expert Group. Over the past year, this group drafted the OECD's Global AI Guidelines, which have now been approved by the ministers and have been ratified by the US and other OECD countries as of May 2019.

  - WPF participated in a multinational consensus effort to develop governance for AI systems (IRGC, Zurich, Switzerland) in 2018.

  - WPF's Pam Dixon was named as an expert advisor on health data uses to the OECD, where she has worked with global stakeholders on health privacy and health data protection.

  - WPF was the lead drafter of the US Department of Commerce NTIA Multistakeholder Process short form privacy notice during 2012-2013. The process finished with a completed short form notice to be used by mobile apps. The notice is now being tested and implemented. This notice provides important and innovative privacy improvements. Among the most important is that consumers receive notification when their information is being sent off of their mobile

devices to data brokers. This is the first notice to allow for this transparency.

- In 2011, WPF led the nation's leading civil society groups in developing the Civil Society Multistakeholder Principles for the White House/ US Department of Commerce Privacy process.

- The World Privacy Forum led a consensus group of non-profits in 2007 meeting that culminated in the now well-known Do Not Track proposal presented to the Federal Trade Commission. Do Not Track is an idea that is now known globally and has been implemented to some degree.

- WPF broke new ground in publishing the first report on privacy in digital signage networks and mobile device tracking in retail spaces in the *One Way Mirror Society* report. The report was easily three or more years ahead of trends.

WPF works on key privacy standards projects in digital privacy. We are currently participating in an IEEE standards setting process for privacy in digital biometric systems.

**Related Links**:

- **World Privacy Forum**: https://www.worldprivacyforum.org
- **World Privacy Forum in the News**: https://www.worldprivacyforum.org/news-and-press-room/
- **The Scoring of America**: https://www.worldprivacyforum.org/2014/04/wpf-report-the-scoring-of-america-how-secret-consumer-scores-threaten-your-privacy-and-your-future/
- **Key WPF reports**: https://www.worldprivacyforum.org/category/reports/
- **WPF Congressional Testimony**: https://www.worldprivacyforum.org/category/congressional-testimony/
- **Consumers Top Ten Opt Out Tips**: https://www.worldprivacyforum.org/2015/08/consumer-tips-top-ten-opt-outs/
- **Data Broker Opt Out List**: https://www.worldprivacyforum.org/2013/12/data-brokers-opt-out/
- **Consumer Tips**: https://www.worldprivacyforum.org/category/consumer-tips/

# EXHIBIT F

**Public Knowledge Cy Pres Grant Request**
**June 21, 2019**

# GRANT PROCESS

<u>**Organization Information**</u>

*1.     Name of Organization*

Public Knowledge

*2.     Discuss the founding and development of the organization. Explain the original issue and/or opportunity the organization was founded to address and how that may have changed over time.*

Public Knowledge (PK) was founded in 2001 to advocate for the public interest and consumer rights in what were then emerging issues: universal access to nondiscriminatory broadband networks and access to knowledge online. Broadband, net neutrality, free speech, and intellectual property issues remain at the core of our mission. As the internet has grown, our mission has grown with it, and now encompasses consumer protection, privacy, and competition issues related to online platforms and services. On issues such as privacy, PK supports comprehensive efforts that cover both network providers such as internet service providers (ISPs) and wireless carriers, online services of all kinds, and even cable and satellite TV providers. However, we do not support a "one-size-fits-all" approach, believing instead that the different characteristics of different services require different rules and kinds of oversight.

*3.     Describe the organization's current goals.*

Public Knowledge's mission is to promote freedom of expression, an open internet, and access to affordable communications tools and creative works. The organization works to shape policy in the public's interest by working with legislators, regulators, community coalitions, and in public forums on issues such as internet privacy and data security, technology and communications consolidation and competition, artificial intelligence and social good, intellectual property, and broadband regulation, access, affordability and deployment.

Our current policy goals include enactment of strong online privacy protections, restoring net neutrality protections, both through legal challenges to the current Federal Communications Commission (FCC) and through legislation, supporting balanced and pro-competitive spectrum policies at the FCC and in Congress, and ensuring that other consumer protections that are being enacted (e.g., with respect to robocalling) both meaningfully protect consumers and preserve competition. In our work on competition policy, we continue to be leaders in challenging anti-competitive mergers and support strengthening both antitrust law and enforcement levels. We also advocate for fair and functional copyright policies. Currently, our

work focuses on promoting controlled digital lending technology for libraries and archives to facilitate preservation and access to historical and cultural works, pursuing policy solutions to restore a functional termination rights regime, and promoting competition in the music licensing marketplace.

Organizationally, we are planning to expand our fellowship program to train the next generation of public interest advocates, to continue to build relationships with policymakers and stakeholders in areas of advocacy including privacy and platform regulation, and to expand and deepen our work in telecommunications and intellectual property law.

4.    *Provide a brief description of the organization's current programs.  Include population and numbers served, as well as expected results.*

Public Knowledge is based in Washington, D.C., and promotes access to communications tools, including the internet, for all members of the public, especially those in underserved communities. While access to communications networks is important for all Americans, many of the issues for which PK advocates are especially important to marginalized communities who may lack access to broadband, have limited resources to advocate, or are especially vulnerable to technology failures such as privacy abuses or algorithmic bias.

Privacy: Public Knowledge has taken a leadership role in the burgeoning privacy debate. PK has submitted regulatory filings to the Federal Trade Commission (FTC), National Telecommunications and Information Administration (NTIA), and the National Institute of Standards and Technology (NIST) and testified before the FTC in its hearings on consumer privacy and data security. PK has met with the White House, NTIA, the State Department, and the FTC to discuss privacy and has provided expertise to the House and the Senate as they attempt to draft comprehensive and consumer-protective privacy approaches. PK plays a leadership role within the Privacy Now coalition, and facilitated the creation of the Public Interest Privacy Principles. PK has also used its writing and online webinars to serve as an expert resource for broader audiences of technology users, looking to understand and engage with the privacy policy conversation in Washington, DC.

In addition, PK provides expert analysis to congressional staff in preparation for privacy hearings and during the drafting process. PK helps to prepare witnesses for hearings, submits written statements for congressional hearings on privacy, and provides technical, strategy, and policy advice to staff for the House and Senate on approaches that meaningfully protect consumers.

Finally, PK continues to engage with industry to find points of compromise and to persuade industry actors to voluntarily undertake best practices to protect consumer privacy and data security. For example, over the past year PK has participated in three rounds of the conferences led by the Local Media Consortium to investigate privacy values to be incorporated in a new

exchange for small publishers seeking a competitive online advertising marketplace to the one dominated by large digital platforms.

Open Internet: Restoring meaningful Open Internet rules is a major focus for PK. Our work includes educating the public and policy makers, gaining support to overturn the FCC's 2017 net neutrality repeal order, and encouraging policy makers to create new rules that meaningfully restore net neutrality. PK is also working to invalidate the 2017 net neutrality repeal order in the courts.

Affordability and Access: PK advocates for increasing access to the internet through the Lifeline low-income subsidy programs and efforts to increase rural broadband deployment. The Lifeline program is under attack at the FCC, and PK is working to preserve the program for the thousands of American families who are eligible for the program. On broadband, PK is advocating for the 19 million Americans—6 percent of the population—who still lack access to fixed broadband service at threshold speeds that would allow them to engage in commerce, employment, and education. PK also led the formation of the Broadband Connects America coalition over the past year, coordinating local and national organizations to promote values and policies that support affordable, open, and secure rural broadband networks.

Digital Platform Accountability: In 2018, consumer and policy maker concerns about the rise and power of the largest digital platforms reached a boiling point. Contributing to public sentiment were privacy and data violations and other abuses. PK quickly became a leader on issues of platform accountability, outlining a general framework for regulating digital platforms with the goal of ultimately curbing competitive abuses through new laws or regulations.

Copyright: Public Knowledge works to promote creativity and openness on the internet by advocating for policies that ensure fair and functional copyright laws for consumers and online creators alike. PK's copyright priorities include preserving the Digital Millennium Copyright Act's protections against liability for online intermediaries, fighting for consumer protection against anti-competitive uses of digital rights management technologies, and promoting the ability for libraries and archives to provide their communities with preservation and access to important historical and cultural works through controlled digital lending.

Other Work: PK opposes media mergers that would be detrimental to consumers by intervening at regulatory agencies and other bodies, advocates for cybersecurity and artificial intelligence policies in the public interest through thought leadership and convenings, and encourages the government to adopt policies to preserve the protections inherent in the legacy phone network during the transition to digital networks.

5.   *Has your organization been reviewed or rated by Charity Navigator or similar entity?*

Yes, by Charity Navigator.

   a.   *If yes, what are your ratings?*
         PK's Overall Score is 88.10;
         Rating is three stars;
         Financial is 87.28; and
         Accountability and Transparency is 89.00

**Grant Proposal**

6.   *Identify Principal Investigator/Project Director*

Legal Director, John Bergmayer

7.   *Explain how much money you are requesting*

Public Knowledge is requesting $770,000 for the projects outlined below, assuming a one-year fellowship is included. If a two-year fellowship is included, the budget would be $907,500. The proposed budgets are summarized below:

**Fortify the Public Knowledge effort to fight for strong federal privacy laws**
- Stakeholder summit: $75,000
- White papers: $75,000
- Public information campaigns: $75,000
- Privacy advocacy website: $100,000

**Address the power of large digital market players to abuse consumer privacy**
- White paper, convening, staff expert work, technology, research costs: $100,000

**Add data and analysis to the debate around individual privacy online**
- Economic analysis and consultation with outside experts: $150,000

**Privacy Fellowship**
- One-year privacy fellow: $125,000
- Or two-year privacy fellow: $250,000

**Organizational Costs**
- 10 percent of total project budget ($700,000) with one-year privacy fellow: $70,000
- Or 10 percent of total project budget ($825,000) with two-year privacy fellow: $82,500

*8.      Provide a summary of the plan for the program or project request. Include the issue and/or opportunity addressed, goals and objectives, activities, and timeline.*

Public Knowledge is a key player in the fight for individuals to control their own data and information online. We fight against colossal big money interests that stand to gain billions by vacuuming up data, regardless of the impact on consumers. Our current privacy work centers around advocating for strong federal rules to put individuals in charge of their own information. However, there is a great deal more we could do with additional resources. We outline here a number of additional tools and projects that would help us make real progress in the fight for individual privacy.

**Fortify the Public Knowledge and coalition effort to fight for strong federal privacy laws.**
Public Knowledge spearheaded creation of a coalition of consumer groups to create privacy principles and form a battle plan to approach Capitol Hill, and PK is at the center of the federal privacy debate. In addition, PK has testified before the FTC, appears routinely across the media, produces white papers, and participates in the Civil Rights Privacy and Technology Roundtable on emerging tech, biometrics, AI, algorithmic justice, and third party uses of data. (Note that as a 501(c)(3), PK's efforts center largely around advocacy and education for policy makers and the public, with strict limits on lobbying activities.) PK has devoted one of its government affairs attorneys to the effort, and several other PK advocates and lawyers work on the project as well. With more resources, PK could create:

- A stakeholder summit to discuss policy options for a comprehensive privacy solution with the goal to continue to build consensus around possible legislation and support in Washington for key consumer protections. (Timeline: between November 2019 and February 2020, or within six months of the start of the project. Activities and budget: venue, technology, travel, and other costs:  $75,000.)

- White papers with new facts and argumentation to influence lawmakers, create incentives for companies, and educate the public. (Timeline: one paper each calendar quarter beginning in the fall of 2019, or within the quarter after the start of the project. Activities and budget: staff experts, printing, technology, and public event: $75,000.)

- Public information campaigns, such as events and webinars with grassroots and grasstops groups who can mobilize to educate their communities and direct their voices to policy makers. (Timeline: September 2019-September 2020, or one year after the start of the project. Activities and budget: staff experts, technology, travel, and public event(s): $75,000.)

- Create a privacy advocacy website that would contain links to live events like congressional hearings, direct action information, educational materials like white papers and blog posts, information about how interest groups and the public can participate, and news about the privacy debate. (Timeline: September 2019-January 2020, or six

months after the start of the project. Activities and budget: staff experts, graphics, technology, web contractor, live streaming: $100,000.)

**Capitalize on the energy and attention that has resulted from consumer concerns about online privacy and data abuses to create stronger privacy protections across the marketplace**

Personal data is an incredibly valuable resource to digital platforms. It is a key input to creating the artificial intelligence systems that will manage production and consumption in many industries in the future and is used for product customization and, of course, for targeting ads. The amount of data that today's dominant platforms are able to collect may create a very high barrier that will be difficult for any new competitor to surmount. If we can significantly curtail the data collection of these companies, that competitive moat they can build will be smaller, and diminish over time as the data ages. Properly targeted policies can address privacy and competition harms while still allowing consumers to benefit from new technologies.

Many privacy harms, such as identity theft, are major, and cause individuals significant harm. In other cases, individual privacy harms may be small but cumulative, and even consensual data sharing may create negative externalities for third parties. In some cases, when a company obtains an individual's data, it can be aggregated and analyzed to learn private information about others. Information may be inferred about people's mental health, political views, or economic status. This information has commercial, and even political value, as we learned from the Cambridge Analytica scandal. When some people have access to this tool and others don't, it provides the keepers of the tool an immense amount of power in the marketplace. Rather than democratize the power to influence human behavior to more for-profit entities, we need to significantly curtail the excessive data collection that makes the ecosystem possible. At the same time, PK will continue our competition and antitrust work, which will directly promote competition in and against the dominant digital platforms. (Timeline: September 2019-September 2020, or one year after the start of the project. Activities and budget: white paper, convening, staff expert work, technology, research costs: $100,000.)

**Add data and analysis to the debate around individual privacy online by expanding economic information**

Public Knowledge has produced major white papers and other reports on online privacy and digital platform competition. With increased resources, PK could add serious economic analyses to this body of work, by studying the costs and benefits of data-heavy advertising to publishers, advertisers, and users, and the advantages of alternate means of providing consumers services (such as federated learning, differential privacy, on-device processing, and more coarsely-targeted ads) that do not involve significant privacy tradeoffs. (Timeline: September 2019-September 2020, or one year after the start of the project. Activities and budget: compensation for economist and associated costs: $150,000.)

6

**Create a privacy fellowship**. A dedicated privacy fellow could focus full time on executing the privacy work described in this grant report and then move on to another position in the field as a privacy advocate. PK has a five year history of cultivating consumer rights advocates through fellowships, hosting 18 full time one or two-year fellowships over that time. PK fellows train by working side-by-side with PK's lawyers and advocates, in the halls of Congress, before agencies like the FCC, FTC, DOJ, in coalition meetings, and with the press. PK fellows have moved on to positions at Common Cause, National Hispanic Media Coalition, elected office as a state senator, the federal government, Capitol Hill, and other policy institutions. A Privacy Fellow could provide one or two years of dedicated attention to the privacy fight, and in doing so make a significant contribution toward policy success. (Timeline, activities, and budget: if one year, October 2019-October 2020 or one year after the start of the project, salary, benefits and costs: $125,000. If two years, through October 2021 or two years after the start of the project, $250,000.)

9.     *Explain why the organization is approaching the issue and/or opportunity in this way.*

Public Knowledge approaches privacy both as a standalone issue, and through the lens of our other work. As a standalone issue, in addition to the coalition, advocacy, and lobbying work we have described, we have published whitepapers, such as December 2017's "Principles for Privacy Regulation," and addressed it substantially in our recent book, "The Case for the Digital Platform Act."

Public Knowledge also has a long history of working in telecommunications law.  By the nature of their operation, telecommunications networks have the ability to monitor a great deal of user activity, and at times they have to share certain kinds of information with each other in order to interoperate. Distinct privacy laws and practices have been developed to deal with these issues, including prohibitions on wiretapping. We have long advocated that the FCC strengthen its privacy protections for users of telephone networks, and for it to extend its privacy protections to broadband users, as well. This work has included filings and meetings at the FCC, and working with members of Congress to preserve and extend these protections. We also fought successfully as intervenors in court to support the previous FCC's extension of the legal framework that protects telephone privacy to broadband, and are currently waiting to see how the DC Circuit rules on our challenge to the current FCC's unwise rollback of that framework. As parties in both cases, we not only prepared briefs but presented oral arguments in court. A core tenet of our privacy work is that privacy rules for modern internet platforms can be informed by the protections that have long been in place for communications networks.

Public Knowledge also has a great deal of expertise in antitrust and competition law. These issues have effects on privacy--for instance, a data breach on a monopoly service will affect more users than a data breach on a service in a competitive market.  Additionally, in a competitive market, some companies may choose to differentiate themselves through data minimization, or by better protecting user privacy.

*10.  Will the money be used to continue an existing project or create a new project?*

As described in the answer to question 8, the funds would be used to expand or create new elements of the PK privacy work.

*a.    If a continuing project please provide all other funding sources*

PK's privacy advocacy is funded through general foundation and donor contributions. PK receives financial support for its mission from a wide array of sources, and ensures that its funding remains diversified and its mission independent. Funding sources include charitable foundation grants and general support contributions, including funds raised through Public Knowledge's annual IP3 Awards event. Foundation support accounts for between half and two thirds of Public Knowledge's budget, and current grantors include the Ford Foundation, Open Society Foundations, the Kahle-Austin Foundation, Media Democracy Fund/New Venture Fund, Nielsen, and the Voqal Fund. The remainder of support comes from companies and individuals through donations or sponsorship of the IP3 Awards.

*11.  Specifically explain how this money will be used to enhance internet privacy and/or internet security for consumers and businesses.*

There is a growing consensus among a wide range of policymakers and stakeholders that a new privacy framework is needed at the federal level. Current federal privacy policy is a hodgepodge of often-ineffective laws. However, new laws can take many forms, and it is just as important to prevent new policies that actually weaken consumer protection from passing, as it is to promote positive reform.

Policy and legal advocates can shape this debate in many ways, through communication with lawmakers, staff, and the press, and through events and persuasive writing. However, empirical support in several key areas would greatly aid these efforts. By hiring economists, industry experts, or other relevant consultants, Public Knowledge can fill in the gaps and provide the kinds of evidence that policymakers can point to in support of constructive legislation.

*12.  What are the major goals and objectives of this project?*

As discussed above, the best outcome of this project would be the enactment of a new strong federal online privacy law that protects consumers.

*13.  Explain exactly how the money will be utilized to accomplish the goal and/or objective identified.*

Public Knowledge is at the forefront of the public debate on how best to create meaningful online privacy laws that protect consumers. As outlined in response to question 8 above, PK would deploy additional funds to fortify the fight for strong federal privacy laws by creating a

stakeholder summit, publishing white papers, launching a public information campaign, and creating a privacy advocacy website. PK would work to address the power of the largest digital market players to abuse consumer privacy through advocacy, thought leadership, and convenings. PK would add data and analysis to the debate around individual privacy online by adding economic analysis to the effort. Finally, PK would create a one or two year fellowship, providing a dedicated resource to fight for privacy, who could then continue his or her work in the public interest field, ideally as a privacy advocate.

*14. What target population will your project benefit?*

Increasing online privacy protections will benefit all Americans. They will be especially important to marginalized and low income communities who may have limited resources to advocate on their own behalf, or are especially vulnerable to data-based discrimination or technology failures such as privacy abuses or algorithmic bias.

*15. When will the project be completed?*

The majority of the projects are estimated to take place from September 2019 through September 2020, or one year from the start of the project, although the work could be ongoing beyond that date. If there is a two-year fellowship, it would continue through October 2021, or two years after the start of the project.

*16. If the project will be continued beyond a year after receiving the grant please describe when the project will be completed*

Most of the work we have outlined has a one year duration, although Public Knowledge will continue to advocate for individual privacy and data security online. The one project that is anticipated for two years is the privacy fellowships. In our experience, two-year fellowships are very effective in training future advocates.

*17. Is this project going to be funded by any other sources in addition to the proposed grant?*

*a.   If yes, by whom and how much?*

Please see response to question 10. PK's privacy advocacy is funded through general foundation and donor contributions.

**Utilization of Data**
*18. Describe how you will evaluate the success of the grant on improving internet privacy and/or internet security for consumers and businesses.*

One way we will evaluate the success of our project is through concrete changes to marketplace behavior as influenced directly or indirectly by public policy. As an

inside-the-beltway organization, we work closely with policymakers, legislators, and regulators. The grant will help us both push for new legal frameworks and enforcement, and to oppose proposals that would harm, or water down, consumer privacy protections. Of course, changing the direction of public policy can be a long process. We will also judge the quality of our advocacy in terms of simply winning over lawmakers and stakeholders to our side, as well as using our expertise to support efforts of partners to broaden support outside the beltway. We also measure progress through successful execution of deliverables such as hearings, holding events for congressional staffers, public education events and campaigns, and white papers or other pieces of written advocacy. Additionally, even in the absence of changes to public policy, we will work to change the practices of dominant services to better promote user privacy. Many companies now claim to put a high priority on user privacy, but we need to match that with concrete changes, such as data minimization.

*19. Describe how often and what the form of evaluation you will provide during the course of the project and upon completion.*

During the course of the project, we will continually monitor the effectiveness of our efforts in promoting positive changes to public policies around privacy, and company practices, and in continuing to build and work with coalitions supporting reform.

*20. Do you intend to use the results of the project in any publications, conference papers, and presentations*

Yes.

> *a. If so, please identify.*

Public Knowledge has outlined a number of projects in this proposal that include white papers and other written work. These papers and any other similar work would be assertively promoted through publication, at convenings hosted by Public Knowledge and others, at panels where PK experts appear, with congressional offices and other policy makers, on our website, with our email listservs, and through the press and social media.

**Miscellaneous**

*21.  Do you have any relationship to the law firms Spector Roseman & Kodroff, PC; Cohen Milstein; or Lieff Cabrasser or any lawyers at those firms?*

No.

*22.  Have you ever received cy pres money previously?*

Yes.

> *a.    If yes, please explain.*

In 2019, Public Knowledge received $78,868.41 of cy pres money. PK was chosen as one of the recipients for the cy pres distribution of residual funds from the settlement between Francis W. Hooker v. Sirius XM Radio Inc to go towards "consumer privacy work and not in furtherance of litigation."

*23.  Within the last 3 years have you received any money from Google or its parent company Alphabet, Inc.*

Yes.

> *a.    If yes, please identify the amounts and the purposes of the money*

Google amounts and purposes:

2016 Funding for Trade Fellow - $100,000

2016 Annual Support - $100,000

2016 Support the Open Internet Online Course - $60,000

2017 Patent Sponsorship - $120,000

2017 Research by an expert economist on the business model for online creators - $25,000

2018 Tech Policy General Support - $100,000

2018 Google Public Policy Fellowship Stipend - $7,500

2018 General Support - $102,000

2018 Support for PK to participate at the IGF (international) - $3,000

# EXHIBIT G



WWW.ROSEFDN.ORG

1970 BROADWAY, SUITE 600, OAKLAND, CA  94612-2218
ROSE@ROSEFDN.ORG

OFFICE: 510.658.0702
FAX: 510.658.0732

# Consumer Privacy Rights Fund Google Cy Pres Proposal

The Rose Foundation for Communities and the Environment specializes in directing consumer class action cy pres and environmental remediation payments back to affected communities.  Our Consumer Funds have received over $12 million in cy pres and our Environmental Funds have received more than $25 million in restitution settlements. Entrusting cy pres to the Rose Foundation clears a path to settlement because we assume the burden of compliance with the class-action nexus. With the assistance of experts whom we recruit to advise each of our funds, we are able to identify nonprofits and university organizations whose work is at the cutting edge of a class action nexus, but which may not be immediately known to the court or the parties at the time of settlement. We then manage a competitive application process, and award the funds in a fair and transparent process that helps the cy pres benefits penetrate deeply and strategically into the communities represented in the class action. Entrusting cy pres to the Rose Foundation also eases post-settlement burdens because we have the ability to efficiently direct remainder cy pres to support the interests of the class, and because we provide accountability over cy pres expenditures by rigorously tracking grantee activities and accomplishments, and reporting back to the parties and the court documenting how the grants tied into nexus and benefited the class.

Here are profiles of our cy pres Consumer Funds:

- **Consumer Privacy Fund** (originally created with the Union Bank and Cal Fed privacy cy pres, the Fund has received cy pres awards from 12 privacy class action settlements to date – including Bank of America, American Express, Fleet Bank, Chase/Manhattan, Wells Fargo, Texaco/Citibank, NDCHealth and Netflix). The Fund has awarded over $6 million in privacy grants to more than 100 consumer privacy non-profits through the United States. According the Electronic Privacy Information Center, this has made the Rose Foundation one of the nation's leading supporters of consumer privacy rights. The most recent grant cycle in 2018 carried a special focus on technological issues related to the intersection of data management, on-line issues and personal privacy. For a list of past grantees, please visit:

  https://rosefdn.org/consumer-privacy-rights-fund/grantees

- **Consumer Financial Education Fund** (created with a $4 million cy pres from Bank of America).  Over a five-year period encompassing four national grants rounds, this fund notified thousands of consumer education organizations of the funding opportunity and awarded a total of 68 grants to organizations throughout the United States teach basic financial literacy to some of the United States' most underbanked and vulnerable citizens. An additional grants cycle supported by an HSBC cy pres was recently completed, with funding awarded in February 2019. For reports on the impacts of this cy pres fund, please visit:

  https://rosefdn.org/wp-content/uploads/2016/10/CFEF-Report-Rose-Fdn-9-23-2016.pdf
  https://rosefdn.org/wp-content/uploads/2019/06/A-Cy-Pres-Impact-Report-2018.pdf

- **Consumer Products Fund** (created with cy pres from Neutrogena and Symantec). In its inaugural grants cycle, the Fund awarded $600,000 to organizations specializing in product ingredient and truth in advertising claims. A follow up grants cycle addressed software performance and marketing claims. An additional cy pres related to health-related product advertising claims is pending in 2019. For a list of past grantees, please visit:

  https://rosefdn.org/consumer-products-fund/grantees

# Strategic Grantmaking to Benefit the Google Street View Class

We would utilize our capacity, grantmaking experience, and deep knowledge of privacy issues and consumer education to conduct a grants cycle that would maximize the benefit to the entire class by providing a public, competitive, and transparent national grantmaking process. Utilizing our national database of over 1,000 non-profit and educational organizations specializing in privacy rights and consumer issues we will ensure that notice of the availability of these cy pres funds penetrates deeply into the community and broadly benefits the entire class.

The Rose Foundation's expertise in using consumer cy pres to award strategic and cutting edge grants is well-recognized. For example, *California Lawyer* magazine has hailed the Rose Foundation for, "its reputation for transparency and a no-nonsense approach to the competition for funds." (September, 2011). We have been honored with the Electronic Privacy Information Center's prestigious *Champion of Freedom* award in recognition of our leadership in supporting consumer privacy rights, and have sponsored major conferences on consumer privacy issues, including the *Future of Privacy Rights* conference – a two-day convening of national privacy activists and scholars, as well as the *California Consumer Privacy Symposium*.  And the Rose Foundation's overall expertise and excellence has been recognized by Charity Navigator, the nation's leading charity rating website. We proudly hold Charity Navigator's coveted *4 Star Charity* rating, which is the highest rating possible and recognizes exceptional financial management, program impact and organizational transparency.

### Restricted Fund/Preservation of the Nexus:

All cy pres funds entrusted to the Rose Foundation will be held in a restricted internal account dedicated solely to the nexus described in the class action settlement. Rose's preliminary understanding is that the nexus of the matter is that it relates to on-line privacy issues and data security. The Rose Foundation looks forward to engaging with the Parties to better understand the nexus and composition of the class, and thus the focus that will shape and target the grantmaking program enabled by this cy pres.

The Rose Foundation regards the settlement documents that would create and describe the allowable uses of the funds as the equivalent of a Deed of Gift. Thus, as directed by the settlement itself as well as a broad underlying body of charitable law, the Rose Foundation assumes full liability for meeting the proscribed nexus with all grants enabled by the fund – including any and all specific restrictions or uses expressed in the settlement documents.

### Expert Funding Board:

Each Consumer Fund is advised by an expert funding board. The funding board members provide strategic guidance, and specifically help review grant applications and make funding recommendations. Members of the funding board cannot not be affiliated with likely grant applicants, and are be governed by the Foundation's conflict of interest policy. The funding board serves on a

2

volunteer basis – however, travel and other direct expenses are reimbursed. We would assemble an expert funding board of between 3-5 individuals to guide the Fund created from the cy pres. To give you the flavor of the types of individuals we would recruit, here is a sample from current funding boards:

- The current Consumer Privacy Rights Funding Advisory Board includes Joanne McNabb, Director of Privacy Education and Policy Office of the Attorney General, California Department of Justice (retired), and Lee Tien, Senior Staff Attorney and Adams Chair for Internet Rights, Electronic Frontier Foundation.
- The financial funding board includes Jean Ann Fox, Director of Financial Services for the Consumer Federation of America, and Greg McBride, CFA, Vice President, Senior Financial Analyst, for Bankrate.com.
- The products funding board includes Stacy Malkan, co-founder of the Campaign for Safe Cosmetics.

While the Rose Foundation's services related to cy pres awards are scalable to the size of the award, the following outline assumes a minimum cy pres of $500,000.  Significant economies of scale are achieved with larger awards.

**Publicizing the Fund:**
The Rose Foundation maintains a broad service list of non-profit organizations working on consumer education and consumer protection issues. We'll supplement our existing list with targeted research to identify additional organizations whose work associates closely with the nexus. A Request for Proposals (RFP) shall be developed and circulated to this service list. In addition to targeted distribution via the service list, the RFP shall also be posted on the Rose Foundation's website, and will be made available to the appropriate foundation directories. We'll also encourage national networks of consumer protection organizations such as the Consumer Federation of America to rebroadcast the RFP throughout their networks. The result will be extremely broad and deep national penetration of the RFP and this grants opportunity. This ensures that we receive numerous grant applications and are able to select the most strategic and effective proposals that are designed to achieve the greatest benefit to the class.

The RFP shall describe the availability of funds and provide specific application instructions. After the grant cycle supported by this cy pres has been completed and the grants are awarded, the Rose Foundation shall publish on its website a list of grantees along with descriptions of projects funded. Foundation shall supply reports to the parties describing the grants awarded and their conformity with the cy pres nexus. Periodically, the Rose Foundation also publishes more general reports that highlight significant accomplishments of various grants funds or specific grantees.  Please visit: https://rosefdn.org/reports

**Competitive & Transparent Grant Awards Process:**
The Rose Foundation shall use the cy pres funds to conduct a competitive grant awards cycle – as an organization, the Rose Foundation strongly believes that a competitive application process leads to the best grant investments because it allows comparison of different ideas and approaches and selects the most effective strategies and projects. The grant cycle shall be administered in accordance with the Rose Foundation's grantmaking policies and procedures. These procedures require:

- Written applications with detailed project descriptions that explain proposed use of funds.
- Full organizational profiles that help us evaluate the applicants' capacity to successfully complete the project, including descriptions of key staff and board of directors.
- Detailed financial information from the applicants and a specific project budget.
- Project timeline, identification of key deliverables and proposed evaluation metrics.
- Applications processes are scaled based on the range of grants being offered. For example, some of the Rose Foundation's grantmaking funds are targeted towards facilitating small grants to very small organizations – these grassroots funds have a streamlined and user-friendly application process that is designed to help first-time applicants through the fundraising process; our programs designed to award larger grants to larger groups have a more complex application process that asks for much more comprehensive and detailed information.
- Specific reporting from grantees describing accomplishments and use of grant funds. These reports fuel Rose's knowledge base and help us make educated grant decisions in future rounds; they also provide the accountability mechanism for both our own diligence and to provide the basis for reports to the parties and the court as well as any other reporting requirements described in the Class Action settlement.

For a full template of the Rose Foundation's grant application process, please visit http://rosefdn.org/apply. Application procedures would be specifically tailored to the requirements of this specific settlement, but would closely track these instructions. Selection of grantees shall be closely advised by the funding board. As required by federal law, the Rose Foundation's governing board must retain final discretion in approving the funding board's recommendations.

**Accountability:**
All grantees from this cy pres shall be bound by grant contracts that provide for the Rose Foundation's ongoing oversight over each grantee's progress, and all grantees shall be required to submit detailed reports documenting activities, accomplishments, and expenses. These reports also ask grantees to share key insights gained during the project. In addition to documenting conformity with the nexus, these reports are shared with the funding board in order to educate an evaluation of the Fund's impact, document conformity with the nexus, and to catalyze consideration of any strategic revisions in overall grantmaking strategy within the general framework required by the nexus.

After the grant cycle supported by this cy pres has been completed and the grants are awarded, the Rose Foundation shall publish on its website a list of grantees along with descriptions of projects funded, and submit a report to the parties and the court describing the grants awarded and their conformity with the cy pres nexus. the Rose Foundation also publishes more general reports that highlight significant accomplishments of various grants funds or specific grantees.  Please visit: https://rosefdn.org/reports


Periodically, the Rose Foundation summarizes grantees' key insights and shares this hard-won advice with other grantees; we also provide grantees with contact information so they have opportunities to network with, and learn from, each other. Our rigorous tracking of grantees over the years has developed a strong knowledge base within the Foundation that would educate effective and strategic decisions regarding the grant awards enabled by this cy pres. We then take the best lessons we learn from cy pres grantees and rebroadcast them to the field, thereby providing additional benefits to the

4

class and extending the benefits of the cy pres awards far beyond the confines of the actual grant dollars.

Since the Rose Foundation will rigorously track all of our grantees throughout the life of their projects, we provide a robust accountability mechanism which is simply lacking in many other cy pres awards processes. This benefits the class because it ensures that the money is spent to the best effect. With the Rose Foundation's grant process, an applicant doesn't just have to look good on paper to win the grant award, they have to produce and document results for the life of the grant.

A list of the grantees funded through this cy pres and summary descriptions of their projects shall be published on the Rose Foundation's website, and sent to the parties. Additionally, the Fund's grants and expenses shall be documented in the Rose Foundation's annual audit. That audit is made available to the public on the Rose Foundation's website: http://rosefdn.org/financials. We would also provide a copy of the audit directly to the parties if desired. Organizational tax filings may also be downloaded here.

### Here is the cycle of work that the Rose Foundation would conduct for this cy pres

- Review and expand our existing proprietary database of approximately 1,000 consumer organizations to especially target organizations that specialize in at heart of the class action and the settlement. In addition to all of the well-known national consumer protection and privacy organizations, our database includes numerous smaller and mid-size organizations throughout the country which have some of the most direct connections to the community. Therefore, the grants we would make with the cy pres funds would significantly broaden and enhance the overall pool of cy pres recipients beyond any circle of potential nominees already known to the parties.
- Develop and broadly circulate a Request for Proposals (RFP) containing detailed application instructions. In addition to sending this RFP to our expanded database, we would register the RFP with appropriate grants directories.
- Respond to prospective applicant inquiries, and advise applicants on shaping their Letter of Inquiry (LOI). These are typically 3 pages in length, and provide an overview of the applicant, their proposed project, and generally outline the funding request. We typically receive large numbers of these inquiry letters.
- Review and respond to all LOIs. Encourage full proposals from well-qualified applicants with strategic ideas that closely conform to the nexus around telecommunications privacy. Advise applicants whose LOIs illustrate potential, but who may need guidance in designing a competitive proposal. Discourage applications from entities that do not seem well poised to submit a competitive or qualifying proposal.
- Respond to applicants during the full proposal development process. At this stage, most applicants typically have detailed questions about specific proposed activities and/or structural requirements of the application process.
- Review full proposals. In addition to a detailed narrative description of proposed activities, full proposals must include a project budget, organizational budget, profit/loss and balance sheet (audited preferred), timeline of activities, identification of specific deliverables, metrics for measuring impact, qualifications of key staff, identification of board members and their affiliations, outside evidence of organizational capacity such as testimonials, copies of media

coverage, referrals or letters of support, and other materials to help evaluate the organization and rank the proposal.

- Interview applicants to discuss their proposals in detail.
- With the assistance of our Funding Board, select the most qualified and strategic proposals for funding.
- Negotiate grant terms with each grantee as needed. For example, we may seek additional deliverables, or may agree to modify proposed deliverables in the event that we elect to only extend partial funding to a project.
- Bind all grantees through a contract that allows for the Rose Foundation's oversight and requires detailed follow-up reporting to ensure that promises made in the grant application are fulfilled to the best ability of each grantee.  Larger grants are typically paid in installments, with interim milestones which must be met before the next payment.
- Rigorously track grantee achievements to hold grantees accountable for their performance and ensure that funds are well spent. Tracking includes periodic check-in calls and written reports. These reports also provide an important history and context for repeat applications that may be funded though some future cy pres, and become part of our knowledge base that educates future grant decisions (and similarly educates our work to recommend strategic disbursement of this cy pres).

**Timeline:**

The following timeline assumes a cy pres between $500,000 and $2 million, which is an appropriate amount to award in a single grant cycle.  Cy pres larger than $2 million would typically be awarded through a multi-year process.  From time of receipt of the cy pres award through grantee selection and the award of grant contracts, a cy pres grant cycle will take about 10 months to complete. Depending on the grant periods – typically one - two years, although sometimes longer – our oversight function over the grants awarded typically then extends for at least two years after grants are awarded. Regardless of the number of grant cycles enabled by the cy pres, the process for each of these grant cycles would be the same.

**Costs:**

To recover our costs of exercising stewardship over the funds, creating and servicing the volunteer funding board, publicizing the availability of the funds, conducting competitive grant cycles, administering grant awards, and evaluating grantee progress; as well as providing reports to the parties, court (and when required, other governmental agencies such as the U.S. Department of Justice), conducting our annual audit, filing IRS and state charitable tax returns, and other related program administration and general foundation overhead, the Rose Foundation charges a program administration fee based on the size of the award. This fee is comprehensive – there are no other surcharges or annual fees.

Fee Schedule (based on the size of the cy pres award):

| | |
|---|---|
| Awards up to $1 million: | 8% |
| Awards up to $3 million: | 7 % |
| Awards up to $5 million: | 5.5% |
| Awards over $5 million: | 5% |

# The Rose Foundation for Communities and the Environment

The Rose Foundation for Communities and the Environment is dedicated to providing resources to communities so that they can participate effectively in civic affairs, consumer protection and environmental stewardship. To accomplish this goal, the Rose Foundation raises funds from individuals, businesses and other foundations, and uses the funds to award grants that benefit consumers, the environment and the community through a competitive and highly transparent grants process. Many of our grantmaking funds (such as the *Consumer Privacy Rights Fund* and *California Watersheds Protection Fund*) are enabled by consumer cy pres awards or pollution restitution settlements where we are selected by the parties and appointed by the court to administer a pollution mitigation or cy pres payment. In each of these Funds, all monies within the Fund are dedicated solely to fulfilling the nexus of the enabling settlement(s), and each fund is advised by an expert funding advisory board to help ensure the most strategic grants decisions. Additional grantmaking programs (such as the *Environmental Grassroots Fund*) are enabled by partnerships with colleague foundations. The Rose Foundation also partners with governmental agencies to mange grants program and conduct service projects. We are particularly proud that the *Central Valley Regional Water Quality Control Board* has chosen the Rose Foundation as its partner in disbursing pollution penalties to impacted communities and our *Central Valley Disadvantaged Community Water Quality Grants Fund* has now disbursed over $2.5 to support community-based water quality programs throughout the San Joaquin and Sacramento valleys. Cumulatively over its 26 year history, the Rose Foundation has awarded more than $50 million in consumer and environmental protection grants. The Rose Foundation's *New Voices Are Rising* program provides youth leadership development serving low income and students of color in East Bay high schools, and our *Summer Leadership Academy* has graduated more than 150 students and helped these at-risk youth get into college. All of our programs are described at www.rosefdn.org.

The Rose Foundation is audited by Maze & Associates, CPA. Organizational tax filings and annual audits are posted at www.rosefdn.org and may be downloaded at any time. All grant awards are published in a searchable grants database on our website. Any interested member of the public can easily pull up a list of all of our consumer grants; and they can further search those grants by year, topic or region if they so choose.

# Past Experience with Cy Pres and Restitution Funds

The Rose Foundation has been named by the courts to receive funds from more than 400 cy pres and restitution settlements, and these funds have enabled a grantmaking program which has awarded more than $40 million to consumer, community, environmental and social justice organizations in California and nationally. Our funding model:

- Utilizes the services of an expert funding board.
- Publicizes availability of funds including distributing an RFP to a broad service list.
- Conducts competitive grants rounds in nexus with the underlying cy pres(s).
- Helps community-oriented grant seekers navigate the complex funding application process.
- Performs ongoing grant administration including evaluating grantee progress and ensuring conformity with nexus.

- Meets all requirements imposed by oversight bodies including DOJ and the courts, circulates regular reports regarding grant awards, and provides documentation in an annual audit.

The following summarizes the Rose Foundation's experience in administering grants funds created by cy pres and restitution payments. Additional information about the Foundation's Restitution and Cy Pres Trustee Program may be found at:  http://rosefdn.org/restitution-and-cy-pres-fund-trustee.

## Consumer Financial Education Fund
Created in 2012 with a $4 million cy pres award from Bank of America, this fund supports consumer education related to finance and banking issues thought the US.  The fund has completed a five-year grantmaking program and fully disbursed these funds, and is currently conducting a $1 million grant cycle enabled by cy pres from HSBC.

## Consumer Privacy Rights Fund:
Created in 2002, the *Consumer Privacy Fund* has since been supplemented by 12 additional cy pres with a combined a combined total of over $5 million from Bank of America, CalFed, Union Bank, American Express, Fleet Bank, Texaco/Citibank and Facebook. It has awarded grants nationally and in California to support consumer education and research on a broad range of privacy issues.

## Consumer Product Fund
Created in 2014 with cy pres from Neutrogena and Symantec, the *Consumer Products Fund* awarded $600 million in its opening grant cycle supporting consumer education around truth in advertising and public health, and additional grant cycles related to health-related and technology-related product advertising, are pending later for 2019.

## Environmental Restitution Funds:
Environmental restitution funds include a *California Watersheds Fund* created in 1998 with a $900,000 mitigation payment from Exxon. Since its launch, the fund has been supplemented by more than 300 other mitigation payments and has awarded more than $17 million in grants to community-based organizations engaged in a broad range of environmental stewardship activities. Current watershed based funds cover areas of California including San Francisco Bay, the Sacramento River, San Joaquin River, Russian River and Humboldt Bay, as well as coastal funds covering near-shore waters adjacent to the Central Coast, Santa Barbara and Los Angeles, and the watersheds of the Inland Empire. Primary organizations helping to build these funds include San Francisco Baykeeper, California Sportfishing Protection Alliance, and other California waterkeeper groups. Other California-centered environmental funds include partnerships with the *Central Valley* and *Los Angeles Water Boards*, which help steer governmental *Supplemental Environmental Project* funds towards disadvantaged communities. Through the end of 2018, these funds have disbursed $3 million to project benefiting vulnerable and underserved communities in close nexus with a series of Administrative Compliance Liability orders.

In 2012, Rose launched the *Puget Sound Stewardship and Mitigation Fund* seeded by a large restitution payment from a Puget Soundkeeper Alliance v. BNSF Railroad settlement. So far, the Puget fund has disbursed $3 million in grants for green infrastructure and other water quality-related projects. Additional location-specific environmental funds have been created as well, including: the *Mike Chappell Fund for the Spokane River*, which conducted its first grants round in 2012 and is being

expanded to encompass parts of the Columbia River; the *Grays Harbor/Chehalis River Watershed Fund*, has awarded $900,000 for coastal watershed protection in Washington State; the *Kern County Air Pollution Mitigation Fund* - a $7 million fund which is supported by settlement payments from 18 residential developers including Lennar, Pulte and Centex; and the *Madera County Responsible Growth Fund* utilizing a $1 million settlement payment from Castle and Cooke. The Kern Fund has helped purchase more than a dozen new clean-fueled school buses, while the Madera Fund is focused on sustainable land use planning.

**Environmental Health Fund:**

Created by more than $1.5 million in cy pres payments from Badger Meters and Vons, this fund supports environmental health research and consumer education related to toxics.  Recent grantmaking has been enabled by a series of Prop 65 settlement payments.

**For More Information Contact:**
Tim Little, Executive Director
(510)658-0702   ~  tlittle@rosefdn.org  ~  www.rosefdn.org

GZJ KDKV'J "

# Data Privacy and Security
## An ACLU application for cy pres funding



For nearly 100 years, the ACLU has been our nation's guardian of liberty, working in courts, legislatures, and communities to defend and preserve the individual rights and liberties guaranteed by the Constitution and the laws of the United States.

Since litigating *ACLU v. Reno* (1997), which helped establish the free and open internet that many now take for granted, the ACLU has been the country's leading nonprofit organization protecting free speech, privacy, and other civil liberties at the intersection of law and technology.  As technology has advanced, we have aggressively sought to ensure that the rights to privacy and freedom of expression have evolved with it—and we have been quite successful.  Over the past few years, for example:

- We won what is widely considered the most significant U.S. Supreme Court decision on privacy in the digital age, *U.S. v. Carpenter*.  The victory marked the culmination of years of ACLU investigation, litigation, and public education around cell phone location tracking.

- The ACLU-led Community Control Over Police Surveillance campaign has helped to secure privacy-protecting laws or ordinances in 13 communities, including San Francisco's landmark ordinance banning face surveillance and restoring democratic control over other technologies, and Maine's groundbreaking new law on internet service provider privacy.

- We secured a historic settlement agreement with Facebook that prevents advertisers from being able to exclude users from learning about opportunities for housing, employment, or credit based on gender, age, or other protected characteristics.

- We helped to achieve a new policy from U.S. Customs and Border Protection (CBP), stating that officers at the border must have reasonable suspicion of unlawful activity or a national security concern before they can conduct an "advanced" search of the contents of an electronic device.

- Advocacy by the ACLU of California resulted in the first transparency reports by T-Mobile and Amazon, and led Twitter, Facebook, and Instagram to suspend access of user data to Geofeedia, a company that marketed its platform to law enforcement as a tool to monitor activists and protesters.

- A primer by the ACLU of California, *Privacy & Free Speech: It's Good for Business*, includes over 100 case studies and cutting-edge recommendations to help businesses build privacy and free speech protections into their products and business plans.

- We have released several widely covered reports to educate the public and policymakers on privacy issues.  For example:

– In June 2019, we released a report on video analytics—all the ways in addition to face recognition that artificial intelligence (AI) can be used to analyze and monitor video surveillance cameras.  AI can be used to identify our unique walks, social connections, emotional states, or "suspicious" behaviors.  Plugged into our existing "dumb" network of surveillance cameras—the most extensive in the world, per capita—AI could create a truly dystopian future that chills free speech and all but eliminates privacy.  We provide concrete recommendations to avoid such an outcome in our report.

– In June 2018, we released a report on malicious software updates, a tactic governments could use—and have tried to use—to help them with surveillance.  The report includes recommendations for companies and software developers to protect themselves and their clients from such moves, which threaten everyone's security, since they discourage people from applying legitimate software updates.

– In March 2018, we released a report on municipal Wi Fi service as a means to provide privacy, net neutrality, and wider internet access to communities nationwide.  The report explains the public internet option, describes various models for implementing it, and recommends core principles to which municipal Wi-Fi service should adhere.

■ ACLU engagement with internet standards-setting bodies has helped to secure privacy- and security-improving advancements to two of the core technologies powering the internet, transport layer security (TLS) and the domain name service (DNS).

## ORGANIZATION INFORMATION

**1. Name**

American Civil Liberties Union Foundation, Inc. [13-6213516]

**2. Founding and Development**

Since 1920, the ACLU[1] has been devoted to protecting the civil liberties of all people in the United States.  We work daily in courts, legislatures, and local communities to defend and preserve the freedoms guaranteed by the U.S. Constitution, state and federal civil rights laws, and international rights treaties by which the United States is bound.

---

[1] The "ACLU" comprises two related entities with a shared mission: the American Civil Liberties Union, a 501(c)(4) nonprofit organization, and the ACLU Foundation, a 501(c)(3) nonprofit organization.  The former engages primarily in lobbying, and the latter engages primarily in litigation, public education, and other nonlegislative advocacy.  Although this application mentions some (c)(4) work to show the breadth of our program, the entity making the request is the ACLU Foundation, and any funding would be used entirely for (c)(3) work.

The ACLU is one of America's largest, oldest, and best-known civil society organizations, with ACLU affiliate organizations in every U.S. state, Puerto Rico, and Washington, D.C. We receive no government funding.  Since November 2016, the number of ACLU members has tripled to 1.5 million individuals, our consolidated budget (ACLU plus ACLU Foundation) has nearly doubled, and our staff has increased both in number (40 percent) and in diversity.  The ACLU litigates more cases before the U.S. Supreme Court than any other nongovernmental organization and engages in policy advocacy in Congress and every U.S. state.  The ACLU is a founding member of the International Network of Civil Liberties Organizations, and we engage with international human rights bodies to advance our values.

In 2010, our longstanding Technology and Liberty Project became the Speech, Privacy, and Technology (SPT) Project, formalizing our commitment to these issues and recognizing their interdependence.  SPT is dedicated to protecting and expanding the freedoms of expression, association, and inquiry; expanding the right to privacy and increasing the control that individuals have over their personal information; and ensuring that civil liberties are enhanced rather than compromised by new advances in science and technology.  SPT is headquartered in New York City, with additional staff in San Francisco and Washington, D.C.

### 3. Current Goals

Although the ACLU works on a wide range of civil rights and liberties (see Current Programs below), digital privacy is one of only six organization-wide goals, along with criminal justice reform, immigrants' rights, LGBT equality, reproductive freedom, and voting rights.

SPT's current goals are:

- Reforming the third-party doctrine and ending warrantless electronic searches;
- Enabling secure and private communications;
- Ending dragnet surveillance;
- Improving cybersecurity through engagement with internet standards-setting bodies; and
- Ensuring that biometric- and AI-driven surveillance technologies are implemented with democratic oversight and in ways that respect civil rights and liberties.
- Ensuring that traditional free speech rights evolve with our increasingly digital lives; and
- Protecting journalists, sources, and press freedom.

### 4. Current Programs

In addition to SPT, the ACLU has 13 other teams organized around advancing our rights and liberties within specific, sometimes overlapping areas.  These teams include our Capital Punishment Project, Criminal Law Reform Project, Disability Rights Program,

3

Human Rights Program, Immigrants' Rights Project, LGBT & HIV Project, National Security Project, Prisoners' Rights Project, Project on Freedom of Religion and Belief, Racial Justice Program, Reproductive Freedom Project, Voting Rights Project, and Women's Rights Project.

**GRANT PROPOSAL**

### 5. Project Director

Ben Wizner, director, ACLU Speech, Privacy, and Technology Project

(212) 519-7860 / bwizner@aclu.org

### 6. Request Range

We request funds totaling between $750,000 and $1.5 million.  The budget we include under Use of Funds (#12) below assumes a grant roughly in the middle of this range, which we could scale up or down accordingly.  Funding at the low end would support substantial privacy and security work by the ACLU and ACLU of California, the largest state-based affiliate and a leader on data privacy, surveillance, and digital security issues.  Funding at the high end would ensure that our privacy and security work is fully funded and robust, greatly support complementary work by the ACLU of California, and enable the national ACLU to hire additional staff to coordinate and expand our work on ensuring that advances in AI and machine learning do not further erode privacy rights.

### 7. Summary

For the first time in human history, it is technologically and financially feasible for governments and corporations to record and store nearly complete records of human lives—our communications, our movements, our associations, and more.  For the most part, the law has not kept pace with these profound changes.

Our work is aimed at bridging that gap, and we have had successes.  In three recent cases—including *Carpenter*, in which the ACLU was counsel—the Supreme Court has recognized that advances in surveillance technology require a reconsideration of the Fourth Amendment.  For the first time in a generation, Congress is seriously considering new privacy legislation to protect consumers from the abuses of large technology companies.  And the public has woken up to these threats, demanding a say over the deployment of new surveillance technologies, and even calling for a moratorium on some, like facial recognition.

At the same time, rapid advances in artificial intelligence and machine learning are presenting grave new threats to privacy and related rights.  The increasing adoption of AI in both public and private decisions means that engaging with algorithmic systems is crucial to protecting civil rights and civil liberties in the 21st century.  The ACLU is uniquely well-positioned to address these issues.  It is the only organization that possesses deep expertise on both the impacts of digital systems and surveillance on

4

liberty, and the impacts of big-data driven tools on equality.  ACLU attorneys and technologists also work at the intersection of these technology-driven concerns, seeking to protect the rights of those often most harmed by the hasty adoption of new systems— members of groups already marginalized by discrimination and exclusion.  Additional resources will allow us to grow this work and provide guidance and direction to partner organizations.

Initial areas of focus will include facial recognition tools, predictive policing, surveillance by private vendors in public schools, and employers' use of software in hiring.

All of SPT's privacy goals and the ACLU's organization-wide digital privacy priority reflect a commitment to protecting the privacy and security of data.  While the ACLU's commitment to digital privacy and security is enduring, the areas in which we expect to focus our efforts over the next two years are described below under #11, Major Goals and Objectives of Project.

## 8. Approach

The ACLU is approaching data privacy and security through a multifront approach— combining litigation, records requests, public education, advocacy before companies and internet standards-setting bodies, and separately funded state and federal lobbying— precisely because we have found this approach to be most successful.  Indeed, most of our most impactful successes over the past few years in protecting data privacy and security have resulted from work on two or more fronts.

## 9. Support

At the low end of our requested support range, funds would help the ACLU continue critical efforts on data privacy and security, including litigation; public records requests and lawsuits; work with internet standards-setting bodies; and advocacy to encourage best practices by companies.  At the high end, support would enable us to grow and enhance our work considerably, most notably through the addition of staff to coordinate and expand our work on the unique threats to privacy posed by AI and machine learning. Rapid advances in facial recognition technologies have been the most visible manifestation of this development, but, as our recent report on video analytics demonstrates, there will be many others, and it is imperative that we impose legal and ethical restraints on these emerging technologies.

## 10. Enhancements to Internet Privacy and Security

We expect our multifront efforts to enhance internet privacy and security, as well as other digital privacy and security, in complementary ways.

Litigation can lead to protective new legal standards.  For example, our win in *Carpenter* requires law enforcement agencies to obtain warrants based on probable cause before requesting historical cell phone location data and sets the stage to extend this requirement to other sensitive digital information, such as prescription drug information. However, litigation–and even public records requests—can help achieve policy changes even apart from the legal outcome of a case.  For example, the U.S. Department of

5

Justice and U.S. Department of Homeland Security (DHS) formalized new policies requiring probable cause warrants before using cell-site simulators following ACLU litigation.  Likewise, CBP's reasonable suspicion standard for forensic device searches follows ACLU litigation.  Together these policies protect the privacy of thousands of people's data—as well as their security, since numerous recent breaches illustrate the government's failure to keep its own surveillance data safe.  Other policy changes we are pursuing—such as a warrant requirement for law enforcement to access data from prescription drug databases—could benefit millions of additional individuals.

Advocacy before internet standards-setting bodies can have a huge impact.  For example, potentially many millions of people worldwide benefit from the contributions of the ACLU to the latest revision of transport layer security 1.3 (TLS 1.3), DNS privacy, and secure email.

Public education can not only inform, but also mobilize individuals and businesses to act.  ACLU videos on privacy and technology have been viewed millions of times, for example, and the ACLU of California's primer *Privacy and Free Speech: It's Good for Business* offers numerous concrete recommendations to help companies protect their customers and bottom lines.

Engagement with companies—often alongside the other avenues of work—carries the potential to benefit millions of people at once.  For example, advocacy by the ACLU and ACLU of California have led to Google's commitment not to sell face surveillance technologies to governments and to Microsoft's call for legislation governing it, as well as the introduction of transparency reports by T-Mobile and Amazon and major social media platforms suspending Geofeedia's access to user data.

### 11. Major Goals and Objectives of Project

Our data privacy and security work currently falls within four major areas, each with its own goals and objectives.

## REFORMING THE THIRD-PARTY DOCTRINE AND ENDING WARRANTLESS ELECTRONIC SEARCHES

A central pillar of our privacy work has been to bring the Fourth Amendment into the 21st century by reforming or eliminating the "third-party doctrine," which denies constitutional protection to data shared with a third party.  We struck a major blow to the doctrine in June 2018, when the Supreme Court ruled in *Carpenter* that law enforcement must obtain warrants before demanding that cell phone companies hand over information showing where their customers have been and when.  In addition to recognizing the need to protect the highly sensitive location data on cell phones, the decision provides a path forward for safeguarding other sensitive digital information in future contexts.  We have since been involved in litigation to establish more widely that law enforcement needs warrants to mine sensitive personal location data beyond just historical cell phone records.  The court made clear that the third-party doctrine does not automatically apply to all digital information held by companies, and that certain kinds of records that are

6

particularly sensitive and private are protected by the Fourth Amendment. Our strategy going forward is threefold.

First, we will continue to push to expand the *Carpenter* rule to real-time cell phone tracking and other forms of location data.  We have already engaged on this issue in a few cases—including one in which the Supreme Judicial Court of Massachusetts recently delivered a sweeping opinion—and we expect to become involved in more.

Next, we will need to push beyond location records into other kinds of sensitive data, including records generated by in-home "internet of things" devices and personal health and biometric data that are stored by private companies.  For example, we are participating as a friend of the court to challenge the Drug Enforcement Agency's attempts to access a New Hampshire's prescription drug database records without a warrant, which state law requires.  We were previously involved in two unsuccessful efforts to establish a warrant requirement in similar cases in Oregon and Utah, both of which were decided before the Supreme Court's *Carpenter* decision.  We believe the current case presents a good opportunity to expand our win in *Carpenter* to another type of highly sensitive and pervasive digital data.

Over the longer term, we aim make new inroads against other anachronistic doctrines that simply no longer hold water in the digital age, such as the so-called "border-search exception" to the Fourth Amendment's warrant requirement.

We are currently engaged in litigation to establish a warrant requirement for device searches at the border, led by our case *Alasaad v. Nielsen*, in which we recently moved for summary judgment.  We will also continue to file amicus briefs in criminal appeals involving this issue, and to advocate against increased vetting of visitors' social media accounts through our continuing Freedom of Information Act (FOIA) litigation.

## ENABLING SECURE AND PRIVATE COMMUNICATIONS

Government efforts to ensure that companies do not deploy encryption that the government cannot circumvent are expanding in the United States and elsewhere.  The government has shifted its strategy from demanding new legislation requiring backdoors in encryption to arguing that providers are already obligated to develop new surveillance capabilities under existing laws.  For example, since November 2018, we have been litigating to unseal court records in a possible replay of 2016's *FBI v. Apple* litigation, this time with the FBI moving to hold Facebook in contempt for its refusal to undermine the security of its own service, Facebook Messenger.

The ACLU expects to be at the forefront of litigation, cybersecurity advocacy (see below), and separately funded legislative efforts to defend encryption and other means of ensuring communications security.  We have been building our relationships with key tech companies to strengthen our coalition in preparation for what may be a major fight this year.  At the same time, we will work to ensure that rampant government hacking is not adopted as the answer to more widespread encryption.

We will also monitor the proliferation of law enforcement requests to Amazon and other purveyors of in-home assistants like Alexa and Google Home for audio recordings

7

captured by those devices.  While the machines purportedly do not capture ambient communications, we believe it is only a matter of time before law enforcement seeks to force purveyors to surreptitiously turn on cameras and microphones—if they have not done so already.  With or without a warrant, this is would be an exceedingly dangerous development.

In addition, we will increase our public education around the risks of such devices and other cutting-edge technologies through our "Free Future" blog, other social media channels, reports, and media outreach.

## IMPROVING CYBERSECURITY THROUGH ENGAGEMENT WITH INTERNET STANDARDS-SETTING BODIES

Much of modern speech and assembly happens on the internet.  When people use online systems to communicate, they leak significant amounts of data by default to the invisible parties that operate the networks.  This opens the door to silent, widespread surveillance that has troubling civil liberties implications for freedom of speech, privacy, and freedom of association.  A major focus of ACLU technologists is reducing that leakage through standards bodies like the Internet Engineering Task Force, which set expectations about how machines across the globe talk to each other.

Our technologists will continue their work on a variety of priority projects, including making encrypted email more widely accessible; securing group chats, which pose more security risks than one-on-one messaging; and improving privacy protections for DNS, which connects users with the network services they use, such as www.aclu.org or www.cnn.com.

## ENSURING THAT BIOMETRIC- AND AI-DRIVEN SURVEILLANCE TECHNOLOGIES ARE IMPLEMENTED WITH DEMOCRATIC OVERSIGHT AND IN WAYS THAT RESPECT CIVIL RIGHTS AND LIBERTIES

For years, a great surveillance machine has been growing up around us.  The United States already deploys more surveillance cameras per capita than any other nation, but most of the footage is never reviewed.  However, technologies that simply collect and store information in case it might be needed—so called "dumb" surveillance—are rapidly evolving into "smart" technologies that actively watch people, often in real time, and analyze our activities for suspicious patterns.

In fact, significant advances in AI and related technologies threaten to fundamentally transform the surveillance landscape and all but eliminate public anonymity.  At this stage, our primary push-back has taken the form of public education (such as our recently released report on intelligent video analytics), demands for transparency and meaningful public control, and legislation.

We will continue to partner with ACLU affiliates in pushing for corporate accountability and policies preventing sale of face surveillance technology to law enforcement, as well as continue legislative advocacy to help achieve local legislation banning law

enforcement use of surveillance technologies and to prevent bad legislation from advancing at the federal level.  We will also be developing litigation strategies and watching for litigation opportunities, just as we did for several years in the line of cell phone-location tracking cases that culminated in the *Carpenter* decision.

We are also pushing back through FOIA requests against the deployment of biometric surveillance techniques by DHS and other federal agencies and will consider litigation if appropriate opportunities arise.

**12. Use of Funds**

We expect to apply a grant near the middle of our range ($1,170,000) as follows:

**SALARIES/BENEFITS:**

New data surveillance/AI counsel: $150,000;

Other ACLU privacy/surveillance attorneys: $618,000;

ACLU of California privacy/surveillance attorneys: $205,000.

> ***Total Salaries/Benefits: $973,000***

**OTHER ACLU AND ACLU OF CALIFORNIA COSTS:**

Litigation: $5,000

Travel (for data surveillance advocacy):  $11,000

Public education on data surveillance: $11,000

Office costs (includes phones, equipment, rent, IT): $57,000

Administrative overhead (includes time dedicated to this surveillance work by ACLU development, executive, human resources, and finance department staff): $113,000

> ***Total Other Costs: $197,000***

**TOTAL BUDGET: $1,170,000**

We would scale our work up or down accordingly to match any funding above or below this amount.

**13. Target Population**

Given our focus on the privacy and security of data of, from, or about individuals, the primary target population consists of all "U.S. persons"—that is, U.S. citizens, wherever in the world they reside, as well as any individual residing within the United States. However, aspects of our work will likely benefit the privacy and security of non-U.S. persons as well.

### 14. Individuals Served

While it is impossible to predict with certainty how many individuals will benefit from our work over a year, we expect to achieve at least one concrete change in policy or legal standards that meaningfully improves the privacy or security of more than 1 million individuals, and at least one change to internet standards or business practices that stands to benefit more than 5 million individuals.

### 15/16. Timeline and Project Completion

Given the ACLU's commitment to data privacy and security, we expect that we will always be looking to advance protections for consumers or defending protections we have already won.  That being said, we expect to achieve at least two meaningful improvements to data privacy and/or security within a year of funding.

### 17. Project Support

The ACLU's Speech, Privacy, and Technology Project's data surveillance work is also funded by the John D. and Catherine T. MacArthur Foundation ($250,000 committed) and the LuEsther T. Mertz Charitable Trust ($150,000 committed), as well as projected grants from the Fritt Ord Foundation ($25,000), New York Community Trust ($30,000), and individual donors ($90,000).  In addition, expenses above revenue will be covered by ACLU general funds.

## UTILIZATION OF DATA

### 18. Evaluating Success

The success of the grant will be assessed in an ongoing basis at SPT's biweekly meetings, and as part of a formal look back/look forward process SPT engages in every year.  It will also be assessed as part of a formal look back/look forward process the ACLU engages in for our organizational priorities.  We will evaluate project success primarily by looking at whether we achieved tangible new protections for 1) the privacy of consumers' data (such as a new warrant requirement to access patients' prescription information, or wider deployment of encrypted email), and 2) the security of consumers' and/or businesses' data (such as adoption of best practices for data retention and storage).  We will also gauge the success of the ACLU's public education efforts through blog posts, op-eds, and earned media.

### 19. Court Updates

We propose submitting a short narrative report with hyperlinks highlighting our work (and, if funding permits, new ACLU staff) to be submitted six months after receipt of funding, with a longer narrative report (about 5–9 pages) more fully detailing supported activities, challenges/opportunities, and lessons learned to be submitted a month after the cy pres grant period has ended.  However, we are open to reporting in a different format and/or frequency at the court's convenience.

10

## 20. Project Results

Our project focuses on policies, legal standards, and technical solutions for data privacy and security rather than the data itself.  We expect to promulgate court victories, positions on best practices, and/or new technical standards, and to educate the public and businesses about risks to privacy and security and how to mitigate them.  This information will be disseminated through the ACLU's dedicated *Free Future* blog, the ACLU's extensive social media channels, and media outreach, and any changes to agency policies or legal standards will be published in the Federal Register (or state counterparts) or court opinions.  Depending on circumstances and funding level, we may also publish a report or white paper on a relevant privacy/security issue.

### MISCELLANEOUS

## 21. ACLU Relationship to Firms

Spector Roseman Kodroff & Willis PC: we are not aware of any relationship and have not been in contact with Spector Roseman about the Google Street View case or settlement apart from this application.

Cohen Milstein Sellers & Toll PLLC: Cohen Milstein has co-counseled several cases with the ACLU or ACLU state-based affiliates.  For example, the firm recently filed a lawsuit with the ACLU of Maryland to stop the Prince George's County Board of Education from charging fees for summer school, and with the ACLU Women's Rights Project against AT&T for violating the Pregnancy Discrimination Act.  Apart from this application, we have not been in contact with Cohen Milstein about the Google Street View case or settlement.

Lieff Cabraser Heimann & Bernstein LLP: The ACLU and ACLU of Michigan filed a lawsuit with Lieff Cabraser in 2012 against Morgan Stanley for violating federal civil rights laws by providing strong incentives to a subprime lender to originate mortgages that were likely to be foreclosed on.  The firm may have co-counseled other cases with the national ACLU or state ACLU affiliates of which we are not immediately aware.  Lieff Cabraser advised the ACLU of the possible Google Street View case and cy pres pool and invited us to apply.

## 22. Other Cy Pres Funding

The ACLU has occasionally received cy pres funding to advance our privacy work, most notably $716,000 through the Google Buzz privacy litigation settlement (2011–2012) and $70,000 from the Digital Trust Foundation (2015–2016) as part of the *Lane v. Facebook* settlement.

11

**23. Google/Alphabet Support**

The ACLU has received over $2.5 million from Google/Alphabet primarily through employee giving, employer matches, and employee-driven donations, but neither Google nor Alphabet has otherwise been a significant ACLU donor.

# EXHIBIT I



**Advancing Consumer Privacy and Security**
**June 2019**

**Name of Organization**

Consumer Reports, Inc. [A 501(c)(3) non-profit organization]

**Discuss the founding and development of the organization. Explain the original issue and/or opportunity the organization was founded to address and how that may have changed over time.**

In the 1930s, as products became increasingly complex and the gloss of advertising replaced objective facts, our founders sought to deliver trusted information to help consumers shape the marketplace to be safer, fairer, and healthier for everyone. For more than 80 years, Consumers Reports' independent product testing, solutions journalism, and advocacy has made us a trusted partner to millions of consumers. We helped deliver some of the 20th century's landmark consumer victories, driving the introduction of seat belts, warning of the health risks of cigarettes, and leading the movement to ban the chemical Bisphenol-A (BPA) in baby bottles, sippy cups, and food packaging. For the past five years, we have been working to address the challenge of the digital marketplace.

Digital technologies have been part of the consumer landscape for many decades. Yet, in recent years, we have seen dramatic growth in the pervasiveness of their use and the speed of their development. Today's embedded technology makes life easier, but also places our security and privacy at risk. The market challenge presented by these shifts is enormous, pressing, and bewildering. Consumers face new dangers including identity theft, discrimination in pricing and access to services via algorithms that favor factors beyond their control and scrutiny, and fundamental and comprehensive invasions of their privacy through unprecedented data collection and tracking. Privacy, security, and individual control are replacing safety, price, and value as the metrics through which product and service quality—and corporate accountability—will be measured in the 21st century.

**Describe the organization's current goals.**

Consumer Reports (CR) advances the interests of consumers in the marketplace. We empower consumers with information so they can make decisions in their own interests. We encourage industry to act responsibly and improve products and services. And we educate and motivate rulemakers to prioritize the rights and interests of consumers.

Traditionally, our work has encompassed a broad range of issues across cars and transportation, technology and electronics, health, food and nutrition, home energy, and personal finance. While we continue to work on a full suite of consumer issues, our current, unifying priority is to understand how ubiquitous connectivity, the large-scale collection of personal data, and a consolidation of corporate power in Silicon Valley are threatening Americans' security, undermining privacy, and eroding our ability to assert control in the marketplace. We are committed to empowering consumers to understand, navigate, and shape the digital market.

**Provide a brief description of the organization's current programs. Include population and numbers served, as well as expected results.**

Consumer Reports' programs include testing thousands of products a year, producing a broad portfolio of media properties, and mobilizing our more than six million members in state and federal advocacy efforts.

**Research & Testing**

Consumer Reports provides consumers with more than 9,000 ratings and reviews of products and services determined by testing and analysis conducted across 63 labs at our National Headquarters and Testing Center in Yonkers, New York, and at our 327-acre Auto Test Center in Colchester, Connecticut. CR's Survey Research team surveys hundreds of thousands of our organization's members each year, as well as conducting dozens of surveys of the US general population.

**Media & Communications**

Our media programs seek to inform consumers and shape the marketplace through expert-driven product reviews, award-winning investigative journalism, trusted consumer guidance, and non-partisan reporting on the regulatory and safety rules and standards that impact consumers. With a team of roughly 140 writers and editors, designers, and video, social media and web producers, as well as a multimedia operations staff, CR reaches tens of millions of people each month. Our audience includes more than 14 million unique monthly visitors to

our flagship website, ConsumerReports.org, the approximately 3.4 million who receive *Consumer Reports* magazine, and the millions we reach through broadcast television. In addition to partnering with more than 150 TV stations in North America to regularly highlight consumer issues, we recently launched our own nationally-broadcast show. Available in English as *Consumer 101* as part of NBC's Saturday morning programming block and in Spanish as *Taller del Consumidor* as a part of Tellemundo's programming, this award-winning show has a weekly audience of approximately one million viewers, with some episodes reaching 1.4 million viewers. In addition to our own programs, CR is a regular contributor to media properties including the *New York Times* and the *Washington Post*, *Good Morning America* and the *Today Show*, and countless special interest websites across the Internet, extending our audience into the 100s of millions.

**Advocacy & Mobilization**

The advocacy division of Consumer Reports directs our efforts to secure strong pro-consumer policies and practices in government and across industries. We have won important victories for consumers to ensure that the cars, food, and other products we buy are safe, to raise the standards for financial services, and to improve health and well-being. We insist that manufacturers, retailers, government agencies, and others be clear and honest. We advocate for truth and transparency wherever information is hidden or unclear. And we push companies to address and remedy quickly issues with their products and services.

**Our Current Focus: The Digital Lab**

In 2015, CR launched a strategy to champion consumer interests in the digital market. With leadership gifts from Craig Newmark Philanthropies, the Ford Foundation, and the William & Flora Hewlett Foundation, we are asserting a vision and framework for the market that restores individual agency over privacy, data, and security. Early results of this effort include:

- CR's launch of The Digital Standard, an open, and collaborative effort to create a digital privacy and security standard to help guide the future design of consumer software, digital platforms and services, and Internet-connected products. The Standard provides a framework for a common understanding by consumers, industry, and rulemakers in order to advance the benefits of connected technology while mitigating the costs. The launch of the Standard led to direct and constructive engagement with Apple, Facebook, Google, GE, Nike, and Samsung—all of which sought more information on how they could better bring their practices in line with the principles of the Standard.
- CR's testing, based on the Digital Standard, has led to the discovery of disturbing security vulnerabilities in Glow, a mobile app designed to help women track

their menstrual cycles and fertility, and [hacking vulnerabilities in smart TVs](). CR has also produced the first-ever comparative ratings of [peer-to-peer payment services](). As a sign of our reputation and influence, nearly all of the companies we rated have engaged in our process, responding to our questions, with the poor performers committing to fixing the issues with their products. As further indicators of the weight of CR's reputation, Microsoft, in recommendations for facial recognition legislation, has suggested CR as the honest broker to conduct testing. Tim Cook, CEO of Apple, referenced our ratings of Apple Pay during an earnings call with public investors.

- CR's [data-intensive]() investigative report, produced in partnership with *ProPublica*, documented how auto insurance companies charge higher rates for people living in predominantly-minority neighborhoods, compared to mostly-white neighborhoods with similar insurance risk. The article catalyzed an investigation by the California Department of Insurance and, ultimately, [legislation]().

- CR's extensive solutions journalism, with articles such as [6 Easy Opt-Outs to Protect Your Privacy]() and just-in-time advice like [Equifax Data Breach: What Consumers Need to Know](), has won multiple awards, including a [min's Editorial and Design award]() for the magazine cover story and online supplements, "[66 Ways to Protect Your Privacy Right Now]()" as well as several [Folio awards]().

- CR expertise is reflected in major media outlets, from interviews in *Recode* ([Can Consumers Save Their Own Privacy]()?) and *Wired* ([Beyond Facebook: It's High Time for Stronger Privacy Laws]()), as well as in Congress and State government. Our experts provided regular testimony to industry bodies, regulatory agencies, and Congress, elevating consumers' interests in privacy, security, and data. CR has played a pivotal role in many important consumer victories, including the passage of the California Consumer Privacy Act (CCPA) and the Internet of Things Cyber Security Law, the New York State Stop Hacks and Improve Electronic Data Security (SHIELD) Law, and the Maine Act to Protect the Privacy of Online Consumer Information.

With more than four years of accomplishments across our testing, journalism, and advocacy, we have demonstrated our ability to continue CR's rich legacy of consumer victories in the digital market.

**Identify the principal Investigator/Project Director.**

**Justin Brookman, Director, Consumer Privacy and Technology,** guides CR's groundbreaking work to shape the digital marketplace in ways that empower consumers and prioritize their data privacy and security needs. Brookman uses CR research to identify critical gaps in consumer privacy, data security, and

technology law and policy, and helps to develop strategies to expand the use and influence of the Digital Standard.

Prior to joining CR, Brookman was Policy Director of the Federal Trade Commission's Office of Technology Research and Investigation. At the FTC, Brookman conducted and published original research on consumer protection issues raised by emerging technologies such as cross-device tracking, smartphone security, and the Internet of Things. He also helped initiate and investigate enforcement actions against deceptive or unfair practices, including actions against online data brokers and digital tracking companies.

He previously served as Director of Consumer Privacy at the Center for Democracy & Technology (CDT), a digital rights nonprofit, where he coordinated CDT's advocacy for stronger protections for personal information in the United States and Europe.

Brookman also served as an Assistant Attorney General and, later, Chief of the Internet Bureau in the New York Attorney General's office, where he brought consumer protection actions on a wide range of issues, including privacy, free speech, data security, and net neutrality. He began his career as a litigation associate at Fried, Frank, Harris, Shriver & Jacobson LLP. He received his J.D. from the New York University School of Law and his B.A. from the University of Virginia.

**Explain how much money you are requesting.**

Consumer Reports seeks a commitment of $969,249 to amplify and expand our work protecting consumer privacy and security in the digital market. The funds will be committed to key staff and program expenses across our privacy- and security-related testing, journalism, advocacy, consumer education, and communications practices. A detailed budget is appended to this proposal.

**Provide a summary of the plan for the program or project request. Include the issue and/or opportunity addressed, goals and objectives, activities, and timeline.**

To keep pace with the expanding scope and influence of connected products and services, Consumer Reports is developing new strategies to address systemic challenges to privacy, security, and individual control. Through the resources provided through this award, we will continue to advance the interests of consumers in the digital market by:

- Researching consumers' understanding, behavior, and attitudes on digital privacy and security;
- Designing and implementing tests to evaluate technology products, services, and platforms on their collection, use, and protection of personal consumer data; and
- Educating and mobilizing consumers through compelling content about privacy and security, including the dissemination of test results and the provision of actionable information.

Our plan to restore privacy, security, and individual control in the digital market has manifested as a re-imagined, digital core to CR: the Digital Lab. Functioning as a strategic priority and guiding purpose across all of CR, the activities of the Lab include:

**Research, Testing & Ratings**

CR's core strength is our ability to test and rate products and services for how well they serve the individual and shared interests of consumers. Maintaining this capacity in the digital market requires tackling significant challenges, including:

- Measuring the impact of connected devices in live ecosystems;
- Figuring out how to discover and evaluate the internal workings of Facebook and the other platforms without compromising our independence; and
- Working with expert communities to define personal safety and other consumer harms and vulnerabilities.

Our capacity to conduct mechanistic testing of traditional products is the result of decades of investment in talent, methodology, and infrastructure. We have initiated the same scale and tenacity of effort to tackle the complexities of digital products and services.

**Journalism & Communications**

Our solutions and investigative journalism drive our reach and relevance, giving consumers the information they need to guide their decisions, bringing understanding to new market practices, and shining a light on abusive and discriminatory practices. We will invest in our capacity to:

- Provide consumers with the information they need to guide their decisions and assert themselves within the digital market;
- Produce long-form reporting and interactive data visualization tools on key privacy and security issues; and
- Partner with like-minded outlets to conduct data-driven investigations into abusive market practices.

6

We will continue to invest in the award-winning editorial work that is establishing CR as a must-read source of tech news, digital marketplace guidance, and consumer advocacy.

**Advocacy & Mobilization**
CR has a long-standing reputation with regulators, policymakers, and corporate executives as a non-partisan, fair, and evidence-driven arbiter of consumer interests, opinions, and rights. Maintaining this position in the digital market requires that we:

- Continue to build our digital talent and expertise;
- Publish analysis that shapes the national and international conversation; and
- Engage directly and constructively with the industry, government, and civil society leaders shaping the market.

We understand the importance and power of an approach that balances holding corporations and regulators to account, fostering constructive dialogue within and across industry and rulemakers, and the celebrating best practices.

While this work is anticipated to stretch over the next several years, we have put forward a budget that would see the funds awarded under the cy pres support 50% of the Digital Lab's leadership and key staff for a period of one year. Given the attention being paid to issues of consumer privacy and security at the moment, the next twelve months will be critical to establishing long-term consumer understanding and protections.

**Explain why the organization is approaching the issue and/or opportunity in this way.**

CR's programmatic approach is grounded in a proven, market-based theory of change.

**Shaping Demand:** We shape demand through our renowned testing and ratings that equip consumers to understand which products and services in the marketplace align most closely with their needs and values—and which fall short. We anchor our testing and reviews in scientific rigor and fact, offering expertise that far surpasses the analytical value of user reviews, and avoiding the subjective opinions and hidden biases found on less-than-transparent advertising-driven review sites. We engage and inform consumers through fearless journalism that shines a light on both broad and narrow marketplace failures and raises consumer voices. We help consumers to become more knowledgeable about the markets they interact with every day, enabling them to bend the marketplace through the collective power of their informed choices.

**Shaping Supply:** Our testing, ratings, and journalism allow consumers and CR to exert influence over businesses before and after products and services hit the market. We design our ratings to incentivize the features, behaviors, and attributes that best serve consumers and contribute to fairer, healthier, and safer outcomes more broadly. We share testing data and survey results to bring the voices, needs, and values of consumers to bear in product design. We empower consumers to have a say *proactively* rather than merely *reactively,* creating an "upstream impact" that quashes unworthy products and services while facilitating the design and delivery to market of safer, healthier, more secure products and services. We also equip consumers to react to marketplace issues by equipping them with the information and amplification necessary to hold bad actors accountable.

**Shaping Rules:** We combine our technical expertise, our bullhorn of consumer voices, and our historic data-driven advocacy to advance and safeguard pro-consumer rules and laws while fighting policies that are detrimental to equity, transparency, safety, privacy, financial security, and public health. CR marries expertise with the strategic use of independent consumer data and analysis—bringing the collective voices of informed consumers together with scientific insights directly into statehouses and agencies across the country. By alerting consumers to marketplace failures and mobilizing consumer communities when and where their interests are at stake, we imbue their voices with meaningful civic power, resulting in rules, laws, and standards that better reflect consumer values and needs.

Historically, we have used these levers to evaluate and shape markets based on how well they delivered value, safety, and fair prices through transparency and competition. As ubiquitous connectivity, the large-scale collection of personal data, and a consolidation of corporate power in Silicon Valley have fundamentally reshaped the marketplace, CR began to redefine the rights of consumers for the digital age. We are developing new thinking in our analysis, new tools in our labs, and new, distributed, and dynamic forms of participation and mobilization to respond to the marketplace in which products and services collect, analyze, and exploit the data of users' actions, attributes, and decisions.

**Will the money be used to continue an existing project or create a new project?**

The investment will support CR's Digital Lab, an initiative to address the data privacy and security issues faced by consumers in a marketplace fueled by personal data. The Lab builds on the last three years of CR's efforts to adapt to the changing marketplace by scaling its expertise in product testing and research, investigative journalism, and advocacy for the digital era.

8

**If a continuing project, please provide all other funding sources.**

CR's Digital Lab and our work on behalf of consumers to improve privacy, security, and fairness in the digital marketplace is supported both by our operating funds and philanthropic investments. As an organization, we secure revenue from memberships, strategic partnerships, and shopping (CR collects a fee for purchases made through links to our publications). CR does not accept advertising, sponsorships, gifts, or free samples from manufacturers. Our philanthropic support includes more than 550,000 individual donors as well as foundations committed to supporting consumers' interests and rights.

Early investments from the Craig Newmark Philanthropies, the Ford Foundation, the William & Flora Hewlett Foundation, and the Alfred P. Sloan foundation played a pivotal role in building CR's privacy, security, and data program. As we secure additional support for the Digital Lab, we will continue to expand our scope to address the systemic challenges to access, transparency, and control that require new strategies to reveal and grow consumer power.

**Specifically explain how this money will be used to enhance internet privacy and/or internet security for consumers and businesses.**

An award to Consumer Reports made through this Cy Pres will allow us to:

- Advance new understanding of consumers' expectations, behavior, and attitudes on digital privacy and security;
- Design and implement tests to rate technology products, services, and platforms on their collection, use, and protection of personal consumer data; and
- Educate and mobilize consumers through compelling content about privacy and security, including the dissemination of test results and the provision of actionable information.

Costs involved in conducting these activities include CR staff in our testing, content, advocacy, and mobilization units; consulting and contracting fees associated with developing testing strategies and conduct tests; as well as direct costs associated with testing including purchasing test samples. All cy pres funds will be committed to supporting the key leadership and program staff who conduct the work of the Digital Lab and its mandate to advance the privacy and security interests of consumers. A detailed budget is appended to this proposal.

**What are the major goals and objectives of this project?**

Our goal is to drive change in the marketplace that asserts consumers' interests for privacy, security, transparency, equity, and control. Our objectives include:

- Empowering consumers with the knowledge and tools they need to make smarter choices
- Galvanizing industry to bring better products and services to market by driving competition on products and promoting the results of our research; and
- Championing consumers interests in legislative and regulatory discussions, promoting policies that address consumer need, increase transparency, and level the playing field in the digital economy.

This project is the next, incremental step in the development of Consumer Reports' efforts to support consumer rights in the digital marketplace.

**Explain exactly how the money will be utilized to accomplish the goal and/or objective identified.**

Since its founding in 1936, CR has delivered a rigorous approach to advancing consumers' interest in the marketplace. Our theory of change integrates empowering consumers to make informed choices, working with manufacturers to bring beneficial products and services to market, and encouraging rulemakers to establish terms that ensure the best possible outcomes. This strategy takes shape as rigorous testing and research, award-winning journalism, wide-reaching communications, expert policy analysis, and meaningful consumer education and engagement. Each of these activities is led by professional executives and practitioners, leverages significant lab and testing infrastructure, and benefits from broad marketing and engagement programs. The funds committed under this cy pres award will be used to support the key program staff and leadership working to expand the privacy and security mandate of the Digital Lab. A detailed budget is appended to this proposal.

**What target population will your project benefit?**

CR and the work of the Digital Lab is grounded in a commitment to serve all Americans. While privacy is a concern for all consumers, certain racial or ethnic communities as well as financially disadvantaged people can experience disproportionate privacy vulnerabilities. Free versions of products, more appealing to price-sensitive consumers, can carry higher risk of data misuse. As evidenced by our recent collaboration with ProPublica about bias in the auto insurance market, widespread, often indiscriminate, use of algorithms across big

10

data sets can lead to huge socio-economic and cultural biases in pricing as well as product and service offerings available to consumers. Consumer Reports takes these realities into account when designing our program activities.

**How many individuals or households will be served by the project?**

For decades, Consumer Reports has been a driving force in changing the standards of many industries. Seat belts and car rear view cameras are, thanks largely to our efforts, standard equipment. Our analysis and reporting of the use of medically unnecessary antibiotics in the chicken supply chain helped to prompt more than half of the top 25 restaurant chains to commit to responsible antibiotics use in chicken production. These efforts have served hundreds of millions of Americans.

The work of CR's Digital Lab aspires to the same scale. The consolidation of power in Silicon Valley mean changes in a single platform have the potential to influence the lives of hundreds of millions. For example, Amazon Prime has more than 100 million members and about 69% of Americans use Facebook. By influencing the standards that shape the development of technology over time, we have the potential not only to serve hundreds of millions today, but, like the development of automotive safety equipment, create a safer world for decades to come.

**When will the project be completed?**

The Digital Lab is a multi-year strategy designed to tackle the vast scope and complication of privacy and security issues in the digital market. Funds committed under this award will be invested to activities taking place within a one-year period. If the award is made by September 1, 2019, we anticipate completing the work supported by this award by August 31, 2020.

**If the project will be continued beyond a year after receiving the grant, please describe when the project will be completed.**

CR's work under the Digital Lab will take place over the coming decades, evolving to deal with emerging concerns, achieving victories and meaningful protections for consumers, and shaping the way technology companies approach privacy and security issues. Our mandate will be complete when consumers have successfully shaped the digital market to prioritize their privacy and security concerns above other, supply-side motivations.

**Is this project going to be funded by any other sources in addition to the proposed grant?**

Yes.

**a.  If yes, by whom and how much?**

CR's Digital Lab currently is stewarding investments from Craig Newmark Philanthropies ($7 million), the Ford Foundation ($1.5 million), and the Alfred P. Sloan Foundation ($342,079).

**Describe how you will evaluate the success of the grant on improving internet privacy and/or internet security for consumers and businesses.**

The scale and scope of the challenges to privacy and security make it difficult to make discrete assessments of the impact of our work over a, relatively speaking, short project period. As a result, we will employ a formative evaluation strategy designed to gauge changes in consumer, industry, and rulemaker understanding and behavior. This will include tracking consumer engagement in our media (number of views, shares, comments, etc.), consumer engagement in our mobilization efforts (number of participants, frequency of involvement), engagement of industry in our testing process (including responsiveness to our inquiries, commitment to address problems we discover, etc.), and engagement of rulemakers (including participation in congressional hearings, solicitation of CR expertise, etc.). We will also track consumer victories for privacy and security, such as when we identified bugs on Facebook and compelled changes in company practice. We will define specific targets for these victories over the course of the year based on our testing, analysis, and emerging threats. In addition, we will track changes in the degree to which:

- Consumers are educated and better able to wield informed choice in the digital marketplace;
- Consumer-centric privacy, security, and data practices gain priority for manufacturers and lawmakers;
- Privacy, security, and user control become more prominent in the design and regulation of products and services;
- Companies begin to compete on the basis of the security and privacy protections they offer; and
- Consumers are motivated, actively engaged, and have a voice in creating strong protections governing their privacy and ownership of their data and devices.

12

We will augment our understanding through the work of our market and survey research teams that survey hundreds of thousands of our members each year as well as the general population.

**Describe how often and what the form of evaluation you will provide to the Court during the course of the project and upon completion.**

We will provide the Court with a mid-project update and a final, summative report detailing our activities and our assessment of the impact of our work based on our surveys and other metrics.

**Other than providing this information to the Court, do you intend to use the results of the project in any publications, conference papers, and presentations? If so, please identify.**

CR's impact in the marketplace is grounded in our work to inform and empower consumers**.** We intend to use the results of our research in our magazine (print and online), TV segments and potentially in the *Consumer 101* television show, and in our social media. As part of our outreach to industry, we anticipate using results from the project at conferences and for presentations to industry associations. For rulemakers, the work of this project will inform our testimony and public comments.

**Do you have any relationship to the law firms (i) Spector, Roseman, Kodroff & Wills, PC; (ii) Cohen, Milstein, Sellers & Toll PLLC; (iii) Lieff, Cabraser, Heimann & Bernstein LLP; (iv) or any lawyers at those firms?**

No, CR does not have any relationship to those law firms.

**Have you ever received cy pres money previously?**

Yes, CR has previously received cy pres money.

**a.   If yes, please explain.**

Consumer Reports has been the recipient of more than two dozen cy pres awards since the 1980s. CR will accept cy pres awards when:

- Reasonable efforts to find all of the aggrieved parties who otherwise would be compensated have failed and/or where payment to specific individuals is impractical or not cost effective;
- There is no possibility of defense or class counsel exercising undue influence over CR;
- CR assesses the settlement as a reasonable one in light of the nature of the case and that any legal fees paid out of the settlement do not appear to be unreasonable; and
- The designation of CR as a recipient is acceptable to the court and is not made exclusively by the defendant(s) or defense counsel over the objections of the plaintiff class or plaintiff's counsel.

The manner in which CR uses cy pres funds is determined by (a) our mission and charitable purposes, (b) any directions imposed by the court, (c) service, in CR's best judgment, of the interests of the class which the settlement or judgment seeks to protect, and/or (d) furtherance of the pro-consumer goals and objectives of the underlying action.

**Within the last 3 years have you received any money from Google or its parent company Alphabet, Inc.**

Consumer Reports has not received any philanthropic investments from Google or its parent company Alphabet, Inc within the last three years. CR did receive funds from the Google AdWords Class Action Settlement.

**b.   If yes, please identify the amounts and the purposes of the money.**

We received $45,424.37, which we committed to program expenses related to the topic of the class action.

**CR Digital Lab - Budget**

| Key Program Leadership | Status | M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 | M11 | M12 | TOTAL | Cy Pres $ | Other $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title | | | | | | | | | | | | | | | | |
| Director, Consumer Privacy & Technology | FTE | $25,500 | $25,500 | $25,500 | $25,500 | $25,500 | $25,500 | $25,500 | $25,500 | $25,500 | $25,500 | $25,500 | $25,500 | $306,000 | $153,000 | $153,000 |
| Director, Digital Lab | FTE | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $375,000 | $187,500 | $187,500 |
| | | **$56,750** | **$56,750** | **$56,750** | **$56,750** | **$56,750** | **$56,750** | **$56,750** | **$56,750** | **$56,750** | **$56,750** | **$56,750** | **$56,750** | **$681,000** | **$340,500** | **$340,500** |

| Key Program Staff | Status | M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 | M11 | M12 | TOTAL | Cy Pres $ | Other $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Research, Testing & Ratings** | | | | | | | | | | | | | | | | |
| Title | Status | | | | | | | | | | | | | | | |
| Program Manager, Product Testing - Privacy | FTE | $17,500 | $17,500 | $17,500 | $17,500 | $17,500 | $17,500 | $17,500 | $17,500 | $21,888 | $21,888 | $21,888 | $21,888 | $227,550 | $113,775 | $113,775 |
| Project Test Leader - Privacy | FTE | $11,687 | $11,687 | $11,687 | $11,687 | $11,687 | $11,687 | $11,687 | $11,687 | $11,687 | $11,687 | $11,687 | $11,687 | $140,247 | $70,124 | $70,124 |
| | | **$29,187** | **$29,187** | **$29,187** | **$29,187** | **$29,187** | **$29,187** | **$29,187** | **$29,187** | **$33,575** | **$33,575** | **$33,575** | **$33,575** | **$367,797** | **$183,899** | **$183,899** |

| Journalism & Communications | Status | M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 | M11 | M12 | TOTAL | Cy Pres $ | Other $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title | Status | | | | | | | | | | | | | | | |
| Electronics Content Development Team Leader | FTE | $21,888 | $21,888 | $21,888 | $21,888 | $21,888 | $21,888 | $21,888 | $21,888 | $21,888 | $21,888 | $21,888 | $21,888 | $262,650 | $131,325 | $131,325 |
| Senior Director, Strategic Communications | FTE | $29,325 | $29,325 | $29,325 | $29,325 | $29,325 | $29,325 | $29,325 | $29,325 | $29,325 | $29,325 | $29,325 | $29,325 | $351,900 | $175,950 | $175,950 |
| | | **$51,213** | **$51,213** | **$51,213** | **$51,213** | **$51,213** | **$51,213** | **$51,213** | **$51,213** | **$51,213** | **$51,213** | **$51,213** | **$51,213** | **$614,550** | **$307,275** | **$307,275** |

| Advocacy & Mobilization | Status | M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 | M11 | M12 | TOTAL | Cy Pres $ | Other $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title | Status | | | | | | | | | | | | | | | |
| Policy Counsel, Technology | FTE | $11,054 | $11,054 | $11,054 | $11,054 | $11,054 | $11,054 | $11,054 | $11,054 | $11,054 | $11,054 | $11,054 | $11,054 | $132,651 | $66,326 | $66,326 |
| Campaign Manager, Technology | FTE | $11,875 | $11,875 | $11,875 | $11,875 | $11,875 | $11,875 | $11,875 | $11,875 | $11,875 | $11,875 | $11,875 | $11,875 | $142,500 | $71,250 | $71,250 |
| | | **$22,929** | **$22,929** | **$22,929** | **$22,929** | **$22,929** | **$22,929** | **$22,929** | **$22,929** | **$22,929** | **$22,929** | **$22,929** | **$22,929** | **$275,151** | **$137,576** | **$137,576** |

| | | **$160,079** | **$160,079** | **$160,079** | **$160,079** | **$160,079** | **$160,079** | **$160,079** | **$160,079** | **$164,467** | **$164,467** | **$164,467** | **$164,467** | **$1,938,498** | **$969,249** | **$969,249** |

| CR Digital Lab - Budget Assumptions | | | | | | |
|---|---|---|---|---|---|---|
| **Key Program Leadership** | | | | | | **Notes** |
| Title | Status | Rate | Unit | Cy Pres % | Other % | |
| Director, Consumer Privacy & Technology | FTE | $17,000 | Month | 50% | 50% | Executive responsible for shaping CR's strategy to address privacy and security concerns in the digital market. |
| Director, Digital Lab | FTE | $20,833 | Month | 50% | 50% | Executive responsible for the day-to-day direction of the Digital Lab. |
| **Key Program Staff** | | | | | | **Notes** |
| **Research, Testing & Ratings** | | | | | | |
| Title | Status | Rate | Unit | Cy Pres % | Other % | |
| Program Manager, Product Testing - Privacy | FTE | $11,667 | Month | 50% | 50% | Designs and manages the privacy and security product and service testing program, including the discovery of various consumer harms and vulnerabilities in technology products. |
| Project Test Leader - Privacy | FTE | $7,792 | Month | 50% | 50% | Implements testing protocols on products and services under the Digital Standard, producing product ratings on the basis of privacy and security. |
| **Journalism & Communications** | | | | | | |
| Title | Status | Rate | Unit | Cy Pres % | Other % | |
| Electronics Content Development Team Leader | FTE | $14,592 | Month | 50% | 50% | Manages the editorial team producing how-to guides, solutions journalism, and investigative reporting relating to privacy and security issues in the digital market. |
| Senior Director, Strategic Communications | FTE | $19,550 | Month | 50% | 50% | Ensures public and expert engagement with the results of CR's product testing, journalism, and advocacy efforts. |
| **Advocacy & Mobilization** | | | | | | |
| Title | Status | Rate | Unit | Cy Pres % | Other % | |
| Policy Counsel, Technology | FTE | $7,370 | Month | 50% | 50% | Prepares expert policy analysis and testifies before Congress on consumer privacy and security issues. |
| Campaign Manager, Technology | FTE | $7,917 | Month | 50% | 50% | Engages and educates consumers on key privacy and security issues, facilitating their engagement with manufacturers, and policy- and rulemakers. |
| **Full-time Employee Logistical Multiplier** | | | | | | |
| FTE Multiplier | Contractor | | | | | |
| 0.5 | 0 | | | | | FTE multiplier includes 35% fringe and benefits and 15% overhead. |

GZJ KDKV'L''

Jeffrey L. Kodroff, Esq.
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market St., Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
jkodroff@srkattorneys.com

Daniel A. Small
**COHEN MILSTEIN SELLERS & TOLL
PLLC** 1100 New York Ave., NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dsmall@cohenmilstein.com
dyoung@cohenmilstein.com

*Interim Class and Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: GOOGLE LLC STREET VIEW ELECTRONIC COMMUNICATIONS LITIGATION** | **Case No. 3:10-md-02184-CRB**<br><br>**DECLARATION OF LINDA V. YOUNG IN SUPPORT OF MOTION FOR APPROVAL OF CLASS NOTICE PROGRAM** |

I, Linda V. Young, hereby declare as follows:

1.     I am the Vice President, Media with A.B. Data, Ltd. ("A.B. Data"). I am fully familiar with the facts contained herein based upon my personal knowledge. My telephone number is (414) 961-6400.

2.     I submit this Declaration ("Declaration") at the request of Class Counsel for the Plaintiffs in this litigation.

3.     At the request of Class Counsel, I have prepared a proposed notice program for this litigation. This Declaration is based upon my personal knowledge and upon information provided to me by Class Counsel, my associates, and A.B. Data staff members. The information is of a type

1  reasonably relied upon by experts in the fields of media, advertising, and communications. This

2  Declaration will describe the proposed notice program that is recommended and how it will meet

3  the requirements of Federal Rule of Civil Procedure, Rule 23 and due process to the class members.

4  The proposed notice program is included as **Exhibit 1**.

5  **RELEVANT EXPERIENCE**

6       4.      As the Vice President, Media for A.B. Data, I provide a broad range of services,

7  including market research and analysis, creative development, advertising, and marketing

8  planning.

9       5.      I have developed and directed some of the largest and most complex national class

10 action notification programs in the country. The scope of my work includes class action notification

11 programs in the fields of antitrust, consumer, securities, ERISA, and insurance cases. I have

12 developed or consulted on hundreds of notification programs, which includes placing millions of

13 dollars in media notice. My curriculum vitae is included as **Exhibit 2.**

14      6.      A.B. Data has also been appointed as notice, claims, and/or settlement administrator

15 in hundreds of high-volume consumer, civil rights, insurance, antitrust, ERISA, securities, and

16 wage and hour cases, administering some of the largest and most complex class action settlements

17 of all time. A profile of A.B. Data's background and capabilities, including representative case and

18 client lists, is included as **Exhibit 3**.

19 **NOTICE PLAN**

20      7.      The objective of the proposed notice program is to provide due process notice to

21 potential class members. The Court certified a class of:

22 All persons who used a wireless network device from which Google's Street View vehicles in the
   United States obtained unencrypted "Payload Data" between January 1, 2007, and May 15, 2010.
23

24      8.      As described in the appended Notice Plan, A.B. Data researched data regarding the

25 target audience and their media consumption, determining the most appropriate media vehicles that

26 would best deliver the legal information to potential class members and provide them with the

27 opportunity to see and act on their rights described in the notice.

28

9.     Counsel estimates the Class to consist of tens of millions of Class Members. Due to the voluminous nature of the Class and since class member contact information is not readily available, direct notice in this case is not feasible and a paid-media notice program is necessary to reach individuals and share information concerning this litigation with them.

10.    The proposed notice program includes a combination of digital advertisements on websites, social media, search engines, and a press release in English and Spanish. Print media is not recommended at this time as potential Class Members by definition are Internet users and profile as light consumers of print media as evidenced by average or low indices for magazine and newspaper readership.[1]

11.    Notice will be provided via strategically designed banner ads appearing on mobile devices and social media newsfeeds. Examples of these digital ads are attached as **Exhibit 4**. These digital ads will feature a graphic image, brief copy describing the litigation and links and directions to access the case-specific website. The more detailed Long Form Notice, attached hereto as **Exhibit 5** ("Long Form Notice"), will be available on the case-specific website.

12.    The digital banner ads will be executed through the Verizon Media Networks, Instagram, Facebook (which includes a settlement-specific Facebook page), Google Display Network and Google AdWords/Search platforms. Utilizing the known demographics of the Class, the digital banner and social media ads will be specifically targeted to likely Class Members. A minimum of 382.1 million impressions will be delivered on a variety of websites and mobile applications, enabling maximum exposure and delivering the reach required to provide constitutional notice and the frequency needed to drive potential Class Members to the case website.

13.    A.B. Data will also disseminate a news release via *PR Newswire* in English and Spanish. This news release will be distributed to more than 10,000 newsrooms, including print, broadcast, and digital media, across the United States. After the press release is disseminated, both A.B. Data and *PR Newswire* will post a link to the press release on their respective Twitter pages.

---

[1] GfK MRI 2018 Doublebase

14.     To assist potential Class Members in understanding the information concerning the lawsuit and their rights, A.B. Data will establish a Settlement website that will go live within 30 days of the entry of an order granting preliminary approval. The Settlement website will be listed with major search engines and the website address will appear on the digital banner ads, the press release and the Long Form Notice. The Settlement website will remain active until at least 30 days after the effective date of the Settlement Agreement. The website will provide, among other things, copies of the Consolidated Class Action Complaint, Settlement Agreement, Long Form Notice, and *cy pres* proposals.  It will notify Class Members of their rights to object or opt-out, inform Class Members that they should monitor the Settlement Website for developments, and notify Class Members that no further notice will be provided to them once the Court enters the Final Order and Judgment, other than updates on the Settlement Website.

15.     Furthermore, A.B. Data will establish an email account and P.O. Box to which Class Members may submit questions regarding the Settlement. A.B. Data will monitor the email account and the P.O. Box and respond promptly to administrative inquiries from Class Members and may direct substantive inquiries to Class Counsel.

16.     A.B. Data will also establish a case-specific toll-free telephone number with an automated interactive voice response system that will present callers with a series of choices to hear prerecorded information concerning the Settlements. If callers need further help, they will have an option to speak with a live operator during business hours.

17.     This notice program will deliver an estimated reach of 70% to the target audience. The digital means of providing notice described herein are the best practicable under the circumstances for reasons of outreach and efficiency.

**<u>CONCLUSION</u>**

18.     It is my opinion, based on my expertise and experience, that the reach of the target audience and the number of exposure opportunities to the notice information are adequate and reasonable. In my opinion, the proposed notice program is designed to effectively reach potential Class Members, as described herein, deliver notices that will capture potential Class Members' attention, and provide them with the information necessary to understand their rights and options.

In my opinion, the notices themselves comply with the plain language requirement of Rule 23. This proposed notice program conforms to the standards employed by A.B. Data in notification programs designed to reach unidentified potential class members of settlement groups or classes that are national in scope and reach narrowly defined entities and demographic targets. In my opinion, the proposed notice program satisfies the requirements of Rule 23 and due process.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 19th day of July 2019 in Milwaukee, Wisconsin.

Linda V. Young

# EXHIBIT J - 1

**Exhibit 1**



A.B. Data, Ltd.

Class Action Administration Company
600 A.B. Data Drive
Milwaukee, Wisconsin 53217

# Settlement Notice Program

*In re: Google LLC Street View Electronic Communications Litigation*

Case No. 10-md-2184 (N.D. Cal.)

United States District Court, Northern District of California, San Jose Division

July 19, 2019

 Notice Program

# CASE BACKGROUND

This Proposed Notice Program is submitted by A.B. Data, Ltd. ("A.B. Data") in connection with *In re: Google LLC Street View Electronic Communications Litigation.* This document outlines our plan to provide settlement notice to the proposed class.

The Class is generally defined as:

- **National Class (Wiretapping and Unfair Competition):**
  All persons in the United States whose electronic communications sent or received on wireless Internet connections were intercepted by Defendant's Google Street View vehicles from May 25, 2007, through the present.

  Excluded from the Class are Defendant, including subsidiaries and affiliates, federal governmental entities and instrumentalities, and the court and court personnel.

Counsel believes that there are tens of millions of Class Members in the National Class. Members of the Proposed Class are numerous and joinder is impracticable.

Data from GfK MRI 2018 Doublebase Survey states that almost 200 million adults in the U.S. connected to the Internet from home using a wireless connection in the past 30 days.

This document outlines the recommended program for providing due process notice to the Proposed Class.

**Program Objective**

The primary goal of this notice program is to deliver notice to the Proposed Class leveraging the latest digital media technologies, while also meeting the requirements of due process and delivering a reach of at least 70%. The Notice Program described herein will deliver an efficient and effective plan for reaching unidentified potential members of the Proposed Class.

# NOTICE PROGRAM OVERVIEW

After thorough research of the demographics of the Proposed Class and their media habits, A.B. Data recommends the following elements in a media Notice Program:

a. Digital media – display ads;
b. Social media;
c. Google AdWords – search;
d. A news release.


Notice Program

These paid media components, which include online platforms, social media, and earned-media vehicles, are specifically targeted for and will reach unidentified potential members of the Proposed Class. A dedicated case website and Facebook page will also be implemented to complement the Notice Program. Detailed information about each component of the Notice Program and its coverage of the target audience in this case appears in the Media Notice section of this plan.

Media will be geo-targeted to include the U.S. territories and possessions.

**The program options will deliver an estimated minimum reach of 70.0% and an average estimated frequency of 2.0.**

The specific components of the program options are as follows:

| Medium | Description |
|---|---|
| Digital/Social Media<br><br>Served across:<br>• Mobile<br>• Tablet<br>• Laptop<br>• Desktop | Verizon Media Networks, Facebook, Instagram, Google Display Network,  Google AdWords/Search<br>• Mobile website and in-app<br>• Banner ads<br>• Behavioral, contextual, predictive modeling strategies<br>• Newsfeed ads<br>• Links and performance tracked via Verizon Media Flurry and Google Analytics |
| Earned Media | *PR Newswire*<br><br>• US1 National newswire<br>• US Hispanic Newswire<br>• Tweeted via *PR Newswire* and A.B. Data Twitter accounts |

 Notice Program

## DELIVERY AND DUE PROCESS

The Proposed Notice Program options will deliver an estimated reach of 70% as calculated by Comscore[1] and A.B. Data experts.

The Notice efforts described herein reflect a strategic, microtargeted, and contemporary method to deploy Notice to potential members of the Proposed Class. The proposed plan options provide a reach and frequency similar to those that Courts have approved and are recommended by the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide,* which considers a 70% - 95% reach among Class Members reasonable.[2]

The Notice Program options that are described herein are consistent with Notice plans that A.B. Data has developed and have been approved by the Court and implemented for other similar national consumer cases with regard to the methods and tools for developing such plans.

The Notice Plan options set forth herein are the best practicable under the circumstances for the Class and meet due process requirements.

---

[1] Comscore is a global Internet information provider on which leading companies and advertising agencies rely for consumer behavior insight and Internet data usage. Comscore maintains a proprietary database of more than 2 million consumers who have given Comscore permission to monitor their browsing and transaction behavior, including online and offline purchasing.

[2] As the 2010 edition of the *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* notes (page 3): "The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70-95%."


Notice Program

# PAID-MEDIA PLANNING METHODOLOGY

A.B. Data Notice Programs are developed to reach Class Members effectively and efficiently and seek to do the following:

1. Identify the demographics of Class Members through the use of syndicated and/or peer-reviewed, accredited research to establish a primary target audience;
2. Outline the methodology for selecting the media vehicles recommended and their relationship to product/service purchase and usage by the target audience; and
3. Provide results that quantify for the Court the adequacy of the Notice based upon recognized tools of media measurement.

The first steps to developing the paid Notice Program involve determining the demographics of the potential Class Members and defining the target audience. A.B. Data then analyzes media quintile usage data and the ability of each advertising medium to provide cost-efficient coverage of the target audience to develop the direction of the Notice Plan, *i.e.*, whether notification is best done through print, online, broadcast, and/or some other methodology.

In the development of successful Notice Programs, A.B. Data uses reach and frequency as the standards upon which to measure an effective Notice Plan. Reach and frequency are the two primary measurements used to quantify the delivery of a Proposed Notice Plan to a defined target audience. Below are the definitions of these terms as they relate to paid media.

- Reach – expressed as a percentage, an estimated measurement of a target audience that was exposed at least one time to a specific media message or combination of media messages, whether via print, broadcast, online, outdoor, etc., media, within a given time period.
- Frequency – the estimated average number of opportunities a member of the target audience sees the Notice during the campaign.

These analytical tools, provided by Comscore and MRI, are used to determine the websites/publications selected and the number of impressions/insertions to be purchased. MRI is the leading supplier of multimedia audience research in the United States. As a nationally accredited research firm, it presents a source of measurement for major media, products, services, and consumer demographic, lifestyle, and psychographic characteristics. Comscore is a global Internet information provider on which leading companies and advertising agencies rely for Internet usage data.

 Notice Program

# TARGET AUDIENCE MEDIA USAGE

To define the Proposed Class and develop the target audience, we utilized accredited marketing data from MRI to examine the number of Adults 18 and Older Who Can Connect to the Internet from Home Using a Wireless Connection. Below are some of the key demographic statistics that will assist in targeting potential Class Members.

| Demographics | Adults 18+ Who Can Connect to the Internet From Home Using a Wireless Connection |
|---|---|
| Female | 51.6% |
| Male | 48.4% |
| 18-24 | 12.9% |
| 25-34 | 19.1% |
| 35-44 | 17.7% |
| 45-54 | 18.3% |
| 55-64 | 16.7% |
| 65+ | 15.7% |
| 18-49 | 58.7% |
| 25-54 | 55.1% |
| Graduated High School | 26.1% |
| Attended/Graduated College | 66.7% |
| Under $20,000 | 7.11% |
| $20,000 - $40,000 | 13.5% |
| $40,000 - $60,000 | 15.0% |
| $60,000 - $75,000 | 10.7% |
| $75,000+ | 53.6% |
| $100,000+ | 38.4% |
| Wage Earner: Sole Earner | 16.6% |
| Wage Earner: Primary Earner | 23.1% |
| Wage Earner: Secondary Earner | 26.6% |
| Not Employed/Retired/Student | 33.7% |
| Now Married | 56.6% |
| Never Married | 28.4% |
| Home Owned | 69.2% |
| Spanish, Hispanic, or Latino Descent | 14.4% |
| Spanish Spoken in Home | 15.4% |

A complete list of all MRI demographics including household income, occupation, education, household size, home value, marital status, marketing region, and others are in Exhibit A.
Based on the information described above, a target demographic of Adults Age 18 and older is recommended as the primary media-buying audience.

 Notice Program

# MEDIA-USAGE ANALYSIS

Everybody is exposed to and consumes media differently, sometimes with daily changes. However, we all develop patterns to our media consumption, and those patterns become our individual media habits. MRI divides those habits into five categories of media usage, from heavy consumption of media to light users of a media type. These five categories are defined by Quintiles ranked from 1 to 5, with Quintile 1 representing the heaviest user of a media vehicle, to Quintile 5 representing a light user.

The media usage of the target audience in each quintile is expressed as an index. An index of 100 is an average usage of a particular medium. Therefore, an index above 100 indicates a heavier usage of the medium than that of the average adult, and an index below 100 indicates a lighter usage of the medium than that of the average adult.

Media vehicles in the quintile analysis summarized below include magazines, newspapers and newspaper supplements, radio, television, and the Internet.

| Media Indices | Adults 18+ Who Can Connect to the Internet From Home Using a Wireless Connection |
|---|---|
| **Magazines** | |
| Quintile 1 | 103 |
| Quintile 2 | 104 |
| **Newspapers and Supplements** | |
| Quintile 1 | 96 |
| Quintile 2 | 100 |
| **Radio** | |
| Quintile 1 | 101 |
| Quintile 2 | 104 |
| **Television** | |
| Quintile 1 | 85 |
| Quintile 2 | 101 |
| **Digital** | |
| Quintile 1 | 114 |
| Quintile 2 | 113 |



Notice Program

Exhibit B includes the entire media quintile analysis for "Adults Connected to the Internet from Home Using a Wireless Network.

Based upon the demographic analysis and the media quintile results, it is recommended that digital media, including banner and social-media ads and a Search campaign be included in the Notice Program.



Notice Program

## DIGITAL MEDIA ANALYSIS AND RECOMMENDATION

MRI provides data on Internet usage by asking survey respondents about their online usage during the 30 days prior. According to the 2018 MRI survey, 94.8% of "Adults who Connected to the Internet from Home Using a Wireless Connection" have used the Internet in the past 30 days. Below is an overview of Internet usage. For a complete list of Internet usage activities, please refer to Exhibit C.

| Internet Usage | Adults 18+ Who Can Connect to the Internet From Home Using a Wireless Connection |
|---|---|
| Looked at/used Internet | 94.8% |
| Have Internet access at home | 100.0% |
| **Devices to Use the Internet** | |
| Desktop computer | 48.1% |
| Laptop or Netbook | 58.6% |
| iPad or tablet | 41.9% |
| Smartphone | 85.0% |
| Television | 19.7% |
| Video Game Console | 10.5% |
| **Online Activities** | |
| Obtained financial information | 36.6% |
| Paid bills online | 61.3% |
| Used email | 83.4% |
| Used Instant Messenger | 72.3% |
| Made a purchase for personal use | 60.5% |
| Made personal or business travel plans | 26.4% |
| Played games | 34.2% |
| Obtained the latest news/current events | 53.6% |
| Obtained sports news information | 35.9% |



Notice Program

| Internet Usage | Adults 18+ Who Can Connect to the Internet From Home Using a Wireless Connection |
|---|---|
| Obtained medical information | 33.8% |
| Obtained entertainment/celebrity information | 31.5% |
| Watched a movie online | 30.9% |
| Looked for recipes online | 46.5% |
| Shared photos | 39.5% |

Because the Internet is such an integral part of the lives of the target audience, it is recommended that online media drive the Proposed Notice Plan with a significant presence.

A.B. Data recommends using a variety of websites and social media applications, enabling maximum exposure opportunities to reach the target audience. Additionally, websites and apps with audiences that include large percentages of the specific target audience will be selected.

Following is a summary of the search engines and websites used most frequently by the target audience. A complete list of search engines and websites reviewed by MRI is included in Exhibit D.

| Search Engines/Websites Visited | Adults 18+ Who Can Connect to the Internet From Home Using a Wireless Connection |
|---|---|
| **Search Engines Used Last 30 Days** | |
| Google | 89.6% |
| Yahoo! | 26.1% |
| **Websited Visited Last 30 Days** | |
| IMBd | 13.4% |
| WebMD | 26.4% |
| Wikipedia | 28.2% |
| CNN | 19.6% |



Notice Program

| Search Engines/Websites Visited | Adults 18+ Who Can Connect to the Internet From Home Using a Wireless Connection |
|---|---|
| Amazon | 54.9% |
| eBay | 22.0% |
| ESPN | 21.4% |
| Google Maps | 45.33% |
| **Social Media Apps Visited** | |
| The Weather channel | 39.6% |
| Facebook | 70.5% |
| Instagram | 32.5% |
| LinkedIn | 15.4% |
| Pinterest | 24.4% |
| YouTube | 56.4% |
| Twitter | 16.1% |
| Facebook Messenger | 53.7% |
| Snapchat chat | 18.0% |
| WhatsApp | 11.6% |

Notice Program

## Digital Media Recommendation

A.B. Data recommends placing a minimum of 382.1 million digital and social media ads on a variety of websites and mobile applications, enabling maximum exposure and delivering the reach required to provide constitutional Notice and the frequency needed to drive potential Class Members to the case website. The campaign will be placed on reputable websites and properties with a high quality index, and will include click fraud detection to monitor and block bot traffic.

Based on our in-house Comscore data analysis, we recommend a mix of Internet banner and newsfeed ads to run using  Verizon Media Networks, Facebook, Instagram, and Google Display Network.

A Google AdWords (Search) campaign will also be instituted, making the case website higher in the search rankings and thus easier to find.

The Internet campaign will be implemented over a 30-day desktop and mobile program utilizing standard IAB (Interactive Advertising Bureau) banner sizes (300 x 250, 728 x 90, 300 x 600, 320 x 50, 300 x 50). All banners and newsfeed ads will include embedded and trackable links to the case-specific website. Links will be tracked using Flurry Analytics from Verizon Media Networks and Google Analytics, providing a way to optimize the ad campaign.

Ads will be served across multiple devices including mobile, tablet, and desktop. Ads will be placed in premium positioning on websites, ensuring they can be viewed without scrolling and easily seen when visitors first open the page.

The following networks and social media will be used in the Notice Plan.



- Verizon Media Networks is comprised of several leading brands such as the Yahoo! properties (Yahoo! Fantasy Sports, Finance, Entertainment, and many others), Huffington Post, Rivals, BuiltByGirls, AutoBlog, and others.
- Campaign tracking is provided by Flurry Analytics which will assist in optimizing the campaign based on demographic information and session activity.
- Offers AI optimization and audience modeling which enables us to connect with potential Class Members.



Notice Program



- A case Facebook page will be developed so mobile newsfeed ads can drive potential members of the Class to the case-specific page.
- More than 70% of the target audience visited Facebook in the last 30 days, and most of these audience members are frequent users of the network, using it to post photos and videos, send messages, and visit the pages of friends.
- Facebook allows specific demographic targeting beyond gender and age.



- Mobile feed ads will drive potential Class Members to the case-specific page and case website.
- Instagram is one of the most popular social media sites within the target demographic, reaching 32% of the target audience.
- 60% of Instagram users access their account daily.
- Instagram users can be targeted by location, interests, behaviors, and other demographic characteristics to effectively reach potential Class Members.

Google
Display Network

- The target audience uses Google for search, email, maps, and other applications.
- Google allows for the purchase of relevant content where we want the banner ads to appear.
- A mix of display banner ad sizes will be utilized.

The digital media will be chosen, first to meet audience notification requirements, and secondly to achieve maximum engagement with the ads. Campaigns and creative will be optimized to drive potential members of the Proposed Class to the website. Several campaign optimization strategies will be utilized, including:



Notice Program

| Digital Media Strategy | Digital Media Tactics |
|---|---|
| Mobile In-App | Targeting users inside mobile applications that fit into our data pools. This could include game apps, weather apps, or news/sports apps. |
| Mobile – Websites | Targeting phones and tablets whose users are visiting websites that are contextually relevant or websites being visited by relevant users in our data pool. |
| Contextual | Targeting websites with relevant content and context. |
| Behavioral | Targeting user IDs whose owners have shown activity in the target data pools. |
| Predictive Modeling | Using "look-alike" modeling to target user IDs whose owners have strong similarities to users who previously clicked through to the case website. |
| Campaign Optimization | The campaign will be optimized frequently to adjust for audiences and demographic groups that fit our target audience and are most responsive. |

**Keyword Search**

To assist further in locating potential members of the Proposed Class, A.B. Data will develop and monitor a Google AdWords and key search terms program. When identified target phrases and keywords are entered in a search on Google and Google-syndicated search pages, links to the case website will appear on the search results pages.

During the course of the notice program, A.B. Data's digital media experts will monitor the success, conversions, and activity associated with the digital and social media campaigns and will adjust the number of impressions delivered across each platform to achieve maximum engagement and efficiency.



Notice Program

## EARNED MEDIA

In addition to the components outlined above, it is recommended that a news release regarding the case be run via *PR Newswire,* US1 National, and Hispanic newswires. This case will gain more attention when the general-market media become aware of this news.

News about the case will also be broadcast to the news media via Twitter. It will be tweeted from *PR Newswire*'s and A.B. Data's Twitter accounts to thousands of news media and other followers. The news release will also assist with driving search engine results, which will help increase traffic to the case website.



Notice Program

## NOTICE DESIGN STRATEGIES

The online social media and banner ads will be designed to alert potential members of the Proposed Class about the case. The ads will each include a link to the case website or case social media pages so potential members of the Proposed Class may click on them and go directly to the website for answers and other case information. All banner ads will include ad-specific code that links to Google Analytics for tracking.

A.B. Data will provide a dedicated, consumer-focused website to ensure easy access to updated information. The website will be secure, with an "https" designation. We will use e-commerce best practices to develop the site so it's easy and intuitive for potential members of the Proposed Class to navigate. There will be easy-to-navigate tabs and a clear link to the registration form. Pixels will be placed on the website to ensure accurate and efficient optimization.

The website will contain general information about the action including relevant dates, a contact form, and further information about the litigation, along with relevant pleadings. The Class Members' legal rights and a link to the registration form will be prominent on the home page, along with a toll-free telephone number for any questions regarding the litigation.

Below is an example of what the banner ads could look like.



## DELIVERY AND DUE PROCESS

The Proposed Notice Program will meet due process requirements and will deliver an estimated reach of at least 70.0% and a 2.0 average estimated frequency as calculated by Comscore and A.B. Data experts.

The Notice efforts described herein reflect a strategic, microtargeted, and contemporary method to deploy Notice to potential members of the Proposed Class. The proposed plan provides a reach and frequency similar to those that Courts have approved and are recommended by the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, which considers a 70% - 95% reach among Class Members reasonable.

  Notice Program

The Notice Program that is described herein is consistent with Notice plans that have been approved and implemented for other national consumer cases with regard to the methods and tools for developing such plans.

The Notice Plan set forth herein is the best practicable under the circumstances for the Class and meets due process requirements.



Notice Program

**Exhibit A**
**Google Street View MRI Data**

**Audience Demographics**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Total Audience | 197659 | 80.20 | 100.00 | 100 |
| Adults | 197659 | 80.20 | 100.00 | 100 |
| Men | 95625 | 80.40 | 48.38 | 100 |
| Women | 102034 | 80.01 | 51.62 | 100 |
| Parents | 65038 | 87.25 | 32.90 | 109 |
| Highest Degree Received by Respondent: 12th grade or less (did not graduate high school) | 14855 | 51.56 | 7.52 | 64 |
| Highest Degree Received by Respondent: Graduated high school or equivalent | 51659 | 72.08 | 26.14 | 90 |
| Highest Degree Received by Respondent: Some college, no degree | 38069 | 85.74 | 19.26 | 107 |
| Highest Degree Received by Respondent: Associate degree | 22379 | 86.01 | 11.32 | 107 |
| Highest Degree Received by Respondent: Bachelor's degree | 45237 | 93.00 | 22.89 | 116 |
| Highest Degree Received by Respondent: Post-graduate degree | 25460 | 94.56 | 12.88 | 118 |
| Highest Degree Received by Respondent: Some college (no degree) OR Associate degree | 60448 | 85.84 | 30.58 | 107 |
| Highest Degree Received by Respondent: Bachelor's degree OR Post-graduate degree | 70696 | 93.56 | 35.77 | 117 |
| Age 18-24 | 25446 | 84.77 | 12.87 | 106 |
| Age 25-34 | 37747 | 85.78 | 19.10 | 107 |
| Age 35-44 | 35063 | 86.98 | 17.74 | 108 |
| Age 45-54 | 36097 | 84.26 | 18.26 | 105 |
| Age 55-64 | 32360 | 78.31 | 16.37 | 98 |
| Age 65+ | 30946 | 64.51 | 15.66 | 80 |
| Adults 18-34 | 63192 | 85.37 | 31.97 | 106 |
| Adults 18-49 | 116069 | 85.88 | 58.72 | 107 |
| Adults 25-54 | 108907 | 85.65 | 55.10 | 107 |
| Adults 35-54 | 71160 | 85.58 | 36.00 | 107 |
| Men 18-34 | 31737 | 85.67 | 16.06 | 107 |
| Men 18-49 | 57484 | 85.77 | 29.08 | 107 |
| Men 25-54 | 53406 | 85.28 | 27.02 | 106 |
| Men 35-54 | 34625 | 85.04 | 17.52 | 106 |
| Women 18-34 | 31455 | 85.07 | 15.91 | 106 |
| Women 18-49 | 58585 | 85.99 | 29.64 | 107 |
| Women 25-54 | 55501 | 86.01 | 28.08 | 107 |
| Women 35-54 | 36535 | 86.10 | 18.48 | 107 |
| Employment: Working full time | 106830 | 87.45 | 54.05 | 109 |
| Employment: Working part time | 24208 | 85.05 | 12.25 | 106 |
| Employment: Not working | 66620 | 69.51 | 33.70 | 87 |
| Occupation: Professional and related occupations | 33276 | 94.99 | 16.83 | 118 |
| Occupation: Management, business and financial operations | 23733 | 94.46 | 12.01 | 118 |
| Occupation: Sales and office occupations | 28802 | 88.04 | 14.57 | 110 |

**Exhibit A**
**Google Street View MRI Data**

**Audience Demographics**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Occupation: Natural resources, construction and maintenance occup. | 10620 | 75.65 | 5.37 | 94 |
| Occupation: Other employed | 34607 | 79.17 | 17.51 | 99 |
| Individual Employment Income: $200,000+ | 2778 | 95.82 | 1.41 | 119 |
| Individual Employment Income: $150,000- | 3719 | 97.74 | 1.88 | 122 |
| Individual Employment Income: $100,000- | 10622 | 95.65 | 5.37 | 119 |
| Individual Employment Income: $75,000-$99,999 | 13908 | 95.38 | 7.04 | 119 |
| Individual Employment Income: $60,000-$74,999 | 14075 | 93.54 | 7.12 | 117 |
| Individual Employment Income: $50,000-$59,999 | 12934 | 91.30 | 6.54 | 114 |
| Individual Employment Income: $40,000-$49,999 | 15596 | 88.58 | 7.89 | 110 |
| Individual Employment Income: $30,000-$39,999 | 17262 | 84.12 | 8.73 | 105 |
| Individual Employment Income: $20,000-$29,999 | 16766 | 80.02 | 8.48 | 100 |
| Individual Employment Income: Under $20,000 | 23378 | 78.09 | 11.83 | 97 |
| Wage Earner Status: Not employed | 66620 | 69.51 | 33.70 | 87 |
| Wage Earner Status: Sole earner | 32792 | 78.52 | 16.59 | 98 |
| Wage Earner Status: Primary earner | 45739 | 88.71 | 23.14 | 111 |
| Wage Earner Status: Secondary earner | 52507 | 91.63 | 26.56 | 114 |
| Household Income: $250,000+ | 8123 | 96.10 | 4.11 | 120 |
| Household Income: $200,000-$249,999 | 8155 | 96.55 | 4.13 | 120 |
| Household Income: $150,000-$199,999 | 19385 | 96.33 | 9.81 | 120 |
| Household Income: $100,000-$149,999 | 40188 | 94.66 | 20.33 | 118 |
| Household Income: $75,000-$99,999 | 30158 | 90.12 | 15.26 | 112 |
| Household Income: $60,000-$74,999 | 21279 | 86.14 | 10.77 | 107 |
| Household Income: $50,000-$59,999 | 14758 | 81.04 | 7.47 | 101 |
| Household Income: $40,000-$49,999 | 14914 | 76.87 | 7.55 | 96 |
| Household Income: $30,000-$39,999 | 14413 | 68.36 | 7.29 | 85 |
| Household Income: $20,000-$29,999 | 12238 | 59.53 | 6.19 | 74 |
| Household Income: Under $20,000 | 14048 | 47.51 | 7.11 | 59 |
| Household Income: $150,000+ | 35663 | 96.33 | 18.04 | 120 |
| Household Income: $100,000+ | 75851 | 95.44 | 38.37 | 119 |
| Household Income: $75,000+ | 106009 | 93.86 | 53.63 | 117 |
| Household Income: $60,000+ | 127287 | 92.47 | 64.40 | 115 |
| Household Income: $50,000+ | 142045 | 91.14 | 71.86 | 114 |
| Household Income: $40,000+ | 156959 | 89.56 | 79.41 | 112 |
| Household Income: $30,000+ | 171373 | 87.28 | 86.70 | 109 |
| Total Net Worth of All HH Members: $1,000,000+ | 20117 | 92.78 | 10.18 | 116 |
| Total Net Worth of All HH Members: $500,000-$999,999 | 35125 | 91.58 | 17.77 | 114 |
| Total Net Worth of All HH Members: $250,000-$499,999 | 52886 | 87.89 | 26.76 | 110 |
| Total Net Worth of All HH Members: $100,000-$249,999 | 41714 | 78.42 | 21.10 | 98 |
| Total Net Worth of All HH Members: Under $100,000 | 47816 | 65.45 | 24.19 | 82 |
| Census Region: North East | 37668 | 85.20 | 19.06 | 106 |

**Exhibit A**
**Google Street View MRI Data**

**Audience Demographics**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Census Region: South | 71356 | 76.57 | 36.10 | 95 |
| Census Region: Midwest | 41369 | 79.14 | 20.93 | 99 |
| Census Region: West | 47266 | 83.22 | 23.91 | 104 |
| Marketing Region: New England | 10084 | 86.69 | 5.10 | 108 |
| Marketing Region: Mid Atlantic | 32420 | 85.79 | 16.40 | 107 |
| Marketing Region: East Central | 22376 | 76.59 | 11.32 | 96 |
| Marketing Region: West Central | 29221 | 81.16 | 14.78 | 101 |
| Marketing Region: Southeast | 39829 | 77.56 | 20.15 | 97 |
| Marketing Region: Southwest | 22233 | 72.33 | 11.25 | 90 |
| Marketing Region: Pacific | 41494 | 83.44 | 20.99 | 104 |
| Mediamarkets: Top 5 | 43461 | 85.22 | 21.99 | 106 |
| Mediamarkets: Next 5 | 22361 | 83.71 | 11.31 | 104 |
| Mediamarkets: New York | 14592 | 86.39 | 7.38 | 108 |
| Mediamarkets: Los Angeles | 11987 | 82.97 | 6.06 | 103 |
| Mediamarkets: Chicago | 6270 | 83.57 | 3.17 | 104 |
| Metropolitan CBSA | 173544 | 82.03 | 87.80 | 102 |
| Micropolitan CBSA/unassigned | 24115 | 69.07 | 12.20 | 86 |
| County Size: A | 88029 | 84.71 | 44.54 | 106 |
| County Size: B | 58467 | 80.24 | 29.58 | 100 |
| County Size: C | 27694 | 77.07 | 14.01 | 96 |
| County Size: D | 23469 | 69.53 | 11.87 | 87 |
| Marital Status: Never married | 56119 | 79.70 | 28.39 | 99 |
| Marital Status: Now married | 111850 | 86.03 | 56.59 | 107 |
| Marital Status: Legally separated/widowed/divorced | 29689 | 64.49 | 15.02 | 80 |
| Marital Status: Engaged | 9417 | 80.54 | 4.76 | 100 |
| Living w/partner/fiance/boyfriend or girlfriend (same or opposite sex) | 17842 | 80.01 | 9.03 | 100 |
| Married in last 12 months | 3320 | 88.28 | 1.68 | 110 |
| Household size: 1 | 20782 | 58.15 | 10.51 | 73 |
| Household size: 2 | 62096 | 80.33 | 31.42 | 100 |
| Household size: 3-4 | 78258 | 86.55 | 39.59 | 108 |
| Household size: 5+ | 36523 | 84.93 | 18.48 | 106 |
| Children: Any | 82453 | 85.93 | 41.71 | 107 |
| Children: 1 | 33225 | 86.21 | 16.81 | 107 |
| Children: 2 | 29890 | 87.94 | 15.12 | 110 |
| Children: 3+ | 19338 | 82.55 | 9.78 | 103 |
| Child Age: <12 months | 8089 | 82.94 | 4.09 | 103 |
| Child Age: 12-23 months | 6533 | 81.72 | 3.31 | 102 |
| Child Age: <2 years | 14081 | 82.63 | 7.12 | 103 |
| Child Age: <6 years | 36332 | 83.51 | 18.38 | 104 |
| Child Age: 2-5 years | 28335 | 83.44 | 14.34 | 104 |
| Child Age: 6-11 years | 39709 | 84.81 | 20.09 | 106 |

**Exhibit A**

**Google Street View MRI Data**

**Audience Demographics**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Child Age: 12-17 years | 40823 | 87.66 | 20.65 | 109 |
| Life Cycle: Respondent 18-34 1 person household | 3807 | 80.52 | 1.93 | 100 |
| Life Cycle: Respondent 18-34 married no kids | 4947 | 90.56 | 2.50 | 113 |
| Life Cycle: Respondent 18-34 married young child under 6 | 12148 | 86.87 | 6.15 | 108 |
| Life Cycle: Respondent 18-34 married young child 6-17 | 2604 | 87.07 | 1.32 | 109 |
| Life Cycle: Balance of respondents 18-34 | 39687 | 84.70 | 20.08 | 106 |
| Life Cycle: Respondent 35-49 1 person household | 3330 | 70.19 | 1.68 | 88 |
| Life Cycle: Respondent 35-49 married no kids | 6629 | 84.92 | 3.35 | 106 |
| Life Cycle: Respondent 35-49 married young child under 6 | 11123 | 91.67 | 5.63 | 114 |
| Life Cycle: Respondent 35-49 married young child 6-11 | 11152 | 91.82 | 5.64 | 114 |
| Life Cycle: Respondent 35-49 married young child 12-17 | 7782 | 93.18 | 3.94 | 116 |
| Life Cycle: Balance of respondents 35-49 | 12861 | 80.63 | 6.51 | 101 |
| Life Cycle: Respondent 50+ 1 person household | 12826 | 51.38 | 6.49 | 64 |
| Life Cycle: Respondent 50+ married no kids | 45459 | 82.16 | 23.00 | 102 |
| Life Cycle: Respondent 50+ married w/kids | 9968 | 84.72 | 5.04 | 106 |
| Life Cycle: Balance of respondents 50+ | 13337 | 69.25 | 6.75 | 86 |
| Years at Present Address: Under 1 year | 30517 | 78.87 | 15.44 | 98 |
| Years at Present Address: 1-4 years | 58751 | 83.08 | 29.72 | 104 |
| Years at Present Address: 5+ years | 108391 | 79.08 | 54.84 | 99 |
| Home Owned | 136684 | 83.47 | 69.15 | 104 |
| Home Value: $500,000+ | 21449 | 92.89 | 10.85 | 116 |
| Home Value: $200,000-$499,999 | 62799 | 89.98 | 31.77 | 112 |
| Home Value: $100,000-$199,999 | 36758 | 81.46 | 18.60 | 102 |
| Home Value: $50,000-$99,999 | 11141 | 64.59 | 5.64 | 81 |
| Home Value: Under $50,000 | 4537 | 53.36 | 2.30 | 67 |
| Race: White | 152544 | 82.37 | 77.18 | 103 |
| Race: Black/African American | 22971 | 72.20 | 11.62 | 90 |
| Race: American Indian or Alaska Native | 2297 | 74.99 | 1.16 | 94 |
| Race: Asian | 7432 | 93.00 | 3.76 | 116 |
| Race: Other | 17415 | 70.89 | 8.81 | 88 |
| Race: White only | 148996 | 82.40 | 75.38 | 103 |
| Race: Black/African American only | 21473 | 71.81 | 10.86 | 90 |
| Race: Other race/Multiple races | 27190 | 76.06 | 13.76 | 95 |
| Spanish Spoken in Home (Most Often or Other) | 30571 | 74.27 | 15.47 | 93 |
| Hispanic Respondent Personally Speaks at Home: Only English | 5699 | 85.86 | 2.88 | 107 |
| Hispanic Respondent Personally Speaks at Home: Mostly English, but some Spanish | 8208 | 84.30 | 4.15 | 105 |
| Hispanic Respondent Personally Speaks at Home: Only Spanish | 5741 | 53.63 | 2.90 | 67 |

**Exhibit A**

**Google Street View MRI Data**

**Audience Demographics**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|---|
| Hispanic Respondent Personally Speaks at Home: Mostly Spanish, but some English | | 7421 | 75.28 | 3.75 | 94 |
| Hispanic Respondent Personally Speaks at Home: Both English and Spanish equally at home | | 1298 | 77.33 | 0.66 | 96 |
| Hispanic Respondent Personally Speaks at Home: Other | * | 148 | 88.13 | 0.07 | 110 |
| Spanish, Hispanic or Latino Origin or Descent | | 28514 | 73.52 | 14.43 | 92 |
| Pet owner | | 121551 | 84.15 | 61.50 | 105 |
| Dog owner | | 96349 | 84.47 | 48.75 | 105 |
| Cat owner | | 49513 | 83.75 | 25.05 | 104 |
| Have a landline telephone | | 89913 | 82.99 | 45.49 | 103 |
| Cell phone only (no landline) in Household | | 107544 | 78.29 | 54.41 | 98 |
| Landline only (no cell phone) in Household | | 870 | 22.37 | 0.44 | 28 |
| Generations: Gen Z (b.1997-2010) only includes respondents 18+ | | 10950 | 85.09 | 5.54 | 106 |
| Generations: Millennials (b.1977-1996) | | 74129 | 85.96 | 37.50 | 107 |
| Generations: GenXers (b.1965-1976) | | 41960 | 85.37 | 21.23 | 106 |
| Generations: Boomers (b. 1946-1964) | | 55903 | 77.88 | 28.28 | 97 |
| Generations: Early Boomers (b. 1946-1955) | | 25224 | 76.13 | 12.76 | 95 |
| Generations: Late Boomers (b. 1956-1964) | | 30679 | 79.38 | 15.52 | 99 |
| Generations: Pre-Boomers (b. before 1946) | | 14717 | 55.69 | 7.45 | 69 |
| Respondent's Sexual Orientation: Heterosexual/Straight | | 190513 | 80.26 | 96.38 | 100 |
| Respondent's Sexual Orientation:  NET Gay/Lesbian | | 2915 | 83.71 | 1.47 | 104 |
| Respondent's Sexual Orientation:  NET Gay/Lesbian/Bisexual | | 4457 | 84.26 | 2.26 | 105 |

Source: 2018 Doublebase GfK MRI

* Projections relatively unstable, use with caution

**Exhibit B**
**Google Street View MRI Data**

**Media Quintiles**

**Adults 18+ and Internet - Can Connect From**
**Home Using A Wireless Connection (Not**
**Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Magazine Quintile I | 40661 | 82.50 | 20.57 | 103 |
| Magazine Quintile II | 40917 | 83.31 | 20.70 | 104 |
| Magazine Quintile III | 40798 | 82.48 | 20.64 | 103 |
| Magazine Quintile IV | 38388 | 78.09 | 19.42 | 97 |
| Magazine Quintile V | 36894 | 74.62 | 18.67 | 93 |
| Newspaper Quintile I | 37991 | 77.07 | 19.22 | 96 |
| Newspaper Quintile II | 39610 | 80.49 | 20.04 | 100 |
| Newspaper Quintile III | 39911 | 81.10 | 20.19 | 101 |
| Newspaper Quintile IV | 39885 | 80.98 | 20.18 | 101 |
| Newspaper Quintile V | 40261 | 81.34 | 20.37 | 101 |
| Radio Quintile I [34] | 39858 | 80.86 | 20.16 | 101 |
| Radio Quintile II [34] | 41186 | 83.52 | 20.84 | 104 |
| Radio Quintile III [34] | 41813 | 85.09 | 21.15 | 106 |
| Radio Quintile IV [34] | 40094 | 81.39 | 20.28 | 101 |
| Radio Quintile V [34] | 34709 | 70.18 | 17.56 | 88 |
| TV (Total) Quintile I | 33648 | 68.12 | 17.02 | 85 |
| TV (Total) Quintile II | 39876 | 80.78 | 20.17 | 101 |
| TV (Total) Quintile III | 41843 | 85.14 | 21.17 | 106 |
| TV (Total) Quintile IV | 41935 | 85.47 | 21.22 | 107 |
| TV (Total) Quintile V | 40357 | 81.52 | 20.42 | 102 |
| Internet Quintile I (Heavy) | 44977 | 91.25 | 22.75 | 114 |
| Internet Quintile II | 44951 | 90.92 | 22.74 | 113 |
| Internet Quintile III | 44242 | 89.89 | 22.38 | 112 |
| Internet Quintile IV | 41756 | 84.96 | 21.13 | 106 |
| Internet Quintile V (Light) | 21733 | 44.02 | 11.00 | 55 |
| Outdoor Quintile I | 42457 | 86.26 | 21.48 | 108 |
| Outdoor Quintile II | 41829 | 85.04 | 21.16 | 106 |
| Outdoor Quintile III | 41178 | 83.55 | 20.83 | 104 |
| Outdoor Quintile IV | 38344 | 77.85 | 19.40 | 97 |
| Outdoor Quintile V | 33852 | 68.37 | 17.13 | 85 |
| TV (Primetime) Quintile I | 37106 | 75.18 | 18.77 | 94 |
| TV (Primetime) Quintile II | 39809 | 80.90 | 20.14 | 101 |
| TV (Primetime) Quintile III | 41281 | 83.96 | 20.88 | 105 |
| TV (Primetime) Quintile IV | 40589 | 82.41 | 20.53 | 103 |
| TV (Primetime) Quintile V | 38874 | 78.56 | 19.67 | 98 |
| TV (Daytime) Tercile I | 15784 | 64.58 | 7.99 | 81 |
| TV (Daytime) Tercile II | 17566 | 72.41 | 8.89 | 90 |
| TV (Daytime) Tercile III | 19149 | 78.78 | 9.69 | 98 |

Source: 2018 Doublebase GfK MRI
* Projections relatively unstable, use with caution

**Exhibit C**

**Google Street View MRI Data**


**Digital Media Usage**


**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Have Internet access at home | 197659 | 89.63 | 100.00 | 112 |
| Internet Service Providers (to HH): AOL | 866 | 90.64 | 0.44 | 113 |
| Internet Service Providers (to HH): AT&T | 34090 | 90.31 | 17.25 | 113 |
| Internet Service Providers (to HH): CenturyLink | 8586 | 95.07 | 4.34 | 119 |
| Internet Service Providers (to HH): Cox | 8733 | 96.51 | 4.42 | 120 |
| Internet Service Providers (to HH): Frontier | 4960 | 95.38 | 2.51 | 119 |
| Internet Service Providers (to HH): Optimum | 5121 | 97.08 | 2.59 | 121 |
| Internet Service Providers (to HH): Spectrum (including Spectrum, Charter, Bright House, Time Warner Cable, measured separately as Time Warner Cable and Charter in Waves 75-76 and as Time Warner Cable/Spectrum and Charter in Wave 77) | 36115 | 95.24 | 18.27 | 119 |
| Internet Service Providers (to HH): Verizon or Fios by Verizon | 19271 | 86.26 | 9.75 | 108 |
| Internet Service Providers (to HH): Xfinity/Comcast | 47454 | 96.92 | 24.01 | 121 |
| Internet Service Providers (to HH): Any Service | 197503 | 89.76 | 99.92 | 112 |
| Looked at/used Internet /last 30 days: At home | 183036 | 90.02 | 92.60 | 112 |
| Looked at/used Internet /last 30 days: At work | 100006 | 91.28 | 50.60 | 114 |
| Looked at/used Internet /last 30 days: At school or library | 28481 | 89.15 | 14.41 | 111 |
| Looked at/used Internet /last 30 days: Another place | 89232 | 90.10 | 45.14 | 112 |
| Looked at/used Internet /last 30 days: Any Internet Usage | 187399 | 88.08 | 94.81 | 110 |
| Used Wi-Fi or wireless connection using a computer outside of home/last 30 days | 66253 | 93.16 | 33.52 | 116 |
| Devices used to use the Internet/last 30 days: Desktop computer | 94981 | 92.06 | 48.05 | 115 |
| Devices used to use the Internet/last 30 days: Laptop or Netbook computer | 115875 | 95.40 | 58.62 | 119 |
| Devices used to use the Internet/last 30 days: Any computer | 156041 | 92.79 | 78.94 | 116 |
| Devices used to use the Internet/last 30 days: iPad or other Tablet | 82779 | 95.53 | 41.88 | 119 |
| Devices used to use the Internet/last 30 days: Cellphone or Smartphone | 167914 | 88.83 | 84.95 | 111 |
| Devices used to use the Internet/last 30 days: E-reader | 6593 | 97.15 | 3.34 | 121 |
| Devices used to use the Internet/last 30 days: iPod or other MP3 Player | 3851 | 94.74 | 1.95 | 118 |
| Devices used to use the Internet/last 30 days: Video game console | 20721 | 95.71 | 10.48 | 119 |
| Devices used to use the Internet/last 30 days: Television | 38961 | 96.83 | 19.71 | 121 |
| Visited a chat room/past 30 days | 9721 | 88.05 | 4.92 | 110 |
| Used e-mail/past 30 days | 164912 | 90.97 | 83.43 | 113 |
| Used instant messenger/past 30 days | 142899 | 89.36 | 72.30 | 111 |
| Participated in online dating/past 30 days | 5886 | 92.68 | 2.98 | 116 |

**Exhibit C**

**Google Street View MRI Data**


**Digital Media Usage**


**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Made a purchase for personal use (on the Internet)/past 30 days | 119604 | 93.85 | 60.51 | 117 |
| Made a purchase for business use (on the Internet)/past 30 days | 31193 | 95.11 | 15.78 | 119 |
| Made personal or business travel plans online/past 30 days | 52090 | 95.62 | 26.35 | 119 |
| Played games online/past 30 days | 67664 | 88.91 | 34.23 | 111 |
| Downloaded a video game/past 30 days | 26365 | 88.96 | 13.34 | 111 |
| Used on-line gambling site/past 30 days | 3309 | 90.90 | 1.67 | 113 |
| Obtained financial information online/past 30 days | 72299 | 93.82 | 36.58 | 117 |
| Tracked investments/Traded stocks, bonds or mutual funds online/past 30 days | 29608 | 95.55 | 14.98 | 119 |
| Paid bills online/past 30 days | 121266 | 92.58 | 61.35 | 115 |
| Obtained the latest news/current events online/past 30 days | 105983 | 92.54 | 53.62 | 115 |
| Obtained sports news/information online/past 30 days | 70900 | 92.22 | 35.87 | 115 |
| Obtained information for new/used car purchase online/past 30 days | 28519 | 91.66 | 14.43 | 114 |
| Obtained information about real estate online/past 30 days | 36160 | 93.68 | 18.29 | 117 |
| Obtained medical information online/past 30 days | 66811 | 92.24 | 33.80 | 115 |
| Obtained childcare or parenting information online/past 30 days | 14601 | 92.25 | 7.39 | 115 |
| Obtained information about entertainment or celebrities | 62269 | 92.54 | 31.50 | 115 |
| Looked for employment online/past 30 days | 32835 | 88.03 | 16.61 | 110 |
| Looked for recipes online/past 30 days | 91818 | 91.73 | 46.45 | 114 |
| Took an online class or course/past 30 days | 19593 | 94.67 | 9.91 | 118 |
| Visited a TV network or TV show's website/past 30 days | 43275 | 93.36 | 21.89 | 116 |
| Looked at TV listings online/past 30 days | 21384 | 91.59 | 10.82 | 114 |
| Looked up movie listings or showtimes online/past 30 days | 52098 | 93.06 | 26.36 | 116 |
| Downloaded a TV program/past 30 days | 11181 | 93.23 | 5.66 | 116 |
| Watched a TV program online/past 30 days | 43686 | 94.27 | 22.10 | 118 |
| Downloaded a movie/past 30 days | 21577 | 92.52 | 10.92 | 115 |
| Watched a movie online/past 30 days | 61029 | 92.93 | 30.88 | 116 |
| Watched other online video/past 30 days | 49322 | 90.83 | 24.95 | 113 |
| Visited online blogs/past 30 days | 29867 | 94.42 | 15.11 | 118 |
| Wrote online blog/past 30 days | 4523 | 92.20 | 2.29 | 115 |
| Posted a comment or review on a blog, online forum, message or bulletin board/past 30 days | 26891 | 92.66 | 13.60 | 116 |
| Made a phone call online/past 30 days | 69922 | 89.07 | 35.38 | 111 |
| Uploaded or added video to website/past 30 days | 19420 | 91.65 | 9.82 | 114 |
| Shared photos through Internet website/past 30 days | 78080 | 91.62 | 39.50 | 114 |
| Sent an electronic greeting card/past 30 days | 10165 | 90.99 | 5.14 | 113 |

**Exhibit C**
**Google Street View MRI Data**

**Digital Media Usage**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Total time spent yesterday using the Internet (does not include email or IM): 10+ hours | 12384 | 90.57 | 6.27 | 113 |
| Total time spent yesterday using the Internet (does not include email or IM): 5-10 hours | 32258 | 91.46 | 16.32 | 114 |
| Total time spent yesterday using the Internet (does not include email or IM): 2-5 hours | 56153 | 91.13 | 28.41 | 114 |
| Total time spent yesterday using the Internet (does not include email or IM): 1-2 hours | 39899 | 89.07 | 20.19 | 111 |
| Total time spent yesterday using the Internet (does not include email or IM): 1/2-1 hour | 23035 | 86.89 | 11.65 | 108 |
| Total time spent yesterday using the Internet (does not include email or IM): less than 1/2 hour | 14419 | 79.54 | 7.29 | 99 |
| Total time spent last Saturday using the Internet (does not include email or IM): 10+ hours | 8431 | 90.61 | 4.27 | 113 |
| Total time spent last Saturday using the Internet (does not include email or IM): 5-10 hours | 23530 | 88.15 | 11.90 | 110 |
| Total time spent last Saturday using the Internet (does not include email or IM): 2-5 hours | 50771 | 91.59 | 25.69 | 114 |
| Total time spent last Saturday using the Internet (does not include email or IM): 1-2 hours | 40339 | 90.09 | 20.41 | 112 |
| Total time spent last Saturday using the Internet (does not include email or IM): 1/2-1 hour | 26018 | 88.33 | 13.16 | 110 |
| Total time spent last Saturday using the Internet (does not include email or IM): less than 1/2 hour | 17199 | 83.09 | 8.70 | 104 |
| Total time spent last Sunday using the Internet (does not include email or IM): 10+ hours | 7629 | 89.37 | 3.86 | 111 |
| Total time spent last Sunday using the Internet (does not include email or IM): 5-10 hours | 21506 | 89.88 | 10.88 | 112 |
| Total time spent last Sunday using the Internet (does not include email or IM): 2-5 hours | 47791 | 91.16 | 24.18 | 114 |
| Total time spent last Sunday using the Internet (does not include email or IM): 1-2 hours | 40801 | 90.56 | 20.64 | 113 |
| Total time spent last Sunday using the Internet (does not include email or IM): 1/2-1 hour | 27308 | 88.87 | 13.82 | 111 |
| Total time spent last Sunday using the Internet (does not include email or IM): less than 1/2 hour | 18207 | 84.02 | 9.21 | 105 |

Source: 2018 Doublebase GfK MRI
* Projections relatively unstable, use with caution

**Exhibit D**

**Google Street View MRI Data**

**Websites and Social Media Usage**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Website or search engines used/last 30 days: AOL/AOL.com | 8346 | 92.86 | 4.22 | 116 |
| Website or search engines used/last 30 days: Ask.com | 4558 | 90.12 | 2.31 | 112 |
| Website or search engines used/last 30 days: Bing.com | 24147 | 93.93 | 12.22 | 117 |
| Website or search engines used/last 30 days: Google.com | 177148 | 88.85 | 89.62 | 111 |
| Website or search engines used/last 30 days: Yahoo.com | 51497 | 90.42 | 26.05 | 113 |
| Chat, Instant Messenger, video chat used/last 30 days: Facebook Messenger | 106119 | 88.77 | 53.69 | 111 |
| Chat, Instant Messenger, video chat used/last 30 days: Google Hangouts | 11054 | 92.67 | 5.59 | 116 |
| Chat, Instant Messenger, video chat used/last 30 days: Skype | 22927 | 95.56 | 11.60 | 119 |
| Chat, Instant Messenger, video chat used/last 30 days: Snapchat Chat | 35411 | 90.29 | 17.92 | 113 |
| Chat, Instant Messenger, video chat used/last 30 days: WeChat | 1642 | 95.23 | 0.83 | 119 |
| Chat, Instant Messenger, video chat used/last 30 days: WhatsApp | 22854 | 89.76 | 11.56 | 112 |
| Chat, Instant Messenger, video chat used/last 30 days: Yahoo! Messenger | 10136 | 87.63 | 5.13 | 109 |
| E-mail used/last 30 days: AOL Mail | 13023 | 92.99 | 6.59 | 116 |
| E-mail used/last 30 days: Gmail | 111192 | 90.33 | 56.25 | 113 |
| E-mail used/last 30 days: Outlook | 45055 | 95.56 | 22.79 | 119 |
| E-mail used/last 30 days: Yahoo! Mail | 54393 | 90.62 | 27.52 | 113 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: ABC | 12143 | 92.57 | 6.14 | 115 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: BuzzFeed | 17868 | 94.92 | 9.04 | 118 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: CBS | 14053 | 92.41 | 7.11 | 115 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: Disney.com | 4911 | 90.97 | 2.48 | 113 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: Disney Channel | 4072 | 91.48 | 2.06 | 114 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: Disney XD | 1362 | 88.45 | 0.69 | 110 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: Fandango | 15653 | 95.14 | 7.92 | 119 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: Fox.com/FOX NOW | 13141 | 92.65 | 6.65 | 116 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: IMDb | 26005 | 95.93 | 13.16 | 120 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: Moviefone | 2010 | 91.13 | 1.02 | 114 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: MSN Entertainment | 4588 | 92.55 | 2.32 | 115 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: MTV | 5058 | 90.22 | 2.56 | 112 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: NBC | 13073 | 94.16 | 6.61 | 117 |

**Exhibit D**

**Google Street View MRI Data**

**Websites and Social Media Usage**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| ENTERTAINMENT Websites/apps visited or used in last 30 days: PBS | 9584 | 93.62 | 4.85 | 117 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: Popsugar | 2199 | 95.72 | 1.11 | 119 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: Ticketmaster | 15613 | 94.49 | 7.90 | 118 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: Vevo | 5511 | 91.54 | 2.79 | 114 |
| ENTERTAINMENT Websites/apps visited or used in last 30 days: Yahoo! Movies | 3502 | 84.44 | 1.77 | 105 |
| FINANCE Websites/apps visited or used in last 30 days: CNBC | 9138 | 95.18 | 4.62 | 119 |
| FINANCE Websites/apps visited or used in last 30 days: MSN Money | 5628 | 92.98 | 2.85 | 116 |
| FINANCE Websites/apps visited or used in last 30 days: TheStreet | 1976 | 94.91 | 1.00 | 118 |
| FINANCE Websites/apps visited or used in last 30 days: Yahoo! Finance | 8543 | 93.92 | 4.32 | 117 |
| INFORMATION/REFERENCE Websites/apps visited or used in last 30 days: Answers.com/WikiAnswers | 10789 | 92.07 | 5.46 | 115 |
| INFORMATION/REFERENCE Websites/apps visited or used in last 30 days: eHow | 9262 | 93.89 | 4.69 | 117 |
| INFORMATION/REFERENCE Websites/apps visited or used in last 30 days: WebMD | 52221 | 92.92 | 26.42 | 116 |
| INFORMATION/REFERENCE Websites/apps visited or used in last 30 days: WhitePages | 9921 | 91.72 | 5.02 | 114 |
| INFORMATION/REFERENCE Websites/apps visited or used in last 30 days: Wikipedia | 55820 | 93.92 | 28.24 | 117 |
| INFORMATION/REFERENCE Websites/apps visited or used in last 30 days: Yahoo! Answers | 11578 | 90.16 | 5.86 | 112 |
| INFORMATION/REFERENCE Websites/apps visited or used in last 30 days: YP (Yellowpages) (measured as Yellowpages.com (YP.com) in Wave 75) | 5716 | 88.79 | 2.89 | 111 |
| JOBS/CAREERS Websites/apps visited or used in last 30 days: CareerBuilder | 8700 | 86.35 | 4.40 | 108 |
| JOBS/CAREERS Websites/apps visited or used in last 30 days: Monster | 6662 | 88.76 | 3.37 | 111 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: ABCNews | 16060 | 92.11 | 8.12 | 115 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: BBC.com | 14075 | 95.62 | 7.12 | 119 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: CBSNews | 12174 | 92.26 | 6.16 | 115 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: CNN | 38764 | 94.29 | 19.61 | 118 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: FOX News | 32267 | 92.38 | 16.32 | 115 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: HuffPost (Huffington Post measured as HuffingtonPost.com in Wave 75 and as | 23823 | 95.18 | 12.05 | 119 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: NBCNews | 12598 | 93.45 | 6.37 | 117 |

**Exhibit D**

**Google Street View MRI Data**

**Websites and Social Media Usage**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: NYTimes.com | 26398 | 95.02 | 13.36 | 118 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: Reuters | 6258 | 95.18 | 3.17 | 119 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: USAToday.com | 17674 | 93.10 | 8.94 | 116 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: WSJ.com | 17092 | 95.42 | 8.65 | 119 |
| NEWS/COMMENTARY Websites/apps visited or used in last 30 days: Yahoo! News | 19849 | 91.53 | 10.04 | 114 |
| SHOPPING Websites/apps visited or used in last 30 days: Amazon | 108424 | 93.87 | 54.85 | 117 |
| SHOPPING Websites/apps visited or used in last 30 days: Coupons | 7394 | 88.88 | 3.74 | 111 |
| SHOPPING Websites/apps visited or used in last 30 days: eBay | 43565 | 91.50 | 22.04 | 114 |
| SHOPPING Websites/apps visited or used in last 30 days: Groupon | 24994 | 95.16 | 12.64 | 119 |
| SHOPPING Websites/apps visited or used in last 30 days: LivingSocial | 3632 | 95.77 | 1.84 | 119 |
| SHOPPING Websites/apps visited or used in last 30 days: Overstock | 12435 | 94.49 | 6.29 | 118 |
| SPANISH LANGUAGE Websites/apps visited or used in last 30 days: Univision | 6039 | 83.12 | 3.06 | 104 |
| SPANISH LANGUAGE Websites/apps visited or used in last 30 days: Yahoo! en Espanol | 2634 | 86.20 | 1.33 | 107 |
| SPANISH LANGUAGE Visited or used in last 30 days: Any spanish language website/app | 8224 | 83.65 | 4.16 | 104 |
| SPORTS Websites/apps visited or used in last 30 days: BleacherReport.com | 9788 | 95.54 | 4.95 | 119 |
| SPORTS Websites/apps visited or used in last 30 days: CBSSports | 8457 | 93.70 | 4.28 | 117 |
| SPORTS Websites/apps visited or used in last 30 days: ESPN | 42210 | 92.57 | 21.36 | 115 |
| SPORTS Websites/apps visited or used in last 30 days: FOX Sports | 15733 | 91.28 | 7.96 | 114 |
| SPORTS Websites/apps visited or used in last 30 days: MLB.com/MLB.com At Bat (measured as MLB.com or MLB At Bat in Wave 76) | 10328 | 94.50 | 5.23 | 118 |
| SPORTS Websites/apps visited or used in last 30 days: NASCAR | 4823 | 88.30 | 2.44 | 110 |
| SPORTS Websites/apps visited or used in last 30 days: NBA | 11866 | 89.23 | 6.00 | 111 |
| SPORTS Websites/apps visited or used in last 30 days: NBCSports.com | 6607 | 93.98 | 3.34 | 117 |
| SPORTS Websites/apps visited or used in last 30 days: NFL.com or NFL/NFL Mobile | 19289 | 92.18 | 9.76 | 115 |
| SPORTS Websites/apps visited or used in last 30 days: WWE | 4018 | 83.50 | 2.03 | 104 |
| SPORTS Websites/apps visited or used in last 30 days: Yahoo! Sports | 10763 | 91.98 | 5.45 | 115 |
| TECHNOLOGY Websites/apps visited or used in last 30 days: CNET | 8244 | 96.34 | 4.17 | 120 |

**Exhibit D**

**Google Street View MRI Data**

**Websites and Social Media Usage**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Airbnb | 12820 | 97.41 | 6.49 | 121 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Bings Maps | 3230 | 92.93 | 1.63 | 116 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Cheap Tickets | 10412 | 94.02 | 5.27 | 117 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Expedia | 19449 | 95.89 | 9.84 | 120 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Google Maps | 89591 | 91.26 | 45.33 | 114 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Hotels.com | 15833 | 94.08 | 8.01 | 117 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Hotwire | 6337 | 94.45 | 3.21 | 118 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: MapQuest | 28773 | 92.00 | 14.56 | 115 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Orbitz | 7178 | 95.20 | 3.63 | 119 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Priceline | 10069 | 95.04 | 5.09 | 119 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Travelocity | 13399 | 94.36 | 6.78 | 118 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: TripAdvisor | 17475 | 95.75 | 8.84 | 119 |
| TRAVEL/MAPS Websites/apps visited or used in last 30 days: Yahoo! Maps | 11149 | 89.05 | 5.64 | 111 |
| WEATHER Websites/apps visited or used in last 30 days: AccuWeather | 36263 | 89.52 | 18.35 | 112 |
| WEATHER Websites/apps visited or used in last 30 days: The Weather Channel (weather.com measured as Weather.com in Wave 75) | 78225 | 91.61 | 39.58 | 114 |
| WEATHER Websites/apps visited or used in last 30 days: WeatherBug | 10449 | 89.40 | 5.29 | 111 |
| WEATHER Websites/apps visited or used in last 30 days: Weather Underground (wunderground.com) | 9243 | 94.05 | 4.68 | 117 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Facebook | 139333 | 89.17 | 70.49 | 111 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Flickr | 2576 | 92.23 | 1.30 | 115 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Foursquare | 962 | 92.25 | 0.49 | 115 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Google+ (Google Plus) | 26382 | 88.96 | 13.35 | 111 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Instagram | 64250 | 92.45 | 32.51 | 115 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: LinkedIn | 30353 | 96.27 | 15.36 | 120 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Periscope | 2034 | 93.76 | 1.03 | 117 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Photobucket | 2248 | 89.60 | 1.14 | 112 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Pinterest | 48133 | 93.64 | 24.35 | 117 |

**Exhibit D**

**Google Street View MRI Data**

**Websites and Social Media Usage**

**Adults 18+ and Internet - Can Connect From Home Using A Wireless Connection (Not Including Cell Phones): Yes**

| | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Reddit | 10928 | 96.52 | 5.53 | 120 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Shutterfly | 7403 | 95.27 | 3.75 | 119 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Tumblr | 8302 | 94.47 | 4.20 | 118 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Twitter | 31910 | 94.74 | 16.14 | 118 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: Yelp | 16376 | 96.76 | 8.29 | 121 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Websites/apps visited or used in last 30 days: YouTube | 111547 | 89.61 | 56.43 | 112 |
| SOCIAL MEDIA/PHOTO/VIDEO-SHARING Visited or used in last 30 days: Any Socializing/Photo/Video-sharing services | 168332 | 89.04 | 85.16 | 111 |
| Activities using social media, photo or video-sharing site: Updated status/last 30 days | 64692 | 89.79 | 32.73 | 112 |
| Activities using social media, photo or video-sharing site: Updated profile/last 30 days | 50325 | 89.41 | 25.46 | 111 |
| Activities using social media, photo or video-sharing site: Posted a picture/last 30 days | 100948 | 90.11 | 51.07 | 112 |
| Activities using social media, photo or video-sharing site: Posted a video/last 30 days | 45079 | 90.46 | 22.81 | 113 |
| Activities using social media, photo or video-sharing site: Posted a website link/last 30 days | 34224 | 93.35 | 17.31 | 116 |
| Activities using social media, photo or video-sharing site: Visited a friend's profile or page/last 30 days | 109472 | 90.76 | 55.38 | 113 |
| Activities using social media, photo or video-sharing site: Commented on a friend's post/last 30 days | 102433 | 90.82 | 51.82 | 113 |
| Activities using social media, photo or video-sharing site: Posted a blog entry/last 30 days | 7932 | 89.75 | 4.01 | 112 |
| Activities using social media, photo or video-sharing site: Rated or reviewed a product or service/last 30 days | 20400 | 93.37 | 10.32 | 116 |
| Activities using social media, photo or video-sharing site: Sent a message or e-mail/last 30 days | 109090 | 91.40 | 55.19 | 114 |
| Activities using social media, photo or video-sharing site: Used IM/last 30 days | 44301 | 92.57 | 22.41 | 115 |
| Activities using social media, photo or video-sharing site: Played a game/last 30 days | 42290 | 89.17 | 21.40 | 111 |
| Activities using social media, photo or video-sharing site: Invited people to an event/last 30 days | 21609 | 92.48 | 10.93 | 115 |
| Activities using social media, photo or video-sharing site: Sent a real or virtual gift/last 30 days | 4329 | 91.85 | 2.19 | 115 |
| Activities using social media, photo or video-sharing site: Posted that you "like" something/last 30 days | 91652 | 90.64 | 46.37 | 113 |
| Activities using social media, photo or video-sharing site: "Followed" or became a "fan of" something or someone/last 30 days | 51810 | 92.11 | 26.21 | 115 |
| Activities using social media, photo or video-sharing site: Clicked on an advertisement/last 30 days | 36352 | 92.63 | 18.39 | 115 |
| Activities using social media, photo or video-sharing site: Watched a video/last 30 days | 113296 | 89.86 | 57.32 | 112 |

**Exhibit D**

**Google Street View MRI Data**


**Websites and Social Media Usage**


**Adults 18+ and Internet - Can Connect From
Home Using A Wireless Connection (Not
Including Cell Phones): Yes**

|  | Audience (000) | % Coverage | % Composition | Index |
|---|---|---|---|---|
| Activities using social media, photo or video-sharing site: Posted your current location/last 30 days | 26693 | 91.73 | 13.50 | 114 |
| Activities using social media, photo or video-sharing site: Re-posted  or shared a post created by someone else/last 30 days | 53039 | 91.22 | 26.83 | 114 |
| Prime Video (measured as Amazon Prime Video)/past 30 days | 38589 | 97.46 | 19.52 | 122 |
| Crackle/past 30 days | 3818 | 90.46 | 1.93 | 113 |
| Google Play/past 30 days | 5323 | 89.75 | 2.69 | 112 |
| Hulu/past 30 days | 29111 | 94.45 | 14.73 | 118 |
| iTunes (video streaming)/past 30 days | 7601 | 95.73 | 3.85 | 119 |
| Netflix/past 30 days | 110545 | 94.35 | 55.93 | 118 |
| PlayStation Vue (video streaming)/past 30 days | 2765 | 93.96 | 1.40 | 117 |
| Sling TV/past 30 days | 3856 | 96.20 | 1.95 | 120 |


Source: 2018 Doublebase GfK MRI                    *
Projections relatively unstable, use with caution

# EXHIBIT J - 2

# LINDA V. YOUNG
Linda.Young@abdata.com

## EXPERIENCE

## A.B. Data, Ltd., Milwaukee, WI

Vice President, Media

Lead the A.B. Data Class Action Administration media team in research, development, and implementation of media notice plans for settlements and other class action administrations. Cases include the following:

## Antitrust Settlements Notice Programs

- *In re Liquid Aluminum Sulfate Antitrust Litigation* No. 16-md-2687 (JLL) (JAD), United States District Court, District of New Jersey
- *In re Aggrenox Antitrust Litigation* No. 3:14-md-02516 (D. Conn.)
- *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation (All End-Payor Actions)* MDL No. 14-MD-2503-DJC, United States District Court for the District of Massachusetts
- *In re Capacitors Antitrust Litigations: All Indirect Purchaser Actions* No 14-CV-03264-JD
- *In re Polyurethane Foam Antitrust Litigation* MDL Docket No. 2196, United States District Court, Northern District of Ohio
- *In re Medco Health Solutions, Inc., Pharmacy Benefits Management Litigation* MDL No. 1508, United States District Court, Southern District of New York
- *In re Warfarin Sodium Antitrust Litigation*, MDL No. 98-1232 (SLR), United States District Court, District of Delaware
- *Blevins v. Wyeth-Ayerst Laboratories, Inc. and American Home Products Corp.* No. 324380, Superior Court of California for the County of San Francisco
- *In re Terazosin Hydrochloride Antitrust Litigation* 99-MDL-1317, United States District Court, Southern District of Florida
- *In re Cardizem CD Antitrust Litigation* 99-MD-1278 United States District Court, Eastern District of Michigan
- *In re High Pressure Laminate Antitrust Litigation*, Civil Action No. 00C-1989 and Related Cases, Second Circuit Court for Davidson County, Tennessee, 20th Judicial District at Nashville
- *In re Pennsylvania Baycol Third-Party Payor Litigation*, September Term, 2001 No. 001874 Court of Common Pleas, Philadelphia County, South Carolina
- *In re Remeron End-Payor Antitrust Litigation*, Master File No. 02-CV-2007 (FSH), United States District Court, District of New Jersey
- *In re Relafen Antitrust Litigation* 01-12239-WGY United States District Court, District of Massachusetts
- *In re Buspirone Antitrust* 01-MD-01413, United States District Court, Southern District of New York
- *Rosemarie Ryan House, et al. v. GlaxoSmithKline PLC and SmithKline Beecham*

*Corporation* No. 2:02cv442, United States District Court, Eastern District of Virginia
- *Cipro Cases I and II*, Judicial Council Coordination Proceedings Nos. 4154 and 4220, Superior Court of the State of California, County of San Diego
- *In re Potash Antitrust Litigation (II)* No. 1:08-CV-6910, United States District Court for the Northern District of Illinois
- *In re Optiver Commodities Litigation* No. 1:08-CV-06842-LAP, United States District Court, Southern District of New York
- *In re: Rough Rice Commodity Litigation* No. 11-CV-00618, United States District Court, Northern District of Illinois
- *In re Platinum and Palladium Commodities Litigation (Platinum/Palladium Futures Action)* 10-CV-3617 (WHP) ("Futures Action") United States District Court, Southern District of New York
- *In re Platinum and Palladium Commodities Litigation (Platinum/Palladium Physical Action)* 10-CV-3617 (WHP) ("Physical Action"), United States District Court, Southern District of New York
- *Kamakahi and Levy v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology* No. 3:11-CV-1781 JCS, United States District Court, Northern District of California
- *Mahoney v. Endo Health Solutions, Inc., et al.* No. 15-CV-9841 (DLC) United States District Court, Southern District of New York
- *State of New York, et al, v. Cephalon, Inc., et al.*, Civil Action No. 16-CV-01833, United States District Court, Eastern District of Pennsylvania

## Securities Settlements Notice Programs

- *Elkin v. Walter Investment Management Corp.,* No. 2:17-cv-02025-JCJ, United States District Court, Eastern District of Pennsylvania
- *In re Starz Stockholder Litigation,* No. 12584-VCG, The Court of Chancery of the State of Delaware
- *In re Quality Systems, Inc. Securities Litigation*, No. 8:13-cv-01818-CJC-JPR, United States District Court, Central District of California, Southern Division
- *In re PTC Therapeutics, Inc. Securities Litigation*, No. 16-1224 (KM)(MAH), United States District Court, District of New Jersey
- *Aude, et al., v. Kobe Steel, Ltd., et al.,* United States District Court, Southern District of New York No. 17-CV-10085-VSB
- *Rahman v. GlobalSCAPE, Inc., et al.,* United States District Court, Western District of Texas No. 5:17-cv-00753-XR
- *In re CytRx Corporation Securities Litigation* United States District Court, Central District of California No. 2:16-CV-05519-SJO-SK
- *In re CPI Card Group Inc. Securities Litigation,* United States District Court, Southern District of New York No. 16-cv-04531 (LAK)
- *Singh v. 21Vianet Group, Inc.* United States District Court, Eastern District of Texas, Marshall Division No. 2:14-cv-00894-JRG-RSP
- *Kasper v. AAC Holdings, Inc., et al.,* United States District Court, Middle District of Tennessee, Nashville Division No. 3:15-CV-00923-JPM
- *Euroyen-Based Derivatives, Laydon v. Mizuho Bank Ltd*., *et al*., 12-CV-3419 (GBD)

*Southern District of New York and Sonterra Capital Master Fund, Ltd., et al. v. UBS AG, et al.* 15-CV-5844 (GBD), Southern District of New York

- *In re Facebook, Inc. IPO Securities and Derivative Litigation*, United States District Court Southern District of New York, MDL No. 12-2389

- *GFI Group, Inc. Securities Litigation,* United States District Court Southern District of New York No. 1:14-CV-09438 WHP

- *In re Juno Therapeutics Inc.,* United States District Court Western District of Washington at Seattle No. C16-1069 RSM

- *Straight Path Communications, Inc.,* United States District Court , District of New Jersey No. 2:15-CV-08051-JMV-MF

- *In re DFC Global Corp. Securities Litigation,* United States District Court Eastern District of Pennsylvania, Civ. A. No. 2:13-CV-06731-BMS

- *In re Berkshire Realty Company, Inc. Shareholder Litigation*, C.A. No. 17242, Court of Chancery for the State of Delaware in and for New Castle County

- *Lipson v. Simon et al.*, CV 98 4573 (TCP), United States District Court, Eastern District of New York

- *In re Service Corporation International*, Civil Action H-99-280, United States District Court, Southern District of Texas

- *Hicks v. Morgan Stanley & Co.* 01 Civ. 10071 (RJH), United States District Court, Southern District of New York

- *High Tide Harry's, Inc. v. Waste Management Inc. of Florida* 05-CA-009441, 9th Judicial Circuit, State of Florida

- *In re Campbell Soup Co. Securities Litigation* 00-152-JEI, United States District Court, District of New Jersey

- *Abrams v. Van Kampen Funds, Inc.* 01-C-7538, United States District Court, Northern District of Illinois

- *In re Seitel, Inc. Securities Litigation* No. 02-1566, United States District Court, Southern District of Texas

- *Stevelman v. Alias Research, Inc.* 591-CV-00682 (EBB), United States District Court, District of Connecticut

- *In re Phoenix Leasing Limited Partnership Litigation* No. 173739, Superior Court of the State of California, County of Marin

- *In re Nuko Information Systems, Inc.* C-97-20471 EAI, United States District Court, Northern District of California

- *In re PriceSmart Securities Litigation*, Master File No. 03-CV-2260-JAH- (BLM), United States District Court, Southern District of California

- *In re General Electric Co. Securities Litigation*, Civ. No. 09-CIV-1951 (DLC) ECF CASE, United States District Court, Southern District of New York

- *In re PAR Pharmaceutical Securities Litigation*, Master File No. 2:06-03226 (ES) (SCM), United States District Court, District of New Jersey

- *In re ING Groep, N.V. ERISA Litigation*, Master File No. 1:09-CV-00400-JEC, United States District Court, Northern District of Georgia

- *In re Fannie Mae 2008 Securities Litigation* No. 08-CV-7831, United States District Court, Southern District of New York

- *In re Massey Energy Co. Securities Litigation*, Civil Action No. 5:10-CV-00689-ICB,

United States District Court, Southern District of West Virginia
- *In re 2014 Avon Products, Inc. ERISA Litigation*, United States District Court, Southern District of New York
- *In re BioScrip, Inc. Securities Litigation*, Civil Action No. 13-CV-6922- AJN, United States District Court, Southern District of New York
- *In re BP plc Securities Litigation* No. 4:10-MD-02185, United States District Court, Southern District of Texas
- *The Department of the Treasury of the State of New Jersey and Its Division of Investment v. Cliffs Natural Resources Inc., et al.* No. 1:14-CV-1031, United States District Court, Northern District of Ohio
- *Laydon v. Mizuho Bank, Ltd., et al.* No. 12-CV-3419 (GBD) and *Sonterra Capital Master Fund Ltd., et al. v. UBS AG, et al.* No. 15-CV-5844 (GBD), United States District Court, Southern District of New York
- *Sullivan, et al. v. Barclays plc, et al.*, No. 13-CV-02811 (PKC), United States District Court, for the Southern District of New York
- *In re Eastman Kodak ERISA Litigation* Master File No. 6:12-CV-06051 DGL, United States District Court, Western District of New York
- *In re NII Holdings, Inc. Securities Litigation*, Civ. No. 1:14-CV-00227-LMB-JFA, United States District Court, Eastern District of Virginia
- *In re Nu Skin Enterprises, Inc., Securities Litigation* Master File No. 2:14-CV-00033-JNP-BCW, United States District Court, District of Utah
- *Första AP-Fonden and Danske Invest Management A/S v. St. Jude Medical, Inc., et al.* Civil, No. 12-3070 (JNE/HB), United States District Court, District of Minnesota
- *In re TIBCO Software Inc. Stockholders Litigation, Consolidated C.A.* No. 10319-CB, Court of Chancery, State of Delaware

## Consumer Settlements Notice Programs

- *MSPA Claims 1, LLC v. Ocean Harbor Cas. Ins. Co.* No. 2015-1946 CA-01, Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida
- *Valle v. Popular Community Bank,* No. 653936/2012, Supreme Court, State of New York, County of New York
- *Bizarro, et al., v. Ocean County* No. OCN-1644-17, Superior Court of New Jersey, Law Division, Ocean County
- *Christina Martin et al. v. the State of Washington, et al.,* Superior Court, State of Washington, County of Spokane, No 14-2-00016-7
- *Picant v. Premier Cruise Lines*, 96-06932-CA-FN, 18th Judicial Circuit, State of Florida
- *McParland and Picking v. Keystone Health Plan Central, Inc.* Civil Action No. 98-SU-00770-01, Court of Common Pleas, York County, Pennsylvania
- *Smith v. American Family Mutual Automobile Insurance Co.* No. 00-CV-211554, Circuit Court of Jackson County, Missouri
- *Duncan v. The Unity Life and Accident Insurance Association, et al.*, Civil Action No. 00-CIV-7621, United States District Court, Southern District of New York
- *Duncan v. Columbian Protective Association of Binghamton, New York, and Columbian Mutual Life Insurance Company* No. 00 CIV. 7236 (JGK), United States District Court, Southern District of New York

- *Watkins, as Executrix of the Estate of Hines, and as Beneficiary of the Adult Whole Life Industrial Policy of Hines, v. Columbian Mutual Life Insurance Company, a Subsidiary of Columbian Financial Group, and Golden Eagle Mutual Life Insurance Corporation* No. 03 CIV. 8620 (JGK), United States District Court, Southern District of New York
- *In re: Benzion v. Vivint, Inc.* No. 12-CV-61826-WJZ, United States District Court, Southern District of Florida
- *In re: ADT Security Services, Inc.* No. 1:11-CV-1925, United States District Court, Northeastern District of Illinois
- *The State of Illinois v. Au Optronics Corporation, et al.* No. 10 CH 34472, Circuit Court of Cook County, Illinois
- *State of Washington v. AU Optronics Corporation, et al.* No. 10-2- 29164-4 SEA, King County Superior Court, Washington
- *Mey v. Interstate National Dealer Services, Inc., et al.* No. 1:14-CV-01846-ELR, United States District Court, Northern District of Georgia
- *Estakhrian, et al., v. Obenstine, et al.* No. CV11-3480-FMO (CWx), Nevada District Court
- *Krakauer v. DISH Network, L.L.C.*, Civil Action No. 14-CV-333, United States District Court, Middle District of North Carolina
- *Lofton v. Verizon Wireless (VAW) LLC* No. 13-CV-05665-YGR, United States District Court, Northern District of California
- *Lyons, et al., v. Litton Loan Servicing, LP, et al.*, No. 13-CV-00513, United States District Court, Southern District of New York; *Katz, et al. v. Live Nation, Inc.,  et al.*, Civil Action No. 1:09-CV-003740-MLC-DEA, United States District Court, District of New Jersey
- *Bergman, et al. v. DAP Products Inc., et al.* No. 14-CV-03205-RDB, United States District Court, District of Maryland

**Mile Marker Zero, LLC, Greenville, SC**

Principal

Directed the development of marketing and advertising plans for national and local clients, including the following:

- **Complete Claim Solutions, Inc.**
  - Developed media recommendations and implemented newspaper, magazine, and press release notice programs with budgets ranging from $500 to as high as $2 million for third-party-payor settlements, including settlements regarding Terazosin Hydrochloride (Hytrin), Coumadin-Warfarin, Augmentin, Cardizem, Remeron, Relafen, Buspar, and Taxol.
  - Developed and implemented media plans for securities settlements in cases involving such firms as Morgan Stanley, First Central Financial, Waste Management, Campbell Soup, Van Kampen, Alias Research, and Nuko Information Systems. Some plans included running newspaper ads in more than 50 city newspapers over a single two-week period.
  - Developed media recommendations and implemented newspaper and magazine advertising campaigns on both regional and national levels for consumer and

insurance settlements in cases involving such firms as Premier Cruise Lines and Unity Life Insurance Company.

Mile Marker Zero worked with Complete Claim Solutions, Inc., for six years as its sole media planning and buying partner. Mile Marker Zero developed and implemented national and international print and earned media notice programs to support the notification of consumers and third-party payors in cases such as the following:

- Coumadin-Warfarin
- Hytrin
- Cardizem
- Buspar
- Nuko
- Columbian Mutual Life
- Freeport-McMoRan Sulphur, Inc.
- Relafen
- Remeron
- Service Corporation International
- Premarin

- Taxol
- Waste Management
- Campbell Soup
- Alias Research
- Augmentin
- Keystone Health Plan
- Seitel, Inc. Securities

- 3M-Scotch
- Baycol
- SmartForce, PLC

- PriceSmart

- Van Kampen
- Unity Life Insurance Co.
- Premier Cruise Lines
- MedCo
- Berkshire Realty
- Platinol
- Transaction System Architects
- Eaton Vance Corp.
- Cipro
- American Family Mutual Automobile Insurance Co.
- Morgan Stanley

- **The Arthritis Foundation** – the largest U.S. not-for-profit organization that supports research regarding more than 100 types of arthritis and related conditions.
  - o Wrote and produced national sponsorship programs to generate financial support for the Foundation.
  - o Wrote and produced collateral materials to support national Foundation events such as *Joints in Motion* and the *Arthritis Walk*.

- **Papa Murphy's Pizza** – the fifth-largest pizza chain in the U.S., with over 1,000 units in the U.S. and Canada.
  - o Developed and implemented grand opening advertising plans for more than 50 stores in 40 cities.
  - o Utilized direct mail, local newspapers, outdoor/billboard advertising, and local radio to promote grand opening activities.

- **FIERO** (Fire Industry Equipment Research Organization) – national fire services association.
  - o Developed collateral material and advertising campaign to generate awareness of association and to announce its annual symposium on fire station design and safety. Symposium exceeded FIERO goals by hosting more than 500 fire-fighting support personnel. FIERO also saw a 25% increase in membership during this period.

- **TeamPoint Systems, Inc.** – a global software company with over 20,000 users.
  - o Directed graphic design, writing, and development of

company website, www.teampointsystems.com, which
received over 8,000 visits monthly.

o Produced brochures, signage, and promotional materials for attendance at
the national SITEK convention.

o Interviewed TeamPoint customers and wrote case studies about their
successful use of TeamPoint's products. After putting the case studies on the
website, visit time lengthened from an average of three minutes to more than
eight minutes per visit. Sales also increased by 45% and have risen steadily.

### Denny's Corporation, Spartanburg, SC

Senior National Advertising Manager

- Partnered with Brand Marketing Director of major worldwide restaurant chain in
the development of new product promotions and determined all marketing
materials needed to support business initiatives and ensure message consistency;
directed five national U.S. advertising agencies and one Canadian agency in
development and implementation of advertising and media strategies, objectives,
and tactics. Ensured that all advertising reinforced brand positioning and marketing
mission.

### The Coca-Cola Company, Atlanta, GA

Advertising Services Manager

- Presented and reinforced general market, African-American, and Hispanic brand
strategies, objectives, and positioning for both carbonated soft drinks and
noncarbonated beverages to company's bottler system and local agencies;
developed local vendor promotions with bottlers and agencies that strengthened
brand positioning and increased case volume, including development of POP
materials, merchandising displays, and broadcast
creative advertising.

### McCann Erickson, Atlanta, GA

Media Supervisor

- Supervised six advertising professionals in media planning and buying for
travel, B2B, consumer retail, and consumer packaged goods accounts.

### EDUCATION

Bachelor of Business Administration, University of North Dakota

# EXHIBIT J - 3



| Headquarters | New York | Washington, D.C. | Florida | Israel |
|---|---|---|---|---|
| 600 A.B. Data Drive | One Battery Park Plaza | 1808 Swann Street, NW | 3507 Kyoto Gardens Drive | 19 Weissburg Street |
| Milwaukee, WI 53217 | 32nd Floor | Washington, D.C. 20009 | Palm Beach Gardens, FL 33410 | Tel Aviv 69358 |
| p: 866-217-4470 | New York, NY 10004 | p: 202-618-2908 | p: 561-336-1801 | Israel |
| f: 414-961-3099 | p: 646-290-9137 | f: 202-462-2085 | f: 561-336-1808 | p: +972 (3) 720-8782 |



A.B. DATA, LTD.
abdataclassaction.com
New York  |  Washington, D.C.  |  Chicago  |  West Palm Beach  |  Milwaukee

info@abdataclassaction.com
Rev. 8/1/17

## ABOUT A.B. DATA

Founded in 1981, A.B. Data has earned an international reputation for expertly managing the complexities of class action administration in securities class actions, Securities and Exchange Commission (SEC) enforcement actions, and ERISA, consumer, antitrust, employment, civil rights, insurance, environmental, wage and hour, and other class action cases. A.B. Data's work in all aspects of class action administration has been perfected by decades of experience. Dedicated professionals deliver A.B. Data's all-inclusive services, working in partnership with its clients to administer their class action cases effectively, efficiently, and affordably, regardless of size or scope.

A.B. Data has administered hundreds of class action cases involving billions of dollars in total settlements. A.B. Data was among the 5,000 fastest-growing companies on the 2010 *Inc.* and 2013 *Inc.* 500|5000, an exclusive ranking of the nation's entrepreneurial businesses. We were the only class action administration company to achieve this elite standing in 2010.

Whether notifying millions of class members in the United States or throughout the world, processing millions of claims, or printing and distributing millions of checks, A.B. Data matches its talent and technology to the specific needs of its clients, delivering unparalleled service on time and on budget without ever compromising quality.

A.B. Data offers unmatched resources and capacity, and is capable of expertly administering any class action notice, settlement, and/or fund administration. We offer the highest level of security and have the in-house capacity to mail four million personalized pieces every 24 hours. The company's 170,000-square-foot mail distribution center, with its own on-site United States Postal Service (USPS) substation, is one of the nation's largest and most advanced facilities. In addition, A.B. Data has been entrusted to Magnetic Ink Character Recognition- (MICR-)print and mail more than 20 million checks in one year alone and has the capacity to print and mail 1 million checks per day.

A.B. Data has administered some of the largest and most complex class action cases in history. Our success is driven by passion for class action administration and our focus on client relationships. An intensely case-specific approach and a philosophy of respect and professionalism toward our clients and claimants guide every aspect of our work, from the presettlement phase through notice administration, claims processing, and fund distribution.

A.B. Data administers class action cases on schedule and on budget with accuracy and efficiency. Trust the extraordinary, experienced professional talent at A.B. Data, and retain our services.

info@abdataclassaction.com

| Headquarters | New York | Washington, D.C. | Florida | Israel |
|---|---|---|---|---|
| 600 A.B. Data Drive | One Battery Park Plaza | 1808 Swann Street, NW | 3507 Kyoto Gardens Drive | 19 Weissburg Street |
| Milwaukee, WI 53217 | 32nd Floor | Washington, D.C. 20009 | Palm Beach Gardens, FL 33410 | Tel Aviv 69358 |
| p: 866-217-4470 | New York, NY 10004 | p: 202-618-2908 | p: 561-336-1801 | Israel |
| f: 414-961-3099 | p: 646-290-9137 | f: 202-462-2085 | f: 561-336-1808 | p: +972 (3) 720-8782 |

A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

info@abdataclassaction.com
Rev. 8/1/17

# TABLE OF CONTENTS

FACTORS THAT DIFFERENTIATE A.B. DATA

CLASS ACTION ADMINISTRATION SERVICES

Presettlement Consultation

Notice Administration

Publication Notice, Print Media, Social Media, and Digital Media

Reach and Frequency Analysis

Claims Processing

Development of Distribution Plans

Fund Distribution

Call Center

Website Services

Secure Environment

Data Security

Fraud Prevention and Detection

Accountability and Reporting

Community and Diversity

Environmentally Friendly Business

A.B. DATA'S LEADERSHIP

NOTABLE NON-CLASS-ACTION ENGAGEMENTS

NOTABLE CLASS ACTION ENGAGEMENTS



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

info@abdataclassaction.com
Rev. 8/1/17

# FACTORS THAT DIFFERENTIATE A.B. DATA

- A.B. Data's competitive and transparent pricing structure contains no hidden fees or unpredictable expenses. No out-of-scope or additional services or costs are incurred without clients' prior approval.

- Our experienced class action administration team includes attorneys and CPAs who handle every aspect of the administration and deliver an impeccable work product with exemplary service. Our executive and management professionals have, on average, 14 years or more of industry experience, and our client services/project employees average ten years.

- We rapidly respond to our clients' needs and strive to exceed their expectations in every detail.

- A.B. Data's notice programs are known worldwide for their innovation, efficiency, and compliance with due process requirements.

- Our customized approach results in simplified claims processing, quick distributions, and considerable cost savings.

- A.B. Data's proprietary fraud detection database prevents payment of fraudulent claims.

- Our call center operates 24/7 and contains state-of-the-art telecommunications systems designed to meet the requirements of all administration projects.

- Our cutting-edge information and systems technologies enable us to provide superior quality control and quality assurance.

- Our proprietary online claims-submission system allows class members to submit claims in a fast, flexible, and cost-effective manner.

- A.B. Data offers the highest level of security and has the in-house capacity to mail 4 million personalized pieces every 24 hours. A.B. Data's 170,000-square-foot mail distribution center, with its own on-site USPS substation, is one of the nation's largest and most advanced facilities.

- We maintain a neutral focus when working with multiple clients, including class counsel, defense counsel, defendant companies, government entities, special masters, and claims-filing services.

- A.B. Data's in-house printing, mailing, and operational facilities streamline communication and maintain the highest level of security.

- Documents are designed to withstand legal scrutiny through accurate, efficient, and timely preparation.

- Clients receive updates with the latest developments in class action and industry news.

# CLASS ACTION ADMINISTRATION SERVICES

## PRESETTLEMENT CONSULTATION

**A.B. Data helps its clients to prepare a stronger case.** During investigation and discovery, our electronic records management and proven procedures enable our team to quickly provide a fully interactive media package for court presentations and settlement negotiations.

By retaining A.B. Data, clients gain confidence that their case management is rock-solid from the start with

- Document analysis, organization, and conversion into an interactive media package
- Consultation on proposed plans of allocation and damages analyses by our experienced administration team and certified public accountants
- Assistance with "reach and frequency" analysis
- Consultation for designing and implementing preliminary notice programs that will withstand objections and challenges, as well as meet legal statutes and CAFA requirements
- Consultation to determine probable claim rates and settlement structures in an effort to avoid unexpected delays and additional costs that can arise when providing notice and distributing a settlement fund

## NOTICE ADMINISTRATION

**A.B. Data is an industry leader in full-service class action notice administration.** Our class action notice programs are known worldwide for their efficiency, effectiveness, affordability, and compliance with Federal Rule of Civil Procedure 23 and due process requirements. Our services include class member location; third-party outreach; and media, internet, email, and direct-mail notice.

A.B. Data has designed and implemented some of the largest and most complicated national and international antitrust and class action notifications in the world. Globally, A.B. Data has successfully notified millions of class members throughout 137 countries in more than 80 languages. Domestically, as part of our multifaceted approach to class member location, A.B. Data is a licensee of various postal products, including NCOALink, which tracks millions of moves across the United States.

As a leading class action notice administrator, A.B. Data produces high volumes of notice documents with accuracy, speed, and quality. We print customized notice packages in a cost-efficient format that substantially improves the efficacy of the notice program.

A.B. Data's team of attorneys, proofreaders, design specialists, and experienced Project Managers ensures that all notice packages are clear, accurate, and easy to understand. We

- Identify and locate potential class members via proprietary methods and research tools
- Design and implement synergistic media notice campaigns (online, print, radio, and television)
- Develop and implement case-specific third-party outreach campaigns
- Coordinate legal translation of notice documents
- Draft CAFA notices, identify appropriate government agencies, and disseminate CAFA notices
- Utilize a proprietary list of over 5,000 domestic and international banks, brokers, and other nominees (for securities class action cases and SEC enforcement actions)

## PUBLICATION NOTICE, PRINT MEDIA, SOCIAL MEDIA, AND DIGITAL MEDIA

**A.B. Data's Media Notice Division** is led by Linda V. Young, a media veteran with decades of class action media notice expertise in some of the most prominent cases in the industry. As Vice President of Media, Young develops media notice plans along with Thomas R. Glenn, President; members of the Development Management Team; Mary Getz, Vice President, Digital Media; and Kelly Gardner, Vice President, List Services.

The Media Notice Division will also provide expertise on Rule 23, MRI-generated audience analysis, reach and frequency analysis, and direct-marketing tactics to reach unidentified class members. Under Young's leadership, the A.B. Data Media Division continues to expand the array of targeted media solutions for class action notice programs.

## CLAIMS PROCESSING

A.B. Data's customized approach combines accuracy, accountability, and speed with our human touch. Each claim is reviewed in detail and processed precisely in accordance with the court-approved plan of allocation or settlement stipulation. A.B. Data's claims-processing services include paper and electronic claims processing, with optical character recognition technology to convert claims and correspondence into electronically searchable databases.

A.B. Data's proprietary Claims Engine, created by expert software engineers in collaboration with the Claimant Services Department, offers an extremely flexible workflow engine that allows high-speed claims imaging and processing without compromising quality. The database's high level of automation allows maximum control and provides a comprehensive and accurate claims solution. The A.B. Data Claims Engine contains the following special features:

- Eligibility criteria formula, which allows automatic flagging of claimants that do not meet the established criteria
- High-speed, bar-coded claims-processing system
- Complete tracking of all claims administration-related activities
- Case-specific algorithms and formulas for the calculation of individual payments and pro rata distributions.

When processing is complete and recommendations must be made to the court for settlement distribution, A.B. Data prepares timely affidavits that are accurate, concise, supported by the required documentation, and designed to withstand legal scrutiny. A.B. Data has the in-house capacity to process millions of pages, but every process is transparent, and every claim is handled as if it were the only one.

Whether processing a claim form requires only a signature or detailed data with supporting documentation, A.B. Data's claims administration team

- Prepares affidavits and recommendations drafted by experienced class action litigators and accounting professionals
- Assures that the lead plaintiff's claim is filed timely and correctly
- Verifies claims substantiations, as well as flags deficiencies and resolutions
- Detects and rejects fraudulent, duplicate, or excluded-party claims
- Processes exclusion requests and objections within two hours of receipt
- Calculates recognized losses and individual payments
- Manages claim-related correspondence
- Audits claims processing, including quality control and quality assurance
- Provides comprehensive on-demand reporting

## DEVELOPMENT OF DISTRIBUTION PLANS

A.B. Data's team of fund administration professionals includes attorneys, certified public accountants, and certified financial analysts and auditors. They bring years of dedicated experience assisting investors with SEC enforcement actions and private securities litigations.

We have developed hundreds of distribution plans, all in accordance with applicable orders, laws, regulations, policies, and procedures. Our customized approach to every case results in timely distributions, user-friendly claims processes, and greater cost savings. Depending upon the circumstances of each action, A.B. Data works in concert with its clients to conduct relevant economic and financial analyses, develop related methodologies for loss calculation, create appropriate plans of allocation, and if applicable, generate targeted notice programs and claims processes.

## FUND DISTRIBUTION

A.B. Data provides a full-service solution to settlement fund distribution. Our team of certified public accountants and financial advisers expertly manages fund distribution while meeting legal, financial, and governmental requirements. We offer complete escrow services; establish qualified settlement funds; print and mail checks, vouchers, and/or coupons; electronically distribute cash or stock; and provide tax services. We also

- Establish and maintain accounts (escrow, FDIC-insured controlled distribution, or managed distribution), with daily account reconciliations and records of all distributions
- Create fund investment strategies
- Electronically transfer cash and/or common stock
- Utilize positive pay
- Securely print and mail checks (up to 1 million per day)
- Monitor outstanding and cleared checks
- Investigate and attempt to resolve issues with undelivered checks
- Provide detailed reporting, including completion of the standardized fund accounting report (SFAR)
- Offer all-inclusive tax and accounting services, including 1099 and W-2 tax reporting

## CALL CENTER

A.B. Data's multilingual call center utilizes state-of-the-art telecommunications systems designed to meet the specific requirements of any administration project, as well as to maximize the financial and service goals of our clients.

Our call center is managed by full-time staff well versed in the specific details of every case. Our skilled multilingual customer service representatives are trained using case-specific materials and resources and use telephone scripts written by our attorneys and approved by our clients.

Quality assurance and quality control procedures ensure the transmission of clear and accurate information to class members in a courteous and professional manner. The call center is able to handle large call volumes for notice mailing and emailing, claims administration, deficiency and rejection letter mailings, and distribution check mailings.

In addition to providing class members with superior-quality service, our customer service representatives can respond to online and email inquiries; document notice, claim form, and call-back requests; and return calls on a next-business-day basis regarding the status of an administration.

Clients may also utilize A.B. Data's advanced interactive voice response (IVR) system, which is a cost-effective way for class members to receive informational announcements, request notices and claim forms, and obtain case-specific details. Our IVR system provides toll-free telephone numbers, multilingual customer service representatives, and Teletype (TTY) for deaf and hearing-impaired individuals.

## WEBSITE SERVICES

In cases where a website is required, A.B. Data in each instance designs, hosts, and maintains a case-specific website via which class members have access to relevant case information and updates, key documents, and downloadable notice and claim documents. Depending upon the circumstances of the specific case, the website could include the following:

- Case status
- Responses to frequently asked questions
- Online claim forms and instructions
- Real-time claim status updates
- Case contact information

For all Web-based features, A.B. Data's system has complete functionality using the three most recent versions of industry-standard browsers. Samples of case-specific websites developed by A.B. Data can be obtained by referencing cases on our website at abdataclassaction.com/cases/.

## SECURE ENVIRONMENT

A.B. Data's facilities provide the highest level of security and customization of security procedures, including

- A Secure Sockets Layer server
- Video monitoring
- Limited physical access to production facilities
- Lockdown mode when checks are printed
- Background checks of key employees completed prior to hire
- Frequency of police patrol – every two hours, with response time of five or fewer minutes
- Disaster recovery plan available upon request

## DATA SECURITY

A.B. Data is committed to protecting the confidentiality, integrity, and availability of information we collect from our clients, investors, and class members. We transmit, save, and process an immense quantity of electronic information on a daily basis. A.B. Data's Information Security Policy includes procedures intended to address all information-security issues for A.B. Data's divisions, departments, employees, vendors, and clients.

A.B. Data has a number of high-profile clients, including the Securities and Exchange Commission (SEC), the United States government, and the Government of Israel, direct-banking and payment-service companies for popular brands, and some of the largest credit-card issuers in the world.

A.B. Data is frequently subject to physical, logical, data, and information system security reviews and audits. We are compliant with our clients' security standards as well as with ISO/IEC 27001/2 and Payment Card Industry (PCI) data-security standards, the Gramm-Leach-Bliley Act of 1999, the National Association of Insurance Commissioners' regulations, the Health Insurance Portability and Accountability Act (HIPAA) of 1996, and the Health Information Technology for Economic and Clinical Health Act (HITECH).

The Government of Israel has determined that A.B. Data is compliant with its rigorous security standards in connection with its work on Project HEART (Holocaust Era Asset Restitution Taskforce).

A.B. Data's fund distribution team has been audited by EisnerAmper LLP and was found compliant with class action industry standards and within 99% accuracy. EisnerAmper LLP is a full-service advisory and accounting firm and is ranked the 15th-largest accounting firm in the United States.

In addition, as part of PCI compliance requirements, A.B. Data has multiple network scans and audits from third-party companies, such as SecurityMetrics and 403 Labs, and is determined to be compliant with each of them.

## FRAUD PREVENTION AND DETECTION

A.B. Data is at the forefront of class action fraud prevention.

A.B. Data maintains and utilizes comprehensive proprietary databases and procedures to detect fraud and prevent payment of allegedly fraudulent claims. We are in constant communication and collaboration with federal, state, and local law enforcement agencies in an effort to identify and prevent fraudulent claims from being paid.

We review and analyze various filing patterns across all existing cases and claims. Potential fraudulent filers are reported to our clients as well as to the appropriate governmental agencies.

## ACCOUNTABILITY AND REPORTING

A.B. Data has the expertise necessary to provide project-management services to ensure that all work is completed timely, accurately, and precisely to our clients' specifications. Upon request, we provide affidavits detailing the methodologies employed in notice administration, claims processing, and fund administration, as well as expert testimony and audit trail reporting.

A.B. Data tracks and audits every aspect of daily production with
- Receipt of files (noting any issues with transmission)
- Status reports regarding claims or check status
- Audited and confirmed record counts
- Confirmation of mailings
- Inventory counts
- Daily production counts reported on a weekly basis

Once funds are fully distributed, we provide a detailed accounting of fund sources and usage with a listing of individual disbursements. We maintain records of all disbursements to answer class member inquiries, investigate and resolve undelivered material, monitor outstanding and cleared checks, and maintain mailing and financial databases for an agreed-upon period.

## COMMUNITY AND DIVERSITY

A.B. Data maintains employment policies that highlight and support diversity within the company and utilizes employment programs that benefit minorities in the community. At the company's mail processing center, located in a HUBZone (Historically Underutilized Business Zone), more than half of the employees are minorities. A.B. Data continues to partner with community organizations to increase minority employment opportunities and benefits.

By participating in employment service programs, such as the Transitional Jobs Demonstration Project, A.B. Data helps to create jobs and build partnerships that improve people's lives with valued job opportunities. Operated by Policy Studies, Inc. (PSI), this important project helps to connect Milwaukee-area employers with qualified job seekers.

As part of the 30th Street Industrial Corridor, a nonprofit organization that advocates on behalf of the corridor-area community, A.B. Data works diligently to restore the economic vitality of the area, providing industry, jobs, and safety to its members, residents, and visitors.

In addition, A.B. Data's mail-processing center is located in Milwaukee's Renewal Community, a targeted area that was designated for renewal from 2002 to 2009. A.B. Data partnered with other businesses to guide and promote development that created jobs, generated wealth, and strengthened the urban environment.

A.B. Data maintains its assistance to workers in need of additional services through State of Wisconsin employment programs, such as Welfare-to-Work (WtW), so that eligible employees receive FoodShare and medical benefits as well as day-care services. Through participation in these and other available employment programs, A.B. Data continues in its commitment to enhancing people's lives by providing quality employment opportunities.

## ENVIRONMENTALLY FRIENDLY BUSINESS

A.B. Data conserves its resources and operates as a green business. Paper claim forms are imaged and stored on A.B. Data's secure SQL server, and all claims processing is done electronically. We emphasize the need for recycling and encourage the use of recycled products. Our policies compel employees to turn off their computers when not in use, and email communications are encouraged to the extent possible.

A.B. Data's headquarters in Milwaukee was designed with the environment in mind. Upon purchasing the 16-acre campus in September 2007, A.B. Data renovated the 30-year-old building, utilizing natural elements such as cork, bamboo, and concrete, and upgraded its mechanical and electrical systems to optimize efficiency. For its efforts, A.B. Data won the *Milwaukee Business Journal*'s Real Estate Award for Best Environmentally Friendly Project.

# A.B. DATA'S LEADERSHIP

A.B. Data's administration team is composed of the following key executives, who collectively have decades of experience settling and administering class actions:

**Bruce A. Arbit, Co-Managing Director**, one of the founders of the A.B. Data Group, serves as Chairman of the Board. Additionally, Mr. Arbit is the Chairman of the United Israel Appeal and has served as President and General Campaign Chair of the Milwaukee Jewish Federation. Mr. Arbit currently serves as the Treasurer of the Jewish Telegraphic Agency and on the Boards of the Milwaukee Jewish Community Foundation and the American Joint Jewish Distribution Committee. Mr. Arbit has been a member of the Jewish Agency for Israel Board of Governors since June 2002, is a member of Jewish Agency Executives, and chairs the Committee on Israel Government Relations. Mr. Arbit has also served on the Boards of community banks for more than 25 years.

**Thomas R. Glenn, President.** Mr. Glenn's management of A.B. Data's Class Action Administration Company includes designing and implementing notice plans and settlement administration programs for antitrust, securities, and Securities and Exchange Commission settlements and SEC disgorgement fund distributions, as well as consumer, employment, insurance, and civil rights class actions. Mr. Glenn previously served as Executive Vice President at Rust Consulting and has more than 25 years of industry executive management experience.

**Eric Miller, Senior Vice President**, as a key member of A.B. Data's Class Action Administration Leadership Team, oversees the Case Management Department and supervises the operations and procedures of all of A.B. Data's class action administration cases. Mr. Miller is recognized in the class action administration industry as an expert on securities, SEC, consumer, product recall, product liability, general antitrust, pharmaceutical antitrust, and futures contract settlements, to name a few settlement types. Prior to joining A.B. Data, Mr. Miller served as the Client Service Director for Rust Consulting, responsible there for its securities practice area. He has more than 15 years of operations, project management, quality assurance, and training experience in the class action administration industry. In addition, Mr. Miller manages A.B. Data's office in Palm Beach Gardens, Florida.

**Ravin Raj, Vice President-Operations**, has more than 12 years of experience in class action claims management, document management, and insurance claims remediation. Mr. Raj's responsibilities for A.B. Data's Class Action Administration Company include heading the shared operations center, which includes mailroom, call center, claims processing, quality control, and information systems operations. His areas of expertise include business process development, strategic/tactical operations planning and implementation, risk analysis, budgeting, business expansion, growth planning and implementation, cost reduction, and profit, change, and project management. In his previous position, as Assistant Vice President-Operations at RR Donnelley India Pvt. Ltd., in Chennai, India, he led a team of more than 400 employees with the capacity to process more than 4 million claims a year, servicing several leading claims administrators. Mr. Raj managed six of the top ten securities class action settlements, by settlement value, including several multibillion-dollar settlements. His background also includes work as a Project Lead for iMarque Solutions Pvt. Ltd., Chennai, India.

**Linda V. Young, Vice President, Media**, oversees the Media Department and is responsible for the direction, development, and implementation of media notice plans for A.B. Data's class action clients. Prior to joining A.B. Data, Ms. Young served as the Principal of Mile Marker Zero, LLC, a full-service marketing and advertising consulting firm. She has more than 20 years of marketing, advertising, and media planning experience, managing advertising for brands such as Georgia-Pacific, American Express, Denny's, and Coca-Cola. In addition, Ms. Young has developed and implemented national and international print- and earned-media notice programs for some of the industry's leading pharmaceutical, insurance, and securities class action cases, including cases involving Premarin, Unity Life Insurance Co., and Morgan Stanley.

**A.B. DATA, LTD.**
**abdataclassaction.com**
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

**Eric Schachter, Vice President**, is a member of A.B. Data's Class Action Administration Leadership Team. He has over 15 years of experience in the legal settlement administration services industry. Mr. Schachter's responsibilities include ensuring successful implementation of claims administration services for A.B. Data's clients in accordance with settlement agreements, court orders, and service agreements. He also works closely with Project Managers to develop plans of administration to provide the highest level of effective and efficient delivery of work product. Mr. Schachter has a bachelor's degree in sociology from Syracuse University, earned his law degree at Hofstra University School of Law, and was previously an associate at Labaton Sucharow LLP in New York City.

**Paul Sauberer, Director of Quality Assurance**, is responsible for overseeing quality assurance and process management, working diligently to mitigate risk, ensure exceptional quality control, and develop seamless calculation programming. Mr. Sauberer brings more than 15 years of experience as a quality assurance specialist with a leading claims-processing company where he developed extensive knowledge in securities class action administration. He is recognized as the class action administration industry's leading expert on claims and settlement administrations of futures contracts class actions.

**Al Wichtoski, CPA, Vice President and Chief Financial Officer**, began as a Controller with A.B. Data over 20 years ago. Mr. Wichtoski rose to a number of corporate administrative and financial management positions before realizing his current role with the company. Mr. Wichtoski attained his financial management expertise through a broad range of roles, including bank liaison, Internal Revenue Service conduit, and final compliance officer for all financial accounts associated with A.B. Data. Mr. Wichtoski's responsibilities include risk management, budgeting, tax filing, statement preparation, and financial analysis.

**Kathy Versteegh, Senior Vice President, Data Services Division**, has been with A.B. Data since 1993. In her current position, Ms. Versteegh oversees operations, client relationships, business development, contracts, budget, security, postal affairs, and other key functions, leveraging her expertise in planning, leading, and controlling resources within the organization to ensure the continued growth of the division. As Vice President of Client Services and Marketing, she was responsible for business-critical communications, client service operations, and marketing, in addition to serving as a Security Team and Corporate Management Team member. Ms. Versteegh earned U.S. Postal Service and Postal Customer Council (PCC) professional certificates in Management and Leadership, Intelligent Mail, Enhancing Mail Value, Mail Center Operations, and PCC Leadership. In May 2010, she was elected the United States Postal Customer Council Co-Chair. Currently, Ms. Versteegh is serving her second term as Co-Chair. She offers an outstanding track record in business/organizational development, client satisfaction, and marketing strategies that include print, internet, mail, trade show, and other sales and marketing communications.

**Lizabeth Ludowissi, MQCCS, Vice President, Production**, is responsible for overseeing the production of all A.B. Data Group mailings and special projects. Ms. Ludowissi has experience in virtually every role in the company, which provides her with invaluable insight into the needs of our clients. During her tenure, Ms. Ludowissi has worked to streamline our Production Department, implementing strict quality controls and overseeing all scheduling and coordination, including print purchasing as well as data-processing, personalization, and mail-shop services. As a Mailpiece Quality Control Certified Specialist (MQCCS), Ms. Ludowissi acts as the company's Postal Liaison regarding all USPS-related matters. Ms. Ludowissi is a member of the Wisconsin Direct Marketing Association and the Milwaukee Postal Customer Council.

**Adam Walter, PMP, Senior Project Manager**, has more than nine years of experience managing a range of securities class action settlements and SEC disgorgements totaling more than $3.5 billon. This includes developing case administration strategies, overseeing daily operations of case administrations, ensuring execution of client deliverables, providing case-related legal and administration support to case counsel, overseeing notice dissemination programs, implementing complex claims-processing and allocation methodologies, establishing quality assurance and quality control procedures, and managing distribution of settlement funds. Mr. Walter frequently consults with clients in planning, reporting, and management of

each unique case to ensure that all requirements and objectives are met. Mr. Walter's background as Project Manager for a leading claims administrator brings his expertise on the development of case administration strategies and service methodologies to A.B. Data's Class Action Administration Company.

**Steve Straub, Senior Project Manager**, joined A.B. Data in February 2012. As a Senior Project Manager, his responsibilities include developing case administration strategies, overseeing daily operations of case administrations, ensuring execution of client deliverables, providing case-related legal and administration support to case counsel, overseeing notice dissemination programs, implementing complex claims processing and allocation methodologies, establishing quality assurance and quality control procedures, and managing distribution of settlement funds. Mr. Straub's experience in administering class action settlements includes securities, consumer, and antitrust settlements, with a primary focus on antitrust cases. He holds a Juris Doctor degree from Seton Hall University School of Law, Newark, New Jersey.

**Linda Opichka, CPA, Quality Assurance Analyst**, has over a decade of experience as a broker-dealer auditor, trainer, and manager and, in 2008, passed the examination for Certified Anti-Money Laundering Specialists. Ms. Opichka is responsible for managing and performing financial analysis, reviewing plans of allocation, working with independent distribution consultants, and performing account reconciliations for fund distributions. Prior to joining A.B. Data, Ms. Opichka conducted audits for Northwestern Mutual, where she was a subject-matter expert for anti-money laundering and broker-dealer audits. Ms. Opichka was also in charge of performing financial and compliance audits for broker-dealers and futures-commission merchants at the Chicago Board of Trade.

**Eric Schultz, MCSE, Information Technology Manager and Security Team Chairperson**, has been with A.B. Data for more than ten years, and is currently responsible for overseeing all information technology areas for all A.B. Data divisions across the United States and abroad. As a Microsoft Certified Systems Engineer (MCSE) with more than 20 years of experience in information technology systems and solutions, Mr. Schultz has developed specializations in network security, infrastructure, design/architecture, telephony, and high-availability network systems.

**Dan Deschamps, Project Manager**, since joining A.B. Data in November 2011, has handled a number of positions developing substantial knowledge regarding the administration of consumer, ERISA, and high-volume securities litigations. In his current role as Project Manager, he leads the planning and implementation of projects to meet internal and external deadlines; manages the day-to-day operational aspects of each of his assigned projects; continuously monitors and reports on the progress of his projects; and resolves any issues and solves problems with projects throughout the project life cycle. He also works closely with A.B. Data's Senior Project Managers, clients, and others on each of his assigned projects and coaches, mentors, and trains project team members. Mr. Deschamps' specialties include ERISA and complex consumer cases, but his practice areas also include SEC enforcement actions; Fair Debt Collection Practices Act (FDCPA), Telephone Consumer Protection Act (TCPA), and personal injury protection (PIP) class actions; Class Action Fairness Act (CAFA) mailings; and securities class actions. Mr. Deschamps received his paralegal certificate from Harper College, Palatine, Illinois, where he was a member of Lambda Epsilon Chi, the national honor society founded by the American Association for Paralegal Education.

**Bridgett Ryland, Project Manager**, joined A.B. Data in January 2014. She has handled a number of positions developing substantial knowledge regarding the administration of class action settlements. She works closely with A.B. Data's Senior Project Managers, the Information Systems team, and clients on all types of cases, including nonsecurities, FDCPA, ERISA, TCPA, and other types of class action settlements. Ms. Ryland manages the day-to-day administration of case settlements, interacting with multiple colleagues and consulting on many projects. She received both her bachelor's degree in communications and her master's degree in education and professional development from Cardinal Stritch University, Milwaukee, Wisconsin.

**Anike Keller, Business Development Director**, provides expertise in legal marketing strategies and brings extensive experience in client relations to A.B. Data's business development team. Previously, Ms. Keller served the legal industry as part of the marketing group at a major class action law firm specializing in securities and antitrust litigation. Ms. Keller's knowledge and understanding of the class action industry, as well as her client relationship skills, expand A.B. Data's capacity to achieve its business development and marketing goals effectively.

# NOTABLE NON-CLASS-ACTION ENGAGEMENTS

## Holocaust Era Asset Restitution Taskforce (Project HEART)

An initiative of the Government of Israel and the Jewish Agency for Israel (JAFI), Project HEART – Holocaust Era Asset Restitution Taskforce – sought to provide the tools, strategy, and information to bring about a small measure of justice to eligible heirs of Jewish victims, the victims themselves, and the Jewish people as a whole.

During its initial phase, Project HEART focused on identifying individuals in 137 countries with potential claims regarding the following types of private property for which no restitution was received after the Holocaust era: (1) private property that was located in countries that were controlled by the Nazi forces or Axis powers at any time during the Holocaust era; (2) private property that belonged to Jewish persons, as defined by Nazi/Axis racial laws; and (3) private property that was confiscated, looted, or forcibly sold by the Nazi forces or Axis powers during the Holocaust era.

## Obama for America – 2008 and 2012

Retained by Obama for America in 2007, A.B. Data was responsible for designing, analyzing, and directing its grassroots fundraising efforts for the presidential campaign of 2008. From February 2007 to Election Day 2008, A.B. Data's direct-marketing efforts helped to elect President Barack Obama, raising a record amount of money – almost $108 million – via the mail from more than 700,000 donors. As a result, A.B. Data was reappointed to lead President Obama's 2012 direct-marketing campaign in his attempt to gain reelection. As the sole administrator of the direct-marketing campaign for Obama for America 2012, A.B. Data designed, printed, and mailed each direct-marketing piece to raise money and awareness about President Obama's candidacy and efforts for reelection in 2012. A.B. Data's effort shattered all previous records, raising more than $147 million through the mail from almost 875,000 individual donors.

## Doctors Without Borders/Médecins Sans Frontières

In 2009, A.B. Data was chosen to manage all facets of the direct-mail program for Doctors Without Borders/Médecins Sans Frontières (MSF). MSF is one of the most respected organizations in the world, having won the 1999 Nobel Peace Prize for its emergency medical humanitarian response to people around the world caught in armed conflict or suffering from epidemics, malnutrition, and natural disasters without access to health care. MSF is known for its fierce independence and its refusal to "look the other way" when a crisis is caused by the failure of a government, either through passive or aggressive actions. MSF raises $84 million a year through its direct-marketing program, and it mails 17 million prospect pieces annually. MSF's house file consists of 465,000 12-month donors and about 800,000 lapsed donors – and it has 38,000 monthly donors. MSF's total house-file volume is 11 million a year.

## Holocaust Victim Assets Litigation (Swiss Banks) – $1.25-billion settlement

As a court-appointed notice administrator for this litigation, A.B. Data played a key role in a worldwide Phase I notice effort that resulted in the processing of more than 500,000 initial questionnaires. In Phase III of the administration, A.B. Data delivered notice to more than 10,000 Jewish communities in 109 countries and administered international help and call centers in Phases I and III that directly assisted more than 100,000 potential claimants.

A.B. Data created a class-appropriate notice targeting Romanies (Gypsies) in 48 countries and directed hundreds of staff members to communicate orally and directly with Romani communities and individuals. A.B. Data notified more than 2 million people and, as designated by the International Organization for Migration (IOM), directly assisted more than 22,000 Romanies in 17 countries of central and eastern Europe with claim completion.

## German Forced Labour Compensation Programme (GFLCP)

As designated by the IOM, A.B. Data located more than 43,000 Romani survivors in 17 countries of central and eastern Europe who were potentially eligible for humanitarian aid. A.B. Data created a comprehensive database for the GFLCP and the Holocaust Victim Assets Litigation and directly assisted more than 11,000 Romanies in eight central and eastern European countries with claim completion.

## The Wilderness Society

In 2012, A.B. Data was chosen to oversee and implement all facets of the direct mail and online fundraising programs for The Wilderness Society.

The Wilderness Society – with 500,000 members and supporters – is the leading American conservation organization working to protect our nation's beautiful wildlands. Since 1945, it has been at the forefront of nearly every major public lands battle, and its collaborative style and focus on practical solutions have saved some of our most beloved natural treasures from destruction.

# NOTABLE CLASS ACTION ENGAGEMENTS

A.B. Data and/or its team members have successfully administered hundreds of class actions, including many major cases. Listed below are some of the most notable of these engagements.

## Securities Cases

- *In re Fannie Mae 2008 Securities Litigation*
- *In re Anadarko Petroleum Corporation Class Action Litigation*
- *Ge Dandong, et al., v. Pinnacle Performance Limited, et al.*
- *In Re: Rough Rice Commodity Litigation*
- *Xuechen Yang v. Focus Media Holding Limited et al.*
- *In re Massey Energy Co. Securities Litigation*
- *In re Swisher Hygiene, Inc.*
- *The City of Providence vs. Aeropostale, Inc., et al.*
- *In re Metrologic Instruments, Inc. Shareholders Litigation*
- *Public Pension Fund Group v. KV Pharmaceutical Company et al.*
- *Pension Trust Fund for Operating Engineers, et al. v. Assisted Living Concepts, Inc., et al.*
- *In re Lehman Brothers Equity/Debt Securities Litigation*
- *In re: Platinum and Palladium Commodities Litigation (Platinum/Palladium Physical Action)*
- *In re: Platinum and Palladium Commodities Litigation (Platinum/Palladium Futures Action)*
- *In re General Electric Co. Securities Litigation*
- *In re CNX Gas Corporation Shareholders Litigation*
- *Oscar S. Wyatt, Jr. et al. v. El Paso Corporation, et al.*
- *In re Par Pharmaceutical Securities Litigation*
- *In re Par Pharmaceutical Companies, Inc. Shareholders Litigation*
- *In re Delphi Financial Group Shareholders Litigation*
- *In re SLM Corporation Securities Litigation*
- *In re Del Monte Foods Company Shareholder Litigation*
- *Leslie Niederklein v. PCS Edventures!.com, Inc. and Anthony A. Maher*
- *In re Beckman Coulter, Inc. Securities Litigation*
- *Michael Rubin v. MF Global, Ltd., et al.*
- *Allen Zametkin v. Fidelity Management & Research Company, et al.*
- *In re BP Prudhoe Bay Royalty Trust Securities Litigation*
- *Police and Fire Retirement System of the City of Detroit et al. v. SafeNet, Inc., et al.*

- *In re Limelight Networks, Inc. Securities Litigation*
- *In re Gilead Sciences Securities Litigation*
- *In re ACS Shareholder Litigation, Consolidated C.A. No. 4940-VCP*
- *Lance Provo v. China Organic Agriculture, Inc., et al.*
- *In re LDK Solar Securities Litigation*

## General and Pharmaceutical Antitrust Cases

- *In re Ready-Mixed Concrete Antitrust Litigation*
- *In re: Marine Hose Antitrust Litigation*
- *Iowa Ready Mixed Concrete Antitrust Litigation*
- *In re Potash Antitrust Litigation (II)*
- *In re Evanston Northwestern Healthcare Corp. Antitrust Litigation*
- *In re Polyurethane Foam Antitrust Litigation*
- *In re LIBOR-Based Financial Instruments Antitrust Litigation*
- *In re Lorazepam and Clorazepate Antitrust Litigation*
- *In re Cardizem CD Antitrust Litigation*
- *Vista Healthplan, Inc., and Ramona Sakiestewa v. Bristol-Myers Squibb Co., and American BioScience, Inc.*
- *In re Lupron Marketing and Sales Practices Litigation*
- *In re Terazosin Hydrochloride Antitrust Litigation*
- *In re Warfarin Sodium Antitrust Litigation*
- *Rosemarie Ryan House, et al. v. GlaxoSmithKline PLC and SmithKline Beecham Corporation*
- *Carpenters and Joiners Welfare Fund, et al. v. SmithKline Beecham*
- *New Mexico United Food and Commercial Workers Union's and Employers' Health and Welfare Trust Fund, et al. v. Purdue Pharma L.P.*
- *In Re Pharmaceutical Industry Average Wholesale Price Litigation*
- *Alma Simonet, et al. v. SmithKline Beecham Corporation, d/b/a GlaxoSmithKline*
- *In re Relafen Antitrust Litigation*
- *In Re Remeron Direct Purchaser Antitrust Litigation*
- *In re TriCor Indirect Purchasers Antitrust Litigation*
- *Nichols, et al., v. SmithKline Beecham Corporation*
- *In re: DDAVP Indirect Purchaser Antitrust Litigation*

## Telephone Consumer Protection Act (TCPA) Cases

- *Diana Mey vs. Frontier Communications Corporation*
- *Matthew Donaca v. Dish Network, L.L.C.*
- *Matthew Benzion and Theodore Glaser v. Vivint, Inc.*
- *John Lofton v. Verizon Wireless (VAW) LLC, et al.*
- *Lori Shamblin v. Obama for America et al.*
- *Ellman v. Security Networks*

## Consumer Products Case

- *In the Matter of Maxfield and Oberton Holdings, LLC and Craig Zucker, et al.* ("Buckyballs Case")

## Representative Case and Client Lists

Representative general lists of A.B. Data's cases and clients are appended.

# A.B. DATA, LTD.: REPRESENTATIVE CASE LIST

Ace Marine Rigging & Supply, Inc. v. Virginia Harbor Services, Inc.

Acevedo v. Lawyers Title Insurance Corporation

Aceves, et al. v. Knights Inspection Services, LLC, and Knight

In re ACS Shareholders Litigation

In re Adolor Corporation Shareholders Litigation

In re Advanta Corp. ERISA Litigation

In re Affiliated Computer Services ERISA Litigation

In re AIG ERISA Litigation

In re AirGate PCS, Inc. Securities Litigation

Akins v. Worley Catastrophe Response, LLC

Alakayak v. All Alaskan Seafoods, Inc.

Allen v. HealthPort Technologies, LLC

Alper v. Warnock Ford, Inc.

Altier v. Worley Catastrophe Response, LLC

In re American Italian Pasta Company Securities Litigation (AIPC Settlement)

In re American Italian Pasta Company Securities Litigation (Ernst Settlement)

Anderson v. Third Federal Savings and Loan Association of Cleveland

In re Andrx Corporation, Inc.

Annoreno and Perez, individually, and on behalf of all others similarly situated v. Claire's Stores, Inc. and Claire's Boutiques, Inc.

Arias v. Award Homes, Inc.

Arteaga v. MODA Furniture, Inc.

In re Assicurazioni Generali S.p.A. Holocaust Insurance Litigation

In re Atlas Energy, Inc. Shareholders Litigation

Austrian Banks Holocaust Litigation

Baptista v. Mutual of Omaha Insurance Company

Bauman v. Superior Financial Corp.

Beach, et al. v. Citigroup Alternative Investments LLC, et al.

In re Bear Stearns Companies, Inc. ERISA Litigation

In re Beazer Homes USA, Inc. ERISA Litigation

In re Beckman Coulter, Inc. Securities Litigation

Benzion v. Vivint, Inc.

Bergman et al. v. DAP Products Inc., et al. (XHose Litigation)

Berry v. Third Federal Savings and Loan Association of Cleveland, et al.

Best v. Bluegreen

In re BigBand Networks, Inc. Securities Litigation

In re BioScrip, Inc. Securities Litigation

In re BISYS Securities Litigation

Black v. Metso Paper USA, Inc.

Blaine v. Pressler & Pressler, LLP

Blanco v. KeyBank USA, N.A.

Board of Commissioners of the Port of New Orleans v. Virginia Harbor Services Inc.

Bosland v. Warnock Dodge, Inc.

Bowe v. Public Storage

In re BP plc Securities Litigation

In re BP Prudhoe Bay Royalty Trust Securities Litigation

Bragg v. Bill Heard Chevrolet, Inc.-Plant City

Branham and Smith, et al. v. Crawford & Company

Brattain v. Richmond State Hospital

Brennan v. Community Bank

Brey Corp. v. Life Time Improvements, Inc.

Brieger v. Tellabs, Inc.

Broad St. Partners Fund v. Dods

Brown v. Hayt, Hayt & Landau, LLC

Brown v. Rita's

Brumfield v. Countrywide Home Loans, Inc.

Burns v. First American Bank

Bushansky v. Simplicity Bancorp, Inc. et al.

In re Calpine Corporation ERISA Litigation

Canning v. Concord EFS, Inc.

Capovilla v. Lone Star Technologies, Inc.

In re Cardinal Health, Inc. ERISA Litigation

Carlson v. C.H. Robinson Worldwide, Inc.

Carlson v. State of Alaska, Commercial Fisheries Entry Commission

In the Matter of Determining whether there has been a violation of the Consumer Loan Act of Washington by CashCall, Inc. et al.

In re Cbeyond, Inc. Securities Litigation

Cement Masons & Plasterers Joint Pension Trust v. TNS, Inc.

Cerda v. Associates First Capital Corporation

Cervantes v. RCS Recovery

Chamberlin v. Mullooly

Chao v. Slutsky

Charlessaint v. Persian Acceptance Corp. et al.

Clayton v. Velociti, Inc.

Clearview Imaging, L.L.C. v. Dairyland Insurance Company

Clearview Imaging, L.L.C. v. Mercury Insurance Company of Florida

Clearview Imaging, L.L.C. v. Nationwide Mutual Insurance Company



**A.B. DATA, LTD.**
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Clearview Imaging, L.L.C. v. Progressive Consumers Insurance Company

Clemons v. Thompson

In re CNX Gas Corporation Shareholders Litigation

Cohen v. JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.

Coleman v. Lincoln Wood Products, Inc.

In re Colgate-Palmolive Co. ERISA Litigation

Collins v. American Consumer Shows, Inc.

Commonwealth of Massachusetts v. H&R Block, Inc.

Conlon v. The City of Fernandina Beach

In re Connetics Securities Litigation

In re: The Consumers Trust

Coppess v. Healthways, Inc.

Corsello v. Verizon New York, Inc.

Cotton v. Ferman Management Services Corporation

Cottrell v. Gardner

In re CP Ships Ltd. Securities Litigation

In re Crestwood Midstream Partners Unitholder Litigation

Croxall v. Tampa Hund L.P.

In re Crude Oil Commodity Futures Litigation

Cruz v. Condor Capital Corporation

Curtis v. Northern Life Insurance Company

Davis v. First Financial Federal Credit Union

In re: DDAVP Indirect Purchaser Antitrust Litigation

DeCario v. Lerner New York, Inc.

In re Del Monte Foods Company Shareholder Litigation

In re Delphi Financial Group Shareholders Litigation

Deprospo v. The Provident Bank

Desai v. ADT Security Services, Inc.

Di Popolo v. Ramsey Nissan, Inc.

In re Diebold ERISA Litigation

Dishkin v. Tire Kingdom, Inc.

In re Dole Food Co., Inc. Stockholder Litigation

Donepudi v. OfficeMax Inc.

Drury v. Countrywide Home Loans, Inc.

Duchene v. Westlake

In re Dura Pharmaceuticals, Inc. Securities Litigation

Eisenberger v. Boston Service Company, Inc.

In re Electronic Data Systems Corp. ERISA Litigation

In re Emergent Group, Inc. Shareholder Litigation

In re: Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation

Epstein v. Sears, Roebuck and Co.

Estakhrian v. Obenstine et al.

Estates of Hampton v. Beverly Enterprises-Arkansas, Inc.

Estep v. Smythe Volvo, Inc.

Evans v. Stewart Title Guaranty Company

In re Facebook, Inc. IPO Securities and Derivative Litigation - NASDAQ

Family Open MRI, Incorporated v. Direct General Insurance Company

In re Fannie Mae ERISA Litigation

In re Fannie Mae 2008 Securities Litigation

Fernando v. Neopost USA, Inc.

Fernando v. Priority Mailing Systems

Ferro v. Florida Windstorm Underwriting Association

Finney v. Stewart Title Guaranty Company

In re First Financial Holdings Inc. Shareholders Litigation

In re FLAG Telecom Holdings, Ltd. Securities Litigation

Flood v. Dominguez

Office of the Attorney General, Department of Legal Affairs, State of Florida v. KB Home et al.

Kellman v. Forever 21 Retail, Inc.

Forsta AP-Fonden, et al. v. St. Jude Medical, Inc., et al.

Francis v. A&E Stores, Inc.

Franco v. Ace Parking Management Inc.

Fray-Witzer v. Metropolitan Antiques, LLC

Fray-Witzer v. Olde Stone Land Survey Company, Inc.

Fremont General Corporation Litigation

Friedman v. Rayovac Corporation

Froumy v. Stark & Stark

FW Transportation, Inc. v. Associates Commercial Corporation

In re General Electric Company Securities Litigation

German Forced Labor Compensation Program (GFLCP)

Gevaerts et al. v. TD Bank, N.A.

In re Gilead Sciences Securities Litigation

Gilley v. Ernie Haire Ford, Inc.

In re Goodrich Shareholders Litigation

Graham v. Town & Country Disposal of Western Missouri, Inc.

Greenstein v. Nations Title Agency of Florida, Inc.

Griffin v. Flagstar Bancorp, Inc.

Groen v. PolyMedica Corporation

Gulf Coast Injury Center, LLC v. Nationwide Mutual Fire Insurance Company

Haas v. Burlington County

Hall v. The Children's Place Retail Stores, Inc.

Hamilton v. ATX Services Inc.

Hargrave v. TXU Corp.

Harlacher and Woodring v. Members 1st Federal Credit Union



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Page 2 of 6
A.B. Data, Ltd.: Representative Case List
Updated: February 24, 2016

Harris v. First Regional Bancorp

Harris v. Koenig

In re Hartford Financial Services Group Inc. ERISA Litigation

Haynes v. Baptist Health

In re: Hearst-Argyle Shareholder Litigation

Hellmers v. Countrywide Home Loans, Inc.

Hess v. Oriole Homes Corp.

Hill v. American Medical Security Life Insurance Company

Hill v. Countrywide Home Loans, Inc.

Hockenberry v. People First Federal Credit Union

Holley v. Kitty Hawk, Inc.

In re Holocaust Victim Assets Litigation (Swiss Banks) (HVAP)

Hudson United Bank v. Chase

Hughley v. Maryland Casualty Company

Hunt v. PacifiCare Life and Health Insurance Company

Hutt v. Martha Stewart Living Omnimedia, Inc.

Hutson v. Baptist Health

In re ICG Communications, Inc. Securities Litigation

Ikuseghan v. MultiCare Health System

The State of Illinois v. Au Optronics Corporation et al.

In re: InfoSonics Securities Litigation

In re ING Groep, N.V. ERISA Litigation

In re International Business Machines Corp. Securities Litigation

International Commission on Holocaust Era Insurance Claims (ICHEIC)

In re Iowa Ready-Mixed Concrete Antitrust Litigation

In re J. Crew Group, Inc. Shareholders Litigation

In re JDS Uniphase Corporation ERISA Litigation

Johnson v. Navient Solutions Inc.

Kalow & Springut, LLP v. Commence Corporation

Katz et al. v. Live Nation Worldwide, Inc.

Katz and Davidson v. Live Nation Worldwide, Inc.

Kay v. Wells Fargo & Company

Kemp v. DataBank IMX, LLC

In re Kinder Morgan Energy Partnership, L.P. Capex Litigation

In re: King Pharmaceuticals, Inc. Securities Litigation

Kolluri v. Belco Community Credit Union

Krakauer v. Dish Network L.L.C.

Kreher v. City of Atlanta, Georgia

Kubota v. Walker

The Lafayette Life Insurance Company v. City of Menasha

Laffan v. Santander Bank, N.A., et al.

Lara, et al., v. G & E Florida Contractors, LLC

In re LDK Solar Securities Litigation

In re Lear Corp. ERISA Litigation

Lehmann v. Ivivi Technologies, Inc.

In re Lehman Brothers Equity/Debt Securities Litigation

In re Lernout & Hauspie Securities Litigation (Directors and FLV Settlements)

In re Lernout & Hauspie Securities Litigation (KPMG Settlement)

Leslie Niederklein v. PCS Edventures!.com, Inc.

Li v. Bowers et al. (Square 1 Financial Case)

Lilly v. Oneida Ltd. Employee Benefits Admin. Comm.

In re Limelight Networks, Inc. Securities Litigation

Long v. Eschelon Telecom, Inc.

The Louisiana Municipal Police Employees Retirement System v. Deloitte & Touche LLP

Lyons, et al. v. Litton Loan Servicing, LP, et al.

Mann & Company, PC v. C-Tech Industries, Inc.

Mann v. Lawyers Title Insurance Corporation

Mantzouris v. Scarritt Motor Group, Inc.

In re Marine Hose Antitrust Litigation (Bridgestone Settlement)

In re Marine Hose Antitrust Litigation (Dunlop Settlement)

In re Marine Hose Antitrust Litigation (Parker Settlement)

In re Marine Hose Antitrust Litigation (Trelleborg Settlement)

In re Marine Hose Antitrust Litigation (Yokohama Settlement)

In re Marsh ERISA Litigation

In re Martek Biosciences Corp. Securities Litigation

Martin v. aaiPharma, Inc.

Martin v. Dun & Bradstreet, Inc.

Martin v. Foster Wheeler Energy Corporation

In re Massey Energy Co. Securities Litigation

In the Matter of Maxfield and Oberton Holdings, LLC

Mayer v. Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans

Mayes v. The Geo Group, Inc.

Mayotte v. Associated Bank, N.A.

In re MBNA Corp. Securities Litigation

Meadows v. Clearwater Bay Marketing, LLC

Means v. River Valley Financial Bank

In re Merck & Co. Inc. Vytorin ERISA Litigation

Medoff v. CVS Caremark Corporation et al.

Merrimon v. UNUM Life Insurance Company of America

In re Metavante Technologies, Inc. Shareholder Litigation

In re Metrologic Instruments, Inc. Shareholders Litigation

Mey v. Herbalife International, Inc.

Mey v. Interstate National Dealer Services, Inc., et al.

In re Micromuse, Inc. Securities Litigation

Milford & Ford Associates, Inc. v. Cell-Tek, LLC



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Page 3 of 6
A.B. Data, Ltd.: Representative Case List
Updated: February 24, 2016

Miller v. Weltman, Weinberg & Reis Co., L.P.A.

In re: MK Resources Company Shareholders Litigation

Montalvo v. Tripos, Inc.

Moore v. The Hertz Corporation

In re Morgan Asset Management, Inc.
(Kelsoe and Weller Settlements)

Morrison v. MoneyGram International, Inc.

Mortgage Settlement Consumer Restitution Program
(Foreclosure Restitution Program and Bank of America Victims
Program)

In re Motive, Inc. Securities Litigation

Mozenter v. Nalco Holding Company

Mukoma v. Fleet Lease Network Inc.

Mulhern v. MacLeod d/b/a ABC Mortgage Company

Munday v. Navy Federal

In re: National City Corporation Securities, Derivative & ERISA
Litigation

In re Neustar, Inc. Securities Litigation

The Department of the Treasury of the State of New Jersey
and its Division of Investment v. Cliffs Natural Resources Inc.,
et al.

The People of the State of New York v. SKS Associates, LLC

In re NII Holdings, Inc., Securities Litigation

Norflet v. John Hancock Life Insurance Company

Norris and Tatem v. Eichenbaum & Stylianou, LLC, et al.

In re Novamed, Inc. Shareholders Litigation

NSL Capital Management v. Gorman

Nthenge v. Pressler and Pressler, LLP

In re: NX Networks Securities Litigation

Obermeyer v. Marinemax East, Inc.

Olivo v. Homecomings Financial LLC

Open MRI of Pinellas, Inc. v. Atlanta Casualty Insurance Company

Ori v. Fifth Third Bank and Fiserv, Inc.

In re: Ortiz v. Aurora Health Care, Inc.

Osborn v. EMC Corporation

In re OSI Pharmaceuticals, Inc. Securities Litigation

Otte v. Life Insurance Company of North America

Overby v. Tyco International Ltd.

Ownby v. Citrus County, Florida

In re: Pacific Gateway Exchange, Inc. Securities Litigation

Paliotto v. Johnny Rockets Group, Inc.

In re Par Pharmaceutical Companies, Inc. Shareholders Litigation

In re Par Pharmaceutical Securities Litigation

Parker v. American Medical Security Group, Inc.

Parthiban v. GMAC Mortgage Corporation

Paskowitz v. Ernst & Young, LLP (Motive, Inc.)

Patel v. Baluchi's Indian Restaurant

Payson v. Capital One Home Loans, LLC (FLSA Settlement)

Payson v. Capital One Home Loans, LLC (KWPA Settlement)

Pension Trust Fund for Operating Engineers v.
Assisted Living Concepts, Inc.

Pereira v. Foot Locker, Inc.

Perez v. Rent-A-Center, Inc.

Pettway v. Harmon Law Offices, P.C.

Pfeiffer and McElroy derivatively on behalf of Occidental
Petroleum Corporation v. Abraham et al. and Occidental
Petroleum Corporation

In re: PFF Bancorp, Inc. ERISA Litigation

Pickett v. Triad Financial Corporation

In Re: Platinum And Palladium Commodities Litigation

Police and Fire Retirement System of the City of Detroit,
Plymouth County Retirement System v. SafeNet, Inc.

Politi v. Pressler & Pressler, LLP

Pollard, et al. v. ETS PC, Inc. (f/k/a Eberl's Temporary Services,
Inc.) et al.

Pollitt v. DRS Towing, LLC

In re Potash Antitrust Litigation (II)

Premier Open MRI, LLC v. Progressive American Ins. Co.

Project HEART—Holocaust Era Asset Restitution Taskforce

In re Prospect Medical Holdings, Inc. Shareholders Litigation

Provo v. China Organic Agriculture, Inc.

Public Pension Group v. KV Pharmaceutical Co.

Puritan Budget Plan, Inc. v. Amstar Insurance Company

Quaak v. Dexia, S.A.

Ragsdale v. SanSai USA, Inc.

Ramirez v. GreenPoint Mortgage Funding, Inc.

Rational Strategies Fund v. Demere, Jr.

Rational Strategies Fund v. Hill

Raul v. Western Liberty Bancorp

In re RBC Dain Rauscher Overtime Litigation

In re RCN Corporation ERISA Litigation

In re Ready-Mixed Concrete Antitrust Litigation

Reeves, et al. v. Zealandia Holding Company, Inc., f/k/a Festiva
Hospitality Group, Inc., et al.

In re Reliant Securities Litigation

In re RenaissanceRe Holdings Ltd. Securities Litigation

In re R.H. Donnelley Corp. ERISA Litigation

Roberti v. OSI Systems, Inc.

Rodriguez v. Fulton Bank, N.A.

Rolark v. Lawyers Title Insurance Corporation



**A.B. DATA, LTD.**
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Rubin v. MF Global, Ltd.

Rufo v. Alpha Recovery Corp.

Rupp v. Thompson

S. Parker Hardware Mfg. Corp. v. AT&T Corp.

Saint Pete MRI v. Hartford

Saint Pete MRI v. Auto Club South Insurance Company

Saint Pete MRI v. First Acceptance Insurance Company

Saint Pete MRI v. First Floridian Auto and Home Insurance Company

Saldana v. C & C Unisex

Sam v. White

Santos v. Silver

Scher v. Oxford Health Plans, Inc.

In re Schering-Plough Corp. Enhance ERISA Litigation

In re Schering-Plough Corp. ERISA Litigation

Schmitz v. Liberty Mutual Insurance Company

In re Scottish Re Group Securities Litigation

In re Sears, Roebuck & Co. ERISA Litigation

SEC v. Anderson

SEC v. Gen-See Capital Corporation and Richard S. Piccoli

SEC v. RenaissanceRe Holdings Ltd.

In re SEC v. Rockford Funding Group

In re SEC v. Take-Two Interactive Software, Inc.

SEC v. Tecumseh Holdings Corporation

SEC v. The BISYS Group, Inc.

SEC v. Value Line, Inc.

SEC v. WexTrust Capital, LLC

SEC v. Zomax, Inc.

Serino v. Kenneth Lipper v. PricewaterhouseCoopers, LLP

In re Sexy Hair Concepts, LLC

In re SFBC International Securities & Derivative Litigation

Shane v. Edge

Sheikh v. Maxon Hyundai, Inc.

Silke v. Irwin Mortgage Corporation

Sivsubramanian v. DNC Health Corp.

In re SLM Corporation Securities Litigation

Smith v. Mill-Tel, Inc.

Smolkin v. Leviton Manufacturing Co., Inc.

Soden v. East Brunswick Buick-Pontiac-GMC, Inc.

Sokoloski v. Stewart Title Guaranty Company Settlement

Sonoda v. Amerisave

Southeast Texas Medical Associates, LLP v. VeriSign, Inc.

Special Situations Fund III, L.P. v. Quovadx, Inc.

Steele v. GE Money Bank

Stein v. Pactiv Corporation

In re: Sterling Financial Corporation Securities Class Action

Stoffels v. SBC Communications, Inc.

In re Stone & Webster, Inc. Securities Litigation

In re: Supervalu, Inc. Securities Litigation

In re Suprema Specialties, Inc. Securities Litigation

In re Susser Holdings Corp. Stockholder Litigation

Sutterfield v. Carney

In Re Swisher Hygiene, Inc. Securities and Derivative Litigation

In re Symbol Technologies, Inc. Securities Litigation

In re Take-Two Interactive Securities Litigation and SEC v. Brant

Tannlund v. Real Time Resolutions, Inc.

Taylor v. McKelvey (Monster Worldwide, Inc.)

Taztia XT Securities Litigation

In re TD Banknorth Shareholders Litigation

In re Terex Corp. ERISA Litigation

In re Ticketmaster Entertainment Shareholder Litigation

In re Tower Group International, Ltd. Securities Litigation

In re Tower Group International, Ltd. Shareholder Litigation

In re: Tyson Foods, Inc. Securities Litigation

In the Matter of UBS Financial Services Inc. of Puerto Rico

Ultra Open MRI Corporation v. Hartford Casualty Insurance Company

Ultra Open MRI Corporation v. Nationwide Assurance Company

United Consumer Financial Services Company v. William Carbo v. A&M Merchandising, Inc.

Valley National Bank v. Cahn

Valuepoint Partners, Inc. v. ICN Pharmaceuticals, Inc.

In re Vaso Active Pharmaceuticals Derivatives Litigation

In re Vaso Active Pharmaceuticals Securities Litigation

Veal v. Crown Auto Dealerships, Inc.

In re Viisage Technology, Inc. Securities Litigation

In re VisionAmerica, Inc. Securities Litigation

Von Friewalde v. Boeing Aerospace Operations, Inc.

In re Vonage Initial Public Offering (IPO) Securities Litigation

Walker v. Hill Wallack LLP

Walter v. Level 3 Communications, Inc.

In re Warner Chilcott Limited Securities Litigation

Warren v. Orkin Exterminating Company, Inc.

State of Washington v. Au Optronics Corp., et al.

Wells v. DTD Enterprises, Inc.

Brown v. Wells Fargo & Company

Wenger v. Cardo Windows, Inc.

Wenger v. Freehold Subaru, LLC



**A.B. DATA, LTD.**
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

*White v. E-Loan, Inc.*

*White v. Wells Fargo, N.A.*

*Will v. American Equity Mortgage, Inc.*

*Williams v. CBE Group*

*Wisniak v. Mirant Americas Generation, LLC*

*Wood v. New Century Financial Services, Inc.*

*Wyatt v. El Paso Corporation*

*Herrera v. Wyeth ERISA Litigation*

*Yang v. Focus Media Holding Limited*

*Yariv v. AT&T Corp.*

*Yingling v. eBay, Inc.*

*Yost v. First Horizon*

*Young v. Heimbuch*

*In re: YRC Worldwide, Inc. ERISA Litigation*

*Zametkin v. Fidelity Management & Research Company*

*Zelnik v. Citation Homes, Inc.*

*Zilhaver v. UnitedHealth Group Incorporated*

*In re Zomax, Inc. Securities Litigation*

**A.B. DATA, LTD.**
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

# A.B. DATA, LTD.: REPRESENTATIVE CLIENT LIST

Abbey Spanier, LLP

Abraham, Fruchter & Twersky, LLP

Abrams & Bayliss LLP

Ademi & O'Reilly, LLP

Ajamie LLP

Akerman LLP

Akin Gump Strauss Hauer & Feld LLP

Aldrich Law Firm, Ltd.

Alston & Bird LLP

Anderson Kill P.C.

Anderson + Wanca

Andrews & Springer LLC

Ankcorn Law Firm, PC

Arent Fox LLP

Atkinson & Brownell, P.A.

Office of the Attorney General, State of Arizona

Office of the Attorney General, Department of Legal Affairs, State of Florida

Office of the Illinois Attorney General

Office of the Attorney General, State of Indiana

Office of the Attorney General, Commonwealth of Massachusetts

Office of the Attorney General, State of New York

Washington State Office of the Attorney General

Bailey & Glasser LLP

Baker & Hostetler LLP

Ballard Spahr LLP

Banker Lopez Gassler P.A.

Bared & Associates PA

Barnes Law Group

Barnow and Associates, P.C.

Barrack, Rodos & Bacine

S. Barrett, P.C.

Barrett Johnston Martin & Garrison, LLC

Law Offices of James V. Bashian, P.C.

Baskin Law Firm

Bell & Brigham

Benesch Friedlander Coplan & Aronoff LLP

Bennett Bigelow & Leedom, P.S.

Berens Law LLC

Berger & Montague, P.C.

Berke, Berke & Berke

Berman DeValerio

Bernstein Liebhard LLP

Bernstein Litowitz Berger & Grossmann LLP

Bernstein & Miller, P.A.

Betts, Patterson & Mines, P.S.

Biggs & Battaglia

The Bilek Law Firm, L.L.P.

Block & Leviton LLP

Bock & Hatch, LLC

Bohrer Law Firm, L.L.C.

Bond, Schoeneck & King PLLC

Bonnett, Fairbourn, Friedman & Balint, P.C.

Borsellino, PC

Bottini & Bottini, Inc.

Brady & Associates

Bressler, Amery & Ross, P.C.

The Briscoe Law Firm, PLLC

Broderick Law, P.C.

Bromberg Law Office, P.C.

Law Office of Brown & Associates

The Brualdi Law Firm, P.C.

Buchalter, Hoffman & Dorchak Law Firm

Buchanan Ingersoll & Rooney PC

Burke Law Offices, LLC

Burns Charest LLP

Bush Law Firm, PC

Butler Weihmuller Katz Craig LLP

Cafferty Clobes Meriwether & Sprengel LLP

Law Office of Michael T. Callahan

Carlton Fields Jorden Burt P.A.

Carney Bates & Pulliam, PLLC

Law Offices of Jeffrey G. Casurella

Catlett Law Firm, PLC

Chaffin & Burnsed, PLLC

Champion Law LLC

Chavez & Gertler LLP

Chimicles & Tikellis LLP

Chitwood Harley Harnes LLP

Law Office of Glen H. Chulsky

Choate Hall & Stewart LLP

Law Offices of J. Mitchell Clark

Clark • Martino, P.A.

Cleary Gottlieb Steen & Hamilton LLP

Clifford Chance

Climaco, Wilcox, Peca, Tarantino & Garofoli Co., L.P.A.

Coblentz Patch Duffy & Bass LLP

Cohen & Malad, LLP

Cohen Milstein Sellers & Toll PLLC

Cohen, Placitella & Roth, P.C.

Cohn Lifland Pearlman Herrmann & Knopf LLP

Cole Schotz P.C.



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Complex Litigation Group LLC

Connolly Gallagher LLP

Conroy, Simberg, Ganon, Krevans, Abel, Lurvey, Morrow, Schefer, Gutterman, Kraft, Klein

Consumer Advocacy Center, P.C.

Consumer Lawyers Group

Cooch and Taylor

Cooley LLP

Cravath, Swaine & Moore LLP

Criden & Love, P.A.

Day Pitney LLP

de La Parte & Gilbert, P.A.

Dechert LLP

Dickie, McCamey & Chilcote, P.C.

Law Office of Dimitrios Kolovos, LLC

DiTommaso • Lubin

The Divale Law Group, P.A.

DLA Piper LLP (US)

Loren Domke, P.C.

Donelon, P.C.

Dorsey & Whitney LLP

Duane Morris LLP

The Law Office of Pelayo Duran

Robert J. Dyer III Law Office

Edelman, Combs, Latturner & Goodwin, LLC

Edelson PC

Eisenstadt Law Group, P.A.

Law Office of David W. Engstrom

Entwistle & Cappucci LLP

Faruqi & Faruqi, LLP

Fay Law Group PLLC

Federman & Sherwood

Feinstein Doyle Payne & Kravec, LLC

Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig LLP

Fields Howell LLP

Fieschko & Associates, Inc.

Figari & Davenport

Finazzo Cossolini O'Leary Meola & Hager, LLC

Fineman Krekstein & Harris P.C.

Finkelstein & Krinsk LLP

Finkelstein Thompson LLP

Finn Law Group

Flaster/Greenberg

Flitter Milz, P.C.

Foley Bryant Holloway & Raluy PLLC

Foote, Mielke, Chavez & O'Neil, LLC

Freshfields Bruckhaus Deringer US LLP

Friday, Eldredge & Clark, LLP

Friedlander & Gorris, P.A.

Gainey McKenna & Egleston

Law Office of Dalinda B. Garcia, P.C.

Gardy & Notis, LLP

Garwin Gerstein & Fisher LLP

Gibson, Dunn & Crutcher LLP

Gilman Law LLP

Girard Gibbs LLP

Giskan Solotaroff & Anderson LLP

Godfrey & Kahn S.C.

Gottesdiener Law Firm, PLLC

Gottlieb & Associates

Grant & Eisenhofer P.A.

Gravely & Pearson, L.L.P.

Green & Noblin, P.C.

Greenberg Traurig, LLP

Greene & Schultz

Greenwald Davidson Radbil PLLC

Grissom Law Office

Grossman Roth Yaffa Cohen

Hagens Berman Sobol Shapiro LLP

Roderick V. Hannah, Esq., P.A.

Harwood Feffer LLP

Hicks Thomas LLP

Hill Wallack LLP

Hill Ward Henderson

Hinshaw & Culbertson LLP

Hoffman Libenson Saunders & Barba

Hogan Lovells

Holland & Knight LLP

Hollis Wright Clay & Vail P.C.

Hughes Brown, PLLC

Hughes Hubbard & Reed LLP

Ice Miller LLP

Irvine Law Group, LLP

Government of Israel

Izard Nobel LLP

The Jackson Law Group, PLLC

Jackson Lewis P.C.

Jacobs Scholz & Associates, LLC

James P.A.

Jeeves Law Group

Jenner & Block

Johnson & Benjamin LLP

Johnson & Weaver, LLP

Jolley Urga Woodbury & Little

Jones Day

Law Office of Justian Jusuf APC

K&L Gates LLP

Kahn Swick & Foti LLC



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Kantrowitz, Goldhamer & Graifman, P.C.

Kaplan Fox & Kilsheimer LLP

Katten Muchin Rosenman LLP

Katz & Korin PC

E. Clinch Kavanaugh P.A.

Keker & Van Nest LLP

Keller Rohrback L.L.P.

Kendall Law Group, LLP

Keogh Law, Ltd.

Kershaw, Cutter & Ratinoff LLP

Kessler Topaz Meltzer & Check, LLP

Kilpatrick Townsend & Stockton LLP

The Kim Law Firm, LLC

King & Spalding

Kirby McInerney LLP

Kirby Noonan Lance & Hoge LLP

Kirkland & Ellis LLP

Klafter Olsen & Lesser LLP

Klein Kavanagh Costello, LLP

Kobre & Kim LLP

Kohn Swift & Graf, P.C.

Korein Tillery

Korth Law Office

The Koval Firm, LLC

Kramer Levin Naftalis & Frankel LLP

Kwall, Showers, Barack & Chilson, PA

LG Law LLC

Labaton Sucharow LLP

The Lambert Firm

Latham & Watkins LLP

Leavengood, Dauval, Boyle & Meyer, P.A.

The Lee Firm

Lemberg Law LLC

León Cosgrove LLC

Levi & Korsinsky LLP

Lieff Cabraser Heimann & Bernstein, LLP

Lifshitz & Miller

John Linkosky & Associates

Litchfield Cavo LLP

Lite DePalma Greenberg, LLC

Locke Lord LLP

Locks Law Firm

Loevy & Loevy

Loren Domke, P.C.

Lovell Stewart Halebian Jacobson LLP

Lowenstein Sandler LLP

Lowey Dannenberg Cohen & Hart, P.C.

Ludwig Law Firm PLC

Lueddeke Law Firm

Law Offices of Sahag Majarian II

Malesovas Law Firm

Margolis Edelstein

Marovitch Law Firm, LLC

Marshall Dennehey Warner Coleman & Goggin, P.C.

Mase Lara, P.A.

Mayer Brown

The McCleery Law Firm

Law Office of Matthew McCue

McDermott Will & Emery

McDonald Carano Wilson LLP

McDonald Hopkins LLC

The Law Office of Christopher J. McGinn

McGuire Law, P.C.

McGuireWoods LLP

McTigue Law LLP

Mehri & Skalet, PLLC

Merlin Law Group, P.A.

Milbank, Tweed, Hadley & McCloy LLP

Milberg LLP

Miles & Stockbridge P.C.

Miller, Canfield, Paddock and Stone, P.L.C.

Miller Law LLC

Mirick, O'Connell, DeMallie & Lougee, LLP

Mitchell, Blackstock, Ivers, Sneddon & Marshall, PLLC

Molleur Law Office

Montes & Associates Law Firm

Montgomery McCracken Walker & Rhoads LLP

Moore & Van Allen PLLC

Morgan, Lewis & Bockius LLP

Morris, Nichols, Arsht & Tunnell LLP

Morrison & Foerster LLP

Motley Rice LLC

Munley Law

Murray Murphy Moul + Basil LLP

National Consumer Law Center, Inc.

Neal, Gerber & Eisenberg LLP

Law Offices of Bohdan Neswiacheny

New York State Department of Labor

Nix, Patterson & Roach, LLP

Law Offices of Stephen J. Nolan, Chartered

Nolan Caddell Reynolds

Norris Law Firm PLLC

Norton Rose Fulbright US LLP

O'Melveny & Myers LLP

O'Quinn Stumphauzer & Sloman, P.L.

Page Perry (Perry Law Firm, LLC)

The Pappas Group

Law Office of Edgar Pauk



A.B. DATA, LTD.
abdataclassaction.com
New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Paul Hastings LLP

Paul, Weiss, Rifkind, Wharton & Garrison LLP

Pepper Hamilton LLP

Perkins Coie LLP

Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman

Pomerantz LLP

Carl D. Poplar, P.A.

Potter Anderson & Corroon LLP

Potter Minton

The Powell Law Firm

Poyner Spruill LLP

Pressler and Pressler, LLP

Preti, Flaherty, Beliveau & Pachios, Chartered, LLP

Prickett, Jones & Elliott, P.A.

Proctor Heyman Enerio LLP

Proskauer Rose LLP

Provost Umphrey Law Firm L.L.P.

Quarles & Brady LLP

Quinn Emanuel Urquhart & Sullivan, LLP

Reed Smith LLP

Reilly Like & Tenety

William Riback LLC

Richards, Layton & Finger, P.A.

Rigrodsky & Long, P.A.

Law Offices of Stephen H. Ring, P.C.

Robbins Arroyo LLP

Robbins Geller Rudman & Dowd LLP

The Roberts Law Firm

Ronald Frederick & Associates Co., L.P.A.

Rose, Klein & Marias, LLP

Rosenthal, Monhait & Goddess, P.A.

Rosman & Germain LLP

Ross Aronstam & Moritz LLP

Craig E. Rothburd, P.A.

Paul S. Rothstein & Associates

Rozwood & Company, APC

Ruckelshaus Kautzman Blackwell Bemis & Hasbrook

Ryan & Maniskas, LLP

SL Chapman LLC

Sacher, Zelman, Hartman, P.A.

Sacks & Sacks, PC

Sandberg Phoenix & von Gontard P.C.

Sanford Heisler Kimpel, LLP

Sarraf Gentile LLP

Saxena White P.A.

Law Office of David Schafer, PLLC

Schiller & Pittenger, P.C.

Schoengold & Sporn, P.C.

Schrader, Byrd & Companion, PLLC

Schwartz Semerdjian Cauley & Moot LLP

Shapiro Haber & Urmy LLP

Shavitz Law Group, P.A.

Shipman & Wright, L.L.P.

Shook, Hardy & Bacon L.L.P.

Shutts & Bowen LLP

Sidley Austin LLP

Sills Cummis & Gross P.C.

Simpson Thacher & Bartlett LLP

Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates

Sly James Law Firm

Smith Mackinnon Et Al

Smyser Kaplan & Veselka, L.L.P.

Spector Roseman Kodroff & Willis, P.C.

Speights & Worrich

Sprenger + Lang, PLLC

Squire Patton Boggs

Squitieri & Fearon, LLP

Starzyk & Associates, P.C.

Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.

Steptoe & Johnson LLP

Philip D. Stern & Associates, LLC

Stinson Leonard Street LLP

Stone Bonner & Rocco LLP

Stradley Ronon Stevens & Young, LLP

Stull, Stull & Brody

Sullivan & Cromwell LLP

Sulloway & Hollis, P.L.L.C.

Susman Godfrey L.L.P.

Gary J. Takacs, P.A.

Tanner Bishop Attorneys

Thierman Buck Law Firm, LLP

Thompson Hine

Tousley Brain Stephens PLLC

Travis Law Group

Trenam Law

Trief & Olk

Troutman Sanders LLP

United States Consumer Product Safety Commission

United States Securities and Exchange Commission

Vianale & Vianale LLP

Vinson & Elkins LLP

Wachtell, Lipton, Rosen & Katz

Walfish & Noonan, LLC

Wardell & Quezon, P.A.

State of Washington, Department of Financial Institutions, Division of Consumer Services

Watton Law Group

Brian L. Weakland Law Office



A.B. DATA, LTD.
abdataclassaction.com

New York | Washington, D.C. | Chicago | West Palm Beach | Milwaukee

Weil, Gotshal & Manges LLP

Weinstein Law Firm

The Weiser Law Firm P.C.

WeissLaw LLP

Weltman, Weinberg & Reis Co., LPA

Westrup Klick, LLP

WhatleyKallas, LLP

White & Case LLP

White & MacDonald, LLP

Theresa I. Wigginton, P.A.

Wilentz, Goldman & Spitzer P.A.

The Law Offices of David M. Wise, P.A.

Williams & Connolly LLP

Williams Cuker Berezofsky

Willkie Farr & Gallagher LLP

Wilmer Cutler Pickering Hale and Dorr LLP

Wilson Elser Moskowitz Edelman & Dicker LLP

Wimmer Stiehl & McCarthy

Winstead PC

Winston & Strawn LLP

Wites & Kapetan P.A.

The Law Offices of Steven L. Wittels, P.C. (Wittels Law)

Wolf Haldenstein Adler Freeman & Herz LLP

The Wolf Law Firm, LLC

Wolf Popper LLP

Wong Fleming

Young Conaway Stargatt & Taylor, LLP

Zamansky LLC

Zimmerman Reed, LLP

Zwerling, Schachter & Zwerling, LLP

**A.B. DATA, LTD.**
abdataclassaction.com
New York  |  Washington, D.C.  |  Chicago  |  West Palm Beach  |  Milwaukee

# EXHIBIT J - 4



**300 x 250**



**Facebook Ad**



**728 x 90**



**320 x 50**

# EXHIBIT J - 5

United States District Court for the Northern District of California

# Notice of Class Action Settlement
# Google Street View WiFi Communications

## Important Information – Read Carefully.

**This is a Court approved Legal Notice. This is not an advertisement.**

A class action Settlement has been proposed in litigation against Google LLC ("Google") relating to allegations that Google "Street View" vehicles unlawfully captured electronic communications sent or received over wireless network connections ("WiFi connections"). If you used an unencrypted wireless network from which Google's Street View vehicles obtained Payload Data (defined below) in the United States between January 1, 2007 and May 15, 2010, you are a Settlement Class Member.

"Payload Data" means data frames under the 802.11 Wireless Standard, consisting of a body that may contain the content of communications being transmitted over the network. Payload Data does not include data frames consisting of a header, nor does it include data frames containing solely network identifying information, such as a MAC Address or SSID.

Under the Settlement, Google has agreed to destroy the Payload Data that Street View Vehicles acquired in the United States between January 1, 2007, and May 15, 2010. Google has also agreed not to collect and store Payload Data via Street View vehicles for use in any product or service, except with notice and consent. In addition to these and other commitments described below, Google has agreed to pay $13 million into a Settlement Fund.

The money in the Settlement Fund will be distributed to non-profit organizations that have a track record of addressing consumer concerns regarding the privacy of their electronic communications, as well as to pay attorneys' fees and expenses as awarded by the Court, and the costs of giving notice of the Settlement to Class Members.

The non-profit organizations that will receive funds from the Settlement are called "Cy Pres Recipients." The Plaintiffs have recommended the following organizations to the Court to be Cy Pres Recipients: American Civil Liberties Union Foundation, Inc., Center for Digital Democracy, The Center on Privacy & Technology at Georgetown Law, Consumer Reports, Inc., Massachusetts Institute of Technology - Internet Policy Research Initiative, Public Knowledge, Rose Foundation for Communities and the Environment, and World Privacy Forum. The Court will select the Cy Pres Recipients and will decide how much money each will receive from the Settlement Fund. As a condition of receiving this money, each Cy Pres Recipient must commit to use the funds to promote the protection of Internet privacy.

The Court will decide whether to approve the proposed Settlement. If approved, the Settlement will resolve the litigation entitled *In re Google Inc. Street View Electronic Communications Litigation*, Case No. 15-md-02184, which is pending before Judge Charles R. Breyer in the Northern District of California.

The class action settlement approval process may take several months, or more if there is an appeal.

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ▢▢.**

### Please read this Notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | | |
|---|---|---|
| **OBJECT TO OR COMMENT ON THE SETTLEMENT** | You may object to the Settlement by writing to the Court about why you don't think the Settlement should be approved.<br><br>You can also write the Court to provide comments or reasons why you support the Settlement.<br><br>For detailed information about how to object to or comment on the Settlement, see Question 15. | Deadline: [Month] [Day], [Year] |
| **GO TO THE FINAL APPROVAL HEARING** | You may, but are not required to, attend the Final Approval Hearing where the Court may hear arguments concerning the approval of the Settlement. If you wish to speak at the Final Approval Hearing, you must state your intention to do so in your written objection or comment. | Deadline: [Month] [Day], [Year] |
| **EXCLUDE YOURSELF FROM THIS SETTLEMENT** | You can exclude yourself from the Settlement by informing the Notice Administrator that you want to "opt-out" of the Settlement. If the Settlement becomes final, this is the only option that allows you to retain your rights to sue for claims relating to unencrypted WiFi communications acquired by Street View Vehicles in the United States between January 1, 2007, and May 15, 2010. | Deadline: [Month] [Day], [Year] |
| **DO NOTHING** | If you do nothing before the deadline to comment, object, or exclude yourself, and if the Settlement becomes final, you will give up your rights to sue for claims relating to the Plaintiffs' complaint in this case, which alleges that between January 1, 2007, and May 15, 2010, Google Street View Vehicles in the United States intentionally intercepted electronic communications that were sent over unencrypted wireless networks. | Deadline: [Month] [Day], [Year] |

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ___.**

# What this Notice Contains

**Page**

**BACKGROUND INFORMATION** ..........................................................................**5**
1. Why is there a notice?.....................................................................5
2. What is this litigation about? .........................................................5
3. Who is the defendant in the lawsuit? .............................................5
4. Why is this a class action? ............................................................5
5. Why is there a settlement? .............................................................5

**SETTLEMENT CLASS MEMBERSHIP** ................................................................**6**
6. How do I know if I am part of the Settlement?...............................6

**THE LAWYERS FOR SETTLEMENT CLASS MEMBERS** .................................**6**
7. Do I have a lawyer in the case? .....................................................6
8. How will Class Counsel be paid? ..................................................6

**BENEFITS FOR SETTLEMENT CLASS MEMBERS** ........................................**7**
9. Will the Settlement Allow Google to keep my WiFi data? ....................7
10. Will the Settlement help protect my WiFi data in the future? ...............7
11. Who will receive money from the Settlement?...............................9
12. What happens if the Court does not approve the proposed Cy Pres Recipients? ....9
13. How will the Cy Pres Recipients use the Settlement money? ..............10

**LEGAL RIGHTS RESOLVED THROUGH THE SETTLEMENT** .....................**10**
14. What am I giving up to stay in the Settlement Class? ..........................10

**OBJECTING TO THE SETTLEMENT** ...............................................................**10**
15. If I don't like the Settlement, how do I tell the Court?.........................11
16. What is the difference between objecting and excluding myself?...............11

**FINAL APPROVAL HEARING**..........................................................................**12**
17. When and where will the Court decide whether to approve the Settlement?.......12
18. Do I have to come to the hearing? ................................................12
19. May I speak at the hearing? ..........................................................12

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ......................................**12**
20. How do I exclude myself from the Settlement?..............................12
21. If I do not exclude myself, can I sue Google for the same thing later? .................13

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ___ .**

# What this Notice Contains
## (continued)

**Page**

22.    If I exclude myself, am I still represented by Class Counsel? ..............................13

**DOING NOTHING**..................................................................................................**13**

23.    What happens if I do nothing? ...............................................................13

**GETTING MORE INFORMATION**......................................................................**13**

24.    How do I get more information?...........................................................13

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ___.**

# BACKGROUND INFORMATION

## 1.   Why is there a notice?

A Court authorized this notice because you have a right to know how the proposed Settlement may affect your rights. This notice explains the nature of the litigation, the general terms of the proposed Settlement, and what it may mean to you. This notice also explains the ways you may participate in, or exclude yourself from, the Settlement.

## 2.   What is this litigation about?

The complaint in this case alleges that between January 1, 2007, and May 15, 2010, Google Street View Vehicles intentionally intercepted electronic communications that were sent over unencrypted wireless internet connections ("WiFi connections") in the United States, in violation of the Federal Wiretap Act, 18 U.S.C. §§ 2510 et seq., and related state statutes.

The lawsuit was brought on behalf of the individuals whose data was intercepted by Google Street View Vehicles. Google denies any wrongdoing, and no court or other entity has made any determination that the law has been violated. The current complaint filed in this litigation, which describes the specific legal claims alleged by the Plaintiffs and the relief sought, is available on the Settlement Website, at [⬛⬛⬛⬛⬛]. You can also find a copy of the Court's order on Google's first motion to dismiss the Plaintiffs' legal claims on the Settlement Website.

## 3.   Who is the defendant in the lawsuit?

The Defendant is Google LLC. Google is a Delaware corporation with its principal place of business in Mountain View, California.

## 4.   Why is this a class action?

Even if you have not filed your own lawsuit against Google regarding allegations that Google intercepted data as alleged in this case, if you are a Settlement Class Member, this Settlement still affects you because the Settlement applies to all Settlement Class Members.

In a class action, one or more people file a lawsuit to assert legal claims on behalf of themselves and other persons who have experienced the same or similar circumstances. Here, twenty-one of the people named as Plaintiffs in the complaint will serve as "Class Representatives" to represent the interests of all the Settlement Class Members.

## 5.   Why is there a settlement?

The Court has not decided in favor of Plaintiffs or Google. Instead, both sides agreed to a settlement. Settlements avoid the costs and uncertainty of a trial and appeals, while providing benefits to Settlement Class Members when the Settlement becomes final. Class Representatives and the attorneys for the Settlement Class ("Class Counsel," *see* Question 7) believe that the Settlement is in the best interests of the Settlement Class Members.

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ⬛⬛⬛.**

- 5 -

## SETTLEMENT CLASS MEMBERSHIP

### 6.   How do I know if I am part of the Settlement?

You are a Settlement Class Member, and you are affected by this Settlement, if you used a wireless network device from which Google's Street View vehicles in the United States obtained unencrypted Payload Data between January 1, 2007 and May 15, 2010.

"Payload Data" means data frames under the 802.11 Wireless Standard, consisting of a body that may contain the content of communications being transmitted over the network. Payload Data does not include data frames consisting of a header, and Payload Data does not include data frames containing solely network identifying information, such as a MAC Address or SSID.

"Unencrypted" Payload Data is typically only available from a wireless network device (such as a router) that is not password protected. If you used such a device in any part of the United States where Google Street View vehicles were driving between January 1, 2007, and May 15, 2010, you may be a Settlement Class Member.

However, the following entities and individuals are **not** Settlement Class Members:

- Google; Google Affiliates, and their respective officers, directors, employees, members, agents, attorneys, administrators, representatives, insurers, beneficiaries, trustees, shareholders, investors, contractors, joint venturers, predecessors, successors, assigns, transferees, and all other individuals and entities acting on Google's behalf with respect to the Released Claims (defined at Question 6);
- Any judicial officer presiding over the Action, or any member of his or her immediate family or of his or her judicial staff; and
- Any individual who meets the class definition and who timely and validly opts-out of the Settlement.

If you are not sure whether you are a Settlement Class Member, you may visit the FAQ's section of the Settlement website, at [_____], contact the Notice Administrator by mail at [_____], or call the Notice Administrator toll-free number at 800-[_____], to ask the Notice Administrator for more information that may help you determine whether or not you are a Settlement Class Member.

## THE LAWYERS FOR SETTLEMENT CLASS MEMBERS

### 7.   Do I have a lawyer in the case?

If you are a Settlement Class Member, you have a lawyer in this case. The Court appointed as "Class Counsel" the law firms Spector Roseman & Kodroff, PC; Cohen Milstein Sellers & Toll PLLC; and Lieff Cabraser Heimann & Bernstein LLP; to represent the Settlement Class Members. If you want to be represented by your own lawyer, you may hire one at your own expense.

### 8.   How will Class Counsel be paid?

Class Counsel will apply to the Court to be paid from the Settlement Fund, and payment will be made only if Class Counsel's request is approved by the Court, and only in the amount that is approved by the Court.

Class Counsel will ask the Court to award no more than $3.25 million in attorneys' fees (25% of the Settlement Fund), up to $750,000 to reimburse Class Counsel for the expenses incurred to litigate and resolve this action, and up to $158,000 to reimburse the Notice Administrator for the costs of administering the Settlement. Class

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ___ .**

Counsel will also ask the Court to approve Service Awards for eighteen of the Plaintiffs named in the Consolidated Amended Complaint who participated in jurisdictional discovery of up to $5,000 per Settlement Class Representative, and for the three Plaintiffs named in the Consolidated Amended Complaint who did not participate in jurisdictional discovery of up to $500 per Settlement Class Representative, as an award for their service to the Settlement Class as Plaintiffs and Class Representatives ($91,500 in total).

Google has the right to oppose Class Counsel's application for fees, reimbursement of costs, and Service Payments, and Settlement Class Members have the right to object. The Court will decide the attorneys' fees and expenses, and Service Awards to be paid. Any attorneys' fees, expenses, or Service Awards approved by the Court will be paid from the $13 million Settlement Fund.

Class Counsel's application for attorneys' fees, expenses, and Service Awards will be made available on the Settlement Website at [＿＿＿＿＿＿] before the deadline for you to comment or object to the Settlement. You can also request a copy of the application by contacting the Notice Administrator at [＿＿＿＿＿＿].

## BENEFITS FOR SETTLEMENT CLASS MEMBERS

### 9.   Will the Settlement Allow Google to keep my WiFi data?

The Settlement requires Google to destroy the Payload Data acquired from unencrypted wireless networks by Google's Street View vehicles operating in the United States from January 1, 2007, through May 15, 2010.

### 10.  Will the Settlement help protect my WiFi data in the future?

Under the Settlement, Google has agreed that for five years after the Settlement becomes final, Google will not collect and store for use, in any product or service, Payload Data via Street View vehicles, except with notice and consent.

Google also agrees to comply with all aspects of the Privacy Program described in paragraph 16 of Section I of the Assurance of Voluntary Compliance and with the prohibitive and affirmative conduct described in paragraphs 1-5 of the Assurance of Voluntary Compliance. Through counsel, Google will confirm to Plaintiffs in writing on an annual basis that it remains in compliance.

"Assurance of Voluntary Compliance" means the Assurance of Voluntary Compliance entered into by Google and the Attorneys General of the States of Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, and Washington in March 2013 regarding Google's collection of Wi-Fi information with its Street View vehicles.

This is a summary of the requirements in Paragraph 16 of Section I of the Assurance of Voluntary Compliance:

Google will implement a "Privacy Program" that includes:

- Delivering a copy of the Assurance of Voluntary Compliance to Google's executive management, employees with supervisory responsibilities, and Google's product

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ＿＿＿.**

counsel and attorneys who have responsibility in providing advice regarding privacy of consumer information;

- Designating one or more employees to coordinate and be responsible for a "Privacy Program" implemented by Google;

- Providing regular employee training designed to (1) inform new employees about the importance of user privacy and their role in helping maintain it, (2) offer further privacy education to Google employees with responsibility relating to the privacy or confidentiality of user data, (3) make privacy certification programs available to key employees, and (4) provide in-house counsel privacy awareness refresher training for counsel advising product teams;

- Holding an annual "Privacy Week" event that is promoted across Google offices and will include presentations by subject matter experts;

- Providing periodic updates on Google's internal communications channels describing key material developments in user privacy, including technical, legal, or policy developments;

- Regularly assessing the effectiveness of the Privacy Program's controls and the consideration of updates to such controls based on those assessments; and

- Developing and maintaining policies and procedures for responding to identified events involving the unauthorized collection, use, or disclosure of user data.

This is a summary of the requirements in Paragraphs 1-5 of the Assurance of Voluntary Compliance:

Google, and its successors and assigns:

- shall not collect and store for use, in any product or service, Payload Data via Street View vehicles, except with notice and consent;

- shall maintain the Privacy Program described in paragraph 16 for ten years;

- Shall provide the Attorneys General a copy of reports conducted pursuant to a consent decree with the Federal Trade Commission;

- Shall delete or destroy the Payload Data it collected in the United States as soon as practicable and at a time when destroying the data is not contrary to any litigation holds or other legal requirements;

- Shall design and implement a public service campaign reasonably designed to educate consumers about steps they can take to better secure their personal information while using wireless networks, which includes a YouTube video about how to encrypt wireless networks, a blog post explaining the value of encrypting a wireless network and directing users to how-to videos on YouTube, running at least one half-page educational newspaper ad in a national newspaper and at least one half-page educational ad in the newspaper with the greatest circulation in each State, incorporating a discussion on WiFi security in an educational pamphlet available to the public about online safety and privacy, and running daily online ads

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ___.**

promoting the how-to video for at least two years from the date the campaign begins.

The full text of the Assurance of Voluntary Compliance is available on the Settlement Website, at [⬚⬚⬚⬚⬚⬚⬚].

## 11.  Who will receive money from the Settlement?

The Settlement provides for distribution of the Settlement Fund, after deducting any attorneys' fees, service awards, and other expenses approved by the Court, to non-profit organizations that have a track record of addressing consumer concerns regarding the privacy of their electronic communications (the "Cy Pres Recipients").  The Plaintiffs have recommended eight non-profit organizations to the Court, and the Court will select the Cy Pres Recipients.  In their motion for final approval of the Settlement, the Plaintiffs will recommend how to allocate the total cy pres money among the recommended Cy Pres Recipients.

Google represents in the Settlement Agreement that the money that will be distributed to the Cy Pres Recipients is in addition to Google's charitable donations and that, but for this Settlement, Google would not have spent this money for charitable purposes.

The portion of the Settlement Fund that will be distributed to the Cy Pres Recipients depends on the amounts the Court approves for attorneys' fees, Service Awards, and other expenses. Any funds that the Court does not award as attorneys' fees, Service Awards, or other expenses will be distributed to the Cy Pres Recipients approved by the Court.

The Plaintiffs have recommended the following Cy Pres Recipients:

American Civil Liberties Union Foundation, Inc.

Center for Digital Democracy

The Center on Privacy & Technology at Georgetown Law

Consumer Reports, Inc.

Massachusetts Institute of Technology - Internet Policy Research Initiative

Public Knowledge

Rose Foundation for Communities and the Environment

World Privacy Forum


A copy of the Proposal from each proposed Cy Pres Recipient describing how it would use money from the Settlement is available on the Settlement Website, at [⬚⬚⬚⬚⬚⬚].

## 12.  What happens if the Court does not approve the proposed Cy Pres Recipients?

The recommended Cy Pres Recipients will only receive money from the Settlement Fund if the Court approves the distribution.

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ⬚⬚⬚.**

If *none* of the recommended Cy Pres Recipients are approved by the Court, the Plaintiffs will seek permission from the Court to recommend different Cy Pres Recipients, which will also be non-profit organizations that have a track record of addressing consumer concerns regarding the privacy of their electronic communications. If this happens, you can find information about the new recommendation by visiting the Settlement Website, at [＿＿＿＿＿].

If the Court decides not to approve one or more of the recommended Cy Pres Recipients, but does approve at least one, the total amount of money to be distributed to Cy Pres Recipients would not change. Instead, the funds proposed for distribution to any Cy Pres Recipient that the Court did not approve will be distributed to the approved Cy Pres Recipients instead.

None of the money in the Settlement Fund will be returned to Google if the Settlement becomes final.

## 13.  How will the Cy Pres Recipients use the settlement money?

Detailed proposals from each Proposed Cy Pres Recipients regarding how they would use funds awarded by the Court are available on the Settlement Website at [＿＿＿＿＿].

Each Proposed Cy Pres Recipient must agree that, if the Court awards it money from this Settlement, it will use the funds to promote the protection of Internet privacy as described in their detailed proposals. Until the funds allocated to it are exhausted, the Settlement requires each Cy Pres Recipient to report to the Court and the parties every six months informing them of how it has used the awarded money since the previous report and how it intends to use any remaining funds. The reports will be posted on the Settlement website, at [＿＿＿＿＿].

# LEGAL RIGHTS RESOLVED THROUGH THE SETTLEMENT

## 14.  What am I giving up to stay in the Settlement Class?

If you do not exclude yourself from the Settlement Class, you will be releasing all of your legal claims relating to the allegations in the plaintiffs' Complaint, which alleges that between January 1, 2007, and May 15, 2010, Google Street View Vehicles intentionally intercepted electronic communications that were sent over unencrypted wireless internet connections in the United States. You may view the entire Complaint on the Settlement Website at [＿＿＿＿＿].

The claims you are giving up are called "Released Claims," and they are defined in paragraph 17 of the Settlement Agreement. You will be releasing the Released Claims against Google, Google Affiliates, and their respective officers, directors, employees, members, agents, attorneys, administrators, representatives, insurers, beneficiaries, trustees, shareholders, investors, contractors, joint venturers, predecessors, successors, assigns, transferees, and all other individuals and entities acting on Google's behalf in connection with the Released Claims, when the Settlement becomes final.

By releasing your legal claims, you are giving up the right to file lawsuits against, or seek further compensation from, Google and the related entities listed above based on those claims—whether or not you are currently aware of those claims. If you are a Settlement Class Member, all of the decisions by the Court will bind you unless you exclude yourself from the Settlement (see Questions 20-22). That means you will be bound to the terms of the Settlement and accompanying Court order, and cannot bring a lawsuit, or be part of another lawsuit against Google or the other entities listed in the paragraph above regarding the use of Street View vehicles operating in the United States to acquire unencryted Payload Data between January 1, 2007, and May 15, 2010, and related allegations in Plaintiffs' complaint.

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ＿＿＿.**

Paragraph 17 of the Settlement Agreement defines the claims that will be released by Settlement Class Members who do not exclude themselves from the Settlement. You can access the Settlement Agreement and read the details of the legal claims being released at [＿＿＿＿＿＿]. If you have any questions about what this means, you can contact the Notice Administrator (see Question 24).

# OBJECTING TO THE SETTLEMENT

## 15.  If I don't like the Settlement, how do I tell the Court?

If you do not exclude yourself from the Settlement, you can object to any aspect of the Settlement, to Class Counsel's request for attorneys' fees and expenses, and/or to the request for Plaintiff Service Awards.

Objecting to the Settlement means asking the Court to deny approval to the Settlement. You can't ask the Court to order a larger settlement—it can only approve or deny the Settlement. If the Court denies approval to the Settlement, Google will not be required to comply with the terms of the Settlement Agreement, no settlement payments will be sent out, and the lawsuit will continue. If that is what you want to happen, you may so state in an objection.

If you chose to make an objection, it must be in writing and contain the following:

  a.   The name and case number of this lawsuit (*In re Google Inc. Street View Electronic Communications Litigation*, case number is 10-md-02184);
  b.   This statement: "I declare under penalty of perjury that I used an unencrypted wireless network in the United States between January 1, 2007 and May 15, 2010";
  c.   Your full name and mailing address, and email address or telephone number;
  d.   All reasons for your objection;
  e.   Whether you intend to personally appear at the Final Approval Hearing;
  f.   The name and contact information of any attorney representing you in this case, and whether the attorney will appear on your behalf at the Final Approval Hearing;
  g.   Your handwritten or electronically imaged written (*e.g.*, "DocuSign") signature. An attorney's signature, or a typed signature, is not sufficient.

To be considered by the Court, your objection must be either (1) filed at any location of the United States District Court for the Northern District of California on or before ＿＿＿, or (2) mailed, postmarked no later than ＿＿＿, to the following two recipients at these addresses:

| THE COURT | THE NOTICE ADMINISTRATOR |
|---|---|
| Judge Breyer Case System Administrator<br>United States Courthouse<br>280 South 1st Street, Room 2112<br>San Jose, CA 95113 | |

## 16.  What is the difference between objecting and excluding myself?

You object to the Settlement when you disagree with some aspect of the Settlement and think the Court should not give Final Approval to the Settlement. An objection, like a comment, allows your views to be heard in Court.

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ＿＿＿.**

Excluding yourself from the Settlement means that you are no longer a Settlement Class Member and don't want the Settlement to apply to you. Once you are excluded, you lose any right to object to any aspect of the Settlement because the case no longer affects you.

# FINAL APPROVAL HEARING

## 17.  When and where will the Court decide whether to approve the Settlement?

The Court will hold the Final Approval Hearing at [___] on [Month] [Day], 2019 in Courtroom 6 (17th Floor) of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102. The hearing may be postponed to a different date or time or location without notice. Please check [_____], or Judge Charles R. Breyer's Calendar (available at https://www.cand.uscourts.gov/crb) for any updates about the Settlement or the Final Approval Hearing. If the date or time of the Final Approval Hearing changes, an update to the Settlement Website or the Court's Calendar is the only way you will be informed of the change.

At the Final Approval Hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them. The Court may listen to people who appear at the hearing and who have provided notice of their intent to appear at the hearing (*see* Question 15). The Court may also consider Class Counsel's application for attorneys' fees, costs, and expenses and for Service Payments. After the hearing, the Court will decide whether to approve the Settlement.

## 18.  Do I have to come to the hearing?

No. Class Counsel will answer any questions the Court may have. You may attend at your own expense if you wish. If you submit a written objection, you may, but you do not have to, come to Court to talk about it. As long as you submitted your written objection on time, the Court will consider it. You may also pay your own lawyer to attend, but it is not required.

## 19.  May I speak at the hearing?

At that hearing, the Court will at its discretion hear any objections and arguments concerning the fairness of the Settlement.

You may attend the hearing, but you do not have to. As described above in response to Question 17, you may speak at the Final Approval Hearing if (a) you have mailed your written comment or objection to the appropriate recipient on or before the postmark deadline, and (b) you identified in your comment or objection whether you intend to appear at the Final Approval Hearing.

You cannot speak at the hearing if you exclude yourself from the Settlement Class.

# EXCLUDING YOURSELF FROM THE SETTLEMENT

## 20.  How do I exclude myself from the Settlement?

If you want to keep the right to sue or continue to sue Google or the other released entities (see Question 14) based on claims this Settlement resolves, you must exclude yourself from the Settlement Class (sometimes called "opting out").

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call [___].**

To exclude yourself from the Settlement, you must send a letter by mail saying that you wish to do so. Your exclusion letter must include:

a.   The name and case number of this lawsuit (*In re Google Inc. Street View Electronic Communications Litigation*, case number is 10-md-02184);

b.   Your full name and mailing address, and email address or telephone number;

c.   The words "Notification of Exclusion" or a statement that you want to be excluded from the Settlement; and

d.   Your handwritten or electronically imaged written (*e.g.*, "DocuSign") signature. An attorney's signature, or a typed signature, is not sufficient.

You must mail your exclusion letter, postmarked no later than ▢▢▢, to:

*In re Google Inc. Street View Electronic Communications Litigation*
c/o ▢▢▢▢▢

You cannot exclude yourself by mailing a notification to any other location or after the deadline of ▢▢▢. You cannot exclude yourself by telephone or by email. Your exclusion letter must be signed by you, personally, and not your lawyer or anyone else acting on your behalf. "Mass" or "class" opt-outs made on behalf of multiple persons or classes of persons will be deemed invalid.

## 21.  If I do not exclude myself, can I sue Google for the same thing later?

No. Unless you exclude yourself, you give up the right to sue Google for the claims that this Settlement resolves.

## 22.  If I exclude myself, am I still represented by Class Counsel?

No. Class Counsel represents the members of the Settlement Class. If you exclude yourself from the Settlement Class, you are not represented by Class Counsel.

# DOING NOTHING

## 23.  What happens if I do nothing?

If you do nothing, and if the Settlement becomes final, you will give up your rights to sue Google (or continue to sue) or related entities (see Question 14) for claims arising out of or related to the allegations in the plaintiffs' Complaint, which alleges that between January 1, 2007, and May 15, 2010, Google Street View Vehicles intentionally intercepted electronic communications that were sent over unencrypted wireless internet connections in the United States.

# GETTING MORE INFORMATION

## 24.  How do I get more information?

This notice summarizes the proposed Settlement. More details are in the Settlement Agreement itself. You can get a copy of the Settlement Agreement, view other case documents, and get additional information, updates, and answers to Frequently asked Questions, by visiting [▢▢▢▢▢▢].

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call ▢▢▢.**

- 13 -

All of the case documents that have been filed publicly in this case are also available online through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov. This case is called *In re Google Inc. Street View Electronic Communications Litigation*, and the case number is 10-md-02184. You may obtain case documents by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California, San Francisco Division, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

You can also get additional information or request a copy of the Settlement Agreement by calling toll-free _____ or writing to the Notice Administrator at *In re Google Inc. Street View Electronic Communications Litigation*, c/o _____.

PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT

**This Settlement affects your legal rights even if you do nothing.**

**Questions?  Go to www.settlementwebsite.com/page or call _____.**

# EXHIBIT K

# SPECTOR ROSEMAN & KODROFF

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
2001 MARKET STREET, SUITE 3420
PHILADELPHIA, PENNSYLVANIA 19103
215.496.0300
FAX 215.496.6611
http://www.srkattorneys.com
email: classaction@srkattorneys.com

## FIRM BIOGRAPHY

Spector Roseman & Kodroff, P.C. is a highly successful law firm with a nationwide practice that focuses on class actions and complex litigation, including securities, antitrust, consumer protection, and commercial claims.   The firm is active in major litigation in state and federal courts throughout the country and internationally.   The firm's reputation for excellence has been recognized by numerous courts which have appointed the firm as lead counsel in prominent class actions.   As a result of the firm's efforts, defrauded consumers and shareholders have recovered billions of dollars in damages and implemented important corporate governance reforms.   The firm is rated "AV" by Martindale-Hubbell, its highest rating for competence and integrity.

Judges throughout the country have recognized the Firm's contributions in class action cases:

- "Lead class counsel - Jeffrey Corrigan and the other lawyers from Spector Roseman & Kodroff, P.C. - performed brilliantly in this exceptionally difficult case."   *In re OSB Antitrust Litigation*, Master File No. 06-CV-00826 (PSD) (E.D. Pa. Dec. 9, 2008)

- "The lawyering in this case was nothing short of superb. … I thought it was just excellent and that makes my job so much easier…"   *In re Blood Reagents Antitrust Litigation*, MDL No. 2081 (E.D. Pa.) (approval hearing October 24, 2018)

- "I think in very brief summary form, you know, that counsel for plaintiffs – for direct action plaintiffs have done an outstanding job here with representing the class, and I though your briefing was always very on point. I thought the presentation of very contentious issues on the class action motion was very well done, it was very well briefed, it was well argued."   *In re Domestic Drywall Antitrust Litigation*, MDL No. 2437 (E.D. Pa.) (approval hearing June 28, 2018)

- "Certainly the Court relies on the recommendation and work of experienced counsel, and I have indicated this before that I think [] [co-lead] counsel is – has handled this case extremely well, and I do rely on their arm's length negotiations, which I believe has gone on here."   *In re Automotive Parts Antitrust Litigation*, MDL No. 2311 (E.D. Mi.) (approval hearing February 28, 2018)

- "[Class counsel] did a wonderful job here for the class and were in all respects totally professional and totally prepared.   I wish I had counsel this good in front of me in every case."   *In re Parmalat Securities Litigation*, No. 04 Civ. 0030 (LAK) (S.D.N.Y.) (approval hearing March 2, 2009)

- "I think perhaps the most important for the class is the recovery, and I think the recovery has been significant and very favorable to the class given my understanding of the risks in the litigation. And so perhaps that's always the starting point for judging and assessing the quality of representation.   The class I think was well represented, in that it got a very significant recovery in the circumstances". *In re SCOR Holding (Switzerland) AG Litigation*, No. 04 Civ. 07897 (MBM) (S.D.N.Y.) (formerly known as Converium Holdings)

- "[O]utstanding work [of counsel] … was done under awful time constraints" and the "efforts here were exemplary…under lousy time constraints."  *In re Atheros Communications, Inc. Shareholder Litigation*, C.A. No. 6124-VCN (Del. Ch.)

- "Plaintiffs' counsel have been excellent in this complex, hard-fought litigation and innovative in its notice program and efforts to find class members."  *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, C.A. 05-11148 (D. Mass. Aug. 3, 2009)

- "Here, Plaintiffs' counsel are highly experienced in complex antitrust litigation, as evidenced by the attorney biographies filed with the Court. . . .   They have obtained a significant settlement for the Class despite the complexity and difficulties of this case."  *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, C.A. No. 03-4578 (E.D. Pa. May 19, 2005)

- "Counsel are among the most experienced lawyers the national bar has to offer in the prosecution and defense of significant class actions."  *In re Lupron Marketing and Sales Practices Litigation*, 345 F. Supp. 2d 135, 137-38 (D. Mass. 2004)

- "[T]he class attorneys in this case have worked with enthusiasm and have been creative in their attempt to compensate as many members of the consumer class as possible. . . .  This Court has consistently noted the exceptional efforts of class counsel."  *In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 80 (D. Mass. 2005)

**Antitrust Litigation**

SRK's antitrust practice group regularly oversees important antitrust cases.   Among the Firm's most significant cases are:

- *In re Automotive Parts Antitrust Litigation, MDL 12-2311 (E.D. Mich.).* SRK has been appointed Interim Co-Lead Counsel for Direct Purchaser Plaintiffs for all product cases filed (currently comprised of more than 25 different cases). These massive price-fixing class actions are being brought on behalf of direct purchasers who were overcharged for various kinds of automotive parts, including wire harness products, heater control panels, instrument panel clusters, fuel senders, occupant safety restraint system products, bearings, air conditioning systems,

starters, windshield wiper systems, windshield washer systems, spark plugs, oxygen sensors, fuel injection systems, alternators, ignition coils, and power window motors. All cases are pending before Judge Marianne Battani in the United States District Court for the Eastern District of Michigan in Detroit. SRK and its Interim Co-Lead Counsel have to date secured more than $300 million in settlements for the various classes.

- *In re Domestic Drywall Antitrust Litigation,* MDL 12-2437 (E.D. Pa.). SRK was appointed as Co-Lead Counsel for direct purchaser plaintiffs in this nation-wide price fixing class action, which resulted in combined settlements of over $190 million for the class.

- *In re Blood Reagents Antitrust Litigation*, MDL 09-2081 (E.D. Pa.). SRK was appointed sole Lead Counsel in this nation-wide, price-fixing class action. The case settled in May 2018, on the eve of trial, resulting in combined settlements of $41.5 million for the class, which was comprised of hospitals, blood banks, laboratories and the American Red Cross.

- *McDonough, et al., v. Toys R Us, et al.* (E.D. Pa.) (Brody, J.). SRK is Co-Lead Counsel for six sub-classes of Babies "R" Us' customers, a rare case involving resale price maintenance in which a purchaser class was certified. A settlement of $35.5 million was achieved on behalf of the sub-classes.

- *In re Linerboard Antitrust Litigation*, MDL No. 1261 (E.D. Pa.). SRK was appointed co-lead counsel for plaintiffs in this price-fixing antitrust action which settled for total of $202 million, the largest antitrust settlement ever in Third Circuit.

- *In re OSB Antitrust Litigation*, Master File No. 06-CV-00826 (PSD) (E.D. Pa.). SRK was lead counsel for a nationwide class of direct purchasers, which settled for $120 million.

- *In re Flat Glass Antitrust Litigation*, MDL No. 1200 (W.D. Pa.). SRK was co-lead counsel for plaintiffs in this price fixing/market allocation antitrust action which settled for $120 million.

- *In re DRAM Antitrust Litigation*, MDL No. 1486 (N.D. Cal.). SRK was a member of the executive committee in this action against all major manufacturers of "dynamic random access memory" ("DRAM"), alleging that defendants conspired to fix the prices they charged for DRAM in the United States and throughout the world. The case settled with all defendants for more than $300 million.

- *In re Vitamins Antitrust Litigation*, Misc. No. 99-0197 (D. D.C.). SRK was a member of the executive committee and co-chair of the discovery committee for plaintiffs in this price-fixing antitrust action which settled for $300 million.

-4-

**Securities/Corporate Governance Litigation**

SRK's securities practice group has actively managed important class actions involving securities fraud, winning not only significant damages but also important corporate governance reforms.   Some of the Firm's most notable cases include:

- *In re Abbott Labs-Depakote Shareholder Derivative Litigation*, Case No.: 1:11-cv-08114 (VMK) (N.D.Ill.).   As the lead counsel, SRK negotiated cutting-edge corporate reforms including new legal and regulatory compliance responsibilities at both the board and management levels, a clawback policy which goes well beyond the requirements under the Dodd-Frank Act of 2010, a change of the "tone at the top" to foster a culture of legal and regulatory compliance, "flow of information" protocols, and other significant reforms designed to address oversight deficiencies that resulted in Abbott having to pay $1.6 billion in criminal and civil penalties due to the illegal marketing and sale of its Depakote drug (the second largest penalties ever paid for off-label marketing at that time).

- *In re Lehman Brothers Holdings, Inc. Equity/Debt Securities Litigation*, No. 08-cv-5523 (S.D.N.Y.).   SRK was one of the firms prosecuting the U.S. action against Lehman Brothers arising from a massive fraud pertaining to the credit market meltdown.   In this securities class action, SRK represents one of the lead plaintiffs, the Northern Ireland Local Government Officers' Superannuation Committee ("NILGOSC").   The case settled for over $600 million.

- *In re Parmalat Securities Litigation*, No. 04 Civ. 0030 (LAK) (S.D.N.Y.).   SRK was one of the co-lead counsel for the lead plaintiffs, who are European institutional bond holders, in this widely-known case, often called the "Enron of Europe."   This is a massive worldwide securities fraud action involving the collapse of an international dairy conglomerate, in which major financial institutions and accounting firms created schemes to materially overstate Parmalat's revenue, income, and assets, and understate its considerable and expanding debt.   The case has been heavily litigated for five years, resulting in settlements of $98 million.

   In addition, settlements with certain accounting firms provided that these defendants confirm their endorsement of specific corporate governance principles of behavior designed to advance investor protection and to minimize the likelihood of future deceptive transactions.   This is the first time in a Section 10(b) case that shareholders were able to negotiate corporate governance measures from a defendant other than the issuer.

- *In re SCOR Holding (Switzerland) AG Litigation*, No. 04 Civ. 07897 (MBM) (S.D.N.Y.) (formerly known as Converium Holdings).   In the *Converium* U.S. class action, SRK was one of the co-lead counsel representing a European institutional investor which served as one of the lead plaintiffs in that action.   The Firm negotiated a $145 million recovery for a global class of investors, which

-5-

involved settling the action on two continents – *the first trans-Atlantic resolution to a securities class action*. Part of the settlement, on behalf of foreign investors, was approved in the Netherlands under the then newly enacted Act on Collective Statement of Mass Claims. What is particularly noteworthy about the *Converium* litigation is that the Amsterdam Court of Appeal, in a landmark decision, ruled that it had jurisdiction to declare the two international settlements of that action binding. What makes the *Converium* decision groundbreaking is that, in addition to showing its willingness to provide an effective forum for European and other investors to settle their claims on a pan-European or even global basis, the Amsterdam Court of Appeal substantially broadened its jurisdictional reach – to the benefit of investors in this case and in future actions. The Dutch Court secured jurisdiction even though the claims were not brought under Dutch law, the alleged wrongdoing took place outside the Netherlands, and none of the potentially liable parties and only a limited number of the potential claimants are domiciled in the Netherlands. The decision means that European Union Member States, as well as Switzerland, Iceland and Norway, must recognize it, under the Brussels I Regulation and the Lugano Convention. Without the approval of the settlements by the Amsterdam Court of Appeal, common stock holders of Converium, who were excluded from the U.S. action, would not have been able to recover a portion of their losses.

- *Utah Retirement Systems v. Strauss*, No. 09-cv-3221 (E.D.N.Y.). SRK served as counsel in an individual (opt-out) action brought on behalf of the Utah Retirement Systems relating to the scandal at American Home Mortgage – one of the companies involved in the subprime market meltdown. This action alleged violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934, as well as various state laws. Although the monetary terms of the settlement are confidential, SRK was able to negotiate an amount that was nearly four times more than what the Utah Retirement Systems would have received had it participated in the class action.

- *In re Laidlaw, Inc. Bondholders Securities Litigation*, No. 3-00-2518-17 (D.S.C.). SRK was a member of the Executive Committee in this complex accounting case which resulted in a settlement of $42,875,000.

- *In re Abbott Laboratories, Inc. Derivative Shareholder Litigation*, C.A. No. 99-C 07246 (N.D. Ill.) (Abbott I). SRK was co-lead counsel for plaintiffs. The case was dismissed twice but reversed on appeal, and settled in 2004 for substantial corporate governance reforms funded by $27 million from directors. The ABA's *Securities Litigation Journal* called the Seventh Circuit's opinion the second most important decision in 2003.

- *Felzen v. Andreas (Archer Daniels Midland Co. Derivative Litigation)*, C.A. No. 95-2279 (C.D. Ill.). As co-lead counsel, SRK negotiated broad corporate governance changes in the company's board structure including strengthening the independence of the board of directors, creating corporate governance and

-6-

regulatory oversight committees, requiring that the audit committee be composed
of a majority of outside directors, and establishing a $8 million fund for educational
seminars for directors and the retention of independent outside counsel for the
oversight committees.

The Firm is in the forefront of advising and representing foreign institutional investors in
U.S. class actions and in group actions in Europe, Australia and Japan.   During the past 14 years,
SRK has been working with and representing various European investors and conducting
educational seminars on securities class actions, as well as speaking at international shareholder
and corporate governance conferences.   The Firm is currently counsel to numerous large
European entities.

**Pharmaceutical Marketing Litigation**

Since 2001, the Firm has been at the vanguard of identifying and pursuing healthcare
reforms.   It has developed an extensive practice in representing consumers and third-party payors
in class actions against pharmaceutical companies over the unlawfully high pricing of prescription
drugs.   These cases have proceeded in state and federal courts on a variety of legal theories,
including state and federal antitrust law, state consumer protection statutes, common law claims
of unjust enrichment, and the federal RICO statute.

As part of their work in this area, the Firm's attorneys have formally and informally
consulted with the Attorneys General of a number of states who have been actively involved in
drug and health care litigation.   The Attorney General of Connecticut chose SRK in a competitive
bidding process to help lead the state's pharmaceutical litigation involving use of the Average
Wholesale Price.   The Firm's clients also include large employee benefit plans as well as
individual consumers.

Some of the Firm's important pharmaceutical cases include the following:

- SRK, as co-lead counsel, devised the legal theory for claims against most major
  pharmaceutical companies for using the Average Wholesale Price to inflate the
  price paid by consumers and third-party payors for prescription and doctor-
  administered drugs.   The larger AWP case, *In re Pharmaceutical Industry Average
  Wholesale Price Litigation*, MDL No. 1456 (D. Mass.), was tried in part to the court
  in November-December 2006.   On June 21, 2007, the judge issued a 183-page
  opinion largely finding for plaintiffs, and requesting additional evidence on
  damages.   Moreover, plaintiffs have reached settlements in amounts exceeding
  $230 million.   SRK was co-lead counsel for the class.

- *In re Lupron Marketing and Sales Practices Litigation*, MDL No. 1430 (D. Mass.).
  SRK, as co-lead counsel, negotiated a settlement of $150 million for purchasers of
  the cancer drug Lupron.

- *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, C.A. 05-

11148 (D. Mass.) and *District 37 Health and Securities Fund v. Medi-Span*, C.A. No. 07-10988 (D. Mass.).   SRK was co-lead counsel for a group of third-party payors who pay for prescription drugs at prices based on the AWP.   The complaints allege that First DataBank and Medispan, two of the largest publishers of AWP, fraudulently published inflated AWP prices for thousands of drugs.   The claims against McKesson settled for $350 million. In addition, the settlement requires First DataBank and Medispan to lower the AWP price they publish for hundreds of drugs (by reducing the formulaic ratio they use to calculate AWP); and to eventually cease publishing AWP prices.   Plaintiffs' experts conservatively estimate that the savings from this settlement will be in the hundreds of millions of dollars.

- *Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.* C.A. 03-4578 (E.D. Pa.).   SRK was co-lead counsel on behalf of direct purchasers of the drug Paxil. The complaint alleged that the drug company misled the U.S. Patent and Trademark Office in obtaining the patents protecting Paxil and then used the patents to prevent lower-cost, generic versions of the drug from coming to market.   A settlement of $100 million was approved by the court.

- *In re TriCor Indirect Purchaser Antitrust Litigation*, C.A. No. 05-360 (D. Del.). SRK was co-lead counsel for indirect purchasers in prosecuting state antitrust and consumer protection claims against Abbott Laboratories and Labatoires Fournier for suppressing competition from generic versions of TriCor.   The indirect purchaser case settled for $65.7 million to the class plus a substantial settlement for opt-out insurers.

- *In re Relafen Antitrust Litigation*, C.A. No. 01-12239 (D. Mass.).   SRK was co-lead counsel for indirect purchasers in prosecuting state antitrust and consumer protection claims against GlaxoSmithKline for suppressing competition from generic versions of its drug Relafen by fraudulently obtaining a patent on the compound.   The indirect purchaser settlement for $75 million was approved by the court (the overall settlement for all plaintiffs exceeded $400 million).

- *Vista Healthplan, Inc. v. Cephalon, Inc.,* CA No. 06-1833 (E.D. Pa.) and *In re Effexor XR Antitrust Litigation*, CA No. 11-5479 (D.N.J.).   SRK is serving as co-lead counsel in on-going litigation over pay-for-delay settlements involving the drugs Provigil and Effexor XR.   The firm represented end -payors (consumers and healthplans) who were denied the chance to buy cheaper generic alternatives because of manipulation of the patent challenge and generic drug approval system by the brand name companies and some generic manufacturers.

- *In re Niaspan Antitrust Litigation* MDL No. 2460 (E.D. Pa) and *In re Suboxone Antitrust Litigation* MDL No. 2445(E.D. Pa).   SRK was appointed to serve as Liaison Counsel for a purported class of end payors for the drugs Niaspan and Suboxone.   In each case, the complaint alleges that the end payors were

overcharged by defendants' illegal efforts to keep generic versions off the market which caused the class to pay supra competitive monopolistic prices.

## Privacy Litigation

SRK is also litigation numerous cases relating to privacy.

- *In re Google Inc. Street View Electronic Communications Litigation* (N.D. Cal.). SRK was appointed Co-Lead Counsel for plaintiffs in this action.  Google used its "Street View" vehicles to access wireless internet networks located in the United States and more than thirty countries around the world.  Google's Street View vehicles traveled through cities and towns and collected data sent and received over the wireless networks they encountered, including all or part of e-mails, passwords, videos, audio files, and documents, as well as network names and router information.  This data was captured and stored without the knowledge or authorization of class members.  Plaintiffs allege that Google's conduct violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2511, *et seq*, also known as the Wiretap Act.  The District Court denied Google's motion to dismiss and Court of Appeals for the Ninth Circuit affirmed the denial of Google's motion to dismiss.  The panel held that Google's data collection could be a violation of the Wiretap Act because Wi-Fi communications are "electronic communications" that are not "readily accessible to the general public."  The Court rejected Google's argument that Wi-Fi communications are "radio communication" and its contention that this permitted Google to freely intercept them so long as they are not encrypted.   Google is seeking Supreme Court review.

- *In Re: Heartland Payment Systems Inc. Customer Data Security Breach* MDL No. 2046 (S.D. TX).   SRK represents banks in a class action after Heartland disclosed on January 20, 2009 that it had been the victim of a security breach within its processing system in 2008. The data stolen included the digital information encoded onto the magnetic stripe built into the backs of credit and debit cards; with that data, thieves can fashion counterfeit credit cards by imprinting the same stolen information onto fabricated cards.

- *In re: Target Corporation Customer Data Breach* MDL No. 14-2522 (D. Minn). SRK represents banks in a class-action lawsuit against Target claiming the retail giant ignored warnings from as early as 2007 that the company's point-of-sale (POS) system was vulnerable to attack, a move that put more than 40 million credit and debit card records at risk and compromised the personal information of up to an additional 70 million customers after Target's systems were penetrated by attackers from on or about November 27, 2013 through December 15, 2013.

## PARTNERS

-9-

**EUGENE A. SPECTOR**, founding partner, has extensive experience in complex litigation, and has represented both plaintiffs and defendants in antitrust and securities.  Mr. Spector has handled many high profile cases, including such antitrust class actions as *In re Linerboard Antitrust Litigation*, MDL No. 1261 (E.D. Pa.), in which he was co-lead counsel and which settled for more than $200 million, the largest antitrust case settlement ever in the Eastern District of Pennsylvania, where Judge Dubois stated: "The Court has repeatedly stated that the lawyering in this case at every stage was superb ...." 2004 WL 1221350, *6 (E.D. Pa. June 2, 2004).  Mr. Spector was also co-lead counsel in *In re Relafen Antitrust Litigation*, No. 01-12239 (D. Mass.), in which a settlement of $75 million was obtained for the class, which Judge Young described as "the result of a great deal of very fine lawyering."   Mr. Spector has been involved in securities class action litigation including *Rosenthal v. Dean Witter*, which resulted in a landmark decision by the Colorado Supreme Court that recognized, for the first time, that securities fraud could be proved without reliance being alleged.  This precedent-setting case was important because under state securities law the reliance element sometimes proved difficult, especially when large numbers of people were involved in a class action suit.

Mr. Spector is currently serving as sole lead counsel in *In Re Blood Reagents Antitrust Litigation*, MDL No. 02081 (E.D. Pa.); as co-lead counsel in such antitrust cases as *In re Domestic Drywall Antirust Litigation*, MDL No. 2437 (E.D. Pa.); *In Re Automotive Parts Antitrust Litigation*, MDL No. 2311 (E.D. Mich.); *McDonough, et al. v. Toys "R" Us, Inc. d/b/a Babies "R" Us, et al.*,2:06-cv-00242-AB (E.D. Pa.); *Elliott, et al. Toys "R" Us, Inc. d/b/a Babies "R" Us, et al.*,2:09-cv-06151-AB (E.D. Pa.); as a member of the direct purchaser Plaintiff's Executive Committee in *In Re Fresh and Process Potatoes Antitrust Litigation*, MDL No. 2186 (D.Id.), *as a member of the Steering Committee for all Plaintiffs in In re Online DVD Rental Antitrust Litigation,* MDL No. 2029 (N.D. Cal.), and as a member of the trial team in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL No. 1869 (D.D.C.).

Mr. Spector has served as lead or co-lead counsel for plaintiffs in numerous cases with successful results, such as:

- *In re Linerboard Antitrust Litigation*, MDL No. 1261 (E.D. Pa.) (settled for $202 million, the largest antitrust settlement ever in the Third Circuit)

- *In re Relafen Antitrust Litigation*, C.A. No. 01-12239 (D. Mass.) (a drug marketing case that settled for $75 million for indirect purchasers)

- *In re Flat Glass Antitrust Litigation*, MDL No. 1200 (W.D. Pa.) (a price-fixing/market allocation antitrust action that settled for $120 million)

- *In re Mercedes Benz Antitrust Litigation, No. 99-4311* (D.N.J.) ( a price-fixing class action against Mercedes-Benz U.S.A. and its New York tri-state area dealers in which a $17.5 million settlement was obtained for the class)

- *Cohen v. MacAndrews & Forbes Group, Inc.*, No. 7390 (Del. Ch.) (a class action on behalf of shareholders challenging a going-private transaction under Delaware

-10-

corporate law in which a benefit in excess of $11 million was obtained for the class)

Mr. Spector has also served as lead counsel or co-lead counsel in a number of other securities fraud class action cases and shareholder derivative actions: *Shanno v. Magee Industrial Enterprises, Inc.*, No. 79-2038 (E.D. Pa.) (trial counsel for defendants); *In re U.S. Healthcare Securities Litigation*, No. 88-559 (E.D. Pa.) (trial counsel); *PNB Mortgage and Realty Trust by Richardson v. Philadelphia National Bank*, No. 82-5023 (E.D. Pa.); *Swanick v. Felton*, No. 91-1350 (E.D. Pa.); *In re Surgical Laser Technologies, Inc. Securities Litigation*, No. 91-CV-2478 (E.D. Pa.); *Tolan v. Adler*, No. C-90-20710-WAI (PVT) (N.D. Cal.); *Rosenthal v. Dean Witter, Reynolds, Inc.*, No. 91-F-591 (D. Colo.); *Soenen v. American Dental Laser, Inc.*, No. 92 CV 71917 DT (E.D. Mich.); *In re Sunrise Technologies Securities Litigation*, Master File No. C-92-0948-THE (N.D. Cal.); *The Berwyn Fund v. Kline*, No. 4671-S-1991 (Dauphin Cty. C.C.P.); *In re Pacific Enterprises Securities Litigation*, Master File No. CV-92-0841-JSL (C.D. Cal.); *In re New America High Income Fund Securities Litigation*, Master File No. 90-10782-MA (D. Mass.); and *In re RasterOps Corp. Securities Litigation*, No. C-92-20349-RMW (EAI) (N.D. Cal. 1992).

Further, Mr. Spector has actively participated as plaintiffs' counsel in national class action antitrust cases, including *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M-02-1486 PJH (N.D. Cal.) (executive committee); *In re Vitamins Antitrust Litigation*, Misc. No. 99-0197 (TFH) (D.D.C.) (Chair of the discovery committee); *In re Neurontin Antitrust Litigation*, MDL No. 1479 (D. N.J.) (executive committee); *Ryan-House v. GlaxoSmithKline, plc*, No. 02-CV-442 (ED Va.) (co-chair class certification committee); *In re Bulk [Extruded] Graphite Products Antitrust Litigation*, Master File No. 02-CV-06030 (D. N.J.) (chair of experts committee); *In re Publication Paper Antitrust Litigation,* No 04-MD-1631 (D. Conn.); *In re Polyester Staple Antitrust Litigation,* No. 03-CV-1576 (W.D.N.C.); *Chlorine & Caustic Soda Antitrust Litigation*, No. 86-5428 (E.D. Pa.); *In re Brand Name Prescription Drug Antitrust Litigation*, MDL No. 997 (N.D. Ill.); *Polypropylene Carpet Antitrust Litigation,* MDL No. 1075 (N.D. Ga.); *NASDAQ Market Markers Antitrust Litigation,* MDL No. 1023 (S.D.N.Y.); *Potash Antitrust Litigation,* MDL No. 981 (D. Minn.); *Commercial Tissue Products Antitrust Litigation*, MDL No. 1189 (N.D. Fla.); *High Fructose Corn Syrup Antitrust Litigation*, MDL No. 1087 (C.D. Ill.).

In 2002, Mr. Spector obtained a jury verdict of $4.5 million in *Heiser v. SEPTA*, No. 3167 July Term 1999 (Phila. C.C.P.), an employment class action.

Mr. Spector is admitted to practice in the Commonwealth of Pennsylvania; the United States Supreme Court; the United States Courts of Appeals for the First, Third, Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits; and the United States District Court for the Eastern District of Pennsylvania and the Eastern District of Michigan.   He is a graduate of Temple University (B.A. 1965) and an honors graduate of Temple University School of Law (J.D. 1970), where he was an editor of the *Temple Law Quarterly*.   He served as law clerk to the Honorable Herbert B. Cohen and the Honorable Alexander F. Barbieri, Justices of the Pennsylvania Supreme Court (1970-71).

Mr. Spector has written a number of articles over the years which appeared in the *National Law Journal*, the *Legal Intelligencer*, and other trade and legal publications; and he has appeared

on CNBC to discuss securities fraud.  He is a member of the American, Federal, Pennsylvania and Philadelphia Bar Associations; the American Bar Association's Antitrust and Litigation Sections and the Securities Law Sub-Committee of the Litigation Section; and the Federal Courts Committee of the Philadelphia Bar Association.  Mr. Spector has been appointed to the Advisory Board of the American Antitrust Institute and has been named as a leading U.S. plaintiffs' antitrust lawyer by Who's Who Legal Competition 2014, published by the Global Competition Review. Mr. Spector also has been appointed to serve on the Board of Visitors of the James E. Beasley School of Law of Temple University.  He is A-V rated by Martindale-Hubbell and has been named by Law & Politics to its list of Pennsylvania "Superlawyers."

**ROBERT M. ROSEMAN,** founding partner of SRK (of counsel), chairs the Firm's international and domestic securities practice.  His practice focuses on investor protection issues, including the enforcement of the federal securities laws and state laws involving fiduciary duties of directors and officers, and under the laws in the various jurisdictions in Europe where group actions can be brought. An important component of his practice involves protecting U.S. and European investors in European proceedings. In that role, he works with U.S. and European institutional investors on investor protection and corporate governance matters.

Most notable example of Mr. Roseman's role is Co-Lead Counsel is in the *Converium/SCOR* action, where he prosecuted the first US securities class action settled on two continents (for a collective $145 million). The European portion of this settlement is being adjudicated before the Court of Appeal in Amsterdam using the Dutch Act on the Collective Settlements of Mass Damage Claims.   Importantly, Mr. Roseman's international expertise helped secure a key decision from the Dutch Court of Appeal in this case that will likely make it easier in the future for U.S. and European investors to claim monies recovered from actions brought in the Netherlands.

Mr. Roseman represented European institutions and was co-lead counsel in the landmark *In re Parmalat Securities Litigation* action, the largest fraud in European corporate history that is frequently referred to as Europe's Enron, which settled for $96.5 million. There, Mr. Roseman devised a unique legal theory against the bankrupt Parmalat which used Italian bankruptcy law to secure funds not normally available to investors. He also extracted corporate governance endorsements from defendants other than the issuer - a first in a US-based investor action.

Among other notable cases, Mr. Roseman represented Brussels-based KBC Asset Management in *In re Royal Dutch/Shell Securities Litigation* and Brussels-based Fortis Investments in *In re Chicago Bridge and Iron Securities Litigation.*  He represented the Northern Ireland Local Government Officers' Superannuation Committee, a UK institution, that is one of the lead plaintiffs in the US investor action involving Lehman Brothers and was co-lead counsel *In re Atheros Communications Shareholder Litigation*, in which he obtained a preliminary injunction of a merger where inadequate information about the transaction had been disclosed to shareholders.

Mr. Roseman has been at the vanguard of using securities class actions and derivative suits to implement corporate governance changes at U.S. and European companies to help them operate

-12-

more effectively and reduce the likelihood that wrongdoing will occur in the future.   He litigated as lead counsel against the directors of Abbott Labs (involving off label marketing of Depakote) in which the company agreed for a four year period to implement cutting-edge, bespoke reforms addressing allegations of illegal conduct which are designed to prevent it from occurring in the future.   As co-lead counsel Mr. Roseman litigated against the directors of Archer Daniels Midland Company in which the corporation agreed to implement significant reforms which, at that time, were "state of the art" corporate governance measures designed to strengthen the independence of the board of directors.   Mr. Roseman also litigated against the directors of Abbott Laboratories (*Abbott I*) and settled the case for numerous corporate governance changes governing the way in which the board of directors addresses regulatory matters. The Seventh Circuit's landmark decision in this case was named second among the top ten securities law decisions of 2003 by the American Bar Association's *Securities Litigation Journal*.

Mr. Roseman has written extensively on securities and investor protection issues, including Global Markets, Global Fraud: What We Can Learn from Europe's Enron', *Investment and Pensions Europe* (May 2006 supp.); Cost-Effective Monitoring of Corporate Fraud: Reducing the Time Necessary to Stay Informed, *Investment and Pensions Europe* (June 2006 supp.); and A Trans-Atlantic Trend, *Professional Investor* (May 2005).   He also appeared in a roundtable discussion in *Global Pensions* (October 2006 supp.).

Mr. Roseman has been a frequent speaker at numerous U.S. and international conferences on the issues of investor protection through litigation and engagement and the importance of using corporate governance measures as part of settlements to ensure that Board of Directors act in the best interest of the Company and its shareholders. In addition to speaking at numerous conferences in the U.S., Mr. Roseman appeared as an invited speaker at institutional investor conferences held in London, Paris, Munich, Milan, Barcelona, Brussels, Paris, Frankfurt and Dublin and the Annual Conference of the International Corporate Governance Network in Amsterdam in 2004 and Paris in 2011.

Mr. Roseman obtained his J.D. in 1982 from Temple University School of Law and earned his B.S. *cum laude* in political science from the State University of New York in 1978.   He is admitted to practice in Pennsylvania and New York, as well as the United States District Courts for the Eastern District of Pennsylvania and Central District of Illinois, the U.S. Courts of Appeals for the Third and Seventh Circuits, United States Court of Federal Claims, and United States Supreme Court.   He is a member of the Philadelphia, Pennsylvania, New York State and Federal Bar Associations.

Mr. Roseman recently served or is currently serving as lead or co-lead counsel in numerous major cases, including:

- *Pension Trust Fund for Operating Engineers v. DeVry Education Group*, No. 16-cv-05198 (N.D.Ill.)

- *In re The Bancorp, Inc. Securities Litigation,* No. 14 Civ. 0952 (GMS) (D. Del.)

-13-

- *In re Abbott-Depakote Shareholder Derivative Litigation,* Case No. 1:11-cv-08114 (N.D. Ill.)

- *In re Lehman Brothers Holdings, Inc. Equity/Debt Securities Litigation*, 1:09-mdl-0217-LAK-GWG (S.D.N.Y.)

- *In re Life Partners Holdings, Inc. Derivative Litigation*, C.A. No. 2:11-CV-00043-AM (W.D. Tex.)

- *In re Atheros Communications, Inc. Shareholder Litigation*, Consolidated C.A. No. 6124-CVN (Del. Ch. Ct)

- *In re SCOR Holding (Switzerland) AG Litigation*, No. 04 Civ. 07897 (MBM) (S.D.N.Y.) (settled for $145 million)

- *In re Parmalat Securities Litigation*, No. 04 Civ. 0030 (LAK) (S.D.N.Y.) (settled for $98 million)

- *In re PSINet, Inc. Securities Litigation*, Civ. No. 00-1850-A (E.D. Va.) (settled for $17,833,000 on the eve of trial)

- *Welmon v. Chicago Bridge & Iron Co. N.V.*, No. 06 Civ. 1283 (S.D.N.Y.)

Mr. Roseman is admitted to practice in the Commonwealth of Pennsylvania and the State of New York; the United States Supreme Court; the United States Court of Federal Claims; the United States Court of Appeals for the Third and Seventh Circuits; and the United States District Courts for the Eastern District of Pennsylvania and the Central District of Illinois. He is also a member of the Philadelphia, Pennsylvania, New York State, and Federal Bar Associations. He has lectured extensively throughout Europe on the role of private litigation in enforcing U.S. securities laws. He earned a B.S. degree with honors in political science from the State University of New York in 1978, and a J.D. degree in 1982 from Temple University School of Law. He is AV-rated by Martindale-Hubbell and has been named by Law & Politics to its list of Pennsylvania "Superlawyers."

**JEFFREY L. KODROFF** concentrates his practice in healthcare antitrust, securities and consumer litigation. He was among the first attorneys to represent clients in class action litigation against national health maintenance organizations. (*Tulino v. U.S. Healthcare, Inc.*, No. 95-CV-4176 (E.D. Pa.)). He also filed the first class action complaint against the manufacturers of the cancer drug Lupron relating to the illegal marketing practices and use of the published Average Wholesale Price. Mr. Kodroff was co-lead counsel in *In re Lupron Marketing and Sales Practices Litigation*, MDL No. 1430 (D. Mass.), which settled for $150 million. Mr. Kodroff was also co-lead counsel in a consolidated national class action against many of the largest pharmaceutical companies in the world, including GlaxoSmithKline, BMS, J&J, Schering-Plough and AstraZeneca, for their illegal marketing and use of a false Average Wholesale Price. See *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456 (D. Mass.)

-14-

(settlement over $300 million.)

He has also served as lead or co-lead counsel in other substantial pharmaceutical marketing cases, including *New England Carpenters Health Benefits Fund v. First Databank, Inc. and McKesson Corp.*, C.A. 05-11148 (D. Mass.); and *District 37 Health and Securities Fund v. Medi-Span*, C.A. No. 07-10988 (D. Mass. 2007). This litigation massive class action was against pharmaceutical wholesaling giant McKesson Corporation ("McKesson") and pharmaceutical pricing publishers First DataBank, Inc. ("FDB") and Medi-Span. The case addressed an unlawful 5% mark-up in the Average Wholesale Prices ("AWPs") of various drugs, causing consumers and third party payors to overpay for pharmaceuticals. The case settled for $350 million plus an agreement to roll back AWPs by 5% thereby saving the Class and others hundreds of millions of dollars.

Mr. Kodroff has also been very active in litigation against brand named pharmaceutical companies in their attempts to keep generic drugs from entering the market.

Mr. Kodroff has served or is serving as co-lead counsel in numerous major cases, including:

- *In re OSB Antitrust Litigation*, Master File No. 06-CV-00826 (E.D. Pa., Judge Paul S. Diamond) (settled for $120 million)

- *Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.* C.A. 03-4578 (E.D. Pa., Judge Padova) (settled for $150 million)

- *In re Express Scripts, Inc., PBM Litigation*, Master Case No. 05-md-01672-SNL (E.D. Mo.)

- *In re Lovenox Antitrust Litigation*, Case No. CV05-5598 (C.D. Cal.)

- *In re DDAVP Indirect Purchaser Antitrust Litigation,* Case No. 05 Civ. 2237 (S.D.N.Y.)

- *Man-U Service Contract Trust, et al. v. Wyeth, Inc. (Effexor Antitrust Litigation)* Civil Action No. 3:11-cv-05661 (D.N.J.)

- *In re: Merck Mumps Vaccine Antitrust Litigation,* Master File No. 2:12-cv-03555 (E.D. Pa., Judge C. Darnell Jones, II)

- *Vista Healthplan Inc. v. Cephalon, Inc., et al.,* Case No. 2:06-cv-1833 (E.D. Pa., Judge Mitchell S. Goldberg) (Provigil)

Mr. Kodroff has served as lead or co-lead counsel in many class action securities fraud cases, including *In re Unisys Corporation Securities Litigation*, No. 99-CV-5333 (E.D. Pa.); *In re Dreyfus Aggressive Growth Mutual Fund Litigation*, No. 98 Civ. 4318 (HB) (S.D.N.Y.); *Kalodner*

-15-

*v. Michaels Stores, Inc.*, No. 3:95-CV-1903-R (N.D. Tex.); *In re Valuevision International, Inc. Securities Litigation*, Master File No. 94-CV-2838 (E.D. Pa.); *In re GTECH Holdings Corp. Securities Litigation*, Master File No. 94-0294 (D.R.I.); *In re Surgical Laser Technologies, Inc. Securities Litigation*, No. 91-CV-2478 (E.D. Pa.); and *The Berwyn Fund v. Kline*, No. 4671-S-1991 (Dauphin Cty. C.C.P.).

He has also served as lead or co-lead counsel in many consumer class actions including the current case *In re Google Inc. Street View Electronic Communications Litigation,* Case No. C 10-md-02184 JW (N.D. Cal.), which arise out of Google's interception of electronic communications by its Street View vehicles.   Other consumer class actions in which Mr. Kodroff has served as lead or co-lead counsel include: *Kaufman v. Comcast Cablevision of Phila., Inc.*, No. 9712-3756 (Phila. C.C.P.); *LaChance v. Harrington*, No. 94-CV-4383 (E.D. Pa.); *Smith v. Recordex*, No. 5152, June Term 1991 (Phila. Cty. C.C.P.); *Guerrier v. Advest Inc.*, C.A. No. 90-709 (D. N.J.); and *Pache v. Wallace*, C.A. No. 93-5164 (E.D. Pa.).

Mr. Kodroff has served as a Continuing Legal Education presenter on class actions and health care issues as well as making presentations at conferences including the NCPERS Health Care Symposium and the Pennsylvania Public Employees Retirement System Conference.

He also serves on the advisory board for the Bureau of National Affairs Class Action Litigation Report. Mr. Kodroff also appeared with one of his clients before the U.S. House of Representatives, Subcommittee on Housing and Community Opportunity, Committee on Banking and Financial Services on the issue of predatory lending.

Mr. Kodroff is admitted to practice in the Commonwealth of Pennsylvania and the United States District Courts for the Middle and Eastern Districts of Pennsylvania. He is a member of the Pennsylvania, Philadelphia and American Bar Associations. A graduate of LaSalle University, where he earned his undergraduate degree in finance (magna cum laude, 1986), Mr. Kodroff received his law degree from Temple University School of Law (1989). He is a resident of Dresher, Pennsylvania.   Mr. Kodroff is AV-rated by Martindale-Hubbell.

**JOHN MACORETTA** represents both individuals and businesses in a wide variety of litigation and, occasionally, transactional matters. He currently represents consumers and healthcare payors in several cases alleging that brand name pharmaceutical companies illegally kept generic drug competitors off the market.   Mr. Macoretta is also involved in electronic privacy litigation, including the In re Google Streetview Electronic Communications Litigation, No. 10-md-02184 (N.D. Cal.) where he is a co-lead counsel representing consumers whose private wi-fi communications were intercepted.   Mr. Macoretta also represents investors in stock-broker arbitration and class-action securities fraud litigation.

He has been involved in a number of significant cases, including In re Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456 (D. Mass.) (where he acted as one of the trial counsel); In re Lupron Marketing and Sales Practices Litigation, MDL No. 1430 (D. Mass.); In re Unisys Corporation Securities Litigation, No. 99-CV-5333 (E.D. Pa.); Masters v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911 (S.D.N.Y.); In re Dynamic Random

Access Memory (DRAM) Antitrust Litigation, C.A. No. M-02-1486 PJH (N.D. Cal.).

Mr. Macoretta graduated with honors from the University of Texas Law School in 1990 and received his undergraduate degree cum laude from LaSalle University in 1986. He is admitted to practice in the Commonwealth of Pennsylvania and the State of New Jersey; the United States Court of Appeals for the First, Third and Ninth Circuits; and the United States District Courts in the District of New Jersey, the Eastern District of Michigan and the Middle and Eastern Districts of Pennsylvania. In addition to being a member of the Philadelphia Bar Association, Mr. Macoretta also serves as an arbitrator in the Philadelphia Court of Common Pleas and the US District Court. Mr. Macoretta also serves as a pro bono attorney representing Philadelphia residents whose homes are facing foreclosure.

**JEFFREY J. CORRIGAN** joined SRK in 2000 as a partner to help direct the Firm's complex antitrust litigation. From 1990 until 2000, he was a Trial Attorney with the U.S. Department of Justice in the New York office of the Antitrust Division.

Mr. Corrigan has extensive experience investigating and prosecuting complex antitrust and other white collar criminal cases. He was lead counsel on numerous federal grand jury investigations and has significant federal trial experience as well. His cases include *United States v. Tobacco Valley Sanitation*, Cr. H-90-4 (D. Conn. 1991); and *United States v. Singleton*, Crim. No. 94-10066 (D. Mass. 1995). He was nominated by the Antitrust Division in 1999 for the Attorney General's Distinguished Service Award for his lead role on a major case involving bid-rigging at state courthouses in Queens and Brooklyn in New York City, which resulted in 49 guilty pleas. *United States v. Abrishamian*, No. 98 CR 826 (E.D.N.Y. 1998). Mr. Corrigan also played a major part in *United States v. Canstar Sports USA, Inc.*, C.A. No. 93-7 (D. Vt. 1993), a complex civil antitrust case.

Mr. Corrigan is currently serving as sole Liaison and Interim Lead Class Counsel in *In re Blood Reagents Antitrust Litigation*, MDL 09-2081 (E.D. Pa.), a nation-wide, price-fixing class action into the market for blood reagents, which are used for testing blood. Mr. Corrigan is also currently serving as Interim Co-Lead Counsel for direct purchaser plaintiffs in *In re Domestic Drywall Antitrust Litigation,* MDL 12-2437 (E.D. Pa.), a nation-wide price fixing class action.

He has been co-lead counsel in *In re OSB Antitrust Litigation*, Master File No. 06-CV-00826 (PSD) (E.D. Pa.), where a nationwide class of direct purchasers settled for $120 million; and *In re Mercedes-Benz Antitrust Litigation*, Master File No. 99-4311 (D. N.J.) (settled for $17.5 million). He was also active in *In re Linerboard Antitrust Litigation*, C.A. No. 98-5055 (E.D. Pa.), which settled for $202 million; *In re Buspirone Antitrust Litigation*, MDL Docket No.1413 (S.D.N.Y.) which in 2003 settled for $670 million for all plaintiff groups; and *In re Flat Glass Antitrust Litigation*, MDL No. 1200 (W.D. Pa.), which settled for $120 million.

Mr. Corrigan is a 1985 graduate of The State University of New York at Stony Brook, where he earned his B.A. in economics. He received his J.D. in 1990 from Fordham University School of Law, where he was a member of the Moot Court Board. Mr. Corrigan is admitted to practice in the states of New York and New Jersey, and in the United States Court of Appeals for

-17-

the Third Circuit and the D.C. Circuit; and the United States District Courts for the District of New Jersey, Southern District of New York and the Eastern District of New York.

**WILLIAM G. CALDES** is a partner in the Antitrust Practice Group. He has a national practice representing plaintiffs in antitrust class actions for over twenty years.   He has represented both individual and corporate clients in class actions across the United States.   Mr. Caldes has been involved in some of the largest Antitrust cases ever litigated, including *In re NASDAQ Market-Makers Antitrust Litigation,* MDL No. 1023 (S.D.N.Y.) which was the first antitrust case to have settlements in excess of one billion dollars to most recently being co-lead counsel in *In re Automotive Parts Antitrust Litigation,* MDL No. 2311 (E.D. Mich.), regarded as one of the largest antitrust cases to be litigated to date.

Mr. Caldes also represents several unions and their members in litigation against the pharmaceutical industry for various types of antitrust and consumer violations on behalf of the union's pension funds.   He is currently involved in *In Re Niaspan Antitrust Litigation* MDL No. 2460 (E.D.Pa.); *In re Loestrin 24 FE Antitrust Litigation*, MDL No. 2472 (D.R.I.); *In Re Lidoderm Antitrust Litigation*, MDL No. 2521 (N.D.Ca.); and *In re Aggrenox Antitrust Litigation*, MDL No. 2516 (D.Conn.).   Among other cases in which Mr. Caldes has participated are *McDonough, et al. v. Toys "R" Us, Inc. d/b/a Babies "R" Us, et al.,* No. 2:06-cv-00242-AB (E.D. Pa.); *Elliott, et al. v. Toys "R" Us, Inc. d/b/a Babies "R" Us, et al.,* No. 2:09-cv-06151-AB (E.D. Pa.); *In re Online DVD Rental Antitrust Litigation,* MDL No. 2029 (N.D. Cal.); *In re Processed Eggs Antitrust Litigation,* MDL No. 2002 (E.D. Pa.); *In re Air Cargo Shipping Services Antitrust Litigation,* MDL No. 1775 (E.D.N.Y.);   *In Re: Municipal Derivatives Antitrust Litigation,* No. 1:08-md-01950-VM (S.D.N.Y.); *In Re Optical Disk Drive Products Antitrust Litigation,* No. 3:10-ms-02143-RS (N.D. Cal.); *In Re Aftermarket Filters Antitrust Litigation,* No. 1:08-cv-04883 (N.D. Ill.); *In re McKesson HBOC, Inc. Securities Litigation,* Master File No. 99-CV-20743 (N.D. Cal.); *In re K-Dur Antitrust Litigation,* MDL No. 1419 (D.N.J.); *In re Relafen Antitrust Litigation,* C.A. No. 01-12222 (D. Mass); *In re Buspirone Antitrust Litigation,* MDL No. 1413 (S.D.N.Y.); *In re Linerboard Antitrust Litigation,* C.A. No.98-5055 (E.D. Pa.); *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation,* No.M-02-1486 PJH (N.D. Cal.); *In re Baycol Products Litigation,* No. 1431 (D. Minn.); and *In re Vitamins Antitrust Litigation,* Misc. No. 99-0197(TFH) (D.D.C.).

Mr. Caldes is a 1986 graduate of the University of Delaware, where he earned a B.A. with a double major in Economics and Political Science.   He received his J.D. in 1994 from Rutgers School of Law at Camden, and then served as law clerk to the Honorable Rushton H. Ridgway of the New Jersey Superior Court, Cumberland County.   Mr. Caldes is admitted to practice in the Commonwealth of Pennsylvania, the State of New Jersey, the United States District Court for the District of New Jersey, the United States District Court for Eastern District of Pennsylvania and the United States Court of Appeals for the 3rd Circuit.

**JEFFREY L. SPECTOR** graduated from the Wharton School of the University of Pennsylvania in 2000 with a B.S. in Economics and concentrations in Marketing and Legal Studies.   He received his J.D. degree from Temple University in 2007.   Prior to attending law school, Mr. Spector worked for the William Morris Agency in New York as a part of its prestigious

-18-

Agent Training Program.

Mr. Spector is a partner in the Antitrust Practice Group, currently participating in *In Re Blood Reagents Antitrust Litigation*, No. 2:09-md-02081-JD (E.D. Pa.); *In re Domestic Drywall Antitrust Litigation*, No. 13-md-2437 (E.D. Pa.); *McDonough, et al. v. Toys "R" Us, Inc. d/b/a Babies "R" Us, et al.*, No. 2:06-cv-00242-AB (E.D. Pa.); *Elliott, et al. v. Toys "R" Us, Inc. d/b/a Babies "R" Us, et al.*, No. 2:09-cv-06151-AB (E.D. Pa.); and *In Re Automotive Parts Antitrust Litigation*, No. 2:12-md-02311 (E.D. Mich.).

Mr. Spector is admitted to practice law in Pennsylvania, New Jersey, and the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey, and the United States Court of Appeals for the 3rd Circuit.   He is currently a member of the American and Philadelphia Bar Associations.

### ASSOCIATES

**DIANA J. ZINSER** focuses her practice on consumer protection and healthcare litigation. She is involved in a number of cases including *In re Merck Mumps Vaccine Antitrust Litigation*, No 2:12-cv-03555 (E.D. Pa.); *In re Niaspan Antitrust Litigation*, No. 2:13-md-2460 (E.D. Pa.; *In re Suboxone Antitrust Litigation*, (E.D. Pa.), and *Vista Healthplan, Inc. v. Cephalon, Inc. et al.*, C.A. No. 2:06-cv-01833 (E.D. Pa.).   Prior to joining SRK, Ms. Zinser was an attorney with the law firm Kessler Topaz Meltzer & Check, LLC, where she was involved with antitrust and complex consumer litigation.

Ms. Zinser graduated *cum laude* from Saint Joseph's University in 2003 with a B.A. in Political Science and a minor in Economics, where she was a member of the Phi Beta Kappa, Pi Sigma Alpha, and Omicron Delta Epsilon Honor Societies.   She earned her J.D. from Temple University Beasley School of Law in 2006.   While attending law school, she received a summer fellowship from the Peggy Browning Fund and worked as a legal intern for Sheet Metal Workers Local Union No. 19.   Ms. Zinser is admitted to practice law in Pennsylvania and the United States District Court for the Eastern District of Pennsylvania.

**LEN A. FISHER** focused his practice in antitrust litigation. Mr. Fisher graduated from Penn State University in 2012 with a B.S. in Crime, Law and Justice, and received his J.D. degree from Temple University Beasley School of Law in 2015.   During law school, he was a member of Asian Pacific American Law Students Association and clerked at two law firms. Prior to joining SRK, Mr. Fisher was an attorney with the law firm Rawle & Henderson LLP.

Mr. Fisher is admitted to practice law in Pennsylvania, New Jersey, and the United States District Courts for the Eastern District of Pennsylvania. He is currently a member of the Philadelphia Bar Association.

**MARY ANN GEPPERT** (of counsel) graduated *cum laude* from St. Joseph's University in 2000, with a B.S. degree in Finance.   She received her Juris Doctor degree from the Widener University School of Law in 2003, where she served as the Articles Editor of the Widener Law

-19-

Symposium Journal.  She also was a legal intern for the Honorable James J. Fitzgerald of the Philadelphia Court of Common Pleas.

Among the cases in which Ms. Geppert has participated are *In re Google Inc. Street View Electronic Communications Litigation*, C.A. No. 5:10-md-02184 (N.D. Cal.); *Vista Healthplan, Inc. v. Cephalon, Inc. et al.*, C.A. No. 2:06-cv-01833 (E.D. Pa.); and *In re Merck Mumps Vaccine Antitrust Litigation*, C.A. No. 2:12-cv-03555 (E.D. Pa.).

Ms. Geppert is currently admitted to practice law in Pennsylvania, New Jersey, the United States District Court for the Eastern District of Pennsylvania, and the United States District Court for the District of New Jersey.  Ms. Geppert was named as a Pennsylvania Rising Star by *Philadelphia Magazine* in 2010 and 2013.

**RACHEL E. KOPP** (of counsel) focuses her practice in antitrust litigation.  She is involved in a number of significant cases, including *In re Domestic Drywall Antitrust Litigation*, No. 13-md-2437 (E.D. Pa.); *In Re Automotive Parts Antitrust Litigation*, No. 2:12-md-02311 (E.D. Mich.); *In Re Blood Reagents Antitrust Litigation*, No. 2:09-md-02081-JD (E.D. Pa.); *In Re: American Express Anti-Steering Rules Antitrust Litigation*, MDL 2221 (E.D.N.Y.); and *In Re Municipal Derivatives Antitrust Litigation*, MDL No. 1950 (S.D.N.Y.). She has also previously been heavily involved in the following securities cases: *In re Parmalat Securities Litigation*, No. 04 Civ. 0030 (LAK) (S.D.N.Y.); *In Re Converium Holding AG Securities Litigation*, No. 04 Civ. 7897 (DLC) (S.D.N.Y.); *Welmon v. Chicago Bridge & Iron Co. N.V.,* No. 06 Civ. 01283 (JES) (S.D.N.Y.); and *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456 (D. Mass.).

Ms. Kopp has also been actively involved in the Philadelphia and American Philadelphia Bar Associations.  Most recently, Ms. Kopp finished serving a three-year term on the Philadelphia Bar Association Board of Governors.  Ms. Kopp has also served as the American Bar Association Young Lawyers Division (ABA YLD) liaison to the ABA Standing Committee on Membership; the Membership Director of the ABA YLD, which is comprised of approximately 150,000 young lawyers worldwide; and the ABA YLD's Administrative Director. In recognition of her service to the ABA YLD, Ms. Kopp has received Star of the Year awards at several ABA Annual Meetings.

Ms. Kopp earned her Juris Doctor degree from Villanova University Law School, where she received a Public Interest Summer Fellowship, to serve as a legal intern at New York Volunteer Lawyers for the Arts and VH1 *Save The Music*. She received a B.A. in Government and Politics from the University of Maryland, where she concentrated in languages and studied abroad in Florence, Italy.  Ms. Kopp is admitted to practice in Pennsylvania and New Jersey, as well as in the U.S. Court of Appeals for the Third Circuit and the U.S. District Court for the Eastern District of Pennsylvania.

# EXHIBIT L

## About the Firm

**Cohen Milstein Sellers & Toll PLLC** fights corporate abuse, pursuing litigation on behalf of affected individuals, investors, whistleblowers, small businesses, and other institutions in lawsuits that have raised significant, challenging, and often novel issues. Cohen Milstein specializes in holding large corporations accountable for their actions, despite the fact that they often have significantly more resources at their disposal than those damaged by their misconduct.

Recognized as one of the premier firms in the U.S. handling major, complex plaintiff-side litigation, Cohen Milstein has over 90 attorneys in offices in Washington, DC; Chicago, IL; New York, NY; Palm Beach Gardens, FL; Philadelphia, PA; and Raleigh, NC. As one of the largest and most diversified plaintiffs' firms in the country, we regularly litigate complex matters across a wide range of practice areas, including:

- Antitrust
- Civil Rights & Employment
- Complex Tort Litigation
- Consumer Protection
- Employee Benefits / ERISA
- Ethics and Fiduciary Counseling

- Human Rights
- Public Client
- Securities Litigation & Investor Protection
- Whistleblower/False Claims Act

Cohen Milstein is consistently lauded as one of the most successful plaintiffs' firms in the country. *Forbes* has called us a **"class action powerhouse,"** while *Inside Counsel* has dubbed us **"[t]he most effective law firm in the United States for lawsuits with a strong social and political component."**

In 2019, nine Cohen Milstein lawyers were named among the **"Lawdragon 500 Leading Lawyers in America."** In 2018, *Law360* named Cohen Milstein **"Practice Group of the Year"** in two categories: **Consumer Protection** and **Environmental**. Cohen Milstein also had the distinct honor of being named the 2018 "Winner" of *The National Law Journal's* **"Elite Trial Lawyer"** in four categories: **Consumer Protection, Counterterrorism, Immigration,** and **Financial Products,** as well as having three partners named "Winner" of its **"Elite Women of the Plaintiffs Bar"** award. In 2017, *Law360* named Cohen Milstein **"Practice Group of the Year"** in **"Privacy,"** and in 2016, *Law360* also named Cohen Milstein **"Practice Group of the Year"** in two categories: **Competition** and **Class Actions**. Similarly, in 2016, *The National Law Journal* named Cohen Milstein a "Winner" in two of its **"Elite Trial Lawyers"** categories: **Antitrust** and **Class Actions**.

In addition, our individual lawyers are regularly recognized as leaders in their respective areas of law in leading peer-reviewed industry rankings, such as *Law360 MVP, Lawdragon 500, Chambers, Legal 500, Best Lawyers in America, Benchmark Litigation, Martindale-Hubbell, Super Lawyers,* among others.

## Recent Awards & Recognition

- In 2019, the *Daily Business Review* honored Cohen Milstein with three Professional Excellence Awards, including Theodore J. Leopold, **DBR's 2019 "Distinguished Leaders" award,** Nicolas C. Johnson, **DBR's 2019 "On the Rise" award,** and the firm's Sexual Abuse, Sex Trafficking, and Domestic Violence Litigation team, **DBR's 2019 "Innovative Practice Areas" award.**

- In 2019, four Cohen Milstein lawyers received **"The Burton Awards' Law360 Distinguished Legal Writing Award - Law Firm."**

- In 2019, nine Cohen Milstein lawyers were named among the **"Lawdragon 500 Leading Lawyers in America."**

- In 2018, *The National Law Journal* and *Trial Lawyer Magazine,* named Steven J. Toll and Betsy A. Miller among **"America's 50 Most Influential Trial Lawyers."**

- In 2018, *Law360* named Cohen Milstein **"Practice Group of the Year"** in two categories: Consumer Protection and Environmental.

- In 2018, *Law360* named three partners MVP in the respective practices, including: Theodore J. Leopold as *Law360's* **Environmental MVP,** Andrew N. Friedman as *Law360's* **Cybersecurity and Privacy MVP,** and Kalpana Kotagal as *Law360's* **Employment MVP.**

- In 2018, The *National Law Journal* named Cohen Milstein winner of **"Elite Trial Lawyer of the Year"** in four categories, including Consumer Protection, Counterterrorism, Immigration, and Financial Products, and finalist in five other categories, including Antitrust, Civil Rights, Disability Rights, Employment Rights, and Racial Discrimination.

- In 2018, *The National Law Journal* named Kalpana Kotagal, Betsy A. Miller, and G. Julie Reiser – **"Elite Women of the Plaintiffs Bar."**

- In 2018 the *Daily Business Review* named Stephan A. LeClainche and Diana L. Martin as one of its **"Most Effective Lawyers"** for Medical Malpractice and Pro Bono, respectively.

- In 2018, A Better Balance presented Kalpana Kotagal with **"A Better Balance: The Work & Family Legal Center's Distinguished Public Service Award."**

- In 2018, the American Antitrust Institute honored Sharon K. Robertson with its **"Outstanding Antitrust Litigation Achievement Award."**

- In 2018, the NAACP honored Cohen Milstein with its **"Foot Soldier in the Sand Award,"** in recognition of the firm's outstanding commitment to providing pro bono legal services.

- In 2018, *The Best Lawyers in America* recognized eleven Cohen Milstein attorneys as among the **Best Lawyers in America (2019),** in their respective areas of law.

- In 2018, *The Best Lawyers in America* singled out and named Joseph M. Sellers **"The Best Lawyers in America 2019, Labor Law Lawyer of the Year – Washington, D.C."**

- In 2018, *The Best Lawyers in America* singled out and named Milstein's Leslie M. Kroeger **"The Best Lawyers in America 2019, Mass Tort Litigation / Class Actions "Lawyer of the Year – West Palm Beach, FL."**

- In 2018, *Palm Beach Illustrated* named seven Cohen Milstein Attorneys to its **""Top Lawyers" List."**

- In 2018, *Benchmark Litigation* named four Cohen Milstein attorneys to its **"40 & Under Hot List."**

2

- In 2018, *Florida Trend* named five Cohen Milstein attorneys to its list of **"Florida's Legal Elite."**

- In 2018, Lawdragon 500 named five Cohen Milstein attorneys to **"Leading Plaintiff Employment Lawyers."**

- In 2018, *Crain's* named Carol V. Gilden one of Chicago's **"Notable Women Lawyers."**

- In 2018, Harvard Law School named Kalpana Kotagal a **"Wasserstein Fellow."**

- In 2018, *Chambers USA Women in Law* honored Kalpana Kotagal with its **"Outstanding Contribution to the Community in Advancing Diversity Award."**

- In 2018, the *New York Law Journal* named Sharon K. Robertson to its list of **"New York Rising Stars."**

- In 2018, *The Legal 500: Guide to the US Legal Profession* listed Cohen Milstein's **Antitrust**, **Employment Disputes**, and **Securities Litigation** practices among its **"Leading Practices."**

- In 2018, the *Daily Business Review* named Leslie M. Kroeger a **"Distinguished Leader."**

- In 2018, *Law360* named Steven J. Toll a 2018 **"Titan of the Plaintiffs Bar."**

- In 2018, Leslie M. Kroeger was sworn-in as President-Elect to the Florida Justice Association.

- In 2018, Lawdragon named seven Cohen Milstein attorneys to the 2018 **"Lawdragon 500,"** an annual list of the **500 Leading Lawyers in America**.

- In 2018, Theodore J. Leopold was recognized as an **"Energy and Environmental Trailblazer"** by *The National Law Journal.*

- In 2018, *Super Lawyers* recognized 20 Cohen Milstein attorneys as **"2018 Super Lawyers"** and 12 Cohen Milstein attorneys as **"Super Lawyer Rising Stars."**

- In 2017, *Law360* named Cohen Milstein a **"Practice Group of the Year: Privacy."**

- In 2017, Steven J. Toll was named a *Law360* **"MVP – Class Action."**

- In 2017, the *Daily Business Review* named Theodore J. Leopold a **"Most Effective Lawyer of 2017: Class Action**."

- In 2017, Joel Laitman, Christopher Lometti, Betsy Miller, and Victoria Nugent were named *The National Law Journal's* **"Plaintiffs' Lawyers Trailblazers."**

- In 2017, *The Best Lawyers in America* recognized seven Cohen Milstein partners as among the "**Best Lawyers in America**" for their respective practices of law.

- In 2017, *Law360* named Cohen Milstein partners, S. Douglas Bunch and Kalpana Kotagal as **"Rising Stars."**

- In 2017, *The Legal 500* named Cohen Milstein a **Leading Firm** in "Antitrust: Civil Litigation / Class Actions" and "Dispute Resolution: Securities Litigation – Plaintiff."

- In 2017, *The Legal 500* named Richard A. Koffman to its **"Legal 500 Hall of Fame."**

- In 2017, *Legal 500* named Sharon K. Robertson and Brent W. Johnson as **"Legal 500 Next Generation Lawyer"** in the area of Antitrust: Civil Litigation/Class Actions.

- In 2017, *Super Lawyers* named Brent W. Johnson as a **"Rising Star"** and a **"Top Rated Antitrust Litigation Attorney in Washington, DC."**

- In 2017, *Super Lawyers* named Leslie M. Kroeger, Stephan A. Le Clainche, and Theodore J. Leopold **"Florida Super Lawyers"** and Nicholas C. Johnson and Adam J. Langino **"Florida Rising Stars."**

- In 2017, the Coalition for Independent Living Options Inc. presented Michael Dolce a Special Acknowledgment Award for his **"Commitment to Ending Sex Crimes against People with Disabilities."**
- In 2017, Adam J. Langino was elected American Association for Justice's Newsletter Chair for the Product Liability Section.
- In 2017, *Florida Trend* named Manuel J. Dominguez a **"Legal Elite."**
- In 2017, Nicholas C. Johnson was elected President of the F. Malcolm Cunningham, Sr. Bar Association.
- In 2017, Leslie M. Kroeger was elected Treasurer to the Florida Justice Association.
- In 2017, *South Florida Legal Guide* named Theodore J. Leopold as a **"Top Lawyer,"** and Diana L. Martin and Adam Langino a **"Top Up and Comer."**
- In 2016, *Law360* selected Cohen Milstein as a **"Competition Practice Group of the Year"** and a **"Class Action Practice Group of the Year."**
- In 2016, Women in Wealth Awards selects Carol V. Gilden Selected as **"Best in Securities Litigation Law - Illinois & Excellence Award for Investor Protection Law."**
- In 2016, Richard A. Koffman was named a *Law360* **"MVP – Competition Law."**
- In 2016, Martha Geer was selected as a **"North Carolina Leaders in the Law Honoree."**
- In 2016, the Washington Lawyers' Committee for Civil Rights and Urban Affairs named Cohen Milstein a recipient of its **"Outstanding Achievement Award."**
- In 2016, for the eighth consecutive year, Cohen Milstein was recognized by *The Legal 500* as one of the leading plaintiff class action antitrust firms in the United States.
- In 2016, Agnieszka Fryszman, Joel Laitman, Chris Lometti, Kit Pierson, Joe Sellers and Steve Toll were named to the **2016 Lawdragon 500 Leading Lawyers in America.**
- In 2016, *Law360* named Julie Goldsmith Reiser one of the **"25 Most Influential Women in Securities Law."**
- In 2016, Cohen Milstein is named to *The National Law Journal's* **"Plaintiffs Hot List"** for the fifth time in six years.
- In 2016, *Law360* named Cohen Milstein as one of the top firms for female attorneys.
- In 2015, *Law360* named Cohen Milstein as the sole plaintiffs' firm to be selected in two **"Practice Groups of the Year"** categories and one of only five class action firms recognized.
- In 2015, Cohen Milstein was named an **"Elite Trial Lawyer Firm"** by *The National Law Journal* for the second year in a row.
- In 2015, Steven J. Toll named a *Law360* **"MVP – Securities Law."**
- In 2015, Cohen Milstein was selected as a **"Most Feared Plaintiffs Firm"** by *Law360* for the third year in a row.
- In 2015, Richard Koffman was named, for the fifth consecutive year, in *The Legal 500* **"Leading Lawyers"** in **"Litigation - Mass Tort and Class Action: Plaintiff Representation – Antitrust."**
- In 2015, Theodore J. Leopold, Leslie M. Kroeger, and Stephan A. LeClainche were selected as **"Florida Super Lawyers"** and Adam J. Langino was selected as a **"Florida Rising Star."**

- In 2015, Andrew Friedman, Agnieszka Fryszman, Karen Handorf, Kit A. Pierson, Julie Reiser, Joseph M. Sellers, Daniel A. Small, Daniel S. Sommers, Steven J. Toll and Christine E. Webber were selected as **"Washington DC Super Lawyers."**

- In 2015, Laura Alexander, Monya Bunch, S. Douglas Bunch, Johanna Hickman, Kalpana Kotagal, and Emmy Levens were selected as "**Washington DC Rising Stars"** by *Super Lawyers.*

- In 2015, for the fourth time in five years, Cohen Milstein was selected to *The National Law Journal "***Plaintiffs' Hot List."**

- In 2015, Carol V. Gilden was selected as **"Pension Funds Litigation Attorney of the Year in Illinois"** for the second year in a row by the Corporate INTL Legal Awards.

# Antitrust

Cohen Milstein is widely respected as one of the preeminent plaintiffs' antitrust practices in the United States, often involved in landmark antitrust class actions. We have received numerous accolades for our work in antitrust litigation, including:

- *The National Law Journal,* "Finalist – Elite Trial Lawyers – Antitrust" (2018)
- *The National Law Journal,* "Winner – Elite Trial Lawyers – Antitrust" (2016)
- *Law 360,* "Competition Practice Group of the Year" (2016)
- *Legal 500,* "Leading Plaintiff Class Action Antitrust Firm" (2010 – 2018)
- *National Law Journal,* Plaintiffs' Hot List (2011 – 2013, 2015 – 2016)
- *Law360,* "Most Feared Plaintiffs Firm" (2013-2015)

We focus predominantly on national antitrust class actions, including litigating (and winning) class action jury trials and appeals. We gladly take on – and defeat – formidable opponents, which have included such giants as Dow Chemical, Apple, and The Walt Disney Company.

**Our Clients**

Our clients include pension funds, businesses, and individuals. Our class action experience spans all industries, including agriculture, automotive parts, chemicals, oil and gas, financial services, health care, high tech, media and entertainment, pharmaceuticals, and many others.

We also have the distinct honor of representing not only plaintiffs, but also, in certain cases, defendants, including the Service Employees International Union, and New York Hotel & Motel Trades Council, AFL-CIO.

**Setting Precedents**

Our work has shaped the antitrust landscape and helped change industry.

- **Ground-Breaking Securities Markets Disputes –** We are one of two law firms leading three ground-breaking antitrust lawsuits involving collusion by many of the world's biggest banks in three of the world's largest securities market, including Interest Rate Swaps, Treasuries, and Stock Lending.
- **Cutting-Edge Disputes in Tech –** Our work against Apple, Google, Pixar, and other companies in the tech sector have helped mitigate uncontrolled growth and collusive behavior in this dynamic and quickly evolving industry.
- **Novel "Pay-for-Delay" Disputes –** We are one of a small handful of plaintiffs' law firms pursuing this novel area of law unique to the pharmaceutical industry, and involving patented drugs, generic drugs, and non-competition agreements.
- **Rare Litigation Involving a Sitting U.S. President** – We are litigating competitor standing issues in litigation that quite literally could change the course of U.S. history – whether President Trump is violating the Constitution's Emoluments Clauses.

We have recovered billions of dollars in damages for injured plaintiffs in some of the nation's most complex antitrust lawsuits.

- *In re Urethanes Antitrust Litigation:* We secured the largest trial verdict ever in a price-fixing case ($1.06 billion – after trebling and settlement offsets).
- *In re Animation Workers Antitrust Litigation:* We secured final approval of $168.5 million in settlements on June 6, 2017, yielding average awards of more than $14,000 per class member in this certified class action involving "do not to solicit employee" agreements between many of the largest high-tech animation companies in the U.S.
- *In re Electronic Books Antitrust Litigation:* We secured a $560 million settlement, including a settlement of $450 million with Apple shortly before trial in this novel litigation, alleging Apple and five of the six biggest U.S. publishers conspired to raise the price of e-books. We litigated together with the Department of Justice and Attorneys General from 33 states and territories.

**Leadership**

We believe leadership is the result of exceptional work by a team of exceptional lawyers, who come from diverse backgrounds and work experience, but who share an appetite for intellectual rigor and the desire to help shape competition and industry for the better. As a result:

- **Court Appointments:** We have the honor of frequently being Court Appointed Lead or Co-Lead Class Action Counsel to some of the largest and most complex antitrust disputes in the United States, including all of the entries in this submission.
- **Industry Scholarship:** We are recognized for setting the bar for intellectual engagement and scholarship in this dynamic area of law. To this end:
  - We are on the advisory Board of the **American Antitrust Institute,** one of the leading "think tanks" on economics and competition; and
  - We are founders of the annual **Jerry S. Cohen Memorial Writing Award for Antitrust Scholarship,** recognized by academics and practitioners alike as a coveted award.
- **Individual Achievement:** Our antitrust lawyers, individually, are recognized among the best in the industry, including:
  - American Antitrust Institute's Outstanding Antitrust Litigation Achievement Award (2018)
  - *Lawdragon 500* Leading Lawyers in America (2016, 2017, 2018, 2019)
  - *Who's Who Legal:* Thought Leaders – Competition (2017, 2018, 2019)
  - *Legal 500:* "Next Generation Lawyer" (2017, 2018)
  - *Law360* Rising Stars (2018)
  - *New York Law Journal* Rising Stars (2018)
  - *Benchmark Litigation* "40 & Under Hot List"
  - *Legal 500* Hall of Fame (2017)
  - *Legal 500* Tier 1, Leading Lawyer (2017)
  - *Law360* Competition MVP (2016)
  - *Law360* Competition MVP (2014)

Most of our lawyers served as judicial law clerks. Some have served in the Department of Justice and other government agencies. Others bring decades of experience at top defense firms.

**Judicial Recognition**

We have also been honored to receive enthusiastic praise from the Court.

- On July 16, 2018, The Honorable Michael M. Baylson for the U.S. District Court for the Eastern District of Pennsylvania noted that plaintiffs' counsel, specifically naming Cohen Milstein, had done **"outstanding work"** in *In re Domestic Drywall Antitrust Litigation,* including surviving an extensive summary judgment motion in February 2016.
- In the July 29, 2016 Court Order, granting final approval of the settlement in *In re: Urethanes Antitrust Litigation,* Judge John W. Lungstrum for the U.S. District Court for the District of Kansas, commended plaintiffs' counsel:

*"[C]ounsel achieved incredible success on the merits of the claims. . . . Liability on these claims was far from certain, and thus the case presented a great deal of risk, as counsel was required to advance all expenses and attorney time to litigate a hard fought case against highly experienced opposing counsel hired by a defendant with ample resources. . . .* ***In almost 25 years of service on the bench, this Court has not experienced a more remarkable result."***

# Representative Matters

For decades, Cohen Milstein Sellers & Toll PLLC has represented individuals, small businesses, institutional investors, and employees in many of the major class action cases litigated in the United States for violations of the antitrust, securities, consumer protection, civil rights/discrimination, ERISA, employment, and human rights laws. Cohen Milstein is also at the forefront of numerous innovative legal actions that are expanding the quality and availability of legal recourse for aggrieved individuals and businesses both domestic and international.  Over its history, Cohen Milstein has obtained many landmark judgments and settlements for individuals and businesses in the United States and abroad. The firm's most significant successes include:

**Antitrust Representative Matters**

- ***In re Lidoderm Antitrust Litigation,*** **No. 3:14-md-02521 (N.D. Cal.):** Plaintiffs allege that Endo and Teikoku, manufacturers of the Lidoderm patch, paid Watson Pharmaceuticals to delay its generic launch. The case settled on the eve of trial and on September 20, 2018, plaintiffs obtained final approval of a $104.75 million settlement – more than 40% of plaintiffs' best-case damages estimate. This case was ranked by *Law360* as "The Biggest Competition Cases Of 2017 So Far" (July 7, 2017).

- ***In re Domestic Drywall Antitrust Litigation,*** **No. 2:13-md-02437 (E.D. Pa.):** Cohen Milstein served as co-lead counsel for a class of direct purchasers of drywall against drywall manufacturers for price-fixing. The court approved settlements that total more than $190 million. The court commented that it had sided with plaintiffs because of counsel's "outstanding work," and that plaintiffs' counsel had a "sophisticated and highly professional approach." It complemented the attorneys as "highly skilled" and noted that their performance on class action issues was "imaginative." It also stated, "Few cases with no government action, or investigation, result in class settlements as large as this one."

- ***In re Animation Workers Litigation,*** **No. 5:14-cv-04062 (N.D. Cal.):** Cohen Milstein served as co-lead counsel representing a class of animation and visual effects workers who allege that Pixar, Lucasfilm, DreamWorks and other studios conspired to suppress their pay. The court granted final approval of $168.5 million in settlements.  To our knowledge, this is the most successful no-poach case ever filed in U.S. history, achieving an average recovery per class member of nearly $14,000.

- ***In re Urethanes Antitrust Litigation,*** **MDL No: 1616 (D. Kan.):** Cohen Milstein served as co-lead counsel on behalf of a class of direct purchasers of chemicals used to make many everyday products, from mattress foam to carpet cushion, who were overcharged as a result of a nationwide price-fixing conspiracy. On February 25, 2016, Cohen Milstein reached an agreement with The Dow Chemical Company to settle the case against Dow for $835 million. Combined with earlier settlements obtained from Bayer, Huntsman, and BASF, the Dow settlement pushed the total settlements in the case to $974 million. The settlement was approved on July 29, 2016.

- ***In Re Electronic Books Antitrust Litigation,*** **No. 11-md-02293 (S.D.N.Y.):** In August 2014, a New York federal judge approved a $400 million antitrust settlement in the hotly contested ebooks price-fixing suit against Apple Inc. Combined with $166 million in previous settlements with five defendant publishing companies, the final settlement totaled more than $560 million. The settlement resolves damages claims brought by a class of ebook purchasers and attorneys general from 33 U.S. states and territories.

- ***In re Plasma-Derivative Protein Therapies Antitrust Litigation,*** **No. 09 C 7666 (N.D. Ill.):** After four years of litigation, in October of 2013, CSL Limited, CSL Behring LLC, CSL Plasma, Inc. (collectively, "CSL"), and the Plasma Protein Therapeutics Association ("PPTA") agreed to pay $64 million dollars to settle a lawsuit brought by the University of Utah Hospital and other health care

providers alleging that CSL, the PPTA, and Baxter agreed between 2003-2009 to restrict the supply of immunoglobulin and albumin and thereby increase the prices of those therapies. Two months later, Baxter International Inc. and Baxter Healthcare Corp. (collectively "Baxter") agreed to pay an additional $64 million to settle these claims – bringing the total recovery to the class to $128 million.

**Other Representative Matters**

- ***New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group PLC et al.,*** **No. 1:08-cv-05310-DAB-HBP (S.D.N.Y.):** On March 8, 2019, the Honorable Deborah A. Batts for the U.S. District Court for the Southern District of New York granted final approval to a $165 million all-cash settlement, bringing this lawsuit, the last of 11 MBS class actions Cohen Milstein successfully handled, to conclusion. Cohen Milstein was lead counsel in this certified MBS class action.

- ***In re Anthem Data Breach Litigation,*** **No. 15-MD-02617-LHK (N.D. Cal.):** On August 16, 2018, the Honorable Lucy H. Koh for the U.S. District Court for the Northern District of California granted final approval to a $115 million settlement – the largest data breach settlement in U.S. history – ending claims that Anthem Inc., one of the nation's largest for-profit managed health care companies, put 78.8 million customers' personal information, including social security numbers and health date, at risk in a 2015 data breach. Cohen Milstein was co-lead counsel.

- ***In re BP Securities Litigation,*** **No. 4:10-MD-02185 (S.D. Tex.):** Cohen Milstein represented the New York State Common Retirement Fund as co-lead plaintiff in a securities class action filed in 2010, alleging that BP injured investors by intentionally downplaying the severity of the Deepwater Horizon oil spill and preventing investors from learning the magnitude of the disaster. After successfully arguing for class certification to the district court, Cohen Milstein presented plaintiffs' defense of that court's decision to the U.S. Court of Appeals for the Fifth Circuit, which affirmed the class. The case settled on February 13, 2017 for $175 million, a few weeks before trial was to begin.

- ***Moody's Litigation:*** Cohen Milstein represented the co-lead state Mississippi and represented New Jersey in the $864 million consumer fraud settlement achieved in January 2017 by 22 states and the U.S. Department of Justice with Moody's Corporation, Moody's Investors Service, Inc., and Moody's Analytics, Inc. Together with the S&P settlement, these cases against the nation's two largest credit rating agencies produced key industry reforms that provide greater transparency for consumers and that divested the credit rating agencies of more than $2.2 billion for their conduct contributing to the national housing crisis and the Great Recession.

- ***S&P Litigation***: Cohen Milstein represented co-lead state Mississippi in the $1.375 billion-dollar consumer fraud settlement achieved in 2015 by 20 states and the U.S. Department of Justice with Standard & Poor's. Together with the Moody's settlement, these cases against the nation's two largest credit rating agencies produced key industry reforms that provide greater transparency for consumers and that divested the credit rating agencies of more than $2.2 billion for their conduct contributing to the national housing crisis and the Great Recession.

- ***United States of America et al., ex rel. Lauren Kieff, v. Wyeth,*** **No. 03-1236 (D. Mass.):** Cohen Milstein was co-lead counsel in this False Claims Act whistleblower case against pharmaceutical giant Wyeth (subsequently acquired by Pfizer), in which the whistleblowers alleged that Wyeth defrauded Medicaid, the joint federal/state healthcare program for the poor, when it reported falsely inflated prices for its acid suppression drug Protonix from 2001 through 2006 for Medicaid rebate purposes. Weeks before trial, in February 2016, in one of the largest qui tam settlements in U.S. history, Wyeth agreed to pay $784.6 million to the U.S. government and the over 35 intervening states.

- ***HEMT MBS Litigation,*** **No. 1:08-cv-05653 (S.D.N.Y.):** On May 10, 2016, U.S. District Judge Paul A. Crotty finally approved a $110 million settlement in the mortgage-backed securities class action brought by investors against Credit Suisse AG and its affiliates. This settlement ends claims brought by the New Jersey Carpenters Health Fund and other investors who claimed that the offering documents for the mortgage-backed securities at issue violated the Securities Act as they contained false and misleading misstatements.
- ***RALI MBS Litigation,*** **No. 08-8781 (S.D.N.Y.):** On July 31, 2015, Judge Katherine Failla gave final approval to a $235 million settlement with underwriters Citigroup Global Markets Inc., Goldman Sachs & Co., and UBS Securities LLC. She also approved a plan for distribution to investors of those funds as well as the previously approved $100 million settlement with RALI, its affiliates, and the individual Defendants that was reached in in 2013. This global settlement marks an end to a long and complicated class action over MBS offerings that RALI and certain of its affiliates issued and sold to the New Jersey Carpenters Health Fund and other investors from 2006 through 2007. The case took seven years of intense litigation to resolve.
- ***In re: Bear Stearns Mortgage Pass-Through Certificates Litigation,*** **No. 08-08093 (S.D.N.Y.):** On May 27, 2015, U.S. District Judge Laura Taylor Swain finally approved a class action settlement with JPMorgan Chase & Co., which agreed to pay $500 million and up to an additional $5 million in litigation-related expenses to resolve claims arising from the sale of $27.2 billion of mortgage-backed securities issued by Bear Stearns & Co. during 2006 and 2007 in 22 separate public offerings.
- ***Harborview MBS Litigation,*** **No. 08-5093 (S.D.N.Y.):** In February 2014, Cohen Milstein reached a settlement with the Royal Bank of Scotland (RBS) in the Harborview MBS Litigation, resolving claims that RBS duped investors into buying securities backed by shoddy home loans. The $275 million settlement is the fifth largest class action settlement in a federal MBS case. This case is one of eight significant MBS actions that Cohen Milstein has been named lead or co-lead counsel by courts and one of three that were nearly thrown out by the court, only to be revived in 2012.
- ***Countrywide MBS Litigation,*** **No. 2:10-cv-00302 (C.D. Cal.):** In April 2013, plaintiffs in the landmark mortgage-backed securities (MBS) class action litigation against Countrywide Financial Corporation and others, led by Lead Plaintiff, the Iowa Public Employees' Retirement System (IPERS), agreed to a $500 million settlement. It is the nation's largest MBS-federal securities class action settlement. The settlement was approved in December 2013 and brings to a close the consolidated class action lawsuit brought in 2010 by multiple retirement funds against Countrywide and other defendants for securities violations involving the packaging and sale of MBS. The settlement is also one of the largest (top 20) class action securities settlements of all time.
- ***In re Beacon Associates Litigation,*** **No. 09-cv-0777 (S.D.N.Y):** Class action settlement of $219 million for trustees and participants in ERISA-covered employee benefit plans whose assets were lost through investments made on their behalf by Beacon Associates LLC I & II in the investment schemes of Bernard Madoff.
- ***Keepseagle v. Vilsack,*** **No. 1:99CV03119 (D.D.C.):** A class of Native American farmers and ranchers allege that they have been systematically denied the same opportunities to obtain farm loans and loan servicing that have been routinely afforded white farmers by the USDA. A class was certified in 2001 by Judge Emmet Sullivan, District Judge for the U.S. District Court for the District of Columbia. On April 28, 2011, the U.S. District Court granted final approval of a historic settlement of $760 million between Native American farmers and ranchers and the USDA. The *Keepseagle* settlement agreement required USDA to 1) pay $680 million in damages to thousands of Native Americans, to 2) forgive up to $80 million in outstanding farm loan debt, and to 3) improve the farm loan services USDA provides to Native Americans.

# COHENMILSTEIN



**Practice Areas**
- Antitrust

**Admissions**
- District of Columbia
- Maryland

**Education**
- American University Washington College of Law, J.D., 1986
- Colgate University, B.A., *cum laude*, 1981

**Clerkships & Fellowships**
- Law Clerk, the Hon. Judge Roger Vinson, U.S. District Court for the Northern District of Florida, 1986-1988

## Daniel A. Small, Partner

Washington, DC

t: 202 408 4600
f: 202 408 4699
dsmall@cohenmilstein.com

**Daniel A. Small** is a Partner at Cohen Milstein and the immediate past Co-Chair of the firm's Antitrust practice group, a role and honor which he has held on and off since 2008. He is also a member of the firm's Executive Committee.

Mr. Small is one of the most respected litigators in antitrust class actions. He was named a Lawdragon 500 Leading Lawyer in 2018 and 2019, and since 2009, *Legal 500* has annually recognized Mr. Small and Cohen Milstein as a "Leading Plaintiffs Antitrust Class Action Lawyer/Firm." Benchmark Plaintiff has repeatedly awarded him with its "National Litigation Star – Antitrust," and in 2014, *International Who's Who of Competition Lawyers & Economists* named him "Leading Competition Lawyer."

Mr. Small is widely regarded for his intellectual energy, deeply studying the economic issues underpinning antitrust disputes and developing a sophisticated understanding of how conspiracies and monopolies operate in a range of complex markets – from animation and visual effects workers and computer software and hardware to wild blueberries and hospital nurses – and achieving just compensation for victims and promoting more open markets nationwide.

Mr. Small has represented plaintiff classes, and defended unions, as lead or co-lead counsel in numerous antitrust cases and obtained settlements and judgments totaling hundreds of millions of dollars. He has tried cases to verdict and argued in numerous appellate courts, including the U.S. Supreme Court.

Currently, Mr. Small is litigating the following notable matters:

- *Sutter Health Antitrust Litigation:* Cohen Milstein is part of a small team of firms representing a certified class of self-funded employers and union trust funds against Sutter Health, a large hospital chain in Northern California, for restraining hospital competition through anticompetitive provider agreements.

- *Rotavirus Vaccines Antitrust Litigation:* Cohen Milstein developed and filed a proprietary case against Merck & Co., Inc. on behalf of a class of direct purchasers, alleging that Merck engaged in an anticompetitive bundled discount scheme to maintain its monopoly power in the rotavirus vaccines market after entry by GlaxoSmithKline plc.

- *National Association of Realtors Litigation:* Cohen Milstein is representing home sellers in a class action against the National Association of Realtors and four of the largest national real estate broker franchisors for conspiring to require home sellers to pay the broker representing the buyer of their homes, and to pay at an inflated amount, in violation of federal antitrust law.

14

**COHEN**MILSTEIN

Past successes include:

- **Animation Workers Litigation:** Cohen Milstein served as co-lead counsel representing a class of animation and visual effects workers who allege that Pixar, Lucasfilm, DreamWorks and other studios conspired to suppress their pay. The court granted final approval of $168.5 million in settlements.

- **NYU Hospitals Center Litigation:** Cohen Milstein served as co-lead counsel defending 1199SEIU United Healthcare Workers East against an antitrust claim by NYU Hospitals Center alleging that 1199SEIU conspired with a multi-employer bargaining association and others to increase NYU's required contributions to the Union's benefit fund. In June 2018, the court granted defendants motion to dismiss the antitrust claim. All remaining claims were dismissed with prejudice in December 2018.

- **Prime Healthcare Services Litigation:** Cohen Milstein defended the Service Employees International Union in an antitrust action brought by Prime Healthcare Services, a hospital chain in Southern California, alleging that SEIU conspired with Kaiser Permanente to drive Prime and certain other hospitals out of the market. Cohen Milstein led the successful effort to dismiss the complaint and amended complaint in the Southern District of California and to defend the dismissal on appeal to the Ninth Circuit.

- **Michigan Blue Cross Litigation:** Cohen Milstein served as co-lead counsel in this class action challenging Michigan Blue Cross's use of most favored nation provisions in its provider agreements with numerous hospitals in Michigan. The court granted final approval of a $30 million settlement.

- **Hy-Ko Products Antitrust Litigation:** Cohen Milstein represented Hy-Ko Products Co., a manufacturer of keys and key duplication machines, in a monopolization case against its dominant competitors. The litigation settled on favorable terms.

- **In re Buspirone Antitrust Litigation:** Cohen Milstein served as co-lead counsel in a class action alleging that Bristol Myers-Squibb Co., the manufacturer of the prescription drug Buspar, conspired to keep generic versions of the drug out of the market. The class of end-payors settled for $90 million.

- **Pease v. Jasper Wyman & Son, et al.:** Cohen Milstein was lead counsel representing a class of wild blueberry growers in Maine who sued four blueberry processors for conspiring to depress blueberry prices. The case was tried before a jury in Maine state court, where Mr. Small was co-lead trial counsel. The jury found the processors liable for 100% of the damages estimated by plaintiffs' expert, resulting in a judgment of $56 million.

Mr. Small also maintains an active pro bono practice. Current notable cases include:

- **Citizens for Responsibility and Ethics in Washington, et al. v. Trump, and District of Columbia et al. v. Trump:** Cohen Milstein is representing restaurant and hotel plaintiffs and the Attorneys General of Maryland and the District of Columbia in lawsuits against President Trump, seeking to enjoin his ongoing receipt of emoluments in violation of the U.S. Constitution.

- **Seeger, et al. v. United States Department of Defense:** Cohen Milstein is representing a group of civilian and military lawyers who represent a detainee in the military commission proceedings at the Guantánamo Bay naval station. Represented by Cohen Milstein, this group of lawyers filed a lawsuit under the Administrative Procedure Act against the Department of Defense, the Navy, and the Convening Authority, claiming that military commission personnel have been forced to live and work for years in facilities that have been found to have dangerous levels of cancer-causing chemicals and other toxic substances, ranging from formaldehyde to heavy metals and mold.

In 2018, Mr. Small, Cohen Milstein, and the co-lead counsel team in *Animation Workers Antitrust Litigation* were nominated for Public Justice Foundation's Trial Lawyer of the Year, recognizing the legal teams that

COHENMILSTEIN

made the most outstanding contributions to the public interest through precedent-setting or otherwise extraordinary litigation concluded within the last year.

Mr. Small serves on the Advisory Board of the American Antitrust Institute (AAI), a pre-eminent thought-leadership organization devoted to promoting competition. He is also Chair of the selection committee for the Jerry S. Cohen Memorial Fund Writing Award, which annually recognizes top antitrust scholarship.

Mr. Small clerked for the Honorable Judge Roger Vinson, United States District Court for the Northern District of Florida, from 1986 to 1988.

Mr. Small attended Colgate University, where he graduated with a B.A., *cum laude,* in History. He earned his J.D. at American University's Washington College of Law.