1   Jeffrey L. Kodroff
    John A. Macoretta
2   Mary Ann Geppert
    SPECTOR ROSEMAN & KODROFF PC
3   2001 Market Street
    Suite 3420
4   Philadelphia, PA 19103
    Telephone: (215) 496-0300
5   Facsimile: (215) 496-6611

6   Daniel A. Small
    Robert W. Cobbs
7   COHEN MILSTEIN SELLERS & TOLL
    1100 New York Avenue NW
8   Suite 500 West
    Washington, DC 20005
9   Telephone: (202) 408-4600
    Facsimile: (202) 408-4699
10
    *Interim Class and Co-Lead Counsel*
11
    Elizabeth J. Cabraser
12  Michael W. Sobol
    Melissa Gardner
13  LIEFF CABRASER HEIMANN & BERNSTEIN LLP
    275 Battery Street, 29th Floor
14  San Francisco, CA 94111
    Telephone: (415) 956-1000
15  Facsimile: (415) 956-1008

16  *Interim Class and Liaison Counsel*

17                  **UNITED STATES DISTRICT COURT**

18                  **NORTHERN DISTRICT OF CALIFORNIA**

19                  **SAN FRANCISCO DIVISION**

20
    **IN RE GOOGLE LLC STREET VIEW**         Case No: 3:10-md-02184-CRB
21  **ELECTRONIC COMMUNICATIONS**
    **LITIGATION**                            **CLASS ACTION**
22
                                              **PLAINTIFFS' NOTICE OF MOTION;**
23                                            **MOTION FOR FINAL APPROVAL OF CLASS**
                                              **ACTION SETTLEMENT; AND**
24                                            **MEMORANDUM OF POINTS AND**
                                              **AUTHORITIES**
25
                                            | | |
26                                          |---|---|
                                          | Date: | February 28, 2020 |
27                                          | Time: | 10:00 a.m. |
                                          | Judge: | The Hon. Charles R. Breyer |
28                                          | Courtroom: | 6, 17th Floor |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................ 1
       A.     Litigation History ................................................................................. 1
       B.     Settlement Terms ................................................................................. 3
       C.     Notice to the Class, Objections and Exclusions.................................. 4
       D.     Counsel Recommendations on Distribution of Cy Pres Funds............ 5

III.   ARGUMENT ..................................................................................................... 6
       A.     The Court Should Certify the Proposed Settlement Class ................... 7
              (1)    Plaintiffs Satisfy Article III Requirements ............................... 7
              (2)    The Proposed Settlement Class Meets the Requirements of Rule 23(a) .......... 9
              (3)    The Proposed Settlement Class Meets the Requirements of Rule 23(b)(3) ................................................................ 11
       B.     The Court Should Reaffirm Appointment of Class Counsel ............... 13
       C.     The Proposed Settlement Is Fair, Reasonable, and Adequate ............ 14
              (1)    Rule 23(e)(2)(A): The Class Representatives and Class Counsel Have Vigorously Represented the Class ........................ 14
              (2)    Rule 23(e)(2)(B): Class Counsel Negotiated the Settlement at Arms' Length .................................................... 15
              (3)    Rule 23(e)(2)(C): The Relief Provided by the Settlements Represents a Strong Recovery, Taking into Account the Costs, Risks, and Delay of Trial and Appeal ............................ 17
              (4)    Rule 23(e)(2)(D): The Settlements Treat Class Members Equitably Relative to Each Other ............................................. 22
              (5)    The *Cy Pres* Awards Will Further the Underlying Interests of the Statute and of the Absent Class Members ............................ 22
              (6)    The Reaction of Class Members to the Proposed Settlement Favors Final Approval ........................................................... 24
       D.     Plaintiffs Have Provided Adequate Notice Under Rule 23(b)(3) ............ 24
       E.     Defendant Has Provided Notice Under the Class Action Fairness Act ....... 25

IV.    CONCLUSION................................................................................................. 25

i

1

# TABLE OF AUTHORITIES

2

3

**Page(s)**

CASES

4

*In re Abbot Labs. Norvir Anti-trust Litig.*,
  2007 WL 1689899 (N.D. Cal. June 11, 2007) ...................................................................9

5

*Allen v. Bedolla*,
  787 F.3d 1218 (9th Cir. 2015) .......................................................................................14

6

7

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ..........................................................................................7, 11, 19

8

9

*In re Baby Products Antitrust Litig.*,
  708 F.3d 163 (3d Cir. 2013).............................................................................................19

10

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ............................................................................... *passim*

11

12

*Campbell v. Facebook, Inc.*,
  315 F.R.D. 250 (N.D. Cal. 2016).....................................................................................18

13

14

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).............................................................................................................7

15

*Cooper v. Slice Techs., Inc.*,
  2018 WL 2727888 (S.D.N.Y. June 6, 2018) ....................................................................9

16

17

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) .......................................................................................7, 8

18

19

*Dennis v. Kellogg Co.*,
  2012 WL 2870128 (9th Cir. July 13, 2012).....................................................................15

20

*DirecTV, Inc. v. Huynh*,
  2005 WL 5864467 (N.D. Cal. May 31, 2005) .................................................................18

21

22

*In re Facebook Internet Tracking Litig.*,
  263 F. Supp. 3d 836 (N.D. Cal. 2017)...............................................................................9

23

24

*Frank v. Gaos*,
  139 S. Ct. 1041 (2019) .......................................................................................................7

25

*In re Google Buzz Privacy Litig.*,
  2011 WL 7460099 (N.D. Cal. June 2, 2011) ...................................................................19

26

27

*In re: Google Inc. Cookie Placement Consumer Privacy Litig.*,
  934 F.3d 316 (3d Cir. 2019)........................................................................................7, 19

28

*In re Google Referrer Header Privacy Litig.*,
   869 F.3d 737 (9th Cir. 2017) ............................................................ *passim*

*Greer v. Dick's Sporting Goods, Inc.*,
   2019 WL 4034478 (E.D. Cal. Aug. 27, 2019) ...........................................24

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ......................................................... *passim*

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ...............................................................10

*Harrington v. City of Albuquerque*,
   222 F.R.D. 505 (D.N.M. 2004).............................................................13

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944)..........................................................................19

*Hughes v. Kore of Indiana Enter., Inc.*,
   731 F.3d 672 (7th Cir. 2013) ..............................................................21

*In re Hyundai and Kia Fuel Economy Litig.*,
   926 F.3d 539 (9th Cir. 2019) .......................................................... *passim*

*Joffe v. Google, Inc.*,
   746 F.3d 920 (9th Cir. 2013) ................................................................2

*Klier v. Elf Atochem North America, Inc.*,
   658 F.3d 468 (5th Cir. 2011) ..............................................................19

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) .......................................................... *passim*

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...........................................................................7

*Mace v. Van Ru Credit Corp.*,
   109 F.3d 338 (7th Cir. 1997) ..............................................................19

*Masters v. Wilhelmina Model Agency, Inc.*,
   473 F.3d 423 (2d Cir. 2007)................................................................19

*Matera v. Google Inc.*,
   2016 WL 5339806 (N.D. Cal. Sept. 23, 2016) ..........................................9

*In re Mego Fin. Corp. Secs. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ..............................................................15

*Nachshin v. AOL, LLC*,
   663 F.3d 1034 (9th Cir. 2011) .........................................................22, 23

iii

*In re Netflix Privacy Litig.*,
    2013 U.S. Dist. LEXIS 37286 (N.D. Cal. Mar. 18, 2013)..........................................................19

*New York v. Reebok Int'l Ltd.*,
    96 F.3d 44 (2d Cir. 1996)..........................................................................................................19

*In re Nickelodeon Consumer Privacy Litig.*,
    827 F.3d 262 (3d Cir. 2016)........................................................................................................9

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)....................................................................................................................19

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ....................................................................................................10

*Perkins v. LinkedIn Corp.*,
    No. 13-CV-04303-LHK (N.D. Cal.) ..........................................................................................6

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    588 F.3d 24 (1st Cir. 2009)........................................................................................................19

*Powell v. Georgia-Pacific Corp.*,
    119 F.3d 703 (8th Cir. 1997) ....................................................................................................19

*Rackemann v. LISNR, Inc.*,
    2017 WL 4340349 (S.D. Ind. Sept. 29, 2017) ..........................................................................9

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ....................................................................................................25

*Simon v. Eastern Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)........................................................................................................................7

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ..................................................................................................20

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)..........................................................................................................7, 8, 9

*Torres v. Mercer Canyons, Inc.*,
    855 F.3d 1125 (9th Cir. 2016) ..................................................................................................11

