Theodore H. Frank (SBN 196332)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

*Attorneys for Objector David Lowery*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GOOGLE LLC STREET VIEW ELECTRONIC COMMUNICATIONS LITIGATION | Case No. 3:10-md-02184-CRB |
| | **OBJECTION OF DAVID LOWERY** |
| DAVID LOWERY, | Time:       10:00 A.M. |
| Objector. | Date:       February 28, 2020 |
| | Judge:      Hon. Charles R. Breyer |
| | Courtroom:  6, 17th Floor |

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................i

TABLE OF AUTHORITIES ............................................................................................ii

INTRODUCTION ............................................................................................................1

I.   Objector Lowery is a member of the settlement class.............................................2

II.  The district court has a fiduciary duty to the unnamed class members and there is no presumption in favor of settlement approval......................................................2

III. The settlement improperly favors third-party charities over class members through its *cy pres* provision. ...............................................................................4

    A.   The settlement resorts to *cy pres* prematurely...............................................7

    B.   Without class members' affirmative election, *cy pres* constitutes compelled speech in violation of the First Amendment............................. 12

    C.   The Court must consider the pre-existing relationships between the *cy pres* recipients, class counsel and the defendant. ...................................... 14

        1.   *Cy pres* beneficiaries should not have a preexisting relationship with class counsel.......................................................................................... 15

        2.   Pre-existing relationships between the defendant and the *cy pres* recipients undermine the theoretical value of the settlement.......................... 16

IV.  In the alternative, if there is no practicable way to afford relief to individual class members, then the putative class cannot be certified................................... 17

    A.   Representatives who propose a plenary class release in exchange for a zero-recovery settlement are not adequately representing the class.................... 17

    B.   If distributions to individual class members are impracticable, then a class action is not superior to other available methods of adjudicating the controversy............................... 19

    C.   If it is impracticable or impossible to ascertain whether individuals are members of the putative class, class certification should be denied........................... 20

V.   If the Court approves the certification and settlement, it should decline to grant the $4 million attorneys' award request................................................... 22

    A.   *Cy pres* is not a direct benefit to the class, and the appropriate attorney-fee award is zero. ................................................................................... 22

    B.   In any event, an above-benchmark attorney request of 30% is excessive. ............................. 22

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Allen v. Bedolla,*
  787 F.3d 1218 (9th Cir. 2015) ...................................................................3

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997)...............................................................13, 18, 21

*In re Anthem Inc. Data Breach Litig.,*
  2018 U.S. Dist. LEXIS 140137, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ...............23

*In re Apple Iphone/Ipod Warranty Litig.,*
  40 F. Supp. 3d 1176 (N.D. Cal. 2014).......................................................23

*In re Asbestos Sch. Litig.,*
  46 F.3d 1284 (3d Cir. 1994) ...............................................................13

*In re Baby Prods. Antitrust Litig..,*
  708 F.3d 163 (3d Cir. 2013) ...................................................5, 10, 22, 24, 25

*In re BankAmerica Corp. Secs. Litig.,*
  775 F.3d 1060 (8th Cir. 2015) ...............................................................4, 9, 10

*Bateman v. Am. Multi-Cinema, Inc.,*
  623 F.3d 708 (9th Cir. 2010)................................................................20

*In re Bluetooth Headset Prod. Liab. Litig.,*
  654 F.3d 935 (9th Cir. 2011)...............................................................3, 22, 23, 24

*Brecher v. Republic of Argentina,*
  806 F.3d 22 (2d Cir. 2015) ...............................................................21-22

*Briseno v. ConAgra Foods, Inc.,*
  844 F.3d 1121 (9th Cir. 2017) ...............................................................21

*Broussard v. Meineke Disc. Muffler Shops,*
  155 F.3d 331 (4th Cir. 1998)................................................................17

*Brown v. Wells Fargo & Co.,*
  No. 11-1362 (JRT/JJG), 2013 U.S. Dist. LEXIS 181262 (D. Minn. Dec. 30, 2013).....................20

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ...............................................................13

*Cahill v. PSC,*
  556 N.E.2d 133 (N.Y. 1990)................................................................13

*Carrera v. Bayer Corp.,*
  727 F.3d 300 (3d Cir. 2013) ...............................................................21

*In re Carrier iQ, Inc., Consumer Privacy Litig.,*
  2016 WL 4474366, 2016 U.S. Dist. LEXIS 114235 (N.D. Cal. Aug. 25, 2016) ...............8

*Churchill Vill., L.L.C. v. Gen. Elec. Co.*,
   361 F.3d 566 (9th Cir. 2004) ........................................................................................3

*Daniels v. Aeropostale West*,
   No. C 12-05755 WHA, 2014 U.S. Dist. LEXIS 74081 (N.D. Cal. May 29, 2014) ................. 18, 20

*Davis v. East Baton Rouge Parish Sch. Bd.*,
   78 F.3d 920 (5th Cir. 1996) .......................................................................................13

*Dennis v. Kellogg Co.*,
   697 F.3d 858 (9th Cir. 2012) .......................................... 3, 4, 5, 14, 15, 16, 17, 23

*In re Dry Max Pampers*,
   724 F.3d 713 (6th Cir. 2013) ................................................................. 3-4, 11, 18

*Dugan v. Lloyds Tsb Bank*,
   2013 WL 1703375, 2013 U.S. Dist. LEXIS 56617 (N.D. Cal. Apr. 19, 2013) ...................5

*Fishman v. Tiger Nat. Gas Inc.*,
   2019 WL 2548665 (N.D. Cal. Jun. 20, 2019) ........................................................23

*Fraley v. Facebook, Inc.*,
   966 F. Supp. 2d. 939 (N.D. Cal. 2013) ....................................................... 7, 8, 10

*Fraley v. Facebook*,
   No. C 11-1726 RS, 2012 U.S. Dist. LEXIS 116526 (N.D. Cal. Aug. 17, 2012) ........... 6, 7

*Frank v. Gaos*,
   139 S. Ct. 1041 (2019) ........................................................... 5, 18, 19, 20, 25

*In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
   55 F.3d 768 (3d. Cir. 1995) ........................................................................................4

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
   934 F.3d 316 (3d Cir. 2019) ................................................. 1, 6, 14, 15, 16

*In re Google Referrer Header Litigation*,
   869 F.3d 737 (9th Cir. 2017),
   *vacated sub nom. Frank v. Gaos*, 139 S. Ct. 1041 (2019) ........................... 7, 14, 19

*Graff v. United Collection Bureau, Inc.*,
   132 F. Supp. 3d 470 (E.D.N.Y. 2016) ................................................................ 5-6

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ....................................................................................4

*Harris v. Quinn*,
   573 U.S. 616 (2014) ......................................................................................... 12. 13

*Hawthorne v. Umpqua Bank*,
   2015 WL 1927342 (N.D. Cal. Apr. 28, 2015) ........................................................23

*In re Heartland Payment Sys., Inc.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) ................................................................24

*In re Hotel Tel. Charges*,
    500 F.2d 86 (9th Cir. 1974) ................................................................................................ 19

*In re HP Inkjet Printer Litig.*,
    716 F.3d 1173 (9th Cir. 2013) ......................................................................................... 3, 23

*In re Hydroxycut Mktg. and Sales Practices Litig.*,
    No. 09-md-2087 BTM (KSC), 2013 U.S. Dist. LEXIS 165225 (S.D. Cal. Nov. 19, 2013) .......... 17

*Jackson v. Phillips*,
    96 Mass. 539 (1867) ........................................................................................................ 4

*Janus v. AFSCME, Council 31*,
    138 S. Ct. 2448 (2018) ........................................................................................ 12, 13, 14

*Kamm v. California City Development Co.*,
    509 F.2d 205 (9th Cir. 1975) ........................................................................................... 20

*Keirsey v. eBay, Inc.*,
    2014 WL 644738 (N.D. Cal. Feb. 18, 2014) ..................................................................... 23

*Keller v. State Bar of California*,
    496 U.S. 1 (1990) ....................................................................................................... 12, 13

*Klier v. Elf Atochem N. Am., Inc.*,
    658 F.3d 468 (5th Cir. 2011) .......................................................................... 4, 7, 11, 13

*Kline v. Coldwell, Banker & Co.*,
    508 F.2d 226 (9th Cir. 1974) ........................................................................................... 20

*Knapp v. Art.com*,
    283 F. Supp. 3d 823 (N.D. Cal. 2017); ............................................................................ 15

*Knox v. Service Employees Int'l Union, Local 1000*,
    567 U.S. 298 (2012) ......................................................................................................... 12

*Koby v. ARS Nat'l Servs.*,
    846 F.3d 1071 (9th Cir. 2017) ...................................................................... 4, 5, 11, 17, 18

*Lagarde v. Support.com, Inc.*,
    No. 12-0609 JSC, 2013 U.S. Dist. LEXIS 67875 (N.D. Cal. May 13, 2013) ......................... 8

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ................................................................................... 1, 6, 11

*In re Lithium Ion Batteries Antitrust Litig.*,
    2019 WL 3856413, 2019 U.S. Dist. LEXIS 139327 (N.D. Cal. Aug. 16, 2019) .................. 25

*In re Livingsocial Mktg. and Sales Practices Litig.*,
    298 F.R.D. 1 (D.D.C. 2013) .......................................................................................... 8, 24

*Lobatz v. U.S. West Cellular of Cal., Inc.*,
    222 F.3d 1142 (9th Cir. 2000) ......................................................................................... 17

*Mandujano v. Basic Vegetable Prods., Inc.,*
    541 F.2d 832 (9th Cir. 1976) .................................................................................6

*Marek v. Lane,*
    571 U.S. 1003 (2013) ...........................................................................................4

*Mateo-Evangelio v. Triple J Produce, Inc.,*
    2017 WL 3669527, 2017 U.S. Dist. LEXIS 135580 (E.D.N.C. 2017) ...................15-16

