Jeffrey L. Kodroff
John A. Macoretta
Mary Ann Geppert
SPECTOR ROSEMAN & KODROFF PC
2001 Market Street
Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Daniel A. Small
Robert W. Cobbs
COHEN MILSTEIN SELLERS & TOLL
1100 New York Avenue NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Class and Co-Lead Counsel*

Elizabeth J. Cabraser
Michael W. Sobol
Melissa Gardner
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Class and Liaison Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE LLC STREET VIEW ELECTRONIC COMMUNICATIONS LITIGATION** | Case No: 3:10-md-02184-CRB<br><br>**CLASS ACTION**<br><br>**REPLY IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| | Date: February 28, 2020<br>Time: 10:00 a.m.<br>Judge: The Hon. Charles R. Breyer<br>Courtroom: 6, 17th Floor |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ................................... 1

    A.    The Cy Pres Settlement Best Benefits the Class ............................................... 2

    B.    Lowery's Demand for a Claims Process Is Unwarranted .............................. 7

    C.    The Parties' Relationships with *Cy Pres* Recipients Are Not Significant, and the Court May Reject Any Proposed Recipients as to Which It Has Concerns. ........ 10

    D.    Cy Pres Does Not Violate the First Amendment ......................................... 11

III.  THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ..................................... 13

IV.   THE COURT SHOULD GRANT COUNSEL'S APPLICATION FOR FEES AND EXPENSES ................................................................................................................. 14

V.    CONCLUSION ................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................................................................. 10

*Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*,
529 U.S. 217 (2000) ............................................................................................................. 15

*In re Bluetooth Headset Prods. Liability Litig.*,
654 F.3d 935 (9th Cir. 2011) ............................................................................................... 17

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ............................................................................................. 16

*Dennis v. Kellogg Co.*,
697 F.3d 858, 866 (9th Cir. 2012) ....................................................................................... 17

*In re: Google Inc. Cookie Placement Consumer Privacy Litig.*,
934 F.3d 316 (3d Cir. 2019) .................................................................................................. 5

*In re Google Referrer Header Privacy Litig.*,
869 F.3d 737 (9th Cir. 2017) ....................................................................................... *passim*

*Harris v. Quinn*,
573 U.S. 616 (2014) ............................................................................................................. 14

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) ............................................................................................................. 10

*Hughes v. Kore of Indiana Enter.*,
731 F.3d 672 (7th Cir. 2013) ................................................................................................. 6

*Janus v. AFSCME, Council 31*,
138 S. Ct. 2448 (2018) ......................................................................................................... 14

*Johanns v. Livestock Mktg. Ass'n*,
544 U.S. 550 (2005) ............................................................................................................. 14

*Keepseagle v. Vilsack*,
307 F.R.D. 233 (D.D.C. 2014) ............................................................................................... 8

*Klier v. Elf Atochem N. Am., Inc.*,
658 F.3d 468 (5th Cir. 2011) ........................................................................................... 7, 10

*Knox v. SEIU, Local 1000*,
567 U.S. 298 (2012) ............................................................................................................. 14

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) .................................................................. *passim*

*In re Mego Fin. Corp. Secs. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ................................................................... 11

*Mirfashi v. Fleet Mortg. Corp.*,
    356 F.3d 781 (7th Cir. 2004) ..................................................................... 6

*Moore v. Verizon Comms. Inc.*
    2014 WL 588035, at *3 (N.D. Cal. Feb. 14, 2014) ................................. 17

*In re Motor Fuel Temp. Sales Practices Litig.*,
    872 F.3d 1094 (10th Cir. 2017) ............................................................... 14

*Nachshin v. AOL, LLC*,
    663 F.3d 1034 (9th Cir. 2011) ........................................................ 4, 9, 12

*In re Netflix Privacy Litig.*,
    2013 U.S. Dist. LEXIS 37286 (N.D. Cal. Mar. 18 2013) ........................ 5

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ............................................................ 11, 17

*Perkins v. Linkedin Corp.*,
    2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ........................................... 13

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) .................................................................................. 14

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ..................................................................... 6

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ................................................................... 8

*Shaffer v. Cont'l Cas. Co.*,
    362 F. App'x 627 (9th Cir. 2010) ............................................................ 17

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ................................................................... 9

*In re Transpacific Passenger Air Tranp. Antitrust Litig.*,
    2015 WL 3396829 (N.D. Cal. May 26, 2015) (Breyer, J.) ....................... 17

*Wash. Legal Found. V. Mass. Bar Foundation*,
    993 F.2d 962 (1st Cir. 1993) .................................................................... 14

*Zweibon v. Mitchell*,
    606 F.2d 1172 (D.C. Cir. 1979) ................................................................. 8

REPLY IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
CASE NO: 3:10-MD-02184-CRB

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ..................................................................................................6, 10, 16

1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 2:2 ................................13

William B. Rubinstein, *4 Newberg on Class Actions* § 12:32 (5th ed. 2019 update) ......................6, 8

## I.      <u>INTRODUCTION</u>

As detailed in the opening brief, the Settlement Agreement provides substantial benefits to class members through *cy pres* awards tailored to promote the interests of class members and through injunctive relief. This is an excellent recovery for the proposed class, considering the risks of continuing litigation. It is fair, reasonable and adequate and the Court should approve it.

