United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE LLC STREET VIEW
ELECTRONIC COMMUNICATIONS
LITIGATION

Case No.  10-md-02184-CRB

**ORDER GRANTING FINAL
APPROVAL OF CLASS ACTION
SETTLEMENT, GRANTING
ATTORNEYS' FEES, AND ENTERING
FINAL JUDGMENT**

The Court must now assess the settlement of a case in which a vast but nonetheless difficult-to-identify class of people suffered intangible injury, and minimal damages.  Specifically, this suit arises under the Electronic Communications Privacy Act of 1986 ("ECPA"), see Transfer Order (dkt. 1), and Plaintiffs allege that between 2007 and 2010, Google used its Street View vehicles to intentionally intercept and store electronic communications transmitted by class members over unencrypted wireless internet connections, see CAC (dkt. 54) ¶¶ 1–4.  After almost a decade of litigation, the parties reached a settlement.  See generally Agreement (dkt. 166-1) Ex. A.  The settlement provides for injunctive relief and a $13 million Settlement Fund, which (after deducting attorneys' fees and expenses, service awards for the named plaintiffs, and notice and settlement expenses) the parties have agreed will be used to fund Court-approved cy pres awards to organizations that address consumer privacy issues.  Mot. (dkt. 184) at 3–4.  The Court preliminarily approved the settlement in October 2019.  See Order on Prelim. Approval (dkt. 178).

Class Counsel now moves for final approval of the settlement.  See generally Mot.  The Court held a motion hearing on Friday, February 28, 2020.  See Motion Hearing (dkt. 204).  The Court has considered the record, the Settlement Agreement, and the briefing on this motion,

including the objections and comments it received, and the arguments at the hearing.  In

adjudicating this motion, the Court bears in mind its responsibility to absent class members.

Particularly when a settlement takes place before formal class certification, the Court must

"scrutinize the proceedings to discern whether" Class Counsel and the named plaintiffs "have

sacrificed the interests of absent class members for their own benefit."  See In re Google Referrer

Header Privacy Litigation, 869 F.3d 737, 741 (9th Cir. 2017), vacated on other grounds by Frank

v. Gaos, 139 S. Ct. 1041 (2019);[1] Lane v. Facebook, Inc., 696 F.3d 811, 819 (9th Cir. 2012).  But

the Court is also mindful that its job is not to create policy about the cy pres doctrine generally, or

even to fashion the settlement agreement that it might most prefer in this case.  Rather, it is to

decide, given the circumstances of this case, whether the settlement the parties have reached is

"'fair, adequate, and free from collusion.'"  See Lane, 696 F.3d at 819 (quoting Hanlon v. Chrysler

Corp., 150 F.3d 1011, 1026 (9th Cir. 1998), overruled on other grounds by Wal-Mart Stores, Inc.

v. Dukes, 564 U.S. 338 (2011)).

       **IT IS THEREFORE HEREBY ORDERED, ADJUDGED, AND DECREED** as

follows:

## I.     DEFINED TERMS

       Unless otherwise defined herein, all terms that are capitalized herein shall have the

meanings ascribed to those terms in the Settlement Agreement.

## II.    JURISDICTION

       This Court has jurisdiction over the subject matter of this Action, all parties to the Action,

and all Class Members.

## III.   STANDING

       Courts considering class action settlements must "assure [them]selves of litigants' standing

under Article III."  Gaos, 139 S. Ct. at 1046 (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S.

332, 340 (2006)).  Moreover, "named plaintiffs who represent a class 'must allege and show that

---

[1] Because Google Referrer is a recent Ninth Circuit case containing an extensive discussion of cy pres-only settlement agreements, the Court finds it instructive as to the Ninth Circuit's view of such settlements; the Court recognizes, nevertheless, that the case has been vacated.

United States District Court
Northern District of California

they personally have been injured.'"  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 n.6 (quoting

Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976)).  The Class

Representatives' standing here was not a foregone conclusion.

Plaintiffs allege that Google willfully intercepted and stored their private electronic

communications in violation of Title III of the Omnibus Crime Control and Safe Streets Act of

1968, as amended by the ECPA, 18 U.S.C. §§ 2510, et seq. (together "the Wiretap Act").  See

CAC (dkt. 54).  Plaintiffs further alleged that Google's Street View vehicles "surreptitiously

collected, decoded, and stored data from [their] WiFi connection, including payload data," and

that they "did not know that Google collected [t]his data, nor did [they] give permission for

Google to do so."  Id. ¶¶ 18–38.

Given these allegations, the parties engaged a Special Master to conduct intensive

discovery on the issue of standing.  See Case Management Conference – Further (dkt. 108).  The

Special Master conducted complex technical searches on data collected by Google "to determine

whether any Plaintiff's communications were acquired by Google."  Order Regarding

Jurisdictional Discovery (dkt. 121-1) at 2.  The Special Master was provided with three billion

frames of wireless raw data, of which about 300 million contained "Payload Data"—the kind of

frames that could contain communications.  See Joint Decl. (dkt. 186) ¶ 19.  It took a year for the

Special Master to organize the data into a searchable database, and another two years for the

Special Master to design and conduct the searches, during which time the parties and Special

Master met regularly to confer on the process.  Id.  Eighteen Named Plaintiffs "produced personal

information and forensic evidence of their wireless network equipment (including MAC

addresses, email addresses, and SSIDs) to the Special Master to facilitate this targeted discovery."

Id.

After the Special Master issued his report, Joint Mot. to File Under Seal (dkt. 138), the

Court stayed these proceedings pending the Supreme Court's consideration of Gaos, see Stay

Order (dkt. 155).  Although the Supreme Court in Gaos had granted certiorari to review the issue

of cy pres-only settlements, it did not reach that issue, concluding that "there remain[ed]

substantial questions about whether any of the named plaintiffs ha[d] standing" in light of Spokeo,

United States District Court
Northern District of California

1   136 S. Ct. 1540.  The holdings of Gaos and Spokeo guide this Court's standing analysis.

2        The district court in Gaos had found that Gaos established standing by alleging that the

3   defendant violated the Stored Communications Act, which provides a private right of action.  See

4   Gaos, 139 S. Ct. at 1044.  While the Ninth Circuit was considering an appeal of Gaos's class

5   action settlement, the Supreme Court decided Spokeo.  See Gaos, 139 S. Ct. at 1045.  In Spokeo,

6   the Court explained that standing consists of having "(1) suffered an injury in fact; (2) that is fairly

7   traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

8   favorable judicial decision."  136 S. Ct. at 1547 (citing Lujan v. Defenders of Wildlife, 504 U.S.

9   555, 560–61 (1992)).  The Court explained that an injury in fact requires "a plaintiff [to] show that

10  he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized'

11  and 'actual or imminent, not conjectural or hypothetical.'"  Id. at 1548.  "Particularized" means

12  that the injury "'must affect the plaintiff in a personal and individual way,'" while "concrete"

13  means that the injury "must actually exist."  Id. (quoting Lujan, 504 U.S. at 560 n.1).  The Court

14  noted that "intangible injuries can be concrete," and that "in determining whether an intangible

15  harm constitutes an injury in fact, both history and the judgment of Congress play important

16  roles."  Id. at 1549.  The Court found it instructive "to consider whether an alleged intangible harm

17  has a close relationship to a harm that has traditionally been regarded as providing a basis for a

18  lawsuit in English or American courts."  Id.  Merely "alleg[ing] a bare procedural violation,

19  divorced from any concrete harm," does not satisfy the injury-in-fact requirement.  Id.  Plaintiffs

20  must allege concrete harm, the Court explained, "even in the context of a statutory violation."  Id.