*United States v. Noland*,
    517 U.S. 535 (1996)....................................................................................................................19

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*,
    2017 WL 672727 (N.D. Cal. Feb. 16, 2017) ............................................................9, 10, 12, 13

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*,
    229 F. Supp. 3d 1052 (N.D. Cal. 2017) ................................................................................6, 9

iv

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................10

*Warth v. Seldin*,
    422 U.S. 490 (1975) ..................................................................................7

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ..........................................................12, 13

STATUTES

18 U.S.C. §2510 .............................................................................. *passim*

18 U.S.C. § 2511 ...........................................................................2, 8, 18, 21

18 U.S.C. § 2520 ........................................................................................8

28 U.S.C. § 1715(d) ..................................................................................25

Am. Law Inst., Principles of the Law of Aggregate Litig.
    (2010) § 3.07(c) ....................................................................................19

Cal. Bus. & Prof. Code § 17200 ...............................................................2

Omnibus Crime Control and Safe Streets Act of 1968,
    34 U.S.C § 10101, Title III ....................................................................1

OTHER AUTHORITIES

7AA Charles Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and
    Procedure* §1779 (3d ed. 2005) ...........................................................12

Fed. R. Civ. P. 23 ............................................................................ *passim*

S. Rep. No. 99-541 (1986) .........................................................................9

William B. Rubenstein, *4 Newberg on Class Actions* (5th ed. 2019 update) ...............................21, 22

1

## NOTICE OF MOTION

2

3       **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

4       **PLEASE TAKE NOTICE THAT** on February 28, 2020 at 10:00 a.m., or as soon thereafter

5  as this matter may be heard, before the Honorable Charles R. Breyer, United States District Court for

6  the Northern District of California, located in Courtroom 6, on the 17th Floor of the San Francisco

7  Courthouse, 450 Golden Gate Avenue, San Francisco, California, Class Counsel Spector, Roseman

8  & Kodroff, PC ("SRK"), Cohen, Milstein, Sellers & Toll PLLC ("CMST") and Lieff, Cabraser,

9  Heimann & Bernstein, LLP ("LCHB") will, and hereby do, move the Court pursuant to Federal Rule

10  of Civil Procedure 23 for an order: (1) certifying the proposed Class for settlement purposes under

11  Federal Rule of Civil Procedure 23(a) and (b)(3); (2) affirming appointment of Class Counsel; (3)

12  approving the Settlement as fair, reasonable, and adequate under Federal Rule of Civil Procedure

13  23(e); (4) directing injunctive relief as agreed in the Settlement; (5) directing distributions to

14  proposed *cy pres* recipients; and (6) dismissing this action with prejudice and directing entry of final

15  judgment.

16       This motion is based on this Notice of Motion and the supporting Memorandum of Points

17  and Authorities; the Joint Declaration of Jeffrey L. Kodroff, Daniel A. Small, and Michael W. Sobol

18  in Support of this motion (the "Joint Declaration"); papers filed in support of preliminary approval;

19  papers filed in support of Plaintiffs' motion for attorneys' fees, expenses, and service awards; any

20  oral argument by counsel at the hearing before this Court; any papers filed in reply; and all other

21  papers and records in this matter.[1]

22

23

24

25

26       [1] Capitalized terms in the supporting memorandum shall have the same meaning and use as
specified in the Class Action Settlement Agreement (the "Settlement") (Dkt. 166-1, Ex. A).  In
accordance with the Court's Order Granting Preliminary Approval of Class Action Settlement, (the
27  "Preliminary Approval Order"), (Dkt. 178), ¶22, a copy of this motion and supporting memorandum
will be uploaded within 24 hours of this filing to the settlement website,
28  http://www.streetviewsettlement.com.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Named Plaintiffs seek final approval of a settlement that will resolve nearly a decade of litigation against Defendant Google, LLC under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§2510, *et seq*. (together, "ECPA"). Plaintiffs allege that between 2007 and 2010, Google, using its Street View vehicles program, intentionally intercepted and stored electronic communications transmitted by Class Members over unencrypted wireless internet connections. *See* Dkt. 54 ¶¶ 1-4.

The proposed settlement was preliminarily approved by this Court on October 9, 2019. Dkt. 178. Since that time, an expert notice administrator has ensured that court-approved notice materials were presented more than 560 *million* times to potential Class Members. Young Decl. ¶ 5. As of November 25, 2019, only one exclusion and no objections have been received. *Id.* ¶¶ 11-12. This response affirms the fundamental fairness of the proposed settlement, which ensures meaningful injunctive relief for the class and advances the purposes of the suit and the statute by providing *cy pres* awards to protect and promote Internet privacy. *See generally* Dkt. 166-1 Ex. A ("Agmt.").

The Court should certify the settlement class as proposed under Rule 23(a) and (b)(3) and grant final approval to the proposed settlement as "fair, reasonable, and adequate" under Rule 23(e).

## II.   BACKGROUND

### A.   Litigation History

By summer of 2010, eight putative class actions had been filed in six jurisdictions alleging various claims against Google for unlawful use of Street View vehicles to collect private information. The United States Judicial Panel on Multidistrict Litigation consolidated these actions in this Court before Judge Ware. Dkt. 1. After a competitive briefing process involving submissions from three separate groups of proposed interim class counsel, the Court appointed Jeffrey Kodroff of Spector Roseman & Kodroff, P.C. and Daniel Small of Cohen Milstein Sellers & Toll PLLC as interim co-lead counsel. Dkt. 47, at 2-3. The Court appointed Elizabeth Cabraser of Lieff Cabraser Heimann & Bernstein, LLP as interim liaison counsel. *Id.* at 4.

Counsel filed a Consolidated Class Action Complaint ("CCAC") on behalf of twenty-two

1

named plaintiffs on November 8, 2010. Dkt. 54, ¶¶ 18-38. The CCAC alleges that Google intercepted the named plaintiffs' private communications in violation of the ECPA, California Business and Professional Code § 17200 *et seq.* (the "UCL"), and thirteen state wiretap statutes. *Id.* ¶¶ 128-145. Defendants moved to dismiss the CCAC in its entirety. Dkt. 60. The Court dismissed the state wiretap claims as preempted by federal law, and the UCL claims as failing to meet the UCL's heightened standing requirements. Dkt. 82, at 25. The Court denied Defendants' motion as to the ECPA claims. *Id.* At Google's request, the Court certified its decision for immediate appeal, and the Ninth Circuit accepted the certification "because the district court resolved a novel question of statutory interpretation." Dkt. 90; *Joffe v. Google, Inc.*, 746 F.3d 920, 924 (9th Cir. 2013).

On appeal, the Ninth Circuit affirmed this Court and denied rehearing *en banc*, affirming for the first time that data transmitted over unencrypted Wi-Fi networks is not "readily accessible to the general public" and exempt from the ECPA under 18 U.S.C. § 2511(2)(g)(i). *Id.* at 936. The Supreme Court denied Google's petition for *certiorari*, United States Sup. Ct. Dkt. 13-1181.

The case proceeded with an initial period of limited discovery devoted to the issue of standing. Dkt. 108. On September 19, 2014, the Court appointed a Special Master to conduct a set of complex technical searches on data collected by Google. Dkt. 121; Dkt. 121-1. The Special Master's charge was "to search the Street View Data to determine whether any Plaintiff's communications were acquired by Google." Dkt. 121-1 at 2. But, as the Court explained, "the Street View Data is not susceptible to a simple keyword search, and instead requires Plaintiffs to study the data, review search results, and develop new strategies based on what they find or what they learn about the data." Dkt. 121 at 2 (internal quotations omitted). To that end, the Special Master was provided with access to Google's collected Street View data, which contain more than 3 *billion* "frames" of wireless raw data, of which approximately 300 million contain "Payload Data"—the kinds of frames that could contain the contents of communications. *See* Joint Decl. ¶ 19.

Over the next three years, the parties coordinated with the Special Master to put the massive database in searchable form and then to search for data that would show whether Google had intercepted communications from the Named Plaintiffs. *Id.* Eighteen Named Plaintiffs provided personal information and forensic evidence of their Wi-Fi equipment, including MAC addresses,

1    email addresses, and SSIDs. *Id.* Even though these searches were focused only on the 18 Named

2    Plaintiffs, the process proved difficult and time-consuming. It was not until December 2017 that the

3    Special Master filed a report under seal setting out the results of his review. *Id.*

4          On February 1, 2018, with the benefit of years of factual investigation, legal research, and the

5    Special Master's findings, the parties mediated before the respected and skilled mediator Greg

6    Lindstrom of Phillips ADR Enterprises P.C. *Id.* ¶ 20. The parties continued settlement negotiations

7    with the aid of the mediator in the succeeding months, reaching agreement and executing a final

8    Settlement Agreement on June 11, 2018. *Id.* On June 19, 2018, the Court stayed proceedings in the

9    case until after the United States Supreme Court issued an opinion in *Frank v. Gaos*, No. 17-961,

10   which had been granted *certiorari*. Dkt. 155. The Supreme Court issued an opinion in *Gaos* in

11   March 2019, and Plaintiffs moved for preliminary approval of the settlement and certification of a

12   settlement class on July 19, 2019, which the Court granted on October 9, 2019. Dkts. 166, 178.