*McDonough v. Toys "R" Us,*
    80 F. Supp. 3d 626 (E.D. Pa. 2015) .....................................................................10

*In re Mercury Interactive Corp. Sec. Litig.,*
    618 F.3d 988 (9th Cir. 2010) ...........................................................................3, 22

*In re Microsoft Corp. Antitrust Litig.,*
    185 F. Supp. 2d 519 (D. Md. 2002) ......................................................................14

*Molski v. Gleich,*
    318 F.3d 937 (9th Cir. 2003) ...........................................................................5, 18

*Moore v. Verizon Comms., Inc.,*
    2014 WL 588035 (N.D. Cal. Feb. 13, 2014) ...........................................................23

*Morris v. Fid. Invs.,*
    2019 WL 4040069 (N.D. Cal. Aug. 26, 2019) ........................................................24

*Mullins v. Direct Digital, LLC,*
    795 F.3d 654 (7th Cir. 2015) ...............................................................................21

*Murray v. GMAC Mortg. Corp.,*
    434 F.3d 948 (7th Cir. 2006) ...............................................................................18

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1958) ............................................................................................12

*Nachshin v. AOL, LLC,*
    663 F.3d 1034 (9th Cir. 2011) ...........................................................4, 5, 14, 15

*Noel v. Thrifty Payless, Inc.,*
    445 P.3d 626 (Cal. 2019) .....................................................................................21

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) ...........................................................4, 7, 10, 22, 25

*Perkins v. LinkedIn Corp.,*
    No. 13-CV-04303-LHK, 2016 U.S. Dist. LEXIS 18649, (N.D. Cal. Feb. 16, 2016) ...........14

*Perry v. FleetBoston Fin. Corp.,*
    229 F.R.D. 105 (E.D. Pa. 2005) ...........................................................................24

*In re Pet Food Prods. Liab. Litig.,*
    629 F.3d 333 (3d Cir. 2010) .................................................................................9

*Pierce v. Visteon Corp.*,
   791 F.3d 782 (7th Cir. 2015)..................................................................................18

*Powers v. Eichen*,
   229 F.3d 1249 (9th Cir. 2000) .............................................................................23

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998) ............................................................................11-12

*Radcliffe v. Experian Info. Solutions*,
   715 F.3d 1157 (9th Cir. 2013) ........................................................................ 15, 18

*Redman v. RadioShack Corp.*,
   768 F.3d 622 (7th Cir. 2014)..................................................................................3

*Retta v. Millennium Prods.*,
   No. CV 15-1801 PSG, 2016 WL 6520138 (C.D. Cal. Sept. 21, 2016) .................4

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002)................................................................................17

*Roe v. Frito-Lay, Inc.*,
   2017 WL 1315626 (N.D. Cal. Apr. 7, 2017) .......................................................23

*Roes v. SFBSC Mgmt., LLC*,
   __F.3d__, 2019 U.S. App. LEXIS 36638 (9th Cir. Dec. 11, 2019) ................. 3, 4

*Rubio-Delgado v. Aerotek, Inc.*,
   2015 WL 1503436, 2015 U.S. Dist. LEXIS 43871 (N.D. Cal. Apr. 1, 2015) .....9

*SEC v. Bear, Stearns & Co. Inc.*,
   626 F. Supp. 2d 402 (S.D.N.Y. 2009)..................................................................14

*Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*,
   559 U.S. 393 (2010)...............................................................................................6

*Sonmore v. CheckRite Recovery Servs.*,
   206 F.R.D. 257 (D. Minn. 2001)..........................................................................20

*In re Sony VAIO Computer Notebook Trackpad Litig.*,
   No. 09-cv-2109 (S.D. Cal. Aug. 7, 2017) .............................................................8

*Spotswood v. Hertz Corp.*,
   2019 WL 498822, 2019 U.S. Dist. LEXIS 20536 (D. Md. Feb. 7, 2019)...........15

*Staton v. Boeing*,
   327 F.3d 938 (9th Cir. 2003)....................................................................3, 11, 12

*In re Subway Footlong Sandwich Mkt'g and Sales Practices Litig.*,
   869 F.3d 551 (7th Cir. 2017)................................................................................18

*Supler v. FKAACS, Inc.*,
   2012 U.S. Dist. LEXIS 159210 (E.D.N.C. Nov. 6, 2012) ...................................19

*In re TD Ameritrade Accountholder Litig.*,
   266 F.R.D. 418 (N.D. Cal. 2009) .................................................................................24

*Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship.*,
   874 F.3d 692 (11th Cir. 2017) ...................................................................................18

*In re Thornburg Mortg., Inc. Secs. Litig.*,
   885 F. Supp. 2d 1097 (D.N.M. 2012)........................................................................11

*In re Transpacific Passenger Air Transportation Antitrust Litig.*,
   2015 U.S. Dist. Lexis 67904 (N.D. Cal. May. 26, 2015) .........................................24

*Tyson Foods Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) .................................................................................................6

*In re Uber FCRA Litig.*,
   2018 WL 2047362 (N.D. Cal. May 2, 2018).............................................................23

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001).....................................................................................................12

*Wash. Legal Found. v. Mass. Bar Found.*,
   993 F.2d 962 (1st Cir. 1993), *superseded on other grounds sub nom. Phillips v. Washington Legal
   Foundation*, 524 U.S. 156 (1998) ..............................................................................13

*Weeks v. Kellogg Co.*,
   No. CV 09-08102 (MMM) (RZx), 2011 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23,
   2011).............................................................................................................................24

*Weinberger v. Great N. Nekoosa Corp.*,
   925 F.2d 518 (1st Cir. 1991) ......................................................................................18

*Wooley v. Maynard*,
   430 U.S. 705 (1977).....................................................................................................12

*Zapeda v. Paypal*,
   No. C 10-2500 SBA, 2014 U.S. Dist LEXIS 24388 (N.D. Cal. Feb. 24, 2014) ........... 6, 7-8, 10, 23

*Zimmerman v. Zwicker & Assocs., P.C.*,
   2011 WL 65912, 2011 U.S. Dist. LEXIS 2161 (D.N.J. Jan. 10, 2011) ........................................6

## Rules and Statutes

18 U.S.C. § 2520(c)(2)(B) ...............................................................................................19

Fed. R. Civ. P. 23 ...............................................................................................9, 13, 21

Fed. R. Civ. P. 23(a)(4) ...........................................................................................17, 18, 19

Fed. R. Civ. P. 23(b)(3) ............................................................................................. 19, 20

Fed. R. Civ. P. 23(g)(4) ...........................................................................................16, 17, 19

Fed. R. Civ. P. 23(h) .............................................................................................2, 23, 25

U.S. Const., Am. I ................................................................................................... 12-14

U.S. Const., Art. III ...................................................................................................... 6, 8

**Other Authorities**

Advisory Committee Notes on 2003 Amendments to Rule 23 ......................................... 22

American Law Institute, *Principles of the Law of Aggregate Litig.* § 1.05 (2010) .......................... 17

American Law Institute, *Principles of the Law of Aggregate Litig.* § 3.07 (2010) ............................. 7, 13, 14

Declaration of Brian R. Strange in Support of Class Plaintiffs' Response to Objection of
    Theodore H. Frank, *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, No. 12-md-
    2358, Dkt. 172-2 at 3 (D. Del. Jan. 4, 2017) .......................................................... 16

Declaration of Deborah McComb re Settlement Claims,
    *Poertner v. The Gillette Co.*, No. 6:12-v-00803-GAP-DAB (S.D. Fla.) ............................... 8

Department of Homeland Security, *Security Tip (ST05-003): Securing Wireless Networks*,
    https://www.us-cert.gov/ncas/tips/ST05-003 (last visited Jan. 10, 2020) .................................. 11

Estes, Andrea,
    *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE (Dec. 17, 2017) ............................. 2

Federal Trade Commission, *Securing Your Wireless Network*,
    https://www.consumer.ftc.gov/articles/0013-securing-your-wireless-network (last visited
    Jan. 10, 2010) .......................................................................................................... 11

Frank, Theodore H.,
    Statement before the House Judiciary Committee Subcommittee on the Constitution and
    Civil Justice, *Examination of Litigation Abuse* (Mar. 13, 2013) .................................................... 5

Jefferson, Thomas,
    *A Bill for Establishing Religious Freedom, in* 2 PAPERS OF THOMAS JEFFERSON 545 (J. Boyd
    ed., 1950) .......................................................................................................... 12

Leslie, Christopher R.,
    *The Significance of Silence: Collective Action Problems and Class Action Settlements*,
    59 FLA. L. REV. 71 (2007) .......................................................................................... 13

Levie, Shay,
    *Reverse Sampling: Holding Lotteries to Allocate the Proceeds of Small-Claims Class Actions*,
    79 GEO. WASH. L. REV. 1065 (2011) ............................................................................. 10

Liptak, Adam, *Doling out Other People's Money*, N.Y. TIMES, Nov. 26, 2007 ............................................. 15

Moth, David, *56% of Businesses Rely Exclusively on Google for Web Analytics: Report*, Econsultancy
    (July 9, 2013), https://econsultancy.com/blog/63026-56-of-businesses-rely-exclusively-
    on-google-for-web-analytics-report#i.8z845218jtfb9t ....................................................................