Objector David Lowery[1] argues that the settlement is unfair, unconstitutional, and unethical; that the class cannot be certified; and that class counsel should not be paid. The gist of each argument is that courts may *never* approve awards of class settlement funds to *cy pres* recipients when the fund could instead be distributed to *any* class members, regardless of how few in number or how poorly it would serve the rest of the class. Ninth Circuit law—indeed, Ninth Circuit law decided only two years ago against Lowery's counsel—holds squarely to the contrary.

Though there are legitimate concerns that *cy pres* settlements *could* be used to serve the self-interests of the parties at the expense of the class members, or to deny the class a feasible, meaningful direct recovery, there are also circumstances in which a *cy pres* distribution is the best way to provide a real benefit to the entire class. That is the case here, where the proposed class is enormous—estimated at 60 million members—and very difficult (and in some cases, impossible) to identify, and the settlement fund, while significant, would provide either small payouts to a small fraction of the class or *de minimis* payouts to a larger fraction. With the Court's supervision of *cy pres* awards to ensure fair dealing, this settlement is the most effective way to distribute benefits broadly to the class. The alternative would distribute funds to a tiny portion of the class and leave the rest empty-handed. The Court should grant Plaintiffs' motions.

## II.      <u>THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE</u>

The Ninth Circuit has an established rubric for analyzing the fairness of *cy pres* settlements. *See In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 741 (9th Cir. 2017), *vacated and*

---

[1] The objection of David Franco raises substantially similar arguments. ECF 192. Arguments concerning the preference for direct payments to class members over *cy pres* distributions are addressed *infra*. Mr. Franco asks whether the parties colluded with *cy pres* recipients, but suggests no reason to think so; as for the merit of the proposed recipients, the Court may make its own judgment. Notably, financial disclosures for every 501(c)(3) organization are publicly available.

*remanded on other grounds*, 139 S. Ct. 1041 (2019)[2]; *Lane v. Facebook, Inc.*, 696 F.3d 811, 819-20 (9th Cir. 2012); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038-41 (9th Cir. 2011). The settlement is amply justified under this body of law. Ignoring this precedent, Lowery relies primarily on broadsides against *cy pres* settlements. But while courts are justly skeptical of such settlements and universally require a close look to ensure their fairness, not only this Circuit but *all* circuits to have addressed the question recognize that in some circumstances *cy pres* settlements are appropriate.

Lowery is correct on one point: neither *Lane* nor any other case *requires* the Court to approve the settlement. Obj. at 1. Rather, Ninth Circuit law commits the decision to the Court's sound discretion. The Court should grant approval, not because it is *required*, but because the settlement is *good for the class.* The *cy pres* awards are the best way to ensure substantial benefits to the *class as a whole*, in stark contrast to Lowery's proposed claims process, which by design delivers benefits to only a tiny sliver of class members.

### A.        The Cy Pres Settlement Best Benefits the Class

The settlement is firmly in line with other cases where courts have found settlement funds to be non-distributable and appropriate for *cy pres* relief. At root, Lowery's main argument is that the settlement is not "non-distributable" or "infeasible" under Ninth Circuit law. *Google Referrer*, 869 F.3d at 741-42; *Lane*, 696 F.3d at 819, 821. This is wrong. The cases consistently show that large classes that would receive only *de minimis* awards across the class are non-distributable. It is no answer that larger sums could perhaps be distributed to a handful of class members. Here, the settlement would provide only an estimated $0.22 per class member even absent *any* attorneys' fees, expenses, or even mailing costs.[3] *See* Decl. of Jeff Kodroff, Daniel Small and Michael Sobol (hereinafter, "Decl."), ¶ 4. The remaining settlement fund if the Court awards the requested attorneys' fees and expenses would amount to approximately $0.15 per class member. This does *not* mean the settlement is itself inadequate, as the undisputed risk factors cited in Plaintiffs' opening

---

[2] Frank argues that *Google Referrer* is not "good law" because it was vacated on other grounds. Obj. of David Lowery ("Obj.") at 7 n.3, ECF 188. Its reasoning is nonetheless both persuasive on its merits and suggestive as to how the Ninth Circuit would resolve the issue.

[3] Class Counsel's best estimate of class size, based on findings from a Canadian government investigation of Street View extrapolated to the U.S. population, is 60 million. Decl. ¶ 3

brief make clear. Mot. for Final Approval ("Mot.") at 17-18, ECF 184. The Ninth Circuit does not require direct payments to class members "where each class member's individual recovery would [be] '*de minimis*.'" *Google Referrer*, 869 F.3d at 741-42 ($0.04 per class member after fees) (quoting *Lane*, 696 F.3d. at 821 ($1.81 per class member after fees); *see also In re Netflix Privacy Litig.*, 2013 U.S. Dist. LEXIS 37286, at *16-20 (N.D. Cal. Mar. 18 2013) ($0.15 per class member before fees). Identifying and paying the estimated 60 million class members here would be impracticable and not meaningful, and Lowery does not argue otherwise.