21  Because the Ninth Circuit had affirmed Gaos's class action settlement without reexamining

22  standing, the Supreme Court remanded the case to the Ninth Circuit to consider Gaos's standing in

23  light of Spokeo.  Gaos, 139 S. Ct. at 1045–46.[2]

24       Because the Plaintiffs here have alleged an intangible injury that stems from a statutory

25  violation, the Court considers Congress's judgment in "identifying and elevating intangible

26  harms" and the relationship between the intangible injury and "harm that has traditionally been

27  

28  _____

[2] Importantly, the Ninth Circuit opinion that Gaos vacated and remanded was Google Referrer, 869 F.3d 737, vacated on other grounds by Gaos, 139 S. Ct. at 1044.

United States District Court
Northern District of California

regarded as providing a basis for a lawsuit." See Spokeo, 136 S. Ct. at 1549. In enacting the

ECPA, Congress sought to protect the concrete privacy interests of individuals in avoiding

unwanted interception of their electronic communications. See Konop v. Hawaiian Airlines, Inc.,

302 F.3d 868, 874 (9th Cir. 2002) (ECPA "was intended to afford privacy protection to electronic

communications."). The prohibition in the statute, and its accompanying private right of action,

reflect Congress's judgment that intentional, nonconsensual interception of private

communications is an invasion of an individual's right to privacy. See S. Rep. No. 99-541 at 5

(1986), as reprinted in 1986 U.S.C.C.A.N. 3555, 3559 ("[T]he law must advance with the

technology to ensure the continued vitality of the fourth amendment. Privacy cannot be left to

depend solely on physical protection, or it will gradually erode as technology advances."). This

congressional judgment is "instructive and important" in establishing a concrete injury under

Article III. See Spokeo, 136 S. Ct. at 1549. Moreover, the injury at issue here—having one's

electronic communication intentionally intercepted—bears a close relationship to a traditional

violation of the right to privacy.

In so holding, the Court follows the guidance of Campbell v. Facebook, No. 17-16873, slip

op. (9th Cir. Mar. 3, 2020), which weeks ago approved the settlement of a class action brought

under the ECPA and the California Invasion of Privacy Act. The Circuit explained that

"'Violations of the right to privacy have long been actionable at common law.'" Id. at 17 (quoting

Eichenberger v. ESPN, Inc., 876 F.3d 979, 983–84 (9th Cir. 2017)). It explained, in addition, that

"under the privacy torts that form the backdrop for these modern statutes, '[t]he intrusion itself

makes the defendant subject to liability.'" Id. (quoting Restatement (Second) of Torts § 652B

cmt. b). The Circuit also held that "The reasons articulated by the legislature[] that enacted ECPA

. . . further indicate that the provisions at issue in this case reflect statutory modernizations of the

privacy protections available at common law." Id. at 18. It concluded that the plaintiffs there

"identified a concrete injury by claiming that Facebook violated the ECPA . . . when it intercepted,

catalogued, and used without consent URLs they had shared in private messages." Id. at 20.

Another court in this district also recently applied Spokeo to a Wiretap Act claim, and

reached the same conclusion. In Matera v. Google, Inc., No. 15-cv-04062, 2016 WL 5339806, at

*8–14 (N.D. Cal. Sept. 23, 2016), Judge Koh concluded that a plaintiff who alleged that Google violated the Wiretap Act, "without claiming any additional harm," had nonetheless alleged injury sufficient to confer standing.  First, the court concluded that Wiretap Act violations resemble invasion of privacy claims at common law "in both their substantive prohibitions and their purpose."  Id. at *10 (citing Restatement (Second) of Torts §§ 652A-I regarding right to privacy). Even though the elements that establish a Wiretap Act violation are not identical to those that establish a common law invasion of privacy, the court found that the harms share a close relationship.  Id. at *11.  Second, Judge Koh noted that when courts determine whether Congress intended to make an alleged statutory violation an injury in fact, they often "place[] dispositive weight on whether a plaintiff alleges the violation of a substantive, rather than procedural, statutory right."  Id. at *12 (citing Cour v. Life360, Inc., No. 16-cv-00805-TEH, 2016 WL 4039279, at *2 (N.D. Cal. July 28, 2016)).  The court found that Congress "create[d] substantive rights to privacy in one's communications" when it enacted the Wiretap Act.  Id. at *13.  Judge Koh concluded, therefore, that the relationship between Wiretap Act violations and privacy torts, as well as Congress's judgment that plaintiffs who allege Wiretap Act violations should have a right to legal relief, meant that an alleged Wiretap Act violation "constitute[s] concrete injury in fact."  Id. at *14.

Numerous other courts have also concluded that violations of the ECPA cause concrete and particularized harms that give rise to Article III standing.  See, e.g., In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 273–74 (3d Cir. 2016); Rackemann v. LISNR, Inc., No. 1:17-cv-00624-TWP-MJD, 2017 WL 4340349, at *3–5 (S.D. Ind. Sept. 29, 2017); Cooper v. Slice Techs., Inc., No. 17-cv-7102 (JPO), 2018 WL 2727888, at *2–5 (S.D.N.Y. June 6, 2018); In re Facebook Internet Tracking Litig., 263 F. Supp. 3d 836, 841–42, 844–45 (N.D. Cal. 2017).

The Court now finds and concludes that the Class Representatives, who have alleged that Google intercepted the private communications transmitted in their payload data, have standing under Article III of the United States Constitution.  The invasions of privacy involved here are concrete and particularized injuries-in-fact to rights defined and protected by statute, and they fall well within the courts' traditional sphere of authority.  See Matera, 2016 WL 5339806, at *10, 14.

1    The alleged injuries are fairly traceable to the challenged conduct of the defendant and are

2    redressable by the Court.  See Spokeo, 136 S. Ct. at 1547.

3    **IV.    CERTIFICATION OF RULE 23(B)(3) CLASS FOR SETTLEMENT PURPOSES**

4         Plaintiffs seek to certify a single nationwide class under Federal Rule of Civil Procedure

5    23(a) and Rule 23(b)(3).  See Mot. at 9–13.

6         **A.    Rule 23(a) Requirements**

7         Under the first Rule 23(a) factor, the class must be "so numerous that joinder of all

8    members is impracticable." Fed. R. Civ. P. 23(a)(1).  Some courts have held that numerosity may

9    be presumed when the class comprises forty or more members.  See Krzesniak v. Cendant Corp.,

10   No. C 05-05156 MEJ, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007).  Whether joinder is

11   impracticable depends on the facts and circumstances of each case.  See id.  Here, Class Counsel

12   estimate that the class has approximately 60 million members.  Reply Decl. (dkt. 198-1) ¶ 3.[3]

13   Plaintiffs have therefore satisfied Rule 23(a)(1).

14        Under the second Rule 23(a) factor, the class must share common questions of law or fact.

15   Fed. R. Civ. P. 23(a)(2).  Not all questions of law or fact must be common: "[t]he existence of

16   shared legal issues with divergent factual predicates is sufficient."  See Hanlon, 150 F.3d at 1019.

17   Here, class members' claims share questions of law and fact, such as whether Google intentionally

18   intercepted electronic communications, in violation of the Wiretap Act.  See CAC ¶ 122.

19   Plaintiffs have satisfied Rule 23(a)(2).

20        Under the third Rule 23(a) factor, a representative party's claims or defenses must be

21   "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "The purpose of the

22   typicality requirement is to assure that the interest of the named representative aligns with the

23   interest of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citing

24   Weinberger v. Thornton, 114 F.R.D. 599, 603 (S.D. Cal. 1986)).  Courts consider whether the

25

26   [3] While this is only an estimate, Class Counsel explained by way of declaration that it reached that
number based on the three hundred million payload data frames in this case, as well as the related
27   investigation done by the Canadian government.  Id.  It discussed its reasoning further at the
motion hearing.  Counsel for Google echoed at the motion hearing that the estimate appeared valid
28   and that the exact class size is unknown.  The Court accepts that the class size is approximately 60
million people.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    named plaintiffs and unnamed class members share "the same or similar injury" and whether the

2    alleged wrongful conduct is "not unique to the named plaintiffs." Id. (quoting Schwartz v. Harp,

3    108 F.R.D. 279, 282 (C.D. Cal. 1985)).  Here, Plaintiffs and the unnamed class members have the

4    same alleged injury—that Google's Street View vehicles collected their electronic

5    communications, without consent, from unencrypted Wi-Fi networks.  See CAC ¶ 123.  Plaintiffs

6    have therefore satisfied Rule 23(a)(3).