13         **B.     Settlement Terms**

14         The Settlement Agreement provides for a single Settlement Class, defined as follows:

15               "Class" means all persons who used a wireless network device from
16               which Acquired Payload Data was obtained.

17               "Acquired Payload Data" means the Payload Data acquired from
                 unencrypted wireless networks by Google's Street View vehicles
18               operating in the United States from January 1, 2007 through May 15,
                 2010.

19   Agmt. ¶¶ 2, 5.[2]

20         Under the Settlement Agreement, Google will pay $13 million into a Settlement Fund which

21   will (after payment of approved attorneys' fees, approved Plaintiff service awards, the costs of class

22   notice and settlement administration, and reimbursement of approved expenses) be used to fund

23   Court-approved *cy pres* awards to "independent organizations with a track record of addressing

24   consumer privacy concerns," who will use the awards "to promote the protection of Internet

25

26         [2] Exclusions apply, e.g., for Google, its employees, and the Court. *See* Agmt. ¶ 7. The class has
     been modified from the class pled in the CCAC to reflect the date range of the challenged conduct
27   and to limit the class to individuals whose "Payload Data" was collected, targeting the "contents" of
     electronic communications targeted by the ECPA. Joint Decl. ¶ 22.
28

3

1  privacy."[3] Agmt. ¶ 29; *see id.* ¶¶ 16, 21, 24. None of the Settlement Fund will revert to Google. *Id.* ¶

2  53. As part of the Agreement, Google represents that funds distributed to *cy pres* recipients through

3  the Settlement Fund are in addition to its charitable giving and would not have been expended absent

4  the Settlement. *Id.* ¶ 25. Google did not select any of the proposed *cy pres* recipients; though

5  Plaintiffs disclosed their proposed recipients per the Agreement, no changes to proposed recipients

6  were made in response to Google's views. *See id.* ¶ 29; Joint Decl. ¶ 24.

7        The settlement also includes both corrective and forward-looking injunctive relief. To protect

8  Class Members who were affected by Google's conduct, the Settlement Agreement requires Google

9  to destroy Acquired Payload Data within 45 days (subject to preservation obligations to Excluded

10  Class Members). Agmt. ¶ 33. Google also will "not collect and store for use in any product or

11  service Payload Data via Street View vehicles, except with notice and consent"; and will comply

12  with the privacy program and other requirements of the Assurance of Voluntary Compliance Google

13  entered into in 2013 with various state Attorneys General regarding its Street View vehicles. *Id.* ¶¶

14  34-35. The latter provision extends the duration of the Assurance by nearly two years. *See* Joint

15  Decl. Ex. F ¶ II-2. Google will also "host and maintain educational webpages that instruct users on

16  the configuration of wireless security modes and the value of encrypting a wireless network." Agmt.

17  ¶¶ 36-37. This measure will help Class Members (and others) avoid the vulnerability of an

18  unencrypted wireless network—the vulnerability at issue in this case.

19        In exchange for the relief described, upon final approval Plaintiffs and Class Members will

20  release all claims "arising out of or related to the allegations in the [CCAC], including but not

21  limited to the claims arising out of or related to the allegations in the [CCAC] that have been

22  asserted or could have been asserted" by Plaintiffs and the other Class Members. *Id.* ¶¶ 17, 46.

23      **C.**    **Notice to the Class, Objections and Exclusions**

24        Pursuant to the Court's approved notice plan, Notice Administrator A.B. Data began

25  disseminating notice on October 22, 2019. Young Decl. ¶ 5. Notice included: a settlement website[4]

26

27      [3] In contrast, the state attorneys general in their companion Street View litigation negotiated a $7 million payment to the states as part of their settlement with Google. Joint Decl. Ex. F at 6-7.

28      [4] www.streetviewsettlement.com.

1   presenting the Court-approved Long Form Notice, as well as other Court documents and answers to

2   frequently asked questions; an email account and P.O. Box to which potential Class Members could

3   submit questions; a toll-free number with an automated interactive voice response system that

4   presented information concerning the settlement; a live operator with whom potential Class

5   Members could speak during business hours; news releases in English and Spanish distributed to

6   more than 10,000 newsrooms via *PR Newswire*; and a concentrated ad blitz calculated to reach more

7   than 70% of the target audience. *See* Young Decl. ¶¶ 6-8, 10, 14. This campaign was appropriately

8   targeted to reach as many members as practicable of a proposed class whose members are not readily

9   identifiable, but whose unencrypted wireless Payload Data were captured by Street View vehicles

10  between 2007 and 2010. Young Decl. ¶ 3; Joint Decl. ¶ 25.

11      The advertising program delivered more than 560 million ad impressions to potential Class

12  Members. Young Decl. ¶ 5. The Settlement Website will remain active for at least 30 days after final

13  approval, but as of filing it had received 122,954 unique hits. *Id. ¶ 10.* The administrator has

14  received 12 emails and 41 phone calls. *Id.* ¶ 10.

15      Though Class Members may exclude themselves or object to the settlement through January

16  20, 2020, to date only one exclusion and no objections have been received. *Id.* ¶¶ 11-12.

17      **D.    Counsel Recommendations on Distribution of Cy Pres Funds**

18      At preliminary approval, Plaintiffs proposed eight non-profit groups as potential recipients of

19  *cy pres* awards: The Center on Privacy & Technology at Georgetown Law, Center for Digital

20  Democracy, MIT's Internet Policy Research Initiative, World Privacy Forum, Public Knowledge,

21  Rose Foundation for Communities and the Environment, American Civil Liberties Foundation, Inc.;

22  and Consumer Reports, Inc. Dkt. 166 at 6. Their proposals were submitted to the Court and posted

23  on the Settlement Website for all Class Members to review and comment on. *Id.*, Dkt. 166-1 Exs. B-

24  I; Young Decl. ¶ 6. The Court also granted the Electronic Privacy Information Center ("EPIC")

25  leave to apply for a *cy pres* award. Dkt. 174. Its proposal was posted on the Settlement Website.

26  Young Decl. ¶ 6. As of filing no comments on the proposed *cy pres* recipients have been received.

27  *Id.* ¶ 12.

28      The Settlement Agreement provides that the Court will have the final word on *cy pres*

recipients. Agmt. ¶ 11. Plaintiffs, however, must propose *cy pres* recipients to the Court, and their respective amounts of the Net Settlement Fund. *Id.* ¶ 32. Accordingly, Plaintiffs recommend that the Court authorize distributions from the Net Settlement Fund as follows:

| Organization | Recommended Amount |
|---|---|
| Center on Privacy & Technology at Georgetown Law | $1,100,000 |
| Center for Digital Democracy | $500,000 |
| MIT Internet Policy Research Initiative | $1,399,710 |
| World Privacy Forum | $500,000 |
| Public Knowledge | $907,500 |
| American Civil Liberties Union Foundation | $1,170,000 |
| Consumer Reports | $969,249 |
| Rose Foundation for Communities and the Environment | *Remainder[5]* |

Counsel make no recommendation as to the proposal submitted by EPIC, but note that EPIC's contributions regarding the issues in this litigation have been substantial.[6]

## III.   ARGUMENT

To determine whether to approve a class action settlement, the Court must first assure itself that the proposed settlement class may be certified under Rule 23(a) and (b); next the Court must assess whether the proposed settlement is "fair, reasonable, and adequate." *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019, 1022, 1025 (9th Cir. 1998) *overruled on other grounds*; *see also In re*

---

[5] Plaintiffs do not currently know the amount of the Net Settlement Fund (i.e., the amount of the $13 million that will remain after payment of court-approved fees, expenses and service awards). Nor do plaintiffs know the amount the Court will award to EPIC. Thus, Plaintiffs propose to award the Rose Foundation the remainder of the Net Settlement Fund, to be sure that the fund is exhausted. For purposes of illustration, if the Court awarded the amounts proposed for the other seven cy pres recipients, which total $6,546,459, and awarded $4,249,500 in fees, expenses and service awards, then $2,204,041, minus the amount awarded to EPIC, would be available for the Rose Foundation.