Parloff, Roger,
    *Google and Facebook's new tactic in the tech wars*, FORTUNE (Jul. 30, 2012) ...................................... 14, 16

Redish, Martin H., Peter Julian, & Samantha Zyontz,
  *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*,
  62 FLA. L. REV. 617 (2010) ............................................................................................... 5, 11, 14-15

Silver, Charles,
  *Due Process and The Lodestar Method: You Can't Get There From Here*,
  74 TUL. L. REV. 1809 (2000) ............................................................................................... 23

Tidmarsh, Jay,
  *Cy Pres and the Optimal Class Action*, 82 GEO. WASH. L. REV. 767 (2013) ............................................. 6

Wasserman, Rhonda,
  *Cy Pres in Class Action Settlements*, 88 U.S.C. L. REV. 97 (2014) ............................................. 24

# INTRODUCTION

Whether from the "vista view" or the Google Street View, "this case is not pretty." *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 331 (3d Cir. 2019) ("*Google Cookie*"). Plaintiffs filed complaints in this case alleging statutory and punitive damages for privacy violations, liabilities that would amount to billions of dollars, and then settled the case for $13 million, of which the class members will not see one penny. Instead, the entire net settlement fund will go to third-party "*cy pres*" recipients, even though it would be practicable to allow class members to recover through a claims-made process after making the same averments that the named plaintiffs made and now rely on. Moreover, several of the proposed *cy pres* recipients have prior relationship with class counsel or defendants. Preexisting relationships with the defendant undermine the value of the settlement to the class. Preexisting relationships with class counsel qualify as improper conflicts of interest. Even more fundamentally, *cy pres* without the affirmative consent of class members constitutes compelled speech in contravention of the First Amendment. These defects render the settlement substantively unfair.

*Lane v. Facebook* does not require settlement approval. In *Lane*, objectors never contended that distribution to the class was feasible. Lowery does. As the Theodore H. Frank declaration demonstrates, distribution to some class members is feasible in this case; distribution regularly occurs in settlements with millions of unknown unnamed class members and a settlement fund of less than a dollar per class member through a claims process. Class counsel owes a fiduciary duty to the absent class members to put their interests ahead of third-party charities. And when courts create the incentives for class counsel to put their clients first, attorneys respond. In cases where Lowery's counsel has objected to *cy pres*, class members have received tens of millions of dollars more that class counsel previously claimed was infeasible to distribute.

Moreover, it is either inequitable or inefficient for class members' money to go instead to wealthy charities. Money is fungible. If the program purportedly funded by the *cy pres* in this case was worthwhile, an MIT—with an endowment of $17.4 billion, more than is owned by virtually every (and perhaps every) class member—would fund itself, and the *cy pres* money will simply be diverted to other programs or MIT's already-full pockets. And if MIT was not going to engage in the program in the absence of the *cy pres* award's artificial requirements, then it is simply a misallocation of resources. Similarly, Georgetown has an endowment of over a billion dollars; the ACLU's two-year *profits* from April 1, 2016 to March 31, 2018 were over $124 million.

OBJECTION OF DAVID LOWERY

Beyond the settlement's fairness, class certification may be untenable. If in fact distributions to class members are impossible, then either a class action is not superior to other methods of adjudicating the dispute, the class's representation is not adequate, or the class definition is not sufficiently ascertainable.

Finally, in the alternative, if the Court overrules all the above objections, the Rule 23(h) request is excessive and should be reduced.

## I.     Objector Lowery is a member of the settlement class.

Objector David Lowery, during the class period, owned and used multiple unencrypted wireless networks. *See* Declaration of David Lowery, ¶ 3 (attached). On information and belief, Google acquired his payload data from those networks. *Id.* Lowery is not within any of the classes of persons excluded from the settlement. *Id.* ¶ 4. He is therefore a class member. His full name is David Charles Lowery, his current address and email address is documented in his declaration. *Id.* ¶ 2.

Hamilton Lincoln Law Institute's Center for Class Action Fairness ("CCAF") represents Lowery *pro bono*, and CCAF attorney Theodore H. Frank intends to appear at the fairness hearing on his behalf. CCAF represents class members *pro bono* where class counsel employs unfair procedures, including the misuse of *cy pres*, to benefit themselves at the expense of the class. *See generally* Declaration of Theodore H. Frank ¶¶ 14-17. Since it was founded in 2009, CCAF has recouped more than $200 million for class members by driving settling parties to reach an improved bargain or by reducing outsized fee awards. *See* Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE (Dec. 17, 2017) (more than $100 million at time); Frank Decl ¶ 17. Lowery brings this objection through CCAF in good faith to protect the interests of the class. Lowery Decl. ¶ 7. His objection applies to the entire class; he adopts any objections not inconsistent with this one.

## II.    The district court has a fiduciary duty to the unnamed class members and there is no presumption in favor of settlement approval.

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval." *Pampers*, 724 F.3d at 715. Unlike ordinary settlements, "class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition

are not present during the negotiations." *Id.* "[T]hus, there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Id.*

To guard against this danger, a district court must act as a "fiduciary for the class . . . with a jealous regard" for the rights and interests of absent class members. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (cleaned up). It "must remain alert to the possibility that some class counsel may urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *In re HP Inkjet Printer Litig.* ("*Inkjet*"), 716 F.3d 1173, 1178 (9th Cir. 2013) (cleaned up). And it must not "assume the passive role" that is appropriate for an unopposed motion in ordinary bilateral litigation. *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). In particular, settlement value "must be examined with great care to eliminate the possibility that it serves only the 'self-interests' of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious." *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012). It is error to exalt fictions over "economic reality." *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015).

"Where the parties negotiate a settlement agreement before the class has been certified, settlement approval requires a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Roes v. SFBSC Mgmt., LLC*, __F.3d__, 2019 U.S. App. LEXIS 36638, at *28 (9th Cir. Dec. 11, 2019) (cleaned up); *accord Dennis*, 697 F.3d at 867  (*quoting Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003)). In such circumstances, consideration of the eight *Churchill Village*[1] factors "alone is not enough to survive appellate review." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ("*Bluetooth*"). "This more exacting review is warranted to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Roes*, 2019 U.S. App. LEXIS 36638, at *28 (internal quotations omitted).

It is "insufficient" that the settlement happened to be at "arm's length" without "secret cabals" or express collusion of the settling parties. *Id.* at *31 n.13 (internal quotation omitted). Because of the danger of conflicts of interest endemic to class action procedure, third parties must monitor the reasonableness of the settlement as well. *Bluetooth*, 654 F.3d at 948 (*quoting Staton*, 327 F.3d at 960). Courts "must be particularly

---

[1] *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests … to infect the negotiations." *In re Dry Max Pampers*, 724 F.3d 713, 718 (6th Cir. 2013) (quoting *Dennis*, 697 F.3d at 864).

There is no presumption in favor of settlement approval: the proponents of a settlement bear the burden of proving its fairness. *Roes*, 2019 U.S. App. LEXIS 36638, at *30 & n.12; *accord Koby v. ARS Nat'l Servs.*, 846 F.3d 1071, 1079 (9th Cir. 2017). Any such presumption would be "inconsistent with [the] probing inquiry" required in this Circuit. *Retta v. Millennium Prods.*, No. CV 15-1801 PSG, 2016 WL 6520138, at *4 (C.D. Cal. Sept. 21, 2016) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). "The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.* ("*GMC Pick-Up*"), 55 F.3d 768, 785 (3d. Cir. 1995) (internal quotation and alteration omitted).

## III.    The settlement improperly favors third-party charities over class members through its *cy pres* provision.

The legal construct of *cy pres* (from the French "*cy pres comme possible*"—"as near as possible") has its origins in trust law as a vehicle to realize the intent of a settlor whose trust cannot be implemented according to its literal terms. *Nachshin v. AOL*, 663 F.3d 1034, 1038 (9th Cir. 2011). A classic example of *cy pres* comes from a 19th-century case where a court repurposed a trust that had been created to abolish slavery in the United States to instead provide charity to poor African-Americans. *Jackson v. Phillips*, 96 Mass. 539 (1867). Imported to the class-action context, it has become an increasingly popular method of distributing settlement funds to non-class third parties—a "growing feature" that raises "fundamental concerns." *Marek v. Lane*, 571 U.S. 1003, 1006 (2013) (Roberts, C.J., respecting the denial of certiorari).

Non-compensatory *cy pres* distributions, disfavored among both courts and commentators alike, remain an inferior avenue of last resort. *See e.g.*, *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060 (8th Cir. 2015) ("*BankAmerica*") (many courts have "criticized and severely restricted" *cy pres*); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014) ("A *cy pres* award is supposed to be limited to money that can't feasibly be awarded to…the class members"); *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011) ("[The *cy pres*] option arises only if it is not possible to put those funds to their very best use: benefitting the class members directly."). Even the Ninth Circuit warns of the dangers of *cy pres*. *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th

Cir. 2012) (warning that *cy pres* settlements can easily become a "paper tiger"); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) ("the *cy pres* doctrine…poses many nascent dangers to the fairness of the distribution process"). Put simply, no class complaint includes a request for *cy pres* in its prayer for relief, it is "not a form of relief to the absent class members and should not be treated as such." *Frank v. Gaos*, 139 S. Ct. 1041, 1047 (2019) (Thomas, J., dissenting).

"*Cy pres* distributions also present a potential conflict of interest between class counsel and their clients because the inclusion of a *cy pres* distribution may increase a settlement fund, and with it attorneys' fees, without increasing the direct benefit to the class." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) ("*Baby Products*"). Commentators have observed these same defects. *See e.g.*, Martin H. Redish, Peter Julian, & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617 (2010); Theodore H. Frank, Statement before the House Judiciary Committee Subcommittee on the Constitution and Civil Justice, *Examination of Litigation Abuse* (Mar. 13, 2013), *available at* https://cei.org/sites/default/files/Testimony%20-%20Cy%20Pres.pdf.

*Ex ante cy pres* is defined as an award "that was designated as part of a settlement agreement…where: (1) an amount *and* at least one charity was named as a recipient of part of the fund from the outset and the charity's receipt of the award was not contingent on there being remaining/unclaimed funds in the settlement fund, or (2) the entire award was given to at least one charity with no attempt to compensate the absent class members." Redish et al., 62 FLA. L. REV. at 657 n.171. The relief here is a clear example of the latter. Settlement ¶24 provides that the entire net settlement fund will be disbursed to non-class member charities, with no payments to individual class members.[2]

As compared with *ex post cy pres*—third-party awards made only after class members fail to cash checks that are distributed—*ex ante cy pres* stands on even shakier footing. *See Koby*, 846 F.3d 1071 (rejecting all-*cy pres* settlement); *Molski v. Gleich*, 318 F.3d 937, 954-55 (9th Cir. 2003) (same); *Graff v. United Collection Bureau, Inc.*,

---

[2] Although it is perhaps the case that some stakeholders of the *cy pres* recipients are class members, there is no legitimate reason to favor those recipients in an uncertified subclass over other class members. *Dugan v. Lloyds Tsb Bank*, 2013 WL 1703375, 2013 U.S. Dist. LEXIS 56617, at *10 (N.D. Cal. Apr. 19, 2013) (adequate representatives may not "take positions that favor [one absent class member] to the detriment of other absent class members").