Lowery suggests without support that, because he could envision a claims process in which cash payments of indeterminate size could be distributed to some sliver of the class, the settlement fund is therefore distributable under Ninth Circuit law and cannot be distributed through *cy pres*. This is wrong. There is no authority that the test for non-distributability is whether *any* cash award could be distributed to *any* class member. The *Google Referrer* Court explicitly rejected this notion:

> Objectors . . . ask us to impose a mechanism that would permit a miniscule portion of the class to receive direct payments, eschewing a class settlement that benefits members through programs on privacy and data protection instituted by the *cy pres* recipients. Objectors suggest, for example, that "it is possible to compensate an oversized class with a small settlement fund by random lottery distribution," or by offering "$5 to $10 per claimant" on the assumption that few class members will make claims. Our review of the district court's settlement approval is not predicated simply on whether there may be "possible" alternatives; rather, we benchmark whether the district court discharged its obligation to assure that the settlement is "fair, adequate, and free from collusion." *Lane*, 696 F.3d at 819 (quoting *Hanlon*, 150 F.3d at 1027). If we took their objections at face value, Objectors would have us jettison the teachings of *Lane*. Objectors would also have us ignore our prior endorsement of *cy pres* awards that go to uses consistent with the nature of the underlying action.

869 F.3d at 742 (citations omitted); *accord In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 327 (3d Cir. 2019) (rejecting proposition that "*cy pres* awards should never be preferred over direct distributions to class members"). The question is not "whether it would be practicable to distribute the available $13 million settlement fund to self-identifying class members through a claims-made process." Obj. at 7. Rather, the question is whether the proposed *cy pres* mechanism is fair, reasonable, and adequate in light of the infeasibility of distributing more than *de minimis* awards to *every* class member. *Lane*, 696 F.3d at 819. There are several reasons to prefer the

proposed *cy pres* distributions over the claims processes Lowery proposes.

*First*, the proposed cy pres distribution takes seriously counsel's and the Court's fiduciary obligation to the class as a whole, not just to the few members who are able to file a claim. See Fed. R. Civ. P. 23(g)(4) ("Class counsel must fairly and adequately represent the interest of *the class*) (emphasis added); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("[C]lass counsel's fiduciary duty is to the class *as a whole* . . . .") (emphasis added).  The *cy pres* settlement delivers *more benefit* to the *class as a whole* than any individual award could. The class consists of a substantial subset of all internet users in the United States. The *cy pres* awards are directed at eight of the most effective advocates for internet privacy in the United States. These groups are *already* responsible for a rising tide of awareness and legal protection for internet privacy. *See* Decl. of Jeffrey L. Kodroff, ECF 166-1, at 33-117. This award would substantially increase funding available for internet privacy work, and there is every reason to believe the proposed groups will use these awards to deliver *actual improvements to internet privacy*. "A foundation that receives $10,000 can use the money to do something to minimize violations of the [statute]; as a practical matter, class members each given $3.57 cannot." *Hughes v. Kore of Indiana Enter.*, 731 F.3d 672, 676 (7th Cir. 2013). Improvements to privacy in the broad internet ecosystem in which a huge proportion of daily life takes place will deliver actual, tangible benefits to nearly all class members. Such "indirect" benefits are the hallmark of *cy pres* settlements. *See Lane*, 696 F.3d at 819. This benefit is *compensation* to class members who would otherwise see none. *See id.*; *accord* William B. Rubinstein, *4 Newberg on Class Actions* § 12:32 (5th ed. 2019 update) ("*Newberg*").[4]

In contrast, Lowery argues that an open claims process is "feasible" *because* fewer than 1% of the class could be expected to file claims. Obj. at 8. By design, his own proposal would leave *99%* of the class with no direct or indirect compensation beyond injunctive relief. The class members who

---

[4] Plaintiffs respectfully submit that Justice Thomas's dissenting opinion in *Frank v. Gaos* that *cy pres* is "not a form of relief to the absent class members and should not be treated as such" is, on these facts, incorrect. *Frank*, 139 S.Ct. at 1047. The leading class action treatise agrees, discussing a similar point originally made by Judge Posner that he reversed in a later opinion: "If remedies are directed to charities, as they must be, and those charities are truly aligned with the class's causes of action, *cy pres* awards should produce social benefits consistent with the class's interest and hence indirectly benefit the class." *Newberg* § 12:26 n.10 (comparing *Mirfashi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) with *Hughes*, 731 F.3d at 676).

*did* file claims, at a 1% response rate, would receive between \$15 and \$22 depending on fees and expenses. Decl. ¶ 5. On its face, it is unclear why counsel or the Court should prefer a mechanism that would distribute small checks to 1% of class members over a *cy pres* mechanism that distributes benefits in the form of improved internet privacy across the entire class.

This proposed alternative plan fares no better under different assumptions about response rate. Given a small enough response rate, claimants could receive checks of up to \$10,000—the statutory penalty under the ECPA. But only 1,300 class members—a mere *0.0002%* of the class—could receive such checks. Alternatively, if the claims process attracts *more* claimants than Lowery expects—if the claims process successfully distributes awards to some not-insignificant portion of the actual class—then awards quickly dwindle from the price of a trade paperback to practically nothing. In short, the award is too small and the class too large to satisfy a goal of distributing non-*de-minimis* payments to all, or at least most, class members. Any direct payments mechanism invariably either excludes the vast majority of the class or reduces payments to insignificance. The fund is, in short, non-distributable, and counsel in their fiduciary capacity believe that a *cy pres* solution better satisfies the compensatory aims of the statute. Decl. ¶ 7.