7         Under the final Rule 23(a) factor, the representative party must "fairly and adequately

8    protect the interests of the class."   Fed. R. Civ. P. 23(a)(4).  Representative parties are required to

9    protect the interests of the class by (1) retaining qualified counsel who will prosecute the case

10   vigorously, and (2) ensuring they do not have any conflicts of interest with the proposed class.

11   See Hanlon, 150 F.3d at 1020.  Class Counsel, Spector Roseman & Kodroff PC, Cohen Milstein

12   Sellers & Toll PLLC, and Lieff Cabraser Heimann & Bernstein LLP, are qualified and competent

13   and have extensive experience in these kinds of cases.  Kodroff Prelim. Approval Decl. (dkt. 166-

14   1) ¶ 28, Exs. K, L; Joint Decl. ¶ 64, Exs. D, E.  The Court has observed their vigorous and capable

15   advocacy since it took over this case.  The Court is not aware of any conflicts with the proposed

16   class, and finds that "each potential plaintiff has the same problem"—that Google allegedly

17   intercepted their payload data.  See Hanlon, 150 F.3d at 1021.

18        Objector Lowery argues that Plaintiffs cannot meet Rule 23(a)(4) and Rule 23(g)(4)

19   ("Class counsel must fairly and adequately represent the interests of the class"), because Class

20   Counsel is supposed to "maximize class recovery," and not sacrifice class recovery for counsel's

21   own "red carpet treatment on fees."  Lowery Obj. (dkt. 188) at 17.  He argues that "the cy pres-

22   only settlement combined with a sizable clear-sailing attorneys' fee, sizable incentive awards, and

23   a donation to a charity working class counsel,[4] combine to indicate inadequate representation."  Id.

24   at 18.  This argument fails because it assumes, wrongly, that the cy pres settlement is not a benefit

25   to the class, see Lane, 696 F.3d at 819 (explaining that cy pres remedy is one in which "class

26

27   _____

28   [4] It is unclear what this means; to the extent that Objector Lowery is objecting to the alleged
     relationship between the parties and the cy pres recipients, the Court has examined the
     relationships here and does not find them problematic.

members receive an indirect benefit (usually through defendant donations to a third party) rather than a direct monetary payment"); 4 Newberg on Class Actions § 12:32 (5th ed. 2019 update) ("by sending money to charities that work in the class's interest, it is arguably compensatory, albeit indirectly so.  The class benefits from a <u>cy pres</u> distribution as it realizes the gains that its charitable contribution can accomplish."), and because it assumes, wrongly, that the attorneys' fees in this case are some kind of windfall for Class Counsel, who are seeking a negative lodestar multiplier after spending nearly a decade on this case, <u>see</u> Fees Mot. (dkt. 185) at 17.  Plaintiffs have satisfied Rule 23(a)(4).

### B.    Rule 23(b) Requirements

Plaintiffs seek to certify the class under Rule 23(b)(3).  <u>See</u> Mot. at 17.  To be certified under Rule 23(b)(3), the proposed class must meet two requirements: (1) common questions of law and fact must predominate over individual claims, and (2) the litigation as a class action suit must be superior to other methods of resolving the controversy.  Fed. R. Civ. P. 23(b)(3).

Common questions of law and fact predominate over individual claims when the common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication. . . ."  <u>Hanlon</u>, 150 F.3d at 1022 (internal quotation marks omitted).  The predominance requirement is "readily met" where the class is a "cohesive group of individuals [who] suffered the same harm in the same way because of the [defendant's] conduct."  <u>In re Hyundai & Kia Fuel Economy Litig.</u>, 926 F.3d 539, 559 (9th Cir. 2019).  Here, Plaintiffs have alleged that Google's alleged collection of payload data by its Street View vehicles uniformly injured the class.  <u>See</u> Mot. at 11; CAC ¶ 126.  The central facts (what was Google's conduct, and was it intentional) and the key questions of law (did such conduct violate the ECPA) are common to the class.  Plaintiffs meet the predominance requirement.

In determining whether a class action is superior to other methods of resolving claims, courts consider whether the class action "will reduce litigation costs and promote greater efficiency."  <u>Valentino v. Carter-Wallace, Inc.</u>, 97 F.3d 1227, 1234 (9th Cir. 1996).  A class action is also superior to other methods when it is the only realistic method of adjudicating class members' claims.  <u>Id.</u> at 1234–35.  Here, because the proposed class likely includes sixty million

9

1    people, there is no realistic alternative to a class action.  In addition, because individual claims for

2    damages would likely be capped at $10,000, and might be zero, see 18 U.S.C. § 2520(c)(2);

3    Campbell v. Facebook, Inc., 315 F.R.D. 250, 268 (N.D. Cal. 2016) ("court 'may' award

4    damages"), class members might find the cost of litigating individual claims prohibitive.  See also

5    Local Joint Executive Bc. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d

6    1152, 1163 (9th Cir. 2001) (explaining that "the disparity between [class members'] litigation

7    costs and what they hope to recover" may favor consolidating individual claims in a class action).

8    Individual lawsuits also risk "the possibility of inconsistent rulings and results."  In re Volkswagen

9    "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig., MDL No. 2672 CRB (JSC), 2017

10   WL 672727, at *14 (N.D. Cal. Feb. 16, 2017).  For these reasons, the Court is inclined to conclude

11   that a class action is the superior method of resolving this controversy.

12       Objector Lowery, however, argues that "[i]f a settlement certification 'serves only as a

13   vehicle through which to extinguish the absent class members' claims without providing them any

14   relief' because it would be too impractical to distribute the settlement funds to class members, then

15   a class action is not a superior means to adjudicating this controversy."  Lowery Obj. at 19

16   (quoting Gaos, 139 S. Ct. at 1047 (Thomas, J., dissenting).  But the Court does not agree that this

17   settlement is only a vehicle for extinguishing class claims.  This settlement has yielded some

18   amount of injunctive relief as well as a meaningful settlement fund[5] that can benefit the class by

19   serving the class's interest in protecting internet privacy.  See Mot. at 3–4; Hughes v. Kore of

20   Indiana Enterprise, Inc., 731 F.3d 672, 676 (7th Cir. 2013) ("Payment of $10,000 to a charity

21   whose mission coincided with, or at least overlapped, the interest of the class (such as a

22   foundation concerned with consumer protection) would amplify the effect of the modest damages

23   in protecting consumers. A foundation that receives $10,000 can use the money to do something to

24   minimize violations of the Electronic Funds Transfer Act; as a practical matter, class members

25   each given $3.57 cannot.").  Objector Lowery's assertion that a class action is not superior because

26   absent class members receive no compensation, Lowery Obj. at 20, is unpersuasive given the

27

28   [5] Counsel for Lowery acknowledged at the motion hearing that he does not contest the adequacy
     of the $13 million fund.

United States District Court
Northern District of California

1    Circuit's approval of a cy-pres only settlement in <u>Lane</u>, 696 F.3d 811.  The Court therefore agrees

2    with <u>Google Referrer</u>, 869 F.3d at 742, which "easily reject[ed] Objectors' argument that if the

3    settlement fund <u>was</u> non-distributable, then a class action cannot be the superior means of

4    adjudicating this controversy under Rule 23(b)(3)."