[6] Plaintiffs did not propose EPIC as a *cy pres* recipient in their preliminary approval motion; because the Court approved EPIC's motion to apply for *cy pres* funding, Plaintiffs hereby disclose that EPIC submitted an *amicus* brief in support of Plaintiffs during Google's appeal earlier in the case. EPIC also received *cy pres* settlement funds in *Perkins v. LinkedIn Corp.*, No. 13-CV-04303-LHK (N.D. Cal.), a case in which Lieff Cabraser Heimann and Bernstein served as Lead Counsel.

1   *Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 229 F. Supp. 3d 1052,

2   1062 (N.D. Cal. 2017) ("*Volkswagen II*") (Breyer, J.).

3   ### A.    The Court Should Certify the Proposed Settlement Class

4   At final approval, Plaintiffs must show that the requirements of Rule 23(a) and 23(b)(3) are

5   met. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-22 (1997). "The district court's Rule 23(a)

6   and (b) analysis must be 'rigorous,'" but "[t]he criteria for class certification are applied differently

7   in litigation classes and settlement classes." *In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d

8   539, 556 (9th Cir. 2019) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). In deciding

9   whether to certify a settlement class, a district court need not consider "manageability at trial"

10  because no trial will proceed, but must "give heightened attention to the definition of the class or

11  subclasses" to protect absentees. *Id.* at 556-557. Before certifying a class, courts must also "assure

12  [them]selves of litigants' standing under Article III," and may not certify a class unless at least one

13  named plaintiff has properly alleged standing. *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019).

14  ### (1)    Plaintiffs Satisfy Article III Requirements

15  Article III standing requires that named plaintiffs "must have (1) injury in fact; (2) that is

16  fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

17  favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v.*

18  *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "To establish injury in fact, a plaintiff must

19  show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and

20  particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*,

21  504 U.S. at 560). "[N]amed plaintiffs who represent a class 'must allege and show that they

22  personally have been injured, not that injury has been suffered by other, unidentified members of the

23  class to which they belong.'" *Id.* at 1547 n.6 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426

24  U.S. 26, 40 n.20 (1976)). At the pleading stage, standing is analyzed taking the allegations of the

25  complaint as true.[7] *See id.* at 1547; *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975).

26

27  _____
    [7] At class certification, courts also examine standing taking the allegations of the pleadings as
28  true. *See Gaos*, 139 S. Ct. at 1046 (remanding because "no court in this case has analyzed whether
    any named plaintiff has *alleged* SCA violations that are sufficiently concrete and particularized to

7

1        Here, the Court can rely on Plaintiff's allegations to establish standing. Each Named Plaintiff

2  alleged that Google intentionally intercepted their electronic communications in violation of the

3  ECPA, 18 U.S.C. § 2511(1)(a). See Dkt. 54 ¶¶ 18-38. Under the ECPA, an interception involves the

4  "acquisition of the contents of any wire, electronic, or oral communication through the use of any

5  electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Named Plaintiffs all alleged that

6  Google's Street View vehicles "surreptitiously collected, decoded, and stored data from [their] WiFi

7  connection, including payload data," and that they "did not know that Google collected [t]his data,

8  nor did [they] give permission for Google to do so." Dkt. 54 ¶¶ 18-38. The alleged injuries are

9  concrete, fairly traceable to the actions of the defendant, and redressable by this Court.

10       Courts have sometimes struggled with standing's concreteness inquiry when plaintiffs allege

11  "intangible" harms. *See Spokeo*, 136 S. Ct. at 1549. "In determining whether an intangible harm

12  constitutes injury in fact, both history and the judgement of Congress play important roles. . . . [I]t is

13  instructive to consider whether an alleged intangible harm has a close relationship to a harm that has

14  traditionally been regarded as providing a basis for a lawsuit in English or American courts. . . . In

15  addition, because Congress is well positioned to identify intangible harms that meet minimum

16  Article III requirements, its judgment is also instructive and important." *Id.* at 1549.

17       In enacting the ECPA, Congress acted to protect the concrete privacy interests of individuals

18  in avoiding unwanted interception of their electronic communications. As with many privacy-related

19  claims, the violation lies in the *invasion* of a plaintiffs' privacy, rather than in material harm flowing

20  therefrom. *See* Restatement (Second) of Torts § 652B cmt. b (1977) ("The intrusion itself makes the

21  defendant subject to liability, even though there is no publication or other use of any kind of the

22  photograph or information outlined."). The prohibition outlined in the statute, and its accompanying

23  private cause of action in 18 U.S.C. § 2520, reflect the considered judgment of Congress that

24

25  support standing.") (emphasis added); *In re: Google Inc. Cookie Placement Consumer Privacy
26  Litig.*, 934 F.3d 316, 324-25 (3d Cir. 2019) (reviewing allegations to determine standing); *In re
    Deepwater Horizon*, 739 F.3d 790, 805-06 (5th Cir. 2014) (rejecting objections about need to
27  conduct "evidentiary inquiry into [] Article III standing . . . during class certification and settlement
    approval" and finding standing based on pleadings).
28

8

1   intentional, nonconsensual interception of private communications is an invasion of individuals'

2   right to privacy.[8] This congressional judgment is "instructive and important" in establishing the

3   existence of a concrete injury under Article III. *Spokeo*, 136 S. Ct. Id. at 1549.

4          That is why courts have routinely—apparently uniformly—held that violations of the ECPA

5   constitute concrete and particularized harms that give rise to Article III standing. *See, e.g.*, *In re*

6   *Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 273-74 (3d Cir. 2016); *Rackemann v. LISNR,*

7   *Inc.*, 2017 WL 4340349, at *3-5 (S.D. Ind. Sept. 29, 2017); *Matera v. Google Inc.*, 2016 WL

8   5339806, at *14 (N.D. Cal. Sept. 23, 2016). Even courts that dismissed cases on the merits have

9   recognized that ECPA complainants have Article III standing. *See, e.g.*, *Nickelodeon*, 827 F.3d at

10  273-76; *Cooper v. Slice Techs., Inc.*, 2018 WL 2727888, at *2-5 (S.D.N.Y. June 6, 2018); *In re*

11  *Facebook Internet Tracking Litig.*, 263 F. Supp. 3d 836, 841-42, 844-45 (N.D. Cal. 2017).

12         So too here, because Plaintiffs have plausibly alleged that Google intercepted private

13  communications transmitted in the "payload data" of Named Plaintiffs' wireless internet traffic (Dkt.

14  54 ¶¶ 18-38), they have alleged what is necessary for Article III standing. Those allegations establish

15  this Court's jurisdiction to approve the parties' settlement.

16                  **(2)      The Proposed Settlement Class Meets the Requirements of Rule 23(a)**

17         Under Rule 23(a), the proponent of class certification must show that the proposed class

18  meets the requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *In re*

19  *Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 2017 WL 672727, at

20  *12 (N.D. Cal. Feb. 16, 2017) (Breyer, J.) ("*Volkswagen I*").[9] Those requirements are met here.

21         The numerosity requirement is satisfied. Discovery has shown that Google collected nearly

22  300 *million* payload data frames in the United States over the course of its Street View program.

23  Joint Decl. ¶ 27. Class membership in this case likely runs into the millions, making joinder

24

25         [8] *See* S. Rep. No. 99-541 at 5 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3555, 3559 ("[T]he
26  law must advance with the technology. . . . Privacy cannot be left to depend solely on physical
    protection, or it will gradually erode as technology advances.").

27         [9] *Volkswagen I* is a decision on preliminary approval. *Id.* at 1. At final approval, the Court relied
28  on the class certification analysis presented in *Volkswagen I*, cited here. *See Volkswagen II*, 229 F.
    Supp. 3d at 1063.

impracticable. *Id.*; *see* Fed. R. Civ. P. 23(a)(1); *In re Abbot Labs. Norvir Anti-trust Litig.*, 2007 WL 1689899, at *6 (N.D. Cal. June 11, 2007) (holding that numerosity may be satisfied where class membership is unknown but common sense indicates that it is large).

Numerous questions of law and fact are common to the class, satisfying the commonality requirement. Fed. R. Civ. P. 23(a)(2); *Hanlon*, 150 F.3d at 1019; *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). Among the issues common to the class are (1) whether Google "intercepted" the "contents" of "electronic communications" within the meaning of the ECPA; (2) whether any interception was "intentional" within the meaning of the Act; and (3) whether payload data transmitted over unencrypted networks is "readily accessible to the general public," within the meaning of the Act. These issues, which are common to each class member's claim, arise from a common course of conduct by Google. *See Volkswagen I* at 12. Commonality is satisfied.