132 F. Supp. 3d 470, 485-486 (E.D.N.Y. 2016) (same); *Zepeda v. Paypal*, No. C 10-2500 SBA, 2014 U.S. Dist

LEXIS 24388, at *21 (N.D. Cal. Feb. 24, 2014) (same); *Fraley v. Facebook*, No. C 11-1726 RS, 2012 WL 5835366,

2012 U.S. Dist. LEXIS 116526, at *4-*7 (N.D. Cal. Aug. 17, 2012) ("*Fraley I*") (same); *Zimmerman v. Zwicker &*

*Assocs., P.C.*, 2011 WL 65912, 2011 U.S. Dist. LEXIS 2161 (D.N.J. Jan. 10, 2011) (same). "This form of *cy pres*

stands on the weakest ground because *cy pres* is no longer a last-resort solution for a problem of claims

administration. The concern for compensating victims is ignored (at least unless the indirect benefits of the *cy*

*pres* award flow primarily to the victims)." Jay Tidmarsh, *Cy Pres and the Optimal Class Action*, 82 GEO. WASH. L.

REV. 767, 770-71 (2013). Such settlements "whose only monetary distributions are to class counsel, class

representatives, and *cy pres* recipients, as in this case, present[] the risk of a still greater misalignment of

interests." *Google Cookie*, 934 F.3d at 327.

Preferring non-compensatory *cy pres* might be acceptable if the class were a free-floating entity, existing

only to permit class counsel to operate as a private attorney general. But Rule 23 is not a substantive bounty-

hunting provision; Rule 23 is a procedural joinder device that aggregates real individuals with real claims into

a class if certain prerequisites are satisfied. *Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*, 559 U.S. 393,

408 (2010) (class action is a "species" of joinder). Thus, the plaintiff-class itself as a legal entity "is not the

client. Rather, the class attorney continues to have responsibilities to each individual member of the class even

when negotiating a settlement." *Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 834-35 (9th Cir. 1976)

(cleaned up). Counsel's duty to their client works hand in glove with the proper role of the judiciary—namely,

"provid[ing] relief to claimants, in individual or class actions, who have suffered, or will imminently suffer,

actual harm." *Tyson Foods Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, J., concurring) (cleaned up).

By proposing an *ex ante cy pres* settlement, the settling parties have lost sight of the very underpinnings of

Article III.

*Lane v. Facebook*, the only extant Ninth Circuit precedent that plaintiffs proffer on the issue, is not to

the contrary. 696 F.3d 811 (9th Cir. 2012). The objectors in *Lane* "concede[d] that direct monetary payments

to the class of remaining settlement funds would be infeasible" and so the opinion operated from that premise

without reaching the question of whether *cy pres* could be offered instead of feasible class distribution. *Id.* at 821.

And Lowery contends that distribution is feasible in this case, which is no different than dozens of other class-

action settlements with millions of class members who are required to self-identify to claim settlement funds worth less than a dollar per class member.[3]

### A. The settlement resorts to *cy pres* prematurely.

*Cy pres* is improper when it is feasible to make distributions to class members, at least where there is no other compelling reason for preferring non-class members. This "last-resort rule" is a well-recognized principle of law. *See Pearson*, 772 F.3d at 784 (*cy pres* permissible "only if it's infeasible to provide that compensation to the victims"). §3.07(a) of the ALI *Principles of the Law of Aggregate Litigation* succinctly states the limitation: "If individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members." The last-resort rule follows from the precept that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier*, 658 F.3d at 474 (citing ALI Principles §3.07 cmt. (b)).

The relevant question then is whether it would be practicable to distribute the available $13 million settlement fund to self-identifying class members through a claims-made process. And the answer is indisputably yes. In *Fraley v. Facebook, Inc.*, the class of Facebook users numbered over one hundred million, and the parties initially proposed a *cy pres*-only settlement to the court alleging that class distributions "[are] simply not practicable in this case, given the size of the class." *Fraley I*, 2012 U.S. Dist. LEXIS 116526, at *6. Judge Seeborg refused to accept the proposal because "[m]erely pointing to the infeasibility of dividing up the agreed-to $10 million recovery…is insufficient…to justify resort to purely *cy pres* payments." 2012 U.S. Dist. LEXIS 116526, at *5. After the court denied approval, the agreement was then restructured as a claims-made settlement disbursing cash directly to class members. 966 F. Supp. 2d. 939 (N.D. Cal. 2013) ("*Fraley II*"). Claimants under the amended agreement were so few in fact that the court would have been able to double the baseline $10 awards and did actually augment the awards by 50%. *Id.* at 944.

Similarly, in *Zepeda v. Paypal*, after Judge Armstrong rejected a proposed *cy pres*-only settlement as unfair,

---

[3] *In re Google Referrer Header Litigation*, 869 F.3d 737 (9th Cir. 2017) did determine that a *per capita* entitlement of $0.04 qualifies as *de minimis* and justifies a *cy pres*-only settlement regardless of the feasibility of a claims process, but this decision, which split with every other appellate circuit to consider the question, is no longer good law, having been vacated by *Frank v. Gaos*, 139 S. Ct. 1041 (2019).

the settling parties returned to the court with an approvable common fund structure that distributed no less than $1.8 million directly to class members. *Compare Zepeda*, 2014 U.S. Dist LEXIS 24388, at *21 (N.D. Cal. Feb. 24, 2014), *with Zepeda*, 2017 U.S. Dist. LEXIS 43672, 2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) (granting final approval of amended settlement). Frank's declaration documents myriad other settlements that demonstrate the feasibility of a claims process with $13 million available and millions of class members. Frank Decl. ¶¶10-13.

Because the percentage of class members that will submit claims in these types of settlements is invariably low, a claims-made settlement would not be economically infeasible. A well-respected settlement administration company conducted a wide-ranging survey that concluded "settlements with little or no direct mail notice will almost always have a claims rate of less than one percent (1%)." *Poertner v. The Gillette Co.*, No. 6:12-v-00803-GAP-DAB (S.D. Fla.), Declaration of Deborah McComb re Settlement Claims (Dkt. 156) ¶5. Recent data points reveal that this is true in low-stakes internet consumer settlements with or without direct notice.  *In re Carrier iQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, 2016 U.S. Dist. LEXIS 114235, at *28 (N.D. Cal. Aug. 25, 2016) (0.14% claims rate with direct notice component); *In re Livingsocial Mktg. and Sales Practices Litig.*, 298 F.R.D. 1, 19 (D.D.C. 2013) (0.25% claims rate with direct email notice); *Lagarde v. Support.com, Inc.*, 2013 WL 1994703, 2013 U.S. Dist. LEXIS 67875, at *7 (N.D. Cal. May 13, 2013) (0.18% of class claiming $10); *In re Sony VAIO Computer Notebook Trackpad Litig.*, No. 09-cv-2109, Dkt. 378 (S.D. Cal. Aug. 7, 2017) (0.44% of class claiming either $5 or $25 without proof of purchase). *Fraley* is the best evidence; even where a class numbers over one hundred million, a claims-made device is feasible.

Notably, plaintiffs do not contend that class distributions are economically infeasible given the class size and the settlement fund size here. Rather, they merely suggest that a *cy pres* distribution is "the most effective means of providing benefit to the class" because there is no "effective and efficient means of identifying Class Members." Plaintiffs' Motion for Final Approval of Class Action Settlement, Dkt. 184 at 25-26. But plaintiffs undercut their own theory by relying entirely on self-averments to prove their Article III standing. Dkt. 184 at 14-16. Yes, the settling parties engaged in lengthy jurisdictional discovery to assess whether Google had obtained the named plaintiffs' payload data, culminating in a sealed report available to neither absent class members nor the general public. Yet, to demonstrate named plaintiffs' standing, the plaintiffs do not rely on that report at all; rather they rely solely on the complaint's allegations. Dkt. 184 at 14-

15 & n.7. On that basis, each of the eighteen plaintiffs seeks a $5,000 individual award. Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Plaintiff Service Awards, Dkt. 185. What is good enough for the named-plaintiffs goose is good enough for the absent-class-members gander who will be getting a small fraction of that $5,000. All absent class members who can, like Lowery, aver the same facts as the named plaintiffs should be permitted to self-identify and file a claim for a portion of the settlement fund on that basis.

Indeed, it is one of the few advantages of a claims-made process that otherwise-unknown absent class members are able to self-identify. *See Rubio-Delgado v. Aerotek, Inc.,* 2015 WL 1503436, 2015 U.S. Dist. LEXIS 43871, at *7 (N.D. Cal. Apr. 1, 2015) (observing that claim forms can permit identification of those "difficult to identify"). The nature of representational litigation under Rule 23 and the Due Process Clause of the Constitution necessitates prioritizing class relief even in situations where it is not the "most efficient" use of settlement funds. It would always be more efficient to distribute settlement proceeds to a select group of charities for then the settling parties can eliminate the bulk of the administrative overhead costs. Maximizing efficiency cannot be the sufficient justification for a *cy pres* heavy settlement required by courts. In their final approval memorandum, plaintiffs envision that the only alternative is a claims process that would require information from long-discarded routers and a cost-intensive verification process that would leave only *de minimis* payments for class members. Dkt. 184 at 27. But again, if the named plaintiffs may rely on general allegations to prove their standing to consummate the class settlement and claim $5000 service awards, then class members must be permitted to rely on the same averments to claim a share of the settlement fund. By no means would this standard claims-made procedure be impracticable or otherwise result in *de minimis* payments. *See* Frank Decl. ¶¶10-13.