*Second*, the *cy pres* mechanism distributes benefits more equitably across class members. Lowery's proposed mechanism divides the class into winners and losers: a tiny portion of the class who get some monetary award, and the vast majority who get nothing. The basis on which Lowery proposes to select winners and losers ranges from completely arbitrary (a lottery, Obj. at 10) to effectively arbitrary (self-identification designed to lead to a 1% response rate, Obj. at 8). Lowery suggests no reason why counsel should prioritize the interests of class members who receive checks over the interests of those who do not, where, as here, *cy pres* awards can be expected to create benefit on a roughly equal basis across a broad cross-section of the class.

A direct distribution would be *less* fair and reasonable in these circumstances. Lowery ignores the tension between his plan and the proposition that "settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." Obj. at 7 (quoting *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011). To the extent this proposition is correct, it must be that each class member has an interest in the settlement fund proportional to the

1   value of their claim.[5] *See Google Referrer*, 869 F.3d at 742 (noting that "each class member was

2   *entitled* to a paltry 4 cents in recovery") (emphasis added). Authorizing payments to *cy pres*

3   beneficiaries who will use the funds to benefit the class is fair and reasonable; directing the fund in a

4   way that delivers the value of some class members' shares to *other* class members, who receive

5   more than their pro rata entitlement, is no more fair or reasonable. *See Keepseagle v. Vilsack*, 307

6   F.R.D. 233, 248 (D.D.C. 2014) (Claimants "cannot now claim a property right in funds that were

7   intended to pay the claims of other class members who did not claim their award."); *Newberg* §

8   12:30 ("When a class member does not claim her share of the fund, it is not at all obvious that her

9   share therefore belongs to the other class members."). Lowery, without rationale, suggests counsel

10   should direct checks to some of those individuals at the expense of others.

11        Moreover, a claims process that depends for its viability on a low response rate perversely

12   twists counsel's usual obligations to encourage claims and reach as much of the class as possible. *Cf.*

13   *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1058 (9th Cir. 2019) (expressing skepticism of

14   clause in settlement because it "creates an incentive for defendants to ensure as low a claims rate as

15   possible."). That a high claims rate, ordinarily a measure of success, would *diminish* the success of

16   Lowery's plan suggests it is a bad plan. In contrast, the *cy pres* mechanism presents no potential

17   conflicts and benefits as many class members as possible as effectively as possible.

18        *Third,* the *cy pres* remedy better serves the deterrence purpose of the statute. *See Zweibon v.*

19   *Mitchell*, 606 F.2d 1172, 1182 (D.C. Cir. 1979). By earmarking charitable funds for privacy-focused

20   work, the deterrence value of the settlement is compounded. Not only will the expense of privacy

21   suits factor into Google's (and others') future decisions on internet privacy, but zealous advocates

22   for internet privacy will work to prevent future breaches.

23        In sum, the proposed *cy pres* settlement is better at compensating the entire class for the

24   harms Google caused them; it is better at deterring future harms; it does not require that counsel try

25   to suppress the number of claimants; and it does not arbitrarily shift benefits from most class

26

27        [5] Rather than an agglomeration of individual $0.15 stakes, the better way to theorize the
settlement fund is a trust for the benefit of the class members. *See Newberg* § 12:32. This conception

28   fits better with the equitable nature of the class mechanism and allows for the flexibility required to
do justice on a class basis.

members to a lucky few. Along no dimension is Lowery's proposed mechanism better at delivering benefits to the class as a whole.

### B. Lowery's Demand for a Claims Process Is Unwarranted

The Court should not ignore the relative benefits of the *cy pres* settlement and send the parties back to the negotiating table (or to further litigation, with its corresponding risk). Lowery offers two arguments to the contrary. Both are flawed. First, he suggests that the Court is *legally required* to reject the settlement, implicitly arguing that whenever *some* monetary award could go to *any* class member, that distribution should be *categorically preferred* over *any* indirect benefit to the class, no matter how much more effective "next best" compensation would be. Even the most skeptical cases do not support this proposition. It twists courts' rulings on the feasibility of distributions and impermissibly ignores the tests for non-distributability established by the Ninth Circuit. And as a practical matter it would lead to bad results, as illustrated above. Second, Lowery argues that the class would be better served by rejecting the settlement, either because they would prefer a claims process or because it would lead to a larger settlement. These arguments, too, fail.

Lowery argues that "*cy pres* is improper when it is feasible to make distributions to class members." Obj. at 7. But we have discussed *supra* how the settlement is clearly "non-distributable" under *Lane* because direct payments are "infeasible." *Google Referrer*, 869 F.3d at 741-42 (citing *Lane*, 696 F.3d at 817-21). Lowery misreads the law, which measures feasibility of direct payment with respect to the *entire class*. *Id.* at 741; *accord Lane*, 696 F.3d at 819; *Nachshin*, 663 F.3d at 1036; *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990). The question is *not* whether some money could be economically distributed to *any* claimant, but whether the recovery is sufficient to economically deliver meaningful payments broadly across the class. *See Google Referrer*, 869 F.3d at 742; *Lane*, 696 F.3d at 821; *Six Mexican Workers*, 904 F.2d at 1305.