5      The Court further rejects Objector Lowery's argument that, because there is no efficient

6    means of identifying class members, then the class cannot be certified.  Lowery Obj. at 20–21.

7    The Circuit in <u>Briseno v. ConAgra Foods, Inc.</u>, 844 F.3d 1121, 1133 (9th Cir. 2017), held that "the

8    language of Rule 23 neither provides nor implies that demonstrating an administratively feasible

9    way to identify class members is a prerequisite to class certification."  Moreover, <u>Briseno</u>

10   cautioned against a stand-alone ascertainability requirement, which "would often be outcome

11   determinative for cases like this one, in which administrative feasibility would be difficult to

12   demonstrate but in which there may be no realistic alternative to class treatment."  <u>Id.</u> at 1128.

13   The class here is ascertainable under the implied ascertainability requirement of Rule 23 because

14   its membership is defined objectively as "all persons who used a wireless network device from

15   which Acquired Payload Data was obtained," <u>see</u> Mot. at 3 (class definition), and because whether

16   a class member used such a device from which Google acquired Payload Data within the class

17   period is also an objective question.  The difficulty that any one individual would have in

18   demonstrating membership in the class, requiring a process akin to the three-year process

19   undertaken by the Special Master, is all the more reason that class treatment is superior to an

20   individual lawsuit, or a slew of individual lawsuits.  <u>See also</u> <u>Google Referrer</u>, 869 F.3d at 742

21   ("Not surprisingly, there is a relationship between the superiority requirement and the

22   appropriateness of a <u>cy pres</u>-only settlement.").

23     Because Plaintiffs' proposed class meets the requirements of Rule 23(a) and Rule 23(b)(3),

24   the Court CERTIFIES the classes for settlement purposes under Rule 23(b)(3).

25   **V.     APPOINTMENT OF CLASS COUNSEL**

26     The Court confirms its appointment of Spector Roseman & Kodroff, P.C. and Cohen

27   Milstein Sellers & Toll PLLC as Co-Lead Class Counsel for the class, and of Lieff Cabraser

28   Heimann & Bernstein LLP as Liaison Counsel for Class under Rule 23(g).

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.    ATTORNEYS' FEES AND EXPENSES

Plaintiffs move for attorneys' fees, litigation expenses, and service awards.  See Fees Mot. (dkt. 185).  They seek out of the Settlement Fund (A) attorneys' fees amounting to 25% of the $13,000,000 Settlement Fund ($3,250,000), (B) $750,000 in litigation expenses, and (C) Service Awards totaling $91,500 for twenty-one Class Representatives.  Id. at 1.  The Court has carefully considered the filings in connection with this motion, as well as the record in this matter, and it GRANTS the motion, as modified herein.

### A.    Attorneys' Fees

The Court finds that Class Counsel are entitled to reasonable attorneys' fees pursuant to the common fund doctrine, In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F. 3d 1291, 1300 (9th Cir. 1994), and under the fee-shifting provision for a prevailing party under the ECPA, 18 U.S.C. § 2520(b)(3); see also Barrios v. Cal. Interscholastic Fed'n, 277 F.3d 1128, 1134 (9th Cir. 2002) (quoting Fischer v. SJB–P.D. Inc., 214 F.3d 1115, 1118 (9th Cir. 2000)) ("[A] plaintiff 'prevails' when he or she enters into a legally enforceable settlement agreement against the defendant . . . [such that] 'the plaintiff can force the defendant to do something he otherwise would not have to do.'").

The Court finds that the percentage-of-recovery method of determining reasonable attorneys' fees is appropriate here, as the settlement creates a common fund.  The Court exercises its discretion to analyze the fee request using that method.  See In re Hyundai, 926 F.3d at 570; Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002); In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 942 (9th Cir. 2011).  The Court will also conduct a lodestar-based analysis as a cross-check on the reasonableness of the requested fee.  See In re Lithium Ion Batteries Antitrust Litig., No. 4:13-md-02420-YGR (MDL), 2019 WL 3856413, at *7 (N.D. Cal. Aug. 16, 2019).

The Court recognizes that in the Ninth Circuit, the "benchmark" fee award is 25%, which can be adjusted upward or downward based on the circumstances of the case.  Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989).  Class Counsel request fees of 25%.  See generally Fees Mot.  While the Court finds Class Counsel's fee request of 25% entirely

United States District Court
Northern District of California

reasonable in terms of the non-exhaustive factors set forth in Vizcaino, 290 F.3d 1043, discussed below, the Court parts ways with Class Counsel in one respect.  This Court does not calculate the 25% fee award based on the gross settlement fund of $13 million, but the net fund, after subtracting the litigation and Service Awards.

It is not an abuse of discretion to calculate fees based on the gross fund.  See Powers v. Eichen, 229 F.3d 1249, 1258 (9th Cir. 2000) ("choice of whether to base an attorneys' fee award on either net or gross recovery should not make a difference so long as the end result is reasonable").  But the Court is not required to use the gross, and has a longstanding preference for using the net.  See also Redman v. Radioshack Corp., 768 F.3d 622, 633 (7th Cir. 2014) ("the central consideration is what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation"); In re Wells Fargo Secs. Litig., 157 F.R.D. 467, 471 (N.D. Cal. 1994) ("If an attorney risks losing some portion of his fee award for each additional dollar in expenses he incurs, the attorney is sure to minimize expenses"); Miles v. AlliedBarton Security Svcs., LLC, No. 12–5761 JD, 2014 WL 6065602, at *5 (N.D. Cal. Nov. 12, 2014) ("the fees paid to the settlement administrator—do[] not constitute a benefit to the class members").  Twenty-five percent of the net is entirely appropriate, as none of the Vizcaino factors warrant a downward adjustment from the benchmark.

First, the overall result and benefit to the class from the litigation supports the requested percentage.  The monetary component of the settlement benefits the class members by serving the goals of this litigation and the ECPA.  The injunctive relief component is modest but nonetheless works a benefit, reducing the chance that similar invasions of the class's privacy recur, and helping Class Members protect against future privacy violations.[6]

---

[6] The Court hereby rejects Objector Lowery's hyperbolic argument that because the cy pres does not benefit the class, the appropriate fee award is zero.  See Lowery Obj. at 22.  The Court further rejects his argument that in calculating attorneys' fees, the Court should discount the Settlement Fund to reflect that the money is going to cy pres organizations rather than to class members.  Id. at 24 ("If this Court endorses a rule that makes class counsel financially indifferent between a settlement that awards cash directly to class members and a cy pres-only settlement, the parties will always agree to the cy pres arrangement and unnamed class members will be permanently left out in the cold.").  Currently, cy pres-only settlements are permissible in the Ninth Circuit.  See Lane, 696 F.3d 811.  That has not meant that every class action settlement has resulted in a cy-pres only settlement.  This Court would not find a cy pres-only settlement fair, reasonable, and

United States District Court
Northern District of California

Second, this case required skill and expertise, which Class Counsel amply demonstrated over nearly ten years of work.  The case involved novel issues, including whether the ECPA applied to wireless networks that the owners had failed to encrypt.  Class Counsel represented the class well, advocating on behalf of consumers' right to privacy in their wireless network communications, taking on a multinational corporation, and ultimately resolving the case favorably to the class.

Third, this was a risky case.  It was uncertain whether Google's conduct violated the ECPA, whether data transmitted over unencrypted wireless networks is "readily accessible to the general public," and whether, even if Plaintiffs won, the Court would exercise its discretion under the ECPA by awarding full statutory damages per class member, or no statutory damages at all. See Campbell, 315 F.R.D. at 268.  This case was made more challenging because of, among other things, the standing issue raised in Spokeo and Gaos; the immense class size but the minimal damages each class member suffered; the technical challenges involved in demonstrating that any one individual class member's privacy was violated; and, arguably, the AVC, which in 2013 granted significant injunctive relief but also stated that "[t]he Payload Data collection occurred without the knowledge of Google executives."  See Pltf. Resp. (dkt. 199) at 4.  Class Counsel devoted substantial time to the case—over 8,000 hours—on a purely contingent basis.  Joint Decl. ¶¶ 3, 40.  There was no guarantee that Plaintiffs' claims would survive a motion to dismiss and subsequent appeals, or that the class would see substantial damages.