To satisfy the typicality requirement, named plaintiffs' claims must be "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanlon*, 150 F.3d at 1020). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Here, the named plaintiffs and the class press the same claims and share similar injuries—violations of privacy rights—all flowing from the same alleged conduct by Google.

Finally, the representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry asks (1) whether "the named plaintiffs and their counsel have any conflicts of interest with other class members"; and (2), "will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

The interests of the named plaintiffs and their counsel are aligned with the interests of the class, and no conflict exists. Here, "each potential plaintiff has the same problem:" Google allegedly intercepted payload data from their unencrypted Wi-Fi connections. *Cf. id.* at 1021. "Potential plaintiffs are not divided into conflicting discrete categories," and all have aligned interests in

10

1    pursuing relief from Google and preventing similar invasions in the future. *Cf. id.*

2          Moreover, Class Counsel have prosecuted this action vigorously and capably for nearly a

3    decade. Plaintiffs' interim co-lead counsel and liaison counsel were originally appointed as part of a

4    competitive application process in 2010. Joint Decl. ¶ 8. Since that time, they have undertaken the

5    responsibilities assigned to them by the Court and vigorously prosecuted this action, guiding the case

6    through intensely contested motion practice, a successful appeal, years of jurisdictional discovery,

7    and months of mediation. Class counsel have extensive experience litigating and settling class

8    actions, including large consumer cases. *See* Joint Decl. ¶ 64 & Exs. D, E. Class Counsel's efforts

9    have uncovered sufficient information to assess the strengths and weaknesses of the case, and to

10   negotiate a settlement that balances the benefits of a settlement against the risks of further litigation.

11   Joint Decl. ¶ 20. Throughout administration of the settlement, Class Counsel will continue to

12   vigorously represent the interests of the Class. *Id.* ¶ 26. Plaintiffs and Class Counsel have fairly and

13   adequately protected the interests of all Settlement Class Members and will continue to do so.

14         The Settlement Class meets all the requirements of Rule 23(a).

15              **(3)      The Proposed Settlement Class Meets the Requirements of Rule 23(b)(3)**

16         Under Rule 23(b)(3), the Court may certify a class when it finds that "the questions of law or

17   fact common to class members predominate over any questions affecting only individual members,

18   and that a class action is superior to other available methods for fairly and efficiently adjudicating

19   the controversy."

20              *a)      Common Issues Predominate Over Individual Ones*

21         The predominance inquiry "tests whether proposed classes are sufficiently cohesive to

22   warrant adjudication by representation." *Hyundai*, 926 F.3d at 557 (quoting *Amchem*, 521 U.S. at

23   623). It "focuses on whether the 'common questions present a significant aspect of the case and they

24   can be resolved for all members of the class in a single adjudication'; if so, 'there is clear

25   justification for handling the dispute on a representative rather than on an individual basis.'" *Id.*

26   (quoting *Hanlon*, 150 F.3d at 1022). In this analysis, "more important questions apt to drive the

27   resolution of litigation are given more weight in the predominance analysis over individualized

28   questions which are of considerably less significance to the claims of the class." *Id.* (quoting *Torres*

1   *v. Mercer Canyons, Inc.*, 855 F.3d 1125, 1134 (9th Cir. 2016).

2        Here, as in the consumer fraud cases highlighted in *Hyundai*, the predominance requirement

3   is "readily met" because the class is a "cohesive group of individuals [who] suffered the same harm

4   in the same way because of [Google's] alleged conduct." *Hyundai*, 926 F.3d at 559. The central facts

5   of the case are common to the class—the course of conduct pursued by Google—and the key

6   questions of law are also common—whether Google's course of conduct violated the ECPA.

7   Google's alleged conduct applies equally "to all Class Members' claims," and Class Members

8   suffered "a common and unifying injury" therefrom. *See Volkswagen I* at 14.

9        Notably, a settlement class may be certified even where the class would not be certified for

10  litigation "if the settlement obviates the need to litigate individualized issues that would make a trial

11  unmanageable." *Hyundai*, 926 F.3d at 558. The class proposed here consists of consumers whose

12  payload data was collected by Street View vehicles in a common, nationwide scheme. However, to

13  the extent that individual issues would have been presented at trial regarding Google's conduct with

14  respect to individual members or their payload data, the settlement means that those individual

15  issues will not be tried and thus will not create any manageability problem.[10]

16                  **b)    Class Treatment Is Superior to Other Methods of Adjudication**

17       "The purpose of the superiority requirement is to assure that the class action is the most

18  efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am.,*

19  *LLC*, 617 F.3d 1168 (9th Cir. 2010) (quoting 7AA Charles Wright, Arthur Miller & Mary Kay Kane,

20  *Federal Practice and Procedure* §1779 at 174 (3d ed. 2005)). In considering whether class treatment

21  is superior, "matters pertinent to [this] finding[] include: (A) the class members' interests in

22  individually controlling the prosecution or defense of separate actions; (B) the extent and nature of

23  any litigation concerning the controversy already begun by or against class members; (C) the

24  desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

25  (D) the likely difficulties in managing a class action." Fed R. Civ. P. 23(b)(3).

26

27  _____

28       [10] Even at trial, the common issues relating to Google's uniform practice of intercepting and
    storing unencrypted wireless communications would have predominated over any individual issues.

                                               12

As noted above, the class here is potentially comprised of millions of individuals. It would be completely impracticable to litigate each class member's claim separately without exhausting the entire capacity of the federal judiciary. Individual lawsuits present "the possibility of inconsistent rulings and results," further militating toward class treatment. *Volkswagen I* at 14. Rule 23's "matters pertinent" weigh in favor as well—any individual seeking to pursue the suit on their own would have to relitigate a considerable portion of a decade's worth of progress—particularly difficult jurisdictional discovery for individuals. And because the case has settled no "likely difficulties in managing a class action" exist. Individual litigations would be a monumentally inefficient undertaking. *See Wolin*, 617 F.3d at 1175. Class treatment is superior.

The requirements of Rule 23 are met. The Court should certify the class.

## B.     The Court Should Reaffirm Appointment of Class Counsel

Federal Rule of Civil Procedure 23(c)(1)(B) states that "[a]n order certifying a class action . . . must appoint class counsel under Rule 23(g)." Rule 23(g)(1)(A) requires the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." The Court has already appointed Spector Roseman & Kodroff and Cohen Milstein as interim co-lead counsel and Lieff Cabraser as interim liaison counsel, Dkt. 47 at 3-4, and affirmed that appointment at preliminary approval, Dkt. 178 at 3.

At initial appointment, the Court considered the submissions and arguments of all of the parties before it and deemed interim co-lead counsel and interim liaison counsel best suited to protect the interests of the proposed class. Since that time, these counsel have capably managed this complex litigation and negotiated a settlement that will provide important injunctive relief and fund substantial work to prevent further intrusions on internet privacy. The work counsel have done to date supports the conclusion they should be appointed as Class Counsel, as the Court initially found at the preliminary approval stage. *See Harrington v. City of Albuquerque*, 222 F.R.D. 505, 520 (D.N.M. 2004). The firms satisfy the criteria of Rule 23(g)(1).

## C.     The Proposed Settlement Is Fair, Reasonable, and Adequate

Under Rule 23(e)(2), the Court may approve the settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate." Where, as here, "the settlement takes place before formal class certification, settlement approval requires a 'higher standard of fairness.' . . . to ensure that class representatives and their counsel do not secure a disproportionate benefit 'at the expense of the unnamed plaintiffs'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1026-27). Rule 23 as recently amended sets forth enumerated factors the Court must consider, each of which is discussed below. Fed. R. Civ. P. 23(e). In considering the fairness of a negotiated settlement, the Court should be guided by the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Hyundai*, 926 F.3d at 556 (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015)). The proposed settlement is fair, reasonable, and adequate under the new Rule 23(e) factors, as well as other relevant considerations identified by the Ninth Circuit.[11]

### (1)     Rule 23(e)(2)(A): The Class Representatives and Class Counsel Have Vigorously Represented the Class

Rule 23(e)(2)(A) requires the Court to consider whether "the class representatives and class counsel have adequately represented the class." The Advisory Committee Notes explain that this subsection, in conjunction with subsection (B), "identify matters that might be described as 'procedural' concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." *See* Fed. R. Civ. P. 23, Notes of Advisory Comm., Subdivision (e)(2), Paragraphs (A) and (B) (2018). As an "example, the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base." *Id.* Ninth Circuit law, too, instructs courts to consider the "extent of discovery completed and the stage of the proceedings." *See Bluetooth*, 654 F.3d at

---

[11] Prior to the recent Rule 23 amendments, the Ninth Circuit instructed courts to weigh some or all of the following factors: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

14

946. The extent of the discovery conducted to date and the stage of the litigation are both indicators of counsel's familiarity with the case and of plaintiffs having enough information to make informed decisions. *See, e.g.*, *In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).