Nor does Rule 23 allow counsel the discretion to deem anything other than class distributions the "best way" (Dkt. 184 at 27) to allocate settlement funds. *BankAmerica*, 775 F.3d at 1065 ("flatly reject[ing]" the idea that *cy pres* recipients could ever be more "worthy" than class members). That would "endorse[] judicially impermissible misappropriation of monies gathered to settle complex disputes among private parties" and is a reason that class action *cy pres* is "inherently dubious." *Id* (internal quotation omitted). By definition, *cy pres* can never surpass what is "next best"; "[c]ertainly, this law suit is not charitable." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 363 (3d Cir. 2010) (Weis, J., concurring and dissenting). The fact that Google has previously paid $7 million to various state attorneys general offers no support for the propriety of *cy pres* here. This civil penalty

was paid to governmental entities in settlement of enforcement actions; "[t]he private causes of action aggregated in this class action—as in many others—were created by Congress to allow plaintiffs to recover compensatory damages for their injuries." *Baby Prods.*, 708 F.3d at 173.

Even if it were not possible to distribute $13 million through a claims-made process because of the implausible chance settlement claims would be oversubscribed, there is no legitimate reason why the parties could not randomly sample the class and/or accept claims submission, and then make payouts on a lottery basis to those individuals class membership can be confirmed. *See* Shay Levie, *Reverse Sampling: Holding Lotteries to Allocate the Proceeds of Small-Claims Class Actions*, 79 GEO. WASH. L. REV. 1065 (2011). (A lottery need not be for "$13 million," but can be, for example, a double-digit percentage of claiming class members for a two- or three-digit sum. Class members would prefer the opportunity to have a 20% chance of obtaining $20 to a 100% chance of receiving zero.) Which alternate method the parties elect is not crucial; what matters is that non-compensatory *cy pres* remains the last resort. Direct payment matters. "Class members are not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either." *Baby Prods.*, 708 F.3d at 178; id. at 178-79 (counsel has "responsibility to seek an award that adequately prioritizes direct benefit to the class" and fees should reflect that fact). "Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds." *Id.* at 174. If *cy pres* is an excessive share of the total relative to direct class recovery, a district court should "urge the parties to implement a settlement structure that attempts to maintain an appropriate balance between payments to the class and *cy pres* awards." *Id.*

Where there is a will, there is a way. When courts demand more of settling parties on behalf of class members, they get more. For example, after *Baby Products* rejected a settlement that would pay class counsel $14 million, charities about $15 million, and class members under $3 million, class counsel on remand, appropriately incentivized to avoid a fee reduction, restructured the settlement to eliminate superfluous *cy pres* in favor of direct class distributions. This constituted a class improvement of nearly $15 million. *McDonough v. Toys "R" Us*, 80 F. Supp. 3d 626 (E.D. Pa. 2015). *Fraley* and *Zepeda*, both discussed above, are similar examples; so is the Eighth Circuit case of *BankAmerica* and the Seventh Circuit case of *Pearson*.

But here class counsel did not negotiate for using the fund to compensate class members, either on a claims-made, lottery, or some combination thereof basis. Rather, in dereliction of their fiduciary obligations,

class counsel proposes to give that money away to non-class entities. The bare legitimacy of *cy pres* in the class action context is controvertible with good reason. *See, e.g., Klier*, 658 F.3d at 480-82 (Jones J., concurring); *In re Thornburg Mortg., Inc. Secs. Litig.*, 885 F. Supp. 2d 1097, 1105-12 (D.N.M. 2012) (collecting sources); Redish *et al.*, *supra*. Although *cy pres* has been given a narrow berth in the Ninth Circuit, *Lane* does not dictate approval of this scenario, and the law of every other circuit to consider the question requires that this application of *cy pres* be rejected for the foregoing reasons.

The settling parties may respond by pointing to the settlement's supposed injunctive benefits. Settlement ¶¶ 33-37. This "relief" is illusion; merely duplicating preexisting obligations imposed on Google by the 2013 consent decree that resolved dozens of state enforcement actions against Google. *See* Assurance of Voluntary Compliance, Ex. F to Joint Declaration of Class Counsel in support of Final Approval, Dkt. 186 at 78-90. Settlement paragraph 33 obligates Google to destroy acquired payload data (subject to preservations for litigation purposes). Google is already so obligated. Assurance § II.4, Dkt. 186 at 82. Settlement paragraph 34 enjoins Google from collecting or storing for use payload data in Google Street View vehicles except with notice and consent. Google is already so enjoined. Assurance § II.1, Dkt. 186 at 82. Settlement paragraph 35 explicitly orders Google to comply with the Privacy Program provided for in the consent decree. Although plaintiffs emphasize that the Settlement's injunction will "extend the duration" of the privacy program "by nearly two years," in reality there is no indication that Google has any plans to change a program that has been in place for more than half a decade.[4]

Settlement relief that replicates the *status quo ante* is not valuable consideration for the waiver of class members' claims. *Koby*, 846 F.3d at 1080; *Pampers*, 724 F.3d at 719; *Staton v. Boeing Co.*, 327 F.3d 938, 961 (9th

---

[4] Paragraph 36 requires Google to host and maintain educational webpages instructing users how to encrypt their networks and on the value of encryption. Regardless of whether Google already maintains such webpages, innumerable such how-to videos already exist on the internet. In 2020 the value of an encrypted network is well-understood, and there's no shortage of people advocating the value of using secured networks, from the local cable company technician to the Federal Trade Commission to the Department of Homeland Security. *See* Federal Trade Commission, *Securing Your Wireless Network*, https://www.consumer.ftc.gov/articles/0013-securing-your-wireless-network (last visited Jan. 10, 2010); Department of Homeland Security, *Security Tip (ST05-003): Securing Wireless Networks*, https://www.us-cert.gov/ncas/tips/ST05-003 (last visited Jan. 10, 2020). In any event, injunctive relief that treats class members identically with non-class members and opt-outs cannot be valid consideration for the release of damages claims.

Cir. 2003). "Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underlie the concept of the common fund…" *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 337 (3d Cir. 1998) (internal quotation omitted). Any reliance of this inert injunctive relief to justify the settlement and fee award would only demonstrate why the Ninth Circuit has cautioned that injunctive relief is "easily manipulable by overreaching lawyers." *Staton*, 327 F.3d at 974.

### B.  Without class members' affirmative election, *cy pres* constitutes compelled speech in violation of the First Amendment.

"[E]xcept perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Harris v. Quinn*, 573 U.S. 616, 656 (2014). Making a charitable contribution is First Amendment protected expressive and associational activity. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). Concomitantly, individuals have a right to refrain from making such a donation, a right to not be compelled to engage in expressive and associational activity. *See, e.g.*, *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018) ("Because the compelled subsidization of speech seriously impinges on First Amendment rights, it cannot be casually allowed"); *Knox v. Service Employees Int'l Union, Local 1000*, 567 U.S. 298, 309 (2012) (the government "may not … compel the endorsement of ideas it approves"). "First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors." *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001); *see also Keller v. State Bar of California*, 496 U.S. 1 (1990) (attorney bar dues cannot be used for political or ideological purposes); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (recognizing the right of an individual to reject a state measure that forces him "as a part of his daily life … to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable"). In articulating this right, the Supreme Court has acknowledged Thomas Jefferson's view that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves[] is sinful and tyrannical." *Janus*, 138 S. Ct. at 2464 (quoting *A Bill for Establishing Religious Freedom*, *in* 2 Papers of Thomas Jefferson 545 (J. Boyd ed., 1950)).

These principles render unconsented-to class action third-party awards (at least those awards like this one that will be reserved for organizations that advance policy positions and seek to influence the direction of

the law) unconstitutional. Three premises support this conclusion. First, "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier*, 658 F.3d at 474 (citing *ALI Principles* § 3.07 cmt. (b)). Though each class members' share of the settlement fund is "small in amount, because it spread across the entire [class]," the monetary support to the third-parties is "direct." *Cahill v. PSC*, 556 N.E.2d 133, 136 (N.Y. 1990). Second, a third-party donation is an expression of support, association, and endorsement of the third party's agenda and activities. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1 (1976); *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1294 (3d Cir. 1994) (Alito, J.) ("Joining organizations that participate in public debate, making contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection.). "[C]ompelled funding of the speech of other private speakers or groups presents the same dangers as compelled speech." *Harris*, 573 U.S. at 647 (internal quotation omitted). Third, absent class members are being compelled into participating in the donations pursuant to the Court's order disbursing the funds to the *cy pres* recipients. It is not enough that class members may exclude themselves from the class; silence is not consent and a waiver of First Amendment rights "cannot be presumed." *Janus*, 138 S. Ct. at 2486. [5]  "Unless [individuals] clearly and affirmatively consent before any money is taken from them, this standard cannot be met." *Id.*; *see generally* Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007). Although reaching a satisfactory private class settlement is a laudable goal, it does not rise to the level of a critical or "compelling" governmental interest, and does not justify an infringement on absent class members' rights. *Davis v. East Baton Rouge Parish Sch. Bd.*, 78 F.3d 920, 929 n.8 (5th Cir. 1996) (the possibility of "lengthen[ing] the process" of settlement does not justify infringing First Amendment rights); *cf. also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620-21 (1997) (interest in settlement does not override procedural safeguards of Rule 23).