That other class actions have given small distributions to small portions of their respective classes does not make this fund distributable under *Lane*. Notably, the list of such cases in ¶ 11 of the Frank Declaration does not indicate how many class members received awards, what costs were associated with identifying class members, or what the average distribution was—but Ninth Circuit case law clearly allows for a *cy pres* distribution here. Class actions are a creature of equity, and

courts are given considerable latitude in crafting remedies that best fit each case. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."). It should be no surprise that courts have taken a variety of approaches to the question of how to distribute awards to very large classes. Plaintiffs believe that *this* settlement is in the best interests of *this* class—and it is enough that the settlement is reasonable.

Neither does *Klier* suggest that the settlement fund is distributable. *Klier* noted that "[e]ach class member has a constitutionally recognized property right in the claim or cause of action that the class action resolves," and concluded that "[t]he settlement-fund proceeds, having been generated by the value of the class members' claims, belongs solely to the class members." 658 F.3d at 474. But the question here is not whether to deprive class members of their property but how to apportion it to its owners. Granting that class members have due process rights in class action claims, as the cases on which *Klier* relies hold, Lowery's argument fails to recognize that Rule 23 provides and prescribes exactly the process that is due: courts must allow class members the best practicable notice and an opportunity to opt out, and courts must ensure that settlements are fair, reasonable, and adequate. It simply does not follow from *Klier* that class action settlement funds must be distributed to a tiny fraction of individual claimants, leaving the rest of the class empty-handed.

Moving to arguments that pertain to the actual benefit to class members, Lowery argues that class members would prefer payment or a chance at payment over the *cy pres* remedy. Obj. at 9-10. He implies that counsel consider the *cy pres* recipients "more 'worthy'" than class members and calls the *cy pres* distributions an "impermissible misappropriation" of class member funds. Obj. at 9. But this argument conveniently ignores the vast majority of class members who, by his own design, would not and could not file claims. Perhaps class members who would file claims would prefer to receive small checks rather than see those funds go to a charity promoting internet privacy. Perhaps some of them would even prefer (as Lowery asserts, without support) a lottery ticket for a small check. Obj. at 10. But counsel's obligation is to represent the interest of the class as a whole. Class counsel did not disregard the interest of class members who would receive nothing under Lowery's

1    approach, and instead negotiated a fair and reasonable settlement that provides meaningful relief to

2    the whole class. The settlement "belongs" as much as to those who would not file claims as to the

3    class members who would. The Court has broad discretion to oversee distribution of the fund in a

4    way that is fair, reasonable, and adequate, and under the circumstances of this case, the proposed *cy*

5    *pres* awards clearly meet this standard. *See In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 460

6    (9th Cir. 2000).

7            *Finally*, Lowery argues that class members get better results when courts reject *cy pres*

8    settlements. Obviously, this argument is highly speculative as it relates to this case, which faces an

9    array of litigation risks. Mot. at 17-18. But it is also unclear whether any example Lowery cites

10   actually secured a better deal for class members. In *Fraley v. Facebook, Inc.*, the court rejected a *cy*

11   *pres* settlement, and the parties agreed on a settlement that distributed cash awards to class members;

12   a $20 million fund was devoted to a class estimated at 150 million members. 966 F. Supp. 2d 939,

13   940, 943-44 (N.D. Cal. 2013). The parties distributed $15 awards, a figure which implies that no

14   more than 0.8% of the class received any benefit from the settlement. *Id.* The actual claims rate was

15   even lower, because after the claims process "several million dollars" remained, which were

16   eventually distributed *cy pres*. *Id.* at 945-46. Fair, reasonable and adequate this result may have been,

17   but it was not an improvement for at least 99.2% of class members. The *In re Baby Prods. Antitrust*

18   *Litig.* settlement *did* include cash distributions to class members, and only the remainder was

19   dedicated to *cy pres*; the defect in that settlement was that the court approved it without being

20   informed that the planned claims process would by design undercompensate most claimants, leaving

21   a substantial sum devoted to *cy pres* without first topping up class members' claims. 708 F.3d 163,

22   175 (3rd Cir. 2013). *In re BankAmerica Corp. Secs. Litig.* similarly reversed a *cy pres* distribution in

23   a case that had already distributed cash to class members, on the ground that further cash payments

24   were feasible. 775 F.3d 1060, 1062-63 (8th Cir. 2015). *Pearson v. NBTY, Inc.* is even less apposite:

25   the primary holding was that the district court analyzed the value of the case for purposes of

26   awarding fees at an unrealistic level, with reversions of some of the "settlement fund" to the

27

28

defendant. 772 F.3d 778, 780-81 (7th Cir. 2014).[6] None of these cases suggest that, should the Court reject this settlement, the parties will arrive at a solution that provides more benefit to a substantial portion of class members. The non-distributability of the settlement fund here is a function of the size of the class and the views of experienced class counsel on the litigation risks.

### C.   The Parties' Relationships with *Cy Pres* Recipients Are Not Significant, and the Court May Reject Any Proposed Recipients as to Which It Has Concerns.