The Court has also conducted a lodestar-based analysis, and finds that the requested percent is reasonable under the lodestar approach.  See Vizcaino, 290 F.3d at 1050.

Class Counsel's billing summaries comply with this Court's guidelines for class action attorneys' fees requests and contain sufficient detail for the Court to conduct a lodestar-based assessment of the fee request.  These summaries show that Class Counsel's lodestar for work on this case through October 31, 2019 is $5,469,030.20, representing 8,083.2 hours of attorney and

---

adequate in many circumstances.  But where the settlement fund is non-distributable, counsel should not be penalized for fashioning a cy pres-only settlement that stands to accomplish some good.

staff time, and representing a negative multiplier of 0.59 on Class Counsel's actual fee request.  A

negative lodestar multiplier "strongly suggests the reasonableness" of the requested fee.  See

Rosado v. Ebay Inc., No. 12-04005-EJD, 2016 WL 3401987, at *8 (N.D. Cal. June 21, 2016)

(collecting cases).

The Court finds that the hours and rates that Class Counsel used to calculate the lodestar

are also reasonable.  First, the Court finds that the time Class Counsel spent on the case was

reasonable.  Class Counsel devoted more than nine years to this challenging litigation, which

involved novel facts and legal issues.  Class Counsel have also attested that they reviewed the

hours expended in this action, and that the lodestar submitted to the Court excludes time that was

removed in the exercise of billing discretion.  Second, the Court finds that the rates Class Counsel

used to calculate their lodestar are reasonable.  The rates of all three Class Counsel firms are

supported by a description of the qualifications of the attorneys and staff who worked on this case.

Moreover, each firm's standard billing have been approved multiple times in this District.

The Court leaves it to Co-Lead Class Counsel, in the first instance, to allocate appropriate

amounts of the attorneys' fees awarded to Class Counsel both among Class Counsel and among

the additional law firms that have reported time in this MDL to Co-Lead Class Counsel.  If there

are disagreements among Counsel, the Court will determine whether Co-Lead Class Counsel's

allocation is reasonable.

For the reasons discussed above, the Court concludes that the requested percentage is

reasonable, and the Court GRANTS attorneys' fees as calculated below.

## B.   Expenses

The Court finds that Class Counsel are entitled to the reimbursement of reasonable

litigation expenses under the common fund doctrine and the ECPA.  See Paul, Johnson, Alston &

Hunt, 886 F.2d at 271; 18 U.S.C. § 2520(b)(3).  The Court finds that the expenses incurred in this

litigation (dominated by the cost of the Special Master) were necessary to the effective

representation of the class and would normally be charged to a fee-paying client.

The Court therefore GRANTS Plaintiffs' motion for litigation expenses in the amount of

$750,000.

United States District Court
Northern District of California

## C.   Service Awards

The Court finds that the requested service awards for Named Plaintiffs are reasonable and appropriate.  Such awards are "intended to compensate class representatives for work done on behalf of the class [and] make up for financial or reputational risk undertaken in bringing the action."  Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 958 (9th Cir. 2009); Van Vranken v. Atl. Ritchfield Co., 901 F. Supp. 294, 299–300 (N.D. Cal. 1995).  "The Ninth Circuit has repeatedly held that $5,000 is a reasonable amount for an incentive award."  Congdon v. Uber Techs., Inc., No. 16-02499, 2019 WL 2327922, at *9 (N.D. Cal. May 31, 2019) (collecting cases).

All of the plaintiffs named as class representatives have expended substantial time and effort in assisting Class Counsel with the prosecution of the class's claims.  The eighteen plaintiffs for whom $5,000 service awards are requested undertook additional burdens by providing evidence and personal information to the Special Master for the jurisdictional discovery in this action.  This level of time and effort justifies a service award of $5,000.  The Court also finds that the request for Service Awards of $500 for the three named plaintiffs who did not participate in jurisdictional discovery is reasonable.

The Court also finds that the total amount requested for service awards ($91,500) compares favorably to the size of the Settlement Fund.

For the reasons discussed above, the Court concludes that the requested service awards are reasonable, and GRANTS the requested service awards.

## D.   Calculation of Fees

The Court calculates attorneys' fees based on a percentage of the net Settlement Fund.  That represents the Settlement Fund of $13,000,000, minus expenses of $750,000, minus service awards of $91,500—a net of $12,158,500—to which Class Counsel is entitled to 25%, or $3,039,625.  The Court therefore GRANTS Fees to Class Counsel in the amount of $3,039,625.

## VII.   FINAL APPROVAL OF SETTLEMENT AS FAIR, REASONABLE, AND ADEQUATE

Under Federal Rule of Civil Procedure 23(e)(2), the Court may approve the settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. Proc. 23(e)(2).  The Court is to consider

16

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Hanlon, 150 F.3d at 1026.  The Court has considered these items.  Where the settlement takes place before class certification, settlement approval requires an even "higher standard of fairness" in order to protect unnamed plaintiffs.  See Lane, 696 F.3d at 819.  However, the Court's role is not to determine "whether the settlement is perfect in [its] estimation"—but to determine if it is fair.  Id. (citing Hanlon, 150 F.3d at 1027).

### A.    Adequate Representation

Rule 23(e)(2)(A) requires the Court to consider whether "the class representatives and class counsel have adequately represented the class."  As the Court explained above, Plaintiffs have vigorously represented the class, providing information and evidence such as their electronic devices.  Counsel are experienced class action litigators.  They spent thousands of hours on motion practice and discovery, which enabled them to assess the benefits of settlement relative to the risks of further litigation.  The views of counsel favor final approval here.  See In re Bluetooth, 654 F.3d at 946.

### B.    Arm's Length Negotiation

Rule 23(e)(2)(B) requires the Court to consider whether "the proposal was negotiated at arm's length."  Counsel declare that it was.  See Joint Decl. ¶ 21.  Counsel also acknowledge that a cy pres-only recovery "may 'present a particular danger' that 'incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of negotiations."  Mot. at 15 (quoting Lane, 696 F.3d at 833 (Kleinfeld, J., dissenting)).  The Court is nonetheless satisfied that the settlement was negotiated at arm's length.  First, the settlement represents a substantial recovery for the class.  The cy pres mechanism is appropriate in light of the difficulty and expense of identifying Class Members, the minimal harm suffered by each Class Member, and the very low percentage of the Settlement Fund that any one Class Member could recover in light of the

1   massive class size.  Second, it is a sign of collusion if "counsel receive a disproportionate

2   distribution of the settlement," see In re Bluetooth, 654 F.3d at 947, but as discussed above, the

3   25% fees sought are reasonable.  The Settlement Agreement leaves the fees and service awards to

4   the discretion of the Court, and none of the funds will revert to Google.  See Agreement ¶¶ 16, 24,

5   53.  Finally, the parties agreed upon a settlement after years of litigation and five months of

6   settlement negotiations.  The parties reached their agreement in principle in a mediation, with full

7   briefing, and with the assistance of an experienced and respected mediator.  See Joint Decl. ¶ 20.