Over nearly a decade of hard-fought litigation, Plaintiffs have vigorously represented the class. Through a motion to dismiss, an appeal, and extensive jurisdictional discovery, the named Plaintiffs themselves have participated in the litigation, providing information and other evidence, including providing electronic devices for forensic imaging, among other duties demanded by the case. Counsel, experienced class action litigators, have committed thousands of hours of legal expertise to guiding the litigation through to its present successful settlement. The motion practice and discovery taken have given ample opportunity to assess the benefits of the settlement relative to the risks of further litigation. The views of counsel and their intimate knowledge of the strengths and weaknesses of the case weigh in favor of final approval. *See Bluetooth*, 654 F.3d at 946.

(2)      **Rule 23(e)(2)(B): Class Counsel Negotiated the Settlement at Arms' Length**

Counsel aver that the settlement was negotiated at arms' length, as required by Rule 23(e)(2)(B). Joint Decl. ¶ 21. Nevertheless, the Court must make its own determination, particularly when cases settle before certification of a class. *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 741 (9th Cir. 2017), *vacated and remanded on other grounds*, 139 S. Ct. 1041 (2019). The Court must "account[] for the possibility that the class representatives and their counsel have sacrificed the interests of absent class members for their own benefit." *Id.* (quoting *Lane*, 696 F.3d at 819); *see also Bluetooth*, 654 F.3d at 946-47. Moreover, Counsel are mindful that a *cy pres* only recovery, though it may be (as here) the only practicable means of providing benefit to the class, may "'present a particular danger' that 'incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of negotiations.'" *Lane*, 696 F.3d at 833 (Kleinfeld, J., dissenting) (quoting *Dennis v. Kellogg Co.*, 2012 WL 2870128 at *6 (9th Cir. July 13, 2012), *opinion withdrawn and superseded*, 697 F.3d 858, 867). Counsel are thus at pains to present objective indicia that the settlement was negotiated at arms' length and is not collusive.

The first indication that the settlement was reached at arms' length is that it is a substantial

1   recovery in light of the risks of the case, and the *cy pres* mechanism involved is necessary in light of

2   the difficulty and expense in identifying Class Members who could plausibly receive a cash

3   recovery. This point is addressed in further detail below.

4          The *Bluetooth* Court noted that a sign of collusion is "when counsel receive a

5   disproportionate distribution of the settlement, or when the class receives no monetary distribution

6   but class counsel are amply rewarded." 654 F.3d at 947 (quoting *Hanlon*, 150 F.3d at 1021). In

7   *Bluetooth*, a *cy pres* award of $100,000 was accompanied by an agreement not to oppose attorneys'

8   fees of up to $800,000 for class counsel. *Id.* Here, counsel seek 25% of the $13 million common

9   fund plus reasonable expenses, in line with the guidance laid out in *Bluetooth*. *Id.* at 942, 945: *Cf.*

10  Fee Pet. at 1. The reasonableness of this fee is confirmed by Counsel's lodestar, which is much

11  higher than the fees sought, resulting in a negative multiplier of 0.59. *See* Fee Pet. at 1. Counsel are

12  thus not receiving a "disproportionate" award; and as explained below, the class is receiving no

13  monetary distribution only because such a distribution would be impossible for many Class

14  Members and too expensive to implement for the few who could be identified. Moreover, the *cy pres*

15  funds are not backdoor attorneys' fees, funneling money to counsel's alma maters; recipients must

16  be independent groups with a track record of privacy work, and use the funds to promote internet

17  privacy. Agmt. ¶¶ 29-30.

18         Other indicia of collusion include "when the parties negotiate a 'clear sailing' arrangement

19  providing for the payment of attorneys' fees separate and apart from class funds," and "when the

20  parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."

21  *Bluetooth*, 654 F.3d at 947. Neither sign is present here. The Settlement Agreement leaves attorneys'

22  fees and service awards entirely to the discretion of the Court, to be deducted from the common

23  fund. Agmt. ¶ 16. And after deduction of Court-determined attorneys' fees, expenses, and service

24  awards, all funds will go to *cy pres* recipients, and none to Google. Agmt. ¶¶ 24, 53.

25         Here, the settlement was reached only after years of litigation, intensive jurisdictional

26  discovery, and hard-fought settlement negotiations spanning five months. The parties' agreement in

27  principle was reached in a mediation, with full briefing, before an experienced, respected mediator.

28  Joint Decl. ¶ 20. Though not dispositive, that fact weighs "in favor of a finding of non-

collusiveness." *Bluetooth*, 654 F.3d at 935. More importantly, the result was achieved by adequately-informed expert litigators whose incentives were aligned with the interests of the class to seek as large a recovery as possible under the circumstances. That the recovery cannot be directed as a monetary benefit to individual Class Members is not a sign of a collusive deal between counsel and the Defendant; rather, it reflects a serious risk of the case—the difficulty of matching intercepted communications to particular, identifiable Class Members—that both justifies a *cy pres* award and militates toward a finding of fairness. The settlement here was not only made at arms' length, it represents a good deal for the class under the circumstances. More on this below.

### (3)   Rule 23(e)(2)(C): The Relief Provided by the Settlements Represents a Strong Recovery, Taking into Account the Costs, Risks, and Delay of Trial and Appeal

Rule 23(e)(2)(C) asks the court to consider whether "the relief provided for the class is adequate," taking into account four enumerated factors.

#### a)      *Costs, Risks, and Delay of Trial and Appeal*

The first factor—"the costs, risks, and delay of trial and appeal"—mirrors the Ninth Circuit's prior consideration of the risk, expense, complexity, and likely duration of further litigation, while also examining the strength of plaintiffs' case, the risk of maintaining class action status throughout the trial, and the amount offered in settlement. *See Bluetooth*, 654 F.3d at 946 (listing factors).

The *cy pres* settlement provides a strong recovery for the class in light of these factors. Although Plaintiffs' case had many strengths—among them the large number of potential Class Members, a body of uncontested facts concerning Google's conduct, and the possibility of statutory damages after a successful trial—continuing the case also presented very considerable risks, even beyond the inherent unpredictability of class action and trial practice.

First, key legal and legal-factual questions remain in dispute concerning whether Google's conduct violated the ECPA. These include whether Google "intentionally" "intercept[ed]" the "contents" of Plaintiffs' electronic communications within the meaning of the Act, with potential disputes between the parties over the proper interpretation of each term; and, separately, whether payload data transmitted over unencrypted wireless networks is "readily accessible to the general public" because no special effort has been made to encrypt the network's transmissions. *See* 18

17

1  U.S.C. §§ 2510(4), 2511(1)(a), (g). Google could also argue that some portion of the intercepted

2  communications were directed at Google servers, and that it is exempt from liability for that portion

3  under § 2511(2)(d), which exempts from liability "a party to the communication" or those to whom

4  "one of the parties to the communication has given prior consent to such interception." Though

5  Plaintiffs believe they would prevail on each of these questions, serious legal questions such as these

6  present substantial risk. Even reaching these questions would entail substantial additional time and

7  expense, weighing in favor of the settlement.

8      Second, this Court has interpreted the ECPA to limit the Court's discretion to a choice

9  between awarding damages in the full statutory amount of $10,000 (per Class Member) or awarding

10  no statutory damages at all. *See Campbell v. Facebook, Inc.*, 315 F.R.D. 250, 268 (N.D. Cal. 2016)

11  (quoting *DirecTV, Inc. v. Huynh*, 2005 WL 5864467, at *6 (N.D. Cal. May 31, 2005). This binary

12  all-or-nothing choice is committed to the Court's discretion, and dramatically exacerbates the risk of

13  further litigation. The Court might view statutory damages as excessive for most Class Members and

14  decide to award statutory damages only to Class Members experiencing the most egregious

15  intrusions, or to no Class Members at all. If the case were to proceed, it is possible that Class

16  Members could succeed on the merits of the case and still receive no monetary relief whatsoever.

17      Third, any further litigation would likely add years to a litigation that has already proceeded

18  for nearly a decade, for uncertain gains. This is a litigation risk for Class Members, whose ability to

19  establish a claim could depend on rapidly-dwindling sources of data and long-obsolete computer

20  hardware, such as individual Wi-Fi router information from (in some cases) more than a decade

21  past—an eternity in computer hardware lifespans. It is also a fundamental detriment to the class, in

22  that, all else equal, earlier certain relief is preferable to uncertain future relief. Thus, the settlement

23  balances potential recovery for the class against the substantial costs, risks, and delay of trial and

24  appeal, and the $13 million *cy pres* fund represents a substantial benefit to the class.