Worse still, the proposed recipients are self-described advocacy groups that advance contentious public policy positions with which at least some class members, including Lowery, disagree. *See* Lowery Decl. ¶ 9. Lowery objects to organizations that work against his interests being subsidized, even to work on different

---

[5] Anyway, the settlement's "opt out" right is not an opportunity to merely abstain from the charitable donation, it is simply the right to exit the class action entirely. This is a Hobson's choice, not a true opt-out. *See Keller*, 496 U.S. at 10; *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 978 (1st Cir. 1993), *superseded on other grounds by Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998) (where the burden to avoid is "more than an inconvenience" a rule requiring monetary contribution should be viewed as compulsory).

issues: as discussed in the introduction, money is fungible, even when it is earmarked for a specific cause. "In simple terms, the First Amendment does not permit the government to compel a person to pay for another party's speech just because the government thinks that the speech furthers the interests of the person who does not want to pay." *Janus*, 138 S. Ct. at 2467. Approving the settlement's *cy pres* provision would violate the First Amendment.[6]

### C.   The Court must consider the pre-existing relationships between the *cy pres* recipients, class counsel and the defendant.

"A cy pres remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the award was made on the merits." ALI Principles §3.07 cmt. (b); *accord Google Cookie*, 934 F.3d at 331 (adopting §3.07 cmt. b standard); *Google Referrer*, 869 F.3d at 749 (Wallace, J., dissenting) (advocating the adoption of same). "[A] growing number of scholars and courts have observed, the cy pres doctrine…poses many nascent dangers to the fairness of the distribution process." *Nachshin*, 663 F.3d at 1038 (citing authorities).

For example, a defendant could steer distributions to a favored charity with which it already does business, or use the *cy pres* distribution to achieve business ends. *Dennis*, 697 F.3d at 867-68 (ruminating on these issues); *SEC v. Bear, Stearns & Co. Inc.*, 626 F. Supp. 2d 402, 415 (S.D.N.Y. 2009); Roger Parloff, *Google and Facebook's new tactic in the tech wars*, FORTUNE (Jul. 30, 2012) (noting criticism of Google Buzz settlement that steered *cy pres* to organizations that are currently paid by Google to lobby for or to consult for the company). In one infamous example, Microsoft sought to donate numerous licenses for Windows software to schools as part of an antitrust class action settlement, essentially using the *cy pres* as a marketing tool that would have frozen out its competitors. *In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d 519 (D. Md. 2002).

Conversely, if the *cy pres* recipient is related to plaintiffs' counsel, class counsel would be double-compensated: the attorney indirectly benefits both from the cy pres distribution, and then makes a claim for attorneys' fees based upon the size of the cy pres. *Bear, Stearns*, 626 F. Supp. 2d at 415; Redish, 62 FLA. L. REV. at 661 (*cy pres* awards "can also increase the likelihood and absolute amount of attorneys' fees awarded without

---

[6] In *Perkins v. LinkedIn Corp.*, a district court overruled a First Amendment challenge to a *cy pres* provision due to its novelty. No. 13-CV-04303-LHK, 2016 U.S. Dist. LEXIS 18649, at *39 n.9 (N.D. Cal. Feb. 16, 2016).

directly, or even indirectly, benefitting the plaintiff"); Adam Liptak, *Doling Out Other People's Money*, N.Y. TIMES (Nov. 26, 2007).

Here, the parties have proposed Center on Privacy & Technology at Georgetown Law, Center for Digital Democracy, Massachusetts Institute of Technology's Internet Policy Research Initiative, World Privacy Forum, Public Knowledge, Rose Foundation for Communities and the Environment, American Civil Liberties Union Foundation, and Consumer Reports as the *cy pres* recipients. Dkt. 184 at 13. Where, as here, lead class counsel has a history of litigating cases with a *cy pres* recipient and its affiliates, there is the unacceptable appearance of divided loyalties of class counsel. And where defendant is already an established donor to several of the *cy pres* recipients, the value of the settlement will be less beneficial to the class than it would appear.

### 1.   *Cy pres* beneficiaries should not have a preexisting relationship with class counsel.

"The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1167 (9th Cir. 2013) (internal quotation omitted). "Cy pres distributions present a particular danger" that "incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of negotiations." *Dennis*, 858 F.3d at 867; *see also Nachshin*, 663 F.3d at 1039 (criticizing *cy pres* where "the selection process may answer to the whims and self interests of the parties [or] their counsel"); *Google Cookie*, 934 F.3d 316 (vacating settlement approval where class counsel sat on the board of one of the *cy pres* recipients).

Here, as plaintiffs disclosed under this Court's Procedural Guidance for Class Action Settlement, liaison and co-lead class counsel firms Lieff Cabraser and Cohen Milstein have both litigated cases with the ACLU and ACLU's state-based affiliates. Dkt. 166 at 15 n.12. Such a recipient is not independent and free from conflict and thus "is not an appropriate designee." *Knapp v. Art.com*, 283 F. Supp. 3d 823, 835 (N.D. Cal. 2017); *cf. also Spotswood v. Hertz Corp.*, 2019 WL 498822, 2019 U.S. Dist. LEXIS 20536, at *36-*38 (D. Md. Feb. 7, 2019) (determining that attorney who co-counseled with putative class counsel on other matters could not adequately represent the class's interests as named plaintiff). "Setting a precedent of regularly returning *cy pres* funds to litigating entities would provide no incentive for counsel…to negotiate class action settlements in a manner to maximize actual award of claims to class member[s]." *Mateo-Evangelio v. Triple J Produce, Inc.*, 2017

WL 3669527, 2017 U.S. Dist. LEXIS 135580, at **16-17 (E.D.N.C. 2017). This Court should not approve any settlement afflicted by such a conflict of interest; it weighs heavily against a finding that counsel is adequately representing the class under Rule 23(g)(4). *See* Section § IV.A below.

### 2. Pre-existing relationships between the defendant and the *cy pres* recipients undermine the theoretical value of the settlement.

As the Ninth Circuit has warned, "[t]he issue of the valuation of [the cy pres] aspect of a settlement must be examined with great care to eliminate the possibility that it serves only the "self-interests" of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious." *Dennis*, 697 F.3d at 868. Google is already a donor to Public Knowledge, World Privacy Forum, and the ACLU. *See* Frank Decl. ¶¶6-8. Google and other large tech firms routinely settle class action cases with *cy pres* donations to these entities. *See,* Dkt. 166-1 at 61-62 (World Privacy Forum, citing *cy pres* from Google and Netflix); *id* at 45 (Center for Digital Democracy, citing *cy pres* from Netflix); *id.* at 76 (Public Knowledge, citing *cy pres* from Sirius XM); *id.* at 85 (Rose Foundation, citing *cy pres* from Symantec); *id.* at 99 (ACLU, citing *cy pres* from Google and Facebook). *Cy pres* donations can grow to constitute a sizable portion of a non-profit's annual budget. *See* Roger Parloff, *Google and Facebook's new tactic in the tech wars*, FORTUNE (Jul. 30, 2012). One can reasonably fear that large tech firms can use the carrot of *cy pres* to ingratiate themselves to those organizations who would otherwise serve independent watchdog roles. Even without consciously compromising their missions, nonprofits might reflexively be less likely to step on Google's toes, lest they cause Google to exercise its veto power over their *cy pres* funding in future cases. *See* Declaration of Brian R. Strange in Support of Class Plaintiffs' Response to Objection of Theodore H. Frank, *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, No. 12-md-2358, Dkt. 172-2 at 3 (D. Del. Jan. 4, 2017) (describing how Google vetoed four of ten proposed *cy pres* recipients, as allowed under the class settlement). Here Google reserved to itself the right to consult during the selection process. Settlement ¶29. And although class counsel aver that they "made no changes to their selection in response to Google's views," they declined to describe what views Google expressed. Dkt. 186 at 10; *compare Google Cookie*, 934 F.3d at 331 (describing the "scrupulous" findings of that district court is obligated to make regarding the relationship between defendant, class counsel and the proposed *cy pres* recipients).

When the defendant is already a regular contributor to a proposed *cy pres* recipient, there is no

demonstrable value added by the defendant's agreement to give money to that institution. *See Dennis*, 697 F.3d at 867-68. Agreeing to do something that the defendant is already doing is not a cognizable class benefit. *Koby*, 846 F.3d at 1080; *see also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 286 (7th Cir. 2002) (it is the "incremental benefits" that matter); *In re Hydroxycut Mktg. and Sales Practices Litig.*, No. 09-md-2087 BTM (KSC), 2013 U.S. Dist. LEXIS 165225 (S.D. Cal. Nov. 19, 2013) (rejecting *cy pres* that provided no additional benefit to class members beyond the status quo). Although the settlement attempts to surmount the fungibility problem by asserting that the *cy pres* "is in addition" to Google's other charitable contributions and that "but for this Settlement, Google would not have expended these funds for charitable purposes," these representations are toothless in economic reality. Settlement ¶25. Though these *cy pres* payments are "in addition" to those made previously, nothing prevents Google from offsetting future donations that otherwise would have been made. The point is not that "these funds" would have been used for donations, it's that other fungible funds might have been. An agreement for Google to shift accounting entries is of no incremental value to the class.

At the very least, the preexisting relationships between Google and the *cy pres* recipients necessitate discounting the putative value of the settlement.

## IV.   In the alternative, if there is no practicable way to afford relief to individual class members, then the putative class cannot be certified.

### A.   Representatives who propose a plenary class release in exchange for a zero-recovery settlement are not adequately representing the class.

Rule 23(a)(4) conditions class certification upon a demonstration that "the representative parties will fairly and adequately protect the interests of the class." 23(g)(4) imparts an equivalent duty on class counsel. Together these provisions demand that the representatives manifest "undivided loyalties to absent class members." *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 338 (4th Cir. 1998). Class counsel's fiduciary duty "forbids a lead lawyer from advancing his or her own interests by acting to the detriment of the persons on whose behalf the lead lawyer is empowered to act." American Law Institute, *Principles of the Law of Aggregate Litig.* § 1.05, cmt. f (2010). Class counsel must maximize class recovery; they "cannot agree to accept excessive fees and costs to the detriment of class plaintiffs"[7] or sacrifice class recovery for "red-carpet treatment on

---

[7] *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000).

fees."[8]  "[I]t is unfathomable that the class's lawyer would try to sabotage the recovery of some of his clients." *Pierce v. Visteon Corp.*, 791 F.3d 782, 787 (7th Cir. 2015). When class counsel is "motivated by a desire to grab attorney's fees instead of a desire to secure the best settlement possible for the class, it violate[s] its ethical duty to the class." *Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship.*, 874 F.3d 692, 694 (11th Cir. 2017). Likewise, the named representatives may not "leverage" "the class device" for their own benefit. *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006). If they are "more concerned with maximizing their own gain than with judging the adequacy of the settlement as it applies to class members at large," they fail to satisfy Rule 23(a)(4)." *Radcliffe*, 715 F.3d at 1165 (cleaned up).