The proposed *cy pres* recipients meet all applicable standards.  Lowery offers no Ninth Circuit standard for evaluating relationships between parties and proposed *cy pres* recipients, and precedent suggests that even substantial entwinements may be approved. *Lane*, 696 F.3d at 821 (approving settlement fund awarded to a newly-created foundation, with a board director appointed by the defendant); *Google Referrer*, 869 F.3d at 744 (approving *cy pres* award to some recipients to whom defendant had previously contributed, some that had previously received settlement funds from the defendant, and some which were housed at class counsel's *alma maters*). In fact, the Ninth Circuit guards against the prospect of conflicted *cy pres* recipients primarily through the "nexus" requirement, which Lowery does not challenge here. *Google Referrer*, 869 F.3d at 743. The Ninth Circuit specifically has not adopted the ALI suggestion that "A cy pres remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the award was made on the merits." ALI Principles of the Law of Aggregate Litig. § 3.07 cmt. (b); *see Google Referrer*, 869 F.3d at 744.

Nonetheless, Plaintiffs agree that *cy pres* settlements can "pose[] many nascent dangers to the fairness of the distribution process," and carry the potential for actual or perceived conflicts of interest that would be detrimental to the class. *Nachshin*, 663 F.3d at 1038-39. The Court can and should scrutinize the proposed *cy pres* recipients to ensure no such conflicts exist. However, even if the ALI standard applied here, no "significant prior affiliation" exists in this case that "would raise substantial questions about whether the selection of the recipient was made on the merits." As the

---

[6] The other case Lowery cites, *Zepeda v. Paypal, Inc.*, did not involve a *cy pres* settlement at all; the court rejected the original proposed settlement as unfair because it provided only injunctive relief related to a narrow claim while offering defendants a broad release that did not match the challenged business practices. 2014 WL 718509, at *6 (N.D. Cal. Feb. 24, 2014).

1  Ninth Circuit noted, "[t]he benchmark for 'significant prior affiliation' is left undefined," but

2  Plaintiffs do not believe their occasional pro bono co-litigation with ACLU substantially impairs the

3  perceived fairness of the award to a group that has historically been on the front lines of defending

4  civil liberties. *Google Referrer*, 869 F.3d at 744. Nor does Google's prior funding of recipient

5  groups (mostly through other *cy pres* settlements) raise such a question; Google had no role here in

6  selecting *cy pres* recipients (other than providing information about its limited prior relationships),

7  and agreed in the Settlement Agreement that *cy pres* distributions would be additional to its ordinary

8  charitable giving and that it would exercise no control over any expenditure of *cy pres* funds.

9  Settlement Agmt. ¶¶ 25, 31, ECF 166-1.

10      Finally, the settlement vests control over *cy pres* awards in the Court. If the Court believes

11  any relationship raises substantial questions about whether the award was made on the merits, the

12  Court can and should choose the recipients that avoid such questions.

13      **D.      Cy Pres Does Not Violate the First Amendment**

14      The *cy pres* mechanism that courts have employed for decades is constitutional. Lacking any

15  case law that applies the First Amendment to *cy pres* awards, Lowery imports broad generalizations

16  from other contexts to argue that the everyday practice of Courts for generations has been

17  unconstitutional the whole time. Obj. at 12-14.[7] This is an ill-advised[8] approach to the First

18  Amendment, a field of law that is notoriously complicated and context-dependent. *See* 1 Rodney A.

19  Smolla, *Smolla & Nimmer on Freedom of Speech* § 2:2 ("Contemporary free speech jurisprudence is

20  a befuddling array of theories, methods, formulas, tests, doctrines and subject areas. . . ., with each

21  category designed to address the unique legal considerations posed by a specific form of speech.");

22  *id.* § 2:13 ("Contemporary free speech doctrines are extraordinarily detailed and often confusing.").

23  Lowery's approach is alien to the settled structures of First Amendment law and should be rejected.

24  *See Perkins v. Linkedin Corp.*, 2016 WL 613255, at *11 & n.9 (N.D. Cal. Feb. 16, 2016).

25

26      [7] Notably, Lowery's argument is not limited to *cy-pres*-only settlements, but to all
    "unconsented-to" distributions to third parties. Obj. at 12-13.

27      [8] For instance, if Mr. Lowery is unqualifiedly correct that "no person in this country may be

28  compelled to subsidize speech by a third party that he or she does not wish to support," he endangers
    his counsel's 501(c)(3) status.

1    *First*, the only appellate court to consider Lowery's argument has rejected it. *In re Motor*

2    *Fuel Temp. Sales Practices Litig.*, 872 F.3d 1094, 1113-14 (10th Cir. 2017). *Motor Fuel* correctly

3    held that the Court's role in approving class action settlements does not implicate the First

4    Amendment at all, because it is not state action. *Id.* Settlements are agreements between parties. The

5    Court must ensure that the settlement is fair to class members who are absent, but approval of the

6    settlement does not transmute the settlement into state action.