8   **C.   Adequate Relief**

9   Rule 23(e)(2)(C) requires the Court to consider whether "the relief provided for the class is

10  adequate" in light of four enumerated factors.  The first factor is the "costs, risks and delay of trial

11  and appeal."  Fed. R. Civ. Proc. 23(e)(2)(C)(i).  As discussed above, this case was risky because it

12  remained unresolved whether Google's conduct violated the ECPA, whether Plaintiffs' data was

13  "readily accessible to the general public," and whether, even if Plaintiffs won, the Court would

14  award statutory damages.  Further litigation would add years to a case that had already proceeded

15  for almost a decade, with an uncertain outcome.  Moreover, every year that passes makes it

16  increasingly likely that class members would replace and dispose of the Wi-Fi routers they used

17  between 2007 and 2010, which are critical to demonstrating that Google actually intercepted their

18  data.  The third factor is the terms of attorneys' fees, which the Court has already concluded are

19  reasonable.  See Fed. R. Civ. Proc. 23(e)(2)(C)(iii).  The fourth factor requires the Court to

20  consider related agreements pursuant to Rule 23(e)(3); there are none here.  See Fed. R. Civ. Proc.

21  23(e)(2)(C)(iv).  The second factor, of great significance here, is whether the relief is adequate in

22  light of "the effectiveness of distributing relief to the class, including the method of processing

23  class-member claims."  Fed. R. Civ. P. 23(e)(2)(C)(ii).

24  **1.   Non-Distributable Settlement Fund**

25  Plaintiffs argue that the relief is adequate, and that the proposed cy pres awards are the

26  most efficient way to benefit the class, because the Settlement Fund is non-distributable.  Mot. at

27  18–21.  Indeed, the Ninth Circuit recognizes that some settlement funds are "non-distributable,"

28  explaining that "[f]or purposes of the cy pres doctrine, a class-action settlement fund is 'non-

United States District Court
Northern District of California

United States District Court
Northern District of California

distributable' when 'the proof of individual claims would be burdensome or distribution of damages costly.'" Lane, 696 F.3d at 819 (quoting Nachshin v. AOL, LLC, 663 F.3d 1034, 1036 (9th Cir. 2011)); see also Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1305 (9th Cir. 1990) (cy pres distribution "frequently approved" "where the proof of individual claims would be burdensome or distribution of damages costly."). Given the 60 million person class size and the $13 million Settlement Fund, "the settlement would provide only an estimated $0.22 per class member even absent any attorneys' fees, expenses, or even mailing costs." Reply (dkt. 198) at 2. Moreover, it is unusually difficult and expensive to identify class members in this case, as discussed below. This appears, therefore, a prime example of a non-distributable Settlement Fund.

Objector Lowery disagrees. First, he argues that "[c]y pres is improper when it is feasible to make distributions to class members." Lowery Obj. at 7. He maintained at the motion hearing that "courts have distributed less than twenty cents" per class member in the past. When the Court commented that "it's been done before" was not a compelling argument, Objector Lowery shifted to an alternative position: that it would not really be a twenty-two cent distribution, because less than 1% of the class would make claims. See also Lowery Obj. at 8 (noting that "[a] well-respected settlement administration company conducted a wide-ranging survey that concluded 'settlements with little or no direct mail notice will almost always have a claims rate of less than one percent (1%).'"). Given a 1% claims rate, approximately 600,000 class members would divide up the Settlement Fund (here, the initial Settlement Fund of $13,000,000, minus the $3,881,125 the Court is awarding in fees, expenses, and service awards, or $9,118,875), yielding about $15 per class member, not calculating the costs of administering payments to those 600,000 class members. At the motion hearing, Amicus Arizona Attorney General's Office made a similar point with slightly different math, asserting that even if two million class members got about five dollars each, it would be a meaningful award, because everyone would have had a chance to file a claim.

Plaintiffs are quick to point out that the Circuit does not calculate feasibility based on whether some money can be paid to some small fraction of the class, but whether it is feasible to

distribute the fund to the class <u>as a whole</u>.  Indeed, in <u>Google Referrer</u>, 869 F.3d at 742, the Circuit explained:

> In <u>Lane</u>, we deemed direct monetary payments "infeasible" where each class member's individual recovery would have been "<u>de minimis</u>" because the remaining settlement fund was approximately $6.5 million and there were over 3.6 million class members.  <u>Id.</u> at 817–18, 820–21.  The gap between the fund and a miniscule award is even more dramatic here.  The remaining settlement fund was approximately $5.3 million, but there were an estimated 129 million class members, so each class member was entitled to a paltry 4 cents in recovery—a <u>de minimis</u> amount if ever there was one.

The court did not calculate feasibility based on the likely number of class members to file claims.

<u>See also</u> <u>In re Netflix Privacy Litig.</u>, No. 5:11-cv-00379 EJD, 2013 U.S. Dist. LEXIS 37286, at

*19–20 (N.D. Cal. 2013) (relying on <u>Lane</u>, concluding where settlement fund was $9 million and

class size was over 62 million people that "each Class member would receive a <u>de minimus</u>

payment," which "would likely prove to be nullified by distribution costs.").

      Plaintiffs also dispute that a claims-made process would work.  Lowery argues that class

members can self-identify in order to claim settlement funds.  <u>See</u> Lowery Obj. at 6–7, 8–9.  He

asserts that, in order to assert their own standing, Plaintiffs do not rely on the Special Master's

report at all but rely solely on the complaint's allegations.  <u>Id.</u> at 8.  And he contends that "[a]ll

absent class members who can, like Lowery, aver the same facts as the named plaintiffs should be

permitted to self-identify and file a claim for a portion of the settlement fund on that basis."  <u>Id.</u> at

9.  But Plaintiffs argue that "The only way to identify prospective Class Members would involve

combing through nearly 300 million frames of collected payload data and trying to associate it

with individual Class Members."  Mot. at 19.  Indeed, Plaintiffs detailed—and the Court observed

firsthand—the painstaking, three-year process that the Special Master undertook just as to

eighteen named plaintiffs.  <u>See id.</u> at 2–3.  At the motion hearing, the parties shed further light on

the question of self-identifying.  The problem is that unlike a case in which a class member could

self-identify as having bought, for example, a particular brand of cereal during the class period, no

member of the class here can know whether Google intercepted his or her data.  The only evidence

is the intercepted data, and that evidence is not in the class member's possession.  While it is in

Google's possession, making sense of it requires a lengthy process, akin to the Special Master's

United States District Court
Northern District of California

process, and it requires class members to have retained possession of the Wi-Fi router they used between 2007 and 2010.  As Google put it at the hearing, the only way to make a claims process administratively feasible is to allow people to self-identify who cannot really know if they are able to self-identify.

Even assuming that a self-identifying claim process would work, Plaintiffs argue that it is not necessarily desirable.  The Court agrees.  A settlement that benefits 1% of the class, and that has no benefit to 99% of the class, is not so obviously superior to a cy pres-only settlement that the Court must reject this settlement as unfair.  See Google Referrer, 869 F.3d at 742 ("Objectors . . . ask us to impose a mechanism that would permit a miniscule portion of the class to receive direct payments, eschewing a class settlement that benefits members through programs on privacy and data protection instituted by the cy pres recipients.").[7]  Class Counsel have an obligation to the class as a whole—not just to the 1% of the class that is able to file a claim.  See Rodriguez v. West Publ'g Corp., 563 F.3d 948, 968 (9th Cir. 2009) ("class counsel's fiduciary duty is to the class as a whole").  A settlement that would leave 99% of the class with no benefit from the Settlement Fund is a rather unsatisfying settlement.  Moreover, there is something perverse in asking Class Counsel to reach a settlement that only works if there is a small claims rate.  Cf. Roes, 1–2 v. SFBSC Mgmt., LLC, 944 F.3d 1035, 1058 (9th Cir. 2019) (noting, regarding a reversionary clause, that there was a "perverse incentive[]" "to ensure as low a claims rate as possible").  "That a high claims rate, ordinarily a measure of success, would diminish the success of Lowery's plan suggests it is a bad plan."  Reply at 6.