25          b)      ***Effectiveness of Distribution***

26      Rule 23(e)(2)(C) also instructs the Court to consider the "effectiveness of any proposed

27  method of distributing relief to the class, including the method of processing class-member claims."

28  The proposed *cy pres* awards are the most effective means of providing benefit to the class.

18

Absent an effective and efficient means of identifying Class Members, the settlement fund is "non-distributable," and courts have consistently held that *cy pres*-only settlements provide the next-best means of providing relief to the class. *See, e.g.*, *Lane*, 696 F.3d at 819-822 (approving *cy pres*-only settlement in privacy class action against Facebook); *Google Referrer*, 869 F.3d at 741; *In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d at 320-21, 328 (approving *cy pres*-only settlement in 23(b)(2) class action involving alleged privacy violation); *In re Netflix Privacy Litig.*, 2013 U.S. Dist. LEXIS 37286, at *20 (N.D. Cal. Mar. 18, 2013) (*cy pres*-only settlement approved where given "sheer size" of class, settlement amount would "be nullified by distribution costs"); *In re Google Buzz Privacy Litig.*, 2011 WL 7460099, at *4 (N.D. Cal. June 2, 2011) (*cy pres*-only settlement approved); Am. Law Inst., Principles of the Law of Aggregate Litig. (2010) § 3.07(c) ("ALI") ("If the court finds that individual distributions are not viable . . . the settlement may utilize a cy pres approach."). Indeed, this accords with the view expressed by multiple courts of appeal that "*cy pres* distributions are most appropriate where further individual distributions are economically infeasible." *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013); *accord Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468, 475 & n.15 (5th Cir. 2011); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 33-34 (1st Cir. 2009); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007); *Powell v. Georgia-Pacific Corp.*, 119 F.3d 703, 706 (8th Cir. 1997); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 345 (7th Cir. 1997); *New York v. Reebok Int'l Ltd.*, 96 F.3d 44, 49 (2d Cir. 1996).[12]

That is the situation here. While the size of the potential class here is massive, the identities of those absent members are completely unknown to the parties. The only way to identify prospective Class Members would involve combing through nearly 300 million frames of collected payload data and trying to associate it with individual Class Members. Generally, the only ready

---

[12] Indeed, the Supreme Court has recognized that the cy pres solution reflects "[t]he essence of equity jurisdiction": "the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case," *United States v. Noland*, 517 U.S. 535, 540 (1996) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944))—especially relevant because Rule 23 too "stems from equity practice," *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *accord Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832- 33 (1999) (describing Rule 23's equitable "roots").

19

means of associating such data with Class Members is through the MAC address of the router or other device in question (usually printed on the device).  Indeed, the parties' experience with the Special Master process used to conduct jurisdictional discovery for the Named Plaintiffs demonstrates just how complex, expensive, and time-consuming it could be to search the Street View database to identify Class Members eligible for possible direct distributions. As this Court recognized, that process was the search for "a needle in the haystack." Dkt. 121 at 1. Applying that search to a class of millions would be a daunting and expensive prospect.

Any attempt to provide payments to individual Class Members would first require an elaborate and expensive verification inquiry, whereby potential Class Members would have to provide information such as their personal email addresses and wireless network identifiers (MAC addresses and SSIDs) in use between 2007-2010. No doubt, many Class Members have long since discarded the relevant equipment, which would leave them unfairly shut out from sharing in the settlement proceeds. After that, for any prospective Class Members that could come forward with the necessary equipment, a claims administrator would need to conduct searches into the Street View Data in an effort to find scraps of possible payload data and to determine their legal and factual significance. At best, this process would leave only *de minimis* distributions to the small percentage of Class Members who could and would provide the necessary identifying information, which would serve only to arbitrarily and minimally reward the few Class Members who happen to have retained outdated computer equipment. See *Lane*, 696 F.3d at 821 (affirming *cy pres* only settlement where "direct monetary payments . . . would be *de minimis*").

In these circumstances, as in the cases discussed above, *cy pres* is the best way to ensure that the class as a whole benefits from the settlement and that the goals of the litigation are met. Rather than spending the bulk of the Settlement Fund to identify absent Class Members and administer claims that at best would benefit a tiny fraction of the class, the *cy pres* mechanism uses as much of the fund as possible to benefit the entire class by funding Internet privacy watchdogs and educators.

The *cy pres* fund also better serves the deterrent *and* compensatory functions of class action litigation. *See Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1306 (9th Cir. 1990)

20

("[W]here the statutory objectives include enforcement, deterrence or disgorgement, the class action may be the 'superior' and only viable method to achieve these objectives, even despite the prospect of unclaimed funds."); *cf.* 18 U.S.C. § 2511(c) (providing for disgorgement remedy). Here, Class Members did not generally suffer economic damages, and none were sought in this class action; rather, the ECPA's statutory damages seek to compensate Class Members for an intangible invasion of their right to privacy and deter such invasions with a monetary penalty. A *cy pres* settlement that directly funds privacy work will vindicate Class Members' privacy rights by educating and protecting the public, serving the compensation goal more effectively than a *de minimis* check; and will also deter future abuses by advancing good policy and holding wrongdoers to account. *See Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013) ("A foundation that receives $10,000 can use the money to do something to minimize violations of the [statute]; as a practical matter, class members each given $3.57 cannot."). The $13 million Google will pay, meanwhile, has the same deterrent value for would-be privacy intruders regardless of how it is distributed.

### c)   Terms of Proposed Attorney's Fees

A third factor to be considered under Rule 23(e)(2)(C) is "the terms of any proposed award of attorney's fees, including timing of payment." Here, while the Settlement Agreement does not contemplate a specific award of attorney's fees, it does provide that any Court-awarded fees will be paid from the Settlement Fund. Agmt. ¶ 16. As detailed in their Fee Motion, Plaintiffs have requested a total award of $3.25 million in attorneys' fees, 25 percent of the total recovery in this case (and the Ninth Circuit's presumptive benchmark, *see Hyundai*, 926 F.3d at 570). Plaintiffs propose no timing provisions of concern to the fairness analysis. *See* William B. Rubenstein, *4 Newberg on Class Actions* § 13:54 (5th ed. 2019 update) ("*Newberg*").

### d)   Agreements Under Rule 23(e)(3).

Rule 23(e)(2)(C)(iv) requires the Court to consider agreements that must be identified under Rule 23(e)(3). This provision is aimed at "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." *See* Fed. R. Civ. P. 23(e) 2003 Advisory Committee Notes.

21

Plaintiffs have entered into no such agreements.

**(4)  Rule 23(e)(2)(D): The Settlements Treat Class Members Equitably Relative to Each Other**

Finally, Rule 23(e)(2)(D) directs the Court to consider whether "the proposal treats class members equitably relative to each other." Here, the class consists of individuals who are similarly situated as to their claims, their potential recoveries, and the difficulties of establishing their membership in the class. Those similarly-situated Class Members each enjoy the benefit of identical injunctive relief and benefits conferred by *cy pres* recipients in furthering their mission to protect internet privacy. There are no conflicts of interest among the Class Members. *Cf. Newberg* § 13:56.

**(5)  The *Cy Pres* Awards Will Further the Underlying Interests of the Statute and of the Absent Class Members**

In addition to the ordinary requirements for approving a class settlement, the Ninth Circuit requires "*cy pres* awards to meet a 'nexus' requirement by being tethered to the objectives of the underlying statute and the interests of the silent class members." *Google Referrer*, 869 F.3d at 743. "[T]he court should not find the settlement fair, adequate, and reasonable unless the *cy pres* remedy 'accounts for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members.'" *Lane*, 696 F.3d at 819-20 (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011)). This analysis guards against "nascent dangers to the fairness of the distribution process," including a selection process that may "'answer to the whims and self interests of the parties, their counsel, and the court.'"[13] *Nachshin*, 663 F.3d at 1038-39.