As a bedrock principle, the specifications of (a)(4) "demand undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 620 (1997). Here, the *cy pres*-only settlement combined with a sizable clear-sailing attorneys' fee, sizable incentive awards, and a donation to a charity working class counsel, combine to indicate inadequate representation. *See, e.g., Pampers*, 724 F.3d at 721; *Molski*, 318 F.3d at 956. "No one should have to give a release and covenant not to sue in exchange for zero (or virtually zero) dollars." *Daniels v. Aeropostale West*, No. C 12-05755 WHA, 2014 U.S. Dist. LEXIS 74081, at *8 (N.D. Cal. May 29, 2014); *accord Koby*, 846 F.3d at 1080. "The lack of any benefit for the class renders the settlement unfair and unreasonable." *Frank*, 139 S. Ct. at 1047 (Thomas, J., dissenting) (cleaned up). Worse still, "the fact that class counsel and the named plaintiffs were willing to settle the class claims without obtaining any relief for the class—while securing significant benefits for themselves—strongly suggests that the interests of the class were not adequately represented." *Id.*

"A class settlement that results in fees for class counsel but yields no meaningful relief for the class is no better than a racket." *In re Subway Footlong Sandwich Mkt'g and Sales Practices Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) (internal quotation omitted). Class members would be unequivocally better off opting out; yet their fiduciaries intend to bind them to a general release in exchange for no meaningful relief. Class counsel has breached their duty to the class by not advising absent class members of the superiority of opting out en masse.

If plaintiffs are correct that no actual class relief is possible, then they cannot demonstrate that the class

---

[8] *Pampers*, 724 F.3d at 718 (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991)).

representation satisfies either (a)(4) or (g)(4).

**B.     If distributions to individual class members are impracticable, then a class action is not superior to other available methods of adjudicating the controversy.**

Another prerequisite of class certification is that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  If a settlement class certification "serves only as a vehicle through which to extinguish the absent class members' claims without providing them any relief" because it would be too impractical to distribute the settlement funds to class members, then a class action is not a superior means of adjudicating this controversy. *Frank*, 139 S. Ct. at 1047 (Thomas, J., dissenting); *see also Supler v. FKAACS, Inc.*, No.. 5-11-CV-00229-FL, 2012 U.S. Dist. LEXIS 159210, at *10-*11 (E.D.N.C. Nov. 6, 2012) (holding that because "benefits to putative class members" from *cy pres* payments "are attenuated and insignificant, class certification does not promote judicial efficiency.") (cleaned up). The Ninth Circuit came to a similar conclusion in *In re Hotel Tel. Charges*, 500 F.2d 86 (9th Cir. 1974).  There, the court reasoned that "[w]henever the principal, if not the only, beneficiaries to the class action are…not the individual class members, a costly and time-consuming class action is hardly the superior method for resolving the dispute," and that, "[w]hen, as here, there is no realistic possibility that the class members will in fact receive compensation, then monolithic class actions raising mind-boggling manageability problems should be rejected." *Id.* at 91-92.  In this case, the proposed settlement falls into that category. It provides at most an indirect and attenuated benefit to the class, justified on the grounds that individual distributions would "be impossible for many Class Members and too expensive to implement for the few who could be identified." Dkt. 184 at 23.[9]

If true, then these claims should proceed as individual actions. Under such actions, class members can seek statutory damages of up to $10,000. 18 U.S.C. § 2520(c)(2)(B) (authorizing statutory damages for

---

[9] On similar facts *Google Referrer* declined to apply *Hotel Telephone Charges*. 869 F.3d at 743 n.3. Again, *Google Referrer* has since been vacated by *Frank* and its reasoning is not persuasive. The fact that *Hotel Telephone Charges* involved "fluid recovery" rather than "*cy pres*" is only a distinction in semantics: the two are "related remed[ies]" and the ALI §3.07 "uses the term cy pres broadly to refer to both remedies." §3.07 cmt. a. Nor does the fact *Hotel Telephone Charges* involved a litigation—rather than a settlement—class make any difference, for neither in settlement nor in litigation may the class attorneys make themselves the foremost beneficiary of the class proceeding. *E.g. Bluetooth*.

violations of the Electronic Communications Privacy Act). Regardless how slim the possibility of attaining such damages, that possibility is superior to releasing those claims for no compensation. *See Brown v. Wells Fargo & Co.*, No. 11-1362 (JRT/JJG), 2013 U.S. Dist. LEXIS 181262, at *16-*17 (D. Minn. Dec. 30, 2013) (concluding that superiority was not satisfied where individuals would be "entitled to between $100 and $1,000 dollars in statutory damages" in successful individual litigation, but only $55 as a class member); *Sonmore v. CheckRite Recovery Servs.*, 206 F.R.D. 257, 265-66 (D. Minn. 2001) (holding that the discrepancy between the $25 that class members could recover and the $1000 in statutory damages they could recover individually meant that a class action was not superior); *cf. also Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 234 n.5 (9th Cir. 1974) (finding no superiority where individual recoveries could have amounted to $1,875 and attorneys' fees and costs were statutorily recoverable); *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 716 (9th Cir. 2010) ("We think it clear that the Rule 23(b)(3) superiority analysis must be consistent with the congressional intent in enacting a particular statutory damages provision.").

Superiority must be contemplated from the perspective of putative absent class members, among other angles. *Frank*, 139 S. Ct. at 1047 (Thomas, J., dissenting); *Bateman*, 623 F.3d at 713 (*quoting Kamm v. California City Development Co.*, 509 F.2d 205, 212 (9th Cir. 1975)). What is best for them? This settlement intends to release their rights in exchange for no compensatory relief. From the perspective of a class member, that cannot be a superior method of adjudicating this controversy. *Cf. Daniels v. Aeropostale West*, No. C 12-05755 WHA, 2014 U.S. Dist. LEXIS 74081, at *8 (N.D. Cal. May 29, 2014) ("The collective-action opt ins would be better off simply walking away from this lawsuit with their rights to sue still intact."). A *cy pres* settlement, in which many of the beneficiaries are already receiving donations from the defendant, is not be superior in either fairness or efficiency to other methods of adjudication.

## C.    If it is impracticable or impossible to ascertain whether individuals are members of the putative class, class certification should be denied.

This Court preliminarily approved for settlement purposes a class comprising "all persons who used a wireless network device from which Acquired Payload Data was obtained." Dkt. 178 at 2. According to plaintiffs there is no "effective and efficient means of identifying Class Members" and indeed no method at all for the many class members who do not have information from their wireless routers in use more than a decade ago. Dkt. 184 at 26-27. If plaintiffs are right that absent class members cannot self-identify as class

OBJECTION OF DAVID LOWERY

members, nor can the settling parties identify individuals as such, then what they ask this Court to endorse is a not a class capable of certification at all.

"A class definition framed in objective terms that make the identification of class members possible promotes due process in at least two ways." *Noel v. Thrifty Payless, Inc.*, 445 P.3d 626, 643 (Cal. 2019) (following *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015)). First, the notice requirements of due process and Rule 23 presuppose class members can be given sound platform for assessing the merits and demerits of the settlement in deciding whether to object or opt-out. If class members are unaware that they are class members in the first instance, then they are deprived of these rights that are the very justification for permitting class treatment. *Id.* Second, "[t]his kind of class definition also advances due process by supplying a concrete basis for determining who will and will not be bound by (or benefit from) any judgment." *Id.*

Lowery recognizes that in *Briseno v. ConAgra Foods, Inc.*, the Ninth Circuit conspicuously eschewed the question of whether or not to adopt an "ascertainability" standard under Rule 23. 844 F.3d 1121, 1124 nn. 3 & 4 (9th Cir. 2017). To the extent that *Briseno* means to eliminate wholesale any ascertainability prerequisite to Rule 23 classes, that would constitute a circuit split with almost every other Court of Appeals, and Lowery would preserve that issue for further appeal. Lowery, however, reads *Briseno* as merely rejecting the heightened "administrative feasibility" standard adopted by the Third Circuit in *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013). In *Briseno*, as in *Noel*, and as in *Mullins*, the court confronted one particular issue: whether classes of consumers who had purchased discrete products within fixed time periods were nonetheless unascertainable because there was no way to corroborate those purchases using documentary evidence. In each of those three cases self-identification by affidavit was possible. Here, conversely, the issue is whether Rule 23 and the Constitution allow a class definition that prevents absent class members from self-identifying as class members. If they can self-identify through declaration, then distribution is feasible, and the *cy pres* is inappropriate. If they cannot self-identify through declaration, then class certification is inappropriate.

The Supreme Court itself has even "recognize[d] the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous." *Amchem*, 521 U.S. at 628. Although the class definition here is couched in objective terms, that is not sufficient for an ascertainable class. "The use of objective criteria cannot alone determine ascertainability when those criteria, taken together, do not establish the definite boundaries of a readily identifiable class."

1   *Brecher v. Republic of Argentina*, 806 F.3d 22, 25 (2d Cir. 2015).

2   **V.    If the Court approves the certification and settlement, it should decline to grant the $4**
3   **million attorneys' award request.**

4          For several reasons, the settlement is substantively unfair (*see supra* § III), and possibly premised on an

5   untenable class certification (see *supra* § IV). Nevertheless, if this Court disagrees with each of those

6   propositions, it should still deem unreasonable the $4 million attorneys' award requested by plaintiffs. *See* Dkt.