7    *Second*, class members may exclude themselves from the settlement. If they dislike the *cy*

8    *pres* mechanism they can reject the settlement and pursue (or not) their own suit. Lowery dismisses

9    this as a "Hobson's choice," Obj. at 13, but Courts and the federal rules disagree; class members'

10   opportunity to exclude themselves is a key element of ensuring due process in class actions. *Phillips*

11   *Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

12   Thus, not only is the settlement not state action, but its *cy pres* mechanism is not compelled

13   speech. The compelled funding cases on which Lowery relies are principally cases concerning the

14   extent to which non-union employees may be compelled to pay fees to public unions. *See Janus v.*

15   *AFSCME, Council 31*, 138 S. Ct. 2448 (2018); *Harris v. Quinn*, 573 U.S. 616 (2014); *Knox v. SEIU,*

16   *Local 1000*, 567 U.S. 298 (2012). In each of these cases (and every compelled subsidy case), the fee

17   in question was actually compulsory, on pain of unemployment; here, all that was required to opt out

18   was for class members to send a letter so stating to the Notice Administrator. Lowery fails to explain

19   why this process, which satisfies the requirements of the Due Process Clause to bind class members,

20   nonetheless violates the First Amendment.[9]

21   Finally, Lowery's theory of the First Amendment is incoherent. It cannot be true that the

22   state may never compel citizens to "subsidize" speech with which they disagree, or even that such

23   subsidies automatically trigger strict scrutiny. *See, e.g.*, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S.

24   550, 559 (2005) (First Amendment does not prohibit compelled subsidy of "government speech");

25

26   _____

     [9] Lowery argues that the standard for "compulsory" speech under the First Amendment is

27   whether it would be "more than an inconvenience" to avoid it. Obj. at 13 n.5. The cited case law
     does not support that standard, which found that contributions were compulsory when they were

28   required "as a condition of retaining employment." *Wash. Legal Found. V. Mass. Bar Foundation*,
     993 F.2d 962, 978 (1st Cir. 1993).

*Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 221 (2000) (permitting mandatory university activity fees that support student speech). Lowery gestures at a distinction between groups that "advance policy positions and seek to influence the direction of the law" and those that do not. Obj. at 12. But he does not explain why those goals, which are sanctioned by the tax code, are of particular concern relative to other speech. He also fails to explain how the Court should distribute non-distributable funds absent a *cy pres* mechanism, or how it should collect consent from class members who are difficult or costly to identify. Lowery's unsupported theory does violence to the First Amendment and the class action mechanism to no good end.

## III.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

The settlement class meets all criteria for certification.  Lowery's argument that the Court may not certify a settlement class where direct distribution is impracticable (Obj. at 17-21) is plainly incorrect under Ninth Circuit law. *See Google Referrer*, 869 F.3d 742 ("[W]e easily reject Objectors' argument that if the settlement fund *was* non-distributable, then a class action cannot be the superior means of adjudicating this controversy under Rule 23(b)(3).") (approving *cy pres* settlement class with no individual payments); *Lane*, 696 F.3d at 826 (affirming *cy-pres-only* class). To the superiority argument the Circuit rejected in *Google Referrer*, Lowery now adds even weaker attacks on the class representatives' adequacy and the class's ascertainability.

Class counsel's representation of the class throughout nearly a decade of litigation has been vigorous, adequate, and un-conflicted. Lowery's contrary assertions (that *cy pres* relief confers "no benefit" and thus must reflect self-dealing) is incorrect about the benefits conferred through *cy pres* (*supra* Section II. A-B), and merely rehashes his claims that the settlement here is not fair. Lowery accuses counsel of self-dealing, but offers only invective where he should offer evidence. No authority holds that a *cy pres* settlement establishes the inadequacy of class counsel or class representatives, and Lowery finds none. In fact, all the law is to the contrary.

As *Google Referrer* explained, "[t]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy. . . . Not surprisingly, there is a relationship between the superiority requirement and the appropriateness of a *cy pres*-only settlement." 869 F.3d at 742-43. For the reasons explained in the opening brief (and not

1   contested by Lowery), it would be folly to litigate each of the millions of potential individual claims

2   in this case separately. Mot. at 12-13.

3   As Lowery admits, the Ninth Circuit recently confirmed that a class may be certified even if

4   there is no "'administratively feasible' means of identifying absent class members." *Briseno v.*

5   *ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017). As that Court noted, the Ninth Circuit

6   has historically addressed what other courts have labeled "ascertainability" concerns "through

7   analysis of Rule 23's enumerated requirements." *Id.* at 1124 n.4. The *Briseno* Court cautioned

8   against analyzing "ascertainability" outside the context of Rule 23's requirements, lest courts reach

9   the wrong result "in cases like this one, in which administrative feasibility would be difficult to

10  demonstrate but in which there may be no realistic alternative to class treatment." *Id.* at 1128.

11  The class meets the implied ascertainability requirement of Rule 23 because it is defined,

12  objectively, as those with a wireless network device from which Acquired Payload Data was

13  obtained. Whether a putative class member used such a device from which Google acquired Payload

14  Data within the class period is an objective test. Those two pieces of factual information determine

15  whether a person is or is not a member of the class. That it would be burdensome, expensive, and

16  technically challenging to determine whether any given individual is in fact a class member does not

17  mean that the class cannot be certified. It does, however, strongly support the reasonableness of the

18  *cy pres* remedy set forth in the settlement.