The cy pres award, on the other hand, is a reasonable alternative in light of the infeasibility of making direct payments to every class member.  See Lane, 696 F.3d at 819.[8]  The cy-pres

---

[7] Interestingly, in his brief before the Supreme Court in Frank v Gaos, counsel for Lowery characterized claims-made settlements in which only 1% of class members file claims and "most class members go totally uncompensated because they don't file a claim" as an option that "create[s] an illusion of relief."  See Brief for Petitioners in Frank v. Gaos, 2018 WL 3374998, at *25–28 (U.S. July 9, 2018) (Appellate Brief).  That hypothetical also involved unclaimed funds reverting to the defendant, which Frank is not advocating here.  But his observation that "most class members go totally uncompensated" applies in either instance.

[8] This is the Court's answer to Objector David Franco, who argues that the cy pres recipients "should not receive a single penny" and that "[t]he funds should only go directly to the individuals that were directly affected."  See Franco Obj. (dkt. 192).

United States District Court
Northern District of California

1   award "'put[s] the unclaimed fund to its next best compensation use, e.g., for the aggregate,

2   indirect, prospective benefit of the class.'"  Nachshin, 663 F.3d at 1038 (quoting Masters v.

3   Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007)).  "[L]arge multimillion dollar

4   contributions to charities related to the plaintiffs' causes of action arguably do more good for the

5   plaintiffs than would a miniscule sum of money distributed directly to them."  Newberg § 12:26.

6   The cy pres recipients here are some of the most effective advocates for internet privacy in the

7   country; the award would increase the funding for their work and likely yield actual improvements

8   to internet privacy.  See Hughes, 731 F.3d at 676 ("A foundation that receives $10,000 can use the

9   money to do something to minimize violations of the Electronic Funds Transfer Act; as a practical

10  matter, class members each given $3.57 cannot.").

11         The Court is of course aware that the Supreme Court has expressed interest in the issue of

12  cy pres-only settlements, and might soon provide further guidance to the lower courts.  See, e.g.,

13  Gaos, 139 S. Ct. at 1043 ("We granted certiorari to review whether such cy pres settlements

14  satisfy the requirement that class settlements be 'fair, reasonable, and adequate.'"  Fed. Rule Civ.

15  Proc. 23(e)(2).");  Marek v. Lane, 134 S. Ct. 8, 9 (2013) (Roberts, J., statement respecting denial of

16  cert.) ("Granting review of this case might not have afforded the Court an opportunity to address

17  more fundamental concerns surrounding the use of such remedies in class action litigation,

18  including when, if ever, such relief should be considered.").  But as of today, the Court is aware of

19  no controlling authority holding that settlements providing direct payments to class members are

20  always preferable to cy pres-only settlements.  Indeed, controlling authority holds to the contrary.

21  See, e.g., Lane, 696 F.3d at 819–25 (holding that cy pres-only settlement was fundamentally fair)[9];

22  Nachshin, 663 F.3d at 1038 ("We have recognized that federal courts frequently use the cy pres

23  doctrine 'in the settlement of class actions where the proof of individual claims would be

24  burdensome or distribution of damages costly.'").  See also In re Google Cookie Placement

25  Consumer Privacy Litig., 934 F.3d 316, 327–28 (3d Cir. 2019) (rejecting proposition that "cy pres

26

27  ───────────────
    [9] See also Google Referrer, 869 F.3d at 742 ("Objectors would have us jettison the teachings of
28  Lane.  Objectors would also have us ignore our prior endorsement of cy pres awards that go to
    uses consistent with the nature of the underlying action.") (citing Nachshin, 663 F.3d at 1039–40).

United States District Court
Northern District of California

United States District Court
Northern District of California

awards should never be preferred over direct distributions to class members.").

Objector Lowery points to cases in which courts have required the parties to re-work their settlements in order to incorporate a direct payment component.  See Lowery Obj. at 7–8.  But the Court is unconvinced that it is necessary to do so here, or that doing so would enhance the overall fairness of the settlement.  Objector Lowery touts the outcome in Fraley v. Facebook, Inc., 966 F. Supp. 2d 939, 943 (N.D. Cal. 2013), see Lowery Obj. at 7, where Judge Seeborg initially rejected a cy pres-only settlement and later approved a settlement that distributed some funds directly to class members and sent the remainder to cy pres.  But in that case, "so few persons . . . filed claims" that each class member received $15, prompting the court to remark that "In a sense, adding a direct payment component to the settlement[] did very little to buttress its overall fairness."  Fraley, 966 F. Supp. 2d at 943.  Nor does the Court accept that a lottery system, see Lowery Obj. at 10, is any more fair or necessary.

Accordingly, the Court concludes that the Settlement Fund is non-distributable, and that the cy pres-only award is adequate in this case.  See Fed. R. Civ. P. 23(e)(2)(C)(ii).[10]

## 2.    Injunctive Relief

The injunctive relief is also adequate, if not the main benefit to the class.  The Settlement requires Google to destroy acquired Payload Data within 45 days (subject to preservation obligations to Excluded Class Members).  See Agreement at ¶ 33.  While the Court observed at the motion hearing that Google cannot destroy the data twice (and had already committed to destroying it in the AVC), Google made the valid point that this settlement pertains to conduct from 2007 to 2010, that the conduct has ceased, and that the AVC was in 2013—so the idea that there is a lot more that can be done in terms of retroactive injunctive relief is flawed.

The Settlement Agreement more meaningfully provides that Google will "not collect and store for use in any product or service Payload Data via Street View vehicles, except with notice

---

[10] The Court rejects Objector Lowery's additional argument that the cy pres award is compelled speech in violation of the First Amendment.  See Lowery Obj. at 12–14.  The settlement agreement between the parties is not state action, see In re Motor Fuel Temp. Sales Practices Litig., 872 F.3d 1094, 1113–14 (10th Cir. 2017), and class members had the opportunity to exclude themselves from the settlement, see Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811–12 (1985).

and consent" and will comply with the privacy program and other parts of the AVC.  Id. at ¶¶ 34–

35.  The Settlement Agreement extends Google's compliance with the AVC by about two years.

Joint Decl. Ex. F ¶¶ II-2.  Plaintiffs' counsel explained at the motion hearing that the AVC

terminates in 2023; this settlement is for five years, and so if it begins this year, it would run

through 2025, and if there is an appeal, it could extend longer.  Google will also "host and

maintain educational webpages that instruct users on the configuration of wireless security modes

and the value of encrypting a wireless network."  Agreement ¶¶ 36–37.  Google asserted at the

hearing that there are changes to the website that it would not have made without the settlement.

It also noted that there were meaningful changes to the disclosures.  Plaintiffs' counsel added that

Google committed in the Settlement to reporting to Plaintiffs on a yearly basis, and that the Court

maintains jurisdiction over the injunctive relief to make sure it is complied with.

While Amicus Arizona Attorney General's Office is probably correct that the injunctive

relief is not as significant in 2020 as it would have been in 2013 (given consumers' sophistication

about privacy issues), that does not mean that the relief does not have some value to the class, and

the rest of the public, now.  See Campbell, slip op. at *11 ("a year-long requirement to make [a

disclosure on Facebook's Help Center page] has value: it provides information to users about

Facebook's message monitoring practices, making it less likely that users will unwittingly divulge

private information to Facebook or third parties in the course of using Facebook's messaging

platform.").  Accordingly, the Court finds that the injunctive relief in the Settlement is adequate.

See Fed. R. Civ. P. 23(e)(2)(C)(ii).

### D.     Class Members Treated Equitably

Rule 23(e)(2)(D) requires the Court to consider whether "the proposal treats class members

equitably relative to each other."  The class consists of individuals who are similarly situated as to

their claims, their potential recoveries, and the difficulties they would face in establishing their

membership in the class.  They each receive identical injunctive relief and enjoy the benefits

conferred by the cy pres recipients in furthering their interest in protecting internet privacy.