The *cy pres* awards proposed here were intentionally designed to fit the nexus requirement. The Settlement Agreement requires that *cy pres* recipients be "independent organizations with a track record of addressing consumer privacy concerns" that "shall commit to use the funds to

---

[13] The Settlement Agreement guards against the prospect of self-interested awards not only by adhering to a tight nexus with the case, but also with procedural protections: under the terms of the Settlement Agreement, the groups must be "independent," and are selected by the Court from proposals made by Plaintiffs' counsel. Agmt. ¶¶ 11-12, 29-30. Google is given no veto on any proposed group. *Id.* ¶ 29. Google represents that all distributions are additional to its other charitable donations and exercises no control over any expenditure of cy pres funds. *Id.* ¶¶ 25, 31. Class members have been informed of potential *cy pres* recipients via the settlement website, and the parties have disclosed all potentially relevant connections with proposed recipients.

1    promote the protection of Internet privacy." Agmt. ¶¶ 29-30. This directly addresses the subject

2    matter of the lawsuit—intrusion by Google into consumers' electronic communications, in violation

3    of the ECPA. The *cy pres* proposals take three complementary approaches to promoting the

4    protection of Internet privacy—first, by educating consumers, and empowering them to protect

5    themselves from intrusive corporations (*see, e.g.*, Dkt. 166-1 Ex. I); second, by promoting law and

6    policy regimes that better protect consumer privacy (*see, e.g.*, Dkt. 166-1 Exs. B,C,H); and third, by

7    educating computer programmers and engineers to incorporate consumer privacy into their design

8    approaches, preventing future corporate abuses of consumer privacy. (*see, e.g.*, Dkt. 166-1 Ex. D).

9    These approaches are directly tied to the gravamen of the suit, the privacy-protective objectives of

10   the ECPA, and the interests of the Class Members whose communications were intercepted.

11   *Compare Google Referrer*, 869 F.3d at 743-44 (privacy groups meeting nexus requirement) *with*

12   *Nachshin*, 663 F.3d at 1039-41 (no nexus between suit alleging unlawful insertion of advertisements

13   into email and awards to local Legal Aid group, local Boys and Girls Clubs, and Federal Judicial

14   Center Foundation).

15         Each proposed *cy pres* recipient is an independent organization with a track record of

16   promoting consumer privacy. They range from specialist policy experts and privacy educators to

17   household names reaching millions. After distribution to named recipients, the remainder of the

18   settlement fund will be distributed through a non-profit professional grantmaking organization

19   targeted directly at Internet privacy. *See* Dkt. 166-1 Ex. G. Most have received privacy-related *cy*

20   *pres* funds in the past, and used them effectively. *See* Dkt. 166-1 Exs. C, E-J. The Court may be

21   confident that each proposed recipient will use *cy pres* funds to further the interests addressed by the

22   lawsuit and of the silent Class Members.

23         Some authority suggests the Court should not order a *cy pres* remedy "if the court or any

24   party has any significant prior relationship with the intended recipient that would raise substantial

25   questions about whether the selection of the recipient was made on the merits." *ALI* § 3.07 cmt. b;

26   *see Google Referrer*, 869 F.3d at 744 (discussing *ALI*). No such relationship exists. Both Plaintiffs'

27   and Defendant's counsel have litigated with proposed recipient ACLU or its affiliates on several

28   occasions, and Defendant's counsel has donated money to ACLU affiliates in the past *see* Dkt. 166-1

                                                   23

1   Ex. H, Dkt. 171 ¶ 5; Google has previous donative relationships with four proposed recipients. Dkt.

2   171 ¶¶ 6-8. None of these relationships rises to the level of "significant prior relationship." First,

3   Plaintiffs' counsel alone selected the proposed recipients and made no changes on Google's behalf.

4   Joint Decl. ¶ 24. *Compare Google Referrer*, 869 F.3d at 744-45 (approving recipients in spite of a

5   requirement for Defendant's approval). Second, "[g]iven the burgeoning importance of Internet

6   privacy, it is no surprise that Google has chosen to support the programs and research of recognized

7   academic institutes and nonprofit organizations. . . . These earlier donations do not undermine the

8   selection process." *Id.* at 745. Third, the ACLU is a broad civil liberties organization with a

9   longstanding litigation practice; its presence in courts is ubiquitous, and counsel's relationships with

10  it are unremarkable. Indeed, it is ACLU's work pursuing privacy through the courts that qualifies it

11  for an award. *See* Dkt. 166-1 Ex. H. "Most importantly, there was transparency in this process, with

12  the proposed recipients disclosing" their relationships and notice provided to the class. *Id.*

13         The Court should find that the proposed *cy pres* awards have an appropriate nexus with the

14  case, the ECPA, and the silent Class Members and approve the settlement.

15             **(6)      The Reaction of Class Members to the Proposed Settlement Favors Final
                         Approval**

16

17         In addition to the enumerated fairness factors of Rule 23(e)(2), Ninth Circuit courts typically

18  consider "the reaction of the class members [to] the proposed settlement." *See Bluetooth*, 654 F.3d at

19  946; *see also Greer v. Dick's Sporting Goods, Inc.*, 2019 WL 4034478, at *2 (E.D. Cal. Aug. 27,

20  2019) (noting that 2018 rule amendments were not intended to displace traditional considerations).

21  Here, following an extensive notice program consisting of hundreds of millions of individual

22  advertising impressions, as of filing only one potential class member has excluded them self and

23  none have objected. Young Decl. ¶¶ 11-12. This reaction strongly favors approval of the settlement.

24         **D.      Plaintiffs Have Provided Adequate Notice Under Rule 23(b)(3)**

25         Class actions brought under Rule 23(b)(3) must satisfy the notice provisions of Rule 23(c)(2),

26  and upon settlement, "[t]he court must direct notice in a reasonable manner to all class members who

27  would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). Rule 23(c)(2) prescribes the "best

28  notice that is practicable under the circumstances, including individual notice to all members who

can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Recent amendments emphasize that "notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." *Id.* "To satisfy Rule 23(e)(1), settlement notices must 'present information about a proposed settlement neutrally, simply, and understandably.'" *Hyundai*, 926 F.3d at 567 (quoting *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009)). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Id.* (citation omitted).

The notice campaign approved by the Court in its preliminary approval order has been successful. A.B. Data, the Court-appointed settlement notice administrator, presented more than 560 *million* ad impressions to potential Class Members. Young Decl. ¶ 5. The advertisements directed potential Class Members to a settlement website that presented key information about the case and links to key documents. *Id.* ¶ 6. A.B. Data also disseminated a news release in English and Spanish to more than 10,000 newsrooms. *Id.* ¶ 8. The notice program generated 122,954 unique hits on the settlement website, and 53 inquiries via phone and email. *Id.* ¶ 10. In her attached declaration, the experienced notice administrator attests that the notice program has reached an estimated 70% of Class Members. *Id.* ¶ 14. In sum, the administrator attests that the notice program complies with requirements of Rule 23 of the Federal Rules of Civil Procedure. *Id.*

The content of the notice also satisfies the Rule 23 requirements, discussed in *Hyundai*. Neutral, simple, and understandable, the notice informed Class Members of the nature of the action, the terms of the proposed settlements, the proposed *cy pres* recipients, the effect of the action and the release of claims, and Class Members' right to exclude themselves and their right to object to the proposed settlement. The notice program complied with all the requirements of Rule 23.

### E.   Defendant Has Provided Notice Under the Class Action Fairness Act

Notice under the Class Action Fairness Act was sent to state and federal officials on November 19, 2019. Young Decl. ¶ 9; *see* 28 U.S.C. § 1715(d). No Attorneys General have submitted statements of interest or objections in response to these notices.

## IV.   <u>CONCLUSION</u>

The Court should certify the Settlement Class and approve the proposed settlement.

Dated: November 25, 2019

Respectfully submitted,

By: _____/s/ Daniel A. Small_____
                Daniel A. Small

COHEN MILSTEIN SELLERS & TOLL
Daniel A. Small
Robert W. Cobbs
1100 New York Avenue NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com
rcobbs@cohenmilstein.com

SPECTOR ROSEMAN & KODROFF PC
Jeffrey L. Kodroff
John A. Macoretta
Mary Ann Geppert
2001 Market Street
Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
Email: jkodroff@srkattorneys.com
jmacoretta@srkattorneys.com
mgeppert@srkattorneys.com

*Interim Class and Co-Lead Counsel*

Elizabeth J. Cabraser (State Bar No. 083151)
Michael W. Sobol (State Bar No. 194857)
Melissa Gardner (State Bar No. 289096)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
ecabraser@lchb.com
msobol@lchb.com
mgardner@lchb.com

*Interim Class and Liaison Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

Dated: November 25, 2019                    Respectfully submitted,

By:_____ /s/ *Daniel A. Small*_____
                        Daniel A. Small

COHEN MILSTEIN SELLERS & TOLL
1100 New York Avenue NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com