7   185, Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses and Plaintiff Service Awards. The

8   Court's fiduciary role remains vital to protect the class at the fee-setting stage. "[C]ourts have an independent

9   obligation to ensure the award, like the settlement itself, is reasonable, even if the parties have already agreed

10  to an amount." *Bluetooth*, 654 F.3d at 941; *see also In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th

11  Cir. 2010) (instructing lower courts to act with a "jealous regard to the rights of those who are interested in the

12  fund"). "Active judicial involvement in measuring fee awards is singularly important to the proper operation

13  of the class action process." Advisory Committee Notes on 2003 Amendments to Rule 23.

14         **A.     *Cy pres* is not a direct benefit to the class, and the appropriate attorney-fee award is**
15         **zero.**

16         *Cy pres* should not be counted as a benefit to the class for purposes of attorneys' fees. *Pearson*, 772 F.3d

17  at 784. Because class counsel has achieved no direct benefit for the class, any attorney-fee award from this

18  settlement would be impermissibly disproportionate under *Pearson* and *Bluetooth*.

19         **B.     In any event, an above-benchmark attorney request of 30% is excessive.**

20         There are two basic flaws with the substance of class counsel's fee request: 1) 30% exceeds the bounds

21  of a reasonable percentage award in a typical case; 2) as a matter of law, class members are simply "not

22  indifferent to whether funds are distributed to them or to cy pres recipients, and class counsel should not be

23  either." *Baby Prods.*, 708 F.3d at 178. In particular, plaintiffs sought billions of dollars—$10,000 per class

24  member plus punitive damages—and settled for less than a dollar per class member. It is inequitable for class

25  counsel to waive virtually 100% of a class's claims, yet be paid as if they had won, and not only that, but be

26  paid above the benchmark rate.

27         First, the percentage-of-recovery method prevails in this Circuit because it aligns the incentives of class

28

counsel and the class much better than does the competing lodestar method. *E.g., In re Anthem Inc. Data Breach Litig.*, 2018 U.S. Dist. LEXIS 140137,2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018); *see also In re Apple Iphone/Ipod Warranty Litig.*, 40 F. Supp. 3d 1176, 1180 (N.D. Cal. 2014) (outlining flaws with lodestar method); *see generally* Charles Silver, *Due Process and The Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV. 1809 (2000) (observing "solid consensus that the contingent approach minimizes conflicts more efficiently than the lodestar"). "Plaintiffs attorneys don't get paid simply for working; they get paid for obtaining results." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1182 (9th Cir. 2013). In the ordinary common fund case, a proportionate attorney award adheres to the 25% of the fund benchmark established in this Circuit and followed by courts nationwide. *See, e.g., Bluetooth*, 654 F.3d at 942. Class counsel seek $4 million of the $13 million gross settlement (*i.e.* 30.7%).

A district court must supply reasons for deviating from the 25% benchmark. *E.g. Powers v. Eichen*, 229 F.3d 1249, 1256-57 (9th Cir. 2000). "That contingency fee litigation doesn't always result in a recovery as large as plaintiff's counsel originally estimated is not a 'special consideration'—it's the nature of the beast." *Keirsey v. eBay, Inc.*, 2014 WL 644738, at *3 (N.D. Cal. Feb. 18, 2014) (refusing to deviate from 25% to the requested 31% even though it would provide only a .23 multiplier on class counsel's lodestar); *Hawthorne v. Umpqua Bank*, 2015 WL 1927342 (N.D. Cal. Apr. 28, 2015) (refusing to deviate upward to 33% even where the fee request was less than lodestar, and class recovery was 38% of potential recovery); *Zepeda v. Paypal, Inc.*, 2017 WL 1113293, at *20-*23 (refusing to deviate upward to 28% even where 28% was less than full lodestar); *Roe v. Frito-Lay, Inc.*, 2017 WL 1315626 (N.D. Cal. Apr. 7, 2017) (declining to award more than 25% even though lodestar was almost double 25% award); *In re Uber FCRA Litig.*, 2018 WL 2047362 (N.D. Cal. May 2, 2018) (refusing to deviate upward to 33% even where that request was less than 80% of lodestar, focusing on the "very modest result"); *Fishman v. Tiger Nat. Gas Inc.*, 2019 WL 2548665 (N.D. Cal. Jun. 20, 2019) (determining that 27% of the net fund is "too high"; awarding 25%, even though 27% was only half of counsel's claimed lodestar).[10]

---

[10] Class counsel proclaim (Dkt. 185 at 7, 14, 15) that they are merely seeking a 25% benchmark fee award, but that pretends that their $750,000 expense reimbursement request does not exist. But courts can, should and do compare the entire 23(h) request to the 25% benchmark. *E.g., Dennis*, 697 F.3d 858 (treating the "fees and costs" award jointly); *Moore v. Verizon Comms., Inc.*, 2014 WL 588035, at *16 (N.D. Cal. Feb. 13, 2014).

But even 25% of the settlement here would be far excessive because "class counsel has not met its responsibility to seek an award that adequately prioritizes direct benefit to the class." *Baby Prods.*, 708 F.3d at 178. Thus, it is "appropriate for the court to decrease the award." *Id.* at 178; *accord* Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 U.S.C. L. REV. 97, 135-46 (2014) (advocating for "presumptive reduction of attorneys' fees" where settlement includes significant *cy pres* component). Although obligating Google to donate to third parties may impose a cost on Google (to the extent those donations are not merely a change in accounting entries), compensable settlement value "is not how much money a company spends on purported benefits, but the value of those benefits to the class." *Bluetooth*, 654 F.3d at 944 (*quoting In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009)).

A dollar that goes to *cy pres* is less valuable than a dollar that goes directly to a class member. District courts awarding fees often recognize this reality. *E.g., In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d 1040, 1077 (S.D. Tex. 2012) (discounting cy pres by 50% for purposes of awarding fees); *In re Livingsocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 19, 22 (D.D.C. 2013) (cutting fees to 18% in consideration of "proportion of the award that is going to cy pres."); *Weeks v. Kellogg Co.*, No. CV 09-08102 (MMM) (RZx), 2011 U.S. Dist. LEXIS 155472, at *111 (C.D. Cal. Nov. 23, 2011) (reducing to 16.2%); *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 123 n.9 (E.D. Pa. 2005) (excluding *cy pres* and non-economic injunctive relief benefits entirely).

The percentage of recovery approach is the prevailing Ninth Circuit fee methodology because it aligns the interests of counsel and its client class much better than does the competing lodestar method. If this Court endorses a rule that makes class counsel financially indifferent between a settlement that awards cash directly to class members and a *cy pres*-only settlement, the parties will always agree to the *cy pres* arrangement and unnamed class members will be permanently left out in the cold. Defendants will prefer to make payments to third parties to whom they are already donating money rather than payments to absent class members. Donations may engender corporate good will, and often merely replace or supplement donations that are

---

At the very least, if litigation expenses are going to be removed from the numerator, they sould also be removed from the denominator such that class counsel does not collect a commission on top of the litigation costs. *In re Transpacific Passenger Air Transportation Antitrust Litig.*, 2015 U.S. Dist. Lexis 67904 (N.D. Cal. May. 26, 2015) (Breyer, J.) (explaining the Court's "longstanding preference" for awarding fees from the net, rather than the gross settlement fund); *Morris v. Fid. Invs.*, 2019 WL 4040069 (N.D. Cal. Aug. 26, 2019) (awarding 25% net of litigation expenses).

already in the pipeline: in the latter case, the "relief" merely reflects a shift in accounting entries. Coupled with the class counsel's financial indifference, the defendant's preference for charitable donations means that the easy way of reaching settlement will be agreeing to *cy pres*-only settlements.[11]

Ultimately, "courts need to consider the level of direct benefit provided to the class in calculating attorneys' fees." *Baby Prods.*, 708 F.3d at 170. If the court it inclined to approve the settlement and certification, to comply with Rule 23(h), it should reduce the fee award to no more than 10% of the $13 million *cy pres* fund.[12] It would be appropriate to cut fees to zero, because *cy pres* is not a direct benefit to the class. *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014); *Frank v. Gaos*, 139 S. Ct. at 1047 (Thomas, J., dissenting).

## CONCLUSION

The court should deny final approval of the settlement, either because the settlement is unfair because distribution is feasible, or because class certification is inappropriate. If the settlement is approved, class counsel is not entitled to fees, and certainly not entitled to the 30% it has requested.

---

[11] Class counsel will themselves often prefer a feel-good ceremony with an oversized check and prominent members of the community to anonymous small-dollar payments to relatively ungrateful involuntary clients. *See, e.g.,* Chasin, *supra*, 163 U. PENN. L. REV. at 1484 ("Many law firms tout their cy pres victories as public service," citing example of self-promotional website of law firm with their *cy pres* recipients).

[12] Although Lowery has not closely inspected class counsel's declared lodestar, their blended rate of $676.60/hour seems likely to be excessive. The "average blended billing rate for forty approved class action settlements in the Northern District of California in 2016 and 2017" was $528.11/hour. *In re Lithium Ion Batteries Antitrust Litig.*, 2019 WL 3856413, 2019 U.S. Dist. LEXIS 139327, at *53 (N.D. Cal. Aug. 16, 2019) (approving blended rate of $467.10/hour) (overlapping class counsel with this case).

Dated: January 20, 2020                    Respectfully submitted,

_/s/ Theodore H. Frank_
Theodore H. Frank (SBN 196332)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

_Attorneys for Objector David Lowery_

I am the objector and I have authorized my attorney to file this objection.

_____
David Lowery

PROOF OF SERVICE

I hereby certify that on this day I electronically filed the foregoing Objection using the CM/ECF filing system thus effectuating service of such filing on all ECF registered attorneys in this case.

DATED this 20th day of January, 2020.

*/s/ Theodore H. Frank*
Theodore H. Frank