19  **IV.   THE COURT SHOULD GRANT COUNSEL'S APPLICATION FOR FEES AND
            EXPENSES**

20

21  Class counsel have earned the requested fee. Lowery argues, in a last-ditch effort, that the

22  Court should deny or modify counsel's request for attorneys' fees and expenses.[10] Obj. at 22. The

23  primary argument again wrongly posits that the settlement is unfair, and that no benefit was obtained

24  for the class, or that the benefit obtained should be discounted because it is insufficiently large to

25  economically distribute to 60 million class members.[11] Obj. at 22, 24. The secondary argument is

26  [10] Objector Franco does not appear to oppose counsel's fee request. ECF 192.

27  [11] Lowery doubts the value of the injunctive relief obtained in the settlement, but does not
     dispute that Google's privacy program is important relief, or that by virtue of the settlement Google

28  is required to maintain it for longer than it would be absent the settlement. Obj. at 11-12; *see* Mot. at
     4.

1   that counsel's request is excessive because the attorneys' fees *plus* expenses add up to more than the

2   25% benchmark established by the Ninth Circuit. *See In re Bluetooth Headset Prods. Liability Litig.*,

3   654 F.3d 935, 942 (9th Cir. 2011). But the established practice in the Circuit is to consider only

4   *attorneys' fees* against the 25% benchmark, and treat expenses separately.[12] *See, e.g.*, *In re Online*

5   *DVD-Rental Antitrust Litig.*, 779 F.3d 934, 941, 949 (9th Cir. 2015) (affirming award of attorneys'

6   fees in the amount of 25% of the settlement fund, and an additional award of expenses); *Shaffer v.*

7   *Cont'l Cas. Co.*, 362 F. App'x 627, 631-32 (9th Cir. 2010) (measuring benchmark against attorneys'

8   fees, but not expenses); *In re Transpacific Passenger Air Tranp. Antitrust Litig.*, 2015 WL 3396829,

9   at *1 (N.D. Cal. May 26, 2015) (Breyer, J.) (granting percentage-of-the-fund attorneys' fees after

10  deducting expenses). The Court *does* have discretion to benchmark attorneys' fees against either the

11  gross settlement fund of $13 million or the net settlement fund after expenses of $12.25 million.

12  *Transpacific Passenger,* 2015 WL 3396829, at *1 (citing *Online DVD*, 779 F.3d at 953). In this case,

13  the vast majority of counsel's expenses were court-ordered payments to a special master. *See* Decl.

14  of Jeffrey L. Kodroff et al. ¶¶ 76-77, ECF 186. Plaintiffs had limited control over these expenses and

15  should not have their fee reduced on that basis, especially given the good results achieved and the

16  negative multiplier on counsel's lodestar. Moreover, Plaintiffs' counsel actually incurred *more* than

17  $750,000 in expenses, but voluntarily limited their request. *Id.* ¶ 78.

18  **V.   CONCLUSION**

19  This case demonstrates that, under the right circumstances and with careful supervision from

20  the Court, *cy pres* settlements are a vital tool for benefitting class members where monetary awards

21  would be infeasible. The Court should reject Lowery's objection and grant Plaintiffs' motions in full.

22

23

24  [12] Lowery's "counterexamples" are misleading. *Dennis v. Kellogg Co.* did not actually hold that fees and costs should be lumped together under percentage-of-the-fund analysis; rather, it reversed

25  approval of the settlement on the basis that its *cy pres* awards were "divorced from the concerns embodied" in the statutes it sought to enforce. 697 F.3d 858, 866 (9th Cir. 2012). It used fees and

26  costs together to illustrate that, if the value of the in-kind *cy pres* were overstated, the fees could be excessive. *Id.* at 867-68. And in *Moore v. Verizon Comms. Inc.*, the Court awarded fees on a

27  lodestar, not percentage, basis; the citation in Lowery's brief is to the magistrate's percentage-method crosscheck, and it is highly unclear whether even in this dictum the court's calculated $7.325

28  million "preliminary settlement value" referred to attorneys' fees alone or fees plus costs. 2014 WL 588035, at *3 (N.D. Cal. Feb. 14, 2014).

Dated: February 19, 2020

Respectfully submitted,

By: _____ /s/ Daniel A. Small _____
Daniel A. Small

COHEN MILSTEIN SELLERS & TOLL
Daniel A. Small
Robert W. Cobbs
1100 New York Avenue NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com
rcobbs@cohenmilstein.com

SPECTOR ROSEMAN & KODROFF PC
Jeffrey L. Kodroff
John A. Macoretta
Mary Ann Geppert
2001 Market Street
Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
Email: jkodroff@srkattorneys.com
jmacoretta@srkattorneys.com
mgeppert@srkattorneys.com

*Class and Co-Lead Counsel*

Elizabeth J. Cabraser (State Bar No. 083151)
Michael W. Sobol (State Bar No. 194857)
Melissa Gardner (State Bar No. 289096)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
ecabraser@lchb.com
msobol@lchb.com
mgardner@lchb.com

*Class and Liaison Counsel*

**ATTESTATION**

I, Daniel Small, am the ECF user whose identification and password are being used to file this Response. I hereby attest that Jeffrey Kodroff and Daniel Small have concurred in this filing.

/s/ Daniel A. Small

Daniel A. Small, Esq.


**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

Dated: February 19, 2020                    Respectfully submitted,


By: /s/ Daniel A. Small
Daniel A. Small

COHEN MILSTEIN SELLERS & TOLL
1100 New York Avenue NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsmall@cohenmilstein.com