### E.     Nexus Requirement

The Court finds and concludes that the cy pres distributions ordered herein are tethered to

1    the nature of the lawsuit, the objectives of the Wiretap Act, and the interests of absent Class

2    Members.  The cy pres distributions are limited to independent organizations with a track record

3    of addressing consumer privacy concerns, who will commit to use the funds to promote the

4    protection of Internet privacy.  See Agreement at ¶¶ 29–30.  The awards ordered below serve the

5    compensatory and deterrent goals of the Wiretap Act better than any available alternative method

6    of redress for Class Members.

7           The Court has scrutinized the Settlement closely for signs that the selection of cy pres

8    recipients may "answer to the whims and self-interests of the parties, their counsel, or the court."

9    See Nachshin, 663 F.3d at 1039.  The Court finds no relationship between proposed recipients and

10   Class Counsel, Google, or the Court that undermines the fairness of the Settlement to Class

11   Members.[11]

12          Further, the Court has reviewed the proposals submitted by the proposed cy pres recipients,

13   as well as the applications of the Electronic Privacy Information Center ("EPIC"), and finds that

14   the awards to the recipients are appropriate and will best serve the objectives of the Wiretap Act

15   and the interests of Absent Class Members.  Accordingly, the Court awards that the net Settlement

16   Fund be divided equally[12] between: (1) Center on Privacy & Technology at Georgetown Law; (2)

17   Center for Digital Democracy; (3) MIT Internet Policy Research Initiative; (4) World Privacy

18   Forum; (5) Public Knowledge; (6) American Civil Liberties Union Foundation; (7) Consumer

19   Reports; (8) EPIC[13]; and (9) Rose Foundation for Communities and the Environment.

20          **F.      Reaction of Class Members**

21          In addition to the enumerated fairness factors of Rule 23(e)(2), courts within the Ninth

22   Circuit typically consider "the reaction of the class members [to] the proposed settlement."  See In

23

---

24   [11] Moreover, the organizations present fewer ethical hurdles than the organization approved in
25   Lane.  See Lane, 696 F.3d at 817 (cy pres award went to defendant Facebook "to set up a new
     charity organization"), 821 ("That Facebook retained and will use its say in how cy pres funds will
26   be distributed so as to ensure that the funds will not be used in a way that harms Facebook is the
     unremarkable result of the parties' give-and-take negotiations.").
27   [12] The equal distribution of the funds differs from the awards proposed in Plaintiffs' Motion.  See
     Mot. at 6.
28   [13] The proposal to add EPIC was posted on the Settlement Website.  See Young Decl. (dkt. 184-1)
     ¶ 6.  EPIC was also included in the long form notice.  See id. Ex. 1.

United States District Court
Northern District of California

re Bluetooth, 654 F.3d at 946.  Here, following an extensive notice program, only one potential class member asked to be excluded from the settlement, see Young Decl. ¶¶ 11–12, and two have objected, see Lowery Obj.; Franco Obj.  This reaction strongly favors approval of the settlement.

## VIII.   NOTICE

The Court finds that the forms, content, and methods of disseminating notice to the class Members previously approved and directed by the Court have been implemented by the Parties and (1) comply with Rule 23(c)(2) of the Federal Rules of Civil Procedure as they are the best practicable notice under the circumstances and are reasonably calculated, under all the circumstances, to apprise the Class Members of the pendency of this Action, the terms of the Settlement, and their right to object to the settlement; (2) comply with Rule 23(e) as they are reasonably calculated, under the circumstances, to apprise the Class Members of the pendency of the Action, the terms of the proposed settlement, and their rights under the proposed settlement, including, but not limited to, their right to object to, or opt out of, the proposed Settlement and other rights under the terms of the Settlement Agreement; (3) comply with Rule 23(h) as they are reasonably calculated, under the circumstances, to apprise the Class Members of any motion by Class Counsel for reasonable attorney's fees and nontaxable costs, and their right to object to any such motion; (4) constitute due, adequate, and sufficient notice to all Class Members and other persons entitled to receive notice; and (5) meet all applicable requirements of law, including, but not limited to, 28 U.S.C. § 1715, Fed. R. Civ. P. 23(c), (e), and (h), and the Due Process Clause of the United States Constitution.

The Court finds that Google properly notified the appropriate state and federal officials of the Settlement, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715.

## IX.   CONSUMMATION OF THE SETTLEMENT

Accordingly, the Court directs the Parties to consummate the Settlement according to its terms, as follows:

### A.   Injunctive Relief

Pursuant to the Settlement, Google shall destroy, if it has not already done so, all Acquired Payload Data, including the disks containing such data, within forty-five (45) days of this Order,

United States District Court
Northern District of California

United States District Court
Northern District of California

1  subject to any preservation obligations Google may have with respect to any Excluded Class

2  Member.  Google shall report via counsel to Class Counsel upon the expiration of the forty-five

3  (45) days whether it has destroyed the Acquired Payload Data.  If Google does not destroy the

4  Acquired Payload Data within the forty-fine (45) days because of ongoing preservation

5  obligations, it will report this to Class Counsel.  When the Acquired Payload Data are destroyed,

6  Google will report via counsel the fact of destruction to Class Counsel.

7        Pursuant to the Settlement, Google shall not collect and store for use in any product or

8  service Payload Data via Street View Vehicles, except with notice and consent.

9        Pursuant to the Settlement, Google shall comply with all aspects of the Privacy Program

10 described in Paragraph 16 of Section I of the AVC and with the prohibitive and affirmative

11 conduct described in Paragraphs 1 through 5 of the AVC.  Through counsel, Google shall confirm

12 to Class Counsel, in writing and on an annual basis, that it remains in compliance.

13       Pursuant to the Settlement, Google shall host and maintain educational webpages that

14 instruct users on the configuration of wireless security modes and the value of encrypting a

15 wireless network, including a how-to video demonstrating how users can encrypt their networks

16 and instructions on how to remove a wireless network from inclusion in Google's location

17 services.

18       Google's Injunctive Relief obligations shall terminate five years after the date of Final

19 Approval of this Settlement (as defined in the Settlement Agreement ¶ 14).

20       **B.**    **Cy Pres Distribution**

21       Pursuant to the Settlement, Class Counsel shall direct equal distributions from the Escrow

22 Account (as defined in the Settlement Agreement) to the cy pres recipients identified herein.  The

23 Court approves and orders such distributions.  The Escrow Agent shall arrange such distributions

24 according to Class Counsel's instructions.

25 **X.**    **RELEASE OF CLAIMS**

26       The Parties and Class Members are bound by the terms and conditions of the Settlement.

27 As of the date of Final Approval of this Settlement (as defined in the Settlement Agreement ¶ 14),

28 Releasors shall be deemed to have fully, finally, and forever released and discharged Releasees

from the Released Claims, as those terms are defined in the Settlement Agreement.  The full terms of the release described in this paragraph are set forth in Paragraphs 46 through 48 of the Agreement.  The Court expressly adopts and incorporates by reference Paragraphs 46 through 48 of the Agreement.

The parties are to bear their own costs, except as awarded by this Court in this Final Order.

The benefits described above are the only consideration Google shall be obligated to give to the Class Members, with the exception of the service awards to be paid to the Class Representatives as directed by the Court.

The Court reserves the exclusive and continuing jurisdiction over the Action, the Class Representatives, the Class Members, and Google for the purposes of supervising the implementation, enforcement, construction, administration and consummation of the Settlement Agreement and this Judgment.

## XI.    FINAL JUDGMENT AND DISMISSAL WITH PREJUDICE

By operation of this Order, this Action is hereby dismissed with prejudice.  Under Rule 54(b) of the Federal Rules of Civil Procedure, no just reason exists for delay in entering final judgment.  The Court accordingly directs the Clerk to enter final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**

Dated: March 18, 2020

_____
CHARLES R. BREYER
United States District Judge